ACCEPTED
03-15-00085-CV
5176028
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/6/2015 2:03:07 PM
JEFFREY D. KYLE
CLERK

# No. 03-15-00085-CV

_____

## In the Third Court of Appeals
## Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/6/2015 2:03:07 PM
JEFFREY D. KYLE
Clerk

_____

## Michael J. DeLitta and DelCom Properties, LLC,
### *Appellants,*

### *v.*

## Nancy Schaefer,
### *Appellee.*

_____

## BRIEF OF APPELLEE

_____

Donald R. Taylor
  State Bar No. 19688800
  dtaylor@taylordunham.com
Stacey Reese (Of Counsel)
  State Bar No. 24056188
  stacey@reeselawpractice.com
TAYLOR DUNHAM & RODRIGUEZ LLP
301 Congress Avenue, Suite 1050
Austin, Texas 78701
(512) 473-2257
(512) 478-4409 (fax)

Lisa Bowlin Hobbs
  State Bar No. 24026905
  Lisa@KuhnHobbs.com
Kurt Kuhn
  State Bar No. 24002433
  Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, Suite 310
Austin, Texas 78731
(512) 476-6003
(512) 476-6002 (fax)

Howard F. Carter, Jr.,
  State Bar No. 03916500
  sam@scarterlawfirm.com
HOWARD F. CARTER, JR., P.C.
5600 Tennyson Parkway, Suite 160
Plano, Texas 75024
(972) 455-2001
(972) 455-2015 (fax)

COUNSEL FOR APPELLEE

May 6, 2015          Oral Argument Conditionally Requested

# TABLE OF CONTENTS

Table of Contents..................................................................................................ii

Index of Authorities...........................................................................................iv

Statement of the Case......................................................................................viii

Statement Regarding Oral Argument..............................................................ix

Issues Presented.....................................................................................................x

Statement of Facts..................................................................................................1

    A.    The parties enter into a highly negotiated and agreed temporary injunction. ................................................................................................1

    B.    For months, DeLitta acknowledges the binding force of the agreed injunction and even seeks enforcement of its terms. ...................................1

    C.    DeLitta retains new counsel who attempts to declare the agreed injunction void.......................................................................................3

    D.    When the trial court enforces the Agreed Order as both an injunction and a Rule 11 agreement, DeLitta seeks review from this Court, without success. ...............................................................................4

    E.    Undeterred, DeLitta tries to take another bite at the apple in the trial court. ......................................................................................................5

Summary of Argument..........................................................................................6

Argument.................................................................................................................7

I.    On appeal from a denial of a motion to dissolve, an appellate court has no jurisdiction to review the validity of the original temporary injunction..........7

II.    Litigants should be able to dispense with the formal requirements of Rule 683 and enter into an agreed temporary injunction without fear that one party to the agreed order will later attempt to declare the order void.................10

    A.    Neither this Court nor the Texas Supreme Court has held an agreed injunction void for failure to strictly comply with Rule 683, yet other appellate courts are split on the issue................................................11

ii

B.      The cases DeLitta cites are distinguishable..................................................15

C.      Cases that appear to prohibit agreed temporary injunctions misconstrue Texas Supreme Court precedent and are not soundly reasoned..........................................................................................17

D.      DeLitta is estopped from now challenging the Agreed Order because he agreed to its issuance and has himself sought to enforce it. ..............................................................................................22

III.      The trial court was within its discretion to deny DeLitta's motion because the Agreed Order is enforceable as a Rule 11 Agreement. ...................................24

A.      The Texas Supreme Court allows enforcement of litigation-related agreements under Rule 11 even when the agreement might not otherwise be enforceable as an agreed judgment........................................25

B.      The Agreed Order meets all the elements of an enforceable Rule 11. ...............................................................................................27

Conclusion...............................................................................................28

Certificate of Compliance .........................................................................30

Certificate of Service .................................................................................30

# INDEX OF AUTHORITIES

## CASES

*Brazzel v. Murray*,
    481 S.W.2d 801 (Tex. 1972) ..................................................................................21

*C.W. 100 Louis Henna, Ltd. v. El Chico Rest. of Tex., L.P.*,
    295 S.W.3d 748 (Tex. App.—Austin 2009, no pet.) .............................................25

*Carle v. Carle*,
    234 S.W.2d 1002 (Tex. 1950) ...............................................................................23

*Certain Underwriters at Lloyd's v. Bristol-Myers Squibble Co.*,
    No. 09-97-00540 CV, 1998 WL 429096 (Tex. App.—Beaumont July 30,
    1998, no writ) (unpublished op.) (per curiam) ..........................................................9

*Chambers v. Rosenberg*,
    916 S.W.2d 633 (Tex. App.—Austin 1996, writ denied) (per curiam) ......... 13, 14

*Cisneros v. Cisneros*,
    787 S.W.2d 550 (Tex. App.—El Paso 1990 no writ) ..................................... 15, 16

*Claxton v. Fork Water Control & Improvement Dist. No. 1*,
    220 S.W.3d 537 (Tex. App.—Texarkana 2007, pet. denied) .......................... 15, 16

*Cleere v. City of Mesquite*,
    594 S.W.2d 831 (Tex. App.—Dallas 1980, no writ) ..............................................12

*CMH Homes v. Perez*,
    340 S.W.3d 444 (Tex. 2011) ....................................................................................7

*Comm'n for Lawyer Discipline v. Schaefer*,
    364 S.W.3d 831 (Tex. 2012) ..................................................................................20

*Conlin v. Haun*,
    419 S.W.3d. 682 (Tex. App. Houston [1st Dist.] 2013, no pet.) .................passim

*Cummings v. Powell*,
    8 Tex. 80 (1852) ............................................................................................... 19, 20

*David Jason W. & Pydia, Inc. v. State*,
    212 S.W.3d 513 (Tex. App.—Austin 2006, no pet.) .............................................13

*Deen v. Kirk*,
    508 S.W2d 70 (Tex. 1974) .....................................................................................22

*DeLee v. Allied Fin. Co.*,
408 S.W.2d 245 (Tex. Civ. App.— Dallas 1966, no writ) ......................................23

*Desai v. Reliance Mach. Works, Inc.*,
813 S.W.2d 640 (Tex. App.—Houston [14th Dist.] 1991, no writ)................ 9, 10

*Dunman v. Hartwell*,
9 Tex. 495 (1853) ................................................................................................22

*Emerson v. Fires Out, Inc.*,
735 S.W.2d 492 (Tex. App.—Austin 1987, no writ) ................................................13

*Ex Parte Coffee*,
328 S.W.2d 283 (Tex. 1959) ................................................................................21

*Ex Parte Kimberlin*,
126 Tex. 60 (1935) ................................................................................................21

*Fortis Benefits v. Cantu*,
234 S.W.3d 642 (Tex. 2007) .......................................................................... 25, 28

*Gray Wireline Serv., Inc. v. Cavanna*,
374 S.W.3d 464 (Tex. App.—Waco 2011, no pet.) .......................................... 15, 16

*Henke v. Peoples State Bank of Halletsville*,
6 S.W.3d 717 (Tex. App.—Corpus Christi 1999, dis'd w.o.j.) .......... 12, 13, 14, 22

*Hernandez v. Telles*,
663 S.W.2d 91 (Tex. App.—El Paso 1983, no writ) ................................................14

*In re Corcoran*,
343 S.W.3d 268 (Tex. App.—Houston [14th Dist.] 2011, orig.
proceeding) ..............................................................................................................17

*In re Garza*,
126 S.W.3d 268 (Tex. App.—San Antonio 2003, orig. proceeding) ......17, 18, 20

*In re Graybar Elec. Co.*,
No. 13-08-00341-CV (consolidated), 2008 WL 3970865 (Tex. App.—
Corpus Christi Aug. 26, 2008, orig. proceeding) (mem. op.)................................9

*In re Kahn*,
No. 09-14-00028-CV, 2014 WL 199024 (Tex. App.—Beaumont Jan. 16,
2014, orig. proceeding) (mem. op.)........................................................................16

*In re Krueger*,
No. 03-12-00838-CV, 2013 WL 2157765 (Tex. App.—Austin May 16, 2013, orig. proceeding) (mem. op.) ................................................................17

*In re U.S. Silica Co.*,
157 S.W.3d 434 (Tex. 2005) (orig. proceeding) (per curiam) ...........................20

*Interfirst Bank San Felipe, N.A. v. Paz Constr. Co.*,
715 S.W.2d 640 (Tex. 1986) (per curiam) ...............................................11, 18, 19

*K-Mart Corp. v. Honeycutt*,
24 S.W.3d 357 (Tex. 2000) (per curiam) ...............................................................25

*Mapco, Inc. v. Forrest*,
795 S.W.2d 700 (Tex. 1990) (orig. proceeding) (per curiam) ...........................20

*Murphy v. McDaniel*,
20 S.W.3d 873 (Tex. App.—Dallas 2000, no pet.) .......................................8, 9, 24

*Padilla v. LaFrance*,
907 S.W.2d 454 (Tex. 1995) ...............................................................................26, 27

*Parham Family Ltd. P'ship v. Morgan*,
434 S.W.3d 744 (Tex. App.-Houston [14th Dist.] 2014, no pet.) .......................17

*Poole v. U.S. Money Reserve Inc.*,
No. 09-08-137-CV, 2008 WL 4735602 (Tex. App.—Beaumont, Oct. 30, 2008, no pet.) ...................................................................................................12, 15, 17

*Qwest Commc'ns Corp. v. AT&T Corp.*,
24 S.W.3d 334 (Tex. 2000) (per curiam) ...............................................11, 18, 19

*Roccaforte v. Jefferson Cnty.*,
341 S.W.3d 919 (Tex. 2011) .......................................................................................22

*Schlumberger Tech. Corp. v. Swanson*,
959 S.W.2d 171 (Tex. 1997) .......................................................................................14

*Scott-Richter v. Taffarello*,
186 S.W.3d 182 (Tex. App.—Fort Worth 2006, pet. denied) .............................25

*State v. Ruiz Wholesale Co.*,
901 S.W.2d 772 (Tex. App.—Austin 1995, no writ) ..............................................9

*Tex. Dep't of Transp. v. City of Sunset Valley,*
    8 S.W.3d 727 (Tex. App.—Austin 1999, no pet.)........................................................7

*Tex. State Bank v. Amaro,*
    87 S.W.3d 538 (Tex. 2002) ...........................................................................................23

*Tober v. Turner of Tex., Inc.,*
    668 S.W.2d 831 (Tex. App.—Austin 1984, no writ) ......................................passim

*Uvalde Country Club v. Martin Linen Supply Co.,*
    690 S.W.2d 884 (Tex. 1985) .........................................................................................22

*Wood v. HSBC Bank USA, N.A.,*
    439 S.W.3d 585 (Tex. App.—Houston [14th Dist] 2014, pet. filed)...................19

## RULES

TEX. R. APP. P. 24.1 ...........................................................................................................22

TEX. R. CIV. P. 11 ...............................................................................................................27

## STATEMENT OF THE CASE

*Nature of the Case:* The underlying suit is a business dispute between business partners Michael DeLitta[1] and Nancy Schaefer over the ownership of Axiom Medical Consulting, LLC ("Axiom"). To preserve their disputed rights and interests in the company during the course of the litigation, the parties entered into a highly negotiated and agreed temporary injunction, which was signed by the trial court on October 29, 2013 (the "Agreed Order").[2]

Despite agreeing to the injunction, and later seeking enforcement of its terms, DeLitta eventually sought relief from the restraints on his conduct. His tactics resulted in several appellate proceedings, all of which failed.[3]

Undeterred, on October 22, 2014, DeLitta made yet another attempt to renege, this time by filing a Motion to Dissolve and Declare Temporary Injunction Void.[4]

*Trial Court:* The Honorable Amy Meachum, 201st District Court, Travis County, Texas.

*Trial Court Disposition:* The trial court signed an order denying DeLitta's motion on January 16, 2015.[5] The order does not state the reasons for its issuance.

---

[1] Appellants in this appeal are Michael J. DeLitta and DelCom Properties, LLC only and will be referred to in this brief as simply "DeLitta."

[2] Exh. A to Brief of Appellant; *see also* CR115–23

[3] *See* No. 03-14-00423-CV (original proceeding seeking to declare injunction void, denied on July 11, 2014); No. 03-14-00426-CV (appeal of an order enforcing the terms of the injunction dismissed for lack of jurisdiction on November 6, 2014). DeLitta also appealed an order appointing a receiver over Axiom, No. 03-13-000425-CV, which was dismissed for failure to prosecute on October 17, 2014.

[4] CR329–48

[5] CR379–81

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not believe oral argument is necessary for the Court to fully understand and properly resolve this appeal. This is an interlocutory appeal from an order denying Appellants' Motion to Dissolve and Declare Temporary Injunction Void. The relevant facts are undisputed, and the law is not difficult to grasp. However, to the extent that the Court has remaining questions after reviewing the briefing, Appellee would gladly participate in any oral argument to answer those questions.

## ISSUES PRESENTED

1. Does this Court have jurisdiction to review an interlocutory order signed in October 2013—over 15 months before this appeal was perfected—when the sole complaint on appeal concerns the validity of the original injunction, not a trial court's failure to dissolve based on changed circumstances?

2. The parties negotiated an agreed temporary injunction to govern their conduct through trial, signed the temporary injunction with the notation "agreed as to form and substance," and submitted it to the judge for approval.

   a. Does omitting the reasons for issuance make an agreed temporary injunction void when all the parties understand that the injunction was issued because it was agreed?

   b. Does a subsequent agreed continuance of the trial date stated in the injunction make an injunction retroactively void?

   c. Does a party waive the right to challenge a temporary injunction for failing to comply with Rule 683 by agreeing to the injunction in the first instance, by not appealing it, and/or by themselves seeking to enforce it?

3. May a trial court refuse to dissolve an agreed temporary injunction because the agreed order meets all the requirement of Texas Rule of Civil Procedure 11 and is thus enforceable in contract?

## STATEMENT OF FACTS

This is a business dispute over the ownership of Axiom Medical Consulting, LLC.[6] Schaefer and DeLitta are two managers and members of Axiom who each control 50% of the company.[7] The relationship between the two deteriorated and, in October 2013, Schaefer filed suit seeking to confirm her ownership in Axiom and, to maintain her status quo within the company, obtained a temporary restraining order.[8]

### A. The parties enter into a highly negotiated and agreed temporary injunction.

Before the restraining order dissolved, the parties requested the trial court approve a highly negotiated consent order and agreement which was entitled a "temporary injunction" (the "Agreed Order").[9] The Agreed Order was signed on October 29, 2013.[10] It prohibited the parties from undertaking certain acts and also obligated the parties to file a joint motion for appointment of a provisional member to break deadlock between Schaefer and DeLitta.[11]

### B. For months, DeLitta acknowledges the binding force of the agreed injunction and even seeks enforcement of its terms.

The parties proceeded for over eight months in this litigation under the terms of the Agreed Order and in full acknowledgement of its binding force. For example, months after its issuance, on March 13, 2014, DeLitta filed a motion titled "Motion to

---

[6] CR134–36
[7] CR132
[8] CR3
[9] CR115
[10] CR121
[11] CR122

1

Enforce, Modify and/or Dissolve Certain Provisions of the Temporary Injunction."[12] As the title implies, the motion sought to enforce certain provisions of the injunction. The motion was heard, along with a competing enforcement motion by Schaefer,[13] on April 14, 2014—*after* the April 7, 2014 trial date set in the Agreed Order.[14] Ultimately, DeLitta's motion was denied and Schaefer's motion granted.[15] The order was signed April 21, 2014.[16]

Around the same time, DeLitta filed a "Joint Application for TRO and Motion to Rescind the Order Appointing a Provisional Member."[17] The motion sought to limit the powers of the provisional member who was appointed and selected under the terms of the Agreed Order. By filing this motion, DeLitta again acknowledged the binding force of the Agreed Order. The application and motion were denied.[18]

No interlocutory appeals were taken from any of these orders. DeLitta never challenged the validity of the injunction or sought to declare the injunction void through these motions. DeLitta likewise never appealed the trial court's orders denying their request to alter or dissolve portions of the original injunction.

---

[12] *See* SuppCR21
[13] SuppCR100
[14] Compare SuppCR121 (noting date of hearing) and CR121 (Agreed Order setting trial date)
[15] SuppCR121–23
[16] SuppCR123
[17] SuppRR60–70
[18] SuppCR120

## C. DeLitta retains new counsel who attempts to declare the agreed injunction void.

The dispute between Schaefer and DeLitta continued to escalate through the Spring of 2014. Despite repeated judicial refusal to modify or dissolve the terms of the injunction, DeLitta still snubbed the agreed terms. Schaefer filed a second motion to enforce on May 16, 2014, this time seeking the appointment of a receiver over certain aspects of the company's financial operations, as well as enforcement of the Agreed Order.[19]

Shortly before the day of the hearing on Schaefer's motion, new counsel appeared[20] and, the day of the hearing, filed a written response in opposition to the motion to enforce and motion for contempt.[21] The response argued (for the first time) that the original injunction was "void," "expired as a matter of law," and thus could not form the basis of a contempt order.[22] The response contained no allegation of changed circumstances that would justify re-litigation of issues.[23]

Following an evidentiary hearing, the trial court signed an order enforcing the Agreed Order on June 19, 2014.[24] The order expressly found it was being enforced, not just as a temporary injunction, but also as a Rule 11 agreement.[25] The court found that

---

[19] SuppCR124
[20] CR641
[21] SuppRR37
[22] *Id.*
[23] SuppRR37–47
[24] SuppCR191–93
[25] SuppCR192 (finding that the Agreed Order "is an agreed order approved as to 'form and content' by all parties, signed by the court and filed in the clerk's office" and "is enforceable as a court order and as a Rule 11 agreement between the parties")

DeLitta had willfully violated the Agreed Order through several specifically enumerated acts.[26] Further, although it "had the authority to enforce the Agreed order by contempt," it "declin[ed] to do so."[27] The trial court reiterated, however, that "all parties [shall] strictly abide by the terms of the" Agreed Order.[28] The Court also, by separate order, appointed a partial receiver over Axiom.[29]

## D. When the trial court enforces the Agreed Order as both an injunction and a Rule 11 agreement, DeLitta seeks review from this Court, without success.

Three appeals followed. DeLitta filed two interlocutory appeals: one appeal of the June 19, 2014 enforcement order[30] and one appeal of the order appointing the receiver.[31] DeLitta also filed a petition for writ of mandamus, seeking to vacate the October 2013 agreed temporary injunction.[32]

None of the appeals were successful. The Court denied the mandamus petition[33] and dismissed the interlocutory appeal of the enforcement order for want of jurisdiction.[34] DeLitta abandoned the receivership appeal.[35]

---

[26] *Id.*

[27] *Id.*

[28] *Id.* (emphasis in original)

[29] SuppCR194–98

[30] No. 03-14-00426-CV

[31] No. 03-14-00425-CV

[32] No. 03-14-00423-CV

[33] *See* No. 03-14-00423-CV (Order dated July 11, 2014)

[34] No. 03-14-00426-CV (Order and Judgment dated Nov. 6, 2014)

[35] The Court dismissed the appeal for failure to prosecute on October 17, 2014. *See* No. 03-14-00425-CV.

**E. Undeterred, DeLitta tries to take another bite at the apple in the trial court.**

Three appellate losses did not deter DeLitta. By December, he was back before another Travis County district judge seeking to dissolve the Agreed Order.[36] Essentially cutting and pasting from his failed briefing to this Court, DeLitta argued that the Agreed Order was void because it did not comply with the mandatory requirements of Texas Rules of Civil Procedure 683 and 684.[37] DeLitta's motion was silent to the fact that the Agreed Order had already been determined to be an enforceable Rule 11 agreement.[38] Nor did the motion contain any allegations of changed circumstances that would justify re-litigation of the various issues.[39]

The trial court denied DeLitta's motion on January 16, 2015, without stating the reasons.[40] This appeal followed.[41]

---

[36] *See* RR (transcript of Dec. 15, 2014, hearing on DeLitta's Motion to Dissolve and Declare Temporary Injunction Void, which was filed on Oct. 22, 2014).

[37] CR329–37

[38] *See generally id.*

[39] SuppRR37–47

[40] CR379

[41] CR632

DeLitta voluntarily agreed to restraints on his conduct, by signing a highly negotiated Agreed Temporary Injunction under the notation "agreed as to form and content," while Schaefer pursued her claims concerning the ownership of Axiom. He sought the benefit of the Agreed Order, when it behooved him to do so, by twice moving to enforce the terms of the order. Yet he has spent the majority of the last year hoping desperately that the judiciary will allow him to renege on his promise. No judge has let him off the hook yet. Nor should this Court.

DeLitta's main argument is that the Agreed Order is void for failing to state the reasons for its issuance, a requirement for court-imposed temporary injunctions under Texas Rule of Civil Procedure 683. This argument makes no sense. A party should not be able to "void" an order for failing to state the reason for its issuance when the reason the trial court entered the order was because the parties asked it to.

DeLitta insists the Agreed Order is void because, otherwise, he loses under a myriad of equitable principles. His consent to the order removed any alleged error in it. He has twice pursued the benefits of the injunctive terms, so he is estopped from challenging the order now. And he waited too long to appeal.

But the Court need not reach any of these issues. The trial court previously enforced the Agreed Order as a Rule 11 Agreement. Rule 11 agreements are enforceable in contract even if they would not be enforceable as a judgment. The trial court's refusal to dissolve the Agreed Order may be affirmed on this ground alone.

6

**I.    On appeal from a denial of a motion to dissolve, an appellate court has no jurisdiction to review the validity of the original temporary injunction.**

The Court should dismiss this interlocutory appeal for lack of jurisdiction. Appellate courts consider their interlocutory jurisdiction "narrow" and thus "strictly apply statutes granting interlocutory appeals." *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011); *see also Tex. Dep't of Transp. v. City of Sunset Valley*, 8 S.W.3d 727, 730 (Tex. App.—Austin 1999, no pet.).

Here, DeLitta seeks review of an agreed injunction issued October 23, 2013—well over a year before this appeal was perfected on February 4, 2015. Unlike most interlocutory appeals of an order refusing to dissolve a temporary injunction, DeLitta did not allege changed circumstances that warrant the injunction's dissolution. Therefore, DeLitta does not seek review of the exercise of discretion to dissolve an injunction. Instead, DeLitta seeks review of the original injunction itself. This Court simply has no jurisdiction to review that order.

The Court decided the issue just over 30 years ago in *Tober v. Turner of Texas, Inc.,* 668 S.W.2d 831 (Tex. App.—Austin 1984, no writ). The trial court in *Tober* signed a temporary injunction on October 11, 1982. *Id.* at 833. The following month, on November 16, 1982, and after the time for filing an interlocutory appeal for immediate review of the injunction, Tober (the party restrained) sought to "set aside" the temporary injunction. *Id.* Soon thereafter, on December 1, 1982, the trial court signed

7

an order overruling Tober's motion (apparently treating it as a motion to dissolve the temporary injunction). *Id.*

Tober appealed, purporting to challenge both the December 1 order and the original November 16 injunction. *Id.* This Court, construing its jurisdiction narrowly, rebuffed Tober's tactic. The Court started by noting that Tober did not timely perfect an appeal from the original injunction and, as such, the Court had no jurisdiction to review it. *Id.* at 833–34. The Court also refused to consider any issues that touched on the propriety of the initial grant of the injunction. *Id.* at 834. Doing so, it reasoned, would allow a party to circumvent Section 51.014:

> If a litigant is permitted, upon motion to dissolve, to again challenge the original temporary injunction grant, without an allegation of changed conditions, then the litigant could accomplish indirectly what he could not directly do . . . thereby render meaningless the appellate timetable applicable to accelerated appeals. . . . [A] litigant, after unsuccessfully opposing a temporary injunction, could wait for an indefinite period to perfect an appeal of the grant of the temporary injunction (by filing a subsequent motion to dissolve, which raises the points of error which could have, and should have, been raised in a direct appeal of the order granting temporary injunction).

*Id.* at 835. The Court was adamant: "[a] motion to dissolve may not be used as a means of evading or expanding the rules applicable to appealing interlocutory orders." *Id.* Thus, unless a temporary injunction order is timely appealed, appellate courts "must presume the trial court's initial decision to grant the temporary injunction was proper." *Murphy v. McDaniel*, 20 S.W.3d 873, 879 (Tex. App.—Dallas 2000, no pet.).

The *Tober* Court does not convey a single justification for its ruling; it teeters between viewing the issue an equitable one and a jurisdictional one.[42] But other decisions make clear the issue is one of jurisdiction:

- "[W]here the time to review the order granting the temporary injunction has expired . . . [w]e do not have jurisdiction to consider the propriety of the trial court's decision to grant the temporary injunction." *Murphy v. McDaniel*, 20 S.W.3d at 879.

- "An interlocutory order that is not timely appealed is not reviewable by this Court. . . . [Appellants'] failure to perfect an interlocutory appeal from [the temporary injunction] order precludes this Court from reviewing its validity." *State v. Ruiz Wholesale Co.*, 901 S.W.2d 772, 775 (Tex. App.—Austin 1995, no writ).

- "[A]ppellees did not perfect an appeal from the initial order, and the time limit for doing so has long since expired. Accordingly, we have no jurisdiction to review the validity of the trial court's . . . order granting the temporary injunction." *Desai v. Reliance Mach. Works, Inc.*, 813 S.W.2d 640, 641 (Tex. App.—Houston [14th Dist.] 1991, no writ).[43]

---

[42] *Compare* 668 S.W.2d at 834 ("By failing to perfect an appeal from the grant of the temporary injunction, Tober has now, upon appeal of the motion to dissolve, waived the right to complain of the specified alleged errors.") *with id.* at 835 ("A motion to dissolve may not be used as a means of evading or expanding the rules applicable to appealing interlocutory orders. A statute authorizing an appeal from an interlocutory order must be given a strict construction since the statute is in derogation of the general rule that only final judgments and orders are appealable."); *see also id.* at 836 ("[O]ur holding does not here turn solely upon jurisdiction, but is also grounded upon Tober's failure to prove that the trial court abused its discretion in overruling the motion to dissolve.").

[43] *See also In re Graybar Elec. Co.*, No. 13-08-00341-CV (consolidated), 2008 WL 3970865, *13 (Tex. App.—Corpus Christi Aug. 26, 2008, orig. proceeding) (mem. op.) (mandamus consolidated with interlocutory appeals) (refusing to consider challenge under Rule 683 brought more than 20 days after temporary injunction entered); *Certain Underwriters at Lloyd's v. Bristol-Myers Squibble Co.*, No. 09-97-00540 CV, 1998 WL 429096, at *1 (Tex. App.—Beaumont July 30, 1998, no writ) (unpublished op.) (per curiam) (dismissing appeal because no jurisdiction to review temporary injunction that allegedly fails to set forth reasons for issuance where time to appeal long passed). *But see Conlin v. Haun*, 419 S.W.3d 682, 685 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (recognizing that *Tober* holds that an appellate court should not, on appeal from a motion to dissolve a temporary injunction, review the validity of the trial court's original decision to grant the injunction in the first instance, but then, confusingly, determining the validity of the injunction anyway).

DeLitta's sole complaint in this appeal concerns the validity of the original injunction. But, as this Court expressed in *Tober*, to permit DeLitta to have unlimited opportunity to "challenge the original temporary injunction grant[] without an allegation of changed conditions," would allow them to "accomplish indirectly what [he] could not directly do . . . thereby render meaningless the appellate timetable applicable to accelerated appeals." 668 S.W.2d at 835. The Court's jurisdiction to review the validity of the agreed temporary injunction has long ago expired. *See Desai*, 813 S.W.2d at 641. This appeal should be dismissed for lack of jurisdiction.

## II. Litigants should be able to dispense with the formal requirements of Rule 683 and enter into an agreed temporary injunction without fear that one party to the agreed order will later attempt to declare the order void.

DeLitta argues that the October 2013 Agreed Temporary Injunction is void because it does not state the reasons for its issuance and because the trial date stated in the Agreed Order has now expired.[44] It is "irrelevant," DeLitta asserts, that the injunction was agreed to.[45]

The ramifications of DeLitta's position, if accepted by this Court, are momentous. Agreed temporary injunctions are entered in Texas state courts almost daily. The reason for their issuance need not be stated; **they are issued because they are agreed**. And rarely would opposing counsel agree to an injunction that stated any

---

[44] Br. at 12-14
[45] Br. at 15

other reason for its issuance, as certainly it is not good strategy to concede that the proponent of the temporary injunction will otherwise suffer harm at your hands.

Texas law has run amuck on this point. A careful study of supreme court precedent will lead the Court to the logical holding that parties can agree to a temporary injunction that does not meet all the requirements of Rule 683 and, once agreed, the parties waive their right to challenge the propriety of the injunction absent fraud, collusion, or misrepresentation.

## A. Neither this Court nor the Texas Supreme Court has held an agreed injunction void for failure to strictly comply with Rule 683, yet other appellate courts are split on the issue.

The requirements of Texas Rule of Civil Procedure 683 are, Schaefer concedes, "mandatory and must be strictly followed" when a court enters a contested temporary injunction. *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam); *Interfirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986) (per curiam). But the Texas Supreme Court has never intimated that parties cannot agree to the entry of a temporary injunction that does not fully comport with Rule 683.

DeLitta cites several appellate court decisions for the controversial proposition that "Rule 683's mandatory requirements *are,* in fact, *mandatory*—and cannot be

waived."[46]  But he sweeps under the rug the split of authority on the issue—perhaps a sign that he does not want to defend the cases he cites.

A persuasive case on all fours is *Cleere v. City of Mesquite*, 594 S.W.2d 831 (Tex. App.—Dallas 1980, no writ).  The parties agreed to the entry of an injunction.  Years later, on appeal, the party restrained by the temporary injunction argued it was void for failing to comply with Rule 683.  As here, the party complained the agreed injunction did not state the reasons for its issuance.  The Dallas court was unpersuaded:

> Although the reasons are not specified in the order, this defect does not invalidate the injunction under the circumstances shown here.  The purpose of the requirement for reasons is to inform the violator of why he is enjoined.  When a party agrees to an injunction, he is in no position to complain that he was not informed of the reasons.

*Id.* at 833 (citations omitted).  In other words, a party cannot void an order for failing to state the reasons for its issuance when the reason the order was entered was simply because the parties asked it to.  By agreeing to an injunction, and joining in the motion to enter it, as DeLitta did here, any complaints about the injunction are waived.

Another court of appeals likewise found waiver in *Henke v. Peoples State Bank of Halletsville*, 6 S.W.3d 717, 719 (Tex. App.—Corpus Christi 1999, dis'd w.o.j.).  The parties in that case, as here, agreed to a temporary injunction.  One party challenged the agreed order on appeal.  The court did not take the bait.  It relied on solid precedent

---

[46] Br. at 15 (emphasis in original) (citing *Poole v. U.S. Money Reserve Inc.*, No. 09-08-137-CV, 2008 WL 4735602 (Tex. App.—Beaumont, Oct. 30, 2008, no pet.); *Conlin v. Haun*, 419 S.W.3d. 682, 686-87 (Tex. App. Houston [1st Dist.] 2013, no pet.)).

12

that "a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation." *Id.* at 720.

This Court has recognized the split of authority on this issue[47] and even has precedent on both sides of the issue. In *Emerson v. Fires Out, Inc.*, the issue arose, not in the context of an agreed injunction, but in the context of simple error preservation. 735 S.W.2d 492 (Tex. App.—Austin 1987, no writ). The temporary injunction did not provide reasons for its issuance, in violation of Rule 683, but the appellant had not objected to the omission in the trial court. This Court held that error was waived. *Id.* at 493. It explained that "[p]rinciples of sound judicial administration support application of the waiver rule" in this context:

> It serves no good purpose to permit appellants to lie in wait and present this error in form for the first time on appeal. On proper request, the district court could easily have added to the judgment a description of the specific harm avoided by granting the temporary injunction. Appellants would then have obtained proper notice of the district court's reasoning and appellate review would have been facilitated.

*Id.* at 494.

Yet, more recently, in the context of related Rule 684, the Court reached the opposite result. A temporary injunction was entered in *Chambers v. Rosenberg* without ordering a bond, in violation of Rule 684. 916 S.W.2d 633 (Tex. App.—Austin 1996, writ denied) (per curiam). The failure to require a bond, the Court held, made the injunction void, not just voidable. *Id.* at 635. Contrary to its prior decision in *Emerson*

---

[47] *David Jason W. & Pydia, Inc. v. State*, 212 S.W.3d 513, 520 n.4 (Tex. App.—Austin 2006, no pet.).

(a decision not mentioned in *Chambers*), the Court found that "the strong theme of literal construction of the rule convinces us that we should construe the rule literally in this case." *Id.* Notably, however, the Court recognized that "none of the cited cases explicitly concerns an agreed order." The Court was nevertheless "persuaded" to hold the injunction void "because the parties here did not explicitly waive the protection of a bond." *Id.*

Despite its equivocal precedent on the issue, this Court has never addressed the precise rationale of *Henke*: "a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation." *See* 6 S.W.3d at 720. *Henke* was correct to apply this general rule in the context of agreed temporary orders. After all, Texas law strongly favors and encourages voluntary and orderly dispute resolution. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997). "The law has always favored the resolution of controversies through compromise and settlement rather than through litigation and it has always been the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." *Hernandez v. Telles*, 663 S.W.2d 91, 93 (Tex. App.—El Paso 1983, no writ). Agreements should be encouraged, particularly early in litigation, to open the door to communication and, hopefully, compromise. Nothing in Rules 683 or 684 governing the scope or form of temporary injunctions overrides this policy favoring compromise. The Court should reconcile its conflicting

14

precedent in favor of voluntary dispute resolution and hold that parties may agree to dispense with the procedural protections of Rules 683 and 684.

## B. The cases DeLitta cites are distinguishable.

DeLitta cites three cases for the proposition that "Rule 683's mandatory requirements cannot be waived."[48] These cases are distinguishable from this case.

Most significantly, neither *Poole* nor *Gray Wireline* involve an injunction that was entered into voluntarily. *Gray Wireline* does not appear to involve an agreed injunction at all. 374 S.W.3d at 467. And the party seeking relief in *Poole* agreed to the injunction "as to form" only. 2008 WL 4735602, at *11 ("Agreed as to Form Only").

Here, however, the parties signed the temporary injunction with the notation "agreed as to form *and content*."[49] This distinction is significant. Approving a judgment "as to form" is a "professional courtesy"—"a usual and harmless procedure." *Cisneros v. Cisneros*, 787 S.W.2d 550, 552 (Tex. App.—El Paso 1990, no writ). "Approval as to substance," on the other hand, means the signatory agrees that all the essential requirements have been met. *Claxton v. Fork Water Control & Improvement Dist. No. 1*, 220 S.W.3d 537, 544 (Tex. App.—Texarkana 2007, pet. denied). A party who approves the *substance* of an order is precluded from later arguing that statutory requirements have not been met. *Cisneros*, 787 S.W.2d at 552 (counsel's approval of form of judgment

---

[48] Br. at 15-16 (citing *Conlin v. Haun*, 419 S.W.3d. 682 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Gray Wireline Serv., Inc. v. Cavanna*, 374 S.W.3d 464 (Tex. App.—Waco 2011, no pet.); *Poole v. U.S. Money Reserve Inc.*, No. 09-08-137-CV, 2008 WL 4735602 (Tex. App.—Beaumont, Oct. 30, 2008, no pet.)).
[49] CR121 (emphasis added)

15

precluded former husband from asserting that judgment did not meet statutory requirements for child support).

The signature on the temporary injunction by DeLitta's attorney signifies that all essential requirements are met. *Claxton*, 220 S.W.3d at 544; *Cisneros*, 787 S.W.2d at 552. His complaint here that the injunction omitted one requirement—the reasons for its issuance—is belied by the signatures on the document and thus has no merit.

*Conlin* and *Gray Wireline* involve the trial court's failure to provide a trial date on the agreed injunction itself. *See Conlin*, 419 S.W.3d. at 687; *Gray Wireline*, 374 S.W.3d at 472. Here, in contrast, the agreed injunction *did* set a trial date.[50] Thus, the agreed injunction is not "void on its face," as found in other cases. *See Gray Wireline*, 374 S.W.3d at 472.

DeLitta twists these cases to apply to the facts here by arguing that, because the Agreed Order "no longer carries an effective trial date," it is somehow retroactively void—a "nullity" at its very issuance. DeLitta cites no cases to support this nonsensical position. Several Texas cases undercut DeLitta's argument. For example, in *In re Kahn*, the Beaumont court of appeals held that a trial court may hold a litigant in contempt after the trial date set in the original temporary injunction when the original trial date is later continued. No. 09-14-00028-CV, 2014 WL 199024, at *1 (Tex. App.—Beaumont Jan. 16, 2014, orig. proceeding) (mem. op.). A Houston court of appeals has come to

---

[50] CR121 (setting case for trial on April 7, 2014)

16

a similar conclusion. *Parham Family Ltd. P'ship v. Morgan*, 434 S.W.3d 774 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (rejecting the argument that a temporary injunction expired because the order stated it was set for trial on a particular date but was later continued several times). If an injunction immediately became a "nullity" upon the passing of the stated trial date, as DeLitta argues here, these cases would have come out differently.[51]

## C. Cases that appear to prohibit agreed temporary injunctions misconstrue Texas Supreme Court precedent and are not soundly reasoned.

To the extent *Conlin* or *Poole* can be read to broadly support DeLitta's proposition that "Rule 683's mandatory requirements cannot be waived," they were wrongly decided. Both cases rely on a single case from San Antonio. *In re Garza*, 126 S.W.3d 268 (Tex. App.—San Antonio 2003, orig. proceeding).[52] *Garza* reaches the radical result that a party can agree to be bound by a temporary injunction and then, later, seek the aide of the appellate courts to renege on that agreement when the party no longer desires to be bound by its terms. The reasoning the *Garza* court offers to support this view of Texas law is questionable, at best.

---

[51] DeLitta suggests he never agreed to the terms of the Agreed Order beyond the original April 7, 2014. But DeLitta asked for the agreed injunction to be enforced *after* the April 7 trial date. SuppCR121. Thus, the trial court was reasonable in rejecting any factual argument that DeLitta did not intend to be bound throughout the entirety of this litigation.

[52] *See Poole*, 2008 WL 4735602, at *11–12 (relying on *Garza*); *Conlin*, 419 S.W.3d at 686 (relying on *Garza* and *In re Corcoran*, 343 S.W.3d 268, 269 (Tex. App.—Houston [14th Dist.] 2011, orig. proceeding), which also had followed *Garza*). This Court has also cited *Garza* favorably in a memorandum opinion. *See In re Krueger*, No. 03-12-00838-CV, 2013 WL 2157765, at *9 n.7 (Tex. App.—Austin May 16, 2013, orig. proceeding) (mem. op.).

It is worth noting, as an initial matter, that *Garza* would have come out differently had it been presented in this Court. This Court would likely follow *Tober v. Turner of Texas*, 668 S.W.2d 831 (Tex. App.—Austin 1984, no writ) and its progeny. As explained previously,[53] this line of cases holds that unless the original temporary injunction is timely appealed, an appellate court—on review of a subsequent order related to the original injunction—will presume that the trial court's initial decision to grant the temporary injunction was proper and will not consider any issues that could have been raised in a prior appeal. *Tober*, 668 S.W.2d at 835; *see also Desai,* 813 S.W.2d at 641 (no jurisdiction to review original temporary injunction that failed to include trial date). In *Garza*, the allegedly void injunction had been entered two years prior, with no appeal taken. 126 S.W.3d at 270. The objection that the injunction was void was not raised until the denial of a second round of competing motions to dissolve and for contempt. *Id.* Thus, pursuant to *Tober*, this Court would likely have denied the *Garza* petition on this ground alone.

But *Garza* is wrong for other reasons too. *Garza* held that a temporary injunction that does not comply with Rules 683 and 684 is void, not voidable, and, as such, a party does not waive its right to attack the injunction—even if the party agreed to its issuance. In reaching this conclusion, the *Garza* court relied heavily on two per curiam opinions from the Texas Supreme Court: *Qwest*, 24 S.W.3d at 334; *Interfirst*, 715 S.W.2d at 641.

---

[53] *See infra*, Sec. I.

Importantly, however, neither *Qwest* nor *Interfirst* concerned an agreed temporary injunction. *Interfirst* is a two-paragraph opinion that mentions nothing about the entry of the injunction. In *Qwest*, the parties reached a tentative agreement concerning the injunction at the entry hearing, which they then read into the record, but "[u]ltimately, the parties could not agree to the terms of the written order to be submitted to the trial court." 23 S.W.3d at 335. So neither opinion addressed whether parties may agree to dispense with the requirements of Rule 683 and 684. In fact, the *Qwest* court stated that the "single issue in this petition is whether the trial court's interlocutory order is a temporary injunction." *Id.* Anything the Court wrote about the voidability of an injunction was not relevant to the "single issue" before it and was thus dicta.

Equally critical is the actual language used in *Qwest* and *Interfirst*. In both cases, the court stated that an order that does not adhere to the requirements of the injunction rules "is subject to being declared void and dissolved." *Qwest*, 24 S.W.3d at 337; *Interfirst*, 715 S.W.2d at 641. If an order is "subject to being declared void," it is voidable. "[T]he key distinction between a void act and a voidable act . . . is a party's ability—either through its own action or through the judicial process—to disaffirm, ratify, or confirm a voidable act." *Wood v. HSBC Bank USA, N.A.*, 439 S.W.3d 585, 591 (Tex. App.—Houston [14th Dist] 2014, pet. filed). In other words, a voidable order is "subject to being declared void," upon an affirmative act by a party or court. *See Cummings v. Powell*, 8 Tex. 80, 80 (1852) ("[A] voidable act is one which is obligatory upon others until disaffirmed by the party with whom it originated, and which may be subsequently

19

ratified or confirmed.").  A void order, on the other hand, "is entirely null, not binding on either party and not susceptible of ratification."  *Id.*

The *Garza* court rejected this argument, emphasizing the Court's explanation in *Qwest* that, in *InterFirst*, the court "declared the temporary injunction void."  *Garza*, 126 S.W.3d at 273.  But, even assuming this dicta has any meaning, the declaration in *InterFirst* does not answer the question of whether a non-compliant temporary injunction is void or voidable.  The declaration in *InterFirst* was made because a party, at that point, had challenged the order.  The voidable order, when challenged (or "disaffirmed," to use the *Cummings* language), was, at that moment, declared void.

Texas supreme court cases actually deciding the issue of whether an order is void or merely voidable are far more instructive than *Qwest* and *InterFirst*, which do not.  These cases emphasize that void orders are "rare."  *Comm'n for Lawyer Discipline v. Schaefer*, 364 S.W.3d 831, 836 (Tex. 2012); *In re U.S. Silica Co.*, 157 S.W.3d 434, 438–39 (Tex. 2005) (orig. proceeding) (per curiam).  A judgment or order is void only when it is apparent that the court rendering it had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment or order, or  no capacity to act as a court.  *Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990) (orig. proceeding) (per curiam).  The high court has applied this principal in the context of allegedly erroneous temporary injunctions and emphasized: "[I]t is evident that the writ was not wholly void for want of jurisdiction, but at most was only voidable as to some of the acts sought to be restrained. . . . If the district had jurisdiction of the parties and the

20

matter adjudicated, the injunction cannot be said to be absolutely void." *Ex Parte Kimberlin*, 126 Tex. 60, 66 (1935).

The same is true of an injunction issued without precise compliance with Rule 683. Judgments which are rendered without observance of statutory requirements which are purely procedural are not void, however irregular or erroneous they may be. *Id.* ("Absent one of those rare circumstances that makes the [order] void, the mere fact that an action by a court [ ] is contrary to a statute, constitutional provision or rule of civil or appellate procedure makes it 'voidable' or erroneous."); *see also Brazzel v. Murray*, 481 S.W.2d 801, 803 (Tex. 1972); *Ex Parte Coffee*, 328 S.W.2d 283, 234 (Tex. 1959) ("Judgments which are rendered without observance of statutory requirements which are purely procedural are not void, however irregular or erroneous they may be.").

Thus, contrary to the holding in *Garza*, non-compliance with Rule 683 makes an injunction voidable, not void. The Rule 683 requirements are "purely procedural." Those requirements do not affect the jurisdiction of the court over the parties or the subject matter. Thus, an order that does not strictly comply with Rule 683 is "subject to being declared void," if "disaffirmed," but is not void when entered. As a voidable order, a defective temporary injunction is subject to all equitable principles, including estoppel and waiver.

*Garza* led multiple courts astray in concluding otherwise, and this Court should not follow its sister courts down this flawed path. Of course, litigants can agree to dispense with procedural protections afforded by the Texas Rules of Procedure,

including those in Rule 683.  They do so every day—from the beginning of a suit[54] to the end.[55]  And Texas' policy favors doing so.  The procedural requirements governing temporary injunctions are not special and should not be treated any differently than Texas' other procedural requirements and protections.

**D.  DeLitta is estopped from now challenging the Agreed Order because he agreed to its issuance and has himself sought to enforce it.**

Because any deficiencies in the form of the temporary injunction make the injunction simply voidable, and not void, DeLitta's complaints are subject to general principles of equity and error preservation.  *See Roccaforte v. Jefferson Cnty.*, 341 S.W.3d 919, 923 (Tex. 2011).  The equitable principles that apply to bar DeLitta's objections to the Agreed Order are myriad.

First and foremost, DeLitta agreed to the temporary injunction.  A party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation.  *Henke*, 6 S.W.3d at 720.  As the Texas Supreme Court succinctly stated:  "consent takes away error."  *Dunman v. Hartwell*, 9 Tex. 495, 496 (1853).  "Having consented to the action of the court in entering" the temporary injunction, DeLitta "waive[d] all errors committed or contained in the judgment, thus leaving nothing which could properly be considered by an appellate

---

[54] For example, issuance, service, and return of citation are mandatory and the failure to strictly comply with the governing procedural rules "renders the attempted service of process invalid and of no effect."  *Uvalde Country Club v. Martin Linen Supply Co.*, 690 S.W.2d 884, 885 (Tex. 1985).  Yet parties can agree to waive service.  *Deen v. Kirk*, 508 S.W2d 70, 71 (Tex. 1974).

[55] Parties may also agree to waive a supersedeas bond.  *See* TEX. R. APP. P. 24.1(a)(1).

court, except want of jurisdiction." *See DeLee v. Allied Fin. Co.*, 408 S.W.2d 245, 247 (Tex. Civ. App.— Dallas 1966, no writ).

This is particularly true when, as here, the party objecting to the temporary injunction twice acknowledged its binding effect. The parties proceeded for over eight months in this litigation under the terms of the Agreed Order and in full acknowledgement of its binding force. "A litigant cannot treat a judgment as both right and wrong." *Carle v. Carle*, 234 S.W.2d 1002, 1004 (Tex. 1950). Rather, a party who accepts the benefits of a judgment is estopped from challenging the judgment by appeal. *See Tex. State Bank v. Amaro*, 87 S.W.3d 538, 544 (Tex. 2002).

DeLitta, just a few months after entry of the injunction, sought to enforce some provisions of the injunction[56]—those still desirable to him. This motion was heard (along with a competing motion by Schaefer) on April 14, 2014—*after* the April 7, 2014 trial date set in the Agreed Order.[57] Around the same time, DeLitta also sought to limit the powers of the provisional member who was appointed and selected under the terms of the agreed temporary injunction.[58] This Court should refuse to allow DeLitta to treat the temporary injunction "as both right and wrong." Having pursued the benefits of injunctive terms when it suited him, he is now estopped from challenging the judgment here.

---

[56] SuppCR21
[57] Compare SuppCR121 (noting date of hearing) and CR121 (Agreed Order setting trial date)
[58] SuppRR60–70

Finally, as previously explained,[59] a party waives any challenge to a temporary injunction by not appealing the injunction when it is first signed. *See Tober*, 668 S.W.2d at 834. "A motion to dissolve may not be used as a means of evading or expanding the rules applicable to appealing interlocutory orders." *Id.* Thus, unless a temporary injunction order is timely appealed, appellate courts "must presume the trial court's initial decision to grant the temporary injunction was proper." *Murphy v. McDaniel*, 20 S.W.3d at 879. DeLitta's sole complaint on appeal concerns the validity of the original injunction. But the injunction issued in October 2013. The 20 day window to challenge the injunction has long since passed. DeLitta waived his right to challenge the temporary injunction in this late appeal.

### III. The trial court was within its discretion to deny DeLitta's motion because the Agreed Order is enforceable as a Rule 11 Agreement.

Conspicuously missing from DeLitta's brief is the fact that the trial court had previously enforced the Agreed Order as a valid and binding Rule 11 agreement. On June 19, 2014, the trial court signed an order enforcing the Agreed Order.[60] The order expressly found it was being enforced, not just as a temporary injunction, but also as a Rule 11 agreement.[61] The court's order emphasized that "all parties [shall] strictly abide by the terms of the" Agreed Order.[62]

---

[59] *See infra*, Sec. I

[60] SuppCR193

[61] SuppCR192 (finding that the Agreed Order "is an agreed order approved as to 'form and content' by all parties, signed by the court and filed in the clerk's office" and "is enforceable as a court order and as a Rule 11 agreement between the parties")

[62] *Id.* (emphasis in original)

The trial court was correct to do so. The parties' agreement meets all the requirements of Rule 11 and is thus a valid agreement, even if it does not meet the requirements of a valid temporary injunction under Rule 683. As such, the trial court had a ministerial duty to enforce the Agreed Order as a Rule 11 agreement. *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 651 (Tex. 2007); *Scott-Richter v. Taffarello*, 186 S.W.3d 182, 189 (Tex. App.—Fort Worth 2006, pet. denied) ("A trial court has a ministerial duty to enforce a valid Rule 11 agreement." (internal citations omitted)). Dissolving the Agreed Order would have been a breach of that obligation. Thus, the trial court's order should be affirmed on this basis. *See generally K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam) (an appellate court may affirm on any meritorious ground); *C.W. 100 Louis Henna, Ltd. v. El Chico Rest. of Tex., L.P.*, 295 S.W.3d 748, 753 (Tex. App.—Austin 2009, no pet.) (same).[63]

## A. The Texas Supreme Court allows enforcement of litigation-related agreements under Rule 11 even when the agreement might not otherwise be enforceable as an agreed judgment.

Even if the agreed temporary injunction is unenforceable as a judgment, it is undoubtedly enforceable in contract. *Padilla v. LaFrance* is dispositive. 907 S.W.2d 454

---

[63] The trial judge that signed the June 19 order was not the same judge. But the trial court knew that the Agreed Order had been enforced previously as a Rule 11 agreement. CR372-76 (arguing the trial court had a ministerial duty to enforce the Agreed Order as a Rule 11). Under the central docket system, trial judges are reluctant to overrule prior rulings of their colleagues. *See* Travis Co. Dist. Ct. L.R. 1.4 ("A request to be heard on a motion for new trial or any other motion challenging a prior ruling, except one by default, must be presented to the judge who made the ruling, including a visiting judge."), available at https://www.traviscountytx.gov/images/courts/docs/local_rules_civildistrict.pdf (last visited April 29, 2015). Thus, the trial court was within its discretion to deny DeLitta's motion on this purely procedural ground. *Tober*, 668 S.W.2d at 835 (trial court has no duty to reconsider the propriety of the granting of a temporary injunction).

(Tex. 1995). *Padilla* was a personal injury case. *Id.* at 455. Through a series of communications, the parties appeared to reach a settlement agreement. *Id.* at 455–56. When the plaintiff refused to accept payment, the defendant filed a counterclaim in the pending action seeking enforcement of the settlement agreement. *Id.* at 457. Both sides moved for summary judgment on the counterclaim. *Id.* The trial court found that the series of emails did not constitute an enforceable agreement under Rule 11 and granted summary judgment for the plaintiff.

The Texas Supreme Court reversed. It first found that, contrary to the trial court's ruling, the parties did have an enforceable agreement under Rule 11. *Id.* at 461. It then addressed the plaintiffs' argument that the settlement agreement, if one was reached, was unenforceable because the plaintiffs withdrew consent before judgment was rendered. Absent consent, the plaintiffs argued, a trial court has no authority to render an agreed judgment. *Id.*

The Texas Supreme Court disagreed. The agreement, the Court said, was enforceable in contract even if it would not meet the requirements of an agreed judgment. *Id.* It explained:

> The LaFrances . . . confuse the requirements for an agreed judgment with those for an enforceable settlement agreement. Although a court cannot render a valid agreed judgment absent consent at the time it is rendered, this does not preclude the court, after proper notice and hearing, from enforcing a settlement agreement complying with Rule 11 even though one side no longer consents to the settlement. The judgment in the latter case is not an agreed judgment, but rather is a judgment enforcing a binding contract.

*Id.*

Like the plaintiffs in *Padilla*, DeLitta "confuse[s] the requirements" for a temporary injunction for those of an enforceable Rule 11 agreement. *See id.* at 461. DeLitta assumes that if he attacks one the other falls. But *Padilla* holds otherwise. *Padilla* instructs that one can fail as a judgment (there, for lack of consent) and still be enforceable in contract. Under the same reasoning, if the Agreed Order meets the requirements of Rule 11, it is enforceable as a Rule 11 agreement, even if it would otherwise fail as a temporary injunction.

**B.    The Agreed Order meets all the elements of an enforceable Rule 11.**

The October 2013 Agreed Order meets all the requirements of Rule 11 and is thus enforceable as a Rule 11 agreement. Rule 11 provides:

> Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

TEX. R. CIV. P. 11.

A trial court must enforce any agreement that meets the elements of Rule 11. *Fortis Benefits*, 234 S.W.3d at 651 ("As this is a valid pretrial agreement under Rule 11, the trial court had a duty to enforce its terms."). Those elements are quite simple:

- The agreement must be between attorneys or parties and touching on a pending lawsuit;
- The agreement must be in writing;
- The agreement must be signed; and
- The agreement must be made a part of the record.

27

The October 2013 order meets these requirements. Nancy Schaefer filed suit on October 9, 2013,[64] and the parties agreed to the injunctive provisions on October 29, 2013,[65] while the suit was still pending.[66] The agreement touched on the lawsuit in that the 9 pages of agreed terms were intended to govern the parties' conduct as it relates to Axiom (the company which is the subject matter of the lawsuit) during the litigation.[67] The agreement was in writing.[68] It was signed—"agreed as to form and content"—by all the party attorneys: Howard Carter and Mark Stromberg, attorneys for plaintiff, as well as Teresa De Ford, attorney for the Axiom defendants, and Joe Griffin, attorney for Michael J. DeLitta and DeLCom Properties, LLC.[69] It was filed in the court's record on the same day as it was signed by the parties.[70]

The October 2013 order meets all the requirements of Rule 11. Accordingly, it is an enforceable agreement. The Axiom defendants "entered into and [are] bound by the specific language in the Rule 11 agreement." *Fortis Benefits*, 234 S.W.3d at 651. The Court can affirm the trial court's refusal to dissolve the Agreed Order on this ground.

## CONCLUSION

For these reasons, Appellee asks that the Court to affirm the trial court's order. Appellee seeks any other relief to which she may be entitled.

---

[64] CR3

[65] CR121

[66] CR2 (docket sheet)

[67] *See* CR115–23

[68] *Id.*

[69] CR121

[70] *Compare* CR115 (filestamp) *with* CR121 (date of signature)

Dated:  May 6, 2015

Respectfully submitted,

/s/Lisa Bowlin Hobbs

Donald R. Taylor
  State Bar No. 19688800
  dtaylor@taylordunham.com
Stacey Reese (Of Counsel)
  State Bar No. 24056188
  stacey@reeselawpractice.com
TAYLOR DUNHAM & RODRIGUEZ LLP
301 Congress Avenue, Suite 1050
Austin, Texas  78701
(512) 473-2257
(512) 478-4409 (fax)

Lisa Bowlin Hobbs
  State Bar No. 24026905
  Lisa@KuhnHobbs.com
Kurt Kuhn
  State Bar No. 24002433
  Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, Suite 310
Austin, Texas  78731
(512) 476-6003
(512) 476-6002 (fax)

Howard F. Carter, Jr.,
  State Bar No. 03916500
  sam@scarterlawfirm.com
HOWARD F. CARTER, JR., P.C.
5600 Tennyson Parkway, Suite 160
Plano, Texas  75024
(972) 455-2001
(972) 455-2015 (fax)

COUNSEL FOR APPELLEE

29

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4, I hereby certify that this brief contains 7,691 words. This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Lisa Bowlin Hobbs
Lisa Bowlin Hobbs

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2015, I served a copy of this Brief of Appellee on counsel of record electronically, in accordance with the Court's rules on electronic filing, as listed below:

Douglas R. Drucker                                          *via e-Service*
Kirby D. Hopkins
DRUCKER | HOPKINS LLP
21 Watery Avenue, Suite 300
The Woodlands, TX 77380
**Counsel for Appellants Michael J. DeLitta and DelCom Properties, LLC**

Eric J. Taube                                               *via e-Service*
HOHMANN, TAUBE & SUMMERS LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
**Counsel for the Axiom entities and Receiver/Provisional Member Jeff Compton**

/s/ Lisa Bowlin Hobbs
Lisa Bowlin Hobbs

481 S.W.2d 801
Supreme Court of Texas.

John BRAZZEL, Petitioner,

v.

Sid MURRAY et al., Respondents.

No. B—3103. | April 12, 1972. | Rehearing Denied June 7, 1972.

The 105th District Court, Nueces County, Horace S. Young, J., dismissed plaintiff's suit on ground that there was no mandate filed after the Court of Civil Appeals had reversed a judgment in plaintiff's favor, and plaintiff appealed. The Corpus Christi Court of Civil Appeals, Thirteenth Supreme Judicial District, Nye, C.J., affirmed, 472 S.W.2d 814, and application for writ of error was granted. The Supreme Court, McGee, J., held that where mandate was on file with trial court from date of original mandate until date original mandate was recalled, it was, although unauthorized for failure to comply with requirement that costs be paid prior to issuance of mandate, valid until recalled; thus, where at no time had there been period of 12 months in which no mandate had been filed with trial court, as required by procedural rule as prerequisite to dismissal, dismissal of case for want of a valid mandate was error.

Reversed and remanded for new trial.

West Headnotes (4)

**[1]** **Judgment** ☞ Errors and Irregularities

Judgments which are rendered without observance of statutory requirements which are purely procedural are not void however irregular or erroneous they may be, but merely voidable.

4 Cases that cite this headnote

**[2]** **Appeal and Error** ☞ Making and Issuance

Civil procedural rules dealing with issuance of return of the mandate subsequent to judgment of remand in the Court of Civil Appeals are procedural and not necessary to the jurisdiction of the trial court. Rules of Civil Procedure, rules 443–445.

5 Cases that cite this headnote

**[3]** **Appeal and Error** ☞ Operation and Effect

Where mandate was on file with trial court from date of original mandate until date original mandate was recalled, it was, although unauthorized for failure to comply with requirement that costs be paid prior to issuance of mandate, valid until recalled; thus, where at no time had there been period of 12 months in which no mandate had been filed with trial court, as required by procedural rule as prerequisite to dismissal, dismissal of case for want of a valid mandate was error. Rules of Civil Procedure, rules 443, 445.

2 Cases that cite this headnote

**[4]** **Appeal and Error** ☞ Operation and Effect

Until mandate was recalled by Court of Civil Appeals which had issued it erroneously before collection of appellate costs, mandate was lawful order upon which all parties could rely and was not void ab initio. Rules of Civil Procedure, rules 443, 445.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*801** William Emerson Wright, Houston, for petitioner.

Wood, Burney, Nesbitt & Ryan, Allen Wood, Corpus Christi, for respondents.

**Opinion**

**\*802** McGEE, Justice.

This case involves the effect of the erroneous issuance of a mandate by the Clerk of the Court of Civil Appeals, the costs of court having not been paid at the time and subsequent dismissal of the cause purportedly under Rule 445, Texas Rules of Civil Procedure (T.R.C.P.).

The original suit was filed by John Brazzel on January 4, 1964, against Sid Murray and others. The trial court rendered judgment upon the jury verdict for Brazzel on July 28, 1967. The Court of Civil Appeals (Waco Court) reversed the trial court judgment and remanded the cause for new trial with costs assessed against Brazzel on February 6, 1969. 438 S.W.2d 382. Judgment became final November 26, 1969 when Brazzel's application for writ of error was overruled by this Court.

The Clerk of the Waco Court issued the mandate to the trial court on December 4, 1969, although Brazzel had failed to pay the costs at that time as ordered by the judgment of the Waco Court and as required by Rule 443, T.R.C.P., which provides:

> 'On the rendition of a final judgment or decree in the Court of Civil Appeals, the clerk of said court shall not issue and deliver the mandate of the court nor certify the proceedings to the lower court until all costs accruing in the case in such appellate court have been paid, subject to the provisions of Rule 444.'

Rule 444, T.R.C.P., provides for the filing of affidavits of inability to pay the costs as required in Rule 443, T.R.C.P.

Murray subsequently filed a motion in the Waco Court to recall the mandate because of the non-payment of the costs. This motion was granted, and the mandate was recalled on January 22, 1971, and returned to the Waco Court, whereupon the Clerk issued a certificate on February 18, 1971, which stated: 'Except for the Mandate of this Court issued December 4, 1969, no mandate in the above has been taken out.'

Murray filed a motion to dismiss the cause in the trial court on February 17, 1971. On March 4, 1971 the trial court entered its order of dismissal relying upon Rule 445, T.R.C.P., which provides as follows:
'In cases which have been reversed and remanded by a Court of Civil Appeals, If no mandate shall have been taken out and filed in the court where the cause originated within one year after the motion for rehearing is overruled or final judgment rendered, Then upon the filing in the court below of a certificate of the clerk of the Court of Civil Appeals where the cause was pending That no mandate has been taken out, the case shall be dismissed from the docket.' (Emphasis added)

On appeal from the order of dismissal, the Court of Civil Appeals (Corpus Christi Court) held that the original mandate, having been mistakenly issued by the Waco Court, was void Ab initio and the wording of the Clerk's certificate need not state that

'no mandate has been taken out' within one year of final judgment and affirmed the judgment of the trial court. 472 S.W.2d 814. With these holdings we disagree.

Petitioner's application for writ of error was granted on the following points:
'1. The Court of Civil Appeals erred in holding, that the mandate, 'having been mistakenly issued,' was void Ab initio.

'2. The Court of Civil Appeals erred in affirming dismissal under Rule 445, T.R.C.P., as a valid mandate was on file with the trial court from final remand until dismissal.

'3. The Court of Civil Appeals erred in affirming dismissal in the absence of compliance with the requirements of Rule 445, T.R.C.P., that the Clerk certify **\*803** that 'no mandate has been taken out' within one year of final judgment.'

Points one and two will be treated together and are considered controlling; thus, point three is not discussed.
 [1]    The distinction between a Void and Voidable judicial act is clearly set out in Murchison v. White, 54 Tex. 78 (1880) as follows:
'A void act is one entirely null within itself, not binding on either party, and which is not susceptible of ratification or confirmation. Its nullity cannot be waived.

'A voidable act is one which is not absolutely void within itself, but which is binding until disaffirmed, and which may be made finally valid by failure within the proper time to have it annulled, or by subsequent ratification or confirmation.'

In Murchison, the Court found the judgment fraudulently obtained in the probate proceedings to be voidable, not void, holding the judgment of a court having jurisdiction, if so irregularly or erroneously rendered as to make it liable to be vacated by a direct proceeding for this purpose, or to be reversed on appeal or writ of error, is nevertheless valid until thus vacated or reversed. Other early Texas cases which uphold this distinction stated in Murchison are Wheeler v. Ahrenbeak, 54 Tex. 535 (1881); Cummings v. Powell, 8 Tex. 80 (1852); Burditt v. Howth, 45 Tex. 466 (1876); Fitch v. Boyer, 51 Tex. 336 at 344 (1876); Simmons v. Arnim, 110 Tex. 309, 220 S.W. 66 (1920).

In similar situations in which a collateral attack is brought against a judgment, the judgment has been held to be voidable and not void. Moore v. Hanscom, 101 Tex. 293, 108 S.W. 150 (1908); White v. White, 142 Tex. 499, 179 S.W.2d 503 (1944). In Ex Parte Coffee, 160 Tex. 224, 328 S.W.2d 283 (1959), this Court held that judgments which are rendered without observance of statutory requirements which are purely procedural are not void, however irregular or erroneous they may be.
 [2]    The Texas Rules of Civil Procedure dealing with the issuance and return of the mandate subsequent to judgment of remand in the Court of Civil Appeals are procedural and not necessary to the jurisdiction of the trial court. Continental Casualty Company v. Street, 364 S.W.2d 184 (Tex.1963). In Continental, the case had been retried and judgment entered before the mandate was taken out. This second judgment of the trial court upon remand was held not to be a void judgment.

 [3]    From December 4, 1969, the date of the original mandate, until February 12, 1971, the date the original mandate was recalled, a mandate was on file with the trial court in this cause. It was an unauthorized mandate, but was valid until recalled. In any event, Petitioner still had an additional year to pay the costs and obtain the issuance of a mandate after the date of recall of the mandate. At no time has there been a period of twelve months in which no mandate has been filed with the trial court, as required by Rule 445, T.R.C.P., as a basis for dismissal.

 [4]    The Corpus Court erred in holding that the mandate was void Ab initio. Until the mandate was recalled by the Waco Court which had issued it erroneously before collection of appellate costs, the mandate was a lawful order of the Court upon which all parties could rely. Murchison v. White, supra.

The judgments of the courts below are reversed and the cause remanded to the trial court for new trial.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

295 S.W.3d 748
Court of Appeals of Texas,
Austin.

C.W. 100 LOUIS HENNA, LTD., Appellant,

v.

EL CHICO RESTAURANTS OF TEXAS, L.P., and El Chico Restaurants, Inc., Appellees.

No. 03–08–00555–CV.  |  Aug. 27, 2009.

**Synopsis**

**Background:** Landlord brought action against tenant, alleging breach of commercial ground lease in tenant's failure to repair damages to air conditioning units that had been subject to copper vandals and hail damage. The District Court, Williamson County, 277th Judicial District, Ken Anderson, J., entered summary judgment in favor of tenant. Landlord appealed.

**[Holding:]** The Court of Appeals, Bob Pemberton, J., held that air conditioning units were trade fixtures and not improvements such that tenant was under no obligation to repair units upon expiration of lease.

Affirmed.

West Headnotes (10)

**[1]** **Appeal and Error**  Particular orders or rulings reviewable in general

**Appeal and Error**  Rendering Final Judgment

Where the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, the appellate court should review the summary-judgment evidence supporting both motions and render the judgment that the trial court should have rendered.

Cases that cite this headnote

**[2]** **Appeal and Error**  Reasons for Decision

If the district court did not specify the ground on which it relied in granting summary motion, the appellate court may affirm the summary judgment if any ground is meritorious.

1 Cases that cite this headnote

**[3]** **Estates in Property**  Ground rents

**Fixtures**  Trade fixtures

Air conditioning units that were purchased and installed by tenant for purpose of running restaurant within leased premises were trade fixtures, and not improvements, such that tenant was not responsible for repairing the units upon expiration of lease; parties' commercial ground lease unambiguously manifested the drafters' intent that the units tenant was to install on the building would be temporary additions to the realty to aid tenant in operating a restaurant

there, which tenant would continue to own at the lease's conclusion, and not "Improvements" that it was required to maintain or repair for the landlord's benefit.

2 Cases that cite this headnote

[4]     **Contracts**  👉 Construction as a whole
        **Contracts**  👉 Language of contract

When courts construe a written contract, the primary concern is to ascertain and give effect to the intentions the parties have objectively manifested in that instrument; to that end, courts construe the contract in its entirety, considering each part in relation to every other part so that the effect of each part on others may be determined and that no part will be rendered meaningless.

1 Cases that cite this headnote

[5]     **Contracts**  👉 Language of Instrument

Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense.

1 Cases that cite this headnote

[6]     **Contracts**  👉 Subject, object, or purpose as affecting construction
        **Contracts**  👉 Extrinsic circumstances

In determining the meaning of contract terms, courts may consider the context of the circumstances existing at the time the contract was executed and the particular business activity sought to be served.

Cases that cite this headnote

[7]     **Contracts**  👉 Existence of ambiguity
        **Contracts**  👉 Ambiguity in general

If courts can give the contract a definite or certain legal meaning, it is unambiguous and it will be construed as a matter of law; if, on the other hand, the contract is subject to two or more reasonable interpretations, it is ambiguous, which creates a fact issue as to the parties' intent.

Cases that cite this headnote

[8]     **Contracts**  👉 Ambiguity in general

Whether a contract is ambiguous is a question of law.

Cases that cite this headnote

[9]     **Fixtures**  👉 Trade fixtures

As between a landlord and his tenant, the term "trade fixtures" refers to and means such articles as may be annexed to the realty by the tenant to enable him properly or efficiently to carry on the trade, profession, or enterprise contemplated by the tenancy contract or in which he is engaged while occupying the premises, and which can be removed without material or permanent injury to the freehold.

1 Cases that cite this headnote

**[10]** **Fixtures** 🔑 Trade fixtures

**Landlord and Tenant** 🔑 Improvements by landlord and covenants therefor

For purposes of distinguishing between trade fixtures and improvements to rental property, improvements made by a landlord are made to enhance the value of the estate, and to be permanent, whereas those made by the tenant are temporary and made for purposes of his trade.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*750** Forest D. Cook, Austin, TX, for Appellant.

Joel R. White, Austin, TX, for Appellees.

Before Justices PATTERSON, PEMBERTON and WALDROP.

*OPINION*

BOB PEMBERTON, Justice.

This is an appeal from a final summary judgment, on cross-motions, in a dispute between a landlord, appellant C.W. 100 Louis Henna, Ltd. (Henna), a tenant, appellee El Chico Restaurants of Texas, L.P. (El Chico), and the tenant's guarantor, El Chico Restaurants, Inc., over the proper construction of their commercial ground lease. The principal issue concerns whether air-conditioning units that El Chico installed on a building that the lease required it to construct are "improvements" that the lease obligated El Chico to maintain and deliver to Henna in good condition upon the lease's expiration, as Henna contends, or are trade fixtures that are excluded from the lease's definition of "improvements," as appellees argue. We agree with appellees that the air-conditioning units are trade fixtures and not "improvements" as a matter of law. Because this is one of the grounds on which the district court could have relied in granting summary judgment for appellees, we will affirm the judgment.

**BACKGROUND**

The material underlying facts are undisputed. On September 24, 1996, El Chico and Henna's predecessor, Boardwalk Center, Ltd., entered into a ground lease of a parcel of land located in Round Rock that Boardwalk owned and was developing as part of a new retail shopping center. On the same day, El Chico Restaurants, Inc. signed an agreement to guarantee El Chico's obligations under the ground lease.

Among its other obligations under the ground lease, El Chico was required to construct a building on the parcel it was leasing (defined as the "Land") within the permissible building area reflected in the project's site plan and "pursuant to plans and specifications approved in writing by Landlord [Boardwalk]." The lease defined this "building and other improvements and appurtenances that may hereafter be erected" on the Land as the "Improvements" and defined the Land and Improvements collectively as the "Premises." The referenced "plans and specifications" included or depicted two 12.5–ton [1] air conditioning units and two 10–ton units (the "HVAC units"), which were to be installed on top of the building.

The lease authorized El Chico to use the Premises to operate a "restaurant, a related cocktail lounge, such other uses as are incidental to the operation thereof and for any other lawful purpose," subject to its complying with "all applicable governmental and regulatory requirements and regulations." The lease was to run for an initial term expiring on the tenth anniversary of the "Rent Commencement Date"—a date tied to when El Chico opened for business on the Premises—subject to El **\*751** Chico's right to renew the lease for up to four additional terms of five years each. While the lease was in effect, El Chico would own the Improvements "hereafter constructed or placed on the Land during the Term," but El Chico had "no right to demolish, remove or alter the Improvements without Landlord's prior written consent." El Chico was further required to carry specified insurance on the Premises and "take good care of the Improvements during the Term, including repairs to the interior, exterior and structure, it being understood that Landlord shall not be required to maintain the Premises or make any repairs to the Improvements during the Term." At the end of the lease, El Chico was required to "deliver up the Land with the Improvements then situated thereon in good repair and condition, loss by fire or other casualty, condemnation, act of God, ordinary wear and tear, decay, depreciation and obsolescence being excepted," whereupon the Improvements were to "be and become the property of Landlord ... without compensation therefor." However, paragraph 12 of the lease provided that "trade and business fixtures ... shall not be deemed to be part of the Premises but shall remain the property of Tenant."

The "Rent Commencement Date" was in April 1997, which meant that the ten-year initial lease term ran until April 2007. The record reflects that, in April 2006, Boardwalk conveyed its interest in the Premises and the ground lease to Henna Blvd., L.L.C., which then assigned these interests to Henna. Around the same time, El Chico gave written notice to Henna Blvd., L.L.C. that El Chico had ceased doing business in the Premises and that it would permit the lease to expire at the end of the initial term without renewing it. In this document, El Chico also waived any rights it possessed under the lease that would have prevented Henna Blvd., L.L.C. (or Henna, its successor) from marketing and selling or leasing the Premises, and El Chico agreed to execute a document terminating the lease upon the landlord's request if the landlord succeeded in selling or leasing the Premises.

In June 2006, El Chico sold Henna "all furniture, fixtures and equipment (collectively, the 'Assets') located, as of this date, in the El Chico® restaurant at 100 Louis Henna Boulevard, Round Rock." Henna acknowledged and agreed that it "ha[d] inspected the Assets at the Premises and [was] acquiring the Assets in their 'AS IS' condition." Around the same time, El Chico and Henna amended the ground lease to provide that effective June 23, 2006, Henna would assume responsibility for paying all charges for utility services at the Premises, including the security alarm system, and for maintaining the grounds around the Improvements. However, El Chico continued to make monthly rental payments through the end of the initial lease term in April 2007.

In January 2007, a few months before the lease's April expiration, Henna learned that the HVAC units on top of the restaurant building had been vandalized by copper thieves and damaged by hail. Henna obtained an estimate of $38,496 to repair the damage. A series of communications ensued between the parties or their agents in which it was disputed whether Henna or El Chico was responsible for repairing and/or insuring against the damage to the HVAC units. Eventually, in August and September of that year, counsel for Henna sent letters to both El Chico and, as guarantor, El Chico Restaurants, Inc., demanding payment of the $38,496 estimated repair amount. In October, Henna sued these entities.

Henna alleged that appellees were obligated under the ground lease to insure or **\*752** repair the HVAC units and had failed to perform. It asserted a cause of action for breach of contract and sought damages and attorney's fees. Henna filed a "traditional" motion for partial summary judgment as to appellees' liability for breaching the lease. It attempted to conclusively establish each of the elements of its breach-of-contract cause of action; namely, that: (1) a valid contract existed between the parties; (2) Henna had performed or tendered performance; (3) appellees had breached the contract; and (4) Henna was damaged as a result of the breach. *See New York Life Ins. Co. v. Miller,* 114 S.W.3d 114, 121 (Tex.App.-Austin 2003, no pet.). Appellees filed a response and a "traditional" cross-motion in which they attempted to conclusively negate each of these elements, as well as Henna's entitlement to attorney's fees. Regarding breach, the parties joined issue as to whether the HVAC units are Improvements that appellees were obligated under the ground lease to repair or insure, as Henna argued, or are trade fixtures that were excluded from that obligation, as appellees contended. The parties also joined issue as to whether Henna had complied with the default or remedy provisions of the lease, whether Henna had incurred any damages, or whether Henna had any entitlement to attorney's

fees. Following a hearing, the district court rendered final judgment denying Henna's summary-judgment motion and granting appellees' motion without stating the specific grounds on which it relied. Henna thereafter filed a motion for new trial, which the district court denied by written order following a hearing. This appeal ensued.

## ANALYSIS

Henna brings twelve issues on appeal. It disputes whether appellees were entitled to prevail on any of the summary-judgment grounds presented in their motion—specifically, whether appellees conclusively negated the elements of breach (points five and six), Henna's performance (points seven and eight), damages (points nine and ten), or Henna's entitlement to attorney's fees (point twelve). Henna also brings a corresponding set of points complaining that the district court erred in denying Henna's summary-judgment motion. Henna asserts that it established each of the elements of its breach-of-contract cause of action as a matter of law: breach (points one and two), performance (point three), and damages (point four), and that it was entitled to attorney's fees (point eleven).

### Standard of review

**[1]** We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). In deciding whether there is a disputed material fact issue precluding summary judgment, we take as true proof favorable to the non-movant, and we indulge every reasonable inference and resolve any doubt in favor of the non-movant. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). Where, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we should review the summary-judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000).

**\*753** **[2]** As the movant in a "traditional" summary-judgment motion challenging Henna's breach-of-contract cause of action, appellees had the initial burden of conclusively negating at least one element of that cause of action (i.e., establishing one of the grounds in their motion as a matter of law). *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). Assuming appellees met that burden as to at least one element, the burden shifted to Henna to present summary-judgment evidence raising a genuine issue of material fact as to that element or elements. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 24 (Tex.2000) (per curiam). Because the district court did not specify the ground on which it relied in granting appellees' motion, we may affirm the summary judgment if any ground is meritorious. *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993).

If the district court properly granted appellees' summary-judgment motion, it follows that it did not err in denying Henna's motion on the same grounds. *See FM Props. Operating Co.,* 22 S.W.3d at 872. If we conclude that the district court erred in granting appellees' motion, then we consider whether it also erred in denying Henna's motion. To prevail on its motion, Henna had the burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its breach-of-contract cause of action. *See Willrich,* 28 S.W.3d at 23 (citing *Rhône–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222–23 (Tex.1999); *Oram v. General Am. Oil Co.,* 513 S.W.2d 533, 534 (Tex.1974) (per curiam)).

### "Improvements" versus trade fixtures

**[3]** Appellees' summary-judgment ground attacking the breach element of Henna's cause of action was premised on its argument that, as a matter of law, the HVAC units were "trade or business fixtures" under paragraph 12 of the ground lease and not "Improvements" that the lease required them to repair or insure. Henna challenges this legal conclusion in its fifth issue, contending that the district court erred in granting summary judgment on this ground because the HVAC units were instead "Improvements" as a matter of law, or that at least a fact issue remains as to the parties' intent. Similarly, in its first issue, Henna

argues that because the HVAC units were "Improvements" as a matter of law, it established the breach element of its cause of action as a matter of law. Our resolution of these issues turns on construction of the ground lease. *See Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.,* 715 S.W.2d 658, 664 (Tex.App.-Dallas 1986, writ ref'd n.r.e.) (observing that such issues turn on the parties' intent, which courts ascertain by looking to relevant provisions of a contract governing their use of the realty); *Jim Walter Window Components v. Turnpike Dist. Ctr.,* 642 S.W.2d 3, 4 (Tex.App.-Dallas 1982, writ ref'd n.r.e.) ("The intent of the parties regarding the right to remove additions at the termination of a lease is to be determined from the provisions of the lease agreement.").

 **[4]** **[5]** **[6]** **[7]** **[8]** When we construe a written contract, such as the ground lease, our primary concern is to ascertain and give effect to the intentions the parties have objectively manifested in that instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam); *see Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 746 (Tex.2006) ("As with any other contract, the parties' intent is governed by what they said, not by what they *intended* to say but did not."). To that end, we construe the lease in its entirety, considering each part in relation to every other part so that the effect of each **\*754** part on others may be determined and that no part will be rendered meaningless. *See City of Keller v. Wilson,* 168 S.W.3d 802, 811 (Tex.2005); *Valence Operating Co.,* 164 S.W.3d at 662. Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co.,* 164 S.W.3d at 662. In determining the meaning of contract terms, we may also consider the context of the circumstances existing at the time the contract was executed and the particular business activity sought to be served. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996); *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987). If we can give the contract a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Willis v. Donnelly,* 199 S.W.3d 262, 275 (Tex.2006); *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). If, on the other hand, the contract is subject to two or more reasonable interpretations, it is ambiguous, which creates a fact issue as to the parties' intent. *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589. Whether a contract is ambiguous is a question of law. *Id.*

At the center of the parties' competing contentions is paragraph 12 of the lease, which explicitly excludes "trade or business fixtures" from "Improvements":

12. *Equipment, Fixtures and Signs*

(a) Tenant shall have the right to erect, install, maintain and operate on the Premises such equipment, *trade and business fixtures,* signs (including, without limitation, pylon signage) and other personal property as Tenant may deem necessary or appropriate, *and such shall not be deemed to be part of the Premises, but shall remain the property of Tenant.* Any such installations shall be in accordance with applicable local codes and Tenant's pylon signage and monument signage, if applicable, shall be installed in those locations designated therefor as reflected in the Site Plan. At any time during the Term and within thirty (30) days after the expiration or termination of the Term, Tenant shall have the right to remove all or any part of Tenant's equipment, *removable fixtures,* signs (including, without limitation, its pylon signage, if any) and other personal property from the Premises, provided that Tenant repairs all damage to the Improvements caused by such removal. Any property remaining in the Improvements after such thirty (30) day period shall be deemed to have been abandoned by Tenant.

(Italics added.) Because the "Premises" from which "trade or business fixtures" are excluded are defined elsewhere in the lease to mean the "Land" plus the "Improvements," paragraph 12 means that anything constituting a "trade or business fixture" (or, for that matter, anything constituting "such equipment, ... signs ... and other personal property as Tenant may deem necessary or appropriate" to install or operate on the Premises) cannot be an Improvement.

 **[9]** **[10]** The ground lease does not contain a definition of trade or business fixtures. However, the term "trade fixture" has acquired a well-established, commonly understood meaning in Texas law. As one of our sister courts has observed:

The term "trade fixture" has been defined many times by the courts.... "It is now well settled that, as between a landlord and his tenant, the term 'trade fixtures' refers to and means such articles **\*755** as may be annexed to the realty by the tenant

to enable him properly or efficiently to carry on the trade, profession, or enterprise contemplated by the tenancy contract or in which he is engaged while occupying the premises, and which can be removed without material or permanent injury to the freehold."

*Boyett v. Boegner,* 746 S.W.2d 25, 27 (Tex.App.-Houston [1st Dist.] 1988, no writ) (quoting *Granberry v. Texas Pub. Serv. Co.,* 171 S.W.2d 184, 186 (Tex.Civ.App.-Amarillo 1943, no writ)). It is also well established that trade fixtures are distinguished from "improvements" and other types of fixtures (i.e., personal property affixed to realty). "An improvement includes all additions to the freehold except for trade fixtures which can be removed without injury to the property." *Sonnier v. Chisholm–Ryder Co.,* 909 S.W.2d 475, 479 (Tex.1995); *see also Reames v. Hawthorne–Seving, Inc.,* 949 S.W.2d 758, 761 (Tex.App.-Dallas 1997, pet. denied) ("The class of improvements is considered to be broader than that of fixtures, which are items of personalty that have become permanent parts of the realty to which they are affixed. Therefore, although all improvements are not necessarily fixtures, any fixture, unless it is a trade fixture, is considered an improvement. A trade fixture is an item, which can be removed without material or permanent injury to the freehold, that a tenant annexes to realty to enable the tenant to carry on its business." (Citations omitted.)). The rationale for these distinctions is that "[i]mprovements made by a vendor, mortgagor or ancestor are made to enhance the value of the estate, and to be permanent; while those made by the tenant are temporary and made for purposes of his trade." *Jim Walter Window Components,* 642 S.W.2d at 5 (quoting *Menger v. Ward,* 28 S.W. 821, 823 (Tex.Civ.App.-San Antonio 1894), *rev'd on other grounds,* 87 Tex. 622, 30 S.W. 853 (1895)).

The drafters' use of "trade or business fixtures" within paragraph 12 without providing definitions of these terms that would be unique to this agreement suggests their intent to employ the well-established definitions and concepts set out in case law. After granting the tenant the right to install or maintain "equipment," "*trade or business fixtures,*" "signs," and "other personal property," paragraph 12 provides the tenant a corresponding right to remove all or part of its "equipment," "*removable fixtures,*" "signs," and "other personal property from the Premises, provided that Tenant repairs all damage to the Improvements caused by such removal." This usage reflects that, consistent with the common meaning of trade fixtures in Texas law, "trade or business fixtures" under the lease are considered to be removable personal property. Similarly, paragraph 12 excluded "trade or business fixtures" from the lease's definition of "Improvements," just as trade fixtures are excluded from improvements under Texas law.

Appellees conclusively established that the HVAC units at issue met the commonly understood definition of trade fixtures. They presented uncontroverted summary-judgment evidence that the HVAC units were not attached to the building, but were designed to be and were placed on curbs on the roof so they could be removed and replaced without injury to the building, and that such units needed to be replaced periodically as they reached the end of their useful life cycles. Appellees likewise presented undisputed evidence that the HVAC units here were approaching the end of their useful lives, and that the units ultimately were replaced without injury to the building. Further, appellees presented uncontroverted summary-judgment evidence **\*756** that the 45 tons of air-conditioning capacity provided by the HVAC units facilitated the building's use as a restaurant, but was many times greater than that needed if the building were to be used for other retail or office use. Several Texas courts, addressing similar facts, have held that air-conditioning units are trade fixtures as a matter of law. *See Boyett,* 746 S.W.2d at 27–28; *White v. Cadwallader & Co.,* 299 S.W.2d 189, 190–92 (Tex.Civ.App.-San Antonio 1957, writ ref'd n.r.e.); *Moskowitz v. Calloway,* 178 S.W.2d 878, 879–80 (Tex.Civ.App.-Texarkana 1944, writ ref'd w.o.m.); *cf. Nine Hundred Main, Inc. v. City of Houston,* 150 S.W.2d 468, 471–73 (Tex.Civ.App.-Galveston 1941, writ dism'd judgm't cor.) (distinguishing tenant-installed air-conditioning system that had been constructed in a manner making it an integral part of the building).

Henna correctly observes that there is no rule or presumption in Texas law that air-conditioning units are always trade fixtures. The issue, rather, turns on the parties' intent, which here we ascertain from the ground lease. *See Tempo Tamers, Inc.,* 715 S.W.2d at 664. Henna argues that portions of the ground lease outside paragraph 12 reflect the drafter's intent that the HVAC units be considered "Improvements" under the lease and that this definition, not the commonly understood definitions of improvements and trade fixtures, must control. *See id.* at 664–66 (example of case where lease language demonstrated that "the parties in this case could not have reasonably intended that 'trade fixtures' have the legal meaning ascribed to it by the courts"). Henna relies on paragraph 1 of the lease, which defines "Improvements" as "any building and other improvements and appurtenances that may hereafter be erected" on the Land, in conjunction with paragraph 5:

> 5. *Construction.* The Improvements shall be constructed and situated on the Land within the permissible building area reflected on the Site Plan and pursuant to plans and specifications approved in writing by Landlord; provided, however, that Tenant shall have the right to revise the permissible building area and the approved plans and specifications subject to Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. Notwithstanding anything contained herein to the contrary, however, Landlord hereby consents to and approves of the prototypical plans and specifications which are being used by Tenant on the Effective Date of this Lease and hereby agrees that Tenant shall have the right to construct the Improvements without any further consent by Landlord so long as the Improvements are constructed generally in accordance with such prototypical plans....

Henna presented uncontroverted summary-judgment evidence that the "plans and specifications" referenced in paragraph 5 included a drawing of a four-unit, 45–ton HVAC system like that El Chico later installed. Thus, Henna reasons, the "Improvements [that] shall be constructed ... pursuant to plans and specifications" under paragraph 5 included the HVAC units that El Chico later installed.

Based on this premise, Henna argues that paragraph 5 evinces the drafters' agreement and intent to impose an obligation on El Chico to include the HVAC units at issue when constructing the building. Henna also relies on paragraphs 6 and 30 of the ground lease for a similar proposition. Paragraph 6 authorized El Chico to use the Premises "for the operation of a restaurant ... and for any other lawful purpose, subject, however, to ... all applicable governmental and regulatory requirements and restrictions." Similarly, **\*757** paragraph 30 provided that, during the lease term, "Tenant ... shall conform to and comply with all ordinances, regulations and laws (federal, state, or municipal) ... affecting the Premises...." Henna presented summary-judgment evidence that El Chico had obtained a certificate of occupancy for its restaurant from the City of Round Rock based on the plans and specifications. From this, Henna reasons that El Chico had obligations under paragraphs 6 and 30 to install the HVAC units in order to comply with this "regulatory requirement."

The existence of these agreements and obligations on the part of El Chico to install the HVAC units when constructing its restaurant building, Henna further reasons, distinguishes the HVAC units from a trade fixture, which, Henna asserts, is characterized by a tenant's unilateral decision to affix personalty to an existing building that the tenant has leased. Relatedly, Henna argues that the HVAC units were part of the consideration the landlord bargained to obtain under the ground lease. In sum, Henna urges that "[t]he decision to originally incorporate the HVAC system was neither unilateral nor voluntary; rather, such decision was bilateral, between El Chico and its landlord, as well as required under the plans and specifications incorporated into the ground lease, itself, of course, the product of arms-length negotiation between the parties, a factual distinction absolutely determinative in the present appeal."

The chief flaw in Henna's reasoning is its foundational premise that the ground lease's definition of "Improvements" encompassed the HVAC units because the plans and specifications called for two 12–ton units and two 10–ton units like El Chico installed. Contrary to Henna's argument, paragraph 5 does not purport to incorporate into the lease's "Improvements" definition whatever property might have been depicted in the plans and specifications. Paragraph 5 requires that "[t]he *Improvements* shall be constructed ... pursuant to [the] plans and specifications," which means that the Improvements must be constructed in a manner carrying out or in conformity with the plans and specifications.[2] It does not follow from this requirement that any piece of property depicted in the plans and specifications, even if otherwise considered a trade fixture, equipment, or other personal property, would be an Improvement. For example, appellees presented summary-judgment evidence that the plans and specifications also included depictions of El Chico's walk-in coolers, freezers, tables and chairs, and other trade fixtures or restaurant equipment. If, as Henna argues, paragraph 5 means that all property depicted in the plans and specifications is an "Improvement" that El Chico could not remove without the landlord's approval, it would conflict with paragraph 12, which grants El Chico the right to "remove all or any part of Tenant's equipment, removable fixtures, signs ... and other personal property from the Premises, provided that Tenant repairs all damage to the Improvements caused by such removal." We must instead construe these provisions in relation to one another so as to give both effect. *See Valence Operating Co.,* 164 S.W.3d at 662. Consequently, we cannot conclude that the drafters intended paragraph 5 to mean that all property depicted in the plans

and specifications is "Improvements" that El Chico could not remove and that the landlord would own after the lease expired. In short, paragraph 5 does **\*758** not mean that the HVAC units are "Improvements" under the ground lease.

We are similarly unpersuaded by Henna's argument that the HVAC units cannot be trade fixtures because the drafters anticipated at the inception of the ground lease that El Chico would install such units when constructing the restaurant building. Henna is correct that the reported Texas cases holding that air-conditioning units are trade fixtures have involved units that a tenant installed in a preexisting building during a lease term—not, as here, a ground lease where the parties contemplated that the tenant would construct a building and install the units. *See Boyett,* 746 S.W.2d at 27–28; *White,* 299 S.W.2d at 190–92; *Moskowitz,* 178 S.W.2d at 879–80. Although Henna is correct as a factual matter, we disagree that the legal principle governing these decisions turns solely on whether or when the tenant and/or landlord anticipated that the units would be installed. The critical issue, rather, is whether the parties intended the air-conditioning units to be permanent additions to the building, for the landlord's ownership and benefit as part of the realty, or temporary additions to aid the tenant, El Chico, while it was operating a restaurant in the building. *See Jim Walter Window Components,* 642 S.W.2d at 5 (quoting *Menger,* 28 S.W. at 823). We ascertain such intent, as Henna has acknowledged, from the terms of the ground lease. *Id.* at 4 ("The intent of the parties regarding the right to remove additions at the termination of a lease is to be determined from the provisions of the lease agreement."); *see Tempo Tamers, Inc.,* 715 S.W.2d at 664.

The drafters' use of "trade or business fixtures" in paragraph 12 of the ground lease, as discussed, manifests their intent to incorporate the commonly understood meaning of trade fixtures under Texas law. Paragraph 5 of the lease does not reflect a contrary intent, nor do paragraphs 6 and 30, the other provisions on which Henna relies. As appellees observe, Henna's arguments concerning the restaurant's certificate of occupancy are simply inapposite. The fact that El Chico submitted the plans and specifications to the City of Round Rock when obtaining a certificate of occupancy permitting it to operate a restaurant in the building has no bearing on whether the drafters intended the HVAC units or other property depicted in the plans and specifications to be "Improvements" or trade fixtures.

Appellees conclusively established that the HVAC units are trade fixtures under the established definition of that term in Texas law. Paragraph 12 explicitly excludes "trade or business fixtures" from the "Premises" and, thus, the "Improvements" under the lease. In other words, the ground lease unambiguously manifests the drafters' intent that the HVAC units El Chico was to install on the building would be temporary additions to the realty to aid El Chico in operating a restaurant there, which El Chico would continue to own at the lease's conclusion, and not "Improvements" that it was required to maintain or repair for the landlord's benefit. We are bound to give effect to this unambiguous language as the controlling indicator of the bargain the drafters intended to strike. *See Willis,* 199 S.W.3d at 275; *J.M. Davidson, Inc.,* 128 S.W.3d at 229.

In a final argument, Henna asserts that El Chico "didn't consider the HVAC system a fixture" in its June 2006 sale of "all furniture, fixtures and equipment" to Henna because the HVAC units did not appear in the list of property attached to the bill of sale. Henna suggests this evidence raises an inference that, as late as June 2006, El Chico intended or understood that the HVAC units were not trade fixtures. We disagree. First, even assuming that **\*759** "fixtures" as used in the bill of sale would have included trade fixtures, the record does not support Henna's factual premise that El Chico excluded the HVAC units from that category of property—the bill of sale explicitly covers "all furniture, fixtures and equipment, whether or not listed in Exhibit 'A.' " Second, and more importantly, even if this evidence supported an inference as to El Chico's subjective intent or understanding regarding whether the HVAC units were trade fixtures, it would be incompetent to raise a fact issue as to the parties' intent in the face of the unambiguous ground lease. *See Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 32 (1958) (parol-evidence rule is a limitation of substantive contract law and not merely a rule of evidence).

Henna's breach-of-contract claims are predicated on the legal conclusion that the HVAC units were "Improvements" under the ground lease. Because the HVAC units were not "Improvements" as a matter of law, the district court properly granted summary judgment for appellees on the ground that Henna cannot prove breach. Accordingly, we overrule Henna's fifth point of error and its corresponding first point of error.

Because this ground alone is sufficient to support summary judgment, *see S.S.,* 858 S.W.2d at 380, we need not reach Henna's contentions regarding other grounds and elements. *See* Tex.R.App. P. 47.1.

## CONCLUSION

We affirm the district court's judgment.

Footnotes

1       A "ton" is a measure of air conditioning power. It refers to the cooling power of one ton of ice melting in a 24–hour period. *Webster's Third New International Dictionary* 2407 (1986).

2       "Pursuant to" is defined as "in conformance to or agreement with" or "according to." *Webster's Third New International Dictionary* 1848 (1986).

**End of Document**                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

149 Tex. 469
Supreme Court of Texas.

CARLE et al.

v.

CARLE.

No. A-2892.  |  Nov. 29, 1950.  |  Rehearing Denied Jan. 10, 1951.

Ollie Mae Carle sued Louis M. Carle for divorce, partition of certain real properties, and attorney's fees. From parts of a judgment of the District Court of Bexar County, defendants appealed to the El Paso Court of Civil Appeals of the Eighth Supreme Judicial District, which dismissed the appeal in part and reversed the judgment and remanded the case in part, 234 S.W.2d 907, and on motions for rehearing, 234 S.W.2d 916, reversed the judgment and rendered judgment in part and certified four questions to the Supreme Court. The Supreme Court, Hickman, C. J., held that the Court of Civil Appeals did not err in holding that appellant was estopped from complaining of a portion of the judgment declaring two properties to be plaintiff's separate properties, but erred in holding that defendant was not estopped from complaining of a portion declaring another property plaintiff's separate property.

One question answered in the negative, two questions answered in the affirmative, and another question not answered.

Appellee's second motion in the Court of Civil Appeals for rehearing, 235 S.W.2d 924, was granted in part and the judgments of such court set aside the part, and the motion was overruled and the judgments adhered to in other respects, in conformity with the answers to the certified questions.

West Headnotes (6)

**[1]**     **Appeal and Error**  👉 Payment of or on Judgment

Generally, a litigant voluntarily accepting benefits of judgment cannot appeal therefrom, unless reversal thereof cannot possibly affect his right to such benefits.

118 Cases that cite this headnote

**[2]**     **Appeal and Error**  👉 Acceptance of sum absolutely due or admitted to be due

A litigant accepting only benefits which adverse party concedes or is bound to concede are due such litigant under judgment is not estopped from prosecuting appeal involving only his right to further recovery.

123 Cases that cite this headnote

**[3]**     **Divorce**  👉 Estoppel

The Court of Civil Appeals did not err in holding that divorced husband, accepting half of community money, used in paying obligations against certain real properties from divorced wife's interest in community estate, could not complain of portion of judgment, declaring such properties wife's separate properties, on appeal therefrom, but erred in holding that husband was estopped from complaining of portion declaring another property wife's separate property, as benefit to him under judgment would be affected, if he succeeded in appeal and established his claim that property was community on another trial, while wife's right to partition of property might be prejudiced. Rev.St.1925, art. 4638.

29 Cases that cite this headnote

**[4]**    **Divorce**  🔑 Discretion of court in general

         **Divorce**  🔑 Equity and proportionality in general

The statute providing that court granting divorce shall also decree and order division of parties' estate as court deems just and right vests discretion in court to determine proper division of community estate and does not require court, as matter of law, to divide such estate equally between parties. Rev.St.1925, art. 4638.

25 Cases that cite this headnote

**[5]**    **Divorce**  🔑 Balance and effect of allocation or other award

The fact that divorce decree, requiring husband to pay all of wife's attorney's fees, may result in award to him of smaller part of community estate than that awarded wife, does not alone condemn decree, as attorney's fee is merely a factor to be considered by court in making equitable division of estate, considering parties' conditions and needs and all surrounding circumstances. Rev.St.1925, art. 4638.

78 Cases that cite this headnote

**[6]**    **Husband and Wife**  🔑 Community and Separate Debts

The Court of Civil Appeals erred in holding that attorney's fee, charged by decree granting wife divorce solely against husband's interest in community estate divided between parties by decree, was chargeable as matter of law against community estate as whole. Rev.St.1925, art. 4638.

4 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*470**  **\*\*1002**  Dibrell & Gardner, James F. Gardner and Sam J. Dotson, all of San Antonio, for appellants.

Conger, Baskin & Casseb, Paul E. Casseb, San Antonio, for appellee.

**Opinion**

HICKMAN, Chief Justice.

The certificate from the Court of Civil Appeals, 8th District, at El Paso recites:
 **\*\*1003** 'This was an action for divorce instituted by Ollie Mae Carle against her husband, Louis M. Carle. She sought the divorce and a partition of certain properties in the city of San Antonio; part of it she alleged was her separate property and the remainder community property of herself and her husband. She likewise sought to recovery attorney's fees in the sum of $6500.00 against defendant. Plaintiff recovered as her separate property (1) the residence at 344 Park Drive, San Antonio, Texas, and the household furnishings located therein; (2) the service station property together with fixtures and equipment thereon at 5401 South Flores Street, San Antonio, Texas; (3) the property located at 605 Guadalupe Street in San Antonio. The judgment provided as to the property located at 344 Park Drive that it was subject to an offset in favor of defendant in the sum of $7,000.00. Under the verdict it was found $14,000.00 of community funds had been used to pay off indebtedness against the property at Park Drive; $900.00 was likewise found to have been paid out of the community funds on the furnishings in this house adjudged to plaintiff; obligations in the sum of $500.00 on the property at 5401 South Flores Street was found to have

been paid out of community funds. These respective amounts, to-wit, $7,000.00, $450.00 and $250.00 were charged against plaintiff's interest in the community property. The balance of the property involved was held to be community property and a commissioner was appointed to sell same under the direction of the court and divide the proceeds in accordance with the judgment under the direction of the court. Defendant perfected an appeal from parts of this judgment. He appealed from that part of the judgment declaring the three pieces of property hereinbefore described as **\*471** the separate property of his wife, from that portion of the judgment allowing his wife the recovery of an attorney's fee of $6500.00 and charging the same against his interest in the community property.

'Appellee has filed a supplemental transcript herein which in substance shows that the commissioner under the direction and authority of the court has sold all community property in accordance with the judgment, has disposed of all the money arising therefrom except the sum of $2666.79 which under the order of the court he paid into the registry of the court, and was discharged. Some of these distributions were requested by the defendant. The attorney's fees in the sum of $6500.00 have been paid and same were charged against the interest of defendant in the community. The charges made in favor of the community estate for indebtedness paid on obligations against property adjudged to plaintiff as her separate property have been paid to defendant, that is, one-half thereof has been charged as against plaintiff's interest in the community estate and paid to the defendant in the sum of $7700.00.

'In our original disposition of the case we held that the accepting by defendant of the offsets adjudged in his favor as to the property located at 5401 South Flores Street and at 344 Park Drive, each of which piece of property was adjudged to be separate property of plaintiff, estopped him from complaining of the trial judge's judgment decreeing same to be the separate property of plaintiff. To this view in ruling on the motion for a rehearing we still adhere. Further, in regard to the property at 605 Guadalupe Street as to which appellee (plaintiff) has filed a motion for rehearing, we still adhere to the view expressed in the original opinion that defendant is not estopped from claiming that same is community property. In regard to the fee for $6500.00 allowed to plaintiff we granted defendant's motion for rehearing and rendered judgment charging said fee to the community estate of plaintiff and defendant. For further facts we refer to our original opinion and our opinion on our holding granting the motion for rehearing, and likewise as to our reasons for the disposition made of the respective matters in controversy.'

The first and second questions certified are:

'Question No. 1. Did we err in holding that defendant was not entitled to complain on appeal of that portion of the **\*\*1004** judgment decreeing the property at 344 Park Drive as the separate property of plaintiff and that portion of the judgment decreeing **\*472** the property at 5401 South Flores Street as the separate property of plaintiff on account of the fact that he accepted and collected from plaintiff's interest in the community estate one-half of the community money used in paying obligations against said property?'

'Question No. 2. Did we err in holding that defendant by his action subsequent to the rendition of the judgment had not estopped himself from complaining of the court's action in decreeing the property at 605 Guadalupe Street as the separate property of plaintiff?'

**[1]** **[2]** A litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot afterward prosecute an appeal therefrom. That is the general rule which appears to be universally recognized. It was announced by this court in the early case of Matlow v. Cox, 25 Tex. 578. The rule is based on the principle of estoppel. It, however, is subject to the exception that '\* \* \* where the reversal of a judgment cannot possibly affect an appellant's right to the benefit secured under a judgment, then an appeal may be taken, \* \* \*.' 2 Am.Jur., Appeal and Error, Sec. 215. Numerous authorities, approaching the exception from a slightly different angle, define it, in effect, in this language: Where an appellant accepts only that which appellee concedes, or is bound to concede, to be due him under the judgment he is not estopped to prosecute an appeal which involves only his right to a further recovery. Embry v. Palmer, 107 U.S. 3, 2 S.Ct. 25, 27 L.Ed. 346; Hodges v. Smith, 34 Tex.Civ.App. 635, 79 S.W. 328, error dismissed; Tyler v. Shea, 4 N.D. 377, 61 N.W. 468, 50 Am.St.Rep. 660; Bass v. Ring, 210 Minn. 598, 299 N.W. 679, 169 A.L.R. 980.

 **[3]** The exception is narrow. Whether or not this case falls within it must be determined from answers to these questions: Could a reversal of the portions of the judgment referred to in these two certified questions possibly affect appellant's right to the benefits secured by him under the judgment? And would appellee be compelled to concede upon another trial that appellant has the right to retain those benefits regardless of the outcome of the litigation?

As we understand the facts stated in the certificate and in the opinion of the Court of Civil Appeals, 234 S.W.2d 907, appellee instituted this suit in which she claimed that the property mentioned in these questions belonged to her in her separate right. The appellant claimed that it belonged to **\*473** the community estate. His claim was denied and he seeks to have that portion of the judgment revised. As the matter now stands, appellant has been awarded and has voluntarily accepted $7,700.00 in cash on the basis of a holding by the trial court that the property belongs to appellee as her separate estate, a part of which was charged with an indebtedness of $15,400.00 in favor of the community. Should the judgment be reversed and the cause remanded to the trial court it would become its mandatory duty to divide the estate of the parties. Article 4638, R.S.1925. If upon another trial it should be adjudged that the property is community property, the court, for instance, might deem it just and right to award one of these lots to one party and the other two lots to the other party. Clearly, the court would have the authority to to so under the article of the statutes above mentioned by making provisions for adjudicating equities. In order to restore the status quo so the court could partition it in the manner indicated it would be necessary for appellant to restore the amount ($7,700.00) received by him under the original judgment. The amount of the community funds remaining undistributed is much less than that sum. It appears, then, that if appellant should be successful in his appeal and then successful upon another trial in establishing his claim that the property is community, the benefit secured by him under the judgment appealed from would necessarily be affected. Besides, the right of appellee to a partition of the property might well be prejudiced. She certainly would **\*\*1005** not concede that appellant would be entitled to retain the money paid him on the ground that the property is not community while pressing his claim that it is community. We accordingly answer the first question, 'No,' and the second question, 'Yes.'

Questions 3 and 4 are as follows:

'Question No. 3. Did we err in holding on rehearing that defendant by his action subsequent to the rendition of the judgment had not estopped himself from complaining of the court's action in charging the attorney's fees against his half of the community estate?'

'Question No. 4. Did we err in holding on rehearing that the attorney's fee charged by the trial court solely against the defendant's interest in the community estate was as a matter of law chargeable against the community estate as a whole?'

 **[4]** **[5]** **[6]** We first consider question No. 4. The decisions of various courts of civil appeals with respect to this question cannot well be harmonized. **\*474** As we view the problem, it is not a correct approach to its solution to classify the wife's attorney's fees as a necessity, and then apply the rule that necessities are primarily the obligations of the community and secondarily of the husband's separate estate. That reasoning fails to take into account Article 4638, supra, which provides: 'The court pronouncing a decree of divorce shall also decree and order a division of the estate of the parties in such a way as the court shall deem just and right, having due regard to the rights of each party and their children, if any. Nothing herein shall be construed to compel either party to divest himself or herself of the title to real estate.'

That statute clearly vests discretion in the trial court in determining the proper division of the community estate of the parties. The court is not required, as a matter of law, to divide that estate equally between them. In practical effect, a decree that the husband pay all of the wife's attorney's fees may be to award him less of the community estate than that awarded to the wife, but that alone does not condemn it. The attorney's fee is but a factor to be considered by the court in making an equitable division of the estate, considering the conditions and needs of the parties and all of the surrounding circumstances. We answer question No. 4, 'Yes.'

In view of our answer to question No. 4, question No. 3 becomes immaterial.

234 S.W.2d 1002

## Parallel Citations

234 S.W.2d 1002

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 429096
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION. UNDER TX R RAP RULE
47.7, UNPUBLISHED OPINIONS HAVE NO PRECEDENTIAL VALUE BUT
MAY BE CITED WITH THE NOTATION "(not designated for publication)."

Court of Appeals of Texas, Beaumont.

CERTAIN UNDERWRITERS AT LLOYD'S, et al., Appellants

v.

BRISTOL-MYERS SQUIBB CO., INC. and MEDICAL ENGINEERING CORP., Appellees

NO. 09-97-540 CV    |    July 30, 1998

On Appeal from the 58th District Court Jefferson County, Texas Trial Cause No. A-145,672-F

Before WALKER, C.J., BURGESS and STOVER, JJ.


OPINION

PER CURIAM.

***1** Certain Underwriters at Lloyd's, London, and other British and European insurance companies (referred to collectively as BES) are plaintiffs in an action against Bristol-Myers Squibb Co., Inc. and Medical Engineering Corp (referred to collectively as Bristol-Myers).

The underlying suit arises from a contract BES entered into with Bristol-Myers to provide comprehensive general liability insurance. BES attempted to rescind the contract and in response Bristol-Myers sued. One of the conditions of coverage is a mandatory arbitration clause. Bristol-Myers sought and was granted an anti-suit injunction designed to prevent BES from commencing arbitration.

BES filed a Motion to Compel Arbitration and to Dissolve the Anti-Suit Injunction, which the trial court denied December 5, 1997. BES then filed an interlocutory appeal from the denial of the motion to dissolve the anti-suit injunction. [1]

The order of the trial court granting the anti-suit injunction forming the basis of this appeal was signed January 27, 1995. [2] BES' notice of appeal was filed December 23, 1997 (amended notice of appeal was filed December 26, 1997). "An interlocutory order that is not timely appealed is not reviewable by this Court." *State v. Ruiz Wholesale Co.,* 901 S.W.2d 772, 775 (Tex.App.-Austin 1995, no writ)(citing *Desai v. Reliance Mach. Works, Inc.,* 813 S.W.2d 640, 641 (Tex.App.-Houston [14th Dist.] 1991, no writ); *Cellular Mktg., Inc. v. Houston Cellular Tel. Co.,* 784 S.W.2d 734, 735 (Tex.App.-Houston [14th Dist.] 1990, no writ); *Tober v. Turner of Texas, Inc.,* 668 S.W.2d 831, 833-34 (Tex.App.-Austin 1984, no writ)). BES argues none of the four circumstances permitting entry of an anti-suit injunction in Texas are present and that the trial court failed to set forth specific reasons for issuance of an injunction. However, BES' failure to perfect an interlocutory appeal from that order precludes this Court from reviewing its validity.

BES did not perfect an appeal from the initial order, and the time limit for doing so has long since expired. TEX. R. APP. P. 26.1(b); TEX. R. APP. P. 28.1. Accordingly, we have no jurisdiction to review the validity of the trial court's January 27, 1995, order. TEX. R. APP. P. 42.3(a).

APPEAL DISMISSED.

Footnotes

1    BES filed separately a petition for writ of mandamus asking this court to direct the trial court to order arbitration. *In re Certain Underwriters at Lloyd's, et. al.,* No. 09-98-001-CV (Tex.App.-Beaumont July 30, 1998, n.w.h.)(orig.proceeding)(not designated for publication).

2    Extending the trial court's December 16, 1994, injunction.

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

916 S.W.2d 633
Court of Appeals of Texas,
Austin.

Russell CHAMBERS, Appellant
v.
Ronald ROSENBERG, Appellee.

No. 03–95–00325–CV.   |   Feb. 7, 1996.   |   Rehearing Overruled March 20, 1996.

Motion was filed to hold respondent in contempt for allegedly violating terms of agreed temporary injunction and agreed final judgment and permanent injunction. The 250th Judicial District Court, Travis County, B.F. Coker, J., entered order denying motion for contempt, and ruled that agreed temporary injunction was void ab initio for lack of bond. Appeal was taken. The Court of Appeals held that even agreed temporary injunction was void ab initio for lack of bond, in case in which parties had not explicitly waived protection of bond.

Affirmed.

West Headnotes (6)

**[1]**    **Contempt**    Decisions reviewable

Denial of motion for contempt is not "final order" from which appeal will lie.

4 Cases that cite this headnote

**[2]**    **Appeal and Error**    Injunction

Trial court's declaration that agreed temporary injunction was void ab initio was judgment from which appeal would lie.

2 Cases that cite this headnote

**[3]**    **Injunction**    Necessity and waiver in general

Requirement that, prior to issuance of temporary restraining order or temporary injunction, applicant must execute and file with clerk a bond to adverse party is to be strictly construed. Vernon's Ann.Texas Rules Civ.Proc., Rule 684.

6 Cases that cite this headnote

**[4]**    **Injunction**    Necessity and waiver in general

Temporary orders or injunctions filed without bond are void, not merely voidable. Vernon's Ann.Texas Rules Civ.Proc., Rule 684.

2 Cases that cite this headnote

**[5]**    **Injunction**    Necessity and waiver in general

Even agreed temporary injunction, which was entered with consent of parties, was void ab initio for lack of bond, where parties did not explicitly waive protection of bond. Vernon's Ann.Texas Rules Civ.Proc., Rule 684.

2 Cases that cite this headnote

[6] **Judgment** 🔑 Effect of Invalidity

**Judgment** 🔑 Judgment void on its face in general

Judgment which discloses its invalidity on its face is nullity and may be disregarded anywhere, at any time.

1 Cases that cite this headnote

**\*634** Appeal from the District Court of Travis County, 250th Judicial District, No. 443,045; B.F. (Bill) Coker, Judge Presiding.

**Attorneys and Law Firms**

Douglass D. Hearne, Jr., Hearne & Eppright, Austin, for Appellant.

Ronald Rosenberg [No Appellee's Brief filed], Austin, Pro Se.

Before CARROLL, C.J., and JONES and B.A. SMITH, JJ.

**Opinion**

PER CURIAM.

Russell Chambers appeals from the trial court's denial of his motion for contempt by Ronald Rosenberg. Chambers contends that Rosenberg's actions violated an agreed temporary injunction and an agreed final judgment and permanent injunction. The trial court held that the temporary injunction was void *ab initio* because no bond was executed. The court found that the final judgment was vague, ambiguous, overly broad, and unenforceable, but did not find it void; the court simply denied the motion for contempt. We will affirm the order of the trial court.

[1] We cannot review the denial of the motion for contempt of the agreed final judgment and permanent injunction. The denial of a motion for contempt is not appealable because it is not a final order. *Norman v. Norman,* 692 S.W.2d 655, 655 (Tex.1985); *Velez v. DeLara,* 905 S.W.2d 43, 46 (Tex.App.—San Antonio 1995, no writ). We therefore overrule points three and four by which Chambers complains of the court's assessment of the final judgment.

[2] [3] [4] [5] We can review the declaration that the agreed temporary injunction was void *ab initio* because of the lack of a bond. The supreme court has construed strictly the requirement of Texas Rule of Civil Procedure 684 that, before a trial court issues a temporary restraining order or temporary injunction, the applicant shall execute and file with the clerk a bond to the adverse party. *Goodwin v. Goodwin,* 456 S.W.2d 885, 885 (Tex.1970) (holding that the failure of the applicant to file a bond before the issuance of the temporary injunction renders the injunction void *ab initio* ); *Lancaster v. Lancaster,* 155 Tex. 528, 291 S.W.2d 303, 308 (1956) (holding that bond provisions of Rule 684 are mandatory **\*635** and that an injunction issued without a bond is void); *see also Ex parte Jordan,* 787 S.W.2d 367, 368 (Tex.1990) (holding temporary restraining order void for lack of requirement of separate bond); *Ex parte Lesher,* 651 S.W.2d 734, 735–36 (Tex.1983) (holding temporary restraining order void because court waived bond); *but see Ludewig v. Houston Pipeline Co.,* 737 S.W.2d 15, 16 (Tex.App.—Corpus Christi. 1987, no writ) (holding that errors other than jurisdiction render the judgment voidable within the standard appellate timetable). The court has held that temporary orders filed without the bond are void, not merely voidable. *Goodwin,* 456 S.W.2d at 885; *Lesher,* 651 S.W.2d at 735–36. Though none of the cited cases explicitly concerns an agreed order, we find the strong theme of literal construction of the rule convinces us that we should construe the rule literally in this case; we are particularly persuaded

<mark>to do so because the parties here did not explicitly waive the protection of a bond. The temporary injunction was void for lack of a bond.</mark> We overrule point two.

 **[6]**    Chambers contends by point one that the trial court exceeded its jurisdiction in improperly setting aside the consent agreements. Our affirmance of the conclusion that the temporary injunction was void, however, defeats this claim. The supreme court has held that a judgment which discloses its invalidity on its face is a nullity and may be disregarded anywhere at any time. *Fulton v. Finch,* 162 Tex. 351, 346 S.W.2d 823, 827 (1961). Though courts generally apply this rule only for jurisdictional defects, the supreme court's insistence that temporary injunctions issued without bonds are *void* convinces us that the trial court correctly disregarded the temporary injunction here. The trial court did not set aside the final judgment and permanent injunction. We overrule point one.

We do not reach point five, which concerned the scope of the temporary injunction. We need not consider the scope of a void order.

We affirm the order of the trial court.

---

**End of Document**                                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

787 S.W.2d 550
Court of Appeals of Texas,
El Paso.

Thomas CISNEROS, III, Appellant,
v.
Elva Alice CISNEROS, Appellee.

No. 08–89–00245–CV.　　|　　March 28, 1990.

Former wife sued former husband for child support arrearages. The 312th District Court, Harris County, Robert S. Webb, III, J., entered judgment for former wife and former husband appealed. The Court of Appeals, Koehler, J., held that: (1) dissolution decree provision calling for automatic increase in child payments beginning in the second year was valid, and (2) counsel's approval of form of judgment precluded former husband from asserting that judgment did not meet statutory requirements for child support order.

Affirmed.

West Headnotes (3)

**[1]**　　**Child Support** 🔑 Other Particular Defenses or Grounds for Reduction of Arrearages

Provisions in dissolution decree that child support payments would increase beginning with the "first payment due in the second year" was not too ambiguous to support a judgment award for arrearages.

3 Cases that cite this headnote

**[2]**　　**Child Support** 🔑 Contracts Relating to Support

**Child Support** 🔑 Automatic or Built-in Adjustments

Provision in dissolution decree calling for automatic increase in amount of child support payments starting the second year of such payments was valid; increase had been agreed upon by parties to dissolution agreement and court had found agreement to be in best interests of child.

2 Cases that cite this headnote

**[3]**　　**Child Support** 🔑 Estoppel and Waiver

Approval by attorney for former husband of the substance of a judgment requiring him to pay an increased amount of child support starting in the second year of the payments precluded challenge to judgment as not complying with the specific statutory requirements for judgments covering past due child support. V.T.C.A., Family Code § 14.33(a).

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*550** Bruce A. Baughman, Baytown, for appellant.

Ron Hayes, John R. Coe, Houston, for appellee.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This is an appeal from a judgment awarding $3,500.00 in child support arrearages following a non-jury hearing. We affirm.

Appellant brings three points of error, complaining (1) that the original divorce decree being too ambiguous to be enforced by contempt is also too ambiguous to support a judgment for arrearages, (2) that the provision in the decree for an automatic increase in child support in the second year is unenforceable, and (3) that the judgment for arrearages, being an enforcement order, does not meet the requirements of Section 14.33 of the Family Code and is therefore unenforceable.

The parties were divorced on January 19, 1982. Appellee was named managing conservator of the only child of the marriage. In the decree, the court found that the parties had entered into a written agreement containing provisions for conservatorship and child support, which were found to be "in the best interest of the child." Appellant, as possessory conservator, was ordered to make child support payments of $300.00 per month beginning on February 1, 1982. The decree then provided that:

> Beginning with the first payment due in the second year of such support payments, said support shall automatically, without further action from the Court, increase to the sum of THREE HUNDRED FIFTY AND NO/100 ($350.00) DOLLARS per month,....

Originally brought as a contempt motion, Appellee pled, and the evidence supported a finding, that Appellant had failed to make the additional $50.00 monthly payment **\*551** commencing with the payment due on February 1, 1983 and extending for each month through December 1988. At a pretrial hearing, upon a suggestion by the court that the order pertaining to the automatic increase was too ambiguous to be enforceable by contempt, Appellee amended her pleadings by requesting a judgment for the arrearages, in addition to enforcement by contempt. However, at the commencement of the hearing, Appellee waived the contempt action, requesting relief only by way of a money judgment for the arrearage.

**[1]** Although it is not necessary for a resolution of this appeal, we do not conclude that the quoted portion of the decree was ambiguous. While it undoubtedly could have been made clearer, it would be difficult to construe "beginning with the first payment due in the second year of such support payments" to mean any date other than February 1, 1983. Had the first payment under the decree been due on December 1, 1982 instead of February 1, 1982, it would have made no sense to argue that the first payment in the second year could have meant January 1, 1983 or some date other than December 1, 1983. But assuming that there was some ambiguity, the worst that could have been contended was that the increased payments were to begin with the payment due on January 1, 1983. Appellee sought a judgment for the arrearages commencing with the payment due February 1, 1983 and waived enforcement by contempt. The fact there may have been some ambiguity as to whether the increased payment should start on January 1 or February 1, 1983 would not make the order void for vagueness for payments due from February 1, 1983 forward. Furthermore, since the provisions in the decree relating to conservatorship and child support were based on the written agreement of the parties, the ambiguity in this case would be susceptible to interpretation by the trial court after hearing the evidence as in the case of an agreed judgment. *Richey v. Bolerjack,* 594 S.W.2d 795 (Tex.Civ.App.—Tyler 1980, no writ); *Johnson v. Johnson,* 572 S.W.2d 364, 366 (Tex.Civ.App.—Amarillo 1978, no writ). This is particularly true where, as in this case, the petitioner is not seeking enforcement by contempt or summary process. Point of Error No. One is overruled.

 **[2]**    Appellant cites several cases for the proposition that if a support order is void for purposes of contempt, it is also void for the purpose of a motion to reduce the arrearage to judgment. *Howard v. Texas Department of Human Resources,* 677 S.W.2d 667 (Tex.App.—Dallas 1984, no writ). In that case, the court, after holding that a contempt order, void because based on an ambiguous support order, could not be taken as a conclusive adjudication of the arrearage in a subsequent action to reduce the arrearage to judgment, remanded the case for a determination of the amount of the child support arrearage not ruled out by the ambiguity. In *Marichal v. Marichal,* 768 S.W.2d 383 (Tex.App.—Houston [14th Dist.] 1989, writ denied), the child support provision was not based on the agreement of the parties and the decree failed to order the obligor to pay any child support. In *Templet v. Templet,* 728 S.W.2d 844 (Tex.App.—Beaumont 1987, no writ), in an opinion lacking any factual recitation on the age of the children and whether or not the child support order was based on the agreement of the parties, it was held that an ambiguous, indefinite and uncertain order would not support a judgment for child support arrearages and furthermore, that the obligor was no longer under any obligation to continue the support payments, presumably because the youngest of two children had reached the age of eighteen years.

In his second point, Appellant contends that the provision for automatic increase in child support is unenforceable, citing as authority *In the Interest of J.M. and G.M.,* 585 S.W.2d 854 (Tex.Civ.App.—San Antonio 1979, no writ), and *Doss v. Doss,* 521 S.W.2d 709 (Tex.Civ.App.—Houston [14th Dist.] 1975, no writ). While a court may not arbitrarily impose automatic or formula increases in child support, if the parties agree on an automatic increase in child support upon the happening of a certain event and the court has found that the  **\*552**  agreement is in the best interest of the child, the parties may be ordered to perform in accordance with that agreement and upon their failure to do so, the child support order as set forth in the decree may be enforced by all available remedies, including contempt. *Doss,* 521 S.W.2d at 713. Tex.Fam.Code Ann. sec. 14.06 (Vernon 1986). In the instant case, the parties had agreed in writing to provisions for child support and the court had found the agreement to be in the child's best interest. Appellant does not now claim, nor did he present any evidence in the trial court, that the child support order did not reflect the agreement of the parties. Point of Error No. Two is overruled.

 **[3]**    In Appellant's final point of error, he challenges the judgment for past due child support as not meeting the requirements of Tex.Fam.Code Ann. sec. 14.33(a) (Vernon Supp.1990). That section in part states:

> (a) Contents. An enforcement order shall contain findings setting out in ordinary and concise language the provisions of the final order, decree, or judgment for which enforcement was sought, the acts or omissions that are the subject of the order, the manner of noncompliance, and the relief awarded by the Court.

At the conclusion of the hearing, the court on the record made its order, which we conclude was in sufficient detail to comply with Section 14.33(a). The trial judge said:

> The Court finds that a judgment in the amount of $3,500 is hereby had against Mr. Thomas Cisneros, III in favor of Mrs. Elva Cisneros for the ordered payments of $50 per month commencing February 1st of '83 through February 15th of '89; and in accordance with the divorce decree ... through the Harris County Probation Department, Child Support Division at 1115 Congress in Houston, Texas. Judgment is here now had in the amount of $3,500 for which let execution issue. Each party will pay their own costs of Court and attorney fees incurred in this cause.

The attorney for Appellant was in effect ordered to prepare the judgment, presumably in accordance with the court's oral order. Had she done so, the judgment in our opinion would have sufficiently met the requirements of Section 14.33(a). All of the cases cited by Appellant in support of his third point involved contempt and commitment situations, which admittedly and obviously require more specificity as to acts or omissions leading to the contempt than would a judgment for unpaid support. Under Tex.R.App.P. 81 (formerly Tex.R.Civ.P. 434), the normal course on this point would be to reform the judgment to conform to the judge's oral order and then affirm the judgment as reformed.

However, such action is not indicated since the judgment may be affirmed for another reason. After its preparation, the judgment was then approved not only as to *form* (a usual and harmless procedure), but as to *substance* as well by the attorneys representing

both parties. Approval as to form is a matter of professional courtesy not necessary to a valid judgment. Such approval (as to form) does not waive any error in the proceedings or incident to the judgment itself. *Sandoval v. Rattikin,* 395 S.W.2d 889 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.), *cert. denied,* 385 U.S. 901, 87 S.Ct. 199, 17 L.Ed.2d 132 (1966); 4 R. McDonald, Texas Civil Practice sec. 17.09.4 (Rev.1984). But approval as to substance is something else. Approval of the substance of a judgment is tantamount to an agreement by the signatory that the judgment meets all of its essential requirements. By Appellant's approval of the substance of the judgment, we hold that Appellant has waived any error in the judgment not complying with the requirements of Section 14.33(a). Point of Error No. Three is accordingly overruled.

Judgment of the trial court is affirmed.

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

220 S.W.3d 537
Court of Appeals of Texas,
Texarkana.

Ray and Carol CLAXTON, Appellant,

v.

(UPPER) LAKE FORK WATER CONTROL AND IMPROVEMENT DISTRICT NO. 1, Appellee.

No. 06–06–00095–CV.  |  Submitted Dec. 18, 2006.  |  Decided Dec. 19, 2006.
|  Opinion Granting Rehearing   May 2, 2007.  |  Rehearing Overruled May 22, 2007.

**Synopsis**
**Background:** Following judgment favoring plaintiffs, in a dispute against water improvement district concerning lake drainage, district filed motion for new trial. After granting new trial, the 62nd Judicial District Court, Hopkins County, Scott McDowell, J., granted district's motion for summary judgment. Plaintiffs appealed. The Court of Appeals dismissed the appeal for want of jurisdiction.

**Holdings:** On rehearing, the Court of Appeals, Morriss, C.J., held that:

[1] allegedly incorrect signing date recited in original judgment in favor of plaintiffs was a clerical error that could be corrected by judgment nunc pro tunc;

[2] originally recited signing date was not binding on the parties as part of any agreement; and

[3] sufficient evidence established that the originally recited signing date was erroneous.

Appeal reinstated.

West Headnotes (26)

**[1]    Courts** 🔑 Acts and proceedings without jurisdiction

The failure of a jurisdictional requirement deprives a court of the power to act, other than to determine that it has no jurisdiction.

Cases that cite this headnote

**[2]    Courts** 🔑 Acts and proceedings without jurisdiction

Once a court determines that it has no jurisdiction, its only legitimate choice is to dismiss.

Cases that cite this headnote

**[3]    Appeal and Error** 🔑 Time for filing
**New Trial** 🔑 Commencement of time

Judgment, which disposed of all claims and parties in lawsuit, stated that it was final judgment, and was approved both as to form and substance by counsel for two remaining parties, was final on date it was signed, thus commencing time to file motion for new trial or notice of appeal. Rules App.Proc., Rule 26.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(d).

3 Cases that cite this headnote

**[4]**    **Motions** ☞ Entry nunc pro tunc

           **Motions** ☞ Amendment of orders

An order nunc pro tunc, correcting only a true clerical error, may be granted by a trial court at any time, even after it has lost jurisdiction over the case.

Cases that cite this headnote

**[5]**    **Courts** ☞ Acts and proceedings without jurisdiction

Judicial action taken after the court's jurisdiction over a cause has expired is a nullity.

Cases that cite this headnote

**[7]**    **Appeal and Error** ☞ Consent of parties

           **Appeal and Error** ☞ Waiver of objections

           **Stipulations** ☞ Matters which may be subject of stipulation

Appellate jurisdiction cannot be created by consent, stipulation of the parties, or waiver, either by the court or by litigants.

2 Cases that cite this headnote

**[8]**    **Appeal and Error** ☞ Determination of questions of jurisdiction in general

Lack of appellate jurisdiction is fundamental error, which can be raised by the court sua sponte.

Cases that cite this headnote

**[9]**    **Judgment** ☞ Clerical errors

           **Judgment** ☞ Allowing amendment nunc pro tunc

Allegedly incorrect signing date recited in original judgment was a clerical error, not a judicial error, and thus could be corrected by judgment nunc pro tunc. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[10]**    **Judgment** ☞ Authority of Court, Judge, or Judicial Officer

Judicial errors in a judgment may not be corrected after the expiration of a court's plenary jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(f).

Cases that cite this headnote

**[11]**    **Judgment** ☞ Clerical errors

**Judgment** 🔑 Allowing amendment nunc pro tunc

A "clerical error" that may be corrected by judgment nunc pro tunc is an error which does not result from judicial reasoning or determination. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

[12] **Judgment** 🔑 Judicial errors

**Judgment** 🔑 Allowing amendment nunc pro tunc

For purposes of determining whether an error may be corrected by judgment nunc pro tunc, a "judicial error" is one which occurs in the rendering, as opposed to the entering, of a judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

[13] **Judgment** 🔑 Allowing amendment nunc pro tunc

A judgment nunc pro tunc may be issued to correct the recited signing date of an order if the original recited date is shown to have been incorrect. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

[14] **Motions** 🔑 Entry nunc pro tunc

**Motions** 🔑 Amendment of orders

An order nunc pro tunc may not be used to backdate the signing of a written order that was not in fact signed earlier. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

[15] **Judgment** 🔑 Opening or vacating judgment

Originally recited signing date in an agreed judgment was not binding on the parties as part of their agreement, and thus the signing date could be corrected nunc pro tunc, though judgment had been approved by the parties as to form and substance; the recited date of signing was not a material part of any agreement, as demonstrated by the fact that the parties overlooked the incorrect recited date until appellate court pointed it out four years later. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

[16] **Judgment** 🔑 Defects and objections

Approval as to form of a judgment does not waive any error in the proceedings or incident to the judgment itself.

2 Cases that cite this headnote

[17] **Judgment** 🔑 Consent of Parties

An agreed judgment means essentially the same thing as a judgment by consent.

Cases that cite this headnote

**[18]**   **Judgment** 🔑 Consent of Parties

A "judgment by consent" is a judgment in which the terms are settled and agreed to by the parties and which is entered of record by authorization of the trial court.

1 Cases that cite this headnote

**[19]**   **Judgment** 🔑 Affidavits and other evidence

Factually and legally sufficient evidence supported trial court's finding that signing date recited in original judgment was erroneous, such that it could be corrected by judgment nunc pro tunc; no party treated defendant's motion for new trial as untimely, even though it clearly was untimely based on recited date of signing, and transcript of hearing that occurred after the recited signing date indicated that the proposed judgment had not yet been signed. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[20]**   **Judgment** 🔑 Affidavits and other evidence

For a judgment nunc pro tunc to be properly granted, the evidence must be clear and convincing that a clerical error was made. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[21]**   **Judgment** 🔑 Affidavits and other evidence

Evidence that a clerical error was made in a judgment, warranting correction by judgment nunc pro tunc, may come from a number of sources, including oral testimony, written documents, previous judgments, docket entries, or the trial judge's personal recollection. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[22]**   **Appeal and Error** 🔑 Amendment or vacation of judgment

If the trial judge corrects a judgment nunc pro tunc, a presumption arises that his personal recollection supports the finding of clerical error in the judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[23]**   **Appeal and Error** 🔑 Amendment or vacation of judgment

Recitations in a nunc pro tunc judgment alone may provide sufficient evidence that the court relied upon its recollection of the facts at the time the original judgment was rendered, that such recollection raises the presumption of the court's finding that clerical error had occurred in the entry of the judgment, and that the nunc pro tunc judgment correctly reflects the judgment rendered. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[24]**   **Judgment** 🔑 Affidavits and other evidence

         **Judgment** 🔑 Allowing amendment nunc pro tunc

The trial judge's recollection of the facts at the time the original judgment was rendered has the dignity and force of evidence, for purposes of determining whether there is sufficient evidence that a clerical error was made, warranting correction by judgment nunc pro tunc. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[25]** **Appeal and Error** Amendment or vacation of judgment

Even though it is presumed that the trial judge's personal recollection supports the finding of a clerical error in the original judgment, the record from the hearing on the motion for judgment nunc pro tunc may negate any such presumption through evidence to the contrary. Vernon's Ann.Texas Rules Civ.Proc., Rule 316.

Cases that cite this headnote

**[26]** **Judgment** Mode of rendition

**Judgment** Necessity for entry

**Judgment** Time of taking effect

A judgment routinely goes through three stages: (1) rendition, (2) signing, and (3) entry, and the judgment becomes effective once it is rendered.

Cases that cite this headnote

**[27]** **Judgment** Mode of rendition

A judgment is "rendered" when the matter submitted to the court for adjudication is officially announced either orally in open court or by memorandum filed with the clerk.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*539** John T. Palter, Riney Palter, PLLC, Dallas, for appellant.

Buford A. Cates, Jr., Dallas, for Billy & Barbara Lynn.

Roland M. Ferguson, Sulphur Springs, for Upper Lake Fork Water Control & Improvement District No. 1.

Before MORRISS, C.J., ROSS and CARTER, JJ.

**\*540 OPINION**

Opinion by Chief Justice MORRISS.

In this dispute concerning drainage of a lake, two different judgments were signed, the first apparently signed July 12, 2002, favoring Ray and Carol Claxton, and the second signed July 19, 2006, favoring (Upper) Lake Fork Water Control and Improvement District No. 1. The Claxtons appeal from the 2006 judgment. Because we determine that the 2002 judgment became the final judgment in this case, we dismiss the appeal for lack of jurisdiction.

In order to explain our analysis, we provide a chronology of the lawsuit, including two substantial periods of inactivity.

June 1996 Claxtons seek injunction against District.

11/4/1996 (Upper) Lake Fork, as third party plaintiffs, add Billy and Barbara Lynn as third party defendants.

3/26/1997 Claxtons add the Lynns as defendants.

6/19/1997 Claxtons seek summary judgment against all defendants.

6/18/2002 Claxtons file motion for partial summary judgment.

7/12/2002 Judgment signed. Court grants partial summary judgment, Claxtons nonsuit all claims against Lynns, and all other claims against District, and District nonsuits all third party claims against the Lynns. Decretal language in judgment specifically renders judgment on all of the above and states that the judgment is final, that this is the final judgment, and that all relief not expressly granted is denied. The judgment is signed as "approved as to form and substance" by counsel for Claxtons and District.

9/6/2002 Judgment filemarked.

10/3/2002 District files motion for new trial.

11/15/2002 Order filed granting new trial.

8/22/2005 Claxtons again nonsuit Lynns.

9/1/2005 Claxtons file second motion for partial summary judgment against District, essentially same as original motion.

3/24/2006 District files motion for summary judgment.

3/27/2006 Claxtons file third motion for partial summary judgment against District, essentially the same as first and second motions.

7/19/2006 Final judgment signed.

   1) Claxtons' third motion for partial summary judgment denied.

   2) District's motion for summary judgment granted.

**[1]** **[2]** The question confronting us is jurisdiction. The failure of a jurisdictional requirement deprives a court of the power to act (other than to determine that it has no jurisdiction). *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004). And once a court determines that it has no jurisdiction, its only legitimate choice is to dismiss. *State of Tex. v. Morales,* 869 S.W.2d 941, 949 (Tex.1994).

The judgment containing a signature date of July 12, 2002, disposes of all claims and parties in this lawsuit, and not only states that it is the final judgment, but was approved both as to form and substance by counsel for the two remaining parties. It appears, from its face, that it was therefore final on that date. All of the relevant timetables begin to run on the date that a judgment is signed. A motion for new trial must be filed within thirty days of that date. TEX.R. CIV. P. 329b. The date on which a notice of appeal must be filed is also calculated based on the date on which the judgment is signed. TEX.R.APP. P. 26.1.

**\*541** **[3]** If the July 12, 2002, judgment was the final judgment in this case, as it says it is, then we must determine whether the case was timely appealed with reference to that date. Using that date, only one result is possible—the notice of appeal filed September 18, 2006, was untimely and could not establish our jurisdiction.

We contacted the parties in connection with this issue, and have received briefing setting out their positions. Essentially, the Claxtons agree that the 2002 judgment is final, and now ask us to dismiss their appeal for want of jurisdiction.

The District takes the position that we should disregard the notation on the judgment as to the date it was signed, because it was actually signed on the date it was ultimately filed. The extensive record provided contains nothing to support that position, other than the District's pleadings. The trial court's order granting the District's motion for new trial states that the prior agreed judgment "entered on September 6, 2002 (but bearing the erroneous date of July 12, 2002) should be, and it is hereby in all things, vacated and set aside."

 **[4]**    Even if the trial court had the jurisdiction to grant the motion for new trial—which on its face it did not—and assuming that some error exists in the face of a judgment signed as correct in form and substance by all counsel, and even if this were a document properly rendering a new judgment, it does not state the correct date on which the judgment was signed, and could not be used by this Court to establish a signing date different from that on the face of the judgment. [1]

The question of our jurisdiction to hear an appeal of this case then depends on the determination of which of the two signed judgments is the valid one. There can only be one final judgment. TEX.R. CIV. P. 301. A trial court retains plenary power to grant a new trial or to vacate, modify, correct, or reform a judgment within thirty days after the judgment is signed. TEX.R. CIV. P. 329b(d); *First Alief Bank v. White,* 682 S.W.2d 251, 252 (Tex.1984). After the expiration of those thirty days, the trial court has no authority to set aside a judgment except by bill of review as provided by law. TEX.R. CIV. P. 329b(d); *Thursby v. Stovall,* 647 S.W.2d 953, 954 (Tex.1983).

 **[5]**    [6] The trial court lost its plenary power to vacate the judgment August 11, 2002. The trial court therefore had no jurisdiction to enter the November 15, 2002, order granting a new trial some 126 days after the signing of the first judgment. *State ex. rel. Latty v. Owens,* 907 S.W.2d 484, 486 (Tex.1995). Judicial action taken after the court's jurisdiction over a cause has expired is a nullity. *Id.*

 **[7]**    **[8]**    Even if both parties agreed that a different date actually existed, we are constrained by the rules to determine our jurisdiction by reference to the date on which the judgment was signed—a party cannot confer or waive jurisdiction by consent or agreement. *Stine v. State,* 908 S.W.2d 429 (Tex.Crim.App.1995). Appellate jurisdiction cannot be created by consent, stipulation of the parties, or waiver, either by the court or by litigants. *Welder v. Fritz,* 750 S.W.2d 930 (Tex.App.-Corpus Christi 1988, no writ). Jurisdiction is fundamental and cannot be ignored by this Court or waived by the parties. *In re Marriage of Johnson,* 595 S.W.2d 900, 902 (Tex.Civ.App.-Amarillo 1980, writ dism'd w.o.j.). Further, lack of appellate jurisdiction **\*542** is fundamental error, which can be raised by the court sua sponte. *New York Underwriters Ins. Co. v. Sanchez,* 799 S.W.2d 677, 679 (Tex.1990).

We have no option in this case but to recognize the state of the record before us and to act accordingly.

The appeal is dismissed for want of jurisdiction.

## OPINION ON REHEARING

In a protracted legal battle in Hopkins County pitting Ray and Carol Claxton against the (Upper) Lake Fork Water Control and Improvement District No. 1, the District first lost. A considerable time later, the trial court—after granting a new trial to the District—ultimately changed course and found for the District.

Our initial opinion dismissed the Claxtons' appeal for lack of jurisdiction. We based that dismissal on apparently jurisdictional facts revealed by the appellate record, starting with the earlier judgment—against the District—which recited a signing date of July 12, 2002. We concluded then that the District's subsequently filed, and granted, motion for new trial had been filed too late to give the trial court any power to grant it. The result of our ruling was that the later, and ultimate, trial court judgment

—dated July 19, 2006, and *favoring* the District—was without effect, since our ruling was that the 2002 judgment—favoring the Claxtons—had become the final judgment. After our initial opinion was issued, the District obtained from the trial court a January 16, 2007, judgment nunc pro tunc changing the signing date recited in the 2002 judgment from July 19, 2002, to September 6, 2002. [2] If that nunc pro tunc change is effective, the District's 2002 motion for new trial was timely and therefore the 2006 judgment favoring the District is the final judgment of the trial court. Because we reach just that result in this opinion, we reinstate the appeal.

In its motion for rehearing, the District urges us to find valid the changes made by the nunc pro tunc judgment and thus recognize the later trial court judgment favoring the District. In their response, the Claxtons argue that, for a few reasons, we should disregard the nunc pro tunc judgment and recognize the 2002 judgment as the final judgment of the trial court. We disagree because (1) the 2002 judgment's originally recited date of signing was a clerical error, (2) the originally recited signing date is not binding as part of any agreement of the parties, and (3) the date change is supported by the record.

### *(1) The 2002 Judgment's Originally Recited Judgment Date Was a Clerical Error*

 **[9]**   The Claxtons assert that the nunc pro tunc date change was substantive or judicial in nature, and was thus not authorized. We conclude otherwise.

 **[10]**   Clerical mistakes in a judgment may be corrected by the judge in open court, and judgment nunc pro tunc rendered by the trial court, according to the truth or justice of the case. TEX.R. CIV. P. 316. This may be done even after the expiration of the court's plenary power. TEX.R. CIV. P. 329b(f). Judicial errors, however, may not be corrected after the expiration of a court's plenary jurisdiction. **\*543** *Escobar v. Escobar,* 711 S.W.2d 230, 231 (Tex.1986).

 **[11]**   **[12]**   A clerical error is an error which does not result from judicial reasoning or determination. *Andrews v. Koch,* 702 S.W.2d 584, 585 (Tex.1986). A judicial error is one which occurs in the rendering, as opposed to the entering, of a judgment. *Escobar,* 711 S.W.2d at 231; *Delaup v. Delaup,* 917 S.W.2d 411, 413 (Tex.App.-Houston [14th Dist.] 1996, no writ).

One type of situation exists when a judgment is substantively incorrect because of a mistake of counsel. [3] In that situation, the judgment is not erroneous, it does not provide different relief from that requested or pronounced in open court—it is simply not the relief anticipated by the parties. When such a mistake is made and memorialized accurately by the trial court, any change is judicial in nature. It may be a mistake, but it is not the result of a clerical error: thus, a nunc pro tunc judgment is not available.

A different situation is presented where a written judgment is ultimately signed that differs from the terms of the judgment as pronounced by the court. [4] In that situation, a nunc pro tunc judgment is available, because the written judgment does not comport with the prior rendering.

 **[13]**   **[14]**   This case presents a third nunc pro tunc situation. It is an error that does not substantively alter the relief provided by the judgment. A judgment nunc pro tunc may be issued to correct the recited signing date of an order if the original recited date is shown to have been incorrect. *See Traylor Bros., Inc. v. Garcia,* 949 S.W.2d 368, 369 (Tex.App.-San Antonio 1997, no writ). Consistent with the definition of the term, however, an order nunc pro tunc may not be used to backdate the signing of a written order that was not in fact signed earlier. *In re Taylor,* 113 S.W.3d 385, 393 (Tex.App.-Houston [1st Dist.] 2003, orig. proceeding); *see Jauregui Partners, Ltd. v. Grubb & Ellis Commercial Real Estate Servs.,* 960 S.W.2d 334, 337 (Tex.App.-Corpus Christi 1997, writ denied). In other words, it cannot be used as a fiction to alter signing dates—it must reflect reality. [5]

In the present case, after conducting a hearing and reviewing the contemporaneous documents, the trial court concluded the indicated date was incorrect. In its order, the trial court stated that it did not actually sign the judgment on that earlier date, but signed it approximately two months later. [6]

Accordingly, for the preliminary purposes of determining our jurisdiction over this appeal, we conclude that the correction was clerical in nature and that the remedy of judgment nunc pro tunc was available. [7]

**\*544** *(2) The Originally Recited Judgment Date Is Not Binding as Part of Any Agreement*

[15]    The Claxtons argue that, because the July 2002 judgment was an agreed judgment, as shown by counsel's signature agreeing as to form and substance, the District could not now attack the judgment's terms, including the date of signature.

[16]    After its preparation, the judgment was then approved not only as to form (a usual and harmless procedure), but as to substance as well by the attorneys representing both parties. Approval as to form is a matter of professional courtesy not necessary to a valid judgment. Approval as to form does not waive any error in the proceedings or incident to the judgment itself. *Sandoval v. Rattikin,* 395 S.W.2d 889 (Tex.Civ.App.-Corpus Christi 1965, writ ref'd n.r.e.). Approval as to substance is something else. Approval of the substance of a judgment has been described as tantamount to an agreement by the signatory that the judgment meets all of its essential requirements. *Cisneros v. Cisneros,* 787 S.W.2d 550, 552 (Tex.App.-El Paso 1990, no writ).

[17]    [18]    An agreed judgment means essentially the same thing as a judgment by consent. A judgment by consent is a judgment in which the terms are settled and agreed to by the parties and which is entered of record by authorization of the trial court. *Matthews v. Looney,* 132 Tex. 313, 123 S.W.2d 871 (1939); *Johnson v. Rancho Guadalupe, Inc.,* 789 S.W.2d 596, 603 (Tex.App.-Texarkana 1990, writ denied).

While the 2002 judgment may have been an agreed or consent judgment, we find no reason to conclude the recited date of signing was actually a material part of any agreement of the parties. The best witness that the parties did not consider the judgment's recited signing date as material to their agreement is the uniform manner in which all parties overlooked the July 2002 recited date until this Court pointed it out in 2006.

Additionally, the signing dates recited in judgments are intended to reflect reality, not some different agreement of the parties. "Judges, attorneys and clerks are directed to use their best efforts to cause all judgments ... to be reduced to writing and signed by the trial judge with the date of signing stated therein." TEX.R. CIV. P. 306a(2). The rule contemplates that each judgment should accurately reflect the date it was actually signed by the court; it does not seem to contemplate allowing parties to include an agreed date of signing into the terms of consent judgments.

We decline to treat the originally recited judgment signing date as part of any agreement of the parties.

*(3) The Date Change Is Supported by the Record*

[19]    The Claxtons also argue that the nunc pro tunc judgment is unsupported by the record. They assert that the information available to the trial court was insufficient to allow it to determine that the date of signing was erroneous.

[20]    For a judgment nunc pro tunc to be properly granted, the evidence must be clear and convincing that a clerical error **\*545** was made. *Avila v. Lone Star Radiology,* 183 S.W.3d 814, 821 (Tex.App.-Waco 2005, no pet.); *Barton v. Gillespie,* 178 S.W.3d 121, 127 (Tex.App.-Houston [1st Dist.] 2005, no pet.); *In re Broussard,* 112 S.W.3d 827, 833 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding).

[21]    [22]    [23]    [24]    That evidence may come from a number of sources, including oral testimony, written documents, previous judgments, docket entries, or the trial judge's personal recollection. *Riner v. Briargrove Park Prop. Owners, Inc.,* 976 S.W.2d 680, 683 (Tex.App.-Houston [1st Dist.] 1997, no writ). Further, "if [the trial judge] corrects the judgment nunc pro tunc, a presumption arises that his personal recollection supports the finding of clerical error." *Pruet v. Coastal States Trading, Inc.,* 715 S.W.2d 702, 705 (Tex.App.-Houston [1st Dist.] 1986, no writ). Moreover, recitations in a nunc pro tunc judgment alone may,

provide sufficient evidence that the court relied upon its recollection of the facts at the time the original judgment was rendered, [that] [s]uch recollection raises the presumption of the court's finding that clerical error had occurred in the entry of the [judgment], and that the nunc pro tunc judgment correctly reflects the judgment rendered.

*Id.; Thompson v. Tex. Dep't of Human Resources,* 859 S.W.2d 482, 485 (Tex.App.-San Antonio 1993, no writ). The trial judge's recollection of facts has the dignity and force of evidence. *Ft. Worth & D.C. Ry. Co. v. Roberts,* 98 Tex. 42, 81 S.W. 25, 26 (1904); *Blum v. Neilson,* 59 Tex. 378 (1883); *Wood v. Paulus,* 524 S.W.2d 749, 756 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.).

 **[25]**   Even though it is presumed that the trial judge's personal recollection supports the finding of a clerical error,[8] the record from the hearing on the motion for judgment nunc pro tunc may negate any such presumption through evidence to the contrary. *In re Fuselier,* 56 S.W.3d 265, 268 (Tex.App.-Houston [1st Dist.] 2001, orig. proceeding). This is consistent with the requirements of Rule 316 of the Texas Rules of Civil Procedure, which requires that such clerical mistakes may "be corrected by the judge in open court according to the truth...." *See* TEX.R. CIV. P. 316. Though a fairly loose version of evidence is allowed, with cases relying on the judge's recollections and on the argument of counsel, nevertheless, that evidence must be sufficiently clear and convincing to allow the trial court to conclude that clerical error exists.

In this case, the record now contains a transcription of a brief hearing held January 17, 2007. At the hearing, the trial court reviewed the court's files and examined the transcript of the September 2002 hearing.

The trial court stated in its January 16, 2007, order that it decided to grant the judgment nunc pro tunc based on its review of the "Court's official file (including the official transcript of the proceedings occurring on 09/06/02 in open court)...."[9]

The District argues that the trial court's determination is supported by the record because the earlier date was logically absurd.[10] It bases this conclusion on several **\*546** factors. One is the obvious fact that no party treated the motion for new trial as being untimely—even though, based on the stated date of signing, it clearly was. All parties simply continued filing pleadings as though the motion for new trial was timely. As the District points out, no party resisted the 2002 motion for new trial based on a lack of jurisdiction, and, before this Court reviewed the record and recognized the problem, this issue was never raised.

Certainly, a party cannot confer or waive jurisdiction either by consent or agreement. *Stine v. State,* 908 S.W.2d 429 (Tex.1995). The mere fact that the parties behaved as though the trial court retained jurisdiction over the case does not confer jurisdiction to the court. But the behavior by both counsel and trial court on such an absolutely basic concept supports a conclusion that everyone involved knew the 2002 judgment was not actually signed on the earlier date. The District argues that the sole explanation for the behavior of all involved was clearly that the judgment was not signed until the later date.[11]

Foolish or perfunctory behavior by counsel or court is a staple of appeals. Although we would prefer to think that such errors would not occur, they do. Counsel for the District has directed us to no specific portion of the reporter's record from the September 2, 2002, hearing to support the argument that the evidence clearly supports the court's decision. Given the brevity of the record, however, we have nonetheless reviewed the transcription of that hearing to see if it supports the court's ruling. It does.

 **[26]**    **[27]**   The September hearing commenced with only one attorney present, representing the Lynns.[12] The court acknowledged that the District and the Claxtons had sent in an agreed order granting the motion for summary judgment. The trial court then questioned the Lynns' counsel at length about any ability they might have to complain about the judgment in the absence of any affirmative cross-pleadings against either the Claxtons or the District. The Lynns' counsel repeatedly asked the court not to enter the order just because the two parties agreed to it. On page seven of the record, counsel stated,

[A]s I understand it, Your Honor, we're a party **until you sign** an order granting a nonsuit. And **if you've not signed that,** we're a party. And being a party, we would like the opportunity to address the Court to tell the Court why it shouldn't enter this order....

(Emphasis added.) On page twelve of the record, counsel stated, "I would like for the Court to know that by the order that's submitted to you, **if you sign it,** you will be ordering...." (Emphasis added.) At the end of the hearing, the trial court stated that it would grant the nonsuit and then "will enter the agreed order between the two remaining parties." That dialogue **\*547**

seems to demonstrate that the judgment was indeed signed in September, not July. [13]

In the January 16, 2007, nunc pro tunc hearing, the trial court reviewed the transcription of the prior hearing, heard argument by counsel, and reviewed a letter dated September 3, 2002, that appears to be a transmittal letter accompanying a delivery of the 2002 judgment to the trial court just before the September 6 hearing.

The trial court did not state either in writing or orally that it was relying on its personal recollection to determine that an error existed, and the discussion between counsel and court at the hearing suggests to the contrary. In that situation, we will not conclusively presume that it was doing so, especially in light of the five-year delay between the judgment and the judgment nunc pro tunc. *See Pruet,* 715 S.W.2d 705; *Thompson,* 859 S.W.2d at 485.

The same judge was involved, however, and he determined that the error existed. It is reasonable to assume he recalled the context of the September 2002 hearing, at least once his recollection was refreshed in 2006. The language used in the 2002 hearing is best understood as indicating that the proposed judgment had not been signed to that point. That conclusion is further supported by the transmittal letter reviewed by the court. There is factually and legally sufficient evidence to support the rendition of the judgment nunc pro tunc.

Because the nunc pro tunc change in the recited judgment date was valid, the District's subsequent motion for new trial was timely. Therefore, the subsequent, 2006, judgment was effective and became the final judgment of the trial court.

We grant the District's motion for rehearing and reinstate the appeal.

Footnotes

[1]    An order nunc pro tunc, correcting only a true clerical error, may be granted by a trial court at any time, even after it has lost jurisdiction over the case. *America's Favorite Chicken v. Galvan,* 897 S.W.2d 874 (Tex.App.-San Antonio 1995, writ denied).

[2]    The new judgment, at its beginning, states that the motion for summary judgment came on for hearing September 6, 2002—a date contrary to the notation originally made on the trial court docket—and contains a corrected signature date of September 6, 2002. Except for those details, the nunc pro tunc judgment is a complete duplicate of the prior judgment, including the original typographical errors. It was filed with the district clerk January 16, 2007.

[3]    *Dikeman v. Snell,* 490 S.W.2d 183, 185–86 (Tex.1973).

[4]    *See Andrews,* 702 S.W.2d at 585; *Delaup,* 917 S.W.2d 411; *Petroleum Corp. v. First Nat'l Bank,* 622 S.W.2d 152 (Tex.App.-Fort Worth 1981, writ ref'd n.r.e.).

[5]    Typical clerical changes to judgments that have been upheld include corrections of the date of judgment, *Nolan v. Bettis,* 562 S.W.2d 520, 523 (Tex.Civ.App.-Austin 1978, no writ), correction of a party name, *Carlyle Real Estate Ltd. Partnership–X v. Leibman,* 782 S.W.2d 230, 233 (Tex.App.-Houston [1st Dist.] 1989, no writ), and correction of a numerical error, *Escobar,* 711 S.W.2d at 232.

[6]    "Dates contained in judgments have been held on many occasions to be the type of errors that are correctable by judgment nunc pro tunc." *Ortiz v. O.J. Beck & Sons, Inc.,* 611 S.W.2d 860, 863 (Tex.Civ.App.-Corpus Christi 1980, no writ); *see Traylor Bros., Inc.,* 949 S.W.2d at 369.

[7]    The Claxtons assert that there were also judicial changes in the 2002 judgment. Certainly, a judgment nunc pro tunc may alter nothing other than clerical matters. But, even if the corrected 2002 judgment differs from the original one in judicial matters, any such differences are irrelevant at this stage. The 2002 judgment was entirely superseded by the 2006 judgment, if the 2006 judgment was effective to do so. The only currently relevant part of the 2002 judgment is the date it was signed. That date determines whether the 2006 judgment was effective.

8    *Davis v. Davis,* 647 S.W.2d 781, 783 (Tex.App.-Austin 1983, no writ); *Bockemehl v. Bockemehl,* 604 S.W.2d 466, 469 (Tex.Civ.App.-Dallas 1980, no writ).

9    Both parties have attached copies of the fifteen-page transcription to their briefs, and it has now been provided to the Court as a supplemental record.

10   The District also posits a physical impossibility argument—that it was impossible for the July 12 date to be the correct one because the District would have been required to file its motion for new trial on a date before the September 6, 2002, hearing—the date on which the judgment was actually signed. This argument is circular. The "impossibility" is based on the assumption that the later date is correct, which is the issue the District is trying to prove by showing impossibility.

11   The alternative, according to the District's brief, was that this is the only rational explanation for what would otherwise be "outrageously irresponsible (if not downright dumb) behavior by both the Trial Court and the parties' counsel. .... in completely ignoring the procedural provisions of Rule 329b."

12   The Lynns were defendants in the case, but all claims against them were disposed of by nonsuit, as reflected in the judgment.

13   A potential problem with this evidence lies in the fact that "entering" a judgment and "signing" a judgment are by no means synonymous concepts. We also recognize that the terms are unfortunately often loosely used by attorneys and judges. A judgment routinely goes through three stages: (1) rendition, (2) signing, and (3) entry. *Gen. Elec. Capital Auto Fin. Leasing Servs., Inc. v. Stanfield,* 71 S.W.3d 351, 354 (Tex.App.-Tyler 2001, pet. denied); *In re Wilburn,* 18 S.W.3d 837, 840 (Tex.App.-Tyler 2000, pet. denied); *Oak Creek Homes, Inc. v. Jones,* 758 S.W.2d 288, 290 (Tex.App.-Waco 1988, no writ). The judgment becomes effective once it is "rendered." *Stanfield,* 71 S.W.3d at 354; *Wilburn,* 18 S.W.3d at 840. A judgment is "rendered" when the matter submitted to it for adjudication is officially announced either orally in open court or by memorandum filed with the clerk. *Samples Exterminators v. Samples,* 640 S.W.2d 873, 875 (Tex.1982); *Wilburn,* 18 S.W.3d at 840.

> In this case, we conclude that, although the language was inaccurately used, court and counsel were actually discussing "signing" rather than "entering" the judgment. So taken, the transcription supports the court's ultimate conclusion that it signed the judgment on the later date.

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

594 S.W.2d 831
Court of Civil Appeals of Texas, Dallas.

D. C. CLEERE, Appellant,

v.

CITY OF MESQUITE, Texas, Appellee.

No. 20176. | Feb. 19, 1980.

Owner appealed from an order of the 162nd District Court, Dallas County, Dee Brown Walker, J., which denied his petition for declaratory relief with respect to a 1974 order requiring him to remove automobile parts from his premises. The Court of Civil Appeals, Humphreys, J., held that agreed order, which required owner to remove automobile parts from his premises, was a valid permanent injunction notwithstanding facts that such order did not explicitly use words "restrain" or "enjoin" with respect to the activities prohibited and fact that reasons for injunction were not specified in the order; inasmuch as owner agreed to an injunction, he could not complain that he was not informed of the reasons.

Affirmed.

West Headnotes (2)

**[1]** **Injunction** 🔑 Real property in general

Agreed order, which required owner to remove automobile parts from his premises, was a valid permanent injunction notwithstanding facts that such order did not explicitly use words "restrain" or "enjoin" with respect to the activities prohibited and fact that reasons for injunction were not specified in the order; inasmuch as owner agreed to an injunction, he could not complain that he was not informed of the reasons. Rules of Civil Procedure, rule 683.

1 Cases that cite this headnote

**[2]** **Injunction** 🔑 Form and requisites

Purpose of requirement that every order granting an injunction set forth reasons for its issuance is to inform a violator of why he is enjoined. Rules of Civil Procedure, rule 683.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*832** Robert C. Cox, William Chris Wolffarth, Erhard, Cox, Ruebel & Rector, Dallas, for appellant.

Elland Archer, City Atty., Mesquite, for appellee.

Before GUITTARD, C. J., and AKIN and HUMPHREYS, JJ.

**Opinion**

HUMPHREYS, Justice.

This is an appeal from an order denying declaratory relief to appellant, D. C. Cleere. Cleere petitioned the court to declare that a 1974 order requiring him to remove automobile parts from his premises is not an injunction and that it is null and void because it does not meet the requirements of Tex.R.Civ.P. 683. We affirm.

The order here resulted from an action in 1974 by the City of Mesquite, to enjoin Cleere from operating an automobile repair garage, selling automobile parts, and operating a wrecking yard on his premises. The 1974 order was an agreed order, prohibiting appellant from storing at his residence automobiles and automobile parts. In 1979, the city filed a contempt proceeding against Cleere, alleging a violation of this order. Cleere counter-claimed for a declaration pursuant to Tex.Rev.Civ.Stat.Ann. art. 2524-1 (Vernon 1965) that the order was not a valid injunction. The court found that he was not in contempt, but that the agreed order was "in force and effect as a permanent injunction."

 **[1]**    Cleere argues that the court erred in refusing to review the 1974 order under the Declaratory Judgment Act, which allows an interested person to have his rights construed under a written contract, and that the court erred in finding the agreed order was a permanent injunction. We conclude that the court had no power to review its previous order. Any attack on the injunction in this proceeding is a collateral attack and cannot succeed unless the injunction is void. The court may determine, however, whether the order is a valid permanent injunction. The question then is whether the court's finding that this is a valid permanent injunction was error.

The agreed order decrees as follows:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Defendant is to remove all junk automobile cars, transmissions and junk automobile parts from his premises; that the Defendant is not to allow said automobiles on his property for a period longer than 24 hours, nor is he to store for commercial purposes any automobile transmissions or other junk automobile parts; that if said parts or transmissions are stored for personal use, they must be stored in a building on Defendant's property.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there will be no work on automobiles on Defendant's premises located at 1123 Peachtree Road, Mesquite, Texas, except for work on the automobiles of Defendant's immediate family, no unloading of automobile parts and transmissions except for the personal use of the Defendant and his immediate family, and shall not allow impact wrenches or other noisy equipment to be used on his property after 10:00 o'clock p. m.

Cleere argues that this order is not a valid injunction because it does not explicitly use the words "restrain" or "enjoin" with respect to the activities prohibited. We do not agree. Admittedly the restraining language **\*833** is unusual, but its intent to impose a permanent restraint is evident.

 **[2]**    Cleere also complains that the order does not comply with Tex.R.Civ.P. 683. That rule requires every order granting an injunction to set forth the reasons for its issuance, be specific in terms and describe the acts sought to be restrained in detail. Cleere contends that this order sets forth no reasons for its issuance and is not specific in its terms. Although the reasons are not specified in the order, this defect does not invalidate the injunction under the circumstances shown here. The purpose of the requirement for reasons is to inform the violator of why he is enjoined. Board of Equalization of City of Plano v. Wells, 473 S.W.2d 88, 91 (Tex.Civ.App. Dallas 1971, no writ). When a party agrees to an injunction, he is in no position to complain that he was not informed of the reasons.

Furthermore, we hold that the order is sufficiently definite in its terms to apprise Cleere of the acts he can and cannot undertake. The only indefiniteness suggested by appellant is that he cannot tell from the order what is commercial use and what is personal

use. While there may be a fact question in the future as to whether a certain use was commercial or personal, these terms are not so vague as to render the order unenforceable.

Affirmed.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

340 S.W.3d 444
Supreme Court of Texas.

CMH HOMES, et al., Petitioners,

v.

Adam PEREZ, Respondent.

No. 10–0688.  |  Argued Feb. 3, 2011.  |  Decided May 27, 2011.

**Synopsis**

**Background:** Mobile home buyer brought action against seller, alleging violations of Texas Deceptive Trade Practices Act and fraud. The 229th Judicial District Court, Duval County, Alex W. Gabert, J., granted buyer's motion to compel arbitration and appointed arbitrator. Seller filed interlocutory appeal challenging the appointment, and requesting in the alternative that its appeal be treated as a mandamus petition. The San Antonio Court of Appeals, 328 S.W.3d 592, dismissed appeal for want of jurisdiction. Seller petitioned for review.

**Holdings:** The Supreme Court, Wainwright, J., held that:

[1] interlocutory appeal from an order appointing an arbitrator was not permitted;

[2] order appointing an arbitrator was not an order directing arbitration to proceed; and

[3] seller's interlocutory appeal from order appointing an arbitrator could be considered as a petition for writ of mandamus.

Judgment of Court of Appeals reversed and remanded.

West Headnotes (15)

[1]  **Courts**  Appellate jurisdiction of Supreme Court in general

Supreme Court has jurisdiction to determine whether the court of appeals correctly decided its jurisdiction.

Cases that cite this headnote

[2]  **Appeal and Error**  Cases Triable in Appellate Court

Supreme Court reviews the court of appeals' determination of its jurisdiction de novo.

Cases that cite this headnote

[3]  **Appeal and Error**  Necessity of final determination

Unless a statute authorizes an interlocutory appeal, appellate courts generally only have jurisdiction over final judgments.

25 Cases that cite this headnote

**[4]**    **Appeal and Error**  ☞ Interlocutory and Intermediate Decisions

Courts strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable.

30 Cases that cite this headnote

**[5]**    **Alternative Dispute Resolution**  ☞ Decisions reviewable; finality

Interlocutory appeal from an order appointing an arbitrator was not permitted. 9 U.S.C.A. § 16; V.T.C.A., Civil Practice & Remedies Code § 51.016.

5 Cases that cite this headnote

**[6]**    **Alternative Dispute Resolution**  ☞ Decisions reviewable; finality

Order appointing an arbitrator was not an order "directing arbitration to proceed," within meaning of section of the Federal Arbitration Act specifying the orders from which an appeal could not be taken, even though order was issued in response to motion requesting that trial court compel arbitration, where order did not explicitly grant the motion to compel and did not explicitly compel the parties to arbitrate their dispute, both parties agreed to arbitrate their dispute, the open question remaining was who would serve as the arbitrator, and the purpose of the order was to answer that question. 9 U.S.C.A. § 16(b)(2).

19 Cases that cite this headnote

**[7]**    **Alternative Dispute Resolution**  ☞ Decisions reviewable; finality

Order appointing an arbitrator remained interlocutory and could not be appealed under section of the Federal Arbitration Act authorizing review of a final decision with respect to an arbitration, where trial court did not enter a dismissal or otherwise dispose of all parties and claims. 9 U.S.C.A. § 16(a)(3).

5 Cases that cite this headnote

**[8]**    **Alternative Dispute Resolution**  ☞ Decisions reviewable; finality

Just as all interlocutory arbitration orders are not subject to appeal under the Texas Arbitration Act, the Legislature, in enacting statute permitting a party to appeal an interlocutory order under the same circumstances that an appeal from a federal district court's order would be permitted by section of the Federal Arbitration Act (FAA) governing appeals, did not intend to make all interlocutory orders under the FAA appealable, only those permitted by section of the FAA governing appeals. 9 U.S.C.A. §§ 1 et seq., 16; V.T.C.A., Civil Practice & Remedies Code §§ 171.098 et seq., 51.016.

23 Cases that cite this headnote

**[9]**    **Mandamus**  ☞ Form, requisites, and sufficiency in general

Seller's impermissible interlocutory appeal from order appointing an arbitrator would be considered as a petition for writ of mandamus, where seller invoked the court of appeals' appellate jurisdiction by specifically requesting that its appeal be treated as a mandamus petition; nothing in the procedures for interlocutory appeals and mandamus actions prevented the appeal from being treated as a petition for writ of mandamus, and judicial efficiency militated against requiring seller to file a separate original proceeding.

23 Cases that cite this headnote

**[10]** **Mandamus** 🔑 Modification or vacation of judgment or order

      **Mandamus** 🔑 Nature of acts to be commanded

      **Mandamus** 🔑 Civil proceedings other than actions

Mandamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, as when a party is erroneously denied its contracted-for arbitration rights under the Federal Arbitration Act. 9 U.S.C.A. § 1 et seq.

8 Cases that cite this headnote

**[11]** **Appeal and Error** 🔑 Nature of remedy by dismissal

State policy as embodied in the appellate rules disfavors disposing of appeals based upon harmless procedural defects.

4 Cases that cite this headnote

**[12]** **Appeal and Error** 🔑 Time for filing

      **Appeal and Error** 🔑 Advancement of cause

Appeals from interlocutory orders are accelerated, and an accelerated appeal is perfected by filing a notice of appeal within 20 days of the order. Rules App.Proc., Rule 26.1(b).

Cases that cite this headnote

**[13]** **Courts** 🔑 In issuance of writs

Because mandamus is controlled largely by equitable principles, there is no fixed deadline for filing original proceedings in the Rules of Appellate Procedure.

Cases that cite this headnote

**[14]** **Mandamus** 🔑 Time to Sue, Limitations, and Laches

An appeal complying with the rules governing an accelerated appeal would generally be timely for mandamus purposes.

1 Cases that cite this headnote

**[15]** **Alternative Dispute Resolution** 🔑 Remedies and Proceedings for Enforcement in General

The interests of promoting the policy considerations of rigorous and expedited enforcement of arbitration agreements would not be served by letting a technicality rule the day.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*446** Brendan K. McBride, The McBride Law Firm, Rio Grande City, David L. Rumley, Wigington Rumley Dunn LLP, Corpus Christi, and Baldemar Gutierrez, Law Offices of Baldemar Gutierrez, Alice, for Adam Perez.

Scott A. Brister, Lino Mendiola, Andrews & Kurth L.L.P., Austin, Jorge C. Rangel, The Rangel Law Firm, P.C., Corpus Christi, for CMH Homes, Inc.

Augustin Rivera Jr., Dunn Weathered Coffey Rivera & Kapertism, P.C., Corpus Christi, for Bruce Robin Moore, Jr.

**Opinion**

Justice WAINWRIGHT delivered the opinion of the Court.

Once more, this Court is presented with a question of the availability of judicial review of an interlocutory arbitration order. In this consumer dispute, CMH Homes, Inc. and Adam Perez agreed to submit their claims to arbitration but could not agree on an arbitrator. Because of this disagreement, the trial judge intervened and appointed an arbitrator to preside over their dispute. CMH Homes filed an interlocutory appeal challenging this appointment, requesting in the alternative that its appeal be treated as a mandamus petition. The court of appeals determined it was without jurisdiction and dismissed the appeal. We agree with the court of appeals' determination that Texas Civil Practice and Remedies Code section 51.016 does not allow an interlocutory appeal of an order appointing an arbitrator. However, under these circumstances, CMH Homes's appeal may properly be considered as a petition for writ of mandamus. We remand for the court of appeals to consider this appeal as a petition for writ of mandamus.

## I. Background

### A. Facts and Procedure

On October 2, 2002, Adam Perez purchased a manufactured home from CMH Homes, with the help of salesman Bruce Robinson Moore Jr. Vanderbilt Mortgage and Finance provided financing for the purchase. The retail installment contract between CMH Homes and Perez contained an arbitration clause which provides:

> All disputes, claims or controversies arising from or relating to this contract ... shall be resolved by mandatory binding arbitration by one arbitrator selected by Seller with Buyer's consent.

**\*447** On November 2, 2009, Perez sued CMH Homes, Inc., Vanderbilt Mortgage and Finance, Inc., and Bruce Robinson Moore Jr. (hereinafter "CMH Homes") for fraud and violations of the Texas Debt Collection Act in the financing of his manufactured home. Perez filed a motion to compel arbitration on January 13, 2010. Although the parties agreed that the contract was governed by the Federal Arbitration Act and agreed to submit to arbitration, they could not agree to an arbitrator. After two months of disagreement, with both parties suggesting arbitrators in various correspondence, Perez's attorney declared an impasse.[1] On March 8, 2010, after a hearing, the trial court issued an order appointing Gilberto Hinojosa as arbitrator. Although the order was titled "Order on Plaintiff's Motion to Compel Arbitration," the only directive in the order was to name an arbitrator to preside over the dispute.

CMH Homes filed an interlocutory appeal pursuant to Texas Civil Practice and Remedies Code section 51.016, challenging the court's appointment of Gilberto Hinojosa as arbitrator. CMH Homes did not file a separate mandamus petition, but asked the court of appeals in the alternative to consider its appeal as a mandamus proceeding. See *CMH Homes, Inc. v. Perez,* 328 S.W.3d 592, 594 (Tex.App.-San Antonio 2010, pet. granted). The court of appeals determined that interlocutory appeal was unavailable under Civil Practice and Remedies Code section 51.016 and dismissed the appeal for want of jurisdiction. *Id.* at 593.

### B. Jurisdiction and Standard of Review

 **[1]** **[2]** This court has jurisdiction to determine whether the court of appeals correctly decided its jurisdiction. *See Badiga v. Lopez,* 274 S.W.3d 681, 682 n. 1 (Tex.2009) (citing *Tex. Dep't of Crim. Justice v. Simons,* 140 S.W.3d 338, 343 n. 13 (Tex.2004)). We review the court of appeals' determination of its jurisdiction de novo. *Villafani v. Trejo,* 251 S.W.3d 466, 467 (Tex.2008).

 **[3]** **[4]** Unless a statute authorizes an interlocutory appeal, appellate courts generally only have jurisdiction over final judgments. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 195 (Tex.2001); *see also Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992) ("Interlocutory orders may be appealed only if permitted by statute." (citations omitted)). We strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable. *See, e.g., Tex. A & M Univ. Sys. v.* **\*448** *Koseoglu,* 233 S.W.3d 835, 841 (Tex.2007); *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex.2001) (citation omitted).

## II. Discussion

First, we must determine whether the court of appeals lacked jurisdiction under Texas Civil Practice and Remedies Code section 51.016 of an interlocutory appeal of an order appointing an arbitrator. If section 51.016 does not provide jurisdiction, we then decide whether the court of appeals should have considered CMH Homes's interlocutory appeal as a petition for writ of mandamus.

### A. *Texas Civil Practice and Remedies Code Section 51.016*

 **[5]** Prior to the Legislature's 2009 amendment to the Texas Arbitration Act (TAA), parties seeking to appeal an order refusing to compel arbitration would commonly file two separate appellate proceedings. Under the TAA, a party could bring an interlocutory appeal of an order denying arbitration. *See* TEX. CIV. PRAC. & REM.CODE § 171.098. Under the Federal Arbitration Act (FAA), a party could only challenge an order denying arbitration by mandamus. *Jack B. Anglin,* 842 S.W.2d at 271–72. As a result, parallel proceedings were the norm in Texas arbitration disputes where parties were unsure which arbitration act applied. Although "unnecessarily expensive and cumbersome," such parallel proceedings were required. *Id.* at 272. Twice, this Court requested that the Legislature "consider amending the Texas Act to permit interlocutory appeals of orders issued pursuant to the Federal Act." *Id.; In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 780 n. 4 (Tex.2006) (quoting *Jack B. Anglin,* 842 S.W.2d at 272). In response, the Legislature added section 51.016 to the Civil Practice and Remedies Code in 2009. Act of May 27, 2009, 81st Leg., R. S., ch. 820, §§ 1, 3, 2009 Tex. Gen. Laws 2061 (codified at TEX. CIV. PRAC. & REM.CODE § 51.016). This is our first opportunity to construe the scope of the Legislature's remedial action.

 **[6]** Section 51.016 provides that a party may appeal a judgment or interlocutory order "under the same circumstances that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16." TEX. CIV. PRAC. & REM.CODE § 51.016. Section 16 of the FAA provides:

 (a) An appeal may be taken from—

   (1) an order—

     (A) refusing a stay of any action under section 3 of this title,

     (B) denying a petition under section 4 of this title to order arbitration to proceed,

     (C) denying an application under section 206 of this title to compel arbitration,

     (D) confirming or denying confirmation of an award or partial award, or

(E) modifying, correcting, or vacating an award;

(2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

(3) a final decision with respect to an arbitration that is subject to this title.

(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—

(1) granting a stay of any action under section 3 of this title;

(2) directing arbitration to proceed under section 4 of this title;

**\*449** (3) compelling arbitration under section 206 of this title; or

(4) refusing to enjoin an arbitration that is subject to this title.

9 U.S.C. § 16. Civil Practice and Remedies Code section 51.016 expressly incorporates federal law. Thus, an interlocutory appeal in this case is permitted only if it would be permitted under the same circumstances in federal court under section 16. *See Little v. Tex. Dep't of Crim. Justice,* 148 S.W.3d 374, 381–82 (Tex.2004) (examining federal law when interpreting state statute that incorporated federal statute).

In considering the scope of section 16's jurisdictional grant, we first determine the nature of the order being appealed. The order at issue is entitled "Order on Plaintiff's Motion to Compel Arbitration" and appoints Gilberto Hinojosa as arbitrator. Although Perez's motion to compel arbitration did not request that the trial court appoint an arbitrator, Perez submitted letters to the court administrator declaring an impasse and requesting the trial judge appoint an arbitrator.

At first glance, this order may appear to fit within section 16(b)(2) as an order "directing arbitration to proceed." 9 U.S.C. § 16(b)(2). The "Order on Plaintiff's Motion to Compel Arbitration" was issued in response to Perez's motion requesting that the trial court compel arbitration. But the substance of the order is the appointment of Gilberto Hinojosa as arbitrator. *See Del Valle Indep. Sch. Dist. v. Lopez,* 845 S.W.2d 808, 809 (Tex.1992) ("[I]t is the character and function of an order that determine its classification."). While it may be argued that by appointing an arbitrator the order implicitly compels the parties to arbitration, the order does not explicitly grant Perez's motion to compel and does not explicitly compel the parties to arbitrate their dispute. There is no question that both parties agreed to arbitrate their dispute; the open question remaining was who would serve as the arbitrator. The purpose of the order was to answer that question.

Section 5 of the FAA explicitly permits a trial court to appoint an arbitrator under certain circumstances. 9 U.S.C. § 5. Where the parties have previously agreed to a method for selecting an arbitrator, the parties must follow that method. *Id.* However, if the agreed upon method breaks down and there is a lapse in appointing an arbitrator, the parties may petition the trial court to appoint an arbitrator. *Id.*

 [7]    An order appointing an arbitrator under section 5 is neither listed in section 16(a) (where appeals may be taken) nor in section 16(b) (where appeals may not be taken). 9 U.S.C. § 16(a), (b). Even though section 16 is silent on the matter, CMH Homes argues that an appeal of an order appointing an arbitrator is "permitted by Section 16" because some federal circuit cases may have entertained interlocutory appeals regarding appointment of arbitrators pursuant to section 5.[2] However, none of the cited cases mentions whether the appeal is interlocutory and all but one of the cited cases fails to specifically discuss its jurisdictional basis or cite section 16.[3] *Nat'l Am. Ins. Co. v. Transamerica* **\*450** *Occidental Life Ins. Co.,* 328 F.3d 462 (8th Cir.2003) (affirming the district court's selection of an arbitrator pursuant to section 5); *ACEquip Ltd. v. Am. Eng'g Corp.,* 315 F.3d 151 (2d Cir.2003) (same); *see also The Stop & Shop Supermarket Co. LLC v. United Food & Commercial Workers Union Local 342,* 246 Fed.Appx. 7 (2d Cir.2007) (same). The one exception, *Universal Reinsurance,* specifically establishes its jurisdiction "pursuant to 9 U.S.C. § 16(a)(3), which authorizes review of 'a final decision with respect to an arbitration....'

" *Universal Reinsurance Corp. v. Allstate Ins. Co.,* 16 F.3d 125, 126 (7th Cir.1994). Neither CMH Homes nor Perez has suggested that this appeal was anything other than interlocutory. Because the trial court did not enter a dismissal or otherwise dispose of all parties and claims, the order remains interlocutory and cannot be appealed under section 16(a)(3).[4] *See In re Gulf Exploration, LLC,* 289 S.W.3d 836, 839 (Tex.2009) ( "[T]here can be an appeal if the underlying case is dismissed." (citing *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 86–87, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000))). Although we presume a court always evaluates its jurisdiction before deciding a matter, these cases do not indicate whether their jurisdictional basis was section 16, and if so, whether the basis was section 16(a)(3) for final orders.[5] The only federal circuit case that speaks directly to the jurisdictional issue is *O.P.C. Farms Inc. v. Conopco Inc.,* which held that under section 16, the trial court's order appointing an arbitrator was not a final decision and was thus unappealable.[6] **\*451** 154 F.3d 1047, 1048–49 (9th Cir.1998). The court explained: "[T]he only basis for an appeal ... that could even be plausibly argued is § 16(a)(3). It is, however, clear that the appointment of the third arbitrator is not the final decision in this case.... Consequently § 16 effectively deprives us of jurisdiction." *Id.*

The appellate jurisdiction of Texas courts in this case is based on federal law. The court of appeals had jurisdiction to consider the trial court's order if "appeal ... would be permitted by 9 U.S.C. Section 16" in federal court. TEX. CIV. PRAC. & REM.CODE § 51.016. Because there is no apparent federal approach to judicial review under section 16 of orders appointing arbitrators, we will not extrapolate jurisdiction from a dearth of federal authority to allow an interlocutory appeal where the law is unclear and section 16 suggests otherwise.

Before the enactment of section 51.016, we specifically invited the Legislature " '[i]n the interests of promoting the policy considerations of rigorous and expedited enforcement of arbitration agreements, ... to consider amending the Texas Act to permit interlocutory appeals of orders issued pursuant to the Federal Act.' " *See In re D. Wilson,* 196 S.W.3d at 780 n. 4 (quoting *Jack B. Anglin,* 842 S.W.2d at 272). While we agree the Legislature added section 51.016 to prevent unnecessary parallel proceedings, this inconsistency generally arose when parties were unsure whether the TAA or the FAA applied to their agreement. *See Jack B. Anglin,* 842 S.W.2d at 272 ("[L]itigants who allege entitlement to arbitration under the Federal Act, and in the alternative, under the Texas Act, are burdened with the need to pursue parallel proceedings—an interlocutory appeal of the trial court's denial under the Texas Act, and a writ of mandamus from the denial under the Federal Act."). The Legislature in enacting section 51.016 has remedied this particular situation and enacted a policy change that promotes efficiency and common sense. *See Sidley Austin Brown & Wood, LLP v. J.A. Green Dev. Corp.,* 327 S.W.3d 859, 862 (Tex.App.-Dallas 2010, no pet.); *Ranchers & Farmers Mut. Ins. Co. v. Stahlecker,* No. 09–10–00286–CV, 2010 WL 4354020, at \*1 (Tex.App.-Beaumont Nov. 4, 2010, no pet.) (mem.op.); *In re Rio Grande Xarin II, Ltd.,* Nos. 13–10–00115–CV, 13–10–00116–CV, 2010 WL 2697145, at \*3–4 (Tex.App.-Corpus Christi–Edinburg July 6, 2010, pet. dism'd) (mem.op.); *950 Corbindale, L.P. v. Kotts Capital Holdings Ltd. P'ship,* 316 S.W.3d 191, 195 n. 1 (Tex.App.-Houston [14th Dist.] 2010, no pet.).

 **[8]**    Here, however, the issue is not which Act applies, but whether this particular type of order is appealable. Just as all interlocutory arbitration orders are not subject to appeal under the TAA, the Legislature in enacting section 51.016 did not intend to make all interlocutory orders under the FAA appealable, only those permitted by section 16 of the FAA.[7] Our interpretation does not promote parallel proceedings of arbitration orders under the TAA and FAA and does not frustrate **\*452** the Legislature's intent in enacting section 51.016.

The court of appeals below correctly determined it was without jurisdiction to hear an interlocutory appeal pursuant to section 51.016. The only remaining appellate option for the parties at this juncture is mandamus relief.


### *B. Mandamus*

[9] Because Civil Practice and Remedies Code section 51.016 does not allow an interlocutory appeal of this type of order, CMH Homes requests in the alternative that we instruct the court of appeals to treat CMH Homes's appeal as a petition for writ of mandamus to prevent form from overriding substance.

Before the adoption of section 51.016, this Court held in *In re Louisiana Pacific Corp.* that a trial court's order appointing an arbitrator could be reviewed by mandamus. 972 S.W.2d 63, 64 (Tex.1998) (per curiam). The arbitration agreement in *Louisiana Pacific* allowed each party to select an arbitrator. *Id.* at 63. After Louisiana Pacific withdrew its arbitrator due to the objection of the other party, the trial court improperly appointed an arbitrator pursuant to section 5 of the FAA. *Id.* at 64. We conditionally issued the writ "[b]ecause the terms of the contract and the FAA allow[ed] Louisiana Pacific to choose an arbitrator" before the trial court intervened to name a replacement. *Id.* We explained the importance of contractual arbitrator selection: "Since its inception, one of the central purposes of the FAA has been to allow the parties to select their own arbitration panel if they choose to do so. 'Toward this end, it is desirable that the arbitration panel consist of arbitrators chosen by each of the parties.' " *Id.* at 65 (quoting *Lobo & Co. v. Plymouth Navigation Co.,* 187 F.Supp. 859, 860 (S.D.N.Y.1960)).

[10] Although this court decided *Louisiana Pacific* when FAA interlocutory orders could only be reviewed by mandamus, the Legislature's addition of section 51.016 is of no effect here. As explained above, section 51.016 does not provide for interlocutory appeal of an order appointing an arbitrator. There is still no remedy by appeal because the FAA does not provide for the review of this type of order in state court. *See id.* at 65 ("Louisiana Pacific has no adequate remedy by appeal because the FAA does not provide for review of the trial court's actions in state court."). Moreover, "[m]andamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, as when a party is erroneously denied its contracted-for arbitration rights under the FAA." *In re D. Wilson,* 196 S.W.3d at 780 (internal citation omitted); *see also Jack B. Anglin,* 842 S.W.2d at 272–73 (awarding mandamus relief where a party "would be deprived of the benefits of the arbitration clause it contracted for, and the purpose of providing a rapid, inexpensive alternative to traditional litigation would be defeated").

Perez argues mandamus review is inappropriate because CMH Homes failed to file a separate mandamus petition and, citing *Jack B. Anglin,* contends that the court "may not enlarge [its] appellate jurisdiction absent legislative mandate." 842 S.W.2d at 272. However, CMH Homes invoked the court of appeals' original jurisdiction by specifically requesting that its appeal be treated as a mandamus petition. *See Warwick Towers Council of Co-Owners v. Park Warwick, L.P.,* 244 S.W.3d 838, 839 (Tex.2008) ("[T]he factor which determines whether jurisdiction has been conferred on the appellate court is not the form or substance of the bond, certificate or affidavit, but whether the instrument was filed in a bona fide attempt to invoke **\*453** appellate court jurisdiction." (internal quotations and citations omitted)); *see also Linwood v. NCNB Tex.,* 885 S.W.2d 102, 103 (Tex.1994) ("The court of appeals ... has jurisdiction over the appeal if a party files an instrument in a bona fide attempt to invoke the appellate court's jurisdiction."); *Grand Prairie Indep. Sch. Dist. v. S. Parts Imps.,* 813 S.W.2d 499, 500 (Tex.1991) ( "If the appellant timely files a document in a bona fide attempt to invoke the appellate court's jurisdiction, the court of appeals, on appellant's motion, must allow the appellant an opportunity to amend or refile the instrument required by law or our Rules to perfect the appeal.").

[11] Texas policy as " 'embodied in our appellate rules ... disfavors disposing of appeals based upon harmless procedural defects.' " *Higgins v. Randall Cnty. Sheriff's Office,* 257 S.W.3d 684, 688 (Tex.2008) (quoting *Verburgt v. Dorner,* 959 S.W.2d 615, 616 (Tex.1997)); *see also* TEX.R.APP. P. 44.3 ("A court of appeals must not affirm or reverse a judgment or dismiss an appeal for formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or irregularities."). This Court has previously treated a petition for review as a petition for writ of mandamus where the appellant/relator specifically sought mandamus relief. *Powell v. Stover,* 165 S.W.3d 322, 324 n. 1 (Tex.2005). And it is our practice when confronted with parallel mandamus and appeal proceedings "to consolidate the two proceedings and render a decision disposing of both simultaneously." *In re Valero Energy Corp.,* 968 S.W.2d 916, 917 (Tex.1998).

[12] [13] [14] [15] Moreover, nothing in the procedures for interlocutory appeals and mandamus actions prevents us from treating this appeal as a petition for writ of mandamus. Appeals from interlocutory orders are accelerated, and an accelerated appeal is perfected by filing a notice of appeal within twenty days of the order. *See* TEX.R.APP. P. 26.1(b). Because mandamus

is "controlled largely by equitable principles," there is no fixed deadline for filing original proceedings in the Texas Rules of Appellate Procedure. *In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 676 (Tex.2009) (citations omitted). An appeal complying with the rules governing an accelerated appeal would generally be timely for mandamus purposes. Additionally, briefs in mandamus actions and interlocutory appeals have the same content and page length requirements. *Compare* TEX.R.APP. P. 38.1, .4 (stating contents of brief and page length requirement for appeal to the courts of appeals), *with* TEX.R.APP. P. 52.3, .6 (stating contents of brief and page length requirement for original proceedings at the supreme court and courts of appeals). "[T]he interests of promoting the policy considerations of rigorous and expedited enforcement of arbitration agreements" would not be served by letting a technicality rule the day. [8] *Jack B. Anglin,* 842 S.W.2d at 272.

We will not unnecessarily waste the parties' time and further judicial resources by requiring CMH Homes to file a separate document with the title "petition for writ of mandamus" listed on the cover where the party has expressly requested mandamus treatment of its appeal in an uncertain legal environment. *See Wagner & Brown, Ltd. v. Horwood,* 53 S.W.3d 347, 351 (Tex.2001) (rejecting an "approach [that] catapults form over substance to deny appellate review on the merits"). **\*454** Because CMH Homes specifically requested mandamus relief in the court of appeals and preserved that issue in this Court, and because judicial efficiency militates against requiring CMH Homes to file a separate original proceeding, we instruct the court of appeals to consider this appeal as a petition for writ of mandamus. Today, we speak only to the propriety of mandamus *review* and not to the propriety of mandamus *relief* in this particular case. Because the merits were not briefed to this Court, we do not decide whether the trial judge improperly appointed an arbitrator.

### III. Conclusion

We hold that Texas Civil Practice and Remedies Code section 51.016 does not permit interlocutory appeal from an order appointing an arbitrator. However, this appeal may properly be considered as a petition for writ of mandamus, as CMH Homes requested. The court of appeals erred in dismissing CMH Homes's appeal for lack of jurisdiction. Accordingly, we reverse and remand to the court of appeals for further proceedings consistent with this opinion.

**Parallel Citations**

54 Tex. Sup. Ct. J. 1098

Footnotes

1    After receiving Perez's motion to compel arbitration, CMH Homes presented three names for consideration as potential arbitrators. Perez rejected the suggested arbitrators and presented CMH Homes with a proposed agreed order that compelled the parties to arbitration and left a blank for the court to appoint an arbitrator. CMH Homes did not agree to the proposed order and offered to submit two more arbitrator names for Perez's consideration. Instead, Perez sent a copy of the proposed order to the court and suggested three possible arbitrators for the court to appoint. In response, CMH Homes sent a letter to the court explaining that under the arbitration provision, CMH Homes, not Perez, has the right to designate the arbitrator and suggested two more arbitrators. The letter also indicates that the parties were considering one of the two arbitrators, Donato Ramos, but Perez was concerned about conflicts of interests because his attorneys had financial connections to Ramos. The court held a hearing on February 9, 2010 where the parties appeared to agree to the appointment of Ramos. However, when the parties could not agree to a waiver of conflicts for Ramos, the agreement fell apart. Perez notified the court that they could not reach an agreed waiver and again asked the court to appoint an arbitrator and re-submitted the three names previously suggested, including Gilberto Hinojosa.

2    CMH Homes relies upon the following cases: *Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.,* 328 F.3d 462 (8th Cir.2003); *ACEquip Ltd. v. Am. Eng'g Corp.,* 315 F.3d 151 (2d Cir.2003); *Universal Reinsurance Corp. v. Allstate Ins. Co.,* 16 F.3d 125 (7th Cir.1994); *ATSA of Cal., Inc. v. Cont'l Ins. Co.,* 754 F.2d 1394 (9th Cir.1985).

3    CMH Homes also cites the Ninth Circuit case *ATSA of California, Inc. v. Continental Insurance Co.,* 754 F.2d 1394 (9th Cir.1985). But because this case was decided before section 16 was enacted, it does not interpret section 16.

4    In state court, cases are typically stayed pending arbitration rather than dismissed, as frequently is the case in federal court. In *In re Gulf Exploration, LLC,* we explained:

> Arbitrability is often the only issue in federal court because nondiverse parties may prevent removal of the underlying case from state court; in such cases, even a stay order will be considered final if the federal action is effectively over. But in the state courts, disputes about arbitrability and the merits must usually proceed in a single court under rules of dominant jurisdiction.
>
> Accordingly, a stay is generally the only appropriate order for a state court with jurisdiction of all issues. Indeed, the Texas Arbitration Act states that "[a]n order compelling arbitration must include a stay" of the underlying litigation. During arbitration, a court order may be needed to replace an arbitrator, compel attendance of witnesses, or direct arbitrators to proceed promptly; after arbitration, a court order is needed to confirm, modify, or vacate the arbitration award. Consequently, dismissal would usually be inappropriate because the trial court cannot dispose of all claims and all parties until arbitration is completed.

  289 S.W.3d 836, 840–41 (Tex.2009) (citations omitted).

5    The appellants in *National American* and *ACEquip* represented to the circuit courts that the order being appealed was final. *See* Appellant's Brief at 3, *ACEquip Ltd. v. Am. Eng'g Corp.,* 315 F.3d 151 (2d Cir.2003); Appellant's Brief at 1, *Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.,* 328 F.3d 462 (8th Cir.2003). The appellees did not challenge this assertion in *ACEquip, see* Brief of Plaintiff–Appellee, *ACEquip Ltd. v. Am. Eng'g Corp.,* 315 F.3d 151 (2d Cir.2003), and appear not to have challenged the assertion in *National American, see* Reply Brief of Appellant, *Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.,* 328 F.3d 462 (8th Cir.2003). In both cases, the parties treated the order appointing an arbitrator as final, and the courts of appeals appear to have taken the parties at their word.

6    In its analysis, the court in *O.P.C. Farms* concluded that an order appointing an arbitrator is "embedded" in the case. *O.P.C. Farms Inc. v. Conopco Inc.,* 154 F.3d 1047, 1049 (9th Cir.1998) (citation omitted). However, the United States Supreme Court eliminated the distinction between embedded and independent proceedings in *Green Tree,* which may raise questions about the precedential value of this case. *See Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 87–89, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

7    The language of section 51.016, and therefore FAA section 16, also indicates the Legislature did not intend to create a comprehensive appellate scheme making all FAA orders appealable through interlocutory appeal, but instead focused on denials of arbitration. *See* TEX. CIV. PRAC. & REM.CODE § 51.016; 9 U.S.C. § 16; *In re Gulf Exploration,* 289 S.W.3d at 839 ("[T]he FAA 'generally permits immediate appeal of orders hostile to arbitration ... but bars appeal of interlocutory orders favorable to arbitration.' " (quoting *Green Tree,* 531 U.S. at 86, 121 S.Ct. 513)); *see also May v. Higbee Co.,* 372 F.3d 757, 762 (5th Cir.2004) (noting the "general, congressionally mandated rule that anti-arbitration decisions are immediately appealable under § 16(a)(1)").

8    Although we note that CMH Homes's petition was not certified at this Court as required by Texas Rule of Appellate Procedure 52.3(j), we are confident that CMH Homes will fully comply with Rule 52 on remand to the court of appeals.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

364 S.W.3d 831
Supreme Court of Texas.

COMMISSION FOR LAWYER DISCIPLINE, Petitioner,

v.

Heather SCHAEFER, Respondent.

No. 10–0609.  |  April 20, 2012.

**Synopsis**
**Background:** In attorney disciplinary proceeding, the Board of Disciplinary Appeals vacated unanimous finding of misconduct and order of disbarment entered by evidentiary panel quorum. Commission for Lawyer Discipline appealed.

**Holdings:** On grant of rehearing, the Supreme Court held that:

[1] composition of evidentiary panel violated ratio requirement;

[2] improper evidentiary panel composition rendered panel's judgment voidable, rather than void;

[3] respondent attorney was required to exercise reasonable diligence to ascertain composition of evidentiary panel assigned to her case and to object if composition requirements were not satisfied; and

[4] attorney waived claim of error with respect to composition of evidentiary panel.

Reversed; judgment of disbarment reinstated.

West Headnotes (8)

**[1]      Attorney and Client**  ☞  Trial or hearing

Rules governing attorney disciplinary proceedings clearly, and repeatedly, mandate a two-to-one ratio of attorneys to public members on evidentiary panels. V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rules 2.02, 2.07, 2.17.

Cases that cite this headnote

**[2]      Attorney and Client**  ☞  Review

Supreme Court would review de novo legal conclusions of Board of Disciplinary Appeals (BODA) concerning construction of the Rules of Disciplinary Procedure.

Cases that cite this headnote

**[3]      Attorney and Client**  ☞  Trial or hearing

Composition of evidentiary panel in attorney disciplinary proceeding violated ratio requirement set forth in rules governing disciplinary proceedings, where one of the two public-member positions on the six-member evidentiary panel was vacant; two public members were required for panel having four attorney members. V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rules 2.02, 2.17.

Cases that cite this headnote

**[4]**     **Attorney and Client** 🔑 Trial or hearing

     **Attorney and Client** 🔑 Judgment or order

Improper evidentiary panel composition did not deprive evidentiary panel of capacity to act on attorney disciplinary complaints, and consequently rendered the evidentiary panel's judgment voidable, rather than void. V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rules 2.02, 2.17.

Cases that cite this headnote

**[5]**     **Attorney and Client** 🔑 Review

Error in the composition of an evidentiary panel in an attorney disciplinary proceeding must be preserved by timely objection, as the attorney-to-public-member composition requirement does not undermine the capacity of an evidentiary panel or otherwise deprive it of jurisdiction to hear evidence and issue disciplinary orders. Rules App.Proc., Rule 33.1(a); V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rules 2.02, 2.17.

Cases that cite this headnote

**[6]**     **Attorney and Client** 🔑 Trial or hearing

Grievance Committee should timely advise respondent attorneys of the composition of the evidentiary panel from which the quorum was drawn to hear an attorney disciplinary case.

Cases that cite this headnote

**[7]**     **Attorney and Client** 🔑 Trial or hearing

In attorney disciplinary proceeding, respondent attorney was required to exercise reasonable diligence to ascertain composition of evidentiary panel assigned to her case, and to object if composition requirements were not satisfied, where attorney was on notice that panel was incomplete. V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rules 2.02, 2.17.

Cases that cite this headnote

**[8]**     **Attorney and Client** 🔑 Review

Attorney waived claim of error, in disciplinary proceedings, with respect to composition of evidentiary panel, where violation did not deprive panel of its capacity to select quorum, hear evidence, and issue judgment, and attorney neither objected to composition of panel nor filed timely post-judgment motion. V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rules 2.07, 2.17.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*833** Linda A. Acevedo, Chief Disciplinary Counsel, Cynthia W. Hamilton, Senior Appellate Disciplinary Counsel, Office of the Chief Disc. Counsel, for Commission for Lawyer Discipline.

Heather Ann Badgett Schaefer, Plano, for Appellee.

**Opinion**

PER CURIAM.

District Grievance Committees appoint evidentiary panels for attorney disciplinary actions, and quorums of the evidentiary panels hear and decide the actions. This case raises the question of whether a properly constituted quorum of an improperly constituted evidentiary panel has the authority to act in an attorney disciplinary matter. Following a unanimous finding of misconduct by an evidentiary panel quorum, an attorney appealed the panel's order of disbarment to the Board of Disciplinary Appeals (BODA) on the ground that the evidentiary panel was not composed of the required ratio of public to attorney members.

The attorney failed to attend her hearing and filed no post-judgment motions with the evidentiary panel. BODA vacated the panel's judgment and remanded for a new hearing because the evidentiary panel was improperly composed, even though the quorum of panelists present for the hearing met the required ratio of lawyers to non-lawyers. BODA concluded the panel-composition error voided the panel's judgment for lack of capacity. We agree with BODA that the composition of evidentiary panels, a mandatory requirement, was not met here. However, we conclude that requirement is not jurisdictional and the evidentiary panel's order was voidable, not void. Therefore, because no objection was lodged to the evidentiary panel's composition, we reverse BODA's judgment.

Complaints of attorney misconduct are assessed by the Office of the Chief Disciplinary Counsel (CDC) of the State Bar of Texas, which administers the attorney disciplinary system at the investigatory and trial levels. TEX.R. DISCIPLINARY P. 1.06(C), 5.01, .02. CDC investigates complaints to determine whether there is just cause that an attorney committed professional misconduct. *Id.* at 1.06(U) & (V), 2.12, 5.02(C). Upon a determination of just cause by CDC, the accused attorney may have her case heard in (1) district court, upon election, with or without a jury or (2) in an administrative proceeding by an evidentiary panel of a State Bar of Texas District Grievance Committee (Grievance Committee) within the relevant geographic district. *Id.* at 2.14, .15. The respondent attorney must be notified of the names and addresses of the evidentiary panel members assigned to adjudicate the complaint. *Id.* at 2.06.

Grievance Committees "must consist of no fewer than nine members," *id.* at 2.02, and "shall act through panels," as assigned by the Grievance Committee chairs. *Id.* at 2.07. "No panel may consist of more than one-half of all members of the [Grievance] Committee or fewer than three members." *Id.* The evidentiary panel hears evidence and adjudicates the grievance against an attorney accused of professional misconduct. *Id.* at 2.17. A quorum consists of "a majority of the membership of the panel," *id.* at 2.07, and also must have "at least one public member for every two attorney members present." *Id.; see also In re Allison,* 288 S.W.3d 413, 417 (Tex.2009).

In these administrative proceedings, the Commission for Lawyer Discipline (Commission), a permanent committee of the State Bar, is the litigant opposing the accused **\*834** attorney. *Id.* at 4.01, .06(A). The Commission is the client of the CDC in complaint proceedings not dismissed at summary disposition. *Id.* at 2.14(A), 5.02(G).

[1] All panels of a Grievance Committee "must be composed of two-thirds attorneys and one-third public members." *Id.* at 2.02; *see also id.* at 2.07 (specifying that panels "must be composed of two attorney members for each public member."). Rule 2.17 repeats this standard specifically for evidentiary panels: "Each Evidentiary Panel must have a ratio of two attorney members for every public member...." *Id.* at 2.17. The rules therefore clearly, and repeatedly, mandate a two-to-one ratio of attorneys to public members on evidentiary panels.

CDC investigated three grievances filed against attorney Heather Schaefer and found just cause to have the grievances adjudicated. *See* TEX.R. DISCIPLINARY P. 5.02(C), (G), (I) & (M) (laying out in relevant part the duties of the CDC in disciplinary proceedings). As Schaefer did not elect to have the grievances heard in district court, CDC assigned them to an evidentiary panel. *Id.* at 2.14, .15. The Chair of the relevant Grievance Committee, District 01A (Collin County, Texas), appointed a six-person evidentiary panel to hear the case. Schaefer filed an eve-of-trial "emergency continuance" on the basis of work conflicts, which the evidentiary panel denied. Schaefer did not attend her hearing. At the hearing in Schaefer's absence, a quorum of evidentiary panel members unanimously found that Schaefer committed misconduct, and disbarred her in its judgment.

Although the pre-hearing notices Schaefer received from the CDC showed a properly constituted evidentiary panel, the panel's "Evidentiary Hearing Report" (hearing report), summarizing basic information about the hearing, including the identity of the panelists present, listed the second public-member position on the six-person panel as "vacant." The hearing was held February 20, 2009; the hearing report was sent to Schaefer on March 2, 2009; and the evidentiary panel's judgment was signed on March 3, 2009. The hearing report indicated that a quorum of four panel members, three attorneys and one public member, were actually present to hear Schaefer's case. Schaefer did not object to the panel's composition at the hearing or subsequently in any post-judgment motion. *See* TEX.R. DISCIPLINARY P. 2.22 (describing post-judgment motions).

Schaefer appealed to BODA, challenging the evidentiary panel's composition. On appeal, BODA vacated the disbarment judgment and remanded for a new hearing, in part on the basis that the evidentiary panel did not have the capacity to act because the panel was improperly composed. [1] BODA found that the evidentiary panel lacked the appropriate ratio of attorney members to public members and, reasoning that such error was fundamental, concluded that evidentiary panels not satisfying this requirement lack capacity to act as a court. *Schaefer v. Comm'n for Lawyer Discipline of the State Bar of Tex.,* Bd. of Disciplinary Appeals Case No. 44292 (Jan. 28, 2011) at 8, 14. The Commission appealed to this Court, challenging BODA's interpretation of the Texas Rules of Disciplinary Procedure governing evidentiary-panel composition. We issued a **\*835** summary affirmance of BODA's judgment and later granted the Commission's motion for rehearing.

 **[2]**    Appeals from determinations of BODA are generally reviewed under a substantial evidence standard. TEX.R. DISCIPLINARY P. 7.11. Because the issue before us involves the interpretation of the Texas Rules of Disciplinary Procedure, we review BODA's legal conclusions on the construction of the rules de novo. *See In re Caballero,* 272 S.W.3d 595, 599 (Tex.2008) (citing *O'Quinn v. State Bar of Tex.,* 763 S.W.2d 397, 399 (Tex.1988) (observing that "our disciplinary rules should be treated like statutes")); *MCI Sales & Serv., Inc. v. Hinton,* 329 S.W.3d 475, 500 (Tex.2010) (noting that a "question of statutory construction is a legal one which we review de novo").

In *In re Allison* we recently addressed the public- and attorney-member ratio requirements in disciplinary hearings. 288 S.W.3d 413 at 415–17. In *Allison,* which focused on the quorum requirements of Rule 2.07, the evidentiary panel was properly constituted with four attorney members and two public members, but the quorum hearing Allison's case consisted of three attorneys and one public member. *Id.* at 414. Under the wording of 2.07, different from 2.02 and 2.17, we held that the quorum that heard the disciplinary action satisfied the ratio requirement that it " 'include one public member for each two attorney members.' " *Id.* at 417 (quoting TEX. GOV'T CODE § 81.072(j)); *see also* TEX.R. DISCIPLINARY P. 2.07. Schaefer's case is different from *Allison* in that the evidentiary panel from which the quorum was drawn included only one public member and four attorney members, although the quorum satisfied *Allison* 's three-attorney-to-one-public-member ratio under 2.07. *See* 288 S.W.3d at 417. Schaefer challenges the composition of the evidentiary panel.

 **[3]    [4]**    As observed above, "[e]ach Evidentiary Panel must have a ratio of two attorney members for every public member...." TEX.R. DISCIPLINARY P. 2.17; *see also* 2.02 (requiring two-thirds of Grievance Committees be attorneys and one-third be public members). This is compulsory language. One of the two public-member positions on the six-member evidentiary panel was vacant. The evidentiary panel's composition therefore violated the ratio requirement of one public member for each two

attorney members. With four attorney members on the evidentiary panel, two public members would be required. *Allison,* 288 S.W.3d at 417. In *Allison,* we explained:

> [T]he factor-of-two rule applies only when there is an even number of attorneys. Thus, if there are four attorney members (two sets of two) a quorum would require two public members.

*Id.* The evidentiary panel failed to meet this requirement. BODA and the Commission disagree over whether this improper panel composition deprived the evidentiary panel of capacity to act on the complaints, and consequently rendered the evidentiary panel's judgment void, or merely voidable.

BODA concluded in its opinion that two of our precedents, *Mapco, Inc. v. Forrest,* 795 S.W.2d 700 (Tex.1990), and *Tesco American, Inc. v. Strong Industries, Inc.,* 221 S.W.3d 550 (Tex.2006), "affirm that, when a court rendering judgment has no capacity to act as a court, the resulting judgment is void." *Schaefer,* at 14. The Commission argues, however, that the Grievance Committee's failure to abide by the panel composition requirements did not deprive the evidentiary panel of capacity, but merely rendered the judgment voidable. Because Schaefer, who was not present at the hearing, did not object to the composition of the evidentiary panel or **\*836** file a post-judgment motion challenging its composition, the Commission also contends that any error was waived.

We construe the analogous precedents differently. *Mapco* concerned an appellate ruling in which one justice of a three-justice panel retired before an opinion was issued, resulting in a one-one opinion and judgment, a departure from both statutory and constitutional provisions requiring a "majority" of a panel for a decision on a case. *Mapco,* 795 S.W.2d at 702–03. We declined to issue a general rule that a violation of a procedural rule, statute, or even a constitutional requirement rendered an appellate judgment "void." *Id.* at 703. Instead, such violations generally only result in a "voidable" or erroneous judgment. *Id.* Describing the "rare circumstances" that would void a judgment, we observed that "[a] judgment is void only when it is apparent that the court rendering the judgment had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment, or no capacity to act as a court." *Id.* (citations omitted).

*Tesco* concerned a judicial-disqualification challenge to a court of appeals decision. *Tesco,* 221 S.W.3d at 552–53. We held that the justice authoring the unanimous opinion for the three-justice panel was disqualified due to an imputed conflict of interest. *Id.* at 554. We also noted that the orders or judgments of disqualified trial judges are void. *Id.* at 555 (citing *In re Union Pac. Res. Co.,* 969 S.W.2d 427, 428 (Tex.1998); *Buckholts Indep. Sch. Dist. v. Glaser,* 632 S.W.2d 146, 148 (Tex.1982); *Fry v. Tucker,* 146 Tex. 18, 202 S.W.2d 218, 221 (1947); *Postal Mut. Indem. Co. v. Ellis,* 140 Tex. 570, 169 S.W.2d 482, 484 (1943); *State v. Burks,* 82 Tex. 584, 18 S.W. 662, 662–63 (1891); *Templeton v. Giddings,* 12 S.W. 851, 852 (Tex.1889)). However, we held that, in the appellate context, where multiple judges are empaneled, a judgment is merely voidable unless every judge on the panel is disqualified. *Id.* at 555–56. We explained that, " '[i]n general, as long as the court entering a judgment has jurisdiction of the parties and the subject matter and does not act outside its capacity as a court, the judgment is not void.' " *Id.* at 556 (quoting *Reiss v. Reiss,* 118 S.W.3d 439, 443 (Tex.2003)). We concluded that the judgment at issue was not void as the appellate court had "jurisdiction of the parties and the subject matter, jurisdiction to enter judgment, and capacity to act as a court." *Id.*

BODA's opinion distinguished *Mapco* and *Tesco* as involving appellate panels and analogized the evidentiary panel at issue here to a trial court. *Schaefer,* at 14. For purposes of the applicable composition rules, the multi-member nature of an evidentiary panel makes it analogous to the appellate courts in *Mapco* and *Tesco.* Accordingly, the evidentiary panel's judgment was not void for lack of capacity. We therefore reverse BODA's judgment.

**[5] [6] [7]** As the attorney-to-public-member composition requirement does not undermine the capacity of an evidentiary panel or otherwise deprive it of jurisdiction to hear evidence and issue disciplinary orders, error must be preserved by timely objection. *See* TEX.R.APP. P. 33.1(a); *cf. State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) (error preservation generally requires that the party make the trial court aware of the complaint, timely and plainly, and obtain a ruling). BODA's opinion noted there is "some evidence" that Schaefer may not have been able to object to the panel's composition, even had she appeared at the hearing. *Schaefer,* at 10. BODA observed that "the [evidentiary panel] chair

introduced only the members present on the record and did not name the absent members of the panel," **\*837** thus creating uncertainty as to whether the evidentiary panel lacked a necessary public member. *Id.* The Grievance Committee should timely advise respondent attorneys of the composition of the evidentiary panel from which the quorum was drawn to hear the case. But generally speaking, reasonable diligence by the attorney requires more than occurred here. Faced with an incomplete evidentiary panel, the respondent attorney must inquire as to panel composition and object if the composition requirements are not satisfied. Should an attorney fail to appear at an evidentiary hearing, she makes her task more difficult and should obtain the hearing report and preserve error through a timely post-judgment motion. *See* TEX.R. DISCIPLINARY P. 2.22.

 **[8]**　The evidentiary panel's composition violated the requirements of Rules 2.07 and 2.17 of the Texas Rules of Disciplinary Procedure. That violation, however, did not deprive the evidentiary panel of its capacity to select a quorum, hear evidence, and issue a judgment. Therefore, in the absence of a timely objection, error was waived. Accordingly, without hearing oral argument, we reverse the Board of Disciplinary Appeals' judgment and reinstate the evidentiary panel's judgment of disbarment. *See* TEX.R. DISCIPLINARY P. 7.11; TEX.R.APP. P. 60.2(c).

**Parallel Citations**

55 Tex. Sup. Ct. J. 620

Footnotes

1　The other bases for BODA's judgment were "issues of statewide public interest": i.e., that (1) the attorney discipline system exists to protect the public, and (2) CDC's adherence to disciplinary rules is essential and must avoid even the appearance of impropriety. *Schaefer v. Comm'n for Lawyer Discipline of the State Bar of Tex.,* Bd. of Disciplinary Appeals Case No. 44292 (Jan. 28, 2011) at 8–11. We do not reach these issues.

**End of Document**　　　　　© 2015 Thomson Reuters. No claim to original U.S. Government Works.

419 S.W.3d 682
Court of Appeals of Texas,
Houston (1st Dist.).

Kevin CONLIN and Kathryn Conlin, Appellants
v.
Darrell HAUN and Solarcraft, Inc., Appellees.

No. 01–13–00329–CV.  |  Dec. 12, 2013.

**Synopsis**

**Background:** Following order for agreed temporary injunction in employer's suit against employees for alleged violation of non-compete agreements that enjoined employees from competing with employer and enjoined employer's majority shareholder from tampering with employer records and data, employees moved for dissolution of temporary injunction. The 434th District Court, Fort Bend County, James H. Shoemake, J., denied employees' motion. Employees filed interlocutory appeal.

**Holdings:** The Court of Appeals, Rebeca Huddle, J., held that:

[1] employees did not waive arguments on appeal regarding trial court's compliance with requirements for issuing temporary injunction, and

[2] agreed temporary injunction order was void for failure to set cause for trial.

Reversed and remanded with instructions.

West Headnotes (5)

[1]     **Appeal and Error** ☛ Time for filing

Employees did not waive arguments on appeal related to any errors made by trial court regarding compliance with requirements for issuing temporary injunction in employer's suit for alleged violation of non-compete agreements, even though employees did not file notice of appeal after trial court denied their first motion to dissolve temporary injunction; appeal was filed within 20 days of date of order orally denying employees' second motion to dissolve temporary injunction. V.T.C.A., Civil Practice & Remedies Code § 51.014(a)(4); Rules App.Proc., Rules 26.1(b), 28.1(a); Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

    1 Cases that cite this headnote

[2]     **Injunction** ☛ Form and requisites

        **Injunction** ☛ Findings and conclusions

Procedural requirements that order granting temporary injunction state reasons for its issuance and set cause for trial on the merits are mandatory, and order granting temporary injunction that does not meet them is subject to being declared void and dissolved. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

3 Cases that cite this headnote

**[3]**     **Injunction**  &#128273;  Authority and discretion of court

Trial court has broad discretion to grant or deny motion to dissolve temporary injunction.

1 Cases that cite this headnote

**[4]**     **Appeal and Error**  &#128273;  Continuing, vacating, or dissolving

On appeal of motion to dissolve temporary injunction, Court of Appeals' review is limited to narrow question of whether trial court abused its discretion in denying motion to dissolve.

1 Cases that cite this headnote

**[5]**     **Injunction**  &#128273;  Form and requisites

Agreed temporary injunction order issued by trial court in employer's action against employees for violation of non-compete agreements was void for failure to set cause for trial on the merits, and thus injunction was required to be dissolved, despite contention that employees were estopped from complaining about order because they agreed to it; procedural requirement that order granting temporary injunction set cause for trial was mandatory. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*683**  Kenneth R. Jones, Law Office of Kenneth R. Jones, L.L.P., Houston, TX, for Appellants.

Lawrence Rothenberg, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices BLAND and HUDDLE.

**OPINION**

REBECA HUDDLE, Justice.

Appellants Kevin and Kathryn Conlin bring this interlocutory appeal of the trial court's order denying their Motion to Declare Void or Alternatively, Dissolve Temporary **\*684**  Injunction. [1] We conclude that the temporary injunction should have been dissolved because it does not comply with Texas Rule of Civil Procedure 683, and accordingly, we reverse.

**Background**

Solarcraft, Inc., a company that designs and manufactures solar power products, was incorporated in March 1994, and initially had two directors and shareholders: Kevin and Kathryn Conlin. In September 2005, Darrell Haun acquired 51% of the shares of Solarcraft. Contemporaneously, the Conlins signed employment agreements with Solarcraft. The employment agreements included a non-compete provision that provided "[f]or 3 years following termination of employment, Employee agrees not

to, directly or indirectly, engage in any business which is competitive with the business of Solarcraft in the United States of America."

In February 2009, Haun and Solarcraft, Inc. (collectively, "Haun") sued the Conlins, alleging they violated their non-compete agreements. Haun sought to enjoin the Conlins from competing with Solarcraft and from having access to Solarcraft facilities and information. The trial court issued a temporary restraining order as requested by Haun on February 2, 2009.

On February 19, 2009, the trial court heard Haun's application for a temporary injunction. However, before the trial court ruled on the application, the parties informed it that they had reached an agreement regarding temporary injunctive relief. On February 24, 2009, the trial court signed an order titled "Agreed Temporary Injunction," which enjoined the Conlins from competing with Solarcraft in various ways, and enjoined Haun from tampering with Solarcraft records and data, including financial records. The order stated that it was effective "until the trial of this cause, or further order of this Court." It contained a blank in which the trial setting date could be written, but the blank was not filled in.

On July 23, 2009, the Conlins moved to dissolve the temporary injunction. They contended that the injunction should be dissolved because (1) it was void under Texas Rule of Civil Procedure 683 because it failed to state the reasons for its issuance and set a date for trial, and (2) Kathryn's three-year covenant not to compete had expired. The parties agree that the trial court orally denied the motion on October 9, 2009, but the record contains no written order on this motion.

More than three years later, on February 27, 2013, the Conlins filed a second motion to dissolve the temporary injunction. The Conlins argued, as they had in their 2009 motion to dissolve, that the agreed temporary injunction order was void under Texas Rule of Civil Procedure 683 because it failed to state the reasons for its issuance and failed to set the case for trial. They also argued that changed circumstances warranted the dissolution of the temporary injunction. Specifically, the Conlins argued that because they were forcibly removed from Solarcraft on February 2, 2009, the three-year covenants not to compete expired, at the latest, on February 2, 2012, and therefore there was no remaining basis for enjoining them from competing with Solarcraft. In addition, the Conlins argued that they had sold all of their shares in Solarcraft to Haun on January 19, 2013, and they now held no interests in Solarcraft. After a hearing on April 1, 2013, at which the trial court orally denied the Conlins' motion, the trial court **\*685** signed a written order denying the motion to dissolve on April 15, 2013. The Conlins filed a notice of appeal from the trial court's denial of the motion on April 8, 2013.

### Discussion

The Conlins raise two issues on appeal. First, they argue that the agreed temporary injunction order is void for failure to state the reasons for its issuance or set the cause for trial, as required by Texas Rule of Civil Procedure 683. Second, and alternatively, they argue the trial court abused its discretion in refusing to modify or dissolve the temporary injunction because no basis for the injunction remained after the Conlins' non-compete agreements expired and the Conlins sold their ownership interest in Solarcraft.

Haun does not dispute that the temporary injunction order does not comply with the requirements of Rule 683. Instead, Haun argues that (1) we lack jurisdiction because the Conlins failed to appeal within 20 days after the trial court denied the Conlins' first motion to dissolve in 2009, and (2) the Conlins are estopped from challenging the temporary injunction order because they agreed to it. We address Haun's challenge to our jurisdiction before turning to the merits.

### A. Jurisdiction

 **[1]** Haun contends that the Conlins' appeal was untimely because their notice of appeal was not filed within 20 days of the date the trial court denied their first motion to dissolve in 2009. He contends "[b]ecause they failed to timely appeal the denial of their first Motion To Dissolve Temporary Injunction in October of 2009, the Conlins waived any errors regarding compliance with

TRCP 683, as well as any other matters raised in this appeal that also existed at the time their first motion to vacate was denied." But Haun cites no authority—and we can find none—to support his contention that a party may appeal only from the denial of his first motion to dissolve an injunction. The cases Haun cites do not support that contention. They merely stand for the proposition that, when an appellate court reviews a trial court's order on a motion to dissolve a temporary injunction, it reviews the trial court's decision to grant or deny the motion to dissolve, and not the trial court's original decision to grant a temporary injunction. *See BS & B Safety Sys., Inc. v. Fritts,* No. 01–98–00957–CV, 1999 WL 447605, at *2 (Tex.App.-Houston [1st Dist.] June 17, 1999, no pet.) (not designated for publication); *Tober v. Turner of Tex., Inc.,* 668 S.W.2d 831, 834 (Tex.App.-Austin 1984, no writ); *Marshall v. Good Times, Inc.,* 537 S.W.2d 536, 538 (Tex.Civ.App.-Fort Worth 1976, writ dism'd).

The interlocutory appeal of an order denying a motion to dissolve a temporary injunction is an accelerated appeal, and accordingly, the notice of appeal must be filed within 20 days of the date of the order denying the motion. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (West Supp.2013); TEX.R.APP. P. 26.1(b), 28.1(a). Here, the Conlins filed their notice of appeal on April 8, 2013, one week after the trial court orally denied the second motion and one week before the trial court signed its order. The notice of appeal was timely filed, and accordingly, we have jurisdiction over the appeal. *See* TEX.R.APP. P. 27.1(a) ("In a civil case, a prematurely filed notice of appeal is effective and deemed filed on the day of, but after, the event that begins the period for perfecting the appeal.").

## B. Failure to Comply with Rule 683

### 1. Applicable Law and Standard of Review

 **[2]**   Texas Rule of Civil Procedure 683 requires that an order granting a temporary  **\*686**  injunction state the reasons for its issuance and set the cause for trial on the merits. *See* TEX.R. CIV. P. 683; *Qwest Commc'ns Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000). "These procedural requirements are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved." *Qwest,* 24 S.W.3d at 337; *see InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (stating that requirements of Rule 683 are mandatory and must be strictly followed); *In re Corcoran,* 343 S.W.3d 268, 269 (Tex.App.-Houston [14th Dist.] 2011, orig. proceeding) ("Agreed Mutual Temporary Injunction" order was void because it did comply with Rule 683); *In re Garza,* 126 S.W.3d 268, 273 (Tex.App.-San Antonio 2003, orig. proceeding) (temporary injunction order that does not comply with Rule 683 is void); *Kaufmann v. Morales,* 93 S.W.3d 650, 656 (Tex.App.-Houston [14th Dist.] 2002, no pet.) ("This provision [in Rule 683] is mandatory; a failure to include a trial setting is grounds for voiding the injunction.").

 **[3]**    **[4]**    The trial court has broad discretion to grant or deny a motion to dissolve a temporary injunction. *Tex. State Optical, Inc. v. Wiggins,* 882 S.W.2d 8, 11–12 (Tex.App.-Houston [1st Dist.] 1994, no writ) (citing *Cellular Mktg. v. Houston Cellular Tel. Co.,* 784 S.W.2d 734, 735 (Tex.App.-Houston [14th Dist.] 1990, no writ)). On appeal, our review is limited to the narrow question of whether the trial court abused its discretion in denying the motion to dissolve. *Cellular Mktg.,* 784 S.W.2d at 735. A trial court abuses its discretion only if it reaches a decision so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. *Intercontinental Terminals Co. v. Vopak N. Am., Inc.,* 354 S.W.3d 887, 892 (Tex.2011).

### 2. Analysis

Haun acknowledges that the temporary injunction order does not comply with Rule 683, but argues the Conlins are estopped from challenging it because they agreed to it. The San Antonio court of appeals considered a nearly identical argument in *In re Garza,* 126 S.W.3d 268 (Tex.App.-San Antonio 2003, orig. proceeding) and rejected it, holding that an agreed temporary injunction order that does not comply with Rule 683 is "fatally defective and void" and that "a party who agrees to a void order has agreed to nothing." 126 S.W.3d at 271. Accordingly, the court held that the agreed temporary injunction order at issue in

that case was void. *Id.* at 273. In so holding, *In re Garza* explicitly rejected another case relied upon by Haun, *Henke v. Peoples State Bank of Hallettsville,* 6 S.W.3d 717 (Tex.App.-Corpus Christi 1999, pet. dism'd w.o.j.), which held that, while failure to comply with Rule 683 was fundamental error, the fact that the appealing party had agreed to the order meant the party was estopped from challenging the order based on that error.

Haun argues that *In re Garza* "fails to follow one Texas Supreme Court case and clearly misinterprets another case" and "is not binding on this Court." The first Texas Supreme Court case Haun references, *Reiss v. Reiss,* 118 S.W.3d 439 (Tex.2003), did not address the validity of temporary injunction orders in any way. The *In re Garza* court specifically considered whether *Reiss* controlled and concluded it did not. 126 S.W.3d at 273. The second Texas Supreme Court case, *Qwest Commc'ns Corp. v. AT & T Corp.,* 24 S.W.3d 334 (Tex.2000), held that a temporary injunction order that does not comply with the mandatory requirements of Rule 683 is **\*687** "subject to being declared void and dissolved." *Id.* at 337. Haun argues this means that the agreed order in this case is merely voidable, and not void, and that a party who has agreed to a voidable order may not attack that order on appeal. The *In re Garza* court rejected this argument, holding that *Qwest* clearly stated that an order that failed to comply with Rule 683 was void. *In re Garza,* 126 S.W.3d at 273.

 **[5]**    Our sister court, the Fourteenth Court of Appeals, has followed *In re Garza* and held that an "Agreed Mutual Temporary Injunction" order that did not comply with the mandatory requirements of Rule 683 was void and must be dissolved. *See In re Corcoran,* 343 S.W.3d at 269. We likewise find *In re Garza* persuasive and follow it and *In re Corcoran* here. Accordingly, the Conlins are not estopped from complaining about the "Agreed Temporary Injunction" order's failure to comply with the mandatory requirements of Rule 683. Here, it is undisputed that the order does not set the case for trial. Accordingly, we conclude the Agreed Temporary Injunction must be dissolved. *See Intercontinental Terminals Co.,* 354 S.W.3d at 892; *Qwest,* 24 S.W.3d at 337; *In re Corcoran,* 343 S.W.3d at 269; *In re Garza,* 126 S.W.3d at 273; *Kaufmann,* 93 S.W.3d at 656.

We sustain the Conlins' first issue. Because we have concluded that the temporary injunction order must be dissolved, we do not reach the Conlins' second issue.

## Conclusion

We reverse the trial court's order denying the Conlins' motion to dissolve and remand with instructions to the trial court to dissolve the temporary injunction. All pending motions are denied as moot.

## Parallel Citations

37 IER Cases 488

## Footnotes

1      *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (West Supp.2013) (authorizing interlocutory appeal of order denying motion to dissolve temporary injunction).

      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

8 Tex. 80
Supreme Court of Texas.

CUMMINGS

v.

POWELL AND OTHERS.

1852.

**Opinion**

**\*80** A void act is one which is entirely null, not binding on either party and not susceptible of ratification; and a voidable act is one which is obligatory upon others until disaffirmed by the party with whom it originated, and which may be subsequently ratified or confirmed.

The difference between the Spanish and the common law, in respect to the terms "null" and "void" in their application to the contracts of minors, &c., discussed.

The tendency of decisions, for a century at least, has been for the extension **\*81** of the rule that the acts of infants shall be deemed voidable only, and subject to their election either to affirm or disallow them.

On examination of the authorities, and with due regard to the object to be attained by the privilege of the infant, viz, his protection, we are justified in concluding that any delivery of a deed or thing granted which, if done by an adult, would pass the title, will, if done by an infant, be voidable but not void; and that if the semblance of benefit be regarded as a criterion, the more rational and consistent rule would be that the act should not be deemed void unless it was one of those which, as a general principle, for the benefit of the infant had better be deemed void than voidable.

*Quere?* As to whether an infant's power of attorney is void or merely voidable.

The sale and delivery of chattels by a minor may be avoided while under age; but the sale of real estate by a minor cannot be avoided on the ground of infancy merely until after he arrives at full age, although it seems he may enter and enjoy the rents and profits.

No case has been cited in which an infant has by himself or guardian attempted, while within age, to recover lands passed from him by an executed conveyance on the ground of infancy merely, and it is probable that none such can be shown.

*Quere?* Where an infant has sold real estate, and after arriving at full age wishes to avoid the sale, whether he ought not to give notice of his intention to disaffirm before bringing suit.

Where it is sought to set aside a sale of real estate on the ground of infancy, there should be an offer to restore the purchase-money. (Note 19.)

Error from Walker. The plaintiffs in error, viz, Elem and James Cummings, being minors, sued by their guardian for the undivided two-thirds of a half league of land, alleging that they had been with their adult brother, William Cummings, joint owners of the half league, and that in the year 1846 the defendant James Powell had fraudulently procured them to join with their said brother in a sale of the said land to the said defendant, and that the latter had since sold portions of the same to the other defendants who were holding, using, and cultivating the same.

They prayed that their deed to Powell, so far as it affected their interests, be declared void; that the deeds from Powell to his co-defendants be set aside; that partition be made and **\*82** petitioners be put into quiet and peaceable possession of their respective shares.

The defendants demurred generally, and filed other pleas not necessary to be noticed. The demurrer was sustained and the petition dismissed.

West Headnotes (6)

**[1]**   **Infants** 🔑 Requisites, Validity, Operation, and Effect

       **Infants** 🔑 Avoidance and disaffirmance

A minor's deed is merely voidable, and conveys title until disaffirmance upon reaching majority.

13 Cases that cite this headnote

**[2]**   **Infants** 🔑 Ratification and affirmance

Under the laws of Spain a sale of a minor's real property becomes valid by assent and approbation of the minor after attaining adult age.

5 Cases that cite this headnote

**[3]**   **Infants** 🔑 Time for ratification or avoidance;  lapse of time

A deed of land executed by an infant cannot be avoided until he comes of age, although he may enter and take the profits in the meantime.

Cases that cite this headnote

**[4]**   **Infants** 🔑 Retention or return of property or consideration

The return of the consideration is a condition precedent to the disaffirmance of a conveyance of land executed by an infant.

1 Cases that cite this headnote

**[5]**   **Infants** 🔑 Requisites, Validity, Operation, and Effect of Contracts

A contract to an infant's prejudice is void. One to his benefit is good; but, if of an uncertain nature as to benefit or prejudice, it is voidable only, at the election of the infant.

7 Cases that cite this headnote

**[6]**   **Infants** 🔑 Goods, Property, and Merchandise

The contract of an infant in relation to personal property may be avoided by him during his minority.

Cases that cite this headnote

**Attorneys and Law Firms**

*Yoakum* and *McCreary,* for plaintiffs in error.

The ground taken by the defendants below and sustained by the court in dismissing the suit is, that the deed made by the minors is not void but only such as may be avoided by them on attaining their majority.

But the guardian, we contend, is not bound to sit down and see his wards stripped of their possessions by their own deeds; but he has the right, and it is his duty, to take care of their estate, and account for rents and profits. Hence the right to control and avoid any of those acts which could dispossess them, and to sue for and recover their property; to eject trespassers, and do everything for them which they could do to protect their own interests if they were of lawful age. The guardian is the legal representative of the infant. Clerke says, speaking of infants, "His acts are either void or voidable. This distinction is not conclusively settled, although the opinion of Lord Chief Justice Eyre is regarded with much satisfaction, that when the court could pronounce the contract to be prejudicial to the infant, it was void; when beneficial, valid; when of dubious benefit or prejudice, voidable only at his election." (Rudiments and Practice, p. 57.) According to this view of the case, when the infant, by his legal representative, elects to declare the deed void, will the court undertake to say, upon looking at the petition, that it is beneficial and valid? The court below, having high chancery jurisdiction, will protect the rights of infants, being their guardian. But we think by the law the deed to Powell is void and not voidable. Story says, "And in respect to the acts of infants of a more solemn nature, such as deeds, gifts, and grants, this distinction **\*83** has been insisted on; that such as do take effect by delivery of his hand are voidable; but such as do not so take effect are void." (Eq. vol. 1, sec. 241; see authorities there cited, Zouch v. Parsons, 3 Burr. R., 1794; Perkins, sec. 12; 8 Am. Jurist, 327, *et seq.*) Nor is it necessary to aver specific fraud. The act itself is a fraud. (1 Story's Eq., sec. 242.) So far as the opinion of the civilians is of weight, they are decided on the point. Grotius places a contract with an infant on the same footing with one made with a lunatic or an idiot. (De jure Belli. Grot., B. 2, ch. 11, sec. 5; so also the Institute, Lib. 3, Tit. 20, secs. 8 and 10; Dig., Lib. 50, Tit. 17; Paudicts, B. 2, Tit. 38, p. 216, *et seq.*

In the different States many conflicting authorities are found. In Connecticut, unless the contracts have a semblance of advantage to the infant, they are void, (4 Day, 59; 6 Conn., 494;) North Carolina, (1 Hayw. R., 143; Hoyle v. Stowe, 2 Dev. & Batt. R., 320;) Maryland, (Fudge v. The State, 3 Gill. & Johns. R., 103; 11 Id., 314; Salmon v. Claggett, 3 Bland Ch. R., 125; (New York, (Bool v. Mix, 17 Wend. R., 119;) but still the infant may enter and take profits; (Stafford v. Root, 9 Cowen, 626; Roof v. Stafford, 7 Id., 22,) decided both ways.

An infant's legal representatives can avoid a deed made by the former. (Roberts v. Wiggin, 1 N. H. R., 73. Clerke lays down the same rule. (Rud. and Practice, 57.

All the books say there must be an affirmance; and the most of them say it must be express. (19 Wend. R., 301; 14 Johns. R., 124.)

In the case of Wheaton v. East, (5 Yerg. R., 41,) the doctrine is laid down that the contract is voidable. Yet the court heard all the proof to show the consideration; that it was fair and full; that the minor wanted but a few months of his majority when he made the contract, and did not bring his suit for nearly four years after the sale.

The petition, in asking that the deed to Powell be declared void, and that they be remitted to the possession of the premises, **\*84** asks nothing inconsistent with either view of the law. They aver in their petition that Powell fraudulently procured them to join with their brother William in the execution of the deed of the 15th May, 1846; that they were then, and still are, minors; they aver no sale; no considerations; but charge that Powell fraudulently procured them to execute the deed.

The fact of their infancy is a badge of fraud. (1 Story's Eq., sec. 242, above cited.) The petition certainly shows sufficient on its face to authorize the court below to hear the proof. Whether the deed be void or voidable the guardian can avoid it. Can he do it in any other way than by asking the court in behalf of his wards to set it aside? Or can he be justified in submitting to the adverse possession of the defendants, and permitting them to reap the fruits and destroy the lands and timber till his wards come of age? Suppose his wards were to call him to account for the way he had managed their estate, would he be excused by setting up this conveyance to Powell? The adoption of such a principle would release every guardian who chose to have his ward's property wasted. (6 Rand. R., 556.)

If the guardian or his wards wished to disaffirm a sale made by his wards, a suit is conclusive evidence of that disaffirmance. (Sellars v. Davis, 4 Yerg. R., 506.)

Perhaps there is not a case in the books where a guardian could be excused on such grounds. And the court below, sitting as a court of equity, if it would not avoid the deed of the minors, should at least have remitted them to the possession and given it to the guardian for the debts of the minors for necessaries, for expenses of guardianship, &c. But if he is estopped by their deed, a guardian is liable to be defrauded by a stranger's meddling with the estate of his wards, and has no remedy.

HEMPHILL, CH. J.

The ground upon which the demurrer was supported below, and which has been urged, is that the **\*85** deed made by the minors was not void, but voidable, and could be avoided by them only after attaining majority.

We will consider, in the first place, whether the deed be void or voidable. It is important to ascertain the exact signification of these terms, as upon that depends the character of the act, and the rights, obligations, and liabilities of parties and of strangers to the transaction. A void act, as defined in the latter cases and by approved authorities, is one which is entirely null, not binding on either party, and not susceptible of ratification; and a voidable act is one which is obligatory upon others until disaffirmed by the party with whom it originated and which may be subsequently ratified or confirmed. Such is the import of these terms; but on examining the earlier cases it will be found that they were frequently confounded. The term void was frequently used when it was intended to imply only that the act was not binding, or that its obligation might be avoided by the infants. (Bingham on Infancy, p. 18.)

As questions growing out of the acts of minors, under our former laws, may and will arise, it may be well to remember that the distinction between void and voidable, as recognized by the authorities at common law in relation to this special subject, is not known to Spanish jurisprudence; at least a void act is not characterized by all of the same incidents.

For instance, one of the results of the nullity of an act of a minor at common law is stated to be its unsusceptibility of ratification.

No such consequence follows under the laws of Spain. If a sale, for instance, of a minor's real property be absolutely null for the want of indispensable legal solemnities, it may, nevertheless, be either expressly or tacitly ratified. Whether the act be *prima facie* good, the sale having been attended with all legal formalities, yet subject to avoidance on the ground of lesion, or whether it be absolutely null for the want of any of these formalities, is immaterial. In either case it becomes valid by the assent and approbation of the minor after attaining **\*86** adult age. (10 Mart. R., 276; Febrero, vol. 5, pp. 379-80.) The reason of the rule is very satisfactory. The privilege for avoiding for lesion, or of considering the contract void when nullities have intervened, is in either and in both cases for the benefit of the minor. His interests are consulted. The rule is designed for his protection, and consequently he may waive or renounce his privilege when he deems it advantageous to his interest. (Febrero, vol. 5, p. 378.) It is a general principle of the Spanish law that any person who has the capacity to dispose of his property by contract, will, &c., may by his voluntary act renounce a present or future right. (Febrero, vol. 2, p. 248.) There are some exceptions to this rule; as, for instance, the right to a future succession cannot be alienated, as this might induce schemes to compass the death of the present owner and affect the free exercise of his testamentary power. But, as a necessary result of the capacity conferred by law, a party may renounce the privileges consequent upon the nullity of contracts or sales made by him during infancy. There are nullities, however, which cannot be cured by ratification, as in the instances above cited, or where the stipulations are in derogation of good morals or public order or policy; but nullities for the benefit of individuals may be renounced and the contracts validated by their express or tacit confirmation. (3 Annual R., 328; Meares v. Robinson and Wife, decided at this term.)

These observations are made that there may be no misapprehension as to the force or precise meaning of the terms "void" or "null," when used with reference to the acts of minors as affected by the laws of Spain, and the modification of that meaning when employed with reference to their acts under the common law.

Notwithstanding the many attempts of the bench, the profession, and jurists to elucidate the subject, yet the questions as to what acts of minors shall be regarded as void and what voidable, and what the criterions by which the precise character of their acts shall be determined, remain involved in doubt and difficulty. **\*87** Some of their contracts, as for instance, for necessaries, are valid, and consequently binding on both parties. So far everything is clear. There is no doubt about the standard of validity. But when these confines are passed, confusion, uncertainty, and conflict of opinion begin to prevail, and we are left in doubt, not

only as to what acts shall be regarded void and what voidable, but as to the grounds or tests by which they shall be adjudged the one or the other.

The tendency of decisions, for a century at least, has been for the extension of the rule that the acts of infants shall be deemed voidable only, and subject to their election either to affirm or disallow them. (2 Kent's Comm., 193.) Where a deed has been delivered, its character of voidability has by some been placed on the ground of the solemnity of the instrument, and by others that there is a semblance of benefit to the infant from the matter of the deed upon the face of it. In Zouch v. Parsons, 3 Burr, 1794, these points were discussed, and though this case has been questioned as authority in England, yet its doctrines have been sanctioned in the various courts of the United States, and have received a more liberal extension in their decisions on the subject-matter. In that case, in relation to the effect of the solemnity of the instrument, the following rule from Perkins was cited with approbation: "All such gifts, grants, or deeds made by infants, which do not take effect by delivery of his hand, are void; but all gifts, grants, or deeds made by matter in deed, or in writing, which do take effect by delivery of his hand, are voidable by himself, his heirs, and by those who have his estate." And the court says that the words "which take effect" are an essential part of the definition, and exclude letters of attorney or deeds which delegate a mere power and convey no interest; that there was no difference between a feoffment and deeds which convey an interest, for the reason that the delivery of the deed must be in the presence of the witnesses as much as the living assignee; the ceremony is as solemn; the presumption that the witness would not attest, if they saw in him an infant, applies equally to both. **\*88** "Powers of attorney are an exception to the general rule that the deeds of infants are only voidable, and a power to receive seizure is an exception to that. The end of the privilege is to protect infants, and to that object all the rules and their exceptions must be directed." But be the point as to the solemnity of the delivery as it may, (and there were respectable sayings the other way,) the court held that it was not necessary to their determination, for they were all of opinion that the consideration received and other circumstances of the transaction showed a semblance of benefit to the infant sufficient to make it voidable only upon the matter of the conveyance.

Reeves, in his Treatise on Domestic Relation, expresses the rule in the following terms: "Purchases by an infant are voidable. Conveyances are voidable only when they take effect by delivery; but if the infant's privilege will not be sufficiently protected by considering them as voidable, they are void. Executory contracts are all voidable only. There is no contract executed or executory but what is voidable only if the contract has taken effect by delivery, excepting cases of delegated powers." (P. 254.)

This last position is questioned in 14 Mass., 462, and it was said that "no satisfactory reason can be assigned for the position that a power of attorney, executed by an infant, was absolutely void, and that, perhaps, it might be assumed as a principle that all simple contracts by infants which are not founded on an illegal consideration are, strictly, not void, but only voidable. They remain a legal *substratum* for future assent, until avoided by the infant; and if, instead of avoiding, he confirm them when he has a legal capacity to make a contract, they are, in all respects, like contracts by adults."

The justness of the views presented in this opinion is very striking, and they apply with special force to the condition of property in this State. The lands of individuals are frequently situate in counties remote from each other and from the residence of the owner.

It is a matter of great convenience, if not of absolute necessity, **\*89** that sales should be effected by agents, and it seems quite preposterous that a sale by a minor, which must necessarily or may most conveniently be made through the intervention of an attorney in fact, should be void, but if made by himself would only be voidable. His infancy, instead of operating beneficially, would, under such circumstances, be perverted to his injury. If the act be void, it is not binding on others; and if the property depreciate after the sale, it might be thrown back upon his hands, and his infancy would then be turned against him, and, instead of shielding himself, would protect others.

It is impracticable, under the circumstances, to review all or many of the decisions on the question now under discussion. The subject is still involved in obscurity. The test of the character of the act, as dependent upon manual delivery of the deed, has very little foundation in reason. It can afford but a very flimsey protection, which is the object of the rule; and it is repudiated by Bingham in his admirable treatise on Infancy, p. 10; and he refers to an instance of an act by an infant which does not take effect by delivery of his hand, but which is not void; and that is the case of a parol lease for years. Upon this the infant can recover for rent in arrear, which he could not do if the act were void; and further, that this criterion comprehends only gifts, grants,

and deeds, and is not sufficiently extensive for general application. The remaining test, that there must be some semblance of benefit to an infant, is apparently better adapted to the protection of the infant, and is better supported by the authorities.

The rule is expressed by Chief Justice Eyre, in Keane v. Boycott, (2 H. Bl. R.,) in the following terms: "When the court can pronounce the contract to be to the infant's prejudice, it is void; and when to his benefit, as for necessaries, it is good; and when the contract is of an uncertain nature, as to benefit or prejudice, it is voidable only, at the election of the infant."

This is something better than the test arising from the solemnity **\*90** of the instrument. But there may be contracts which a court may deem prejudicial to the infant, but which he, for good reasons, may know to be otherwise. And in such case, if the act be void, its benefits cannot be made available at his election. It is not binding on the other party, and he may refuse compliance with its obligations. Perhaps it would be more consonant with sound policy to hold that none of the acts of an infant should be deemed void on the mere technical ground of infancy alone, but that they should be held binding on others, and voidable at the election of the infant, unless they be such as by the policy of the law are deemed and held to be valid.

This is apart from cases where actual fraud exists or advantage is taken of the minor's imbecility. In all such the contracts would be void; and so they would be where the consideration was illegal, or against public policy, or incompatible with the confidential relations existing between the minor and others.

On examination of the authorities, and with due regard to the object to be attained by the privilege of the infant, viz, his protection, we are justified in concluding that any delivery of a deed or thing granted, which, if done by an adult, would pass the title, will, if done by an infant, render it voidable but not void; and that if the semblance of benefit be regarded as a criterion, the more rational and consistent rule would be that the act should not be deemed void unless it was one of those which, as a general principle, it would be better for the infant that they should be deemed void than voidable. As to what contracts of infants are void and what voidable, see 4 Day R., 59; 6 Conn. R., 494; 1 Hayw. R., 143; 3 Gill & Johns. R., 314; 1 J. J. Marsh, R., 236; 5 Yerg. R., 41; 14 Mass. R., 462; 13 Id., 239; 7 Cow. R., 22; 9 Id., 126; 17 Wend. R., 119.

It is very clear, then, that this deed, having been delivered as deeds usually are delivered by adults, and having also a semblence of benefit on the face of it to the infant, must be **\*91** regarded as not void, but only voidable; and the question then arises whether it can be avoided, by guardian or by themselves, before their attaining full age.

Upon principle it would seem that if an act of an infant be only voidable and be binding upon the other party until it is avoided, that the act of disaffirmance must be by the infant himself on attaining mature age. That it can be avoided at all is owing to the want of legal discretion in the infant at the time of its execution; and this continues during his nonage, and renders his affirmance or disaffirmance before majority of no avail.

In Oliver & Clapp v. Howdlet, (13 Mass. R., 237,) it was said by the court that they knew of no position of law which gave the guardian of the minor authority to disaffirm purchases made by the minors; that the sales had the semblance of benefit to the vendees, and that the authority of guardians extending only to such things as may be for the benefit and advantage of their wards, they could not avoid contracts from which they derive benefit, for this, being injurious to the infant, would be a violation of the guardian's duty.

The question under consideration has been discussed and elaborately investigated in the courts of New York.

In Roof v. Stafford, (7 Cowen, 179,) which was an action of trover brought for the recovery of a horse sold by a minor, the plaintiff suing by guardian, the Supreme Court held that the contract was not voidable until the infant came of age. An extensive review was taken of the authorities in relation to the time at which an infant can avoid a conveyance of his lands. In Zouch v. Parsons (3 Burr. 1794,) it was said that an infant could not avoid such conveyance until arriving at twenty-one years of age. This is said to follow, because, if it were otherwise, he might also bring a writ analogous to a *dum fuit infra œtatem,* and so conclude his right upon the record. Other books give the same reason, and say the matter should remain open until he comes of age and is legally capable of thinking over what he has done. (4 Cruise's Dig., 17 Deeds, § 12.) These **\*92** and other books advance the doctrine in qualified terms, (Co. Lit., 302; 8 Taunt., 40, 41, 42; Com. Dig., ENFANT, (C. 4,) stating that the infant may avoid when he comes of age.

The judgment of the Supreme Court was reversed in the court of errors. (9 Cowen 628.) In the opinion given by the chancellor it is said, "the general rule is that an infant cannot avoid his contract executed by himself, and which is therefore voidable only while he is within age. He lacks legal discretion to do the act of avoidance. But this rule must be taken with the distinction that it shall not work unavoidable prejudice to the infant, or the object of his privilege would not be answered. When applied to a sale of his property it must be to his land, a case in which he may enter and receive the profits until the power of finally avoiding shall arrive." The true rule was said to be that where the infant can enter and hold the subject of the sale till his legal age, he shall be incapable of avoiding till that time; but where the possession is changed, and there are no legal means to hold and regain it in the meantime, the infant, or his guardian for him, has the right to exercise the power of rescission immediately; that the common law gave no action or other means by which the mere possession of personal property could be reclaimed and held subject to the right of avoidance.

The sum of the doctrines held by both courts in this case in relation to conveyances of lands by a minor is, that they cannot be avoided until after the minor arrives at full age, though he may enter and take the profits in the meantime, but that the sale and delivery of chattels by a minor may be avoided while under age.

The whole subject in relation to the character of the acts of infants, and the time and manner in which they may be avoided, was thoroughly canvassed in the case of Bool v. Mix, 17 Wendell, 119, and it was said that the general rules vary; that the act *in pais* of an infant may be avoided by some other act of equal solemnity and notoriety. It may also be avoided by a writ of *dum fuit infra ætatem;* but that it cannot be  **\*93**  avoided until the infant becomes of age, though he may enter and take the profits; that some of the old books say that an infant may avoid his deed by entry before he becomes of age, but such is not the doctrine of the present day. He may enter and take the profits until he has the legal capacity to affirm or disaffirm the deed, but the deed is not rendered void by the entry; it may still be confirmed after he arrives at full age.

No case has been cited in which an infant has, by himself or guardian, attempted, while within age, to recover lands passed from him by an executed conveyance, and it is probable that none such can be shown; otherwise it would, doubtless, have been cited in support of the plaintiffs. It is very doubtful whether in cases of this character a formal demand, even if the infant had attained majority, should not have been made for possession before the bringing of suit. The deed of the infant was only voidable, and until avoided the defendant is not a trespasser. His possession is rightful, and it would seem that he should have some notice of the intention to disaffirm the contract. But this point is left open.

Another ground which might have been taken in support of demurrer is this, that there was no offer on the part of the plaintiffs to restore the purchase-money which they had received from the defendant Powell on the sale. This is the rule under the laws of Spain, (*vide* Febrero, vol. 5, p. 379) and it has received the sanction of the courts of some of the States, eminent for their wisdom and authority. It is characterized by honesty, and enforces rectitude of conduct in transactions between individuals, and, as a general rule, it will be recognized and enforced by this court. See Reeve's Dom. Rela., 243-249; 15 Mass. R., 359; 1 N. H. R., 73-75; 5 Sergt. & Rawle's R., 309, 313; 7 Cow. R., 183.

We are of opinion that there is no error in the judgment, and it is ordered that the same be affirmed.

Judgment affirmed.

NOTE 19.--Kilgore v. Jordan, 17 T., 341; Stuart v. Baker, 17 T., 417.

**Parallel Citations**

1852 WL 3911 (Tex.)

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

212 S.W.3d 513
Court of Appeals of Texas,
Austin.

DAVID JASON WEST AND PYDIA, INC. d/b/a www.bankopp.com, Appellants,

v.

STATE of Texas, Appellee.

No. 03–05–00724–CV. | July 21, 2006.

**Synopsis**

**Background:** State brought action against individual and business, alleging violations of the Deceptive Trade Practices–Consumer Protection Act (DTPA) arising out of defendants' offers to eliminate consumers' debt. The District Court, Travis County, 353rd Judicial District, Margaret A. Cooper, J., granted State's motion for supplemental restraining order, freezing defendants' funds, and supplemental temporary injunction maintaining the freeze on the account. Defendants appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] State demonstrated a probable right to recovery;

[2] sufficient evidence supported findings that defendants violated DTPA and that temporary injunction was in the public interest;

[3] temporary injunction complied with statutory requirements under the DTPA; and

[4] temporary injunction satisfied specificity requirement of Rules of Civil Procedure.

Affirmed.

West Headnotes (8)

**[1]** **Injunction** 🔑 Preservation of status quo

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits.

Cases that cite this headnote

**[2]** **Appeal and Error** 🔑 Injunction

**Appeal and Error** 🔑 Refusing injunction

Because the decision to grant or deny a temporary injunction lies within the sound discretion of the trial court, the Court of Appeals will not disturb that decision absent a clear abuse of discretion.

1 Cases that cite this headnote

**[3]    Appeal and Error** 🔑 Injunction

When reviewing a trial court's decision to grant or deny a temporary injunction, the Court of Appeals views the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor.

1 Cases that cite this headnote

**[4]    Antitrust and Trade Regulation** 🔑 Credit repair and counseling

Debt elimination service offered by business was that of a credit services organization, rather than a loan and was, thus, subject to the Deceptive Trade Practices–Consumer Protection Act (DTPA), such that State demonstrated a probable right to recovery in its DTPA action against business, in support of its motion for a temporary injunction freezing business's assets, where business advertised a "banking opportunity" on radio, in a telephone message, and on the Internet, offering debt elimination, for $5,000, to any "U.S. Citizen" for any type of debt through a "loan" that would not require repayment. V.T.C.A., Bus. & C. §§ 17.46(a, b), 17.47.

1 Cases that cite this headnote

**[5]    Injunction** 🔑 Irreparable injury

**Injunction** 🔑 Adequacy of remedy at law

Probable injury, as required for issuance of a temporary injunction under the common law, includes elements of imminent harm, irreparable harm, and lack of an adequate remedy at law.

10 Cases that cite this headnote

**[6]    Antitrust and Trade Regulation** 🔑 Credit repair and counseling

Sufficient evidence supported trial court's findings that business that advertised "banking opportunity," offering debt elimination for $5,000, may have been violating the Deceptive Trade Practices–Consumer Protection Act (DTPA), and that State's efforts to freeze business's assets were in public interest, as required for issuance of temporary injunction under the DTPA provision governing restraining orders and injunctions; business's Internet site contained repeated assertions that participants would not repay bank because loans would be forgiven, and evidence showed that account to which participants' $5000 had been transferred belonged to business's owner. V.T.C.A., Bus. & C. § 17.47(a).

Cases that cite this headnote

**[7]    Antitrust and Trade Regulation** 🔑 Particular cases

District Court's temporary injunction freezing business's assets, complied with statutory requirements for temporary injunctions issued under the Deceptive Trade Practices–Consumer Protection Act (DTPA), where court found that business may have been violating the DTPA through its "banking opportunity," and that the temporary injunction was in the public interest. V.T.C.A., Bus. & C. § 17.47(a, b).

Cases that cite this headnote

**[8]    Antitrust and Trade Regulation** 🔑 Particular cases

District Court's temporary injunction freezing business's assets, satisfied specificity requirement of the Rule of Civil Procedure governing the form and scope of temporary injunctions, where court found that, unless business was "immediately restrained from the acts prohibited," business would "dissipate funds obtained from consumers through

misrepresentations in violation of the Deceptive Trade Practices Act" (DTPA). V.T.C.A., Bus. & C. § 17.47(a); Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*514** Mark D. Hopkins and C. Wilson Shirley, III, Savrick, Schumann, Johnson, McGarr, Kaminski & Shirley, Austin, for Appellants.

David M. Ashton, Mary Taylor Henderon, Nanette Marie Dinunzio, Asst. Atty. Gen., Austin, for Appellees.

Before Chief Justice LAW, Justices PURYEAR and PEMBERTON.

## *OPINION*

BOB PEMBERTON, Justice.

In this interlocutory appeal, we must determine whether the district court abused its discretion by granting the State's request for a supplemental temporary injunction and asset freeze against appellants, David West and Pydia, Inc. d/b/a *www.bankopp.com* (collectively "West"). In three issues, West asserts that the district court erred by granting **\*515** the temporary injunction because the State did not demonstrate (1) a probable right to recovery or (2) a probable injury, and (3) the order did not specifically state the reasons for its issuance. Because we hold that the district court did not abuse its discretion, we affirm the supplemental temporary injunction order.

## BACKGROUND

At the supplemental temporary injunction hearing, the court admitted evidence of a printed copy of West's Web site, testimony from an investigator employed by the Consumer Protection and Public Health Division of the Texas Attorney General's office, and documents from Hibernia National Bank in Baton Rouge provided in response to the State's civil investigative demand. The investigator's testimony and the Web site evidence revealed that West used an Austin radio commercial, a recorded telephone message (identified as a "phone overview"), and a Web site to advertise meetings at a local hotel about a "banking opportunity" that would allow any "U.S. Citizen" to pay off all personal debt—including "credit cards, mortgages, student loans, vehicles, loans, IRS settlements, and back child support"—before December 31, 2005, by securing a "loan" from an unnamed bank. West's "*www.bankopp.com* " Web site also stated that "David [West] found a Bank that is willing to give individuals loans to pay off their debts. Then the Bank is willing to turn around and forgive that loan so it doesn't have to be paid off." It asserted that "two little known banking practices ... Fractional Banking and Forgiven Loans" made this "one shot opportunity" possible. The site claimed that although "this opportunity is legal," the "Federal Reserve will undoubtedly close the loopholes that allowed the project to take place this once. While the system intended on well connected, wealthy individuals to be able to take advantage of this, it was never intended that regular every day people would gain access to it."

The site further claimed that the unnamed bank had agreed to pay off $100 million in debt and that "[the] project is about David [West]'s looking for others to add their debt to the pile David started." The idea was to accumulate $100 million in debt for the bank to "fractionalize then forgive" so that "the bank can make money and the folks with David can get out of debt." The site claimed that, after "David told his 10 closest friends about the project," word spread quickly throughout Louisiana and Mississippi. The site also explained that West accelerated its marketing of the project following Hurricane Katrina:

> After Hurricane Katrina hit the area he had been putting the word out in, David switched gears to Radio advertising across the South and is now starting a hectic schedule of FREE open meetings in major Southern Cities. These Open Meetings will have hundreds of people in attendance and are expected to help reach[ ] the goal of $100 Million in debt before Thanksgiving. This would leave plenty of time for the bank to pay before December 31st (the bank only needs 10 business days).

As a signal of their "commitment to be involved with the project," the site asked participants to deposit a wire transfer of $5,000 to a bank account in Panama, or to the "Del Sur International Holdings" account with Hibernia National Bank in Baton Rouge. According to the site, after the money was submitted, the bank would perform a financial analysis and might contact the participant to discuss any issues: "[T]he bank will analyze each project member's debt and provide feedback if there are concerns." Also after wiring their $5,000 "commitment/deposit money," the site stated that participants would receive **\*516** a document "guarantee[ing] that the loan that [they] are signing will be forgiven and that [they] will not have to pay it back!" Visitors to the Web site were not informed that the Del Sur International Holdings account, to which the $5,000 wire transfers were directed, was the sole proprietorship of David West.

The State filed suit under the Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com.Code Ann. §§ 17.46(a)-(b), .47 (West Supp.2005) ( "DTPA") against David West, Roxana Suadi West, [1] Carlos M. Suadi, and Pydia, Inc. d/b/a www.bankopp.com, seeking civil penalties and injunctive relief based on the debt elimination "service for sale to consumers." The State obtained a temporary restraining order and temporary injunction against West, preventing any further marketing in Texas of the "banking opportunity." [2]

After learning that David West attempted to withdraw all funds from the Baton Rouge account to which the participants' $5,000 wire transfers had been directed, [3] the State obtained a supplemental restraining order, freezing the funds in the Hibernia bank account. The State also sought to convert the supplemental restraining order into a supplemental temporary injunction, maintaining the freeze on the account. Following a hearing on October 25, 2005, the district court entered an order preventing David West, Roxana Suadi West, Carlos M. Suadi, and Pydia, Inc. d/b/a www.bankopp.com from accessing the Hibernia bank account.

Specifically, the order enjoined them (and those associated with them) from

- transferring, spending, hypothecating, concealing, encumbering, withdrawing, removing or allowing the transfer, removal, or withdrawal of any funds from Account # [ ], held at Hibernia National Bank; and

- transferring, spending, hypothecating, concealing, encumbering, withdrawing, removing or allowing the transfer, removal, or withdrawal of any funds from any other financial institution and/or account into which Defendants have placed or caused to be placed, funds from consumers to participate in Defendants' "bank opportunity."

The order also set the case for trial.

West appeals only from the district court's October 25 supplemental temporary injunction order that froze the assets in the Hibernia bank account. It asserts that the district court abused its discretion by entering the supplemental temporary injunction because the State did not demonstrate (1) a probable right to recovery or (2) a probable injury, and (3) the order did not specifically state the reasons for its issuance. We consider each of these assertions.

## DISCUSSION

**Standard of review**

 **[1]**   **[2]**   **[3]**    The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). Because the decision to grant or deny a  **\*517** temporary injunction lies within the sound discretion of the trial court, we will not disturb that decision absent a clear abuse of discretion. *Id.* at 204. We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor. *Brammer v. K.B. Home Lone Star, L.P.,* 114 S.W.3d 101, 105–06 (Tex.App.-Austin 2003, no pet.). This Court may not substitute its judgment for that of the trial court unless its action was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru,* 84 S.W.3d at 204. The trial court does not abuse its discretion if some evidence reasonably supports its decision. *Id.* at 211.

### Probable right to recovery

 **[4]**    In its first issue, West argues that the district court erred in granting the temporary injunction because the State did not demonstrate a probable right to recovery. West asserts that the transaction at issue is a loan of money, which is neither a "good" nor a "service" under the DTPA. *See Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex.1980); *see also* Tex. Bus. & Com.Code Ann. § 17.45(1), (2) (West 2002). West argues that the DTPA applies to transactions in which the borrower's objective is to purchase or lease goods or services, but the DTPA is inapplicable if a borrower's objective is merely an attempt to acquire money. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 566–67 (Tex.1984); *Megason v. Red River Employees Fed. Credit Union,* 868 S.W.2d 871, 872 (Tex.Civ.App.-Texarkana 1993, no writ).

The State responds that West's "banking opportunity" is not a "loan" because it specifies that repayment is unnecessary. *Cf.* Tex. Fin.Code Ann. § 301.002(a)(10) (West Supp.2005) (defining "loan" as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor"). Alternatively, the State argues that West is offering a loan forgiveness service.

The district court's finding of a probable right to recovery under the DTPA is supported by the evidence that West's Web site, offers a service—specifically, the elimination of debt—in exchange for $5,000. According to the site, after the money was submitted, "the bank [would] analyze each project member's debt and provide feedback if there are concerns." The site also informed the public that, after wiring $5,000, participants would receive a document "guarantee [ing] that the loan that [they] are signing will be forgiven and that [they] will not have to pay it back!"

"Services" are defined in the DTPA as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Tex. Bus. & Com.Code Ann. § 17.45(2). The State's suit complains that West's service violates the DTPA because it (1) fails to disclose the factual basis for its representations that David West has found a bank willing to give individuals "loans" to pay their debts without expectation of repayment and (2) encourages consumers to wire $5,000 to an account that is not identified as belonging to David West.

The debt elimination opportunity that West offered is similar to the function of a "credit services organization," defined in the finance code as

 a person who provides, or represents that the person can or will provide, for the payment of valuable consideration, any of the following services with respect to the extension of consumer credit by others:

 (A) improving a consumer's credit history or rating;

 (B) obtaining an extension of consumer credit for a consumer; or

  **\*518**  (C) providing advice or assistance to a consumer with regard to Paragraph (A) or (B).

Tex. Fin.Code Ann. § 393.001 (West 1998). A credit services organization is prohibited from making false or misleading representations in the offer or sale of its services, including any unfounded guarantees to "erase bad credit" or to obtain an

extension of consumer credit "regardless of credit history." *Id.* § 393.304 (West 1998). A violation of chapter 393 is actionable under the DTPA. *Id.* § 393.504 (West 1998).

One company was held to have been a credit services organization based on its:

- television commercials "targeting consumers with debt problems and urging them to contact [the company] for relief from these woes;"

- printed materials informing a debtor that it could assist in obtaining and repairing credit; and

- Web site, which stated that the company could provide advice or assistance to "empower debtors [to] make an informed decision on how to manage, service or liquidate their debts."

*In re Zuniga,* 332 B.R. 760, 786 (Bankr.S.D.Tex., 2005) (applying Texas law). These activities parallel West's "banking opportunity"—advertised on the radio, in a telephone message, and on the Web—offering debt elimination, for $5,000 as specified on the Web site, to any "U.S. Citizen" for any type of debt through a "loan" that would not require repayment. The service West promoted on its Web site included financial analysis, by which "the bank [would] analyze each project member's debt and provide feedback if there are concerns."

We conclude that the district court did not abuse its discretion in determining that the State demonstrated a probable right to recovery under the DTPA. We overrule West's first issue.

**Probable injury**

[5] In its second issue, West argues that the district court erred in granting the temporary injunction because the State did not demonstrate a probable injury prior to final trial on the merits. *Butnaru,* 84 S.W.3d at 204. Probable injury includes elements of imminent harm, irreparable harm, and lack of an adequate remedy at law. *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 577 (Tex.App.-Austin 2000, no pet.) (citing *Surko Enters., Inc. v. Borg–Warner Acceptance Corp.,* 782 S.W.2d 223, 225 (Tex.App.-Houston [1st Dist.] 1989, no writ)).

West argues that the State did not produce any competent evidence that money in the Hibernia bank account in Louisiana belonged to any Texas consumer or that West would dissipate the funds from the account. The State contends that the common law requirements for a temporary injunction—including balancing of the equities, proof of irreparable harm or injury, and lack of an adequate remedy at law—are inapplicable when the State is seeking statutorily-authorized injunctive relief. *See* Tex. Bus. & Com.Code Ann. § 17.47(a). Section 17.47 of the DTPA states that

> whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, and that proceedings would be in the public interest, the division may bring an action in the name of the state against the person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice.

*Id.* The Texas Supreme Court has ruled that "when it is determined that [a] statute is being violated, it is within the province of the district court to restrain it." *State* **\*519** *v. Texas Pet Foods, Inc.,* 591 S.W.2d 800, 805 (Tex.1979) (affirming award of permanent injunctive relief based on threatened violation of environmental statutes). The court observed that the doctrine of balancing the equities had no application to statutorily-authorized injunctive relief. *Id.*

Texas courts have likewise held that when an applicant relies upon a statutory source for injunctive relief, such as the DTPA, the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law. *See, e.g., Shields v. State,* 27 S.W.3d 267, 273 (Tex.App.-Austin 2000, no pet.) (State need not prove likelihood of future violations because injunctive relief available under Securities Act for past acts alone);

*MortgageBanc & Trust, Inc. v. State,* 718 S.W.2d 865, 869 (Tex.App.-Austin 1986, no writ) (express statutory language of Securities Act authorizing injunction supersedes equitable requirements generally applicable to common law injunctive relief); *Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 921 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.) (State need only meet statutory provisions of Securities Act and is not required to otherwise show probable injury); *Gulf Holding Corp. v. Brazoria County,* 497 S.W.2d 614, 619 (Tex.Civ.App.-Houston [14th Dist] 1973, writ ref'd n.r.e.) (State need not prove irreparable injury to be entitled to injunction under Open Beach Act); *see also Household Retail Servs., Inc. v. State,* No. 04–00–00734–CV, 2001 Tex.App. LEXIS 5893, at *9, 2001 WL 984779, at *3, (Tex.App.-San Antonio Aug.29, 2001, no pet.) (holding that when legislature authorized attorney general to seek injunctions on behalf of multiple consumers, it determined that past or threatened DTPA violation coupled with public need constituted sufficient "irreparable risk of harm" to support entry of injunction).

 [6]     Accordingly, the State argues that, to be entitled to a temporary injunction under the DTPA, it need only demonstrate to the court its reason to believe that (1) any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by the DTPA, and (2) that proceedings would be in the public interest. *See* Tex. Bus. & Com.Code Ann. § 17.47(a). The fact that a person has ceased its unlawful conduct will not affect the State's entitlement to injunctive relief. *Id.* Furthermore, the DTPA authorizes the court to "make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which *may have been* acquired by means of any unlawful act or practice." *Id.* § 17.47(d) (emphasis added).

At the October 25 hearing on the supplemental temporary injunction, the State introduced evidence of West's "*www.bankopp.com* " Web site, promoting a "banking opportunity" that would allow any "U.S. Citizen" to pay off all personal debt—including "credit cards, mortgages, student loans, vehicles, loans, IRS settlements, and back child support"—before December 31, 2005, by securing a "loan" from an unnamed bank. The site contained repeated assertions that participants will not repay the bank because the "loans" will be forgiven. It claimed that "two little known banking practices ... Fractional Banking and Forgiven Loans" made this "one shot opportunity" possible. The site also claimed that although "this opportunity is legal," the "Federal Reserve will undoubtedly close the loopholes that allowed the project to take place this once. While the system intended on well connected, wealthy individuals to be able to take advantage of this, it was never intended that regular every day people would gain access to it." The site also asked participants to deposit a wire transfer of $5,000—as a signal of their "commitment **\*520** to be involved with the project"—to a bank account in Panama, or to an account with Hibernia National Bank in Baton Rouge.

The State also introduced into evidence documents that the Hibernia National Bank in Baton Rouge, Louisiana provided in response to the State's civil investigative demand. The documents included a commercial new account information card for Del Sur International Holdings and its "sole proprietorship resolution certificate," along with a copy of a Louisiana driver's license issued to David Jason West. These documents show that David West opened a free small business checking account with $100 cash at Hibernia on August 8, 2005, under the business name of Del Sur International Holdings. He is the sole owner and signatory on the account. The account number assigned to the Del Sur International Holdings checking account matches the account number on the Web site to which the participants' $5,000 wire transfers had been directed. The Web site does not disclose that the $5,000 transfers of participants' "commitment money" were deposited into an account owned by David West.

Based on this evidence, the district court determined that West "may be violating the DTPA" and that the State's action "was in the public interest." Indulging every reasonable inference in favor of the court's order as we must, we conclude that there is sufficient evidence to support the court's findings in accordance with section 17.47(a). Thus, we overrule West's second issue.

**Specificity of order under rule 683**
 [7]     [8]     In its third issue, West claims that the district court's temporary injunction violated rule 683 because it did not state the reasons for its order with specificity. *See* Tex.R. Civ. P. 683. West argues that the district court's order does not specifically state the reasons why injury will be suffered if the interlocutory relief is not ordered. West also faults the order for its failure to state why the identified probable injury is an irreparable one for which the State has no adequate legal remedy. Under Rule 683

[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

Tex.R. Civ. P. 683.

The State responds that West waived its complaint about the specificity of the court's order by failing to object when the court inquired about its agreement to the form of the order. Because we conclude that the order was sufficiently specific under rule 683, we need not address the waiver issue. [4]

 **\*521**  Relying on rule 693, the State responds that "the principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with these rules *or the provisions of the statutes."* Tex.R. Civ. P. 693 (emphasis added); *see also* *Texas Pet Foods, Inc.,* 591 S.W.2d at 805 ("When it is determined that the statute is being violated, it is within the province of the district court to restrain it .... [t]he doctrine of balancing the equities has no application to this statutorily authorized injunctive relief.").

The State reiterates that section 17.47(a) of the DTPA authorizes the State's consumer protection division to bring an action for injunctive relief when "it has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by [the DTPA], and that proceedings would be in the public interest." Tex. Bus. & Com.Code Ann. § 17.47(a). The DTPA also authorizes the court to "make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice." *Id.* § 17.47(d). The State contends that the order is proper because it contains the essential findings that "Defendants may be violating § 17.47(a) and (b) of the Texas Deceptive Trade Practices–Consumer Protection Act," and that "this action is in the public interest."

The court found that the freeze was necessary to prevent West from dissipating funds in the account to which the participants' wire transfers had been directed:

> [U]nless Defendants are immediately restrained from the acts prohibited below, Defendants will dissipate funds obtained from consumers through misrepresentations in violation of the Deceptive Trade Practices Act, before a full trial can be held on the merits of the State's claims. To the extent required by law, Plaintiff [State] has proved that continued violation of these laws will continue to cause Plaintiff and the general public to suffer irreparable harm.

We conclude that this order complied with the statutory prerequisites under section 17.47(a) of the DTPA by finding that "Defendants may be violating § 17.47(a) and (b) of the Texas Deceptive Trade Practices–Consumer Protection Act," and that "this action is in the public interest." The order also satisfied the specificity requirement of rule 683 by finding that, "unless Defendants are immediately restrained  **\*522**  from the acts prohibited below, Defendants will dissipate funds obtained from consumers through misrepresentations in violation of the Deceptive Trade Practices Act, before a full trial can be held on the merits of the State's claims." Accordingly, we overrule West's third issue.

## CONCLUSION

Based on the record before us, West has not shown that the district court acted outside the bounds of its reasonable discretion by granting the supplemental temporary injunction. Accordingly, we affirm the court's order.

Footnotes

1    Roxana Suadi West and Carlos M. Suadi are not parties to this appeal. The State's petition implicates them by alleging that the radio advertisements for the "debt elimination" seminar were paid by Pydia, Inc. with West's and Suadi's credit cards. The petition also alleges that Roxana West paid for the seminar room at the hotel where the meetings were scheduled.

2    David West and Pydia, Inc. d/b/a *www.bankopp.com* (collectively "West") did not appeal from this temporary injunction.

3    The State made this assertion, which West did not dispute, at the supplemental temporary injunction hearing.

4    The record shows that, after an initial objection to the order, West denied any further objection to its form:

      THE COURT: Do you want to take a moment to look at it?

      [West's counsel]: Thank you, Your Honor. (Pause). Your Honor, the proposed order states that given the exhibits and sworn affidavits attached thereto, that unless defendants are immediately restrained from the acts prohibited below, defendants will dissipate funds obtained from consumers through misrepresentation. Is that the court's ruling today?

      THE COURT: Well, we didn't have any sworn affidavits, I don't think, introduced into evidence, did we?

      [State's counsel]: No, Your Honor.

      THE COURT: Okay. I'll make that change. Any other objections to the form?

      [West's counsel]: No, Your Honor.

      The State acknowledges that Texas courts are split on whether failure to object to a temporary injunction order results in waiver on appeal or a fatally defective order. *Compare* Tex.R.App. P. 33(a)(1); *Texas Tech Univ. Health Scis. Ctr. v. Rao,* 105 S.W.3d 763, 768 (Tex.App.-Amarillo 2003, pet. dism'd) (finding waiver of complaint about order's lack of specificity); *Shields v. State,* 27 S.W.3d 267, 273 (Tex.App.-Austin 2000, no pet.) (same); *Emerson v. Fires Out, Inc.,* 735 S.W.2d 492, 493–94 (Tex.App.-Austin 1987, no writ) (same); *with* Tex.R.App. P. 683; *Monsanto Co. v. Davis,* 25 S.W.3d 773, 789 (Tex.App.-Waco 2000, pet. dism'd w.o.j.) (voiding order for failure to explain reasons for its issuance); *University Interscholastic League v. Torres,* 616 S.W.2d 355, 358 (Tex.Civ.App.-San Antonio 1981, no writ) (same); *Smith v. Hamby,* 609 S.W.2d 866, 868 (Tex.Civ.App.-Fort Worth 1980, no writ) (same). We need not address that issue here, however.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

508 S.W.2d 70
Supreme Court of Texas.

Berry L. DEEN, Relator,

v.

Stanley C. KIRK, Judge et al., Respondents.

No. B—4397.　|　April 3, 1974.

Original mandamus proceeding wherein relator sought expungement of an order purporting to set aside a previously rendered divorce judgment. The Supreme Court, Walker, J., held that where trial court had jurisdictional power to determine validity and effectiveness of waiver of citation executed by wife and to render a judgment granting husband a divorce, a bill of review was the only remedy available to wife in the trial court more than thirty days after rendition of judgment, but where a petition for bill of review was never heard and, in fact, was dismissed, order purporting to set aside divorce judgment previously rendered was void and subject to being set aside.

Writ granted conditionally.

West Headnotes (2)

**[1]　Divorce** 🔑 Jurisdiction of the Person

Waiver of citation executed by wife prior to husband's institution of divorce suit in Wichita County did not subject wife to jurisdiction of court considering statutory prohibition against waiver of process by an instrument executed prior to institution of suit. Vernon's Ann.Civ.St. art. 2224; Rules of Civil Procedure, rules 119, 329b.

11 Cases that cite this headnote

**[2]　Divorce** 🔑 Bill of Review

Where trial court had jurisdictional power to determine validity and effectiveness of waiver of citation executed by wife and to render a judgment granting husband a divorce, a bill of review was the only remedy then available to wife in the trial court, but where a petition for writ of review was never heard and, in fact, was dismissed, order purporting to set aside divorce judgment previously rendered was void and subject to being set aside. Vernon's Ann.Civ.St. art. 2224; Rules of Civil Procedure, rules 119, 329b.

52 Cases that cite this headnote

**Attorneys and Law Firms**

**\*70** C. Coit Mock and W. J. Fleniken, Jr., Fort Worth, for relator.

Clyde Fillmore, Wichita Falls, for respondents.

**WestlawNext**® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Opinion**

WALKER, Justice.

This is an original mandamus proceeding. It was instituted by Betty L. Deen, relator, against F. Edgar Deen, Jr., and the Honorable Stanley C. Kirk, Judge of the 78th Judicial District of Wichita County, to require the latter to expunge an order purporting to set aside a divorce judgment previously rendered by him. We agree with relator that the judgment in question had become final and that Judge Kirk had no power to set it aside as he attempted to do. In accordance with our usual procedure in cases of this nature, the writ of mandamus will be granted conditionally.

On June 22, 1973, F. Edgar Deen, Jr., hereinafter referred to as respondent, instituted suit for divorce against relator in Cause No. 94,536—B in the 78th District Court of Wichita County. At the same time he filed a waiver of citation previously executed by relator. The jurat on the waiver is dated June 21, 1973. On August 22, 1973, without further notice, citation or waiver, Judge Kirk rendered judgment granting respondent a divorce and approving an undescribed property settlement agreement. Relator first learned of these proceedings on October 27, 1973.

On November 30, 1973, relator filed suit for divorce against respondent in the Domestic Relations Court No. 4 of Tarrant County. Temporary injunctions were issued in that suit, and both parties were ordered **\*71** to file written inventories. Apparently no further action has been taken in that case, which is still pending in the trial court. It has no bearing on our disposition of this mandamus proceeding.

On December 3, 1973, relator filed in Cause No. 95,544—B in the 78th District Court of Wichita County a petition in the nature of a bill of review, praying that the judgment in Cause No. 94,536—B be set aside. On December 13, 1973, Judge Kirk on his own motion entered an order in Cause No. 94,536—B setting aside the judgment previously rendered in that case. A few days later relator was served with citation in the original divorce case. Respondent then filed in Cause No. 95,544—B a motion to dismiss, alleging that since the judgment in Cause No. 94,536—B had been set aside, the bill of review proceeding was moot. On January 3, 1974, the motion was granted and the bill of review proceeding was dismissed. The original divorce case was also set for trial on the merits.

It is our understanding that relator appealed the judgment of dismissal in Cause No. 95,544—B to the Court of Civil Appeals. So far as we know, she did not attempt to carry the original divorce judgment in Cause No. 94,536—B to the Court of Civil Appeals by writ of error. In the present proceeding she seeks a writ of mandamus to require Judge Kirk to set aside the order of December 13, 1973, whereby he attempted to give her the relief she sought by her petition for a bill of review.

 [1]    Under the provisions of Rule 119, Texas Rules of Civil Procedure, a defendant may waive the issuance and service of citation by filing among the papers of the cause a verified written memorandum 'signed by him, or by his duly authorized agent or attorney, after suit is brought.' Article 2224, Vernon's Ann.Civ.St., prohibits the waiver of process by an instrument executed prior to institution of suit. It is clear then that the waiver executed by relator prior to institution of the divorce suit in Wichita County did not subject her to the jurisdiction of the court. McAnelly v. Ward, 72 Tex. 342, 12 S.W. 206.

Respondents say that since the lack of jurisdiction over relator was apparent from the record, the judgment rendered on August 22, 1973, was void and could properly be set aside by Judge Kirk at any time. There are Texas decisions that support this position, and respondents cite a number of them. See, for example, Harrison v. Whiteley, Tex.Com.App., 6 S.W.2d 89, where it was held that a judgment was void and could be vacated at a subsequent term of court because the lack of jurisdiction over the defendant affirmatively appeared in the 'judgment roll', i.e. from the citation on file among the papers in the case.

The present case is governed by the following provisions of Rule 329b, T.R.C.P.:

> 5. Judgments shall become final after the expiration of thirty (30) days after the date of rendition of judgment
> or order overruling an original or amended motion for new trial. After the expiration of thirty (30) days

from the date the judgment is rendered or motion for new trial overruled, the judgment cannot be set aside except by bill of review for sufficient cause, filed within the time allowed by law. . . .

The history of these provisions was reviewed in McEwen v. Harrison, 162 Tex. 125, 345 S.W.2d 706, where it was pointed out that the meaning and effect of the two sentences could not be determined from either: (1) decisions in cases tried in district courts whose proceedings were not governed by the Special Practice Act passed by the Legislature in 1923 [1] and its amendments and extensions or by Rule 330(l), T.R.C.P., as it existed prior to 1955, or (2) decisions in cases tried in county courts before January 1, 1961. We also **\*72** observed that the case of Harrison v. Whiteley, Tex.Com.App., 6 S.W.2d 89, is in the latter category.

The opinion in McEwen recognizes that a bill of review might not be an appropriate method for attacking in the trial court, more than thirty days after the rendition of judgment or order overruling motion for new trial, a judgment in a case which the court was without jurisdictional power to hear and adjudicate. The words 'jurisdictional power' as used in that opinion mean jurisdiction over the subject matter, the power to hear and determine cases of the general class to which the particular one belongs. We were not speaking of jurisdiction over the parties. The examples given were the rendition by a county court of judgment for divorce or for title to land. In each instance the court would have been utterly without power to render an effective judgment on the merits of the controversy.

The quoted provisions of Rule 329b were construed in McEwen as follows:

> Accordingly, we construe the emphasized provision of Rule 329—b to mean that when the time for filing a motion for new trial has expired and relief may not be obtained by appeal, a proceeding in the nature of a bill of review is the exclusive method of vacating a default judgment rendered in a case in which the court had jurisdictional power to render it. Into this category will fall those cases in which a default judgment is asserted to be void for want of service, or of valid service, of process. This is in harmony with our holding in Brown v. Clippenger, 113 Tex. 364, 256 S.W. 254. With this construction of the Rule, we may assume, without deciding, that Texaco is correct when it says that the default judgment against it is a void judgment and that its motion to vacate is a direct attack on the judgment. We are yet compelled to hold that the order vacating the default judgment is unauthorized and void because the district court had jurisdictional power to determine the validity of service (Indeed, it was its duty to do so) and to render the judgment, and Texaco's motion to vacate it does not qualify as a bill of review. (Emphasis supplied)

 **[2]**    Paraphrasing the italicized portion of the opinion just quoted, the 78th District Court of Wichita County had jurisdictional power to determine the validity and effectiveness of the waiver and to render a judgment for divorce. Relator's petition for a bill of review was never heard but was dismissed. In these circumstances and under the provisions of Rule 329b, the order of December 13, 1973, purporting to set aside the divorce judgment previously rendered in Cause No. 94,536—B is void and should itself be set aside. We are not to be understood as saying that a bill of review was the only effective remedy available to relator when she learned of the divorce judgment. See Art. 2255, V.A.C.S.; Whitney v. L & L Realty Corp., Tex., 500 S.W.2d 94; Flynt v. City of Kingsville, 125 Tex. 510, 82 S.W.2d 934. It was, however, the only remedy then available to her in the trial court.

We assume that Judge Kirk will set aside his order of December 13, 1973, promptly after our judgment in this proceeding becomes final. In the event he fails to do so, a writ of mandamus will issue.

Footnotes

1    Acts 1923, 38th Leg., ch. 105, p. 215, s 1, later codified as Art. 2002, Tex.Rev.Civ.Stat. 1925.

408 S.W.2d 245
Court of Civil Appeals of Texas.
Dallas.

Bob DeLEE, Appellant,

v.

ALLIED FINANCE COMPANY OF DALLAS, Appellee.

No. 16797. | Oct. 21, 1966. | Rehearing Denied Nov. 10, 1966.

The District Court, Dallas County, Owen Giles, J., entered a consent judgment, and the defendant appealed. The Court of Civil Appeals, Claude Williams, J., held that where recitations contained in judgment embodying compromise and settlement agreement of parties were clear and explicit, and judgment was made in open court and was agreed to not only bye attorneys but by the defendant himself, defendant on appeal could not complain of judgment, in absence of allegations and proof of fraud, collusion, or some other similar reason.

Judgment affirmed.

West Headnotes (5)

**[1]**    **Appeal and Error**    Failure to Make Bill of Exceptions, Case, or Statement of Facts

Where points of appellant were preserved in unverified motion for a new trial, but there was no statement of facts in record which would reveal testimony introduced in support of appellant's motion for new trial, each finding in unchallenged consent judgment would be presumed to be true.

Cases that cite this headnote

**[2]**    **Appeal and Error**    Assent to Proceeding

Where recitations contained in consent judgment embodying compromise and settlement agreement of parties were clear and explicit, and judgment was made in open court and was agreed to not only by attorneys but by the defendant himself, defendant on appeal could not complain of judgment, in absence of allegation and proof of fraud, collusion, or some other similar reason. Rules of Civil Procedure, rule 11.

11 Cases that cite this headnote

**[3]**    **Appeal and Error**    Assent to Proceeding

Stipulation by parties to an action as to nature and terms of judgment to be entered constitutes a waiver of all nonjurisdictional errors committed by trial court prior to agreement and judgment and justifies its affirmance, if agreement was based on valid consideration and was not obtained by fraud, collusion, or the like.

1 Cases that cite this headnote

**[4]**    **Appeal and Error**    On Consent, Offer, or Admission

Consent by party to action of trial court in entering judgment is waiver of all errors committed or contained in judgment, thus leaving nothing which can properly be considered by reviewing court, except want of jurisdiction.

3 Cases that cite this headnote

**[5]**    **Appeal and Error**  👈 On Consent, Offer, or Admission

Where final judgment executed by defendant and his attorneys of record was contractual in nature and was governed by laws relating to contracts and defendant alleged no valid basis for vacating the contract reduced to judgment, defendant could not be heard to complain on appeal that contract and judgment be set aside.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*246**  Henry Klepak and William B. Pasley, Dallas, for appellant.

Locke, Purnell, Boren, Laney & Neely and John D. Crawford and J. L . Shook, Dallas, for appellee.

**Opinion**

CLAUDE WILLIAMS, Justice.

This appeal is from a consent judgment, as follows:

**'FINAL JUDGMENT**

'On this day came on regularly to be heard the above entitled and numbered cause and came the plaintiff, Allied Finance Company of Dallas, by its attorneys and announced ready for trial; and came the defendant Bob DeLee, in person and by his attorneys, in open court and all parties announced to the court that a compromise and settlement of all matters between the parties, including additional matters not heretofore alleged, to-wit, a Note and Chattel Mortgage, dated October 8, 1964 in the principal amount of $14,099.22 secured by the hereinafter listed personal property, said settlement and compromise being that plaintiff recover judgment against the defendant for the sum of $16,278.89, principal, interest and attorneys' fees and that the plaintiff is entitled to judgment therefor, together with interest from this date until paid at the rate of 10% Per annum and all costs of this suit, and is entitled to the establishment and foreclosure of its chattel mortgage lien and certificate of title lien as it existed on the date of said October 8, 1964 note, contract and chattel mortgage and the application for certificate of title; and it appearing that the defendant consents and agrees to this judgment and agrees that the pleadings support this judgment and further agrees that he will not appeal same;

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the court that plaintiff, Allied Finance Company of Dallas, a corporation, do have and recover of and from the defendant, Bob DeLee, the sum of $16,278 .89, together with interest at the rate of 10% Per annum from this date until paid, and all costs of this suit; and the chattel mortgage and possessory certificate of title lien (on title No. 22971906) on the following  **\*247**  property is established and foreclosed, to-wit:'

(Here follows a description of personal property and details of order of sale.)

'SIGNED and ENTERED this 5 day of January, 1966.

'/s/ Owen Giles

JUDGE

'AGREED TO AS TO FORM, SUBSTANCE AND ENTRY:

'By /s/ Roy J. True

Henry Klepak, Attorney for Bob DeLee

'/s/ Bob DeLee

Bob DeLee, Defendant

'LOCKE, PURNELL, BOREN, LANEY & NEELY

'By: /s/ John D. Crawford,

John D. Crawford, Attorney for

Allied Finance Company of Dallas'

Appellant seeks to attack this judgment in two points of error wherein he alleges (1) that the trial court erred in rendering the consent judgment against appellant without a settlement agreement being reduced to writing or entered of record in open court, as required by Rule 11, Vernon's Texas Rules of Civil Procedure, to thereby evidence the present consent of the appellant; and (2) that the court erred in rendering judgment against appellant in an amount in excess of the pleadings. We find no merit in either of these points and overrule same.

 **[1]**    While appellant's points are preserved in an unverified motion for new trial, we find no statement of facts in this record which would reveal testimony introduced in support of the motion for new trial. Accordingly, the judgment, above recited, stands unchallenged and each finding recited therein is presumed to be true.

 **[2]**    A casual reference to the judgment clearly demonstrates that it is sufficient to meet every requirement of Rule 11, T.R.C.P., relied upon by appellant. The recitations contained in the judgment are clear and explicit and the same was made in open court and agreed to by not only the attorneys but by the appellant himself. Thus we find appellant complaining of that to which he has agreed. This, he cannot do in the absence of allegation and proof of fraud, collusion, or some similar reason. As early as 1853 the Supreme Court of Texas had occasion, speaking through Chief Justice Hemphill, to classically announce the rule in such cases as follows:

'\* \* \* appellants are at once confronted with the general principle that consent takes away error, and that a judgment by agreement or compromise cannot be impeached, unless for fraud, collusion, or like causes, none of which appear in this record or are alleged or assigned. (Citing authorities.) The appellants are concluded by their own consent, and their appeal cannot be sustained .' Dunman v. Hartwell, 9 Tex. 495, 60 Am.Dec. 176.

 **[3]**    The rule, more recently stated, is expressed in 3 Tex.Jur.2d, s 213, p. 479, as follows:

> 'A stipulation by the parties to an action as to the nature and terms of the judgment to be entered constitutes a waiver of all nonjurisdictional errors committed by the court prior to the agreement and judgment and justifies its affirmance, if the agreement is based on a valid consideration and was not obtained by fraud, collusion, or the like.'

 **[4]**  The rationale of such rule is that a party will not be allowed to complain on appeal of an action or ruling which he invited or induced. Having consented to the action of the court in entering judgment he thereby waives all errors committed or contained in the judgment, thus leaving nothing which could properly be considered by an appellate court, except want of jurisdiction. **\*248**  Posey v. Plains Pipe Line Co., Tex.Civ.App., 39 S.W.2d 1100; Blume v. Shadyacres Inv. Co., Tex.Civ.App., 83 S.W.2d 1026; Hall v. McKee, Tex.Civ.App., 179 S.W.2d 590; 69 A.L.R.2d 767 et seq.

 **[5]**    Moreover, the final judgment executed by appellant and his attorneys of record was contractual in nature and is governed by the laws relating to contracts. Appellant has alleged no valid basis for vacating his contract reduced to judgment. Therefore, appellant cannot now be heard to complain that the agreement and judgment be set aside. Plumly v. Plumly, Tex.Civ.App., 210 S.W.2d 177; Alexander v. Alexander, Tex.Civ.App., 373 S.W.2d 800; Rawlins v. Stahl, Tex.Civ.App., 329 S.W.2d 308; 33 Tex.Jur.2d, ss 105, 107, pp. 623, 626.

The judgment of the trial court is

Affirmed.

**End of Document**                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

813 S.W.2d 640
Court of Appeals of Texas,
Houston (14th Dist.).

Davendra D. DESAI, Appellant,

v.

RELIANCE MACHINE WORKS, INC., Natu Patel and Kokila Patel, Appellees.

No. A14–90–280–CV. | July 11, 1991. | Rehearing Overruled Aug. 22, 1991.

Appeal was taken from order of the 240th District Court, Fort Bend County, C.A. Dickerson, J., dissolving temporary injunction in dispute over ownership of controlling 1% interest in corporation. The Court of Appeals, Junell, J., held that temporary injunction designed to restrain 51% shareholder's abuse of controlling interest in corporation was properly dissolved, in view of evidence that shareholder had since been deprived of any participation in management, operation, and benefits of corporation.

Affirmed.

West Headnotes (4)

**[1]** **Appeal and Error** Appeal from orders relating to injunctions

Court of Appeals did not have jurisdiction to review validity of order granting temporary injunction, on appeal from order dissolving injunction, where appeal was not perfected from initial injunction order, and time limit for doing so had expired. Vernon's Ann.Texas Rules Civ.Proc., Rule 683; Rules App.Proc., Rule 42(a).

4 Cases that cite this headnote

**[2]** **Appeal and Error** Continuing, vacating, or dissolving

**Injunction** Authority and discretion of court

Decision to dissolve temporary injunction is matter lying within broad discretion of trial court; review of trial court's order of dissolution is limited to narrow question of whether trial court's actions constituted clear abuse of discretion.

6 Cases that cite this headnote

**[3]** **Injunction** Grounds or cause in general

Trial court has authority to dissolve temporary injunction upon showing of changed condition.

6 Cases that cite this headnote

**[4]** **Injunction** Particular cases

Temporary injunction designed to restrain 51% shareholder's abuse of controlling interest in corporation was properly dissolved, in view of evidence that shareholder had since been deprived of any participation in management, operation, and benefits of corporation.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*640** Stuart M. Nelkin, Kathy D. Boutchee, Houston, for appellant.

**\*641** Leonard L. Scarcella, Stafford, Deborah Bailey, Suger Land, for appellees.

Before JUNELL, MURPHY and CANNON, JJ.

**OPINION**

JUNELL, Justice.

This is an interlocutory appeal from the trial court's order dissolving a temporary injunction. TEX.CIV.PRAC. & REM.CODE ANN. § 51.014 (Vernon Supp.1989). In six points of error, appellant asserts that the trial court abused its discretion in dissolving the temporary injunction. We affirm.

Reliance Machine Works, Inc. was founded in 1982 by appellant and appellee, Natu Patel. Fifty percent of the stock was issued to appellant and the remaining fifty percent was issued to Dhanash Patel, Natu Patel's brother. Appellant and Dhanash Patel were the sole officers of the corporation and the only members of the board of directors. In 1983, the parties entered into an oral agreement whereby ownership of Reliance would be transferred to appellant's wife, Minaxi Desai, and appellee, Kokila Patel, in order to qualify as a minority (female) owned business for the purposes of securing government contracts. Shortly thereafter, fifty-one percent of the stock was transferred to appellee, Kokila Patel, and this is where the dispute begins. Appellees contend that the issuance of an additional one percent of the stock to Kokila Patel was permanent in that it was in exchange for $55,000 of unpaid salaries. Appellant asserts that this arrangement was only temporary due to the fact that Minaxi Desai was in India at the time, and that the agreement was that ownership in Reliance would be equalized upon her return. When Minaxi Desai returned from India, Kokila Patel did not relinquish her majority interest. Appellant contends that appellee, Kokila Patel, fraudulently obtained the majority interest in Reliance and has used that interest to the detriment of Reliance and appellant.

In January 1987, appellant brought a shareholder's derivative suit against appellees and on April 2, 1987, the trial court entered a temporary injunction order enjoining the appellees from engaging in twenty enumerated acts. The temporary injunction order did not include an order setting the cause for trial on the merits. On March 21, 1990, the trial court dissolved the temporary injunction upon a finding that a material and substantial change in circumstances and conditions had occurred since the issuance of the temporary injunction, and appellant appealed. On appellant's motion, this court entered a temporary order, pursuant to TEX.R.APP.P. 43(c), continuing the injunction pending disposition of this appeal.

**[1]** By way of a counterpoint, appellees assert that the trial court did not abuse its discretion in dissolving the temporary injunction because the original temporary injunction order did not comply with TEX.R.CIV.P. 683. Rule 683 provides, in pertinent part, that:

> Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought.

TEX.R.CIV.P. 683. The trial court's April 2, 1987 order granting the temporary injunction did not include an order setting the cause for trial on the merits. We agree that had appellees appealed from the original order, the temporary injunction should have been dissolved. *E.g., Interfirst Bank San Felipe N.A. v. Paz Construction Co.,* 715 S.W.2d 640 (Tex.1986). However, appellees did not perfect an appeal from the initial order, and the time limit for doing so has long since expired. *See* TEX.R.APP.P. 42(a). Accordingly, we have no jurisdiction to review the validity of the trial court's April 2, 1987 order granting the temporary

injunction. *See, e.g., Ludewig v. Houston Pipeline Co.,* 737 S.W.2d 15, 16 (Tex.App.—Corpus Christi 1987, no writ); *Tober v. Turner of Texas, Inc.,* 668 S.W.2d 831, 834 (Tex.App.—Austin 1984, no writ). Appellees' counterpoint is overruled.

 **[2]**   **[3]**   The decision to dissolve a temporary injunction is a matter lying within the broad discretion of the trial court. Our review of the trial court's order of dissolution **\*642** is limited to the narrow question of whether the trial court's action constituted a clear abuse of discretion. *See Tober,* 668 S.W.2d at 834; *State v. Friedmann,* 572 S.W.2d 373, 375 (Tex.Civ.App. —Corpus Christi 1978, writ ref'd n.r.e.). The trial court has the authority to dissolve a temporary injunction upon a showing of changed conditions. *See, e.g., Tober,* 668 S.W.2d at 835–36. Here, appellees' motion to dissolve alleged that, since the issuance of the temporary injunction, appellees had been effectively excluded from any participation in the operations and management of Reliance. After three days of testimony in a contested hearing, the trial court dissolved the injunction upon a finding of material and substantial changes in circumstances and conditions since the issuance of the temporary injunction on April 2, 1987.

 **[4]**   Appellant's first point of error asserts that the trial court abused its discretion in dissolving the temporary injunction because there was no change in circumstances that altered the status quo that existed at the time the temporary injunction was granted. We cannot agree. The trial court heard testimony that numerous changes in Reliance had occurred since the issuance of the temporary injunction. These changes were made at the direction of appellant and without the participation of Kokila Patel, the majority shareholder and member of Reliance's board of directors.

Appellees introduced testimony at the hearing to show that appellant had relocated Reliance to a larger facility. The testimony indicated that the new site was environmentally contaminated by leaking gasoline tanks. The relocation of the business was a part of appellant's course of expansion which would include increased numbers of employees and equipment. In relocating the company, appellant entered into a new lease agreement which called for increased monthly rent and insurance costs. Furthermore, Reliance's new landlord would become a business entity operated by members of appellant's family. Whether these changes were beneficial to Reliance or not, they were completed without the knowledge or participation of Kokila Patel. Further testimony revealed that Kokila Patel had even been barred admittance to Reliance's facilities.

When the temporary injunction was issued, Kokila Patel was in possession of 51% of the outstanding stock in Reliance. The dispute in the underlying case involves the ownership of the 1% controlling interest. Rather than curtail Kokila Patel's alleged abuse of that controlling interest, ample testimony was introduced to show that, since the issuance of the temporary injunction, Kokila Patel has been deprived of *any* participation in the management, operation, and benefits of Reliance. Under these circumstances, we hold that the trial court did not abuse its discretion in dissolving the temporary injunction. The first point of error is overruled.

In his second point of error, appellant asserts that the trial court abused its discretion when it dissolved the temporary injunction because the dissolution imperils his rights. In support of this contention appellant relies on the holding in *Lone Star Mining Co. v. Texeramics, Inc.,* 340 S.W.2d 871 (Tex.Civ.App.—Eastland 1960, writ ref'd n.r.e.). In *Lone Star,* the court held that "[w]here it appears that a continuation of a temporary injunction cannot imperil the rights of the adverse party, but its dissolution may seriously jeopardize the rights of the complaining party, the temporary injunction should be continued in force." *Id.* at 874. As our prior discussion reflects, the trial court was presented with ample evidence tending to show that the continuation of the temporary injunction would imperil the rights of the appellees. Therefore, appellant's contention is without merit. We overrule the second point of error.

Appellant's third point of error asserts that even if changed circumstances existed, the trial court abused its discretion by dissolving the temporary injunction rather than modifying it to order that Kokila Patel be consulted in future management decisions. Appellant cites no authority in support of this contention. However, based upon our review of the record before us, **\*643** and our discussion relating to appellant's first point of error, we find that the trial court did not abuse its discretion in dissolving the temporary injunction rather than modifying it to reflect that Kokila Patel be consulted in future management decisions. Appellant's third point of error is overruled.

Our disposition of the appeal on these grounds make it unnecessary to consider appellant's remaining points of error. The trial court's order dissolving the temporary injunction is affirmed. Accordingly, this court's temporary order continuing the injunction pending disposition of this appeal is hereby dissolved.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

9 Tex. 495
Supreme Court of Texas.

DUNMAN AND WIFE

v.

N. W. & T. R. HARTWELL.

1853.

**Opinion**

 **\*495** Where the record, in a case in which process has been served, recites that the parties appeared by their attorneys and agreed to the following decree, &c., the authority of the attorneys cannot be questioned on appeal or writ of error. (Note 85.)

Consent takes away error; and a judgment by agreement or compromise cannot be impeached, unless for fraud, collusion, or like causes.

Where there has been two partitions, and on final judgment the former was re-established, it was but just and proper to require the distributees under the second partition to give an equivalent to the distributees under the first partition for any of the property which the distributees under the second and rejected partition had alienated or consumed in the interval.

Error from Liberty. This case was before the Supreme Court once before, and is reported in 7th Texas Reports, 576. On the receipt of the mandate a decree in accordance with it was made by consent of the parties appearing by their attorneys. Dunman and wife alone prosecuted this writ of error.

 West Headnotes (4)

[1]     **Appeal and Error** 👉 Consent to judgment or order

In a case where the record recites that "the parties appeared by their attorneys, and agreed to the following decree, to be entered as the judgment of the court," and one of the parties appealed, it was *held* that the appellant was concluded by his own consent, and that the judgment should be affirmed, with damages.

21 Cases that cite this headnote

[2]     **Compromise and Settlement** 👉 Impeachment for fraud, mistake, or undue advantage only

A compromise and settlement of a suit or disputed claim is binding unless it is shown that it was the result of fraud, mistake, or improper means.

Cases that cite this headnote

[3]     **Attorney and Client** 👉 Stipulations and admissions

Where a judgment is entered by agreement of the attorneys whose authority is not questioned, the parties are concluded, and no appeal will lie.

2 Cases that cite this headnote

[4]     **Partition** 👉 Adjustment of claims and equities between parties

Where there had been two partitions, and, on final judgment, the former was re-established, it was but just and proper to require the distributees under the second partition, to give an equivalent to the distributees under the first partition, for any of the property which the distributees under the second and rejected partition had alienated or consumed in the interval.

Cases that cite this headnote

**Attorneys and Law Firms**

*H. N. & M. M. Potter* and *Allen & Hale,* for appellees.

HEMPHILL, CH. J.

The record in this case is very defective. **\*496** The proceedings and judgment were based on a mandate of the Supreme Court; but the mandate is not transcribed. It should have been the first entry, and a copy should have been transmitted with the transcript. The judgment which we are invoked to revise and reverse was entered by consent. It commences with the recital that the "case coming on to be heard upon the mandate from the Supreme Court, the parties appeared by their attorneys and agreed to the following decree to be entered as the judgment of this court," &c., &c. This agreement was made by the attorneys of the parties; but no objection is taken to the judgment on that ground. It is not assigned or contended that their authority should have appeared of record. No question is raised as to their power. That they had competent authority must be presumed until it is impugned and the contrary shown, and the judgment must be taken as having been agreed to by the parties themselves; under this aspect the appellants are at once confronted with the general principle that consent takes away error, and that a judgment by agreement or compromise cannot be impeached, unless for fraud, collusion, or like causes, none of which appear in this record or are alleged or assigned. (Story v. Hawkins *et al.,* 8 Da. R., 12; French v. Hotwell, 5 Johns. Chan. R., 555; 14 Ves. R., 31.)

The appellants are concluded by their own consent, and their appeal cannot be sustained.

But if the decree had not been entered by consent there does not appear any such substantial error prejudicial to the appellants as would have authorized a reversal.

The mandate of the Supreme Court required the rights of Mrs. Hartwell, under the deed of gift, and of her minor children to a portion of the estate under the law to be respected; and this appears in substance to have been done, in accordance with the spirit and intent of the mandate, and without injustice to the other distributees of the estate.

After deducting the property or its value embraced in the deed of gift, the surplus was directed to be equally divided **\*497** between the heirs of the deceased. This has been effected, as to the real estate, by establishing the partition formerly made and of record in the County Court; and if execution has been given the widow for the value of her property under the deed of gift, and the minor heirs for the value of their shares respectively of the personal property, it arose doubtless from the fact that this property had been converted by the other parties to their own use.

The errors assigned are:

1st. In rendering judgment against the heirs, and ordering execution to issue against the same.

This has been already considered and its futility shown.

2d. In authorizing the auditors to set aside to Francis M. and Hansel R. Hartwell, out of any of the lands set apart to Rachel Dunman, one of the heirs of E. H. Wallis, deceased, an equal amount in lands in value to that of any amount that the said Rachel and James F. Dunman may have sold, &c.

The mandate under which the District Court was acting directed the minors, Francis and Hansel, to have shares of the estate equal to those of the other distributees. To effect this the former partition in which their shares were set apart was recognized or confirmed; and if the Dunmans had in the meantime sold any portion of the land formerly assigned to these minors, it was but equitable that the deficiency should be made up out of the lands set apart as the distributive share of Rachel. Such a disposition was in conformity with the spirit of the mandate, was but just to the minors, and could not operate to the injury of the appellants.

3d. That Francis M. and Hansel R. Hartwell are given by said decree more than their share. There is no evidence of this in the record. No statement of facts or bills of exceptions are sent up with the transcript.

4th. In ordering execution to issue against the estate of Elisha W. Wallis, deceased, one of the heirs.

The record furnishes no evidence that any such execution was issued.

**\*498**  The appellants have not appeared to prosecute their appeal, and it was evidently taken for delay. It is ordered, adjudged, and decreed, that the judgment of the District Court be affirmed, with ten per cent. damages on the *pro rata* amount of the judgment, for money which is due from the appellants.

Affirmed with damages.

NOTE 85.--Hutchinson v. Owen, 20 T., 287; Laird v. Thomas, 22 T., 276; Goss v. Pilgrim, 28 T., 263. The want of service of an amendment is cured by a recital in the judgment which shows that the defendant was in court, (Delvalt v. Snow, 25 T., 320,) and a recital that the defendant appeared avoids the necessity of a statement of facts when service is made by publication. (Chester v. Walters, 30 T., 53; Smith v. Wood, 37 T., 616.)

**Parallel Citations**

1853 WL 4235 (Tex.), 60 Am.Dec. 176

       © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

735 S.W.2d 492
Court of Appeals of Texas,
Austin.

Ernest A. EMERSON, Texas State Fire Marshal, et al., Appellants,

v.

FIRES OUT, INC., Appellee.

No. 3–86–081–CV.   |   June 10, 1987.   |   Rehearing Denied Sept. 9, 1987.

Manufacturer and seller of small fire extinguishers filed declaratory judgment suit seeking temporary injunction against fire marshal's interference with its sales. The 261st Judicial District Court, Travis County, Pete Lowry, J., granted temporary injunction and fire marshal appealed. The Court of Appeals, Shannon, C.J., held that: (1) error was not preserved as to claim that reasons for issuance of injunctive order were not sufficiently set out as required by civil rule, and (2) district court could conclude that manufacturer demonstrated probable right to recover.

Affirmed.

West Headnotes (4)

[1]    **Appeal and Error**  Sufficiency and Scope of Statement of Grounds

Error was not preserved as to claim that reasons for district court's issuance of injunctive order were not sufficiently set out as required by civil rule; motion for reconsideration did not point to any claimed deficiency in form of order. Vernon's Ann.Texas Rules Civ.Proc., Rule 683; Rules App.Proc., Rule 52(a).

3 Cases that cite this headnote

[2]    **Injunction**  Likelihood of success on merits

**Injunction**  Injury, Hardship, Harm, or Effect

To warrant issuance of temporary injunction, applicant need only show probable right and probable injury and is not required to establish that he will finally prevail in litigation.

1 Cases that cite this headnote

[3]    **Appeal and Error**  Injunction

**Appeal and Error**  Refusing injunction

**Injunction**  Discretionary Nature of Remedy

**Injunction**  Abuse of discretion

Trial court is clothed with broad discretion in determining whether pleadings and evidence present case of probable right and probable injury that warrant issuance of temporary injunction, and its order issuing or denying writ of injunction will be reversed only on showing of clear abuse of discretion; if petition alleges cause of action and evidence tends to sustain it there is no abuse in issuance of writ, and there's no abuse where trial court predicates its order upon conflicting evidence.

Cases that cite this headnote

**[4]** **Declaratory Judgment** 🔑 Preliminary injunction or other relief

Manufacturer and seller of small fire extinguishers demonstrated probable right to recover on merits of declaratory judgment suit and was entitled to temporary injunction against state fire marshal's interference with marketing, sale, and delivery of its product; salesman's testimony that manufacturer lost sales due to fire marshal's actions was some evidence from which it could be concluded that manufacturer was "retailing or wholesaling" so as to qualify for Insurance Code exemption from regulation, and district court could conclude that Kansas laboratory which approved those extinguishers was "nationally recognized testing laboratory" as required by other Code provisions. V.A.T.S. Insurance Code, art. 5.43–1, §§ 1, 3, 5(a), 6(d).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*493** Jim Mattox, Atty. Gen., Daniel Zemann, Jr., Asst. Atty. Gen., Austin, for appellants.

Joanne Summerhays, Barry Bishop, Clark, Thomas, Winters & Newton, Austin, for appellee.

Before SHANNON, C.J., and BRADY and ABOUSSIE, JJ.

**Opinion**

SHANNON, Chief Justice.

This is an appeal from an order of the district court of Travis County granting a temporary injunction.

Appellee, Fires Out, Inc., is a corporation engaged in the manufacture and sale of small fire extinguishers designed for private use. Appellee sells its products in Texas and in other states. Appellants, the State Fire Marshal and his employees, took the position that appellee could not lawfully sell its products in Texas and actively interfered with appellee's efforts to make such sales.

Appellee filed a declaratory judgment suit in the district court of Travis County and, ancillary to its declaratory judgment suit, sought a temporary injunction. After hearing, the district court temporarily enjoined appellants from (a) "taking any action whatsoever to interfere with the marketing, sale or delivery of Fires Out, Inc. fire extinguishers"; and from (b) "contacting any person for the purpose of stating or representing that fire extinguishers manufactured or sold by Fires Out, Inc. may not legally be sold in Texas." This Court will affirm the district court's temporary injunctive order.

**[1]** Appellants attack the district court's order by two points of error. By their first point, appellants assert that the injunctive order must be dissolved because the reasons for its issuance are not sufficiently set out as required by Tex.R.Civ.P.Ann. 683 (Supp.1987). Rule 683 provides that every order granting an injunction "shall set forth the reasons for its issuance."

The only reason set forth in the district court's order is as follows:

> The Court considered the verified pleadings, the evidence, and arguments of counsel, and finds and concludes that the plaintiff has shown and demonstrated its right to a temporary injunction under the law, and the Court further concludes that plaintiff's sale of its fire extinguisher product within the State of Texas is exempted from regulation by the State Fire Marshal under Section 6(d) of Article 5.43–1.

We need not determine, however, whether the order is in violation of Rule 683 because appellants failed to preserve the claimed error for appellate review. Although appellants filed a "Motion for Reconsideration," they did not point out to the district court any claimed deficiency in the form of the order.

Texas R.App.P.Ann. 52(a) (Supp.1987) provides generally that

> [i]n order to preserve a complaint for appellate review, a party must have presented to the trial court *a timely request,* objection or motion, stating the *specific grounds* for the ruling he desired the court to make.... (Emphasis supplied).

Rule 52(a) derives from Tex.R.Civ.P.Ann. 373 (1985). To preserve error, Rule 373 required a party to make known to the court the desired action and the party's grounds therefor at the time the ruling or order was made or sought. Rule 373 was applied to errors committed by the trial court in the entry of judgments. *Travis Heights Improvement Ass'n v. Small,* 662 S.W.2d 406, 414 (Tex.App.1983, no writ). In *Travis Heights,* the appellant complained that the trial court had failed to include a particular finding in the judgment. This Court stated in response:

> We think that appellant's second point of error goes only to the form of the judgment. As such, it was waived by appellant's failure to make a motion to reform the judgment, or to in some other way **\*494** make the complaint known to the trial court.

*See also Plasky v. Gulf Insurance Co.,* 160 Tex. 612, 335 S.W.2d 581, 584 (1960) (appellant waived error concerning time period, stated in judgment, during which interest on judgment could be collected, when he failed to object or except to judgment —R. 373); *Whatley v. Whatley,* 493 S.W.2d 299, 304 (Tex.Civ.App.1973, no writ) (defendant who failed to object to judgment awarding child support in lump sum rather than to individual children waived error). In *Delhi Gas Pipeline Corp. v. Lamb,* 724 S.W.2d 97 (Tex.App.1987, writ pending), the El Paso Court of Appeals expressly held that Rule 52(a) carried forward the provisions of Rule 373, and that the rationale of *Plasky* and other opinions decided under Rule 373 applied under Rule 52(a).

Principles of sound judicial administration support application of the waiver rule in this appeal. As in the above opinions, there was no claimed error present until the judgment was prepared and presented to the district court. At that time, appellants could have moved to modify or change the terms of the judgment. It serves no good purpose to permit appellants to lie in wait and present this error in form for the first time on appeal. On proper request, the district court could easily have added to the judgment a description of the specific harm avoided by granting the temporary injunction. Appellants would then have obtained proper notice of the district court's reasoning and appellate review would have been facilitated.

Although appellants did request the district court to reconsider the order, appellants did not raise the facial inadequacy of the order. Accordingly, appellants' motion did not preserve the error. *See, e.g., State v. Williams,* 357 S.W.2d 799, 800–01 (Tex.Civ.App.1962, writ ref'd n.r.e.); *see also* Tex.R.App.P. 52(a) (objection must state "specific grounds").

 **[2]**  **[3]**  **[4]**  By their second point of error, appellants complain that the district court abused its discretion in granting the injunctive order because appellee did not demonstrate a probable right to recovery. In a hearing on an application for a temporary injunction, the only question before the trial court is the appellant's right to the preservation of the *status quo* of the subject matter of the suit, pending a final trial on the merits. To warrant the issuance of a temporary injunction, the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation. The trial court is clothed with broad discretion in determining whether the pleadings and evidence present a case of probable right and probable injury. The trial court's order in issuing or denying the writ of injunction will be reversed only on a showing of a clear abuse of discretion. There is no abuse of discretion in the issuance of a writ of injunction if the petition alleges a cause of action and the evidence tends to sustain it. *Transport Co. of Texas v. Robertson Transports,* 152 Tex. 551, 261 S.W.2d 549 (1953). Further, there is no abuse of discretion where the trial court predicates its order upon conflicting evidence. *Davis v. Huey,* 571

S.W.2d 859, 862 (Tex.1978). Even questions of law "can only be determined from a review of the entire record after a full and final hearing." *Transport Co. of Texas v. Robertson Transports, supra.*

The district court concluded that appellee's sale of its fire extinguishers within Texas was exempted from regulation by Tex.Ins.Code art. 5.43–1 § 6(d) (1981). That provision provides as follows:

The provisions of this article do not apply to the following:

---

firms engaged in the *retailing or wholesaling* of portable fire extinguishers *as defined in Section 3,* but not engaged in the installation or recharging of them.... (Emphasis supplied).

Appellants argue that the district court erred in applying this exemption to appellee because there was insufficient proof that appellee was "retailing or wholesaling" portable fire extinguishers. Although the proof is somewhat lacking in clarity, appellants concede that Lawrence C. Lasalle, a salesman of Fires Out fire extinguishers, **\*495** testified that appellee "lost sales" due to the Fire Marshal's actions. Lasalle's testimony is some evidence from which the district court could conclude that appellee qualified for the statutory exemption.

Appellants contend, alternatively, that the district court abused its discretion by refusing to ignore the § 6(d) exemption entirely. Appellants claim that § 6(d) is an anachronism, an exemption that the legislature should have omitted when art. 5.43–1 was amended to regulate the sale of fire extinguishers as well as their installation and servicing. According to appellants, giving effect to § 6(d) defeats the legislature's intent to regulate the *sale* of portable fire extinguishers "as a measure of public safety." In support of their contention, appellants point to art. 5.43–1, § 1, which provides:

> The purpose of this article is to regulate the *leasing, renting, selling, and servicing* of portable fire extinguishers and the installing and servicing of fixed fire extinguisher systems, in the interest of safeguarding lives and property. (Emphasis supplied).

Appellee, in turn, relies upon the general rule of statutory construction that every word of the statute is presumed to have purpose and each sentence, clause, phrase and word should be given effect if reasonably possible. *Ex Parte Pruitt,* 551 S.W.2d 706, 709 (Tex.1977). Appellee reminds us that this rule is particularly appropriate in the case of a penal statute, such as art. 5.43–1 (*see* § 12), because penal statutes must be strictly construed. *First Bank of Bedford v. Miller,* 563 S.W.2d 572, 577 (Tex.1978).

Upon examination of the statute, it appears to this Court that the district court could reasonably have given effect to the exemption consistent with the statute's overall intent. Section 6(d) only exempts firms selling portable fire extinguishers "as defined in Section 3." Section 3(c) defines a "portable fire extinguisher," in part, as one that "has a label of approval attached by a nationally recognized testing laboratory...." Accordingly, the § 6(d) exemption only applies to sales of *approved* fire extinguishers. Sale of *unapproved* fire extinguishers thus remains subject to sanction under art. 5.43–1, § 10(9) (prohibiting sale of fire extinguishers in violation of § 5(a)), and § 5(a) (prohibiting sale of unapproved fire extinguishers). Such a construction preserves the exemption and still gives effect to the legislative intent to make portable fire extinguishers safe.

The record supports appellee's contention that its product carries the label of approval by a "nationally recognized laboratory." Ronald Wells, director of General Laboratories, the test laboratory for appellee, testified that General Laboratories is a member laboratory of the American Society of Testing Materials, a nationally recognized testing and certification board. Although Wells indicated that Kansas, the state in which General Laboratories is located, had not certified it as a nationally recognized laboratory, the conflicting evidence provided a reasonable basis for the district court's determination that General Laboratories was nationally recognized. *Huey v. Davis, supra.*

Appellants contend, the evidence aside, that the Fire Marshal's determination that General Laboratories is not nationally recognized is conclusive on this point. No one disputes that the term "nationally recognized testing laboratory" is undefined by the statute. The Fire Marshal asserts, nonetheless, that his statutory duty to "administer, enforce and carry out the applicable provisions of the code ...," Tex.Ins.Code Ann. art. § 1.09(a), requires him to set the correct standard. Perhaps the Fire Marshal's assertion is correct, especially since art. 5.43–1, § 2 gives the State Board of Insurance power to promulgate rules and regulations for the administration of the article "through the State Fire Marshal." Nevertheless, as the testimony of the Fire Marshal's manager of licensing investigation, Quay Wood, makes plain, neither the State Board of Insurance nor the Fire Marshal has made any attempt to articulate a standard by which testing laboratories may be measured. The district court was free, accordingly, to conclude under the proof that General Laboratories was **\*496** "nationally recognized," as required by §§ 3 and 5(a) of the statute.

Because a reasonable construction of the statute permits appellee to claim the benefit of exemption from its regulation, this Court concludes that the district court did not abuse its discretion in determining that appellee demonstrated a probable right to recover on the merits.

The district court's order is affirmed.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

160 Tex. 224
Supreme Court of Texas.

Ex parte John R. COFFEE and A. L. Holley, Relators.

No. A-7439.  |  Oct. 7, 1959.  |  Rehearing Denied Nov. 11, 1959.

Original habeas corpus proceeding by relators to relieve themselves of penalties imposed by judgment of contempt entered by the District Court of the 51st Judicial District growing out of a violation by relators of a temporary injunction granted by the court. The Supreme Court, Calvert, J., held that where petition for injunctive relief was presented to the judge of the district court of the 51st Judicial District in Tom Green County and one defendant was a resident of Dallas County and the other three were residents of Howard County and the restraint was not to stay proceedings in the suit or execution on a judgment but to restrain the sale under a deed of trust, action of the district judge, without requiring proof that it was impracticable to reach the District Judge of Howard County or a District Judge of Dallas County, in granting a temporary restraining order returnable to his own court in Sterling County and granting the temporary writ was not void so as to be subject to collateral attack by relators seeking to relieve themselves from a judgment of contempt for violation of the injunction.

Relators remanded to custody.

Griffin and Hamilton, JJ., dissented.

West Headnotes (16)

[1]     **Judgment**  ☞ Invalidity of Judgment in General

Collateral attack on a judgment is entitled to prevail only if the judgment is void.

4 Cases that cite this headnote

[2]     **Injunction**  ☞ Authority of court;  jurisdiction and venue

The statute providing that writs of injunction granted to stay proceedings in a suit or execution on a judgment shall be tried in court where suit is pending applies to and governs the issuance and returns of writs and trials in cases in which relief sought is purely or primarily injunctive. Vernon's Ann.Civ.St. arts. 4656.

12 Cases that cite this headnote

[3]     **Evidence**  ☞ Geographical Facts

The Supreme Court takes judicial notice that neither Dallas nor Howard County is in the 51st Judicial District.

Cases that cite this headnote

[4]     **Courts**  ☞ Dicta

Where it was unnecessary to the decisions of the Courts of Civil Appeals that the validity of injunction orders be adjudicated, any statements in the opinions that the orders were void or indicating that the respective trial courts were without jurisdictional power to enter them, was dicta.

1 Cases that cite this headnote

**[5]** **Injunction** Authority of court; jurisdiction and venue

The term "writ of injunction" as used in the articles relating to granting of writ of injunction by nonresident judges and requiring writs of injunction granted to stay proceedings to be tried in court where suit is pending includes "temporary restraining orders" as provided for in the rule. Vernon's Ann.Civ.St. arts. 4642 et seq., 4643 and subds. 2, 3; arts. 4647–4650, 4652, 4653, 4656, 4658; Rules of Civil Procedure, rules 680, 681.

2 Cases that cite this headnote

**[6]** **Judgment** Irregularities in Proceedings

Where petition for injunctive relief was presented to the judge of the district court of the 51st judicial district in Tom Green County, and one defendant was a resident of Dallas County and the other three were residents of Howard County, and the restraint was not to stay proceedings in the suit or execution on a judgment, but to restrain a sale under a deed of trust, action of district judge without requiring proof that it was impracticable to reach the district judge of Howard County of a district judge of Dallas County, in granting a temporary restraining order returnable to his own court in Sterling County and granting the temporary writ was not void so as to be subject to collateral attack by relators seeking to relieve them from a judgment of contempt for violation of the injunction. Vernon's Ann.Civ.St. arts. 4642 et seq.; 4643 and subds. 2, 3; arts. 4647–4650, 4652, 4653, 4656, 4658; Rules of Civil Procedure, rules 680, 681.

3 Cases that cite this headnote

**[7]** **Injunction** Authority of court; jurisdiction and venue

When a suit is one for purely injunctive relief, other than to stay proceedings in a suit or execution on a judgment and the relief is sought and granted before the filing of suit, the order granting relief is not void for failure to make the restraining order returnable to the county of residence of the defendant or one of them, nor is the writ a temporary injunction thereafter granted by the court issuing a restraining order void. Vernon's Ann.Civ.St. arts. 4643, subds. 2, 3, 4656.

9 Cases that cite this headnote

**[8]** **Judges** Exercise of powers beyond territorial limits of jurisdiction

Orders entered by nonresident judge granting an injunction order presented by a nonresident judge granting a temporary restraining order and a temporary writ of injunction without requiring the filing of the statutory affidavit and the making of statutory proof of the inaccessibility of an effort to make or reach a resident judge as provided by the statute are not void. Vernon's Ann.Civ.St. arts. 4643, subds. 2, 3, 4656.

1 Cases that cite this headnote

**[9]** **Judges** Exercise of powers beyond territorial limits of jurisdiction

**Statutes** Construction of Revised Statutes and Codes

Under the article relating to the granting of writs of injunction by nonresident judges, significance may be attached to the legislative elimination from the article in 1925 codification of all of the express language indicating that in absence of the required affidavit, a nonresident judge would have no power to act. Vernon's Ann.Civ.St. art. 4643.

Cases that cite this headnote

**[10]    Injunction** 🔑 Authority of court;  jurisdiction and venue

The statutory requirement for affidavit and proof before a nonresident judge is authorized to grant a writ of injunction and statutory requirement for making the writs returnable to and triable in the county of the residence of the defendant are procedural and not jurisdictional. Vernon's Ann.Civ.St. arts. 4643, 4656.

1 Cases that cite this headnote

**[11]    Judgment** 🔑 Errors and Irregularities

Judgments which are rendered without observance of statutory requirements which are purely procedural are not void, however irregular or erroneous they may be.

8 Cases that cite this headnote

**[12]    Mortgages** 🔑 Restraining exercise of power

An order granting a writ of temporary injunction against foreclosure sale under a deed of trust was not void because no new bond was required of or filed, where a bond was required and filed as a prerequisite to the granting of the restraining order, since new order granting the writ of temporary injunction continued the restraining order bond with full force and effect as a temporary injunction bond. Vernon's Ann.Civ.St. arts. 4643, 4656; Rules of Civil Procedure, rule 684.

6 Cases that cite this headnote

**[13]    Injunction** 🔑 Particular cases

Where, in a restraining order the signers of the bond obligated themselves to "abide the decision" which might be made in the suit, such was a continuing obligation until the suit was finally disposed of.

Cases that cite this headnote

**[14]    Injunction** 🔑 Particular cases

Though in granting a writ of temporary injunction upon the expiration of a restraining order, the trial court should have required a new bond with new contractual obligations, there was no reason why the signers of a restraining order bond before it and agreeing, that the court could not extend the bond and obligation of its signers to comply with the rule. Rules of Civil Procedure, rule 684.

3 Cases that cite this headnote

**[15]    Habeas Corpus** 🔑 Conclusiveness of Prior Determinations

In original habeas corpus proceeding where there was nothing in the record before the Supreme Court to show that the trial court did not extend the restraining order bond and second obligation of its signers to comply with the rule, the Supreme Court would assume in support of the validity of the court's order and writ, that it did occur. Rules of Civil Procedure, rule 684.

Cases that cite this headnote

**[16]    Injunction** 🔑 Form and requisites

If the written terms of a restraining order bond on file did not then truly reflect the full statutory obligations of the signers, the bond could have been amended or corrected upon motion to afford relators full protection.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*225** **\*\*285** John A. Coffee, George T. Thomas, John R. Coffee, Big Spring, for relators.

Ralph Logan, San Angelo, for respondent.

**Opinion**

CALVERT, Justice.

This is an original habeas corpus proceeding filed in this court by relators to relieve themselves of penalties imposed by a judgment of contempt entered by the District Court of the 51st Judicial District. The judgment of contempt and imposition of penalties grew out of a violation by relators of a temporary injunction granted by the court in the following fact situation.

On May 29, 1959 R. L. Damron, a resident of Crane County, and Wm. W. Gruber, a resident of Tom Green County, presented to the judge of the aforesaid court at his chambers in Tom Green County their petition in which they sought injunctive relief against Kathleen Amberson, a resident of Dallas County, and John Coffee, G. L Holley and Louis Bankston, all residents of Howard County. It was alleged that plaintiffs were the owners of an interest in leasehold estates owned by Amberson Petroleum Company in certain lands located in Sterling County, which estates were subject to a deed of trust lien given to secure an indebtedness in favor of Mrs. Amberson; that the indebtedness was not due until September 10, 1959, but that the defendant, John Coffee, as substitute trustee, had posted notices of his intention to sell the property on June 2nd under power of sale contained in the deed of trust and unless restrained and enjoined from so doing would make the sale, to the plaintiffs irreparable injury. They prayed for a restraining order, for a temporary injunction and for a permanent injunction until the debt should become due.

Upon presentation of the petition to the District Judge a restraining order was issued restraining the defendant, John Coffee, from selling the property pending a hearing to be held on the prayer for a temporary injunction, which hearing was set at 10 o'clock a. m., June 8th, in the courtroom of the District Court in the courthouse at Sterling City, Sterling County, within **\*226** the 51st Judicial District. The issuance of the restraining order was conditioned upon the filing by Damron and Gruber of a bond in the penal sum of $7,500, conditioned as required by law. A bond in that sum, conditioned that Damron and Gruber would abide the decision in the case and would pay all sums of money and costs which might be adjudged against them if 'the restraining order' should be dissolved, in whole or in part, was approved and filed by the Clerk of the District Court, Sterling County, on June 2, and the sale advertised for that date was avoided.

At the conclusion of the hearing on June 8th the court granted a temporary injunction restraining and enjoining all defendants from selling the property at trustee's sale under the deed of trust pending final hearing and determination of the cause or until September 10, 1959, whichever was earlier in time. The judgment contained the following order: 'And the bond heretofore filed with the Clerk upon issuance of the restraining order herein be, and is hereby continued in full force and effect as a temporary injunction bond.'

**\*\*286** On July 15th the District Judge, sitting in Sterling County, pursuant to a show cause order and after hearing, determined that on July 7th relators, Coffee and Holley, did, in violation of the temporary injunction and in contempt of the court, sell and cause to be sold the property at trustee's slae to relator Holley, and that Coffee, as substitute trustee, executed, a deed conveying the property to Holley, which deed had been filed for record and recorded in Sterling County. The court assessed a fine of $100 against each of the defendants and ordered them confined in jail for twenty-four hours and thereafter until the fines and costs

were paid and until they should purge themselves of their contempt by executing and filing of record a reconveyance of the property to Amberson Petroleum Company without prejudice to the rights, titles, etc. of lienholders or other persons as the same existed prior to the trustee's sale. It is from these penalties that relators seek relief in this proceeding.

 **[1]**    Relators recognize the collateral nature of the attack they make on the trial court's judgment and that they are entitled to relief in this proceeding only if the judgment is void. They assert that the judgment is void for two reasons: because the trial court had no power, authority or jurisdiction to grant the temporary injunction, and because no bond was required or filed as a condition precedent to the issuance of the writ of temporary injunction as required by Rule 684, Texas Rules of  **\*227**  Civil Procedure. If the order granting the writ of temporary injunction and the writ itself were void, then the judgment of contempt is also void. Ex parte Coward, 110 Tex. 587, 222 S.W. 531.

Relator's contention that the order granting the injunction was void because the court was without power or jurisdiction to grant it is based upon the failure of the trial judge to comply with Articles 4643 and 4656, Vernon's Annotated Texas Civil Statutes.

Article 4643 relates to the granting of writs of injunction by nonresident judges and reads as follows:
'No district judge shall grant a writ of injunction returnable to any other court than his own except in the following cases:

'1. Where the resident judge cannot hear and act upon the application by reason of his absence, sickness, inability, inaccessibility, disqualification or refusal to act, when such facts are fully set out in the application or in an affidavit accompanying same, and if such judge refuses to act, such refusal shall be indorsed by said judge on such writ with his reasons therefor. In such case no district judge shall grant the writ when the application therefor has once been acted upon by another district judge of this State.

'2. To stay execution, or to restrain foreclosure, sales under deeds of trust, trespasses, the removal of property, or acts injurious to or impairing riparian or easement rights, when satisfactory proof is made to such nonresident judge that it is impracticable for the applicant to reach the resident judge and procure his action in time to effectuate the purpose of the application.

'3. When the resident judge cannot be reached by the ordinary and available means of travel and communication in sufficient time to effectuate the purpose of the writ sought. In such case the applicant or his attorney seeking a writ on the ground of such inaccessibility shall attach to his application an affidavit fully stating the facts of such inaccessibility and his efforts made to reach and communicate with said judge, and the result thereof, and unless such efforts appear to have been fair and reasonable the application shall not be heard. Such injunction may be subsequently dissolved upon it being  **\*\*287**  shown  **\*228**  that the petitioner did not first make reasonable efforts to procure a hearing upon said application before the resident judge.'

Article 4656 reads as follows:

> 'Writs of injunction granted to stay proceedings in a suit, or execution on a judgment, shall be returnable to and tried in the court where such suit is pending, or such judgment was rendered; writs of injunction for other causes, if the party against whom it is granted be an inhabitant of the State, shall be returnable to and tried in the district or county court of the county in which such party has his domicile, according as the amount or matter in controversy comes within the jurisdiction of either of said courts. If there be more than one party against whom a writ is granted, it may be returned and tried in the proper court of the county where either may ahve his domicile.'

 **[2]**    It is settled that Art. 4656 only applies to and governs the issuance and return of writs and trial in cases in which the relief sought is purely or primarily injunctive. Southwest Weather Research, Inc. v. Jones, Tex.Sup., 327 S.W.2d 417; Brown v. Gulf Television Co., 157 Tex. 607, 306 S.W.2d 706. In that type of suit Article 4643 directs that no district judge shall issue a writ returnable to any court other than his own except in specified emergency situations and upon adequate proof of the emergency, and if one of the emergency situations arises which authorizes the granting of emergency restraint by a nonresident judge, Art. 4656 directs, with the two exceptions set out in the opening clause, that the writ be made returnable to the county of residence of the defendant or of one of the defendants if there be more than one.

 **[3]**    The petition presented to the Judge of the District Court of the 51st Judicial District in chambers in Tom Green County shows on its face that Damron and Gruber sought injunctive relief only. It also shows on its face that one of the defendants was a resident of Dallas County and the other three were residents of Howard County. We take judicial notice that neither Dallas nor Howard County is in the 51st Judicial District. It further shows on its face that the restraint sought was not to stay proceedings in a suit or execution on a judgment, but was to restrain a sale under a deed of trust. With those facts before him the District Judge, without requiring an affidavit or proof that it was impracticable to reach the District Judge of Howard County or one of the District Judges of Dallas County and procure action from one of them in time to halt the sale, granted **\*229** a temporary restraining order returnable to his own court in Sterling County and there tried the right of the plaintiffs to and granted a temporary writ of injunction. The order granting the writ did not direct to what court the writ was returnable and the writ, if one was actually issued, is not in the record. We may assume, however, that the writ was returnable and returned to the court from which it was issued from the fact that the contempt hearing was held in that court.

In asserting that the proceedings are void relators rely on Bridges v. Williams, Tex.Civ.App., 154 S.W.2d 669, no writ history; Uvalde Rock Asphalt Co. v. Asphalt Belt R. Co., Tex.Com.App., 262 S.W. 736, reversed on rehearing Tex.Com.App., 267 S.W. 688, and City of Dallas v. Armour & Co., Tex.Civ.App., 216 S.W. 222. To that list of cases affording seeming support for relators' position may be added Box v. Oliver, Tex.Civ.App., 43 S.W.2d 979, no writ history, and Anderson v. Southwestern Presbyterian Home, etc., Tex.Civ.App., 248 S.W.2d 775, writ dismissed.

In Bridges v. Williams, a suit solely for injunctive relief filed in the 77th Judicial District in and for Limestone County, the District Judge granted an ex parte writ of temporary injunction against a resident of Caldwell County, which was not within the **\*\*288** 77th Judicial District, and made the writ returnable to his own court. On appeal the Court of Civil Appeals reversed the judgment of the trial court, dissolved the writ of injunction and ordered the suit dismissed. In the course of its opinion the court pointed out that plaintiff's petition showed on its face that the defendant was a resident of Caldwell County, and said: 'The petition shows upon its face that the judge of the 77th Judicial District of Texas was without statutory right or power to issue the temporary writ of injunction, as well as without authority to make the same returnable to his court.'[1] 154 S.W.2d 671. In support of its conclusion the court cited City of Dallas v. Armour, supra, and Box v. Oliver, supra.

In City of Dallas v. Armour, the plaintiffs in a suit against residents of Dallas County to cancel a contract performable in Dallas County and to enjoin its performance pendente lite presented their petition to the District Judge of the 66th Judicial District, Hill County, and, upon the theory that the District Judges of Dallas County were disqualified to act, secured an exparte writ of temporary injunction returnable to the District Court of the 14th Judicial District of Dallas County, where the **\*230** suit was directed to be filed. On appeal, the Court of Civil Appeals held the District Judges of Dallas County to be qualified to act and, citing Article 4643, said: '* * * the nonresident judge who issued the writ, was without authority to do so, since he acted and assumed to act only on the basis that the Dallas county judges were disqualified, and, being without authority, his act is void.' 216 S.W. 225.

In Box v. Oliver, the Judge of the District Court of the 77th Judicial District granted an ex parte writ of injunction, pending further order of the court, against the sheriff of Robertson County, a county not within the 77th Judicial District. On appeal the Court of Civil Appeals, citing Articles 4643 and 4656, dissolved the injunction, holding that 'the court was without authority to make the order' of restraint. 43 S.W.2d 980.

In Anderson v. Southwestern Presbyterian Home, etc., the plaintiff filed suit in the District Court of the 66th Judicial District, Hill County, seeking purely injunctive relief against a resident of Tarrant County, a county not within the 66th Judicial District. After hearing, the court overruled the defendants' plea of privilege and by separate order granted a temporary injunction. On appeal the Court of Civil Appeals held both orders to be erroneous and reversed and ordered the cause transferred to one of the District Courts of Tarrant County. With reference to the order granting the writ of temporary injunction, the court said that the trial court 'was without the statutory right or power to issue the temporary writ of injunction against the defendant

in Tarrant County and that it was likewise without authority to make the writ returnable to the district court of Hill County.' 248 S.W.2d 777.

 [4]    In the four cases analyzed it was unnecessary to the decisions of the Courts of Civil Appeals that the validity or invalidity of the injunction orders be adjudicated, and any statements in the opinions that the orders were void or indicating that the respective trial courts were without jurisdictional power to enter them may be treated as dicta. Each of the cases was before the respective Courts of Civil Appeals by appeal from the trial court's order, and dissolution of the various orders of restraint was proper on the ground that they were irregularly and erroneously granted. The cases analyzed are therefore not regarded as controlling or as particularly persuasive.

Article 4643 was originally enacted in 1907 as a proviso to Article 2989 of the Revised Civil Statutes of 1895. Acts of Regular **\*231**  Session, 30th Leg., ch. 107, p. 206. As thus amended Art. 2989 was codified as  **\*\*289**  Art. 4643 of the Revised Civil Statutes of 1911. In the codification of 1925 the first part of Art. 4643 of the 1911 statutes was carried forward as Art. 4642 and the proviso was carried forward as Art. 4643. In the process of codification the language of the proviso was materially altered. We need note only a few of the pertinent alterations. In the original Act and in the 1911 statute it was provided that a nonresident district judge should have no power to grant a writ of injunction returnable to any other court than his own, unless the resident judge was absent from his district, or was sick and unable to hear and act on the application, or was inaccessible, or had refused to act, or was disqualified; and the applicant was required to set out the facts of, and relating to, the resident judge's absence, sickness, inability to act, inaccessibility or disqualification in his application or in an accompanying affidavit. If the basis for seeking action by a nonresident judge was inaccessibility of the resident judge the applicant was required to file with his application an affidavit showing the efforts made to reach and communicate with the resident judge, and it was provided that a nonresident judge should have no power to grant relief unless it appeared from the affidavit that a fair and reasonable effort had been made to secure relief from the resident judge. But while providing that a nonresident judge would have no power to grant relief because of inaccessibility of the resident judge unless the required affidavit showed fair and reasonable efforts to obtain relief from the resident judge, the statute did not declare violative action by the nonresident judge voil. Instead, it declared that a violative injunction should be dissolved upon a showing that a reasonable effort had not been made to procure a hearing before the resident judge. In the present statute there is no express reference to a want of power in a nonresident judge to act; a want of power can only be implied from the opening words of the Article: 'No district judge shall grant a writ of injunction returnable to any other court than his own except * * *.' Moreover, the Article still provides for dissolution of an injunction granted by a nonresident judge upon proof that the applicant 'did not first make reasonable efforts to procure a hearing upon said application before the resident judge.' In the original Act and in the 1911 statute a 'resident judge' was defined as one 'in whose district the suit is, or is to be brought,' and we will ascribe to the term that meaning even though the definition was eliminated in the 1925 codification. We interpret the words 'in whose district the suit is * * * to be brought' to mean the district in which venue properly lies as shown on the face of the petition. Conversely, a nonresident  **\*232**  judge is one in whose district the suit is not filed or in whose district venue, as shown on the face of an unfiled petition, does not properly lie. Paragraphs 2 and 3 of Art. 4643 are interrelated and must be construed as overlapping.

Article 4656, with a few minor and unimportant changes in verbiage, is derived from what may be termed the first comprehensive practice act governing judicial proceedings in the State of Texas. It was enacted by the First Legislature of the State of texas in 1846. Gammel's Laws of Texas, Vol. 2, pp. 1669, 1711-1712.

 [5]    Articles 4643 and 4656 are but two of a series of Articles in Title 76 of the Revised Civil Statutes of 1925, Vernon's Ann.Civ.St. art. 4642 et seq., dealing with injunctions. As written they formed a logical procedural whole applicable to our practice before adoption of the Rules of Civil Procedure in 1941. They contemplated that a trial judge could, upon presentation of a sworn petition therefor and before the filing of suit, grant a writ of temporary injunction without a hearing, Arts. 4647 and 4648, effective upon the filing of bond, Art. 4649, whereupon the party to whom the writ was granted would file his petition and the court's order with the clerk of the proper court, Art. 4650, the clerk would issue the writ, Art. 4652, and it would be served by an officer and  **\*\*290**  returned to the court from which it issued, Art. 4653, or to the court to which it was made returnable. Art. 4656. Restraint under a temporary writ continued, unless dissolved, until the case was finally disposed of. Riggins v. Thompson, 96 Tex. 154, 71 S.W. 14, 15; Ex parte Zuccaro, 106 Tex. 197, 163 S.W. 579, 580. Relief from the restraint of a temporary writ was obtainable through a motion to dissolve. Art. 4658. Under our present Rules of Civil Procedure no writ of

temporary injunction may be issued without notice and hearing. Rule 681. Under the Rules of Civil Procedure the purpose once served by an exparte temporary injunction in obtaining immediate restraint is now served exclusively by an ex parte restraining order, Rule 680, but it will be noted that Arts. 4643 and 4656 nowhere expressly mention or purport to govern issuance, service or return of restraining orders. However, a restraining order is one type of injunction, Riggins v. Thompson, supra; Ex parte Zuccaro, supra, and inasmuch as restraining orders serve the same purpose under the Rules as was theretofore served, in part, by temporary injunctions, and in order to bring the statutes and the Rules into a harmonious whole, we interpret the term 'writs of injunction' as used in Arts. 4643 and 4656 to include 'temporary restraining order' as provided for in Rule 680. It is under that interpretation **\*233** that we test the validity of the proceedings in the trial court in this case.

 [6]    The proceedings leading up to the judgment of contempt against relators were undoubtedly irregular and erroneous. Upon presentation of the petition to the District Judge it was his duty to make any restraining order granted by him returnable to a District Court of Dallas or Howard County, and he was authorized to grant it in the first instance only upon the filing of an affidavit showing the inaccessibility of the district judges of those counties and that fair and reasonable efforts had been made by the plaintiffs to reach such judges but that it was impracticable to reach them and to obtain action from one of them in time to halt the sale. Not only were the proceedings in the granting and return of the restraining order irregular and erroneous, but the proceedings in trying in Sterling County the right of the applicants to a temporary writ and in making it returnable to the District Court of the 51st Judicial District Court were also irregular and erroneous. But the important question here is not whether the proceedings were irregular and erroneous, but whether they were wholly void. We hold that they were not.

 [7]    The only types of suits in which the return of a writ as required by Article 4656 has been held jurisdictional are those to stay proceedings in a suit or execution on a judgment, Baker v. Crosbyton Southplains R. Co., 107 Tex. 566, 182 S.W. 287; Seligson v. Collins, 64 Tex. 314; Switzer v. Smith, Tex.Com.App., 300 S.W. 31, 68 A.L.R. 377, and even in suits of that character it has been held by the Court of Criminal Appeals that failure to make the writ returnable as directed by the statute does not justify violation of the injunction or relieve a violator from punishment for contempt. Ex parte Breeding, Tex.Cr.App., 90 S.W. 634. Since the instant suit is not one of that character it is unnecessary for us to decide whether we would follow that decision. There is far less reason for holding void a writ of injunction made returnable to the court issuing it in other types of suits. As to such other types of suits our courts have recognized that the statute is primarily a venue statute. Brown v. Gulf Television Co., 157 Tex. 607, 306 S.W.2d 706; Uvalde Rock Asphalt Co. v. Asphalt Belt R. Co., Tex.Com.App., 262 S.W. 736, on rehearing Tex.Com.App., 267 S.W. 688; Perry v. Jaggers, Tex.Civ.App., 9 S.W.2d 143, writ dismissed; Pipe Line Workers Local No. 38 v. H. b. Zachry Co., Tex.Civ.App., 276 S.W.2d 876, writ refused, n. r. e. Whereas in the two types of suits designated in the first clause of the statute any injunction granted, if not **\*234** made returnable to the court **\*\*291** where the suit is pending or the judgment was rendered, would bring about an immediate conflict between two courts, often of coordinate jurisdiction, that would not be true with respect to the issuance, return and trial of the right to an injunction in other types of suits, particularly when, as in this case, the injunctive relief is sought and granted before suit is filed. Our specific holding is that when a suit is one for purely injunctive relief other than to stay proceedings in a suit or execution on a judgment, and the relief is sought and granted before the filing of suit, the order granting the relief is not void for failure to make the restraining order returnable to the county of residence of the defendant or of one of them, nor is a writ of temporary injunction thereafter granted by the court issuing the restraining order, void.

 [8]    We also hold that orders entered by a nonresident judge granting a temporary restraining order and a temporary writ of injunction without requiring the filing of the statutory affidavit and the making of statutory proof of the inaccessibility of and efforts made to reach a resident judge, as provided by Art. 4643, are not void. If the Legislature had intended that such orders should be void, there would have been no point in providing in the Article for a dissolution of writs granted in the absence of such affidavit and proof, with the burden placed on the person enjoined to prove facts entitling him to dissolution. Moreover, significance may be attached to legislative elimination from the article in the 1925 codification of all express language indicating that in the absence of the required affidavit a nonresident judge would have no power to act.

 [9]    [10]    The requirement of Article 4643 for affidavit and proof before a nonresident judge is authorized to grant a writ and the requirement of Article 4656 for making writs returnable to and triable in the county of residence of the defendant are

procedural and not jurisdictional requirements. Violation of the requirements of the two statutes may be corrected at very little expense and in a very brief time through orderly channels of procedure. There is no showing in the record before us that relators sought to have the restraining order dissolved or opposed the granting of the writ of temporary injunction on the ground that the granting of such relief was violative of Arts. 4643 and 4656. Judgments which are rendered without observance of statutory requirements which are purely procedural are not void, however irregular or erroneous they may be. 25 Tex.Jur. 809-812, Judgments, s 308; Freeman v. Freeman, Tex.Sup., 327 S.W.2d 428.

[11] *235 Neither was the order granting the writ of temporary injunction void because no new bond was required of or filed by Damron and Gruber. We recognize the rule to be that a writ of temporary injunction is void when no bond is required and filed as required by Rule 684, Texas Rules of Civil Procedure. Lancaster v. Lancaster, 155 Tex. 528, 291 S.W.2d 303. This is not such a case. A bond was required and filed as a prerequisite to the granting of the restraining order. The order granting the writ of temporary injunction continued the restraining order bond in full force and effect as a temporary injunction bond.

[12] [13] [14] [15] [16] In asserting that the order and the writ were void relators rely on San Felipe Independent School Dist. v. Nelson, Tex.Civ.App., 74 S.W.2d 136, 138, no writ history, in which the San Antonio Court of Civil Appeals expressly stated that a restraining order bond could not be substituted for the bond required by law for the issuance of a writ of temporary injunction. On the other hand, the Dallas Court of Civil Appeals has held that when a restraining order is continued in force, even in part, the restraining order bond remains in force and effect as a temporary injunction bond. Porter v. Guggenheim, Tex.Civ.App., 107 S.W.2d 891, 892, writ dismissed. Rule 684 requires that a restraining order or temporary injunction bond be conditioned **292 'that the applicant will abide the decision which may be made in the cause, and that he will pay all sums of money and costs which may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part.' In the restraining order bond the signers obligated themselves to 'abide the decision' which might be made in the suit, and that was a continuing obligation until the suit was finally disposed of. Their other obligation was to pay all sums of money and costs which might be adjudged against them if the restraining order should be dissolved in whole or in part. In granting a writ of temporary injunction upon expiration of the restraining order, the trial court should have required a new bond with new contractual obligations, but we know of no reason why, with the signers of a restraining order bond before it and agreeing, the court could not extend the bond and the second obligation of its signers to comply with Rule 684. There is nothing in the record before us to show that that did not occur. In support of the validity of the court's order and the writ we will presume it did occur. 25 Tex.Jur. 830, Judgments, s 319. If the written terms of the bond on file did not then truly reflect the full statutory obligations of the signers, the bond could have been amended or corrected, upon motion, to afford relators full protection. *236 Mansfield v. Ramsey, Tex.Civ.App., 196 S.W. 330, no writ history; Lindley v. Easley, Tex.Civ.App., 59 S.W.2d 927, 929, no writ history. In the latter case the court said that 'the failure to require a bond in a sufficient amount would not render the injunction void and authorize its disobedience with impunity.' The same may be said of the failure of the bond to correctly express one of the obligations of the signers. See also 24-A Tex.Jur. 255, Injunctions, s 160.

The relators are remanded to the custody of the sheriff of Sterling County there to remain until discharged according to the terms of the trial court's judgment.

GRIFFIN, Justice (dissenting).

I agree with the result reached in the majority opinion that the temporary injunction issued by Judge Mays was not void, but voidable and irregular. This was a matter that could have been corrected by a prompt appeal under the provisions of Art. 4662, Vernon's Ann.Tex.Civ.Stats.

I disagree that the injunction was not void by virtue of the fact that the order of the judge did not require a bond to be given and no amount was fixed for the bond.

It is not disputed that the only bond in the record is the bond given to secure the temporary restraining order. It contains no provisions that secure the issuance of a temporary injunction, or protect anyone by virtue of the issuance of a temporary injunction. In fact, it was issued ten days prior to the hearing on the issuance of a temporary injunction.

I do not believe that it can be questioned that the order of May 29, 1959 issued only a temporary restraining order. The life of that restraining order is specifically stated to be 'operative until and pending the hearing below ordered.' The hearing was ordered for 10:00 a. m. on June 8, 1959 in the District Courtroom of Sterling County, Texas in Sterling City. The court ordered a bond given before the District Clerk should issue the restraining order. By virtue of its own provisions and also by Rule 680, Tex.Rules Civ.Proc., and innumerable cases, this restraining order expired June 8, 1959 and was of no further force and effect. **\*237** Fort Worth Street Railway Company v. Rosedale Street Railway Company, 1887, 68 Tex. 163, 7 S.W. 381; Riggins v. Thompson, 1902, 96 Tex. 154, 71 S.W. 14; Cole v. Forto, Tex.Civ.App.1913, 155 S.W. 350, no writ history; City of Jacksonville v. Devereux, Tex.Civ.App.1926, 286 S.W. 572, no writ history; Wood v. Bird, Tex.Civ.App.1929, 20 S.W.2d 221(1), no writ history; Dunlap v. Rotge, Tex.Civ.App.1935, 85 S.W.2d 650(2, 3), no writ history; 24-A Tex.Jur. 24.

 **\*\*293** It is true, as declared by the majority, that a temporary restraining order is a species of injunction. The above authorities and others hold that it is a separate and distinct order from either a temporary injunction or a permanent and perpetual injunction. The Rules of Civil Procedure recognize that fact for Rule 680 deals only with such restraining order.

Rule 684 also recognizes such fact. That rule provides that 'in the order granting any temporary restraining order or temporary injunction, the court shall fix the amount of security to be given by the applicant. Before the issuance of the temporary restraining order or temporary injunction * * *; if the restraining order or temporary injunction shall be dissolved * * *; where the temporary restraining order or temporary injunction is against the State * * * the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved * * *'. (Emphases added) It is apparent from the above wording in Rule 684 that the two species of injunction are separate and distinct.

Rule 685 continues this distinction between the two types of injunctive relief by using the following language: 'Upon the grant of a temporary restraining order or an order fixing a time for hearing upon an application for a temporary injunction * * *'. Rule 686 further carries forward this distinction. This Rule makes a difference in the form of citations to be issued in the temporary restraining order and temporary injunction. Rule 688 also recognizes this difference.

The order entered June 18, 1959 reciting a hearing and judgment of June 8, 1959 nowhere continues the restraining order, nor does it mention the restraining order except where the court provides the restraining order bond shall be extended to cover the temporary injunction. I say the court had no right to so order. The temporary restraining order expired and was of no further force and effect. Riggins v. Thompson, supra, and other authorities therein cited. When the restraining order expired **\*238** the bond expired with it. The only case in Texas which I have been able to find in point holds that a temporary restraining order bond cannot be continued as a bond for a temporary injunction. San Felipe Independent School Dist. v. Nelson, Tex.Civ.App.1934, 74 S.W.2d 136, 138, no writ history. In that case the San Antonio Court of Civil Appeals had held in their original opinion that such bond could be continued in force and effect. On rehearing they changed their holding and said:

> 'We wish to expressly state that we were in error in our original disposition of this cause wherein we held that the bond given in connection with the issuing of the temporary restraining order might be substituted for the bond required by law for the issuing of a temporary injunction. This, of course, cannot be done.'

The case of Porter v. Guggengeim, Tex.Civ.App.1937, 107 S.W.2d 891, wr. dism., is not in point on the question here before us. In that case the trial court had continued the restraining order in part. The Dallas Court of Civil Appeals rested its holding that the bond could be used as a bond for the temporary injunction. That court said, 'on the hearing, (for temporary injunction) the court continued the restraining order, in part at least, as a temporary injunction, and the bond likewise continued in force and effect.' (2), 2nd. col., at page 892. In our case, as pointed out above, the judge made no such order. He did not mention the temporary restraining order at all, except as to the bond.

The effect of the majority opinion is to subject the surety on the temporary restraining order bond to new and additional liabilities for which it did not contract when signing the original bond. It also overlooks the plain provision of the first sentence of Rule 684 'in the order granting any temporary restraining order or temporary injunction, the court shall fix the **\*\*294** amount of security to be given by the applicant.' (Emphasis added) The trial court did not comply with this provision as no bond was set or given for

the temporary injunction. No surety nor sureties have bound themselves for liability under the temporary injunction; nor does the record show any agreement on the part of the sureties on the restraining order bond to be bound for the temporary injunction.

I believe the trial court had no right or authority to make the surety liable for more than it contracted in its original undertaking, **\*239** and, therefore, I believe the temporary injunction is absolutely void. I would discharge relators.

HAMILTON, J., joins in this dissent.

**Parallel Citations**

328 S.W.2d 283

Footnotes

1       Emphasis ours throughout.

---

**End of Document**                                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

126 Tex. 60
Supreme Court of Texas.

Ex parte KIMBERLIN.

No. 6971.    |    Oct. 9, 1935.

Original habeas corpus proceeding by Sam Kimberlin, seeking release from a commitment issued out of the district court of the Fourteenth judicial district of Texas, at Dallas.

Order granting temporary writ of habeas corpus set saide.

West Headnotes (8)

**[1]  Habeas Corpus**  &#x1F511; Particular issues and problems

Habeas corpus proceeding in Supreme Court to secure release from commitment based on judgment of contempt in lower court constitutes collateral attack upon such judgment and cannot be made to take place of appeal, or writ of error.

1 Cases that cite this headnote

**[2]  Habeas Corpus**  &#x1F511; Void or invalid judgment or order

In original habeas corpus proceeding to secure release from commitment based on judgment of contempt for violation of restraining order, Supreme Court could not give relief unless restraining order, judgment of contempt, or writ of commitment thereunder were void for lack of jurisdiction.

5 Cases that cite this headnote

**[3]  Injunction**  &#x1F511; Trade or business

Order restraining state tax collectors from interfering with alleged interstate business of selling cigarettes to buyers within state held not wholly void for want of jurisdiction, notwithstanding error in holding that cigarettes were still in interstate commerce after delivery to buyers, where court had right to protect business from some of acts sought to be restrained, and hence not to justify release of officer from commitment for contempt in violating such order. Vernon's Ann.Civ.St. art. 7047c–1, and Vernon's Ann.P.C. art. 131c–1.

6 Cases that cite this headnote

**[4]  Commerce**  &#x1F511; Manufacture and Sale of Goods

Cigarettes purchased from seller outside state held no longer in interstate commerce after delivery to purchasers within state, and hence subject to taxation by state. Vernon's Ann.Civ.St. art. 7047c—1, and Vernon's Ann.P.C. art. 131c.

1 Cases that cite this headnote

**[5]  Taxation**  &#x1F511; Remedies for wrongful enforcement

Fact that collection of state tax, upon cigarettes already delivered to purchaser in Texas, interferes with business of seller located in another state furnishes seller no ground for injunctive relief (Vernon's Ann.Civ.St. art. 7047c–1, and Vernon's Ann.P.C. art. 131c–1).

1 Cases that cite this headnote

**[6]    Habeas Corpus**  Particular Issues and Problems

Tax collector held not entitled to release under writ of habeas corpus from commitment based on judgment of contempt for violation of order restraining him from interfering with certain cigarette purchasers while collecting cigarette tax, where collector appeared to have acquiesced in issuance of order by failing to seek its modification or dissolution (Vernon's Ann.Civ.St. art. 7047c–1, and Vernon's Ann.P.C. art. 131c–1).

Cases that cite this headnote

**[7]    Injunction**  Public revenue;  bonds and taxation

Order restraining state tax officials from interfering with certain cigarette purchasers in collecting cigarette tax held not void as attempt to prevent enforcement of criminal laws, since it was merely to maintain status quo until final hearing could be had. Vernon's Ann.Civ.St. art. 7047c–1, and Vernon's Ann.P.C. art. 131c–1.

1 Cases that cite this headnote

**[8]    Habeas Corpus**  Collateral or direct attack

Habeas corpus proceeding in Supreme Court to secure release from commitment based on judgment of contempt in lower court constitutes collateral attack upon such judgment and cannot be made to take place of certiorari or quo warranto.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*61    \*\*717**  William McCraw, Atty. Gen., and John W. Pope, Jr., T. F. Morrow, William C. Davis, and Pat M. Neff, Jr., Asst. Attys. Gen., for relator.

Hughes & Monroe and P. P. Ballowe, all of Dallas, for Julius Klugsberg.

**Opinion**

GERMAN, Commissioner.

This is an original habeas corpus proceeding, whereby Sam Kimberlin seeks release from a commitment issued out of the district court of the Fourteenth judiciai district of Texas, at Dallas, on September 26, 1935; said commitment having been based on a judgment finding him in contempt of court by reason of the wilful violation of a restraining order previously issued.

On July 29, 1935, Julius Klugsberg of Dallas county, doing business under the trade-name of Interstate Tobacco Company, filed petition in the district court of Dallas county, complaining of George H. Sheppard, in his capacity as Comptroller of Public Accounts of the State of Texas, and others, including Sam Kimberlin in his capacity as assistant and  **\*62**  deputy of the said Sheppard. In his petition plaintiff set out in substance the various provisions of what is known as the 'Cigarette Tax Law of the State of Texas,' as enacted by H. B. No. 755, chapter 241, of the Forty-Fourth Legislature, and which became effective May

11, 1935 ([Vernon's Ann. Civ. St. art. 7047c-1](), and Vernon's Ann. P. C. art. 131c-1). He then alleged that defendants George H. Sheppard and his **\*\*718** deputies, including relator, were charged with the enforcement of the various provisions of that law.

Plaintiff alleged that he was engaged in the business of selling cigarettes exclusively and solely in interstate commerce; that his principal place of business was at Neosho, Mo., where he kept his office, warehouse, stock of cigarettes, etc.; and that the manner of doing business was as follows: That he made his purchase of cigarettes in wholesale quantities; that they were shipped in interstate commerce to Neosho, Mo., and there held by him in stock; that he had one or more general salesmen in the state of Texas and other solicitors and salesmen who worked under the supervision of the general salesmen; that his solicitors obtained orders from various persons within the state of Texas for cigarettes to be shipped from the stock held at Neosho, Mo., which orders were forwarded to the general salesmen, who in turn sent them to the office at Neosho, Mo., for approval; that after orders were accepted in this way the cigarettes were put in separate lots or packages according to the individual orders and each separate lot labeled with the name of the particular purchaser; that after the orders were filled in this manner, the cigarettes were forwarded in one bulk shipment to the general salesmen, who then turned over to the salesmen the separate orders of the various purchases, and these salesmen delivered same to the purchasers; that upon delivery of same the purchase money was paid by the purchaser to the solicitor and was then forwarded to the office at Neosho, Mo. It is also shown that when the cigarettes were finally delivered to the purchasers and payment made, plaintiff had completely and finally parted with title to same and had nothing further to do with them.

Plaintiff alleged that although his bisiness as above conducted and the cigarettes sold by him in this manner were not subject to any of the provisions of the Cigarette Tax Law, being entirely within interstate commerce, nevertheless the Comptroller and his assistants were seeking and attempting to make the provisions of the law applicable to him and to his business, and were in various ways interfering with him in the **\*63** conduct of his business by attempting to make applicable said law and to collect the taxes therein provided for upon cigarettes handled by him. Allegations were made of several specific acts on the part of the Comptroller and his assistants, including threats of prosecution against solicitors and salesmen, in an effort to make him and his business subject to provisions of the law.

The constitutionality of the Cigarette Tax Law was attacked on many grounds not necessary to mention here. Among other things, it is alleged that the Comptroller 'seeks to extend the terms of its prohibitions and penalties to persons and consumers buying in interstate commerce, and thereby destroying, crippling and overthrowing the lawful business of your petitioner, by inculcating in the minds of the purchasers who buy from petitioner in interstate commerce that purchases under such circumstances are criminal in their nature and violative of the terms of this act, and expose such purchasers and consumers so buying from your petitioner to the pains, penalties and punishment of the law; and that the effect of such act and the extension of its penalties and prohibitions to such purchasers, customers and patrons is to deny to your petitioner the right under the Federal and State Constitutions, to conduct his business through the avenues of interstate commerce, and to lawfully sell to purchasers desiring to consume his cigarettes such tobacco commodities, all of which is contrary to the interstate commerce clause of the Federal Constitution hereinbefore set out, and is contrary to the Fourteenth Amendment to the Federal Constitution, in that it seeks to deprive the petitioner of his rights, his property and his liberty without due process of law; and by liberty as herein meant is the liberty to pursue a lawful calling in and under the provisions of the Interstate Commerce Clause of the Federal Constitution hereinbefore mentioned.'

Plaintiff prayed for a restraining order to continue until such time as a hearing might be had for a temporary injunction and that finally he be awarded a permanent injunction against the Comptroller and other defendants including relator. As the temporary restraining order followed almost verbatim the language of the prayer in the petition, we set out the restraining portion thereof. Among other things, the defendants were commanded to 'desist and refrain from harassing and annoying petitioner, his agents, and servants in the prosecution and conduct of such interstate business as aforesaid, and commanding and **\*64** **\*\*719** enjoining them to refrain from arresting and criminally prosecuting, under the Act aforesaid, your petitioner his agents, servants and employees, in the conduct of such interstate trade, and commanding and enjoining the said defendants and each of them, their agents, servants and employees, to desist and refrain from seizing and confiscating the goods and commodities of your petitioner, shipped in interstate commerce, and commanding said defendants, and each of them, their agents, servants and employees, from wrecking the business of the petitioner by proclaiming to the general public that the purchase of petitioner's

goods and commodities shipped in interstate commerce are criminal in their nature, and will subject the patrons and customers of your petitioner to criminal prosecution and to the infliction of pains and penalties, where such purchases are made; and further to desist, abstain and refrain from annoying, harassing, threatening or intimidating purchasers and patrons of petitioner who buy his merchandise through channels of interstate commerce, from petitioner, his agents, servants and employees, for their own private consumption, and not for resale, and to desist and refrain from threatening such purchasers and patrons with criminal prosecution for such purchases or to seize or confiscate cigarettes so purchased or to institute under such circumstances criminal prosecutions therefor.'

The temporary restraining order was entered on July 29, 1935, and served as to certain defendants at 4:30 o'clock p. m. of that day. It was especially provided that the defendants should appear at 9 o'clock a. m. on August 1, 1935, and show cause why a temporary injunction should not issue. On September 21, 1935, plaintiff Klugsberg filed in the district court a motion for contempt as to defendants George H. Sheppard and relator Kimberlin. It is unnecessary to set out the various acts alleged to constitute the contempt, as it was later found by the court that only one of them constituted a contempt.

The motion was set for hearing on September 26, 1935, before Judge Sarah T. Hughes, judge of the district court of the Fourteenth judicial district, who had caused the restraining order to be issued, and relator was properly served with notice. On the day set for hearing he appeared in person and by attorneys, and after full hearing upon the facts, relator was adjudged to be in contempt of court. The judgment of the court in this regard is as follows: '* * * But as to the said Sam Kimberlin, however, it is the opinion of the court, and the court so finds, that he, on **\*65** the 20th day of September, 1935, in willful violation of the orders of the court referred to above, seized the quantity of cigarettes as described in the pleadings and testimony of the witnesses from one Barrett, who had purchased same on a standing order, and from one Keys, who had purchased on regular order; and the court finds that acts of said Kimberlin were and are an interference with the previous orders of the court in this case, and that said transactions with the said Barrett and the said Keys were interstate commerce between them and the plaintiff herein, and the court finds that the said Kimberlin by reason of the premises is in active contempt.'

[1] [2] It is elementary that a habeas corpus proceeding in this court constitutes a collateral attack upon the judgment of contempt in the lower court, and a writ of habeas corpus cannot be made to take the place of an appeal, certiorari, quo warranto, or writ of error. In such a proceeding as this the court cannot give relief unless the restraining order by the district judge, or the judgment of contempt or the writ of commitment thereunder, is absolutely void; and such voidness must be solely because of lack of jurisdiction. Ex parte Smith, 110 Tex. 55, 214 S. W. 320; Ex parte Lipscomb, 111 Tex. 409, 239 S. W. 1101; Ex parte Olson, 111 Tex. 601, 243 S. W. 773, 777; Lytle v. Ry. Co., 41 Tex. Civ. App. 112, 90 S. W. 316.

[3] Relator apparently recognized this rule, but attempts to justify his action in violating the restraining order on the ground that the court was wholly without jurisdiction to issue same and to restrain interference with purchasers of cigarettes from plaintiff Klugsberg by demanding of them payment of the cigarette tax provided for by H. B. No. 755; and was likewise without power to adjudge him in contempt for violating that portion of the order which sought to restrain him from confiscating cigarettes sold to Barrett and Keys by plaintiff. However, no contention is made that the district court did not have jurisdiction of the cause of action and of the parties. Nor can it be plausibly contended that the court did not have **\*\*720** power to issue the writ in order to accomplish some of the purposes therein mentioned. Apparently it is not contended that the business being conducted by plaintiff Klugsberg up to the time the cigarettes were delivered to the purchasers was not interstate business within the decisions of our federal courts. The court undoubtedly had the right to protect plaintiff and his business from some of the acts sought to be **\*66** restrained by the writ. This being true, it is evident that the writ was not wholly void for want of jurisdiction, but at the most was only voidable as to some of the acts sought to be restrained. In Ex parte Olson, supra, the court said: 'The district court clearly had jurisdiction of relator and the subject-matter of the suit, and the injunction issued, therefore, cannot be said to be absolutely void.' The court cited Lytle v. Ry. Co., 41 Tex. Civ. App. 112, 90 S. W. 316, 317, wherein it was said: 'Until we come to consider and determine the questions involved in the appeal, we must observe the rule that, in proceedings for contempt in failing to obey an order of court, the respondent may question the order which he is charged with refusing to obey, only in so far as he can show it to be absolutely void, and cannot be heard to say that it is erroneous, however flagrant it may appear to be. If the district court had jurisdiction of the parties and the matter adjudicated, the injunction cannot be said to be absolutely void.' 'Jurisdiction,' in the sense here used does not mean simple jurisdiction of the particular case occupying the attention of the court, but jurisdiction of the class of cases to which the particular case belongs. It is sufficient, in a proceeding like this,

that the case belongs to a general class over which the authority of the trial court extends. If it does, then jurisdiction attaches, and is not lost because of an erroneous decision, however erroneous it may be. O'Brien v. People (216 Ill. 354), 75 N. E. (108), 109 (108 Am. St. Rep. 219, 3 Ann. Cas. 966). The case in which the decree appealed from was one of injunction-the class over which the court that rendered it had unquestionable original jurisdiction.'

[4] [5] We are decidedly of the opinion that even though plaintiff Klugsberg was engaged in interstate commerce, yet when the cigarettes were finally delivered by the salesmen to the respective purchasers and the purchase money was paid to the salesmen, they ceased to be in interstate commerce and became a proper subject for taxation under the provisions of the Cigarette Law. The correct rule is reflected by such cases as Waring v. Mayor, etc., of Mobile, 8 Wall. (75 U. S.) 110, 19 L. Ed. 342, and Fuqua v. Pabst Brewing Co., 90 Tex. 298, 38 S. W. 29, 750, 35 L. R. A. 241. It becomes immaterial to determine here whether the tax after the cigarettes were delivered to the purchasers was to be collected on the sale or on the consumption of same, as this is a matter wholly between the purchaser and the officers of the state. Even if the attempt by the Comptroller and his *67 associates to lay the tax on the purchaser had an indirect effect upon the business of plaintiff (which we do not find it necessary to decide), this furnishes no ground for injunctive relief on his part. This is not a case of interference with business by reason of willful threats and intimidations, but the alleged interference results from a bona fide effort to enforce the tax laws of this state; and such acts cannot be held to be such an interference with the business of plaintiff as to justify relief by injunction. It is admitted that when the cigarettes were delivered to the purchaser and the purchase money paid, plaintiff had no further interest in them or in the transaction by which the sale was effected.

Notwithstanding, however, the district judge was in error in holding that the cigarettes were still in interstate commerce and notwithstanding the fact that the judge and notwithstanding the fact that the judge erroneously held relator in contempt because he confiscated the cigarettes after being delivered to the purchasers, yet we are of the opinion that the action of the court in this regard was an error of judgment upon the law and facts, and was not absolutely void because of lack of jurisdiction. Upon this point the cases of Ex parte Testard, 101 Tex. 250, 106 S. W. 319, Ex parte Warfield, 40 Tex. Cr. R. 413, 50 S. W. 933, 938, 76 Am St. Rep. 724, and Ex parte Olson, supra, appear to be in point. In Ex parte Roper, 61 Tex. Cr. R. 68, 134 S. W. 334, 338, it was said: ,'Again, it is urged as grounds of release that the writ of injunction goes beyond the power of the court to restrain appellant from the unlawful use of property and to engage in unlawful sales, but effectually restrains him from selling under prescription and in accordance with the law. It may be conceded that the writ, as issued, goes beyond the prayer in the petition for injunction, **721 and beyond the precise limits authorized by law. This would not, however, render the injunction granted absolutely void, but, so far as the court was authorized to issue an injunction, it would and should be upheld. This, as we understand, was directly held by our Supreme Court in Ex parte Testard, 101 Tex. 250, 106 S. W. 319.'

[6] In this connection we observe that relator had a speedy and effective remedy, easily available, to which he could have resorted and by which he could have no doubt removed the objectionable features from the writ long before he violated same on September 20th. We think it was clearly his duty to file motion before the court to modify the restraining order, *68 and in the event he failed in that regard, to insist upon a prompt hearing to determine whether or not a temporary or permanent injunction should issue. In the event a temporary or permanent injunction was issued, he had a speedy remedy by appeal to the Court of Civil Appeals. It will be noted that the original order of the court directed the cause to be set for hearing at 9 o'clock a. m. August 1st, which was only two days after the restraining order was issued. The judgment of contempt shows that by agreement of the parties the hearing was continued from day to day and the restraining order kept in force until it was violated by relator on September 20th. Thus it is seen that instead of moving to modify or dissolve the writ, and instead of seeking to have a hearing on same, relator appears to have fully acquiesced in the action of the court until the 20th of September. If the restraining order was too broad and included matters of doubtful validity, it was clearly the duty of relator to obey same and to seek a modification or dissolution. The language of the Court of Criminal Appeals in the case of Ex parte Warfield, supra, appears to be appropriate here. In that case it was said:

'It has been said that applicant was not shown to have violated the spirit of the injunction, inasmuch as no conversation was shown of a character calculated to persuade or lead away the wife of plaintiff; but his conduct was certainly in violation of the letter of said injunction, and we cannot say that the court did not have the right and authority to make the injunction as broad as it did, as, under the allegations of the petition, it is shown that defendant was not to be trusted in the society of Mrs. Morris, or to speak with her.

'But, even if it be conceded that the act of the court in this regard is of doubtful validity,-that is, that it may or may not be void,-still we do not feel inclined to interfere. The defendant in that suit had his right to invoke the action of that court ot dissolve that injunction. He did not do so, but he saw fit to willfully disregard it, and he now claims before this court that the same was absolutely void, and that he had the right to defy it and set it at naught. It occurs to us that the injunction could have been easily obeyed, without infringing upon any of the fundamental rights of the applicant.'

The necessity for appropriate action to obtain relief by motion to modify, or by the usual processes afforded by resort to the court where the cause is pending, is clearly recognized by the court in the case of Ex parte **\*69** Travis, 123 Tex. 480, 73 S.W. (2d) 487, 489, in an able opinion by Justice Greenwood.

 **[7]**    Relator contends, however, that the writ was void in all particulars because it was an attempt to prevent enforcement of the criminal laws of this state. This was obviously not an attempt to interfere with the orderly administration of the law. It was merely for the purpose of holding the situation in status quo until the court could consider and pass upon the various contentions presented by the petition. As is shown above, an opportunity was afforded for a prompt hearing and relator evidently did not consider the action of the court as seriously interfering with the administration of the law, because he waited some fifty days without attempting to modify the order or have a hearing thereon, and then violated the writ.

The order granting temporary writ of habeas corpus is set aside, and the relator is remanded to the custody of the sheriff of Dallas county.

Opinion adopted by the Supreme Court.

**Parallel Citations**

86 S.W.2d 717

---

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

234 S.W.3d 642
Supreme Court of Texas.

FORTIS BENEFITS, Petitioner,

v.

Vanessa CANTU and Ford Motor Company, Respondents.

No. 05–0791.   |   Argued Nov. 16, 2006.   |   Decided June 29, 2007.   |   Rehearing Denied Nov. 2, 2007.

**Synopsis**

**Background:** Automobile accident victim's health insurer sought reimbursement or subrogation following victim's settlement of tort claims. The 249th District Court, Johnson County, D. Wayne Bridewell, J., entered summary judgment in favor of victim. Insurer appealed. The Waco Court of Appeals, Bill Vance, J., 170 S.W.3d 755, affirmed. Review was granted.

**Holdings:** The Supreme Court, Willett, J., held that:

[1] made-whole doctrine did not apply to insurer's claim based on contractual right to subrogation, abrogating *Esparza v. Scott & White Health Plan,* 909 S.W.2d 548, and

[2] insurer relinquished any subrogation claim against automobile manufacturer by entering written pretrial agreement.

Affirmed in part, reversed in part, and remanded.

West Headnotes (18)

| [1] | **Insurance** 🔑 Reimbursement of Payments |

**Insurance** 🔑 Adequate compensation of insured; "made whole" doctrine

Made-whole doctrine did not apply to medical insurer's claim based on contractual right to reimbursement or subrogation; policy gave to insurer an unfettered right to recover the proceeds from insured's settlement of the underlying tort suit; abrogating *Esparza v. Scott & White Health Plan,* 909 S.W.2d 548.

12 Cases that cite this headnote

| [2] | **Subrogation** 🔑 Nature and theory of right |

**Subrogation** 🔑 Agreements for subrogation

Contractual subrogation rights generally arise from contract language; they do not derive their validity from principles of equity.

5 Cases that cite this headnote

| [3] | **Subrogation** 🔑 Agreements for subrogation |

Contractual subrogation clauses express the parties' intent that reimbursement should be controlled by agreed contract terms rather than external rules imposed by the courts.

3 Cases that cite this headnote

**[4]**     **Subrogation**  ☞  Nature and theory of right

       **Subrogation**  ☞  Agreements for subrogation

The three varieties of subrogation—equitable, contractual, and statutory—represent three separate and distinct rights that, while related, are independent of each other.

5 Cases that cite this headnote

**[5]**     **Equity**  ☞  Equity follows the law

Courts generally adhere to the maxim that equity follows the law, and this requires equitable doctrines to conform to contractual and statutory mandates, not the other way around.

1 Cases that cite this headnote

**[6]**     **Contracts**  ☞  Contravention of law in general

       **Contracts**  ☞  Public Policy in General

Where a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy.

5 Cases that cite this headnote

**[7]**     **Payment**  ☞  Nature and grounds of right

       **Subrogation**  ☞  Agreements for subrogation

Neither subrogation nor reimbursement clauses in contracts violate public policy.

3 Cases that cite this headnote

**[8]**     **Statutes**  ☞  Nature and Definition of Legislative Acts

State's public policy is reflected in its statutes.

2 Cases that cite this headnote

**[9]**     **Insurance**  ☞  Adequate compensation of insured; "made whole" doctrine

Parties are free to negate the made-whole doctrine contractually and to do so before an event occurs that triggers medical benefits under the policy.

3 Cases that cite this headnote

**[10]**    **Subrogation**  ☞  Agreements for subrogation

Contract-based subrogation rights should be governed by the parties' express agreement and not invalidated by equitable considerations that might control by default in the absence of an agreement.

5 Cases that cite this headnote

**[11]**   **Insurance**  ☞  Validity and Enforceability

**Insurance**  ☞  Public policy

Adhesion contracts such as insurance policies are not automatically unconscionable or void.

1 Cases that cite this headnote

**[12]**   **Insurance**  ☞  Reimbursement of Payments

**Insurance**  ☞  Subrogation Against Third Parties;  Right to Proceeds of Action or Settlement

It is not per se unconscionable that an insurer would seek to reduce its risk and boost its solvency by including a subrogation and/or reimbursement clause.

1 Cases that cite this headnote

**[13]**   **Insurance**  ☞  Adequate compensation of insured;  "made whole" doctrine

**Insurance**  ☞  Medical insurance

Subrogation clause entitled health insurer to recover from insured's settlement of tort claim, even if the insured was not made whole and even though the clause did not refer to "first money"; the policy entitled insurer to the proceeds of any settlement or judgment limited to the amount of benefits paid.

2 Cases that cite this headnote

**[14]**   **Insurance**  ☞  Medical insurance

Subrogation clause entitling health insurer to proceeds of any settlement or judgment limited to the amount of benefits paid gave a subrogation right only on recoveries for claims that related to benefits available under the contract; the clause did not allow subrogation of claims unrelated to the policy.

2 Cases that cite this headnote

**[15]**   **Insurance**  ☞  Waiver or loss of subrogation rights

Health insurer relinquished any subrogation claim against automobile manufacturer by entering written pretrial agreement and stipulations that insured would pursue case against manufacturer and other defendants independently of insurer and that insurer would then look only to insured. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

Cases that cite this headnote

**[16]**   **Stipulations**  ☞  Necessity for writing in general

Rule making pretrial agreement between attorneys or parties enforceable only if in writing aims to remove misunderstandings and controversies that accompany verbal assurances, and the written agreements speak for themselves. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

2 Cases that cite this headnote

**[17]**   **Stipulations**  ☞  Use and enforcement in general

Trial court has duty to enforce terms of valid pretrial agreement. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

11 Cases that cite this headnote

[18]    Subrogation    Agreements for subrogation

The equitable made-whole doctrine is inapplicable when the parties' agreed contract provides a clear and specific right of subrogation.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*643**  Loren R. Smith, Kelly, Smith & Murrah, P.C., Thomas A. Laucius, Laucius & Associates, Houston, TX, for Petitioner.

Thomas B. Cowart, Law Offices of Thomas B. Cowart, P.C., Adolfo Ruiz Rodriguez, Basheer Youssef Ghorayeb, Rodriguez Law Firm, P.C., Dallas, TX, Michael W. Eady, Thompson, Coe, Cousins & Irons, L.L.P., Austin, TX, for Respondents.

Kevin J. Cook, Payne & Blanchard, Dallas, TX, E.L. Caraway III, Watson Caraway Harrington Nelson Midkiff & Luningham, Fort Worth, TX, for Other Interested Parties.

Gary L. Wickert, Matthiesen, Wickert & Lehrer, S.C., Hartford, WI, Brent M. Rosenthal, Baron & Budd, P.C., Dallas, TX, for Amicus Curiae.

**Opinion**

**\*644**  Justice WILLETT delivered the opinion of the Court.

The issue in this insurance subrogation case is whether the equitable "made whole" doctrine—the rule that an insurer is not entitled to subrogation of medical benefits unless the insured has been "made whole"—trumps an insurer's contract-based subrogation right.

After respondent Vanessa Cantu sued multiple parties for severe injuries she sustained in an auto accident, her medical insurer, petitioner Fortis Benefits, intervened, claiming a subrogation right under the policy. The various defendants settled with Cantu, and Fortis looked only to Cantu for its recovery. A divided court of appeals upheld a trial court finding that because Cantu's medical expenses exceeded the settlement amount plus the benefits Fortis had paid, Fortis's subrogation claim was barred by the equitable "made whole" doctrine. We hold that the "made whole" doctrine must yield to Fortis's right to contractual subrogation under the plain terms of the insurance policy.

### I. Background

Cantu suffered severe injuries in a car wreck and later sued the driver of the vehicle in which she was riding, his employer, the vehicle seller, and the vehicle manufacturer (Ford). Fortis intervened and asserted contractual subrogation and reimbursement rights to recoup from Cantu's tort recovery the amount of medical benefits it had paid under the policy. At a pretrial conference, Fortis agreed with all parties on the record that Fortis was excused from participating in the pretrial and trial proceedings and that Fortis at the post-verdict phase would look only to Cantu to resolve its subrogation and reimbursement claims.

Cantu settled her claims with the defendants before trial for $1.445 million. Cantu and Fortis disputed what portion of the settlement proceeds, if any, should go to Fortis, and Cantu moved for summary judgment, arguing she had not been "made whole" by the settlement. Cantu's past medical expenses totaled $378,500 (of which Fortis claimed to have paid $247,534.14),

and her summary judgment evidence included two "life care plans" estimating her future medical expenses at roughly $1.7 million and $5.3 million. She argued that her past and future medical expenses, exclusive of other amounts like pain and suffering, exceeded the amount of the settlement plus what Fortis had already paid. Cantu argued that the "made whole" doctrine precluded Fortis's contractual claims of subrogation and reimbursement. The trial court granted summary judgment in favor of Cantu, and a divided court of appeals affirmed. [1]

## II. Subrogation and the "Made Whole" Doctrine

This Court recognized the "made whole" doctrine twenty-seven years ago in *Ortiz v. Great Southern Fire & Casualty Insurance Co.* [2] The Ortiz family had a fire insurance policy from Great Southern on their home, but not the contents. [3] A fire caused damages of $4,000 to the home and $11,614 to personal property, and Great Southern paid $4,000 for home repairs. [4] The Ortizes then sued Stacy–Mason, Inc., alleging that one of its employees negligently started the fire. Great Southern intervened, claiming a right of equitable **\*645** subrogation. [5] After the Ortizes settled with Stacy–Mason for $10,000, the trial court awarded, and the court of appeals affirmed, $4,000 of that settlement to Great Southern. [6]

We reversed, holding, "An insurer is not entitled to subrogation if the insured's loss is in excess of the amounts recovered from the insurer and the third party causing the loss." [7] We reasoned that one justification for equitable subrogation is to prevent the insured from receiving a double recovery, first from the insurer, then from the third party. [8] We also recognized, however, that if the insured's total recovery is less than his or her losses, equity cuts the other way: "when 'either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume.' " [9] Because the settlement in *Ortiz* encompassed both covered and noncovered items, we remanded for a determination of how much of the $10,000 related to house damage. [10]

[1] *Ortiz* would govern if Fortis were merely asserting a claim for *equitable* subrogation. But Fortis is not citing principles of equity to recover its money; its policy with Cantu conferred on Fortis two separate *contractual* rights of recovery, one styled "subrogation" and one styled "reimbursement." [11] Fortis argues that these provisions authorize recovery from Cantu's $1.445 million settlement with the defendants, and that neither provision is displaced by the "made whole" doctrine. We agree.

### A. Equitable Subrogation v. Contractual Subrogation

Our *Ortiz* decision addressed the "made whole" doctrine in the context of equitable subrogation, but it did not discuss how the doctrine applies, if at all, to contractual subrogation. Other courts, however, have discussed whether the doctrine applies in the face of a contract that grants the insurer greater subrogation rights. For example, in *Oss v. United Services Automobile* **\*646** *Ass'n,* [12] the Fifth Circuit, applying Texas law in a diversity case, was confronted with facts similar to those in this case. The insured was not made whole by the settlement following a car wreck, yet insurer USAA sought enforcement of its contractual subrogation rights under the policy. [13] Like Fortis, USAA urged the Fifth Circuit to reject the "made whole" doctrine by distinguishing *Ortiz* as involving equitable rather than contractual subrogation. [14] The Fifth Circuit, relying on the El Paso Court of Appeals' decision in *Means v. United Fidelity Life Insurance Co.,* refused because it believed that, in Texas, "the same principles govern both equitable and contractual subrogation." [15]

In *Means,* the insureds had challenged the validity of United Fidelity's contractual subrogation right to foreclose on their 200–acre property. [16] The court noted, "Whether we have a purely equitable subrogation or, as here, a purely contractual one where both Mr. and Mrs. Means agreed to the subrogation, the principles are the same, and the rights of United Fidelity Life Insurance

Company after the payment were superior to the homestead rights of Mr. and Mrs. Means." [17] Read in context, the court's discussion in *Means* does little more than affirm a subrogee's basic rights, whether they arise via contract or equity. Moreover, *Means* nowhere addressed the "made whole" doctrine that we first articulated in *Ortiz*, nor could it have, since *Ortiz* was decided three years later. When the El Paso Court of Appeals declared in *Means* that "the principles are the same" in contractual and equitable subrogation, it did so against a legal landscape that did not yet include the "made whole" doctrine. [18] For this reason, *Means* is not particularly instructive, nor is *Oss,* which relies predominantly on *Means*.

Other Texas courts of appeals have addressed the difference between equitable and contractual subrogation. For example, the Austin Court of Appeals in *Lexington Insurance Co. v. Gray* recognized the distinction between "legal" and "conventional" subrogation. [19] The former is governed by equity; the latter by contract. [20] The court (1) observed that Texas courts have given "substance to the distinction," (2) noted the "unusually 'hospitable' treatment that the right of subrogation has historically received in Texas," especially express subrogation agreements, which are given "considerable weight" and are governed by general contract law principles, [21] and (3) cited several cases holding that a subrogee invoking contractual subrogation can "recover without regard to the relative equities of the parties." [22] *Lexington* did not specifically **\*647** involve the "made whole" doctrine we had adopted a decade earlier in *Ortiz*, but it suggested that this equitable defense would not apply in the face of an express agreement whereby the parties agree in advance that the matter will be governed by contract principles rather than equitable principles. Where the policy's terms govern subrogation, the court added, "there is no reason for the equitable principles usually found in subrogation cases to come into play." [23]

A few years later, however, in *Esparza v. Scott & White Health Plan,* [24] the Austin Court of Appeals backed away from this interpretation. The Esparzas settled for an amount that did not make them whole, and Scott and White sought subrogation under an express provision in the parties' insurance contract, citing *Lexington* as holding that the "made whole" doctrine should apply only to equitable subrogation and not to contractual subrogation. [25] The court of appeals disagreed, stating:

> The distinction we drew between legal and conventional subrogation in *Lexington* simply means that under conventional subrogation no balancing of equities is necessary to determine whether the subrogee has a right to recover at all. While an insurance contract providing expressly for subrogation may remove from the realm of equity the question of *whether* the insurer has a right to subrogation, it cannot answer the question of *when* the insurer is actually entitled to subrogation or *how much* it should receive....
>
> ... To avoid injustice, the equities must still be balanced in deciding what amount, if any, the subrogee is entitled to receive in a given case. [26]

The court adopted the reasoning from *Oss* that a boiler-plate subrogation provision does not automatically negate an insurance policy's fundamental purpose, which is to protect the insured by shifting the risk of loss to the insurer. [27] If anyone is to go unpaid, the court reasoned, it should be the insurance company. The court concluded that contracts " 'confirm, but [do] not expand, the equitable subrogation rights of insurers,' " and the equities must still be balanced to achieve justice. [28]

**[2]** We do not disagree that equitable and contractual subrogation rest upon common principles, but contract rights generally arise from contract language; they do not derive their validity from principles of equity but directly from the parties' agreement. The policy declares the parties' rights and obligations, which are not generally supplanted by court-fashioned equitable rules that might apply, as a default gap-filler, in the absence of a valid contract. If subrogation arises independent of any contract, then an express subrogation agreement would be superfluous and serve only to acknowledge this preexisting right, a position we reject. [29]

**[3]** Contractual subrogation clauses express the parties' intent that reimbursement should be controlled by agreed contract **\*648** terms rather than external rules imposed by the courts. The United States Supreme Court addressed this very point in a

subrogation case decided shortly after we granted the instant case. In *Sereboff v. Mid Atlantic Medical Services, Inc.,* [30] insurer Mid Atlantic was an ERISA plan fiduciary for the Sereboffs. When the Sereboffs were injured in an auto accident, Mid Atlantic paid the couple's expenses pursuant to the plan. [31] When the Sereboffs settled the tort claims that arose from the accident, Mid Atlantic filed suit under ERISA to collect the medical expenses it had paid. [32] Mid Atlantic sought reimbursement under an "Acts of Third Parties" provision in the plan. [33] The Sereboffs argued that the equitable defense of the "made whole" doctrine should apply, even though language in the plan document was to the contrary. [34] The Court disagreed, comparing an action under the "Acts of Third Parties" provision to an action to enforce an equitable lien established by agreement. [35] The Court refused to apply the "made whole" doctrine, deeming the Sereboffs' equitable defenses "beside the point" because Mid Atlantic's subrogation claims arose by written agreement. [36]

This position was earlier adopted by the Fifth Circuit in another ERISA case, *Walker v. Wal–Mart Stores, Inc.* [37] That case, like today's case, concerned a subrogation clause that granted a right of recovery against "any and all" third-party settlements. Walker brought a malpractice action against her dentist, alleging he propped open her mouth excessively, resulting in three jaw surgeries and medical expenses of over $41,000. [38] Walker settled for $12,500, and the trial court awarded the insurer the entire settlement amount as first-money reimbursement for the medical benefits it paid. [39] The Fifth Circuit held that "the Plan's language is unambiguous.... We agree with the district court in holding that the 'any and all' language plainly means the first dollar of recovery (any) and 100% recovery (all) of the funds received by the plaintiff in the settlement, up to the full amount of the benefits paid." [40]

 [4]   [5]   [6]   [7]   [8]   The three varieties of subrogation—equitable, contractual, and statutory—represent three separate and distinct rights that, while related, are independent of each other. Independent, however, does not mean co-equal. We generally adhere to the maxim that "equity follows the law," which requires equitable doctrines to conform to contractual and statutory mandates, not the other way around. Where a valid contract prescribes particular **\*649** remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy. This Court has "long recognized a strong public policy in favor of preserving the freedom of contract." [41] And in *Texas Ass'n of Counties County Government Risk Management Pool v. Matagorda County,* we emphasized that insurers are well equipped to evaluate and reduce risk by, for example, "drafting policies to specifically provide for reimbursement." [42] Fortis did exactly that, drafting two separate recovery provisions that replaced equitable rights with specific contractual rights. Neither subrogation nor reimbursement clauses violate Texas public policy. [43] As we have stated, " 'the State's public policy is reflected in its statutes,' " [44] and Texas workers' compensation law specifically embraces an insurer's first-money right of subrogation, thus indicating no blanket legislative disfavor of such provisions. [45] It is indeed difficult to declare something contrary to public policy when state law, both statutory and regulatory, actually suggests approval. [46] In a subrogation case arising under the Labor Code, the Amarillo Court of Appeals distinguished statutory subrogation from equitable and contractual subrogation. [47] The court looked only at the statute's plain language in affirming the trial court's refusal to invoke its equitable powers to deny subrogation. [48] We agree with this modest, text-based approach.

 [9]   Given this insurance policy's plain language, we are loathe to judicially rewrite the parties' contract by engrafting extra-contractual standards that neither the Legislature nor the Texas Department of Insurance has thus far decided to promulgate. As we have said before, balancing dueling policy concerns is generally for non-judicial bodies, and it remains the "better policy for the contracts of insurance to be changed by the public body charged with their supervision, the State Board of Insurance, or by the Legislature, rather than for this Court" to contravene the express language of insurance contracts with equitable arguments. [49] The **\*650** contrary, however—replacing equitable protections with specific contract language—is not unknown in Texas law. [50] Parties are thus free to negate the "made whole" doctrine contractually, and to do so before an event occurs that triggers medical benefits under the policy. [51]

 **[10]**     **[11]**     **[12]**     Leading insurance law treatises likewise recognize that specific policy terms can override equitable principles and that many jurisdictions, though not all, apply the "made whole" doctrine only in the absence of contrary reimbursement language in the contract. [52] We agree with those courts holding that contract-based subrogation rights should be governed by the parties' express agreement and not invalidated by equitable considerations that might control by default in the absence of an agreement. [53]

### B. Subrogation Under Cantu's Insurance Contract With Fortis

 **[13]**     **[14]**     We turn now to the specific language of the policy in issue, which defines the parties' rights and obligations. It contains a section called "Recovery," which includes a "Subrogation Right" provision and a separate (and broader) "Right of Reimbursement" provision. The former establishes a right of subrogation: "Upon payment of benefits, We [Fortis] will be subrogated to *all* rights of recovery a Covered Person [Cantu] may have against *any* person or organization." [54] The provision continues: "Such right extends to the proceeds of *any* settlement or judgment; but is limited to the amount of benefits We have paid." [55] Fortis thus retained an unfettered right to recover the proceeds from  **\*651**  the settlement of the underlying suit, the only limitation being the *amount* of recovery—what Fortis had paid under the contract. Nowhere does this provision suggest that Cantu must first be "made whole" for Fortis to recover. This provision does not use the modifier "first money," but its meaning is not imprecise or ambiguous. The contract's specific language controls Fortis's right to subrogation, and the equitable defense of the "made whole" doctrine must give way.

Accordingly, we hold that Fortis is contractually entitled to recover from the $1.445 million settlement the total amount of benefits it paid to Cantu. [56]

### III. Fortis's Claims Against Ford

 **[15]**     **[16]**     **[17]**     Fortis also asserts that the court of appeals erred in not considering the validity of a pretrial agreement regarding its claims against defendant Ford. At a pretrial conference convened under Texas Rule of Civil Procedure 11, Fortis agreed to divide the proceeding into two phases: first Cantu would litigate the case with the defendants completely independent from Fortis, and then Fortis would look only to Cantu to resolve its claim for subrogation. The Rule 11 agreement and stipulations in the record, which narrowed the issues presented to the trial court, make clear that Fortis has unequivocally relinquished any claims against Ford. Just as Cantu entered into and is bound by the specific language in the insurance agreement, Fortis entered into and is bound by the specific language in the Rule 11 agreement. Rule 11 aims to remove misunderstandings and controversies that accompany verbal assurances, and the written agreements "speak for themselves." [57] As this is a valid pretrial agreement under Rule 11, the trial court had a duty to enforce its terms. [58] Hence, the trial court did not err in dismissing Fortis's claims against Ford, and the court of appeals did not err in affirming that portion of the judgment.

### IV. Conclusion

 **[18]**     The equitable "made whole" doctrine is inapplicable when the parties' agreed contract provides a clear and specific right of subrogation. Accordingly, while we affirm that part of the court of appeals' judgment regarding respondent Ford, we reverse and remand to the trial court for further proceedings consistent with this decision.

**Parallel Citations**

50 Tex. Sup. Ct. J. 965

Footnotes

1     170 S.W.3d 755.

2     597 S.W.2d 342 (Tex.1980).

3     *Id.* at 343.

4     *Id.*

5     *Id.*

6     *Id.*

7     *Id.*

8     *Id.*

9     *Id.* at 344 (quoting *Garrity v. Rural Mut. Ins. Co.,* 77 Wis.2d 537, 253 N.W.2d 512, 514 (1977)).

10    *Id.*

11    The policy states:

        **Subrogation Right.** Upon payment of benefits, *We will be subrogated to all rights of recovery a Covered Person may have against any person or organization.* This includes but is not limited to recoveries against such third party, against any liability coverage for such third party or against automobile insurance in the event a claim is made under the uninsured or underinsured motorist coverages. Such right extends to the proceeds of any settlement or judgment; but is limited to the amount of benefits We have paid. You must 1) do nothing to prejudice any right of recovery; 2) execute and deliver any required instruments or papers; and 3) do whatever else is necessary to secure such rights.

        If We are precluded from exercising Our Subrogation Right, We may exercise Our Right of Reimbursement.

        **Right of Reimbursement.** If benefits are paid under this plan, and any Covered Person recovers against any person or organization by settlement, judgment or otherwise, *We have a right to recover from that Covered Person an amount equal to the amount We have paid.* This includes but is not limited to recoveries against such third party, against any liability coverage for such third party or against automobile insurance in the event a claim is made under the uninsured or underinsured motorist coverages.

    (emphases added).

12    807 F.2d 457 (5th Cir.1987).

13    *Id.* at 458–59.

14    *Id.* at 460.

15    *Id.* (citing 550 S.W.2d 302, 309 (Tex.Civ.App.-El Paso 1977, writ ref'd n.r.e.)).

16    550 S.W.2d at 308.

17    *Id.* at 309.

18    *Id.*

19    775 S.W.2d 679, 683 (Tex.App.-Austin 1989, writ denied).

20    *Id.*

21    *Id.* at 683–84.

22    *Id.* (citing *Girard Fire & Marine Ins. Co. v. Farmer,* 53 S.W.2d 1016 (Tex.Com.App.1932, judgm't adopted); *Duval County Ranch Co. v. Alamo Lumber Co.,* 663 S.W.2d 627 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.); *Quincy Mut. Fire Ins. Co. v. Jones,* 486 S.W.2d 126 (Tex.Civ.App.-Dallas 1972, no writ); *F.H. Vahlsing, Inc. v. Hartford Fire Ins. Co.,* 108 S.W.2d 947 (Tex.Civ.App.-San Antonio 1937, writ dism'd w.o.j.)).

23    *Id.* at 684.

24    909 S.W.2d 548 (Tex.App.-Austin 1995, writ denied).

25    *Id.* at 551 (citing 775 S.W.2d 679).

26    *Id.* at 552–52 (emphasis in original).

27    *Id.*

28    *Id.* at 552 (quoting *Oss,* 807 F.2d at 460).

Even if the "Subrogation Right" provision merely confirmed the preexisting right of equitable subrogation and nothing more, the policy's separate and broader "Right of Reimbursement" provision affords Fortis an alternative basis to recover from Cantu the medical benefits it paid.

547 U.S. 356, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006).

*Id.* at 1872.

*Id.* at 1873.

*Id.* at 1872–73.

*Id.* at 1877.

*Id.*

*Id.* Cantu would have us distinguish *Sereboff* because it arises under the ERISA statute and "has no application to this non-ERISA case." However, "ERISA neither requires a welfare plan to contain a subrogation clause nor does it bar such clauses or otherwise regulate their content." *Ryan v. Fed. Express Corp.,* 78 F.3d 123, 127 (3d Cir.1996). Accordingly, a contractual subrogation provision, whether in an ERISA plan or in a private insurance policy, must be enforced as written. *See id.* at 128.

159 F.3d 938 (5th Cir.1998) (per curiam).

*Id.* at 939.

*Id.*

*Id.* at 940.

*Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553 (Tex.2001) (citing *Wood Motor Co. v. Nebel,* 150 Tex. 86, 238 S.W.2d 181, 185 (1951)). As a rule, a court should not by judicial fiat insert non-existent language into statutes or into parties' agreed-to contracts, or delete existent language from them either. Our confined duty is to construe the contract as is, and holding that equitable considerations trump contrary contract terms would render contractual subrogation a nullity.

52 S.W.3d 128, 136 (Tex.2000). As we noted, "the presence of absence of a reimbursement clause in the insurance contract could affect the premium charged," so such provisions cannot be deemed illusory. *Id.* at 131 n. 4.

*See id.; Ortiz,* 597 S.W.2d at 343.

*Town of Flower Mound v. Stafford Estates Ltd. P'ship,* 135 S.W.3d 620, 628 (Tex.2004) (quoting *Texas Commerce Bank, N.A. v. Grizzle,* 96 S.W.3d 240, 250 (Tex.2002)).

*See* TEX. LABOR CODE §§ 417.001–.004 (authorizing subrogation in Texas workers' compensation law).

*See Lawrence,* 44 S.W.3d at 553 ("Public policy, some courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law.").

*Tex. Workers' Comp. Ins. Fund v. Knight,* 61 S.W.3d 91, 93 (Tex.App.-Amarillo 2001, no pet.).

*Id.*

*Members Mut. Ins. Co. v. Cutaia,* 476 S.W.2d 278, 281 (Tex.1972).

*See, e.g., Zapata v. Torres,* 464 S.W.2d 926, 930 (Tex.Civ.App.-Dallas 1971, no writ) (stating it is "reasonable to suppose" that the parties' express agreement was intended to replace implied equitable rights) (citations omitted).

Of course, if the Legislature and/or TDI believes that the contract's terms, though clear, work an unfair result, they can take action to prescribe or proscribe whatever principles they believe strike the best balance. The Insurance Code requires insurers to submit their insurance forms to TDI for approval, TEX. INS.CODE § § 1701.051, 1701.054, and while TDI can disapprove forms it deems unjust, *id.* § 1701.055(a)(2), it did not do so here.

16 COUCH ON INSURANCE 3d §§ 223:134, 223:147; 22 HOLMES APPLEMAN ON INSURANCE 2d § 141.2[B][1]; 3 APPLEMAN INSURANCE LAW & PRACTICE § 1675.

Cantu attempts to avoid the policy's express language by arguing that insurance contracts "are contracts of adhesion in which the insured has little, if any, negotiating room," and that contractual abrogation of the "made whole" doctrine is thus unconscionable and unenforceable. Even taking as true the contention that insurance contracts are contracts of adhesion that reflect unequal bargaining power, "adhesion contracts are not automatically unconscionable or void." *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 574 (Tex.1999). Nor is it per se unconscionable that an insurer would seek to reduce its risk and boost its solvency by including a subrogation and/or reimbursement clause. In any event, Cantu has produced no evidence of duress or unconscionability.

Emphasis added. Although Cantu argues that this language is so open-ended it allows for subrogation of claims unrelated to the policy, we must construe this provision in relation to the entire instrument, *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983), to avoid an interpretation that renders the contract "unreasonable, inequitable, and oppressive," *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987). This contract is a "Major Medical Policy" that "describes the benefits available to You and covered Family

Members from Fortis Insurance Company." The provision therefore gives Fortis a subrogation right only on recoveries for claims that relate to benefits available under the contract.

Emphasis added.

Because we enforce the contract's "all rights of recovery" subrogation provision, we need not reach the separate "Right of Reimbursement" provision, which by its terms only applies if Fortis is denied subrogation. Nor need we consider whether the trial court erred in computing past and future medical expenses in relation to Cantu's total damages.

*Padilla v. LaFrance,* 907 S.W.2d 454, 460 (Tex.1995) (citing *Birdwell v. Cox,* 18 Tex. 535, 537 (1857)).

*See EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 91 (Tex.1996) (orig. proceeding) (noting that trial courts cannot consider evidence outside the bounds of the Rule 11 agreement); *Scott–Richter v. Taffarello,* 186 S.W.3d 182, 189 (Tex.App.-Fort Worth 2006, pet. denied) ("A trial court has a ministerial duty to enforce a valid Rule 11 agreement.").

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

374 S.W.3d 464
Court of Appeals of Texas,
Waco.

GRAY WIRELINE SERVICE, INC., Appellant

v.

Larry R. CAVANNA, David Gray, Steve D. Gray, Kenneth M. Nester, Sr., Ismael Alvarez, Extreme Wireline
Trucks & Equipment, LLC, Andrew E. Hughes, Bruce R. Barnett, and CGN Leasing, LLC, Appellees.

No. 10–11–00058–CV.   |   Oct. 12, 2011.

**Synopsis**
**Background:** Company brought action against former employees, equipment company, and leasing company alleging various
causes of action based on violations of employment agreements. The 335th District Court, Burleson County, Terry Flenniken,
J., granted motion compelling arbitration in part, granted a temporary injunction, and reformed several of the employment
agreements. Company appealed.

**Holdings:** The Court of Appeals, Tom Gray, C.J., held that:

[1] trial court's reformation of the non-compete agreements was not within the exception to the arbitration clause;

[2] reformation of non-compete agreements in employment contracts was an issue to be determined by the arbitrator;

[3] litigation had to be stayed pending the outcome of the arbitration; and

[4] temporary injunction order that did not set the cause for trial on the merits was void on its face.

Reversed and remanded.

West Headnotes (23)

**[1]**   **Alternative Dispute Resolution** 👈 Validity

  **Alternative Dispute Resolution** 👈 Disputes and Matters Arbitrable Under Agreement

  In evaluating a motion to compel arbitration, a court must first determine whether a valid arbitration agreement exists,
  and then whether the agreement encompasses the claims raised.

  Cases that cite this headnote

**[2]**   **Alternative Dispute Resolution** 👈 Scope and standards of review

  Whether a valid arbitration agreement exists is a legal question subject to de novo review.

  Cases that cite this headnote

**[3]**     **Alternative Dispute Resolution** 🔑 Evidence

The presumption favoring arbitration arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists.

Cases that cite this headnote

**[4]**     **Alternative Dispute Resolution** 🔑 Construction in favor of arbitration

Courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration.

Cases that cite this headnote

**[5]**     **Alternative Dispute Resolution** 🔑 Construction

Arbitration agreements are interpreted under traditional contract principles.

Cases that cite this headnote

**[6]**     **Alternative Dispute Resolution** 🔑 Evidence

If the trial court finds a valid arbitration agreement, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration.

1 Cases that cite this headnote

**[7]**     **Alternative Dispute Resolution** 🔑 Discretion

Absent a defense to enforcing the arbitration agreement, the trial court has no discretion but to compel arbitration and stay its own proceedings.

Cases that cite this headnote

**[8]**     **Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

To determine whether an arbitration agreement covers a party's claims, a court must focus on the complaint's factual allegations, not the legal causes of action asserted.

Cases that cite this headnote

**[9]**     **Alternative Dispute Resolution** 🔑 Liberal or strict construction

**Alternative Dispute Resolution** 🔑 Evidence

Court construes arbitration clauses broadly, and when a contract contains an arbitration clause, there is a presumption of arbitrability.

Cases that cite this headnote

**[10]**     **Alternative Dispute Resolution** 🔑 Construction in favor of arbitration

Any doubts as to arbitrability are to be resolved in favor of coverage.

Cases that cite this headnote

**[11]**    **Alternative Dispute Resolution** 🔑 Construction in favor of arbitration

Court resolves any doubts about the scope of the arbitration agreement in favor of coverage.

Cases that cite this headnote

**[12]**    **Alternative Dispute Resolution** 🔑 Construction in favor of arbitration

The policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation covering the dispute at issue.

Cases that cite this headnote

**[13]**    **Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

Generally, if the facts alleged touch matters that are covered by, have a significant relationship to, are inextricably enmeshed with, or are factually intertwined with the contract that contains the arbitration agreement, the claims are arbitrable.

1 Cases that cite this headnote

**[14]**    **Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

To come within the scope of the arbitration provision, a party's allegations need only be factually intertwined with arbitrable claims or otherwise touch upon the subject matter of the agreement containing the arbitration provision.

1 Cases that cite this headnote

**[15]**    **Alternative Dispute Resolution** 🔑 Employment disputes

**Contracts** 🔑 In restraint of trade

**Reformation of Instruments** 🔑 Form of remedy

Trial court's reformation of the non-compete agreements in employment agreements could only be construed as a permanent reformation, which was not within the exception to the arbitration clause in the employment agreements; arbitration clause in employment agreements clearly contemplated that only temporary relief could be sought in the trial court, and thus, any equitable relief to be granted by the trial court would have to be interim in nature only.

1 Cases that cite this headnote

**[16]**    **Contracts** 🔑 In restraint of trade

**Judgment** 🔑 Contract cases in general

**Reformation of Instruments** 🔑 Form of remedy

Reformation pursuant to statute regarding remedies in actions to enforce covenants not to compete is a remedy to be granted at a final hearing, whether on the merits or by summary judgment, not as interim relief. V.T.C.A., Bus. & C. § 15.51(c).

2 Cases that cite this headnote

**[17]**    **Alternative Dispute Resolution** 🔑 Matters to Be Determined by Court

Reformation of non-compete agreements in employment contracts was an issue to be determined by the arbitrator rather than the trial court; the motion to reform, which asked for a determination that the restrictions contained within the non-compete agreements were not reasonable either in scope or duration or alternatively that the former employees had fully complied with the non-compete agreements, necessarily touched matters that were covered by, had a significant relationship to, were inextricably enmeshed with, or were factually intertwined with the contract that contained the arbitration agreement.

1 Cases that cite this headnote

**[18]** **Alternative Dispute Resolution** Particular cases

Litigation between company and various defendants had to be stayed pending the outcome of the arbitration between company and former employees, where the central issue in the case was the purported violation of non-compete agreements by the employees.

Cases that cite this headnote

**[19]** **Alternative Dispute Resolution** Stay of Proceedings Pending Arbitration

Even when a party has brought arbitrable claims against one party and claims not subject to arbitration against another party in the same lawsuit, courts should stay all litigation if the collateral litigation addresses the same issues as arbitration which threatens to render the arbitration moot.

Cases that cite this headnote

**[20]** **Appeal and Error** Reply briefs

**Injunction** Form and requisites

Temporary injunction order that did not set the cause for trial on the merits was void on its face, and thus, the issue was not waived by the failure to complain about the injunction order in the original appellant's brief. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

4 Cases that cite this headnote

**[21]** **Injunction** Scope and duration of relief

**Injunction** Form and requisites

The requirements of rule regarding form and scope of temporary injunctions are mandatory and must be strictly followed. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

1 Cases that cite this headnote

**[22]** **Appeal and Error** Defects, objections, and amendments

**Injunction** Scope and duration of relief

**Injunction** Form and requisites

When a temporary injunction order does not meet the mandatory requirements of rule on form and scope of injunctions, it must be declared void and dissolved, regardless of whether the defect was raised or briefed on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

3 Cases that cite this headnote

**[23]** **Motions** ⚷ Construction and operation of orders in general

A void order has no force or effect and confers no right; it is a nullity.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*466** Ryan P. Hartman, Fulbright & Jaworski LLP, Houston, Bill Youngkin, Law Offices of Bill Youngkin, Bryan, for appellant.

J. Davis Watson, Watson Law Firm LLP, Bryan, Wayne T. Rife, Law Offices of Wayne T. Rife PC, College Station, Laura J. Upchurch, Moorman Tate Urquhart Haley Upchurch & Yates, LLP, Brenham, James M. Riley Jr., Coats/Rose, Houston, Jay B. Goss, Bruchez Goss Thornton Meronof & Hawthorne, Bryan, for appellees.

Ismael Alvarez, Pro Se.

Before Chief Justice GRAY, Justice DAVIS, and Justice SCOGGINS.

## OPINION

TOM GRAY, Chief Justice.

This is an interlocutory appeal from three orders that (1) reformed several employment agreements, (2) compelled arbitration in part and denied a stay of the balance of the litigation involving third parties during the pendency of the arbitration, and (3) granted a temporary injunction. *See* TEX. CIV. PRAC. & REMEDIES CODE ANN. § 51.016 (West 2008). Gray Wireline Service, Inc. complains that the trial court erred by reforming the employment agreements rather than sending those issues to be determined by the arbitrator in contravention of the employment agreement and by refusing to stay the pending litigation in the trial court. GWSI further complains that the trial court erred by granting a temporary injunction in favor of Steve Gray and CGN Leasing. Because **\*467** we find that the trial court erred by reforming the employment agreements but should have sent that issue to arbitration, and erred by denying the motion to stay the litigation, we reverse the judgments of the trial court and remand to that court for further proceedings. Additionally, because we find that the temporary injunction did not comply with the Rules of Civil Procedure, we reverse the order granting the temporary injunction and order that it be dissolved.

### Background

Steve Gray formed GWSI, a cased-hole wireline company, which operated primarily in Texas. In 2006, the shareholders of GWSI agreed to sell a portion of their shares to Centre Partners, Inc. and by doing so Centre Partners, Inc. gained control of GWSI. The new owners entered into employment agreements with Larry Cavanna, David Gray, Steve Gray, and Kenneth M. Nester, Sr. [1] which each contained a non-compete clause that terminated at various times depending on the reasons for the individual's departure, but was generally two years in duration. Each of the four departed from GWSI at various times, with Nester being the last to leave, terminating his employment on August 15, 2009.

GWSI originally filed suit in mid-October of 2009 against Larry Cavanna, David Gray, Steve Gray, Kenneth M. Nester, Sr., Ismael Alvarez, Extreme Wireline Trucks & Equipment, LLC, Andrew E. Hughes, Bruce R. Barnett, and CGN Leasing, LLC seeking a temporary restraining order and asserting various causes of action based on violations of the employment agreement, including tortious interference, breach of fiduciary duty, breach of contract, civil conspiracy, unjust enrichment, unfair competition, violation of Penal Code Chapter 33, conversion, and trespass against the various defendants. The trial court

issued a temporary restraining order, which was subsequently extended by agreement of the parties so that they could conduct limited expedited discovery. Shortly after the issuance of the temporary restraining order, Steve Gray and CGN Leasing, LLC filed a demand for arbitration in accordance with Steve Gray's employment agreement, and included a cause of action for a declaratory judgment in the arbitration demand. GWSI ultimately withdrew its request for a temporary injunction the day before the scheduled hearing. Cavanna, David Gray, and Nester then filed a "Motion to Reform and Alternate Motion for Determination" seeking reformation of the non-compete clause pursuant to Section 15.51(c) of the Business and Commerce Code or alternatively a determination that they were in full compliance with the employment agreements. GWSI subsequently filed its own demand for arbitration as to Steve Gray, Cavanna, David Gray, and Nester with the American Arbitration Association as well as a motion to stay the litigation pending the arbitration with the trial court.

After a hearing on the motions, the trial court denied the motion to compel arbitration relating to the motion to reform and by separate order granted the motion to reform and reformed the employment agreements of Cavanna, David Gray, and Nester. The trial court then granted the motion to compel arbitration but denied **\*468** the motion to stay the trial court's proceedings pending the arbitration as to all of the defendants except for Cavanna, David Gray, Nester, Steve Gray, and CGN Leasing. The trial court did stay the pending litigation against them until the completion of the arbitration.

### The Non–Compete Agreements

Each of the employment agreements contained the following language which Cavanna, Gray, and Nester sought to modify in the motion to reform:

*Geographic Limitation.* The geographic limitation for the Non–Compete Obligations is any state, province (or substantially equivalent designation of a geographic area within a foreign country), or Outer Continental Shelf region (A) in which the Company provided its products, services, or activities during the twenty-four (24) months prior to the date of termination of Executive's employment with the Company, (B) in which the Company had plans to provide or contemplated providing its products, services, or activities during the twenty-four (24) months prior to the date of termination of Executive's employment, or (C) in which a customer or client of the Company, with whom Executive had or made contact or had access to information and/or files about during Executive's employment with the Company or within the twelve (12) months prior to the date of termination of Executive's employment with the Company, is located.

*Acknowledgments.* Executive acknowledges and agrees that:

...

(g) the restricted period set forth is a material term of this Agreement and that the Company is entitled to Executive's compliance with these terms during that full period. Therefore, Executive agrees that the restricted period will be tolled during any period of non-compliance by Executive. If the Company must seek injunctive relief or judicial intervention to enforce this Agreement, the restricted time period set forth herein does not commence until Executive is judged by a court of competent jurisdiction to be in full compliance with this Agreement;....

The trial court reformed the first paragraph to include the language "as evidenced by existing memoranda, minutes, or other correspondence (including, without limitation, internal or external presentations)" in paragraph (B) of the geographic restriction section. The trial court also reformed the tolling paragraph to delete the last sentence and to add the following: "If the Company must seek injunctive relief or judicial intervention to enforce this Agreement, the restricted time period set forth herein does not commence until a court of competent jurisdiction deems it should commence."

### Arbitration

**[1]** **[2]** **[3]** **[4]** In evaluating a motion to compel arbitration, a court must first determine whether a valid arbitration agreement exists, and then whether the agreement encompasses the claims raised. *Am. Std. v. Brownsville Indep. Sch. Dist. (In re D. Wilson Constr. Co.),* 196 S.W.3d 774, 781 (Tex.2006); *see In re Dillard Dep't Stores, Inc.,* 186 S.W.3d 514, 515

(Tex.2006) (per curiam); *LDF Constr., Inc. v. Bryan,* 324 S.W.3d 137 (Tex.App.-Waco 2010, no pet.). Whether a valid arbitration agreement exists is a legal question subject to *de novo* review. *Id.* Although the Texas Supreme Court has repeatedly expressed a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). Courts must resolve any **\*469** doubts about an arbitration agreement's scope in favor of arbitration. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001).

 [5]  [6]  [7]  Arbitration agreements are interpreted under traditional contract principles. *J.M. Davidson,* 128 S.W.3d at 227. If the trial court finds a valid agreement, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration. *Id.* Absent a defense to enforcing the arbitration agreement, the trial court has no discretion but to compel arbitration and stay its own proceedings. *In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 549 (Tex.2002) (per curiam).

 [8]  [9]  [10]  [11]  [12]  To determine whether an arbitration agreement covers a party's claims, a court must focus on the complaint's factual allegations, not the legal causes of action asserted. *FirstMerit Bank,* 52 S.W.3d at 754. *See also Energy Transfer Fuel, LP v. Estate of Souter,* No. 10–09–00361–CV, 2010 WL 1611082, at \*2–3, 2010 Tex.App. LEXIS 2975 at \*6– 7 (Tex.App.-Waco Apr. 21, 2010, no pet.) (mem. op.). We are to construe arbitration clauses broadly, and when a contract contains an arbitration clause, there is a presumption of arbitrability. *See AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986). Any doubts as to arbitrability are to be resolved in favor of coverage. *FirstMerit Bank,* 52 S.W.3d at 754. Likewise, we resolve any doubts about the scope of the arbitration agreement in favor of coverage. *Id.* In fact, the policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation covering the dispute at issue. *Prudential Sec., Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995).

 [13]  [14]  Generally, if the facts alleged "touch matters" that are covered by, have a "significant relationship" to, are "inextricably enmeshed" with, or are "factually intertwined" with the contract that contains the arbitration agreement, the claims are arbitrable. *Pennzoil Co. v. Arnold Oil Co.,* 30 S.W.3d 494, 498 (Tex.App.-San Antonio 2000, orig. proceeding). In other words, to come within the scope of the arbitration provision, a party's allegations need only be factually intertwined with arbitrable claims or otherwise touch upon the subject matter of the agreement containing the arbitration provision. *See Prudential,* 909 S.W.2d at 900; *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992).

*The Arbitration Clause*
The arbitration clause at issue in each of the employment agreements states:

> Arbitration. Any dispute or controversy between the Company and Executive, arising out of or relating to this Agreement, the breach of this Agreement, or otherwise, shall be settled by arbitration in Wilmington, Delaware administered by the American Arbitration Association in accordance with its Commercial Rules then in effect and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall have the authority to award any remedy or relief that a court of competent jurisdiction could order or grant, including, without limitation, the issuance of an injunction. However, either party may, without inconsistency with this arbitration provision, apply to any court having jurisdiction over such dispute or controversy and seek interim provisional, injunctive or other equitable relief until **\*470** the arbitration award is rendered or the controversy is otherwise resolved. Except as necessary in court proceedings to enforce this arbitration provision or an award rendered hereunder, or to obtain interim relief, neither a party nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of the company and Executive. Each party shall bear its or his own costs and expenses in any arbitration hereunder and one- half of the arbitrator's fees and costs; provided, however, that the arbitrator shall have the discretion to award the prevailing party reimbursement of its or his reasonable attorney's fees and costs.

No party is contending that the arbitration agreement is not valid or that arbitration should not be ordered. Rather, it is which claims to be determined by the arbitrator that are at issue, specifically, the motion to reform. Therefore, the burden is on Cavanna, Gray, and Nester to establish that the motion to reform the non-compete agreements is not within the scope of the arbitration agreement. *See J.M. Davidson,* 128 S.W.3d at 227.

GWSI complains that the reformation of the non-compete agreements by the trial court was not allowed within the limited categories of relief allowed by the arbitration clause, but that the issue of reformation should be determined by the arbitrator because reformation pursuant to Business and Commerce Code section 15.51(c) is an issue to be determined at a final hearing on the merits. Because of this, GWSI contends that pursuant to the arbitration clause, the trial court could not permanently and finally reform the agreements prior to a determination on the merits at a final hearing, which should have been before the arbitrator.

 **[15]** Cavanna, Gray, and Nester responded by contending both in the trial court and to this Court that the trial court's reformation of the employment agreements was allowed pursuant to the arbitration clause because it constitutes "other equitable relief" as allowed in the arbitration clause. Their position is that the term "interim" does not apply to the entire phrase "interim provisional, injunctive or other equitable relief." We disagree. The arbitration clause clearly contemplates that only temporary relief may be sought in the trial court. In order for Cavanna, Gray, and Nester's interpretation to be correct, the phrase immediately following "interim provisional, injunctive or other equitable relief" which states "until the arbitration award is rendered or the controversy is otherwise resolved" would have to be ignored entirely. Any equitable relief to be granted by the trial court would have to be interim in nature only, and thus that relief would seemingly be subsumed in or otherwise resolved at the final hearing on the merits. The trial court's reformation of the non-compete agreements can only be construed as a permanent reformation, which was not within the exception to the arbitration clause in the employment agreements.

 **[16]** Additionally, we agree that reformation pursuant to section 15.51(c) of the Business and Commerce Code is a remedy to be granted at a final hearing, whether on the merits or by summary judgment, not as interim relief. *See EMS USA, Inc. v. Shary,* 309 S.W.3d 653, 657 (Tex.App.-Houston [14th Dist.] 2010, no pet.); *Cardinal Health Staffing Network, Inc. v. Bowen,* 106 S.W.3d 230, 238–39 (Tex.App.-Houston [1st Dist.] 2003, no pet.). *See also, e.g., Lockhart v. McCurley,* No. 10–09–00240–CV, 2010 WL 966029, at *1–2, 2010 Tex.App. LEXIS 1909 at *5 (Tex.App.-Waco March 10, 2010, no pet.) (mem. **\*471** op.); *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 885 (Tex.App.-Dallas 2003, no pet.); *W.R. Grace & Co.-Conn. v. Henson,* No. 13–06–00668–CV, 2007 WL 2389547, at *4–5, 2007 Tex.App. LEXIS 6771 at *11–12 (Tex.App.-Corpus Christi 2007, no pet.) (mem. op.).

### *Other Provisions in the Agreement*

 **[17]** Having determined that the trial court's reformation of the non-compete agreements did not fit within the exceptions to the arbitration agreement, we must determine whether the reformation is an issue to be determined by the arbitrator or the trial court. Cavanna, Gray, and Nester contend that there are two provisions outside of the arbitration provisions in the employment agreements which establish that the trial court was the proper forum for the issue of the reformation of the non-compete agreements rather than to be determined through arbitration. The first is the reference to "a court of competent jurisdiction" within the tolling provision. The second is contained in the next paragraph, paragraph (h) in the acknowledgment section which states:

> (h) the covenants contained in Paragraphs 8 through 12 are reasonable with respect to their duration, geographic area and scope. If, at the time of enforcement of this Paragraph 11, a court holds that the restrictions stated herein are unreasonable under the circumstances then existing, the parties hereto agree that the maximum period, scope or geographic area legally permissible under such circumstances will be substituted for the period, scope or area stated herein.

Cavanna, Gray, and Nester argue that these provisions establish a clear intent between the parties that even if the exception stated in the arbitration agreement itself does not allow for the reformation of the agreement pursuant to the Business and

Commerce Code as "other equitable relief," the reformation dispute should be resolved only by the trial court because of the use of the term "court" rather than "arbitrator" or "arbitral forum" in these additional paragraphs.

The motion to reform asked the trial court to determine that the restrictions contained within the non-compete agreements were not reasonable either in scope or duration or alternatively, for the trial court to determine that they had fully complied with the non-compete agreements. When we consider the factual allegations contained within the motion to reform, we find that these claims necessarily "touch matters" that are covered by, have a "significant relationship" to, are "inextricably enmeshed" with, or are "factually intertwined" with the contract that contains the arbitration agreement. *See Pennzoil Co. v. Arnold Oil Co.,* 30 S.W.3d 494, 498 (Tex.App.-San Antonio 2000, orig. proceeding). Thus, we find that Cavanna, Gray, and Nester have not established an affirmative or other defense to the arbitration clause sufficient to overcome the presumption in favor of arbitration, and therefore the trial court erred in ruling on the motion to reform. We sustain issue one. Because of our holding sustaining the first issue, we do not reach the second issue relating to the arbitrators determining arbitrability.

### Stay of Proceedings

 **[18]**    In its third issue, GWSI complains that the trial court erred by denying its motion to stay the proceedings entirely pending the outcome of the arbitration. The trial court granted the motion to stay relating to Steve Gray, Cavanna, David Gray, Nester, and CGN Leasing but denied the motion as it relates to the other defendants.

 **\*472**  **[19]**    Federal law requires courts to stay litigation of claims that are subject to arbitration until arbitration is completed. 9 U.S.C.A. § 3 (West 2009); *In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185, 195–96 (Tex.2007) (orig. proceeding). Even when a party has brought arbitrable claims against one party and claims not subject to arbitration against another party in the same lawsuit, courts should stay all litigation if the collateral litigation addresses the same issues as arbitration which threatens to render the arbitration moot. *See In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d at 195–96.

None of the non-signatories have filed briefs in this Court. However, our review of the claims indicates that the central issue to all is the purported violation of the non-compete agreements. Therefore, the litigation should be stayed pending the outcome of the arbitration and the trial court erred to order otherwise. We sustain issue three.

### TEMPORARY INJUNCTION

 **[20]**    GWSI indicated in its notice of appeal that it was appealing the trial court's order granting a temporary injunction against it and in favor of Steve Gray and CGN Leasing. Steve Gray and CGN Leasing contend that any complaint regarding the temporary injunction has been waived because no issue was raised complaining of the trial court's entry of the temporary injunction. GWSI, in its reply brief, acknowledged the failure to raise the issue but argues that the injunction order is void on its face; therefore, the issue is not waived by the failure to complain about the injunction order in the original appellant's brief.

 **[21]**    Rule 683 of the Rules of Civil Procedure sets forth part of the requirements for a temporary injunction. *See* TEX.R. CIV. P. 683. Rule 683 requires that "[e]very order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought." TEX.R. CIV. P. 683. The order of temporary injunction does not include an order setting the cause for trial on the merits as required by Rule 683. *Id.; see also EOG Res., Inc. v. Gutierrez,* 75 S.W.3d 50, 52 (Tex.App.-San Antonio 2002, no pet.) (reason for requiring injunction order to include trial date is to prevent temporary injunction from effectively becoming permanent without trial). The requirements of Rule 683 are mandatory and must be strictly followed. *Qwest Commc'ns. Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000) (per curiam); *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (per curiam).

 **[22]**    **[23]**    When a temporary injunction order does not meet the mandatory requirements of Rule 683, it must be declared void and dissolved, regardless of whether the defect was raised or briefed on appeal. *InterFirst,* 715 S.W.2d at 641 (temporary injunction that does not set cause for trial on merits is void and must be dissolved); *Bay Fin. Sav. Bank, FSB v. Brown,* 142 S.W.3d 586, 591 (Tex.App.-Texarkana 2004, no pet.) (although error not raised on appeal, temporary injunction void because

it did not include order setting cause for trial on merits); *EOG Res.,* 75 S.W.3d at 53 (same). A void order has no force or effect and confers no right; it is a nullity. *See In re Garza,* 126 S.W.3d 268, 273 (Tex.App.-San Antonio 2003, orig. proceeding).

Because the temporary injunction order does not set the cause for trial on the merits, it is void. We reverse the trial court's temporary injunction order and order that it be dissolved. *InterFirst,* 715 S.W.2d at 641 (Tex.1986).

**\*473** *Conclusion*

We find that the trial court erred by reforming the employment agreements and not determining that the issue of reformation should be determined by the arbitrators. We further find that the trial court erred by denying the motion to stay the litigation as to the non-signatories to the employment agreements until the completion of the arbitration. We order that the temporary injunction is void and order the trial court to dissolve it. We reverse and remand to the trial court for further proceedings. The stay of the trial court proceedings issued by this Court on March 11, 2011 is hereby lifted.

Footnotes

1    David Gray and Steve Gray are both defendants in the trial court proceedings. On appeal, the issue relating to Steve Gray and CGN Leasing, LLC involves only the temporary injunction. The other issues relating to the reformation, the arbitration, and the stay of proceedings involves David Gray but not Steve Gray. Therefore, in this opinion we will refer to Steve Gray by his full name. References to "Gray" refer to David Gray only.

**End of Document**                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

6 S.W.3d 717
Court of Appeals of Texas,
Corpus Christi.

David HENKE, Individually and d/b/a Breslau Cattle Co., Appellant,

v.

PEOPLES STATE BANK OF HALLETTSVILLE, Texas, Appellee.

No. 13–99–274–CV.　|　Nov. 10, 1999.　|　Rehearing Overruled Dec. 22, 1999.

Debtor moved to dissolve temporary injunction pertaining to liquidation of collateral. The 25th District Court, Lavaca County, Dwight E. Peschel, J., denied motion. Debtor appealed. The Court of Appeals, Hinojosa, J., held that: (1) appellate jurisdiction existed; (2) debtor waived right to complain of any errors in orders comprising temporary injunction; (3) defects in injunction and modifying orders were not fundamental errors; and (4) debtor failed to prove changed circumstances.

Affirmed.

West Headnotes (18)

**[1]**　**Appeal and Error**　Necessity of final determination

Under Texas procedure, appeals are allowed only from final orders or judgments.

Cases that cite this headnote

**[2]**　**Appeal and Error**　Necessity of final determination

Unless a statute specifically authorizes an interlocutory appeal, Texas appellate courts have jurisdiction only over final judgments.

Cases that cite this headnote

**[3]**　**Appeal and Error**　Injunction

Court of Appeals had jurisdiction to consider debtor's interlocutory appeal challenging denial of motion to dissolve temporary injunction pertaining to liquidation of collateral. V.T.C.A., Civil Practice & Remedies Code § 51.014(4) (1997).

Cases that cite this headnote

**[4]**　**Injunction**　Authority and discretion of court

The determination of whether to dissolve a temporary injunction lies within the sound discretion of the trial court.

3 Cases that cite this headnote

**[5]**　**Appeal and Error**　Continuing, vacating, or dissolving

On appeal from denial of motion to dissolve temporary injunction, review is limited to the narrow question of whether the trial court abused its discretion by denying the motion to dissolve.

2 Cases that cite this headnote

[6]     **Appeal and Error**    Burden of showing grounds for review

Appellant challenging denial of motion to dissolve temporary injunction bore burden of establishing that trial court abused its discretion.

3 Cases that cite this headnote

[7]     **Appeal and Error**    Injunction

Debtor waived right to complain of any errors in orders comprising temporary injunction when he failed to appeal order granting temporary injunction and subsequent modifying orders.

5 Cases that cite this headnote

[8]     **Appeal and Error**    On consent, offer, or admission

The general rule is that a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation.

5 Cases that cite this headnote

[9]     **Appeal and Error**    Judgment

**Appeal and Error**    Rulings and proceedings on motions

Debtor waived any errors in temporary injunction and modifying orders, and waived right to appeal from such orders, when he agreed to orders and did not show fraud, collusion, or misrepresentation.

5 Cases that cite this headnote

[10]    **Injunction**    Grounds in general

A trial court may modify a temporary injunction because of changed circumstances.

Cases that cite this headnote

[11]    **Injunction**    Grounds in general

Movant seeking modification of temporary injunction must prove that circumstances have changed.

Cases that cite this headnote

[12]    **Injunction**    Grounds in general

Changed circumstances justifying modification of temporary injunction are conditions that altered the status quo existing after the temporary injunction was granted or that made the temporary injunction unnecessary or improper.

5 Cases that cite this headnote

**[13]** **Injunction** 👉 Grounds or cause in general

The trial court has no duty, upon the filing of a motion to dissolve a temporary injunction, to reconsider the grant of the injunction if the motion does not allege fundamental error or changed conditions, and the trial court cannot be held to have abused its discretion by refusing to alter its prior decision if there is no new evidence.

6 Cases that cite this headnote

**[14]** **Injunction** 👉 Terminating, Vacating, or Dissolving Injunction

The purpose of a motion to dissolve a temporary injunction is to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant.

1 Cases that cite this headnote

**[15]** **Injunction** 👉 Particular cases

Defects in temporary injunction and modifying orders, which failed to set forth date for trial, were not fundamental errors requiring trial court to reconsider grant of injunction when party that sought to dissolve injunction actively agreed to each order. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

5 Cases that cite this headnote

**[16]** **Injunction** 👉 Scope of Relief in General

**Injunction** 👉 Form and requisites

Requirements of rule governing form and scope of injunctions and restraining orders are mandatory and must be strictly followed. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

Cases that cite this headnote

**[17]** **Injunction** 👉 Authority and discretion of court

**Injunction** 👉 Grounds in general

If failure to comply with rule governing temporary injunctions was fundamental, trial court had a duty to reconsider its grant of a temporary injunction and modifying orders. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

1 Cases that cite this headnote

**[18]** **Injunction** 👉 Evidence and affidavits

Debtor seeking to dissolve temporary injunction pertaining to liquidation of collateral did not prove requisite change in circumstances, even though he argued that collateral at issue had been liquidated and proceeds applied to debt owed to one creditor, inasmuch as debtor did not show that all creditors had been paid in full, and underlying orders were necessary to ensure proper disbursement of any remaining proceeds.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*719** Percy L." Wayne" Isgitt, Atty. at Law, Houston, for Appellant.

D B Stone, Atty. at Law, Don D. Sunderland, Mullin, Hoard & Brown, Amarillo, David C. Junkin, Steven James Wingard, Scott, Douglas & McConnico, Austin, Marcus F. Schwartz, Schwartz & Schwartz, Attys. at Law, Hallettsville, Kaaran E. Thomas, Vinson & Elkins, Houston, for Appellee.

Before Justices HINOJOSA, YAÑEZ, and RODRIGUEZ.

# O P I N I O N

Opinion by Justice HINOJOSA.

This is an interlocutory appeal from the trial court's denial of a motion to dissolve a temporary injunction. In three issues, appellant, David Henke, contends the trial court erred in refusing to grant the motion to dissolve because:

> (1) the portions of the underlying orders which comprise the temporary injunction are subject to being declared void and dissolved because they fail to meet the mandatory requirements of Texas Rule of Civil Procedure 683 [1] in that they: (a) do not specify a trial date, (b) do not set forth the reason for the issuance of the temporary injunction, (c) are not specific as to the terms of the temporary injunction, and (d) do not contain reasonable detail as to the act or acts sought to be restrained without reference to the complaint or other document;

> (2) while the parties agreed to a temporary injunction, the injunctive provisions as embodied in the orders constitute a permanent injunction in the absence of an order setting the case for trial; and

>> (3) the basis for the temporary orders was to provide an orderly manner for the liquidation of collateral—because the collateral has been liquidated and the proceeds applied to the debt owed Peoples State Bank, the reasons for the issuance of the temporary injunction no longer exist.

We affirm the trial court's order.

The record reflects the trial court rendered: (1) a temporary restraining order, signed on August 8, 1997; (2) an agreed order, signed on August 22, 1997, granting a temporary injunction; (3) an agreed order, signed on September 5, 1997, modifying the temporary orders (the temporary restraining order of August 8 and the agreed temporary injunction of August 22); and (4) an agreed order, signed on **\*720** September 16, 1997, modifying the temporary restraining order (and all temporary injunction orders) and providing for the terms and conditions for the sale of cattle.

Henke could not appeal the temporary restraining order; however, he had twenty days within which to perfect an appeal from the remaining temporary orders. TEX.R.APP. P. 42; TEX. CIV. PRAC. & REM.CODE ANN. § 51.014 (Vernon 1997). Henke did not appeal any of the temporary orders.

On April 22, 1999, Henke filed a motion to dissolve the temporary injunction and the subsequent modifying orders. The trial court denied the motion on April 27, 1999 stating, "Henke has not timely appealed or otherwise challenged the Orders and ... he has agreed to the Orders." Henke appeals from the trial court's order denying his motion to dissolve.

## A. APPELLATE JURISDICTION

**[1]  [2]  [3]**   Under Texas procedure, appeals are allowed only from final orders or judgments. *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992); *North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 895 (Tex.1966). Unless a statute specifically authorizes an interlocutory appeal, Texas appellate courts have jurisdiction only over final judgments. *Cherokee Water Co. v. Ross,* 698 S.W.2d 363, 365 (Tex.1985) (orig.proceeding); *Aldridge,* 400 S.W.2d at 895; *City of Mission v. Ramirez,* 865 S.W.2d 579, 581 (Tex.App.—Corpus Christi 1993, no writ). Section 51.014 of the Texas Civil Practice & Remedies Code specifically allows appeal of various interlocutory orders, including an order that "(4) grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction ... [.]" TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(4) (Vernon 1997). We conclude we have jurisdiction to consider this interlocutory appeal.

### B. MOTION TO DISSOLVE

**[4]  [5]  [6]**   The determination of whether to dissolve a temporary injunction lies within the sound discretion of the trial court. *Cellular Marketing, Inc. v. Houston Cellular Telephone Co.,* 784 S.W.2d 734, 735 (Tex.App.—Houston [14th Dist.] 1990, no writ). On appeal, our review is limited to the narrow question of whether the trial court abused its discretion by denying the motion to dissolve. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). Accordingly, Henke has the burden to establish that the trial court abused its discretion. *Tober v. Turner of Texas,* 668 S.W.2d 831, 834 (Tex.App.—Austin 1984, no writ).

### C. RULE 683

**[7]**   Henke correctly argues that the orders to which he and Peoples State Bank agreed, and which the trial court signed, are technically subject to being declared void and dissolved because they fail to meet the requirements of Rule 683. However, because Henke failed to appeal the trial court's order granting the temporary injunction and the subsequent modifying orders, we hold Henke has waived his right to complain of any errors in those orders.

**[8]  [9]**   Further, the general rule is that a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation. *First American Title Ins. Co. v. Adams,* 829 S.W.2d 356, 364 (Tex.App.—Corpus Christi 1992, writ denied) (citing *Bexar County Criminal Dist. Attorney's Office v. Mayo,* 773 S.W.2d 642, 644 (Tex.App.—San Antonio 1989, no writ) and *Charalambous v. Jean Lafitte Corp.,* 652 S.W.2d 521, 525 (Tex.App.—El Paso 1983, writ ref'd n.r.e.)). We find no evidence in the record of fraud, collusion, or misrepresentation. Because he agreed to the orders, we hold Henke has waived any error and has waived his right to appeal.

### *721  C. CHANGED CIRCUMSTANCES AND FUNDAMENTAL ERROR

**[10]  [11]  [12]  [13]  [14]**   A trial court may modify a temporary injunction because of changed circumstances. *Smith v. O'Neill,* 813 S.W.2d 501, 502 (Tex.1991). The movant must prove that circumstances have changed. *City of Seagoville v. Smith,* 695 S.W.2d 288, 289 (Tex.App.—Dallas 1985, no writ). Changed circumstances are conditions that altered the status quo existing after the temporary injunction was granted or that made the temporary injunction unnecessary or improper. *Desai v. Reliance Mach. Works, Inc.,* 813 S.W.2d 640, 641 (Tex.App.—Houston [14th Dist.] 1991, no writ). The trial court has no duty, upon the filing of a motion to dissolve, to reconsider the grant of the injunction if the motion does not allege fundamental error or changed conditions. *Cellular Marketing,* 784 S.W.2d at 735. The trial court cannot be held to have abused its discretion by refusing to alter its prior decision if there is no new evidence. *Id.* The purpose of a motion to dissolve is to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant. *Tober,* 668 S.W.2d at 836. The *Tober* Court stated:

> From a practical standpoint, if a litigant could, by motion to dissolve, force reconsideration of the original grant, without a showing of changed conditions, then there is an incentive for him to do so at least once, or more often, in hope that he will be able to wear down the resistance of the original trial judge, or in hope that he will be able to secure a hearing before a different trial judge who may be more sympathetic. Such actions needlessly add to the judicial caseload, both at the trial and appellate level. Recognition of the principle that the trial court has no duty to reconsider the validity of the original grant of temporary injunction upon motion to dissolve enables the trial court to dispose of motions to dissolve solely upon the pleadings when the motion to dissolve, on its face, shows that the litigant offers no new evidence.

*Id.* at 835.

 **[15]**    At the hearing on the motion to dissolve, Henke argued the orders he had agreed to were "void." He stated:

> Under the case law and under the Rules of Civil Procedure a temporary injunction must set forth a date for trial in order for it to be valid.... And also, if it does not contain a trial setting and if it does not contain findings as to the reason for it, it is void and may not be made valid by waiver.

 **[16]**    **[17]**    Initially, it appears the trial court's failure to comply with Rule 683 is fundamental error. The requirements of rule 683 are mandatory and must be strictly followed. *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986). If the error is fundamental, the trial court had a duty to reconsider the grant of the temporary injunction and the modifying orders. *See Cellular Marketing,* 784 S.W.2d at 735. However, because the orders were agreed, they are not subject to attack by Henke. *See Alexander v. Alexander,* 373 S.W.2d 800, 805 (Tex.Civ.App.—Corpus Christi 1963, no writ). Because Henke actively agreed to each order, we hold the deficiencies in the orders are not fundamental error.

 **[18]**    Henke contends the temporary injunction should have been dissolved because of changed conditions. Henke argues the agreed order of September 16, 1997, provided for the liquidation of collateral (sale of cattle) and the application of the proceeds to the indebtedness of his creditors. Henke contends the collateral has been liquidated and the proceeds have been applied to the debt he owed Peoples State Bank. Thus, he argues, the reason for the temporary injunction no longer exists.

 **\*722**  After reviewing the record, we hold Henke did not prove a change in the circumstances made the basis of the temporary injunction. We note that Henke's motion to dissolve alleges only the violation of Rule 683 and not any changed conditions. The record reflects that Henke only argued changed conditions at the hearing on the motion to dissolve. Henke argued:

> [T]he whole point of the order is now moot. Peoples Bank was paid in December of 1997. They continue to pursue Mr. Henke and raise their attorneys' fees up to a quarter of a million dollars level when they were paid within three months of filing this lawsuit. The purpose for the injunction doesn't exist anymore. All the money that is going to be collected has been collected months and months ago.

Henke's argument is no evidence that circumstances had changed. The agreed order modifying temporary orders, signed on September 5, 1997, states that Henke was indebted to Peoples State Bank, First State Bank, Prairie Livestock, Friona Agricultural Credit Corporation, and several other entities. Henke made no effort to prove that all these entities had been paid in full.

In addition, the order states:

> In the event disbursements to PSB [Peoples State Bank] for application to the Henke's debt result in payment in full of Henke's debt to PSB, then, all additional proceeds that are distributed to PSB under the provisions of this order are to be maintained by PSB in an interest-bearing escrow account and disbursed only upon further order of this Court.

Thus, even if Peoples State Bank was paid in full as alleged by Henke, the temporary injunction and the modifying orders are still necessary to ensure the proper disbursement of any remaining proceeds.

We hold the trial court did not abuse its discretion by denying Henke's motion to dissolve. We overrule Henke's three issues.

The trial court's order denying Henke's motion to dissolve is AFFIRMED.

Footnotes

1    RULE 683. FORM AND SCOPE OF INJUNCTION OR RESTRAINING ORDER

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise. Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

TEX.R. CIV. P. 683.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

663 S.W.2d 91
Court of Appeals of Texas,
El Paso.

Miguel HERNANDEZ & Antonio Hernandez, d/b/a Bocaccio 2000, Appellants,

v.

Ramon TELLES, Appellee.

No. 08–82–00320–CV. | Dec. 14, 1983.

Buyers brought action against seller for breach of warranties and violations of the Deceptive Trade Practices-Consumer Protection Act, alleging they had been damaged by purchase of defective mechanical bucking bull. The 34th District Court, El Paso County, Jerry Woodard, J., entered take nothing judgment against buyers, and buyers appealed. The Court of Appeals, Ward, J., held that: (1) original contract of sale between buyers and seller was replaced by new agreement made by compromise and settlement; (2) evidence existed supporting trial court's submission to jury of issues regarding compromise and settlement; (3) sufficient evidence existed to support finding on issues regarding compromise and settlement; and (4) buyers' objection, made on appeal, as to late filing of seller's answer, was untimely and had been waived.

Affirmed.

West Headnotes (10)

**[1]** **Compromise and Settlement** 👉 Unliquidated, disputed, or doubtful claims in general

Disputed or unliquidated claim is basis for compromise.

Cases that cite this headnote

**[2]** **Compromise and Settlement** 👉 Nature and Requisites

Law has always favored resolution of controversies through compromise and settlement rather than through litigation and it has always been policy of law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy.

7 Cases that cite this headnote

**[3]** **Compromise and Settlement** 👉 Subject-matter

Even strong policy of statute to protect consumers against false, misleading and deceptive business practices, which is foundation of Deceptive Trade Practices Act, does not overrule stronger policy of law favoring settlements of disputes. V.T.C.A., Bus. & C. § 17.50.

5 Cases that cite this headnote

**[4]** **Compromise and Settlement** 👉 Nature and Requisites

Compromise and settlement agreement is subject to general principles of law of contracts.

4 Cases that cite this headnote

**[5]** **Compromise and Settlement** 🔑 Nature and Requisites

**Compromise and Settlement** 🔑 Unliquidated, disputed, or doubtful claims in general

Enforceable agreement of compromise requires offer of compromise, meeting of minds of parties and unconditional acceptance within time and on terms offered; it is also essential that amount of claim be disputed.

2 Cases that cite this headnote

**[6]** **Compromise and Settlement** 🔑 Subject-matter

Where buyers purchased allegedly defective bucking bull from seller, buyers and seller reached new agreement to rescind sale, seller agreeing to return balance paid on contract upon buyers' return of bull, and buyers never returned bull though seller was ready, willing and able to perform, original contract of sale was replaced by new agreement made by compromise and settlement.

1 Cases that cite this headnote

**[7]** **Compromise and Settlement** 🔑 Operation and Effect

Settlement agreement could be asserted as a defense in action brought under the Deceptive Trade Practices Act, notwithstanding fact that compromise and settlement is not statutory defense under Act. V.T.C.A., Bus. & C. §§ 17.41 et seq., 17.50B(d).

Cases that cite this headnote

**[8]** **Compromise and Settlement** 🔑 Weight and sufficiency

Considering only evidence and inferences therefrom which supported jury's findings, evidence existed that buyers and seller of allegedly defective bucking bull reached compromise agreement.

Cases that cite this headnote

**[9]** **Compromise and Settlement** 🔑 Weight and sufficiency

Considering all evidence, sufficient evidence existed that buyers and seller of allegedly defective bucking bull reached compromise agreement.

Cases that cite this headnote

**[10]** **Appeal and Error** 🔑 Amendments and supplemental pleadings

Where no objection appeared in record to defendant's filing of pleading on defensive issues as trial amendment without leave of trial court, nor to evidence supporting pleading, plaintiff's objection made on appeal as to late filing of defendant's answer was untimely and had been waived.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*92** Lawrence Douglas Durnford, El Paso, for appellants.

Miguel A. Alvarez, Scott Segall, El Paso, for appellee.

Before PRESLAR, C.J., and WARD and SCHULTE, JJ.

## OPINION

WARD, Justice.

The Plaintiffs Miguel and Antonio Hernandez filed this suit against the Defendant Ramon Telles under the provisions of the Deceptive Trade Practices-Consumer Protection Act, Tex.Bus. & Com.Code Ann. sec. 17.41, et seq. (Vernon Supp.1982), alleging they had been damaged by their purchase of a defective mechanical bucking bull. Trial was to a jury which answered the Plaintiffs' issues generally in favor of the Plaintiffs. However, the jury also answered issues which submitted the Defendant's theory that the dispute had been previously compromised and settled in favor of the Defendant. Based on the latter findings, a take nothing judgment was entered against the Plaintiffs who now bring this appeal. We affirm.

On February 18, 1981, the parties entered into a written agreement by which the Defendant agreed to sell to the Plaintiffs the bucking mechanical bull for the total price of $5,250.00, the terms being the sum of $1,000.00 cash paid to the Defendant on the date of the contract, $1,500.00 to be paid on the date of delivery and the balance by a series of IOUs. The bull was delivered to the Plaintiffs in El Paso about the first of March and the $1,500.00 was paid to the Defendant. Plaintiffs then took the device to their place of entertainment in Juarez, Mexico, and it immediately started breaking down. This occurred on three or four occasions. According to the Defendant, one of the Plaintiffs then came to the Defendant in El Paso some time in March, and a new agreement was entered into whereby the parties agreed to rescind the sale. The sum of $1,000.00 in cash was immediately repaid to the Plaintiffs as well as $500.00 of the IOUs. Defendant agreed that when the Plaintiffs delivered the bull back to him in El Paso he would give the Plaintiffs the balance of their cash and notes that they had paid on the contract. The Plaintiffs thereafter never returned the bucking bull, although the defendant was ready, able and willing to return the balance of the purchase price upon the return of the bull.

On June 26, a letter termed a Deceptive Trade Practices Act Notice was mailed to the Defendant by the Plaintiffs' attorney. By it, demands were made for the balance of the purchase price, the cost of certain repairs made to the machine, losses of business suffered by the Plaintiffs and attorney's fees. Thereafter the suit was filed and the trial resulted. At the trial, the jury returned issues in favor of the Plaintiffs regarding two Deceptive Trade Practices Acts and breaches of express and implied warranties. In addition, they found that the Plaintiffs had suffered $4,400.00 in actual damages and $4,700.00 in lost profits. No attack by the Defendant is made on this appeal as to these findings.

The findings that are the subject of this appeal are those regarding Special Issue Nos. 27, 28 and 29. The jury determined by No. 27 that the Plaintiffs and Defendant **\*93** entered into an agreement for the return of the mechanical bull to El Paso and the refund of the purchase monies, by No. 28 that the Plaintiffs after that agreement refused to return the said mechanical bull, and by No. 29 that the Defendant stood ready, able and willing to refund said monies upon return of the mechanical bull. On the basis of these answers, the court entered the take nothing judgment.

The Plaintiffs' first point of error alleges that they are entitled to judgment as a matter of law based upon the favorable jury findings on their cause of action and award of damages. Under the point, they further argue that as a matter of law Special Issue Nos. 27, 28 and 29 were either improperly submitted or were immaterial to the verdict as a matter of law. The Plaintiffs' position is that the statutory cause of action created by the Deceptive Trade Practices Act can only be defended against by the statutory defenses specifically enumerated in the Act. Section 17.50B(d) provides a defense to any cause of action under Section 17.50 if

the Defendant proves: (1) that he received statutory notice of the claim, (2) that within thirty days of the date of said notice he, (3) tendered to the consumer the amount of actual damages claimed and expenses reasonably incurred in asserting the claim. The Plaintiffs argue that there is no evidence to prove that the defendant ever complied with the Act.

 [1]    [2]    [3]    [4]    [5]    [6]    [7]    Regardless of the statute, the issues in question submitted the Defendant's theory that there was a compromise and settlement of the cause of action between the parties in March, 1981. A disputed or unliquidated claim is the basis for a compromise. The law has always favored the resolution of controversies through compromise and settlement rather than through litigation and it has always been the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy. 15A Am.Jur.2d, Compromise and Settlement, secs. 2 and 5 (1976). We hold that even the strong policy of the statute to protect consumers against false, misleading and deceptive business practices, which is the foundation of the Deceptive Trade Practices Act does not overrule the stronger policy of the law favoring settlements of disputes. A compromise and settlement agreement is subject to the general principles of the law of contracts. An enforceable agreement of compromise requires an offer of compromise, a meeting of minds of the parties and an unconditional acceptance within the time and on the terms offered. It is essential that the amount of the claim be disputed. 12 Tex.Jur.3d, Compromise and Settlement, sec. 4 (1981). All of the recited elements were met according to the testimony of the Defendant, and the special issues in question together with any necessary implied findings by the court resolved the dispute in the Defendant's favor. The original contract of sale was replaced by the new agreement made by the compromise and settlement. It was the Plaintiffs who breached the new agreement and they should not be in a position to profit by their breach. The first point is overruled.

 [8]    [9]    [10]    The Plaintiffs' second point of error is that the trial court erred in overruling their objections to the submission of Special Issue Nos. 27, 28 and 29, as they were not controlling issues on any theory of defense and had no effect upon the liability issues in the case. As previously discussed, we disagree with this contention. Also under this point, the Plaintiffs argue that there was no evidence or insufficient evidence to support the submission. We have considered only the evidence and inferences therefrom which support the jury's findings and the no evidence argument is overruled. Having considered all of the evidence, the factual insufficiency argument is likewise overruled.

Also under the point, the Plaintiffs complain because the pleadings supporting these defensive issues were not filed within seven days of trial without leave of court. It appears this pleading was filed as a trial amendment and no objection appears in the record to the filing of this pleading or to the evidence supporting it. The objection now made on appeal as to the late filing of the answer is untimely and the objection has been waived. The second point of error is overruled.

 **\*94**  The judgment of the trial court is affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

343 S.W.3d 268 (Mem)
Court of Appeals of Texas,
Houston (14th Dist.).

In re G. Christian CORCORAN and Peggy Corcoran, Relators.

No. 14–10–01187–CV.  |  May 19, 2011.

Original Proceeding Writ of Mandamus, 125th District Court Harris County, Texas,  **\*269**  Trial Court No. 2009–41594, Shearn Smith, Judge.

**Attorneys and Law Firms**

Marc J. Wojciechowski, Malcom Deon Dishongh, Spring, for Relators.

Kimberly M. Spurlock, Humble, Jeffrey D. Roberts, Houston, for Real Party in Interest.

Panel consists of Justices BOYCE, CHRISTOPHER, and JAMISON.

**SUBSTITUTE OPINION**

WILLIAM J. BOYCE, Justice.

We grant relators' motion for rehearing, withdraw our opinion of March 31, 2011, and substitute this opinion on rehearing.

In this original proceeding, G. Christian Corcoran and Peggy Corcoran, relators, seek a writ of mandamus ordering respondent, the Honorable Shearn Smith, sitting for the Honorable Kyle Carter in the 125th District Court of Harris County, Texas, to vacate his order signed August 3, 2009, granting an Agreed Mutual Temporary Injunction. Further, relators request we direct the Honorable Kyle Carter, presiding judge of the 125th District Court of Harris County, Texas, to vacate his order signed October 14, 2009, granting sanctions against relators. We conditionally grant the writ.

Relators contend the order granting the Agreed Mutual Temporary Injunction is void as a result of the absence of a trial setting. We agree. "Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought." Tex.R. Civ. P. 683. "This provision is mandatory; a failure to include a trial setting is grounds for voiding the injunction." *Kaufmann v. Morales,* 93 S.W.3d 650, 656 (Tex.App.-Houston 14th Dist.2002, no pet.); *see also In re Garza,* 126 S.W.3d 268 (Tex.App.-San Antonio 2003, orig. proceeding).

We therefore conditionally grant the petition for a writ of mandamus and direct the Honorable Shearn Smith, sitting for the Honorable Kyle Carter in the 125th District Court of Harris County, Texas, to vacate his order signed August 3, 2009, granting the Agreed Mutual Temporary Injunction. The writ will issue only if the Honorable Shearn Smith fails to act in accordance with this opinion.

Relators also contend the Order Granting Plaintiff's Motion for Contempt, signed October 14, 2009, must be vacated. We agree. A trial court that holds a party in contempt for violating a void order necessarily abuses its discretion. *See In re Garza,* 126 S.W.3d at 272 (citing *Ex parte Shaffer,* 649 S.W.2d 300, 301–02 (Tex.1983)). Here, the trial court held relators in contempt for violating a void order. As such, the trial court abused its discretion, and relators are entitled to relief.

We therefore conditionally grant the petition for a writ of mandamus and direct the Honorable Kyle Carter to vacate his order signed October 14, 2009, granting sanctions. The writ will issue only if the Honorable Kyle Carter fails to act in accordance with this opinion.

Because we have found the order void, it will not support the award of sanctions or attorney fees. *See Ex parte Sealy,* 870 S.W.2d 663, 667 (Tex.App.-Houston [1st Dist.] 1994, orig. proceeding); *Keene Corp. v. Gardner,* 837 S.W.2d 224, 232 (Tex.App.-Dallas 1992, writ denied). We therefore order the Joneses and their attorney to refund to the Corcorans any monies they paid under the trial court's void order.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

126 S.W.3d 268
Court of Appeals of Texas,
San Antonio.

In re Andrea GARZA, Individually and as Independent Executrix of the Estate of Alfred S. Garza, deceased.

No. 04–03–00478–CV.    |    Nov. 12, 2003.

Litigant sought writ of mandamus ordering the 81st Judicial District Court, Atascosa County, Donna S. Rayes, J., to vacate contempt judgment. The Court of Appeals, Karen Angelini, J., held that: (1) temporary injunction which did not include a trial setting date or provide for a bond was void, and (2) trial court abused its discretion in holding litigant in contempt for violating void injunction.

Writ conditionally granted.

West Headnotes (9)

[1]    **Mandamus**  ☞ Remedy at Law

       **Mandamus**  ☞ Nature of acts to be commanded

       Mandamus issues only to correct a clear abuse of discretion or a violation of a duty imposed by law when there is no other adequate remedy at law.

       2 Cases that cite this headnote

[2]    **Habeas Corpus**  ☞ Contempt

       **Mandamus**  ☞ Existence and Adequacy of Other Remedy in General

       Contempt orders that do not involve confinement cannot be reviewed by writ of habeas corpus, and the only possible relief is a writ of mandamus.

       3 Cases that cite this headnote

[3]    **Appeal and Error**  ☞ Consent to judgment or order

       Generally, a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation; the rationale for this rule is that a party should not be allowed, but rather be estopped, to complain on appeal of an action or ruling which he invited, agreed to, or induced.

       Cases that cite this headnote

[4]    **Motions**  ☞ Construction and operation of orders in general

       A void order has no force or effect and confers no rights; it is a mere nullity.

       9 Cases that cite this headnote

[5]    **Contempt**  ☞ Validity of mandate, order, or judgment

A party who agrees to a void order has agreed to nothing, and thus, a trial court that holds a party in contempt for violating a void order necessarily abuses its discretion.

10 Cases that cite this headnote

[6]    **Injunction** 👈 Preservation of status quo

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the suit, pending a final trial on the merits of the case.

Cases that cite this headnote

[7]    **Injunction** 👈 Form and requisites

There are two reasons for requiring a temporary injunction to include a trial date; one is to prevent the temporary injunction from effectively becoming permanent without a trial, and another is for the order to be complete on its face and not reference to the complaint or other document. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

5 Cases that cite this headnote

[8]    **Injunction** 👈 Necessity and waiver in general
       **Injunction** 👈 Form and requisites

Temporary injunction issued by trial court was void, where it did not contain a trial setting date or provide for a bond as required by procedural rules. Vernon's Ann.Texas Rules Civ.Proc., Rules 683, 684.

8 Cases that cite this headnote

[9]    **Injunction** 👈 Illegality or invalidity of injunction

Trial court abused its discretion by holding litigant in contempt for violating temporary injunction which was void due the failure to include in injunction order a trial setting date or provide for a bond. Vernon's Ann.Texas Rules Civ.Proc., Rules 683, 684.

13 Cases that cite this headnote

**\*269**  Original Mandamus Proceeding. [1]

**Attorneys and Law Firms**

W. Wendall Hall, Rosemarie Kanusky, Fulbright & Jaworski L.L.P., Terrence J. Martin, Martin, Friedland & Strolle, P.C., San Antonio, for Relator.

Ellen B. Mitchell, Cox & Smith Incorporated, Douglas W. Sanders, Jeffrey T. Cullinane, Paul D. Barkhurst, Oppenheimer, Blend, Harrison & Tate, Inc., San Antonio, for Real Party in Interest.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Relator Andrea Garza seeks a writ of mandamus ordering respondent, the Honorable Donna S. Rayes, to vacate the May 28, 2003 contempt judgment. Because we conclude that Garza is entitled to the relief sought, we conditionally grant the writ.

## BACKGROUND

This mandamus proceeding arises out of a dispute over a family business. In October 1995, Real Party in Interest Jaime Trevino and his cousin, Alfred G. Garza, entered into a partnership agreement to operate a business called Lobo Security. According to Trevino, however, his uncle, Alfred S. Garza, was his true partner. For personal financial reasons, Alfred S. Garza had requested that the partnership agreement name his son, Alfred G. Garza, as Trevino's partner. During their partnership, Trevino claims that Alfred S. Garza diverted partnership funds for his own benefit and the benefit of his immediate family members. On March 1, 2001, Alfred S. Garza died.

On July 27, 2001, Trevino sued Alfred S. Garza's estate for fraud, breach of fiduciary duty, and breach of contract. Trevino also sued his aunt, Relator Andrea Garza, Alfred G. Garza, his partner under the partnership agreement, and two of his other cousins for fraud, conversion, civil conspiracy, and aiding and abetting Alfred S. Garza's breach of fiduciary duty. Additionally, Trevino sought a declaratory judgment regarding the characterization of the partnership's property. In response, Alfred G. Garza filed a counterclaim for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and conversion. Alfred G. Garza also sought declaratory relief.

On August 8, 2001, the trial court entered a temporary injunction, preventing the defendants ("the Garzas") from depleting their assets during litigation. The Garzas were enjoined from "[d]estroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties." And, they were enjoined from "[s]elling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of [Trevino] or [the Garzas], whether personalty or realty, and whether separate or community, except as specifically authorized" by the trial court. The temporary injunction did permit the Garzas to incur indebtedness to pay legal expenses. It did **\*270** not, however, contain a trial setting date or provide for a bond.

A year later, the Garzas moved to dissolve the temporary injunction. Trevino then filed his first motion for contempt, which was denied by the trial court. On April 17, 2003, Trevino filed his second motion for contempt, arguing that Andrea Garza had violated the temporary injunction by borrowing $112,000 against her homestead to pay for her legal fees and costs. According to Trevino, the temporary injunction's prohibition against encumbrances trumped the provision allowing Garza to fund her defense. After holding an evidentiary hearing, the trial court signed a "Judgment of Contempt" on May 28, 2003, ordering Garza, on or before July 1, 2003, to effectuate a release of lien and pay Trevino's attorney $3,500 and costs of the proceeding. On June 26, 2003, Garza filed this mandamus proceeding, seeking relief from the trial court's contempt judgment. [2]

## MANDAMUS

 **[1]** **[2]** Mandamus issues only to correct a clear abuse of discretion or a violation of a duty imposed by law when there is no other adequate remedy at law. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig.proceeding); *In re Dilley Indep. Sch. Dist.,* 23 S.W.3d 189, 191 (Tex.App.-San Antonio 2000, orig. proceeding). Contempt orders that do not involve confinement

cannot be reviewed by writ of habeas corpus, and the only possible relief is a writ of mandamus. *In re Long,* 984 S.W.2d 623, 625 (Tex.1999) (orig.proceeding); *Rosser v. Squier,* 902 S.W.2d 962, 962 (Tex.1995) (orig.proceeding).

## WAIVER?

According to Garza, because the temporary injunction failed to (1) set a trial setting pursuant to Texas Rule of Civil Procedure 683 and (2) set bond pursuant to Texas Rule of Civil Procedure 684, the temporary injunction is void. Thus, she argues that the trial court abused its discretion in holding her in contempt for violating a void order. *See Ex parte Shaffer,* 649 S.W.2d 300, 301–02 (Tex.1983) (holding that trial court abuses its discretion by holding party in contempt for violating void order). In response, Trevino argues that Garza has waived her complaint by agreeing to the terms of the temporary injunction.

The temporary injunction states that "[t]he parties have agreed to the terms of this order as evidenced by the signatures below." Although counsel for the Garzas signed the temporary injunction, his signature was prefaced by the phrase, "Approved as to Form Only." However, in "Defendants' Motion to Dissolve or Modify Temporary Restraining Order," counsel for the Garzas admits that at the time the temporary injunction was entered, the Garzas had agreed to its terms. The record, therefore, shows that the Garzas did, in fact, agree to the terms of the temporary injunction.

 **[3]**    According to Trevino, because the Garzas agreed to the terms of the temporary injunction, they are barred from complaining of any error now. Trevino emphasizes that generally, a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation. *Henke v. Peoples State Bank,* 6 S.W.3d 717, 720 (Tex.App.-Corpus Christi 1999, pet. dism'd w.o.j.). "The rationale for this rule is that a party should not be allowed, but rather be estopped, to complain on **\*271**  appeal of an action or ruling which he invited, agreed to, or induced." *Ayala v. Minniti,* 714 S.W.2d 452, 456 (Tex.App.-Houston 1986, no writ). By consenting to the action of the court, a party waives all errors committed or contained in the judgment, except want of jurisdiction. *Id.*

Specifically, Trevino relies on *Henke v. Peoples State Bank,* 6 S.W.3d 717 (Tex.App.-Corpus Christi 1999, pet. dism'd w.o.j.), a case with similar facts to those presented here. In *Henke,* the appellant filed an interlocutory appeal of the trial court's denial of his motion to dissolve a temporary injunction, arguing that the temporary injunction was void because it did not set a trial date. *Id.* at 719. As here, the appellant had agreed to the temporary injunction at the time it was entered. Relying on the general rule that a party may not appeal or attack an agreed judgment, the Thirteenth Court of Appeals held that by agreeing to the temporary injunction, the appellant had waived any error and had waived his right to appeal. *Id.* at 720.

 **[4]**    **[5]**    The Thirteenth Court of Appeals, however, failed to discuss if a party could agree to a void order. Garza argues that she has not waived her rights, because the temporary injunction is void. We agree that if the temporary injunction is void, Garza has not waived her rights to attack the void injunction. A void order has no force or effect and confers no rights; it is a mere nullity. *Slaughter v. Qualls,* 139 Tex. 340, 345, 162 S.W.2d 671, 674 (1942). Thus, a party who agrees to a void order has agreed to nothing. And, a trial court that holds a party in contempt for violating a void order necessarily abuses its discretion. *Ex parte Shaffer,* 649 S.W.2d at 301–02. In response, Trevino contends that the temporary injunction is voidable, not void. We must, therefore, determine whether the temporary injunction is void or voidable.

## VOID OR VOIDABLE?

 **[6]**    **[7]**    Texas Rule of Civil Procedure 683 provides that "[e]very order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought." TEX.R. CIV. P. 683. The Texas Supreme Court has stated that the requirements of rule 683 are mandatory, and "an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved." *Qwest Comm. Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000) (per curiam); *see also InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (per

curiam). Thus, we have held that failure to meet the requirements of rule 683 renders the injunction order "fatally defective and void, whether specifically raised by point of error or not." [3] *EOG Res., Inc. v. Gutierrez,* 75 S.W.3d 50, 53 (Tex.App.-San Antonio 2002, no pet.) (quoting *Hopper v. Safeguard Bus. Sys., Inc.,* 787 S.W.2d 624, 626 (Tex.App.-San Antonio 1990, no writ)); *accord Kaufmann v. Morales,* 93 S.W.3d 650, 656–57 (Tex.App.-Houston [14th Dist.] 2002, no pet.); **\*272** *Permian Chem. Co. v. State,* 746 S.W.2d 873, 874 (Tex.App.-El Paso 1988, writ dism'd); *TY Equity Group, Inc. v. Cmty. Crossing, Ltd.,* No. 05–02–00591–CV, 2002 WL 31357002, at \*1 (Tex.App.-Dallas Oct.21, 2002, no pet.) (not designated for publication).

Despite all the above-cited case law, Trevino argues that the temporary injunction is voidable because a judgment that is contrary to statute, constitutional provision, or procedural rule is merely voidable. Unlike a void judgment that is subject to collateral attack, a voidable judgment has effect until challenged. Thus, a voidable judgment may become valid by failure to timely challenge it by direct appeal. Because Garza did not challenge the temporary injunction by interlocutory appeal, Trevino contends that the temporary injunction has now become valid.

In support of his argument that the temporary injunction is merely voidable, Trevino cites *Reiss v. Reiss,* 118 S.W.3d 439 (Tex., 2003). In *Reiss,* the supreme court interpreted a 1980 divorce decree that divided retirement benefits stemming from one spouse's employment both during and after the marriage. *Id.* at 440. The trial court held that the language in the divorce decree included retirement benefits accrued after the marriage. *Id.* The former husband appealed, arguing that the divorce decree is a void judgment because the trial court that entered it did not have jurisdiction to divest him of his separate property, i.e. retirement benefits accrued after the divorce. *Id.* at 442. Thus, the former husband contended that as a void judgment, the divorce decree was subject to attack at any time. *Id.* The supreme court disagreed. *Id.*

The supreme court noted that in general, "as long as the court entering a judgment has jurisdiction of the parties and the subject matter and does not act outside its capacity as a court, the judgment is not void." *Id.* Thus, according to the supreme court, other than lack of jurisdiction, errors "such as a court's action contrary to a statute or statutory equivalent, merely render the judgment voidable so that it may be corrected through the ordinary appellate process or other proper proceedings." *Id.* (internal quotations omitted). Thus, Trevino argues that because Texas Rule of Civil Procedure 683 was violated in this case, the temporary injunction is voidable, not void, according to *Reiss.*

For support, *Reiss* cites *Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71 (Tex.2000) and *Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990) (per curiam). *Dubai* and *Mapco,* however, were decided before *Qwest Communications Corp. v. AT & T Corp.,* 24 S.W.3d 334 (Tex.2000) (per curiam). In *Qwest,* the supreme court reiterated the following:

> The Texas Rules of Civil Procedure require that an order granting a temporary injunction set the cause for trial on the merits and fix the amount of security to be given by the applicant. *See* TEX.R. CIV. P. 683, 684. These procedural requirements are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved. *See InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (stating that requirements of rule 683 are mandatory and must be strictly followed). In *InterFirst Bank,* however, the order failed to set the case for trial on the merits. *Id.* at 641. *Yet rather than dismissing the appeal for want of jurisdiction, we declared the temporary injunction void and ordered it dissolved. See id. We have also held that a temporary injunction was void when there was no bond. See* **\*273** *Lancaster v. Lancaster,* 155 Tex. 528, 291 S.W.2d 303, 308 (1956) (holding that bond provisions of rule 684 are mandatory). Here, these procedural requirements may render the trial court's order void but they do not change the order's character and function defining its classification.

*Qwest,* 24 S.W.3d at 337 (emphasis added). *Qwest,* thus, clearly states that unless a temporary injunction complies with both rules 683 and 684, it is void. *Qwest* was decided after *Dubai,* the case relied on by the supreme court in *Reiss.* Thus, we must assume that if the supreme court believed the principles it stated in *Dubai* applied to temporary injunctions, it would have so stated in *Qwest.* Moreover, *Reiss* does not discuss temporary injunctions in any manner. We, therefore, must follow *Qwest's* holding.

 **[8]**   Additionally, Trevino argues that the supreme court cases discussing temporary injunctions state that a temporary injunction failing to comply with rules 683 and 684 is "subject to being declared void and dissolved." *InterFirst Bank,* 715 S.W.2d at 641. According to Trevino, "subject to being declared void" means that the order is voidable, not void. However, the *Qwest* court made clear that a temporary injunction failing to comply with rules 683 and 684 is void. *See Qwest,* 24 S.W.3d at 337 ("[W]e declared the temporary injunction void and ordered it dissolved. We have also held that a temporary injunction was void when there was no bond."). If the supreme court had meant that such a temporary injunction was voidable, we feel certain it would have used the word "voidable." Instead, the court has repeatedly used the word "void." *See Qwest,* 24 S.W.3d at 337; *InterFirst Bank,* 715 S.W.2d at 641. We, therefore, hold that because the temporary injunction here failed to comply with rules 683 and 684, it is void. [4]

## CONTEMPT JUDGMENT

 **[9]**   A trial court that holds a party in contempt for violating a void order necessarily abuses its discretion. *Ex parte Shaffer,* 649 S.W.2d 300, 301–02 (Tex.1983). Here, the trial court held Garza in contempt for violating a void order. As such, the trial court abused its discretion, and Garza is entitled to the relief sought.

## CONCLUSION

Because the trial court abused its discretion, we conditionally grant Garza's petition for writ of mandamus. TEX.R.APP. P. 52.8(c). Only if the Honorable Donna S. Rayes fails to vacate the "Judgment of Contempt" signed on May 28, 2003, will we issue the writ.

Footnotes

1   This proceeding arises out of Cause No. 01–07–0443–CVA, styled *Jaime J. Trevino v. Andrea Garza, Annette Carrasco, Amanda Garcia, and Alfred G. Garza,* pending in the 81st Judicial District Court, Atascosa County, Texas, the Honorable Donna S. Rayes presiding.

2   Garza also filed a motion to stay the contempt judgment. We granted the motion and stayed the contempt judgment pending final disposition of this petition.

3   The purpose of a temporary injunction is to preserve the status quo of the subject matter of the suit, pending a final trial on the merits of the case. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). There are at least two reasons for requiring a temporary injunction to include a trial date. One is to prevent the temporary injunction from effectively becoming permanent without a trial. *EOG Res.,* 75 S.W.3d at 53; *see also Kaufmann,* 93 S.W.3d at 657. The second is for the order to be complete on its face and not "reference to the complaint or other document." *Kaufmann,* 93 S.W.3d at 657 (quoting rule 683). "It is important for trial judges or parties to read the original order and have before them all information relevant to the injunction." *Id.*

4   Because we have determined that the temporary injunction is void, we need not reach the relator's other issues.

---

**End of Document**                                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 3970865
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Corpus Christi-Edinburg.

In re GRAYBAR ELECTRIC COMPANY, INC.

Graybar Electric Company, Inc., Appellant,

v.

Alvaro Gonzalez, et al., Appellees.
In re Graybar Electric Company, Inc., Mira Enterprises, Inc., and Mark Stallings, Inc.
Graybar Electric Company, Inc., Appellant,

v.

Laredo Hix, L.P. and Alvaro Gonzalez, Appellees.

Nos. 13-08-00073-CV, 13-08-00294-CV, 13-08-00333-CV, 13-08-00341-CV.  |  Aug. 26, 2008.

West KeySummary

1    **Courts**  🗝  Injunction or Prohibition Against Proceedings

Trial court was not required to dissolve an anti-suit injunction so the party bound by the injunction could bring suit in another county. The party that sought to dissolve the injunction was seeking to enforce a mechanics' lien in a different county. The purpose of the injunction was to prevent this from happening until after a trial on the merits was held. The party that sought dissolution was not stripped of their rights to foreclose on their lien.

5 Cases that cite this headnote

On Petition for Writ of Mandamus.
On appeal from the 93rd District Court of Hidalgo County, Texas, Rodolfo Delgado, J.

**Attorneys and Law Firms**

Ben Louis Aderholt, Looper, Reed & McGraw, Joe Virene, Houston, Mike Mills, Atlas & Hall, McAllen, Adriana H. Cardenas, McAllen, John T. Dailey, San Antonio, TX, for Appellants Relators.

Raymond L. Thomas, David H. Jones, Tracy A. Spillman, Kittleman, Thomas & Gonzales, L.L.P., Rebecca Vela, Kittleman, Thomas Ramirez & Gonzales, McAllen, for Real Parties in Interest.

Before Justices RODRIGUEZ, GARZA, and VELA.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice GARZA.

**\*1** Appellant/relator, Graybar Electric Company ("Graybar"), alleges that the trial court abused its discretion in denying its motion to partially dissolve or modify an injunction granted in favor of appellees/real parties in interest, Alvaro Gonzalez and Laredo Hix, L.P. ("Laredo Hix"). By two issues in its first interlocutory appeal, cause number 13-08-00294-CV, [1] Graybar contends that the trial court abused its discretion in denying its motion because: (1) the trial court did not have jurisdiction under the Texas Property Code, *see* TEX. PROP.CODE ANN. § 53.157(2) (Vernon 2007); and (2) the trial court did not have subject matter jurisdiction to issue a temporary injunction pursuant to section 65.023 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 65.023 (Vernon 1997). [2] In addition, Graybar petitions this Court for a writ of mandamus, in cause number 13-08-00073-CV, directing the Hidalgo County district court to set aside its order denying Graybar's motion to abate, by which the court effectively asserts dominant jurisdiction.

By six issues, reorganized as four, Graybar alleges in its second interlocutory appeal, cause number 13-08-00341-CV, that the trial court abused its discretion in granting Laredo Hix's motion to extend the original temporary injunction. [3] Graybar, MIRA Enterprises, Inc. ("MIRA"), and Mark Stallings Electric, Inc. ("Stallings") also petition this Court for a writ of mandamus, in cause number 13-08-00333-CV, directing the Hidalgo County district court to transfer the entire case to Webb County. We affirm the trial court's judgment in cause number 13-08-00294-CV; we deny Graybar's petition for writ of mandamus in cause number 13-08-00073-CV; we dismiss Graybar's appeal in cause number 13-08-00341-CV; and we deny Graybar's second petition for writ of mandamus in cause number 13-08-00333-CV.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case centers on the management and construction of a Holiday Inn Express & Suites Hotel in Laredo, Texas. On January 18, 2007, HMC Hospitality Operating Company ("HMC") filed suit against Gonzalez in Collin County, asserting claims for breach of contract, declaratory judgment, quantum meruit, and attorney's fees with respect to alleged breaches of various hotel management agreements between HMC and Gonzalez pertaining to the Laredo Holiday Inn. The district court in Collin County transferred the case to Hidalgo County on April 4, 2007, in response to a motion to transfer venue filed by Gonzalez.

On May 23, 2007, Graybar [4] perfected a mechanic's lien against the Laredo Holiday Inn and its owner, Laredo Hix, by filing its lien in the public records of Webb County. Graybar sought repayment for materials provided in the construction of the Laredo Holiday Inn in the amount of $37,788.55.

On June 22, 2007, Gonzalez filed an amended answer and counterclaim in the Hidalgo County district court denying the allegations made by HMC, asserting various affirmative defenses, and stating a counterclaim for fraud. Subsequently, Gonzalez filed an application for a temporary restraining order and motions for temporary and permanent injunctive relief in the Hidalgo County district court, seeking to enjoin HMC from communicating with or litigating against Gonzalez.

**\*2** On July 20, 2007, The Gonzalez-DLS Family Limited Partnership and Brownsville SB, L.P. filed an original petition in intervention in the Hidalgo County suit against HMC seeking declaratory relief, damages for breach of contract and fraud, exemplary damages, and attorney's fees pertaining to alleged material misrepresentations made by HMC to induce Gonzalez to enter into various hotel management agreements for four separate hotels in Pharr, McAllen, Brownsville, and Laredo. In addition, Ascension Hospitality Management, L.L.C. filed a petition in intervention to join in Hidalgo County suit. Furthermore, all parties joined in Gonzalez's application for temporary injunction.

On August 6, 2007, the Hidalgo County district court granted Gonzalez's application for temporary injunction. In its order, the court restrained HMC "from continuing to harass, threaten or communicate with the Gonzalez Group and the Gonzalez Group's employees, agents, or representatives...." The court also restrained HMC "from filing, initiating, serving any process and from

continuing any litigation against the Gonzalez Group and the Gonzalez Group's employees, agents[,] and representatives...." On August 23, 2007, HMC filed notice of its accelerated interlocutory appeal which was assigned cause number 13-07-00518-CV. [5]

On September 24, 2007, Graybar filed an original petition in Webb County against Stallings, MIRA, and Laredo Hix seeking to foreclose on the lien it filed on May 23, 2007, asserting that the defendants had failed to timely pay balances due for materials furnished for the construction of the Laredo Holiday Inn. [6] In its petition, Graybar contended that it was owed $37,788.55 for materials provided.

On October 9, 2007, Laredo Hix filed an original petition in intervention with the Hidalgo County district court. In its petition, Laredo Hix named sixteen parties as counter-defendants. Among the many counter-defendants were HMC, MIRA, Graybar, and Stallings. Laredo Hix claimed that HMC was in breach of contract, was negligent, and had breached a fiduciary duty owed to it. Additionally, Laredo Hix contended that Graybar, MIRA, and Stallings were in breach of contract and had negligently carried out their duties in the construction of the Laredo Holiday Inn. Laredo Hix also filed an application for a temporary restraining order and requests for temporary and permanent injunctions to prevent Graybar from pursuing its suit in Webb County until the Hidalgo County suit was resolved. Also on October 9, 2007, Gonzalez filed a supplemental counterclaim, an application for temporary restraining order, and requests for temporary and permanent injunctions against Graybar which were virtually identical to those filed by Laredo Hix. [7]

On November 2, 2007, the Hidalgo County district court granted the requests for temporary injunction made by Gonzalez and Laredo Hix. The court specifically restrained Graybar from (1) "continuing to harass, threaten or communicate with Laredo Hix, L.P. and/or Alvaro Gonzalez, and their employees, agents, or representatives," and (2) "filing, initiating, serving any process, and from continuing any litigation either criminal or civil against Laredo Hix, L.P., and/or Alvaro Gonzalez, and their employees, agents and representatives, except in this Court." The temporary injunction, which was in part an anti-suit injunction, was to last until May 12, 2008, when the matter was set for trial.

 **\*3**  On November 8, 2007, Graybar filed a motion to partially dissolve or modify the November 2, 2007 injunction and a verified plea in abatement with the Hidalgo County district court. In support of its motion, Graybar attached a copy of its original petition in Webb County against Stallings, MIRA, and Laredo Hix. [8] On January 2, 2008, after a hearing, the Hidalgo County district court denied Graybar's motion and plea in abatement. Graybar perfected its appeal. [9] Graybar also filed a petition for writ of mandamus on February 4, 2008, claiming that the trial court abused its discretion in denying its plea in abatement because the Webb County district court has dominant jurisdiction over all claims.

At a hearing on May 12, 2008, the Hidalgo County district court denied motions to transfer venue filed by Graybar and other interested parties-namely, Harden Plumbing Company, Inc., Pete Gallegos Paving, Inc., Stallings, and MIRA-and addressed a motion to compel. However, the court did not commence a trial on the merits at this time. Nevertheless, the November 2, 2007 temporary injunction expired. On May 20, 2008, Gonzalez and Laredo Hix filed an emergency motion to extend the November 2, 2007 temporary injunction until November 10, 2008, when the matter was scheduled for a trial on the merits in Hidalgo County. The Hidalgo County district court granted the extension, noting that "[a]ll findings set forth in this Court's Temporary Injunction Order dated November 2, 2007 are incorporated by reference as if set forth fully herein." No other changes were made to the temporary injunction.

Graybar, MIRA, and Stallings filed a joint petition for writ of mandamus in cause number 13-08-00333-CV on May 27, 2008, asserting that the venue provisions of the civil practice and remedies code mandate venue in Webb County. *See id.* §§ 15.011, 15.012 (Vernon 2002). In conjunction with its motion for leave of court, which we granted earlier, Graybar filed its notice of appeal in cause number 13-08-00341-CV on June 12, 2008.

**II. CAUSE NUMBER 13-08-00294-CV**

### A. Appellate Jurisdiction

Section 51.014(a)(4) of the civil practice and remedies code provides this Court with interlocutory appellate jurisdiction if the district court "grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction...." *Id.* § 51.014(a)(4) (Vernon 2008). Here, the trial court denied Graybar's motion to dissolve or modify an injunction. Therefore, we have jurisdiction over Graybar's interlocutory appeal. *See id.*

### B. Standard of Review

Whether to dissolve a temporary injunction is a matter lying within the trial court's discretion. *Cellular Mktg., Inc. v. Houston Cellular Tel. Co.,* 784 S.W.2d 734, 735 (Tex.App.-Houston [14th Dist.] 1990, no writ); *Tober v. Turner of Tex., Inc.,* 668 S.W.2d 831, 834 (Tex.App.-Austin 1984, no writ). On appeal, our review is limited to the question of whether the trial court abused its discretion in denying Graybar's motion to dissolve. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig.proceeding).

 **\*4** The trial court may modify a temporary injunction because of fundamental error or changed circumstances, but it has no duty to reconsider the grant of a temporary injunction if the movant fails to present new evidence showing fundamental error or changed circumstances. *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 580 (Tex.App.-Austin 2000, no pet.) (citing *Henke v. Peoples State Bank,* 6 S.W.3d 717, 721 (Tex.App.-Corpus Christi 1999, pet. dism'd w.o.j.)). Fundamental error exists when "the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982). On the other hand, changed circumstances "are conditions that altered the status quo existing after the temporary injunction was granted or that made the temporary injunction unnecessary or improper." *Henke,* 6 S.W.3d at 721.

### C. Discussion

#### 1. Graybar's Mechanic's Lien in Webb County

In its first issue, Graybar asserts that the Hidalgo County district court did not have jurisdiction over its Webb County claims pursuant to section 53.157 of the Texas Property Code. *See* TEX. PROP.CODE ANN. § 53.157(2). Specifically, Graybar contends that Webb County is the only county in which its foreclosure suit can be brought and maintained because that is where the property is located. On the other hand, Gonzalez and Laredo Hix argue that section 53.157 of the property code relates to venue of a mechanic's lien foreclosure suit and not to subject matter jurisdiction. They further argue that the injunction issued by the Hidalgo County district court does not require that Graybar pursue its mechanic's lien foreclosure suit in Hidalgo County.

Section 53.157 of the property code provides, in relevant part: "A mechanic's lien or affidavit claiming a mechanic's lien filed under Section 53.052 *may* be discharged of record by ... failing to institute suit to foreclose the lien in the county in which the property is located...." *Id.* § 53.157(2) (emphasis added). [10] Moreover, section 53.154 states that "[a] mechanic's lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien." *Id.* § 53.154 (Vernon 2007).

It is undisputed that Graybar perfected its mechanic's lien by filing an affidavit in the Webb County public records. The thrust of Graybar's argument pertaining to its mechanic's lien is that the Hidalgo County district court's issuance of the anti-suit injunction essentially forbids Graybar from foreclosing on its lien because the property code prevents it from instituting a foreclosure suit in Hidalgo County. We disagree.

The part of the Hidalgo County district court's November 2, 2007 temporary injunction, which is, in effect, an anti-suit injunction, provides, in relevant part:

**\*5** IT IS FURTHER ORDERED, that Counter-Defendants JUAN A. CASTILLO, GRAYBAR ELECTRIC COMPANY, INC., GILBERT J. GUERRERO D/B/A RIO DELTA ENGINEERING, PETE GALLEGOS PAVING, INC., SOLORIO & ASSOCIATES, MARK STALLINGS ELECTRIC, INC., and their agents, representatives, attorneys and those acting in concert therewith, are hereby immediately restrained from filing, initiating, serving any process, and from continuing any litigation either criminal or civil against the Laredo HIX, LP and/or Alvaro Gonzalez, and their employees, agents and representatives, except in this Court.

IT IS FURTHER ORDERED that this Temporary Injunction shall be valid for the remainder of this litigation until a final trial on the merits shall take place at 9 a.m., May 12, 2008.

We do not find and Graybar has not directed us to, anything in the record demonstrating that the Hidalgo County district court affirmatively asserted jurisdiction over Graybar's suit pertaining to its mechanic's lien. The effect of the anti-suit injunction was merely to abate Graybar's foreclosure suit until a trial on the merits occurred in the Hidalgo County lawsuit. [11] *See Golden Rule Ins. Co. v. Harper,* 925 S.W.2d 649, 651 (Tex.1996). We disagree with Graybar's contention that it has been "stripped of its right to bring suit to foreclose its lien." Graybar has commenced its foreclosure suit in Webb County, and based on the record before us, there is nothing preventing Graybar from prosecuting its foreclosure suit after the Hidalgo County suit is resolved. Graybar has not provided any citations to authority supporting its argument that the resolution of the Hidalgo County lawsuit would eliminate its ability to ultimately foreclose on its mechanic's lien or that the court's injunction required Graybar to foreclose on its mechanic's lien in Hidalgo County. *See* TEX.R.APP. P. 38.1(h). Moreover, Graybar has not raised any issues pertaining to changed circumstances. *See Universal Health Servs., Inc.,* 24 S.W.3d at 580; *Henke,* 6 S.W.3d at 721. Therefore, we do not find any fundamental error in the Hidalgo County district court's actions necessitating a modification or dissolution of the temporary injunction issued. Accordingly, we overrule Graybar's first issue.

## 2. Section 65.023 of the Texas Civil Practice and Remedies Code

By its second issue, Graybar asserts that the trial court did not have subject matter jurisdiction to issue the anti-suit injunction pursuant to section 65.023 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 65.023. Specifically, Graybar argues that section 65.023 requires that any injunction must be filed in Webb County. *See id.* Conversely, Gonzalez and Laredo Hix contend that section 65.023 of the civil practice and remedies code is not applicable because the Hidalgo County lawsuit is not purely injunctive in nature. *See id.*

The principle of comity requires that courts exercise the power to enjoin foreign suits "sparingly, and only in very special circumstances." *Harper,* 925 S.W.2d at 651. An anti-suit injunction may be justified when the injunction will prevent a multiplicity of suits or will protect a party from vexatious or harassing litigation. *Christensen v. Integrity Ins. Co.,* 719 S.W.2d 161, 163 (Tex.1986); *see Gannon,* 706 S.W.2d at 307; *see also Harper,* 925 S.W.2d at 651 (holding that an anti-suit injunction is appropriate: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation). The issuance of an anti-suit injunction is within the sound discretion of the trial court. *London Mkt. Insurers v. Am. Home Assurance Co.,* 95 S.W.3d 702, 705-06 (Tex.App.-Corpus Christi 2003, no pet.).

**\*6** Graybar's second issue hinges upon the interpretation of section 65.023 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 65.023. Specifically, section 65.023, entitled "Place for Trial," provides:

(a) Except as provided by Subsection (b), a writ of injunction against a party who is a resident of this state shall be tried in a district or county court in the county in which the party is domiciled. If the writ is granted against more than one party, it may be tried in the proper court of the county in which either party is domiciled.

(b) A writ of injunction granted to stay proceedings in a suit or execution on a judgment must be tried in the court in which the suit is pending or the judgment was rendered.

*Id.*

Graybar contends that the Hidalgo County district court was powerless to enjoin the Webb County suit because section 65.023 mandates that a writ of injunction had to be filed in Webb County. *See id.* We disagree.

The Texas Supreme Court, in *In re Continental Airlines,* interpreted section 65.023 of the civil practice and remedies code, the injunction venue statute. 988 S.W.2d 733 (Tex.1998) (orig.proceeding); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 65 .023. The supreme court noted that "the injunction *venue* statute applies only to suits in which the relief sought is purely or primarily injunctive." *In re Continental Airlines,* 988 S.W.2d at 736 (emphasis added) (citing *Ex parte Coffee,* 160 Tex. 224, 328 S.W.2d 283, 287 (Tex.1959) (holding that the statute now codified as section 65.023 of the civil practice and remedies code "only applies to and governs the issuance and return of writs and trial in cases in which the relief sought is purely or primarily injunctive.")); *see also In re Daniel,* No. 12-06-00232-CV, 2006 Tex.App. LEXIS 7207, at *7, 2006 WL 2361350 (Tex.App.-Tyler Aug. 16, 2006, orig. proceeding) (suggesting that if the petition includes both a plea for declaratory judgment and an injunction without any additional causes of action, then the primary purpose of the suit is injunctive in nature). Furthermore, this Court has held in similar circumstances that when "[t]he injunction granted by the court below was ancillary in nature," former article 4656 does not apply. [12] *Ray v. Paulus,* 489 S.W.2d 446, 449-50 (Tex.Civ.App.-Corpus Christi 1972, no writ).

This case is not purely injunctive in nature. In fact, the Hidalgo County district court merely issued the injunction as a means to prevent a multiplicity of suits and vexatious or harassing litigation. *See id.* at 450; *see also Harper,* 925 S.W.2d at 651. In applying Graybar's logic, no trial court would be able to obtain subject matter jurisdiction to enjoin another court from litigating a matter unless the enjoined court agreed to be enjoined. This contention is not supported by case law on anti-suit injunctions. *See Harper,* 925 S.W.2d at 651; *Christensen,* 719 S.W.2d at 163; *Gannon,* 706 S.W.2d at 305.

 **\*7**  In support of its contention that section 65.023 prevented the Hidalgo County district court from enjoining the Webb County lawsuit, Graybar relies heavily on this Court's holding in *Butron v. Cantu,* 960 S.W.2d 91, 94-95 (Tex.App.-Corpus Christi 1997, no writ). However, we find the *Butron* decision to be factually distinguishable from this case.

In *Butron,* a district court in Cameron County rendered a judgment against an attorney for legal malpractice. *Id.* at 93. In response to this judgment, the attorney filed an action in Hidalgo County to declare the Cameron County judgment void and later sought a temporary injunction to prevent collection on a supersedeas bond posted with the Cameron County district court. *Id.* The Hidalgo County district court subsequently issued a temporary injunction prohibiting the collection of the supersedeas bond. *Id.* The issue on appeal was the propriety of the Hidalgo County district court's grant of the attorney's request for temporary injunction. *Id.* at 94. This Court held that, since the Cameron County district court had rendered the judgment, only that court could enjoin collection on the supersedeas bond. *Id.* at 95. There, injunctive relief was the primary relief sought by the attorney in Hidalgo County to "prevent [appellant] from executing on that [Cameron County] judgment." *Id.* Moreover, this Court specifically noted that "[s]ection 65.023 is intended to ensure that comity prevails among the various Texas trial courts because 'orderly procedure and proper respect for the courts will require that ... attacks upon their judgments should be made in the court rendering such judgment, rather than in other courts indiscriminately.' " *Id.* at 94 (quoting *McVeigh v. Lerner,* 849 S.W.2d 911, 914 (Tex.App.-Houston [1st Dist.] 1993, writ denied)).

We first note that Graybar has not secured a final judgment on its foreclosure suit in Webb County. Here, unlike *Butron,* the temporary injunction sought by Gonzalez and Laredo Hix in Hidalgo County was not pursued for the purpose of preventing Graybar from collecting on a final judgment. [13] However, most importantly, the relief sought in the case at bar is not primarily injunctive in nature. The temporary injunction in the present case is merely ancillary to the primary relief sought-damages associated with various causes of action, including breach of contract and breach of fiduciary duty, pertaining to the management

and construction of the Laredo Holiday Inn. *See Karagounis v. Bexar County Hosp. Dist.,* 70 S.W.3d 145, 146-47 (Tex.App.-San Antonio 2001, pet. denied) (holding that because the true nature of the relief being sought was not purely injunctive but for specific performance of a contract, section 65.023 of the civil practice and remedies code did not apply). We believe this case is akin to *Ray. See* 489 S.W.2d at 449-50. Contrary to Graybar's assertions, Texas courts have routinely authorized the issuance of anti-suit injunctions to prevent a multiplicity of suits and to prevent vexatious or harassing litigation. *See Harper,* 925 S.W.2d at 651; *Christensen,* 719 S.W.2d at 163; *Gannon,* 706 S.W.2d at 305.

**\*8** We therefore do not find any fundamental error in the Hidalgo County district court's issuance of the temporary injunction to maintain the status quo. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002) (stating that the purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits); *see also Harper,* 925 S.W.2d at 651; *Christensen,* 719 S.W.2d at 163; *Gannon,* 706 S.W.2d at 305. Accordingly, we conclude that the trial court did not abuse its discretion in issuing the anti-suit injunction and denying Graybar's motion. We overrule Graybar's second issue, and we affirm the judgment of the trial court.

### III. CAUSE NUMBER 13-08-00073-CV

In its first petition for writ of mandamus, Graybar argues that the Hidalgo County district court abused its discretion in denying its verified plea in abatement because the Webb County district court has dominant jurisdiction. Graybar also claims that Gonzalez and Laredo Hix engaged in impermissible "forum shopping." Gonzalez and Laredo Hix argue that: (1) Hidalgo County has dominant jurisdiction over the Webb County lawsuit because suit was commenced there first and the claims are interrelated; (2) the Webb County lawsuit has not commenced because Laredo Hix has yet to be served; and (3) Graybar has not introduced any evidence to support an abatement of the Hidalgo County lawsuit. [14]

#### A. Standard of Review

Mandamus relief is available only to correct a "clear abuse of discretion" when there is no adequate remedy by appeal. *Walker,* 827 S.W.2d at 839. Mandamus is appropriate to resolve disputes over dominant jurisdiction. *Perry v. Del Rio,* 66 S.W.3d 239, 258 (Tex.2001) (orig.proceeding) (citing *Curtis v. Gibbs,* 511 S.W.2d 263, 268 (Tex.1974)). Moreover, mandamus relief may be granted when one court actively interferes with the jurisdiction of another court. *See In re Reliant Energy, Inc.,* 159 S.W.3d 624, 626 (Tex.2005) (orig.proceeding).

The party bringing a plea in abatement must show: (1) the other suit (here, the Webb County lawsuit) commenced first; (2) the suit is still pending; (3) the same parties are involved; and (4) the controversies are the same. *S. County Mut. Ins. Co. v. Ochoa,* 19 S.W.3d 452, 468 (Tex.App.-Corpus Christi 2000, no pet.) (op. on reh'g). The movant has the burden of proof to establish the allegations in his motion to abate. *Flowers v. Steelcraft Corp.,* 406 S.W.2d 199, 199 (Tex.1966); *S. County Mut. Ins. Co.,* 19 S.W.3d at 469.

We review the trial court's action in granting or denying a plea in abatement using an abuse of discretion standard. *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 248 (Tex.1988); *Davis v. Guerrero,* 64 S.W.3d 685, 691 (Tex.App.-Austin 2002, no pet.); *S. County Mut. Ins. Co.,* 19 S.W.3d at 468. The trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985).

#### B. The Doctrine of Dominant Jurisdiction & Venue

**\*9** The dominant jurisdiction doctrine applies when venue is proper in two or more Texas counties or courts. *Gonzalez v. Reliant Energy, Inc.,* 159 S.W.3d 615, 622 (Tex.2005) (noting that the concept of dominant jurisdiction is not applicable in cases where venue is not proper in more than one Texas county); *Wyatt,* 760 S.W.2d at 248. Dominant jurisdiction recognizes

"the plaintiff's privilege to choose the forum" and accepts that choice as correct, provided "the forum is a proper one." *Gonzalez,* 159 S.W.3d at 622; *Wyatt,* 760 S.W.2d at 248; *see Cleveland v. Ward,* 116 Tex. 1, 285 S.W. 1063, 1070 (Tex.1926) (orig.proceeding), *disapproved on other grounds by Walker,* 827 S.W.2d at 843.

"The long-standing common law rule in Texas is that the first court to acquire jurisdiction over the subject matter and the parties of a controversy has dominant jurisdiction over all other courts." *San Miguel v. Bellows,* 35 S.W.3d 702, 704 (Tex.App.-Corpus Christi 2000, pet. denied) (citing *Cleveland,* 285 S.W. at 1070); *see Curtis,* 511 S.W.2d at 267. "Where jurisdiction of a district court has attached, it has the power to permit pleadings to be amended, new parties to be made, to determine all essential questions, and to do anything with reference thereto authorized by law." *San Miguel,* 35 S.W.3d at 704 (citing *Cleveland,* 286 S.W. at 1069). Dominant jurisdiction excludes other courts from exercising jurisdiction over the same case. *Curtis,* 511 S.W.2d at 267; *San Miguel,* 35 S.W.3d at 704.

Dominant jurisdiction requires "an inherent interrelation of the subject matter" in the two suits before a plea in abatement must be granted in the second action. *Wyatt,* 760 S.W.2d at 248. It is not required that the exact issues and all the parties be included in the first action before the second action is filed, provided that the claim in the first suit may be amended to bring in all necessary and proper parties and issues. *Id.* at 247. In determining whether an inherent interrelationship exists, courts should be guided by the rule governing persons to be joined if feasible and the compulsory counterclaim rule. *Id.*

### C. Discussion

It is undisputed that the Hidalgo County district court has general subject matter jurisdiction over all claims involved. *See* TEX. CONST. art. V, § 8 (providing that the district court has exclusive, original jurisdiction of "all actions, proceedings, and remedies," except when the constitution or other law confers jurisdiction on some other court); TEX. GOV'T CODE ANN . § 24.007 (Vernon 2000) ("The district court has the jurisdiction provided by Article V, Section 8 of the Texas Constitution."); *see also Gordon v. Jones,* 196 S.W.3d 376, 381-82 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Moreover, Graybar acknowledges in its plea in abatement that the "Webb County Lawsuit is clearly inherently interrelated with the Hidalgo County Lawsuit.... Both have the same subject matter-the HOLIDAY INN-LAREDO." *See Wyatt,* 760 S.W.2d at 248. Therefore, the only issue before us is which suit was filed first.

 **\*10** HMC filed its original petition with the Collin County district court on January 18, 2007, asserting various causes of action pertaining to an alleged breach of several hotel management agreements regarding the Laredo Holiday Inn. The lawsuit was transferred to Hidalgo County on May 21, 2007. It was not until September 24, 2007, that Graybar filed its suit in Webb County to foreclose upon its mechanic's lien. Clearly, the Hidalgo County lawsuit was filed first.

When suit is proper in more than one county, the court in which the suit is first filed acquires dominant jurisdiction. *Wyatt,* 760 S.W.2d at 248. As long as the forum is proper, it is the plaintiff's privilege to choose the forum. *Id.* "Defendants are not at liberty to decline to do battle in the forum chosen by the plaintiff." *Id.* Therefore, because the parties agree that the claims are interrelated and because the Hidalgo County lawsuit was filed first, we conclude that the Hidalgo County district court has dominant jurisdiction over the Webb County suit. [15]

Graybar, however, relies heavily on this Court's holding in *San Miguel* to support its contention that Webb County has dominant jurisdiction over the involved claims. 35 S.W.3d at 703-05. In that case, San Miguel obtained a judgment against R.D. Bellows Law Office ("Bellows") for damages of $513,000 in a Harris County district court. *Id.* at 703. After the judgment had become final, San Miguel filed an application for ancillary relief in the Harris County district court seeking a turnover order and joining Bellows's wife, Suzette, and the Bellows Law Firm, P.L.L.C. *Id.* Subsequently, Suzette and the P.L.L.C. obtained an ex parte temporary restraining order in Live Oak County to prevent San Miguel from proceeding with her collection efforts in Harris County. *Id.* at 704. Suzette and the P.L.L.C. also filed an application for temporary injunction and a petition for declaratory judgment. *Id.* This Court concluded that the Live Oak trial court abused its discretion in issuing a temporary injunction enjoining San Miguel from pursuing her collection efforts against Bellows in the Harris County trial court. *Id.* at 703, 705.

We find this case to be factually distinguishable. Unlike *San Miguel,* Graybar has not secured a final judgment in Webb County. Further, the purpose of the Hidalgo County district court's issuance of the temporary injunction and its denial of Graybar's plea in abatement was not to prevent Graybar from enforcing a final judgment. Additionally, as previously discussed, the claims involved are inherently interrelated and the Hidalgo County lawsuit was filed first; therefore, Hidalgo County has dominant jurisdiction over the claims involved. Finally, the claims asserted by Suzette and the P.L.L.C. were merely injunctive in nature whereas the claims asserted by Gonzalez and Laredo Hix in the Hidalgo County district court are not. *See In re Continental Airlines,* 988 S.W.2d at 736; *see also In re Daniel,* 2006 Tex.App. LEXIS 7207, at \*7, 2006 WL 2361350 (suggesting that if the petition includes both a plea for declaratory judgment and an injunction without any additional causes of action, then the primary purpose of the suit is injunctive in nature).

 **\*11** Graybar further argues that Gonzalez and Laredo Hix are engaging in impermissible "forum shopping." *See Reliant Energy, Inc.,* 102 S.W.3d at 875 ("Forum shopping is against public policy...."). Graybar has not cited to any authority stating that the Hidalgo County district court was required to abate the Hidalgo County lawsuit for impermissible "forum shopping." In any event, our review of the record does not yield a finding that Gonzalez and Laredo Hix engaged in impermissible "forum shopping." Gonzalez and Laredo Hix joined Graybar and several other counter-defendants in the underlying Hidalgo County lawsuit because, as Graybar admits, these claims are interrelated.

In concluding that the Hidalgo County district court has dominant jurisdiction, we do not find that Graybar's Webb County foreclosure lawsuit is extinguished; instead, it is merely abated pending the resolution of the Hidalgo County lawsuit. Therefore, based on the foregoing, we conclude that the Hidalgo County trial court did not abuse its discretion in denying Graybar's motion to abate. Accordingly, we deny Graybar's petition for writ of mandamus.

## IV. CAUSE NUMBER 13-08-00341-CV

In its second interlocutory appeal, Graybar asserts that the trial court erred in granting the motion to extend the November 2, 2007 temporary injunction filed by Gonzalez and Laredo Hix. Specifically, Graybar contends that the temporary injunction should be dissolved because: (1) it does not state the court's reason for issuing the injunction; (2) it does not describe the acts sought to be restrained; (3) the trial court did not give Graybar an opportunity to be heard, in violation of the Due Process Clause of the United States Constitution, *see* U.S. CONST. amend. XIV; and (4) the trial court did not have subject matter jurisdiction to issue the order and Webb County has dominant jurisdiction over the remaining claims.

Gonzalez and Laredo Hix argue that: (1) this Court does not have jurisdiction over this appeal; (2) Graybar's alleged procedural violations do not apply to extensions of temporary injunctions; (3) Graybar has already raised the issues of subject matter jurisdiction and dominant jurisdiction in cause number 13-08-00294-CV, its first interlocutory appeal; and (4) Graybar received "all the process to which it was due."

### A. Applicable Law

An appellate court lacks jurisdiction to review an interlocutory order unless a statute specifically authorizes such an appeal. *Qwest Commc'ns Corp. v. AT & T Corp.,* 24 S.W.3d 334, 336 (Tex.2000). Section 51.014 of the civil practice and remedies code provides that a party may appeal from an interlocutory order of the trial court that "grants or refuses a temporary injunction." TEX. CIV. PRAC. & REM.CODE ANN. § 51.014. Texas courts, however, have construed this provision to allow interlocutory review of an amended order making a substantive modification to a temporary injunction. *See Currie v. Int'l Telecharge, Inc.,* 722 S.W.2d 471, 472 (Tex.App.-Dallas 1986, no writ) (deciding that a temporary injunction was modified by restricting the area affected by a non-competition provision); *Toby Martin Oilfield Trucking, Inc. v. Martin,* 640 S.W.2d 352, 355 (Tex.App.-Houston [1st Dist.] 1982, no writ) (finding that temporary injunction was modified by increasing the amount of the bond); *see also City of Lancaster v. Tex. Motor Transp. Ass'n, Inc.,* No. 05-05-00169-CV, 2005 Tex.App. LEXIS 7744, at \*3, 2005 WL

2303415 (Tex.App.-Dallas Sept. 22, 2005, no pet.) (mem.op .) (concluding that the appellate court did not have jurisdiction to review a temporary injunction where the sole modification was to extend the date until a trial on the merits could be conducted); *cf. Ludewig v. Houston Pipeline Co.,* 737 S.W.2d 15, 16 (Tex.App.-Corpus Christi 1987, no writ) (holding that the trial court's order amending a temporary injunction to include a new trial date is not an appealable order). We must determine whether the extension of the temporary injunction in this case amounted to a substantive modification.

## B. Discussion

**\*12**  The trial court's order extending the November 2, 2007 temporary injunction specifically incorporated by reference the substantive findings contained in the original November 2, 2007 temporary injunction. The lone change in the trial court's order was to extend the duration of the injunction until the new trial setting of November 10, 2008. *See City of Lancaster,* 2005 Tex.App. LEXIS 7744, at \*3, 2005 WL 2303415. As in *City of Lancaster,* no substantive changes were made to the November 2, 2007 temporary injunction. *See id.*

Graybar relies heavily on the decisions in *EMC Mortgage Corp. v. Jones,* No. 05-06-00419-CV, 2008 Tex.App. LEXIS 3270, at \*5, 2008 WL 1960812 (Tex.App.-Dallas May 7, 2008, no pet.) (op. on reh'g); *Webb v. Hartman Newspapers, Inc.,* 793 S.W.2d 302, 303 (Tex.App.-Houston [14 th Dist.] 1990, no writ), and *Herider Farm Processing, Inc. v. City of Nacogdoches,* 573 S.W.2d 297, 298-99 (Tex.Civ.App.-Tyler 1978, writ ref'd n.r.e.) for the proposition that an extension is appealable because it is itself a temporary injunction. We disagree.

The *EMC Mortgage Corp.* case involved the trial court's extension of an underlying temporary injunction after a final judgment had been secured. 2008 Tex.App. LEXIS 3270, 2008 WL 1960812 at ----9-10. The Dallas Court of Appeals concluded that once a final judgment was secured, under the circumstances involved, the underlying temporary injunction terminated; therefore, the extension of the underlying temporary injunction constituted a new temporary injunction. *Id.* at \*14. In this case, we do not have a final judgment; instead, Graybar challenges the temporary injunction on interlocutory appeal, for which our jurisdiction is limited. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4). Therefore, *EMC Mortgage Corp.* is not applicable.

In *Webb,* appellant Willis Webb appealed the trial court's extension of a temporary injunction ordering him to comply with provisions on a covenant not to compete with his former employer. 793 S.W.2d at 303. The Fourteenth Court of Appeals reviewed the mertis of the temporary injunction without any discussion as to whether the trial court's extension of the temporary injunction's duration constituted a substantive modification. *Id.* at 305. Here, we have a unique situation in that we have reviewed the merits of the temporary injunction in cause number 13-08-00294-CV, Graybar's first interlocutory appeal. The only matter for review in this cause is the extension. Therefore, we find *City of Lancaster* to be more on point in this cause, and we decline to follow *Webb.*

Finally, in *Herider Farm Processing,* appellant appealed the trial court's issuance of a temporary injunction enjoining the City of Nacogdoches from terminating water and sewer services for a period of fifteen days. 573 S.W.2d at 297. After a hearing on the temporary injunction, the trial court concluded that appellant was entitled to injunctive relief and granted appellant's motion for a temporary injunction for a period of fifteen days from the date of the hearing. *Id.* at 298. Appellant subsequently filed a motion for extension of the temporary injunction "until such time as the principal suit herein may be tried to a conclusion." *Id.* The trial court denied appellant's motion. *Id.* On appeal of the temporary injunction, the court of appeals noted that the crux of the disagreement between appellant and appellee pertained to the length of time for which the trial court granted or should have granted the injunction. *Id.* The court of appeals concluded that the trial court had abused its discretion in granting the injunction for only a fifteen day period, reasoning that fifteen days is insufficient to preserve the status quo. *Id.* at 299.

**\*13**  The *Herider Farm Processing* case is not directly analogous to the instant case. Although it was argued that the trial court had abused its discretion in denying its motion to extend the temporary injunction, the court of appeals did not analyze the denial of the motion to extend the temporary injunction. *Id.* at 298. Instead, the court analyzed the original temporary injunction that the trial court had granted. *Id.* at 298-99. In doing so, the court concluded that the duration of the original temporary injunction was insufficient to maintain the status quo of the underlying suit, especially in light of the trial court's conclusion

that appellant had proven its rights to permanent injunctive relief. *Id.* at 299. Therefore, the court modified the duration of the original temporary injunction to last until a trial on the merits. *Id.* Considering the court did not address appellant's motion to extend the temporary injunction and instead addressed the trial court's grant of the original temporary injunction, we do not find this case to be persuasive in this matter. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (providing for an interlocutory appeal premised on a grant or refusal to issue a temporary injunction).

Graybar further argues that the holdings in *Sweet v. Inkjet International, Ltd.,* No. 05-03-00233-CV, 2003 Tex.App. LEXIS 8539, 2003 WL 22254695 at ----6-8 (Tex.App.-Dallas Oct.2, 2003, no pet.) (mem.op.) (concluding that the trial court's amended temporary injunction clarifying the term "contacting" constituted a second temporary injunction and, therefore, did not interfere with the appellate court's jurisdiction), *Ahmed v. Shimi Ventures,* 99 S.W.3d 682, 688-89 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (holding that an order modifying a temporary injunction, including adding a provision applicable to insurers, reducing bond, and changing some compliance dates, but not incorporating the original temporary injunction by reference was a complete temporary injunction in itself), and *Martin,* 640 S.W.2d at 355 (involving a modified temporary injunction increasing the bond amount in the original temporary injunction from $2,000 to $100,000) support its contention that in changing the date of the temporary injunction, the Hidalgo County district court made a substantive modification to the November 2, 2007 temporary injunction. We disagree.

None of the cases cited by Graybar address a situation where a trial court has extended a temporary injunction. Furthermore, none of the cases cited by Graybar stand for the proposition that a mere changing of the date on the temporary injunction to effectuate an extension constitutes a substantive modification. Thus, the cases relied upon by Graybar are not persuasive in this matter.

Based on the foregoing, we conclude that the order falls outside the ambit of section 51.014(a)(4) of the civil practice and remedies code, and that we do not have jurisdiction to review it. *See id.; see also* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(4). On June 10, 2008, Gonzalez and Laredo Hix moved to dismiss this appeal. Accordingly, we grant the motion to dismiss filed by Gonzalez and Laredo Hix, and we dismiss this interlocutory appeal. [16]

## V. CAUSE NUMBER 13-08-00333-CV

**\*14** In a second petition for writ of mandamus, Graybar, MIRA, and Stallings assert that the trial court abused its discretion in denying their motions to transfer venue. Specifically, they argue that sections 15.011 and 15.012 of the civil practice and remedies code are mandatory venue provisions which necessitate trying the entire case in Webb County. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 15.011, 15.012 (Vernon 2002). Gonzalez and Laredo Hix counter by arguing that: (1) the mandatory venue provisions noted by Graybar do not apply because venue in this case is governed by section 15.062 of the civil practice and remedies code, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 15.062 (Vernon 2002); (2) Graybar and MIRA are barred from obtaining a writ of mandamus because of waiver; and (3) section 15.011 does not apply because the underlying suit does not involve the recovery of property or quieting title, *see id.* § 15.011.

### A. Standard of Review

As previously stated, the general rule is that mandamus relief is available only to correct a "clear abuse of discretion" when there is no adequate remedy by appeal. *Walker,* 827 S.W.2d at 839. However, section 15.0642 of the civil practice and remedies code provides that "[a] party may apply for a writ of mandamus with an appellate court to enforce the mandatory venue provisions of this chapter." TEX. CIV. PRAC. & REM.CODE ANN. § 15.0642 (Vernon 2002); *see id.* § 15.064 (Vernon 2002) ("No interlocutory appeal shall lie from the determination [of a motion to transfer venue]."). The Texas Supreme Court has held that parties bringing a mandamus under section 15.0642 to enforce the mandatory venue provisions of the civil practice and remedies code need not demonstrate that they lack an adequate remedy by appeal. *In re Mo. Pac. R.R.,* 998 S.W.2d 212, 215 (Tex.1999) (orig.proceeding) (citing *In re Continental Airlines,* 988 S.W.2d at 735). Instead, the supreme court concluded that

a party need only demonstrate that the trial court abused its discretion. *Id.* at 216. Therefore, Graybar has properly raised this issue in its second petition for writ of mandamus.

## B. Discussion

Rule 86 of the Texas Rules of Civil Procedure provides that "[a]n objection to improper venue is waived if not made by written motion filed prior to or concurrently with any other plea, pleading or motion except a special appearance motion...." TEX.R. CIV. P. 86(1).

### 1. Graybar

Graybar was first joined as a party to this matter when Laredo Hix filed its original petition in intervention and Gonzalez filed his supplemental counterclaim on October 9, 2007. Graybar filed its motion to partially dissolve or modify the November 2, 2007 temporary injunction entered by the Hidalgo County trial court and its verified plea in abatement. Subsequently, on November 20, 2007, Graybar filed its motion to transfer venue and original answer subject thereto, contending that section 15.011 of the civil practice and remedies code mandated venue in Webb County. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.011. On March 19, 2008, Graybar filed a supplement to its November 20, 2007 motion to transfer venue, asserting that section 15.012 of the civil practice and remedies code also mandated venue in Webb County. *See id.* § 15.012; *cf. In re Pepsico, Inc.,* 87 S.W.3d 787, 794 (Tex.App.-Texarkana 2002, orig. proceeding) ("[A]n original timely motion to transfer venue may be amended to cure defects in the original motion if the amended motion is filed before the trial court rules on the original motion, and that the properly filed amended motion relates back to and supersedes the original motion to transfer venue."). Because Graybar filed its motion to dissolve or modify the temporary injunction and verified plea in abatement prior to its motion to transfer venue, we conclude that Graybar has waived this contention. *See* TEX.R. CIV. P. 86(1). Therefore, Graybar is not entitled to mandamus relief.

### 2. MIRA

**\*15** In its motion to transfer venue filed on November 1, 2007, MIRA contended that Eastland County was the proper venue for this matter. At no point did MIRA allege that Webb County was the proper venue. Furthermore, MIRA did not make reference to either sections 15.011 or 15.012 of the civil practice and remedies code in arguing that venue was not proper in Hidalgo County. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 15.011, 15.012. Because this petition for writ of mandamus specifically alleges that sections 15.011 and 15.012 mandate venue in Webb County and because MIRA did not plead those provisions in its motion to transfer venue and did not assert that venue should be in Webb County, we conclude that MIRA has waived its venue contention. *See* TEX R. CIV. P. 86(3)(b) (providing that a motion to transfer venue must "state that the action should be transferred to another specified county of proper venue because.... Mandatory venue of the action in another county is prescribed by one or more specific statutory provisions *which shall be clearly designated or indicated* ") (emphasis added); *Wilson v. Tex. Parks & Wildlife Dep't.,* 886 S.W.2d 259, 260-61 (Tex.1994). Therefore, MIRA is not entitled to mandamus relief.

### 3. Stallings

Stallings filed its original motion to transfer venue on November 1, 2007, asserting that section 15.011 mandated venue in Webb County .[17] *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.011. Stallings filed a first amended motion on November 1, 2007, and a second amended motion on November 15, 2007.[18] *See In re Pepsico, Inc.,* 87 S.W.3d at 794. In its first amended motion to transfer venue, Stallings specifically denied Laredo Hix's and Gonzalez's venue facts suggesting that venue was proper in Hidalgo County, and it contended that section 15.012 also mandated venue in Webb County. *See id.* § 15.012. Stallings filed a motion requesting a hearing on its motion to transfer venue on November 1, 2007. *See* TEX.R. CIV. P. 87(1) (providing, among other things, that "[t]he movant has the duty to request a setting on the motion to transfer"). The Hidalgo County trial court denied all pending motions to transfer venue after a hearing on May 12, 2008.[19]

Stallings argues that sections 15.011 and 15.012 mandate venue in Webb County. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 15.011, 15.012. We disagree.

Section 15.011 of the civil practice and remedies code provides that:

> Actions for recovery of real property or an estate or interest in real property, for partition of real property, to remove encumbrances from the title to real property, for recovery of damages to real property, or to quiet title to real property shall be brought in the county in which all or a party of the property is located.

*Id.* § 15.011. [20] Additionally, section 15.012 of the civil practice and remedies code provides that "[a]ctions to stay proceedings in a suit shall be brought in the county in which the suit is pending." *Id.* § 15.012.

**\*16** We are, however, persuaded by the reasoning in *Allison v. Fire Insurance Exchange,* 98 S.W.3d 227, 241-44 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.). In *Allison,* the Austin Court of Appeals analyzed the applicability of section 15.011 of the civil practice and remedies code in a case involving actions for negligence, negligence per se, breach of contract, deceptive trade practices, and breach of good faith and fair dealing in insurance claims handling pertaining to water damage and mold contamination of an entire house. *Id.; see also* TEX. CIV. PRAC. & REM.CODE ANN. § 15.011. The *Allison* court stated the following:

> When considering venue, we note that the legislature's use of the word "shall" in a statute generally indicates the mandatory character of the provision. Because of the mandatory nature of section 15.011, we will strictly construe it and will not hold that it applies unless [appellant's] suit falls clearly within one of the categories in the section.

*Allison,* 98 S.W.3d at 241 (internal citations omitted).

Here, Stallings argues that the phrase "recovery of damages of real property" encompasses the claims made by Laredo Hix and Gonzales; therefore, venue is mandatory in Webb County. As the *Allison* court properly noted, "[i]f we were to look at the words 'recovery of damages to real property' in isolation, we would concede that the phrase may be sufficiently broad to encompass the expansive reading urged by [appellee]. But we do not construe statutory phrases in isolation; we read statutes as a whole." *Id* . at 243. Furthermore, we must look to the "true" nature of the action to determine whether section 15.011 applies. *Id.* (citing *Renwar Oil Corp. v. Lancaster,* 154 Tex. 311, 313, 276 S.W.2d 774, 775 (1955); *Yzaguirre v. KCS Res., Inc.,* 53 S.W.3d 368, 371 (Tex.2001)).

> Before the addition of the phrase "recovery of damages to real property," the venue provision applied only when the suit directly involved a question of title to land. *See, e.g., Yzaguirre,* 53 S.W.3d at 371 (mandatory venue provision does not apply because suit does not involve recovery of real property or quieting title); *Maranatha Temple, Inc. v. Enterprise Prods. Co.,* 833 S.W.2d 736, 738 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *Scarth v. First Bank & Trust Co.,* 711 S.W.2d 140, 141-42 (Tex.App.-Amarillo 1986, no writ). We have been cited to no authority that supports expanding the scope of the provision beyond questions relating to the recovery of real property or affecting title to "land." Except to make it explicit that the provision in question allows for the recovery of damages in such a suit relating to land, there is no indication that the legislature sought to broaden the provision with the addition of the phrase. That the phrase "for recovery of damages to real property" was sandwiched between "to remove encumbrances from the title" and "to quiet title" further bolsters our reading. Reading the relevant phrase in its entire context, then gives support for the more narrow interpretation. *See* 1 Scott Brister, et al., *Texas Pretrial Practice* § 9.34 (2000).

> **\*17** Were we to interpret the provision to allow for mandatory venue in all instances in which any damages are sought relating to a dwelling, no matter the nature of the action, we believe we would be extending beyond permissible bounds the statute's language.... The phrase must be understood against the background of what the legislature was attempting to accomplish in restoring a damage provision to the section, thereby completing the availability of an array of remedies to actions involving "land."

*Id.*

Here, Laredo Hix and Gonzalez brought actions against Stallings for breach of contract and negligence in carrying out its duties in the construction of the Laredo Holiday Inn. Stallings has not cited to any authority expanding the scope of section 15.011 beyond questions relating to the recovery of real property or affecting title to "land." *See Trafalgar House Oil & Gas Inc. v. De Hinojosa,* 773 S.W.2d 797, 798 (Tex.App.-San Antonio 1989, no writ) (construing the identical statutory predecessor to section 15.011 and concluding that "[i]t is not enough that the suit merely involves land; it must be a suit for the recovery of land or damages thereto, or to quiet the title to land, or to prevent or stay waste on land.") (quoting *Canales v. Estate of Canales,* 683 S.W.2d 77, 81 (Tex.App.-San Antonio 1984, no writ)). Because Laredo Hix's and Gonzalez's claims do not involve recovering real property or quieting title or seeking damages for such loss, section 15.011 does not apply. *See Allison,* 98 S.W.3d at 244.

Moreover, section 15.012 does not apply because we have previously concluded that the Hidalgo County district court has dominant jurisdiction over this matter and that the court was authorized to issue an anti-suit injunction with respect to the pending Webb County claims in cause numbers 13-08-00294-CV and 13-08-00073-CV. *See Fleming v. Ahumada,* 193 S.W.3d 704, 711-12 (Tex.App.-Corpus Christi 2006, no pet.). Given that sections 15.011 and 15.012 do not apply in this case, we conclude that the trial court did not abuse its discretion in denying Stallings's motion to transfer venue. Accordingly, we deny Stallings's petition for writ of mandamus.

## VI. CONCLUSION

Accordingly, we affirm the trial court's judgment in cause number 13-08-00294-CV, deny Graybar's petition for writ of mandamus in cause number 13-08-00073-CV, dismiss Graybar's appeal in cause number 13-08-00341-CV, and deny Graybar's second petition for writ of mandamus in cause number 13-08-00333-CV.

Footnotes

1    This interlocutory appeal is accelerated. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon 2008); TEX.R.APP. P. 28.1.

2    On appeal, Graybar raises a third issue pertaining to dominant jurisdiction. However, Graybar raised its dominant jurisdiction issue with the Hidalgo County district court in its plea in abatement. In its first petition for writ of mandamus, Graybar takes issue with the propriety of the Hidalgo County district court's denial of its plea in abatement. Therefore, we will address Graybar's dominant jurisdiction issue in our analysis of its entitlement to a writ of mandamus in cause number 13-08-00073-CV.

3    On June 12, 2008, Graybar filed a motion for leave with this Court to re-file its notice of appeal in cause number 13-08-00294-CV and to file its notice of appeal in cause number 13-08-00341-CV. In conjunction with issuing this memorandum opinion, we GRANT Graybar's motion for leave.

4    Graybar was the supplier of electrical materials to the construction project.

5    On February 26, 2008, HMC Hospitality Operating Company ("HMC") filed an unopposed motion to dismiss its appeal against Gonzalez. In this motion, HMC notified this Court that the parties in the original appeal had successfully mediated their claims and that it sought to dismiss its appeal and that each party would pay its own costs. This Court subsequently granted HMC's motion to dismiss in cause number 13-07-00518-CV on May 13, 2008.

6    The record reflects that MIRA was the general contractor and Stallings was an electrical subcontractor.

7    The record contains an affidavit executed by Gonzalez stating that he is the president of Laredo Hix.

8    On appeal, Laredo Hix contends that it was never served with notice of the Webb County suit filed by Graybar; therefore, it argues, the suit cannot be considered to have commenced against it.

9    On January 18, 2008, Graybar filed notice of its accelerated interlocutory appeal of the trial court's January 2, 2008 order, in cause number 13-07-00518-CV, essentially joining in HMC's original interlocutory appeal. Realizing its error, Graybar filed an emergency expedited motion for severance on January 25, 2008. In this motion, Graybar moved this Court to sever its appeal from cause number

13-07-00518-CV and to docket its appeal under a distinct cause number. This Court granted Graybar's motion for severance and assigned its interlocutory appeal a new cause number-13-08-00294-CV.

Section 53.157 of the property code allows for the discharge of Graybar's mechanic's lien by five other methods besides failure to institute a foreclosure suit in the county in which the property is located. *See* TEX. PROP.CODE ANN. § 53.157 (Vernon 2007). In any event, Graybar has already filed suit to foreclose its mechanic's lien in Webb County. *See id.* § 53.158 (Vernon 2007) (providing that "suit must be brought to foreclose the lien within two years after the last day a claimant may file the lien affidavit under Section 53.052 or within one year after completion, termination, or abandonment of the work under the original contract under which the lien is claimed, whichever is later"); *id.* § 53 .052 (Vernon 2007) (providing that "the person claiming the lien must file an affidavit with the county clerk of the county in which the property is located ... not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues").

Gonzalez and Laredo Hix concede this fact on appeal.

Section 65.023 of the Texas Civil Practice and Remedies Code is the successor to both former article 4656 of the Texas Revised Civil Statutes and article 4653 of the "Revised Civil Statutes of Texas 1911." *Hughes v. Morgan,* 816 S.W.2d 557, 559 (Tex.App.-Fort Worth 1991, writ denied); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 65.023 (Vernon 2008).

Graybar also relies on *Gardner v. Stewart,* 223 S.W.3d 436, 437 (Tex.App.-Dallas 2006, pet. denied) and *McVeigh v. Lerner,* 849 S.W.2d 911, 914 (Tex.App.-Houston [1st Dist.] 1993, writ denied) for the contention that section 65.023 prevented the Hidalgo County district court from issuing the temporary injunction. Specifically, Graybar argues that section 65.023 requires a party seeking to enjoin pending litigation "must do so where the litigation is pending." However, like *Butron v. Cantu,* 960 S.W.2d 91, 94 (Tex.App.-Corpus Christi 1997, no writ), the *Gardner* and *McVeigh* courts concluded that attacks on a judgment must be made in the court that rendered the judgment and that a party cannot seek to enjoin a party from enforcing a judgment issued in another district court. *See Gardner,* 223 S.W.3d at 437; *McVeigh,* 849 S.W.2d at 914. As we have previously noted, Graybar has not secured a judgment in the Webb County lawsuit. Therefore, we do not find the *Gardner* or *McVeigh* cases to be persuasive in this matter.

Gonzalez and Laredo Hix also assert that Graybar is not entitled to a writ of mandamus because it already has an adequate remedy at law-its interlocutory appeal. As previously noted, Graybar took issue with the Hidalgo County district court's denial of its plea in abatement in its petition for writ of mandamus, not in its interlocutory appeal. Moreover, section 51.014 of the civil practice and remedies code does not grant this Court interlocutory appellate jurisdiction over a denial of a plea in abatement. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014.

Appeal is ordinarily an adequate remedy to review incidental rulings such as pleas in abatement. *See Wyatt v. Shaw Plumbing Co. .,* 760 S.W.2d 245, 248 (Tex.1988); *see also In re Ayala,* No. 13-07-140-CV, 2007 Tex.App. LEXIS 3319, at *6, 2007 WL 1238572 (Tex.App.-Corpus Christi Apr.27, 2007, orig. proceeding). However, the Texas Supreme Court has held that mandamus is appropriate to resolve disputes over dominant jurisdiction. *See Perry v. Del Rio,* 66 S.W.3d 239, 258 (Tex.2001) (orig.proceeding) (citing *Curtis v. Gibbs,* 511 S.W.2d 263, 268 (Tex.1974)). In addition, the supreme court, in *Abor v. Black,* denied mandamus relief requesting a court to abate a case in deference to another court's dominant jurisdiction absent "any order [of the former court] which actively interferes with the exercise of jurisdiction" by the court with dominant jurisdiction. 695 S.W.2d 564, 567 (Tex.1985). The supreme court has not resolved these tests into one uniform test governing mandamus relief pertaining to dominant jurisdiction issues. Here, the Webb County district court set a hearing for December 6, 2007, to resolve an emergency plea in abatement and a motion filed by Stallings to dissolve or modify the November 2, 2007 temporary injunction. Clearly, the setting of the December 6, 2007 hearing date by the Webb County district court interferes with the exercise of jurisdiction by the Hidalgo County district court. Under either test, Graybar does not have an adequate remedy by appeal and, therefore, it properly raised this issue in its petition for writ of mandamus. *See Perry,* 66 S.W.3d at 258; *Abor,* 695 S.W.2d at 567.

Though Graybar did, in fact, institute its Webb County suit before Laredo Hix's plea in intervention, we must refer to the original Hidalgo County suit filed on January 18, 2007. *See Wyatt,* 760 S.W.2d at 247. This is so because Laredo Hix, through its plea in intervention, effectively amended the Hidalgo County suit to join all necessary parties, and Graybar did not challenge the joinder in the trial court. *See id.; see also* TEX.R. CIV. P. 39 (providing that a person subject to service of process shall be joined as a party if (1) in his absence complete relief cannot be accorded to those already made parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in its absence may "(i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest"); R. 40 (providing that defendants may be joined in one action if the assertions against them arise "out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action.").

Given our disposition, we need not address Graybar's remaining issues in cause number 13-08-00341-CV. *See* TEX.R.APP. P. 47.1.

The November 1, 2007 motion to transfer venue was the first pleading filed by Stallings in the trial court; therefore, we do not have for review any issues pertaining to the due order of pleading rule with respect to Stallings. *See* TEX.R. CIV. P. 86(1).

18      In its second amended motion to transfer venue, Stallings made a convenience argument which was not briefed on appeal.

19      The Hidalgo County trial court's order denying the motions to transfer venue includes a handwritten message stating that the hearing on the motions was held on February 12, 2008. However, the order denying the motions was signed and the reporter's record reflects that the hearing was conducted on May 12, 2008.

20      Section 15.011 of the civil practice and remedies code is a mandatory venue provision. *See In re Applied Chem. Magnesias Corp. .,* 206 S.W.3d 114, 119 (Tex.2006) (orig.proceeding); *see also* TEX.R. CIV. P. 87(2).

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 199024
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Beaumont.

In re Mujtaba Ali KHAN.

No. 09–14–00028–CV.　|　Jan. 16, 2014.

Original Proceeding.

**Attorneys and Law Firms**

Jamal A. Asafi, Asafi Law Firm, Houston, TX, Gary Michael Block, Humble, TX, for relator.

Margaret T. Brenner, Mark A. Font, Schirrmeister Diaz-Arrastia Brem, LLP, Houston, TX, for real parties in interest.

Before McKEITHEN, C.J., HORTON and JOHNSON, JJ.

**MEMORANDUM OPINION**

PER CURIAM.

**\*1** In this original mandamus proceeding Mujtaba Ali Khan ("Khan") contends that the trial court abused its discretion in ordering a show cause hearing for alleged violations of two temporary injunction orders ("the temporary injunction orders"). *See Xenon Anesthesia of Tex. P.L.L.C. v. Xenon Health L.L.C.,* No. 09–12–00553–CV, 2013 WL 1279408, at \*4 (Tex.App.-Beaumont Mar.28, 2013, no pet.) (mem.op.). Khan argues the temporary injunction orders are void because the trial court granted Khan's motion for continuance and re-set the trial date to a later date than the trial dates contained in the temporary injunction orders. The trial court reset the trial date for February 10, 2014. Khan asks this Court to issue a temporary stay of the trial court proceedings and to issue a writ of mandamus directing the trial court (1) to vacate its order setting the show cause hearing, and (2) to dissolve the temporary injunctions. *See* Tex.R.App. P. 52.8(c); *see also* Tex.R.App. P. 52.10(b).

After reviewing the petition for writ of mandamus and the mandamus record, we conclude that the relator has not established an abuse of discretion by the trial court. *See In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004) (orig.proceeding); *In re CI Host, Inc.,* 92 S.W.3d 514, 516 (Tex.2002) (orig.proceeding). We deny the petition for writ of mandamus and motion for temporary relief. *See* Tex.R.App. P. 52.8(a).

PETITION DENIED.

**End of Document**　　　　　　　　　　　　　　© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2157765
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

***MEMORANDUM OPINION***
Court of Appeals of Texas,
Austin.

In re Jeffrey (Tre) KRUEGER.

No. 03–12–00838–CV.    |    May 16, 2013.

Original Proceeding from Travis County.

**Attorneys and Law Firms**

Mark A. Cohen, Law Office of Mark Cohen, Austin, TX, for real party in interest.

D. Todd Smith, Smith Law Group, P.C., Austin, TX, for relator.

Before Justices PURYEAR, PEMBERTON and ROSE.

***MEMORANDUM OPINION***

BOB PEMBERTON, Justice.

**\*1** Relator Jeffrey (Tre) Krueger was found in contempt of court for violating a temporary injunction and was committed to jail for 125 days. During his confinement, Krueger filed a petition for writ of habeas corpus and an emergency motion to set bond pending this Court's determination of the merits of the petition. We granted the emergency motion, ordered Krueger released upon the posting of bond, and requested a response from the real parties in interest, Michael Torres and Cru Energy, Inc. (Cru Energy). A response was subsequently filed. Having considered the petition and response, we conclude that Krueger is entitled to relief. Accordingly, we will grant the petition for writ of habeas corpus.

## BACKGROUND

Krueger and Torres are opposing parties in ongoing litigation involving Cru Energy, a company that they co-founded. In the underlying suit, Krueger sued Torres for breach of fiduciary duty, fraud, conversion, and other theories of recovery. Torres filed an answer and counterclaim in which he made similar allegations against Krueger. During the course of the litigation, Torres sought and obtained a temporary restraining order and two temporary injunctions against Krueger. The temporary restraining order, which was entered on June 14, 2011, and extended by agreement on July 27, 2011, prohibited Krueger from, among other things, "making or initiating any withdrawals or transfers from the Wells Fargo Account (as defined in Plaintiffs' Original Petition), excluding transfers to be made in the ordinary course of business of Cru Energy." [1] The first temporary injunction, which was entered on July 5, 2011, and replaced the temporary restraining order, prohibited Krueger from:

(1) scheduling or providing notice of or conducting a shareholder's meeting;

(2) making or initiating any withdrawals or transfers from any of Cru Energy, Inc. bank accounts, including, but not limited to, the Wells Fargo Account as defined in Plaintiffs' Original Petition;

(3) disposing of, selling or encumbering the shares or any assets of Cru Energy, Inc. to which Jeffrey Krueger claims ownership;

(4) removing, destroying, or otherwise making unavailable any written information or documents related to the activities of any of Cru Energy, Inc.'s employees, agents, contractors, prospective or actual investors, customers or governmental agencies and its employees, or any other person who may be directly or indirectly involved with the affairs or business of Cru Energy, Inc.;

(5) contacting any of Cru Energy Inc.'s investors or potential investors, or any other persons doing business with or potentially a participant in the business of Cru Energy, Inc., except as specifically authorized by Michael Torres.

The second temporary injunction, which was entered on July 15, 2011 and purports to supplement the first temporary injunction, further ordered Krueger to "[r]eturn $80,000 to the Cru Energy bank account number 7038038340 to said account no later than July 18, 2011," to "[r]efrain and desist from denying or restricting Michael Torres' access to all money in Cru Energy, Inc.'s bank account number 7038038340 or any other account in the name of Cru Energy, Inc. at Wells Fargo Bank for usual and customary purposes of Cru Energy, Inc.," and to "[r]efrain and desist from denying or restricting Michael Torrres' access to or control over the Cru Energy, Inc. Website registered in the company's name...."

**\*2** On January 18, 2012, Krueger filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Northern District of Texas. Subsequently, Cru Energy filed a motion for relief from the automatic stay, and the bankruptcy court modified the stay to allow Cru Energy to pursue criminal contempt charges against Krueger relating to his obligations under the temporary orders. On September 6, 2012, following a hearing, Krueger was held in contempt for violating the temporary restraining order by making three cash withdrawals on June 17, 2011, totaling $3,091.21, from the Wells Fargo Account referenced in the order. Krueger was subsequently committed to the Travis County Jail for three consecutive days.

In November 2012, Cru Energy pursued additional contempt charges against Krueger relating to alleged violations of the first temporary injunction. Cru Energy alleged that Krueger had violated the injunction by failing to cease and desist from either directly or indirectly "making or initiating any withdrawals or transfers from any of Cru Energy, Inc. bank accounts, including, but not limited to, the Wells Fargo Account as defined in Plaintiffs' Original Petition." Specifically, according to Cru Energy, Krueger admitted that he had "held $80,000 in trust for Cru Energy, Inc." and that he had "withdrew and transferred all of that money in separate violations of the Temporary Injunction."

Cru Energy also alleged that Krueger had further violated the injunction by failing to cease and desist from either directly or indirectly "contacting any of Cru Energy Inc.'s investors or potential investors, or any other persons doing business with or potentially a participant in the business of Cru Energy, Inc., except as specifically authorized by Michael Torres." According to Cru Energy, Krueger had contacted "multiple investors, vendors, and potential contractors and employees of Cru Energy." These alleged contacts "includ[ed] but [were] not limited to": (1) sending an email to several investors and potential contractors and employees of Cru Energy; (2) contacting and ultimately contracting with DSL, a vendor of Cru Energy; (3) contacting on multiple occasions Pablo Cortez and Robert Cook, both of whom were employees of Cru Energy; (4) contacting an employee of Seva Energie, a vendor of Cru Energy; and (5) sending an email to Dr. Patrick Hayes, "an investor and potential vendor or customer" of Cru Energy.

A hearing was held on the allegations. At the hearing, the district court admitted into evidence the transcript of the September contempt hearing (but not the documentary evidence from that hearing) and took "judicial notice of its court file." [2] The district court proceeded to consider additional evidence regarding the allegations, including the testimony of Krueger and former Cru Energy employees Cook and Cortez. Documentary evidence was also admitted relating to Krueger's allegedly improper contacts, including copies of email messages and phone logs.

**\*3**  At the conclusion of the hearing, the district court found that Krueger had violated the temporary injunction as alleged. Specifically, the district court found that Krueger had made 23 separate withdrawals and transfers from a Cru Energy bank account (the account was not specifically identified in the contempt order, other than as "the bank account holding Cru Energy, Inc. funds"), in the aggregate amount of approximately $80,000. The district court further found that Krueger had also violated the injunction by sending an email to several investors and employees of Cru Energy, sending an email to a vendor of Cru Energy, and sending emails to Pablo Cortez, an employee of Cru Energy. For each violation, the district court committed Krueger to jail for five consecutive days, for a total term of confinement of 125 days. Krueger was immediately taken into custody and confined to the Travis County jail. [3] This habeas-corpus proceeding followed.

### STANDARD AND SCOPE OF REVIEW

Contempt is "broadly defined" as "disobedience to or disrespect of a court by acting in opposition to its authority." *In re Reece,* 341 S.W.3d 360, 364 (Tex.2011) (orig.proceeding) (citing *Ex parte Chambers,* 898 S.W.2d 257, 259 (Tex.1995) (orig.proceeding)). "[C]ontempt is a broad and inherent power of a court." *Id.* (citing *Ex parte Browne,* 543 S.W.2d 82, 86 (Tex.1976) (orig.proceeding)). However,

> [D]espite the breadth of a court's contempt power, we have warned it is a tool that should be exercised with caution. As the Court of Criminal Appeals has explained, "[c]ontempt is strong medicine"—the alleged contemnor's very liberty is often at stake—and so it should be used "only as a last resort."

*Id.* (internal citations omitted).

An order finding a party in contempt is not an appealable order. *See Norman v. Norman,* 692 S.W.2d 655, 655 (Tex.1985). Therefore, the only remedies available to the contemnor are obtaining a writ of mandamus if the contemnor is not confined, or a writ of habeas corpus if, as here, the contemnor is subject to confinement. *See In re Long,* 984 S.W.2d 623, 625 (Tex.1999); *Ex parte Cardwell,* 416 S.W.2d 382, 384 (Tex.1967). "The remedy [of habeas corpus] is in the nature of a collateral attack and its purpose is not to determine the ultimate guilt or innocence of the relator, but only to ascertain whether the relator has been unlawfully imprisoned." *Ex parte Gordon,* 584 S.W.2d 686, 688 (Tex.1979). In a habeas-corpus proceeding, the order or judgment challenged is presumed to be valid until the relator has discharged his burden of showing otherwise. *Ex parte Occhipenti,* 796 S.W.2d 805, 809 (Tex.App.-Houston [1st Dist.] 1990, orig. proceeding) (citing *Johnson v. Zerbst,* 304 U.S. 458, 468–69 (1938)). For the relator to be entitled to release from custody, "the trial court's order of commitment must be void, either because it was beyond the power of the court or because it deprived the relator of his liberty without due process of law." *Ex parte Barnett,* 600 S.W.2d 252, 254 (Tex.1980).

**\*4**  The amount of due process afforded to the contemnor depends on the type of contempt being charged. "Contempt may occur in the presence of a court (direct contempt), or outside the court's presence (constructive contempt)." *Reece,* 341 S.W.3d at 365 (citing *Gordon,* 584 S.W.2d at 688). Because constructive contempt occurs outside the court's presence, more procedural safeguards are afforded to constructive contemnors, including notice, a hearing, and the opportunity to obtain an attorney. *See Ex parte Krupps,* 712 S.W.2d 144, 147 (Tex.Crim.App.1986); *Ex parte Werblud,* 536 S.W.2d 542, 546 (Tex.1976) (orig.proceeding). It is undisputed that the contempt alleged in this case, the violation of a written court order that occurred outside the court's presence, is constructive contempt. *See Chambers,* 898 S.W.2d at 259.

"Contempt is further classified into either civil or criminal contempt." *Reece,* 341 S.W.3d at 365. "Civil contempt in Texas is the process by which a court exerts its judicial authority to compel obedience to some order of the court." *Ex parte Padron,* 565 S.W.2d 921, 924 (Tex.1978) (orig.proceeding). Once the contemnor obeys the court order, the contemnor is released from his confinement. *See Werblud,* 536 S.W.2d 545. In other words, "the civil contemnor 'carries the keys of his prison in his own pocket.' " *Id.* (quoting *Shillitani v. United States,* 384 U .S. 364, 368 (1966)). "Criminal contempt[,] on the other hand[,] is

punitive in nature." *Id.* "The sentence is not conditioned upon some promise of future performance because the contemnor is being punished for some completed act which affronted the dignity and authority of the court." *Id.* Here, it is undisputed that Krueger was subject to criminal contempt, confined as punishment for his completed act of allegedly violating a court order and without the ability to obtain his release through compliance. *See Reece,* 341 S.W.3d at 365.

"Many constitutional rights are accorded criminal contemnors." *Werblud,* 536 S.W.2d at 547. This is because "criminal contempt is a crime in every fundamental respect," *Bloom v. Illinois,* 391 U.S. 194, 201 (1968), and constitutional protections are required to ensure that the power to hold a person in contempt is not abused. *See id.* These rights include "full and complete notification" of the charges and a "reasonable opportunity to meet the charges by way of defense or explanation," *Gordon,* 584 S.W.2d at 688, the right to assistance of counsel if requested, *Ex parte Hiester,* 572 S.W.2d 300, 302 (Tex.1978), the privilege against self-incrimination, *Werblud,* 536 S.W.2d at 547–48, and the right to a jury trial if the proposed punishment exceeds six months' imprisonment. *Taylor v. Hayes,* 418 U.S. 488, 495 (1974); *Werblud,* 536 S.W.2d at 547. Because "contempt proceedings are quasi-criminal in nature," the procedures followed in contempt cases "should conform as nearly as practicable to those in criminal cases." *Ex parte Sanchez,* 703 S.W.2d 955, 957 (Tex .1986) (orig.proceeding); *Ex parte Johnson,* 654 S.W.2d 415, 420 (Tex.1983) (orig.proceeding); *In re Houston,* 92 S.W.3d 870, 877 (Tex.App.-Houston [14th Dist.] 2002, orig. proceeding).

**\*5** A criminal contempt conviction for disobedience to a court order requires proof beyond a reasonable doubt of: (1) a reasonably specific order; (2) a violation of the order; and (3) the willful intent to violate the order. *Chambers,* 898 S.W.2d at 259. "In reviewing the record, we are without jurisdiction to weigh the proof and determine whether it preponderates for or against the relator; rather, we determine only if the judgment is void because, for example, the relator has been confined without a hearing or with no evidence of contempt to support his confinement." *Id.* at 259–60. A reviewing court will issue a writ of habeas corpus and release the contemnor if either the contempt order or the order underlying the contempt is void, because "one may not be held guilty of contempt for refusing to obey a void order." *Ex parte Shaffer,* 649 S.W.2d 300, 301–02 (Tex.1983).

## ANALYSIS

Krueger contends that the contempt order is void for five reasons: (1) the temporary injunction underlying the contempt order is void for failing to comply with the requirements of Texas Rule of Civil Procedure 683; (2) the temporary injunction is not sufficiently specific; (3) the show-cause order informing Krueger of the contempt charges failed to notify him that criminal confinement and a criminal penalty would be sought as punishment; (4) there was no evidence supporting the district court's findings that Krueger violated the injunction by making withdrawals or transfers from Cru Energy bank accounts; and (5) there was no evidence supporting the district court's findings that Krueger violated the injunction by making contact with the individuals he was prohibited from contacting. We agree with Krueger that the temporary injunction he was alleged to have violated is void for failure to comply with the requirements of Rule 683.

"The law demands clear and complete orders granting injunctions." *Webb v. Glenbrook Owners Ass'n,* 298 S.W.3d 374, 384 (Tex.App.-Dallas 2009, no pet.) (citing Tex.R. Civ. P. 683). Rule 683 provides in pertinent part that "[e]very order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained. Tex.R. Civ. P. 683. "The requirements of Rule 683 are mandatory and must be strictly followed." *Interfirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (per curiam). "When a temporary injunction order does not adhere to the requirements of Rule 683 the injunction order is subject to being declared void and dissolved." *Id.; see Qwest Commc'ns. Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000) (per curiam).

" '[T]he obvious purpose of [Rule 683] is to adequately inform a party of what he is enjoined from doing and the reason why he is so enjoined.' " *El Tacaso, Inc. v. Jireh Star, Inc.,* 356 S.W.3d 740, 744 (Tex.App.-Dallas 2011, no pet.) (quoting *Schulz v. Schulz,* 478 S.W.2d 239, 244–45 (Tex.Civ.App.-Dallas 1972, no writ)) (alteration in original). Therefore, "an injunction decree must be as definite, clear and precise as possible and when practicable it should inform the defendant of the acts he is restrained

from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *Villalobos v. Holguin,* 146 Tex. 474, 208 S.W.2d 871, 875 (Tex.1948). Stated another way, "[t]he injunction must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him ." *Drew v. Unauthorized Practice of Law Comm.,* 970 S.W.2d 152, 156 (Tex.App.-Austin 1998, pet. denied) (citing *Slavin,* 412 S.W .2d at 44). "Interpretation of the provisions of the court order in question should not rest upon implication or conjecture." *Id.*

**\*6** "On the other hand, a court order need not be 'full of superfluous terms and specifications adequate to counter any flight of fancy a contemnor may imagine in order to declare it vague.' " *Id.* (quoting *Ex parte McManus,* 589 S.W.2d 790, 793 (Tex.Civ.App.-Dallas 1979, no writ)). Rather, "the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written." *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.,* 156 Tex. 7, 291 S.W.2d 697, 702 (Tex.1956). But an injunction "must not be so broad as to enjoin a defendant from activities which are a lawful and proper exercise of his rights." *Hitt v. Mabry,* 687 S.W.2d 791, 795 (Tex.App.-San Antonio 1985, no writ) (citing *Villalobos,* 208 S.W.2d at 875).

The temporary-injunction provisions at issue in this case prohibited Krueger from: (1) "making or initiating any withdrawals or transfers from any of Cru Energy, Inc. bank accounts, including, but not limited to, the Wells Fargo Account as defined in Plaintiff's Original Petition"; and (2) "contacting any of Cru Energy Inc.'s investors or potential investors, or any other persons doing business with or potentially a participant in the business of Cru Energy, Inc., except as specifically authorized by Michael Torres." We conclude that neither provision complies with Rule 683.

We first address the prohibition against withdrawals or transfers from "any of Cru Energy, Inc. bank accounts, including, but not limited to, the Wells Fargo Account as defined in Plaintiff's Original Petition." This prohibition violates Rule 683 in two ways. First, rather than describing in reasonable detail the Wells Fargo Account, the injunction describes the account solely by reference to a separate document, the petition, that contains identifying information regarding the account in question. Thus, the petition—not the injunction—provides the means of describing the act or acts sought to be restrained. This is a violation of Rule 683's requirement that the injunction "describe in reasonable detail and *not by reference to the complaint or other document,* the act or acts sought to be restrained." *See* Tex.R. Civ. P. 683 (emphasis added).

In its brief, Cru Energy acknowledges that "[a]t best, if transfer from that [Wells Fargo] account had formed the basis of the contempt finding, it may have been subject to habeas corpus for that portion of the judgment." However, Cru Energy contends that the reference in the injunction to the Wells Fargo Account was "merely an example" of an account that Krueger was prohibited from accessing, and it "was irrelevant to the [contempt order] because it was not the account Relator transferred the money from and for which he was held in contempt." [4] In other words, according to Cru Energy, the only possible problem with the injunction is the reference to the Wells Fargo Account, which Krueger was not alleged to have accessed. Therefore, in Cru Energy's view, if that portion of the injunction is found to be void, it does not affect the validity of the contempt order.

**\*7** However, Cru Energy's argument overlooks the second way in which the prohibition violates Rule 683. In addition to impermissibly describing the Wells Fargo Account by reference to another document, the entire prohibition on withdrawals and transfers fails to describe in reasonable detail the other accounts that Krueger is enjoined from accessing. The injunction prohibits Krueger from making withdrawals or transfers from "any" Cru Energy bank accounts, "including but not limited to" the Wells Fargo Account. But the injunction does not describe in reasonable detail those other accounts. There are no account numbers listed in the injunction, no identification of the banks in which the accounts exist, and no information describing the history or current status of the accounts. Thus, even if we were to disregard the portion of the injunction that referenced the Wells Fargo Account, the injunction still violates Rule 683's requirements that the injunction "shall be specific in terms" and "shall describe in reasonable detail ... the act or acts sought to be restrained." *See* Tex.R. Civ. P. 683.

Cru Energy argues that the injunction "is in the most detail possible since Mr. Krueger would have to have known an account which fit that description in the injunction in order to be entitled to transfer money out of it" and that "Krueger himself established the Cru account he took the funds out of after he acquired knowledge of the July 5, 2011 injunction." However, Rule 683 requires that the injunction be as "definite, clear and precise as possible ... without calling on [the enjoined party] for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *Villalobos,* 208 S.W.2d at 875. The injunction here, by not specifically identifying the off-limit accounts, required Krueger to make "inferences or conclusions about which persons might well differ" regarding the accounts he was prohibited from accessing and, consequently, "left for further hearing" the issue of whether withdrawals and transfers from certain accounts violated the injunction.[5] Thus, the injunction failed to comply with the specificity requirements of Rule 683. *See Computek Computer & Office Supplies, Inc. v. Walton,* 156 S.W.3d 217, 222–23 (Tex.App.-Dallas 2005, no pet.) (holding that lack of specificity in injunction was not cured by any knowledge that enjoined party may have had).

We also disagree with Cru Energy's contention that the injunction was in "the most detail possible." The second temporary injunction, which Krueger was not alleged to have violated, specifically ordered Krueger to "[r]eturn $80,000 to the Cru Energy bank account number 7038038340 to said account no later than July 18, 2011," and to "[r]efrain and desist from denying or restricting Michael Torres' access to all money in Cru Energy, Inc.'s bank account number 7038038340 or any other account in the name of Cru Energy, Inc. at Wells Fargo Bank for usual and customary purposes of Cru Energy, Inc." Thus, the second injunction specifically identified the relevant bank accounts, leaving no doubt as to how Krueger was to comply with the injunction. The first injunction, on the other hand, contained no such specificity. To comply with Rule 683, the first injunction merely needed to "describe in reasonable detail" the bank accounts that Krueger was prohibited from accessing. *See* Tex.R. Civ P. 683. This was not an impracticable requirement—providing the specific bank account names and numbers would have sufficed. By not providing that or similar information identifying the specific accounts that Krueger was enjoined from accessing, the injunction failed to comply with Rule 683.

**\*8** We next address the prohibition against Krueger "contacting any of Cru Energy, Inc.'s investors or potential investors, or any other persons doing business with or potentially a participant in the business of Cru Energy, Inc., except as specifically authorized by Michael Torres." This portion of the injunction violates Rule 683 by failing to describe in reasonable detail the individuals or organizations that Krueger was prohibited from contacting. Specifically, the injunction fails to name or otherwise identify those who are considered "investors or potential investors" of Cru Energy, and those who are "persons doing business with or potentially a participant in the business of" Cru Energy.

Cru Energy argues that because of Krueger's role in running the company, he is "in a position to know who were investors and persons doing business with Cru [Energy]." Even assuming that this is true,[6] an injunction must be as "definite, clear and precise as possible ... without calling on [the enjoined party] for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *Villalobos,* 208 S.W.2d at 875. The above prohibition fails to inform Krueger of who he is enjoined from contacting, and it requires him to infer the identity of those individuals based on his then-existing knowledge of the company's operations. This is similar to the injunction in *Computek,* 156 S.W.3d at 221–23, that was held to violate Rule 683. In that case, OEM Supplies (OEM) and the owner of Computek, Michael Williams, were opposing parties in litigation involving Computek's alleged use of trade secrets to form a competing company in violation of a covenant not to compete. *Id.* at 219–20. Computek had been permanently enjoined "from doing business, or authorizing anyone else to do business, with any OEM client not listed on Attachment A or that was a new account set up while Williams worked for OEM." *Id.* at 221. Although Attachment A listed some clients whom Computek could contact, the injunction did not name or otherwise identify the clients whom Computek could not contact. *Id.* Computek contended that due to this lack of specificity, it could not know whether contacting certain clients violated the injunction. *Id.* at 221–22. The appeals court agreed, explaining its reasoning as follows:

> [T]hese paragraphs [of the injunction] enjoin Computek from taking specific actions involving specific OEM clients who are not identified or listed in the permanent injunction, and from using or disclosing information and files that are not specifically

identified in the permanent injunction. Because these OEM clients are not specifically named, we agree with Computek that it must ask every non-ABBA contact it makes whether it was an OEM client during the relevant times, and that question may be construed as "canvassing" or "soliciting," and thus a violation of the permanent injunction. We agree with Computek that the permanent injunction lacks specificity in this regard.

**\*9** *Id.* at 222. In response to OEM's argument that Computek "ha[d] the information as to the clients it may not contact 'as demonstrated by their repeated contacts of those clients,' " the appeals court observed,

> [E]ven if the trial court had expressly found Computek had such information, rule 683 provides that the order granting an injunction "shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or any other document, the act or acts sought to be restrained." Thus, the injunction itself must provide the specific information as to the off-limits clients, without inferences or conclusions, or, in this case, implied references to other records Computek might have. Thus, we cannot agree with OEM that the lack of specificity as to OEM clients is cured by any knowledge Computek may have outside the permanent injunction.

*Id.* at 222–23. Similarly, in this case, the injunction does not identify the individuals who Krueger is prohibited from contacting, and it requires Krueger to make inferences or conclusions concerning whom those individuals are. In fact, this injunction is even more vague than the injunction at issue in *Computek,* which at least provided a list of specific clients who Computek could contact. *See id.* at 221. Krueger was not specifically informed of either whom he was allowed to contact or whom he was enjoined from contacting.

For the above reasons, we conclude that the first temporary injunction violates the specificity requirements of Rule 683 and is, accordingly, void. [7] Consequently, the order finding Krueger in contempt for allegedly violating that injunction is also void. *See Shaffer,* 649 S.W.2d at 301–02; *In re Garza,* 126 S.W.3d 268, 273 (Tex.App.-San Antonio 2003, orig. proceeding). It is therefore unnecessary for us to address the other reasons why, in Krueger's view, the contempt order is void. *See Gordon,* 584 S.W .2d at 689–90; *Garza,* 126 S.W.3d at 273 n. 4. We grant Krueger's petition for writ of habeas corpus, vacate the district court's contempt order, and order Krueger discharged from custody and released from the bond set by this Court on December 31, 2012.

Footnotes

1    The "Wells Fargo Account" is described in Krueger's petition as follows:
> The Board authorized a checking/banking account for CRU Energy with Wells Fargo Bank (the "Wells Fargo Account"). The Board resolution authorizing the Wells Fargo Account provides that Mr. Krueger and Mr. Torres would both be authorized signatories on the Wells Fargo Account.
Although no identifying account number was provided in the petition, the "Wells Fargo Account" was referenced multiple times in the petition and formed the basis for Krueger's conversion theory against Torres. Krueger pled,
> On or about October 1, 2010, Mr. Krueger attempted to electronically access the Wells Fargo Account. Mr. Krueger was able to view the Wells Fargo Account, but was unable to conduct any transactions in it. When Mr. Krueger asked Mr. Torres about his inability to access the Wells Fargo Account, he informed Mr. Krueger that he had Mr. Krueger's signature authority on the Wells Fargo Account revoked. Mr. Torres said that he believed having too many persons with access to the Wells Fargo Account was not consistent with how he wanted to handle CRU Energy's accounting functions.

2    The record reflects that most of the evidence concerning the alleged withdrawals and transfers was admitted during the September hearing.

3    Krueger was confined from December 19, 2012, when he was taken into custody, through December 31, 2012, when this Court ordered him released upon the posting of bond.

4    We note that the contempt order did not specifically identify the account from which Krueger had transferred money in violation of the injunction, other than as "the bank account holding Cru Energy, Inc. funds." The record reflects that there was more than one such account.

5    The record of the September 6 contempt hearing reflects this problem. At the hearing, Krueger testified that at one point he withdrew $160,000 from a Cru Energy bank account and transferred the funds into his personal account, which, Krueger claimed, was "linked" to a Cru Energy bank account. He later withdrew $56,000 of those funds from his personal account and transferred the funds into another account that, according to Krueger, was an "operating Cru Energy account" that he had opened at Bank of America

without authorization from Michael Torres. At another point in his testimony, Krueger admitted to withdrawing $80,000 from "a Cru Energy bank account," but claimed that the trial court "didn't specifically say that I wouldn't have access to that account." Without specificity in the injunction, questions remain as to which particular accounts qualify as "Cru Energy, Inc. bank accounts" for purposes of the injunction. For example, was Krueger's personal account considered a "Cru Energy, Inc. bank account" at the time it contained $160,000 of Cru Energy funds? Similarly, was the Bank of America account, which Krueger testified he had opened without authorization from Torres, actually a "Cru Energy, Inc. bank account" or, due to the lack of authorization, was it another one of Krueger's personal accounts? Such questions can be answered only by drawing inferences and conclusions based on information not contained within the injunction.

There is some authority for the proposition that, at least in the context of covenants not to compete, injunctions generally restraining solicitation of customers and not specifically listing the individual customers are not impermissibly vague. *See Safeguard Bus. Sys., Inc. v. Schaffer,* 822 S.W.2d 640, 644–45 (Tex.App.-Dallas 1991, no writ). This is because, in that context, it is not "unreasonable to assume that he who is sought to be enjoined is sufficiently familiar with the employer's business and its customers to avoid violating the injunction." *Id.* This case presents a different situation. First, Krueger is prohibited from contacting not merely current investors and persons currently doing business with Cru Energy, but also "potential" investors and "potential" participants in the business. Additionally, despite whatever role Krueger may have had in Cru Energy in the past, the record reflects that during the ongoing litigation, Michael Torres has been making business decisions for the company, and there is no indication in the record that Torres has notified Krueger of whom Torres might be soliciting to become an "investor or potential investor in" Cru Energy, or of whom Torres might be considering to become "a person doing business with or potentially a participant in the business of" Cru Energy. Thus, it would not be reasonable on the facts of this case to assume that Krueger is sufficiently familiar with Cru Energy's investors, potential investors, and "any other persons doing business with or potentially a participant in the business of" Cru Energy, to avoid violating the injunction.

In its brief, Cru Energy asserts that if there is a lack of specificity in the injunction, the defect would render the injunction merely voidable (and therefore subject to attack only on direct appeal) as opposed to void. We disagree. The Texas Supreme Court has repeatedly stated that an injunction that fails to strictly comply with the requirements of Rule 683 and other rules of civil procedure is subject to being declared void. *See, e.g., In re Office of Attorney Gen.,* 257 S.W.3d 695, 697–98 (Tex.2008) (per curiam); *Qwest Commc'ns Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000) (per curiam); *Interfirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (per curiam); *Lancaster v. Lancaster,* 155 Tex. 528, 291 S.W.2d 303, 308 (Tex.1956); *see also In re Garza,* 126 S.W.3d 268, 271–73 (Tex.App.-San Antonio 2003, orig. proceeding) (rejecting contention that injunction which failed to comply with procedural requirements was merely voidable and observing that "[i]f the supreme court had meant that such a temporary injunction was voidable, we feel certain it would have used the word 'voidable.' Instead, the court has repeatedly used the word 'void' ").

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

157 S.W.3d 434
Supreme Court of Texas.

In re U.S. SILICA CO. et al.
In re Badger Mining Corp.
In re Norton Co., et al.
In re Norton Co. (n/k/a/ Saint Gordon Abrasives) Siebe North Inc. and Textron Inc.
In re Bacou–Dalloz Safety, Inc.

Nos. 04–0270, 04-0271, 04-0297, 04-0308, 04-0309.  |  Feb. 11, 2005.

**Synopsis**

**Background:** Ten silicosis cases involving hundreds of plaintiffs were filed in Cameron County and randomly assigned to six different courts. The first case was assigned to the 197th District Court, Migdalia Lopez, J., but the plaintiffs successfully moved to transfer and consolidate all cases to the 404th District Court, Abel Limas, J., and some defendants thereafter successfully move to transfer and consolidate all cases in the 197th District Court. The 103rd District Court, Menton Murray, Jr., J., transferred to the 197th District Court. The 138th District Court, Robert Garza, J., entered an anti-transfer order. The 357th District Court, Leonel Alejandro, J., recused and transferred to the 107th District Court, Benjamin Euresti, J., which took no further action. The 404th District Court, Abel Limas, J., rescinded its consolidation order and blocked any transfer of the case originally filed in that court. Cross-petitions for writs of mandamus were filed. The Corpus Christi-Edinburg Court of Appeals, 129 S.W.3d 810, denied the cross-petitions. A defendant petitioned for writ of mandamus.

**Holdings:** The Supreme Court held that:

[1] local administrative judges could not enforce or overrule competing orders of coordinate courts transferring cases, and

[2] under local court rules, only the court in which the first related case was filed could unilaterally transfer cases.

Writ conditionally granted.

West Headnotes (4)

**[1]**    **Courts**  ⟜  Designation or assignment of judges

Government Code provision assigning to local administrative judges the duty to implement and execute local rules of administration, including assignment, docketing, transfer, and hearing of cases, does not give local administrative judges the authority to enforce or overrule competing orders of coordinate courts transferring cases; such enforcement or overruling is the duty of a higher court. V.T.C.A., Government Code § 74.092(1).

1 Cases that cite this headnote

**[2]**    **Courts**  ⟜  Courts from and to which transfer may be made

Under local court rules for Cameron County, only the court in which the first of two or more related cases was filed may unilaterally transfer cases, with such transfers moving the cases to the court of first filing.

1 Cases that cite this headnote

**[3]** **Mandamus** 🔑 Entertaining and proceeding with cause

Mandamus relief is appropriate to resolve conflicting orders from two or more courts asserting jurisdiction over the same case.

9 Cases that cite this headnote

**[4]** **Judges** 🔑 Exercise of powers in different courts

Trial courts have broad discretion to exchange benches and enter orders on other cases in the same county, even without a formal order or transfer. Vernon's Ann.Texas Const. Art. 5, § 11; V.T.C.A., Government Code § 74.094(a); Vernon's Ann.Texas Rules Civ.Proc., Rule 330(h).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*435** Henry S. Platts, David E. Sharp, Beirne Maynard & Parsons, L.L.P., Chester J. Makowski, Keith N. Uhles, Royston Rayzor Vickery & Williams, L.L.P., Houston, and David C. Garza, Garza & Garza, L.L.P., Brownsville, for Relator.

Cynthia Hardy Smith, Adam Tyler Fox, Cynthia Hardy Smith, Angela Clanton, Strasburger & Price, L.L.P., and William C. Dowdy III, Dallas, Hubert Oxford III, Benckenstein & Oxford, L.L.P., Beaumont, Kenneth E. McKay, Locke, Lidell & Sapp, L.L.P., Eva D. Geer, Mayer Knight & Williams, LLP, Gregory Michael Sullivan, John Duff Cleland, Jeffery Keith Gordon, Andrews & Kurth, L.L.P., Houston, Chris C. Pappas, Alan H. Marks, Amy Dunn Taylor, James Vincent Hewitt, Godwin Gruber, LLP, George J. Kacal, **\*436** Kacal Adams & Law, P.C., Jeffrey Boyd Lucas, Dunn Kacal Adams Pappas & Law, Houston, Thomas B. Taylor, Taylor & Warren, L.L.P., and Jack B. Manning, Douglas T. Gosda, and William J. Cozort Jr., Manning Gosda & Arredondo, LLP, Houston, and Jeffrey D. Roerig, Roerig Oliveira & Fisher, Brownsville, W. Bruce Williams, Cotton Bledsoe Tighe & Dawson, P.C., Midland, Lynne Miller Ford, Phillips & Akers, Houston, Paul J. Holmes, Paul J. Holmes, P.C., Beaumont, Pamela Jean Neale Williams, Irving, William B. Coffey Jr., Adams & Coffey, P.C., Beaumont, Shawn Robert Redman, Mark C. Clemer, Brown Sims, P.C., Houston, Edward J. Hennessy, Hennessy Gardner & Barth, Houston, Willard M. Tinsley, Funderburk & Funderburk, LLP, Houston, and Rex N. Leach, Atlas & Hall, McAllen, David Brill, Brill & Associates, P.C., Curt Webb, Beck Redden & Secrest, L.L.P., Houston, and Norton A. Colvin Jr., Robert Patrick Rodriguez, Teri L. Danish, Rodriguez, Colvin & Chaney & Saenz, LLP, Brownsville, Dale Marett Holidy, Houston, Boyd Wells, Wells Peyton Beard Greenberg Hunt, L.L.P., Beaumont, Sharla J. Frost, James H. Powers, Karen M. Alvarado, Powers & Frost, L.L.P., Houston, Terence M. Murphy, and Charles Christopher Groves, Jones Day, Dallas, Richard P. Hogan Jr., and Jennifer Bruch Hogan, Hogan & Hogan, L.L.P., Houston, Jerry C. Parker, Sammons & Parker, P.C., Tyler, Kent M. Adams, Adams & Coffey, P.C., and Ellen G. Reynard, Adams Coffee & Duesler, Beaumont, Ewing Edben Sikes III, Royston, Rayzor, Vickery & Williams, L.L.P., Brownsville, Andrew S. Oretsky, Davis Oretsky & Guilfoyle, Houston, Thomas B. Taylor, Taylor & Warren, L.L.P., Houston, David Craig Landin, Lori Elliott Jarvis, Paul Oliver Wickes, and Clinton David Howie, Hunton & Williams, LLP, Richmond, VA, Hubert A. Crouch III, Crouch & Ramey, L.L.P., Dallas, Ryan A. Beason, Beason Willingham, LLP, Houston, Dulcie Green Wink, Haynes & Boone, LLP, Houston, John R. Robinson, Johnson & Sylvan, P.C., Dallas, Michael Scott Pyle, John Philip Parsons, Forman, Perry, Watkins, Krutz & Tardy, L.L.P., Dallas, Thomas W. Tardy III, Jackson, MS, Anthony E. Pletcher, Huseman & Pletcher, Corpus Christi, Erin Patterson, Adams & Reese, L.L.P., Houston, R. Stephen Ferrell, Giessel Barker & Lyman, P.C., Houston, Deborah A. Newman and Roger Henry Nebel, Forman, Perry, Watkins, Krutz & Tardy, LLP, Houston, Clinton Eugene Phillips, Johnson Ferguson Pipkin & Phillips, Houston, Charles A. Green and Timothy Dewayne Ammons, Cowles & Thompson, P.C., Dallas, Robert G. Newman, Fulbright & Jaworski L.L.P., San Antonio, Patrick

M. Martinez, Hermansen McKibben Woosley & Villarreal, L.L.P., Corpus Christi, Jeff Shaver, Sammons & Parker, Houston, Jeffrey D. Roberts, Roberts Markel, Guerry, P.C., Houston, Frank N. Luccia, and Cathryn Ann Adams, Luccia & Evans, L.L.P., Houston, Robert E. Thackston and Stephanie L. Spardone, Hawkins, Parnell & Thackston, L.L.P., Dallas, Barbara Jane Barron, Mehaffy & Weber, Beaumont, Richard Reyna, Brock & Person, P.C., San Antonio, Robert J. Rose, Timaeus & Rose, L.L.P., Beaumont, Carl Dawson, Ryan & Dawson, Houston, Juan A. Magallanes, Gilberto Hinojosa, Magallanas & Hinojosa, P.C., and Armando Roberto Villalobos, Brownsville, Alan G. Sampson, Benckenstein & Oxford, Beaumont, Clarence Thomas Valentine Jr., James Odis Blackwell III, Daw & Ray, P.C., Houston, and Michael Ray Walzel, Stevens, Baldo & Freeman, Beaumont, Cortlan Howard Maddux, Houston, Gerry Lowery, Robert G. Newman, Fulbright & Jaworski L.L.P., San Antonio, Joe Michael Dodson, Dodson Law Offices, P.C., Beaumont, Harold Hudson Henley and Geoffrey Justin Henley, Henley & Henley, P.C., Dallas, Steve A. Bryant, **\*437** Steve A. Bryant & Associates, P.C., Houston, for Real Parties.

**Opinion**

PER CURIAM.

Ten silicosis cases involving hundreds of plaintiffs were filed in Cameron County and randomly assigned to six different courts. At the behest of different parties, three judges issued conflicting orders asserting jurisdiction over cases in their own courts or others. Because the Cameron County local rules permit a unilateral transfer only by the court where the first case was filed, we conditionally grant a writ of mandamus directing the others to vacate orders forbidding that transfer.

On May 30, 2003, a single attorney filed ten silicosis lawsuits in Cameron County. The allegations in each were identical, as were the 82 defendants. Only the plaintiffs varied—each suit included about 70, for a total of almost 700.

The cases were randomly assigned among the six district courts in Cameron County. Though all were file-stamped with the same time, consecutive cause numbers indicate the first case filed was assigned to the 197th District Court (Judge Migdalia Lopez presiding).

Thereafter ensued a scramble for possession. First on the field were the plaintiffs, who kicked things off by moving to transfer and consolidate all ten cases in the 404th District Court (Judge Abel Limas presiding). That motion was granted on January 6th.

Close behind came some of the defendants, who countered by moving to consolidate all ten cases in the 197th District Court, where the first case was filed. That motion, too, was granted on January 7th.

The reaction of the remaining courts varied. The 103rd District Court (Judge Menton Murray, Jr. presiding) took the second option, lateraling cases to the 197th District Court. The 138th District Court (Judge Robert Garza presiding) blocked, entering an anti-transfer order because no one had requested his consent. The 357th District Court (Judge Leonel Alejandro presiding) punted, signing a recusal order and transferring cases to the local administrative judge. That court, the 107th District Court (Judge Benjamin Euresti presiding), remained on the sidelines, taking neither offensive nor defensive action in the proceedings.

At this point, some of the contestants reversed field. Judge Limas rescinded his original consolidation order, but also signed an order blocking any transfer of the case originally filed in his court. Eventually, the plaintiffs followed suit, seeking to return all cases to the courts where originally filed, except for those transferred by recusal from the 357th.

 [1]    Unable to determine the winner of these jurisdictional contests, the relators sought mandamus relief from the Thirteenth Court of Appeals. That court declined to referee, holding the proper umpire was the local administrative judge. 129 S.W.3d 810, 814. The court of appeals relied on a provision of the Texas Government Code that assigns to local administrative judges the statutory duty (among others) to "implement and execute the local rules of administration, including the assignment, docketing, transfer, and hearing of cases." Tex. Gov't Code § 74.092(1).

We disagree that this statute gives local administrative judges authority to review and reverse conflicting rulings of coordinate courts like those issued here. While the local administrative judge may transfer cases pursuant to local rules, enforcing or overruling competing orders is the duty of a higher court.

**\*438** **[2]** In this case, the Cameron County rules allow transfer of related cases to the court in which filing was first made without the consent of any other judge:

> Whenever any pending case is so related to another case previously filed in or disposed of by another District Court of Cameron County that a transfer of the later case to such other court would facilitate orderly and efficient disposition of the litigation, the Judge of the court in which the earlier case is or was pending may, on notice and hearing, transfer the later case to such court.

Cameron County Civ.Ct. R. 1.1(f)(2). The local rules permit the first-filed case to be transferred to a court with a later-filed case, but only with the first judge's consent:

> In the event that an assigned case is subject to the provisions of paragraphs 1.1(f)(2) and (3) and the earlier case is still pending, the judge of the court wherein the later case is pending may on notice and hearing order the earlier case transferred to the later court provided that the judge of the court wherein the earlier case is assigned consents.

*Id.* at 1.1(f)(5). Under these rules, only the 197th court could transfer cases unilaterally.

As the relators challenge only the conflicting transfer orders, the propriety of consolidating such a large number of claims is not before us. *See In re Van Waters & Rogers, Inc.,* 145 S.W.3d 203, 207–10 (Tex.2004) (holding consolidation was abuse of discretion based on "Maryland factors"); *see also In re Bennett,* 960 S.W.2d 35, 40 (Tex.1997) (holding that a scheme designed to subvert random case assignment "breeds disrespect for and threatens the integrity of our judicial system.").

While we have encouraged consolidation for pretrial purposes (most recently pursuant to legislative mandate), we have avoided placing such decisions in the hands of one of the players. *See generally* Tex. Gov't Code § 74.161–63; Tex.R. Jud. Admin. 11.4(h) (appointment by regional administrative judge), 13.3 (appointment by multidistrict litigation panel). Local consolidation rules have made similar arrangements to avoid the awkward problem of one court taking a case from another. *See, e.g., CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996) (noting adoption by Harris County courts of rules for and appointment of presiding judge in asbestos cases).

But the only issue before us is which court, if any, could unilaterally transfer to itself related Cameron County cases. Accordingly, we do not address whether the transfers here would (as the local rules also require) "facilitate orderly and efficient disposition of the litigation." Cameron County Civ.Ct. R. 1.1(f)(2).

**[3]** We have long held that mandamus relief is appropriate to resolve conflicting orders from two or more courts asserting jurisdiction over the same case. *See Bigham v. Dempster,* 901 S.W.2d 424, 428 (Tex.1995) (granting mandamus relief from "conflicting orders issued from different district courts"); *see also Abor v. Black,* 695 S.W.2d 564, 567 (Tex.1985); *Curtis v. Gibbs,* 511 S.W.2d 263, 267 (Tex.1974). Accordingly, mandamus is appropriate here.

The relators also challenge certain interim orders signed by the 404th and 138th District Courts that set trial dates, ordered mediation, and set aside a number of default judgments. Relators argue that any orders signed after the consolidation in the 197th District Court are void.

We disagree that all orders signed by a transferring court after transfer are void; many are not. *See, e.g.,* **\*439** Tex. Fam.Code § 155.005(a) (providing transferring court retains jurisdiction to render temporary orders); Tex.R. Jud. Admin. 13.5(b) (providing transferring court in multidistrict litigation may make further orders on certain conditions); *In re Bennett,* 960 S.W.2d 35, 40

(Tex.1997) (holding trial court retained power to sanction litigant after removal to federal court). This is especially true here because the transfers involved district courts in a single county.

[4]    Trial courts have broad discretion to exchange benches and enter orders on other cases in the same county, even without a formal order or transfer. Tex. Const. art. V, § 11 ("[T]he District Judges may exchange districts, or hold courts for each other when they may deem it expedient"); Tex. Gov't Code § 74.094(a); Tex.R. Civ. P. 330(h) (providing that in multi-court counties "any judge may hear and determine motions, ... and all preliminary matters, questions and proceedings and may enter judgment or order thereon in the court in which the case is pending without having the case transferred to the court of the judge acting"); *In re Houston Lighting & Power Co.,* 976 S.W.2d 671, 673 (Tex.1998). Given the broad powers district courts have to act for one another, we do not agree that these orders were entered without jurisdiction.

We need not decide whether some post-transfer orders in cases transferred intra-county may qualify among the "rare circumstances" that render an order void rather than merely voidable. *Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990). Here, the relators do not argue that the 197th District Court would be hampered by or unable to rescind any of the orders. Thus, we decline to grant mandamus relief ordering that they be vacated. *See Abor,* 695 S.W.2d at 567 (declining to grant mandamus relief when courts were not actively interfering with each other).

Accordingly, pursuant to Texas Rule of Appellate Procedure 52.8 and without hearing oral argument, we direct the 138th and 404th District Courts to vacate their orders of January 13, 2004, so that the 197th District Court may conduct further proceedings consistent with this opinion. We are confident that the trial courts will promptly comply, and our writ will issue only if they do not.

**Parallel Citations**

48 Tex. Sup. Ct. J. 411

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

715 S.W.2d 640
Supreme Court of Texas.

INTERFIRST BANK SAN FELIPE, N.A. Petitioner,

v.

PAZ CONSTRUCTION COMPANY, et al., Respondents.

No. C–5393.　|　Sept. 10, 1986.

Debtor sought temporary injunction enjoining bank from foreclosing deed of trust lien which secured payment of promissory note. The 334th District Court, Harris County, Marsha Anthony, J., granted temporary injunction and bank appealed. The Houston Court of Appeals, Fourteenth Supreme Judicial District, Paul C. Murphy, J., affirmed and bank brought error. The Supreme Court held that failure of order granting temporary injunction to include order setting matter for trial on merits in violation of rule required temporary injunction to be declared void.

Judgment of Court of Appeals reversed.

West Headnotes (2)

**[1]　Injunction　〰 Form and requisites**

Rule which provides that every order granting temporary injunction must include order setting cause for trial on merits with respect to ultimate relief sought is mandatory and must be strictly followed; when temporary injunction order does not adhere to requirements, injunction order is subject to being declared void and dissolved. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

136 Cases that cite this headnote

**[2]　Mortgages　〰 Restraining exercise of power**

Temporary injunction order which enjoined bank from foreclosing deed of trust lien securing payment of promissory note but which did not include order setting cause for trial on merits as required by rule was void and would be dissolved, without hearing oral argument. Vernon's Ann.Texas Rules Civ.Proc., Rule 683; Rules App.Proc., Rule 133(b).

93 Cases that cite this headnote

**Attorneys and Law Firms**

**\*640**　Jerry L. Schutza, Alexrod, Smith, Komiss & Kirshbaum, Houston, for petitioner.

W. Briscoe Swan and Leon J. Hursch, Houston, for respondents.

**Opinion**

PER CURIAM.

This is an appeal from an order granting a temporary injunction enjoining InterFirst Bank San Felipe from foreclosing a deed of trust lien securing payment of a promissory note. On appeal, InterFirst complained that the trial court's injunction order is void because it does not include an order setting the cause for trial on the merits. Finding no abuse of discretion in the trial court's decision to grant the temporary injunction, the court of appeals affirmed the trial court's judgment. The court of appeals concluded the trial court's failure to include an order setting the matter for trial on the merits did not mandate a dissolution of the injunction.

Rule 683 provides in pertinent part as follows:

> **\*641** Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought.

 **[1]**    **[2]**    The requirements of Rule 683 are mandatory and must be strictly followed. When a temporary injunction order does not adhere to the requirements of Rule 683 the injunction order is subject to being declared void and dissolved. *E.g., Northcutt v. Warren,* 326 S.W.2d 10, 10 (Tex.Civ.App.—Texarkana 1959, writ ref'd n.r.e.); *University Interscholastic League v. Torres,* 616 S.W.2d 355, 357–58 (Tex.Civ.App—San Antonio 1981, no writ); *Smith v. Hamby,* 609 S.W.2d 866, 868 (Tex.Civ.App.—Fort Worth 1980, no writ). Because the court of appeals' decision conflicts with the requirements of Rule 683, we grant the application for writ of error. Pursuant to Rule 133(b), Tex.R.App.P., without hearing oral argument, we reverse the judgment of the court of appeals, declare the temporary injunction void and order that it be dissolved.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

24 S.W.3d 357
Supreme Court of Texas.

K–MART CORPORATION, Petitioner,

v.

Lisa HONEYCUTT and Michael Honeycutt, Respondents.

No. 99–1112. | June 29, 2000.

Invitee brought negligence action against store for personal injuries she allegedly sustained when struck by shopping carts as store employee pushed them into cart corral. The 319th District Court of Nueces County, Max Bennett, J., entered take-nothing judgment against invitee. Invitee appealed. On motion for reconsideration, the Corpus Christi Court of Appeals reversed and remanded, 1 S.W.3d 239. On petition for review, the Supreme Court held that testimony by invitee's human factors and safety expert would not have assisted trier-of-fact to understand evidence or to determine fact issue.

Court of Appeals' judgment reversed and rendered.

West Headnotes (11)

**[1]** **Appeal and Error** 👉 Rulings on admissibility of evidence in general

The Supreme Court reviews a trial court's exclusion of expert testimony for abuse of discretion. Rules of Evid., Rule 702.

35 Cases that cite this headnote

**[2]** **Evidence** 👉 Determination of question of competency

A trial court abuses its discretion in excluding expert testimony when its ruling is arbitrary, unreasonable or without reference to any guiding rules or legal principles. Rules of Evid., Rule 702.

104 Cases that cite this headnote

**[3]** **Appeal and Error** 👉 Reasons for Decision

Where the trial court does not specify the ground on which it excluded expert testimony, the Supreme Court will affirm the trial court's ruling if any ground is meritorious. Rules of Evid., Rule 702.

16 Cases that cite this headnote

**[4]** **Evidence** 👉 Matters involving scientific or other special knowledge in general

When determining the admissibility of expert testimony, the fact that the expert has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier-of-fact. Rules of Evid., Rule 702.

10 Cases that cite this headnote

**[5]** **Evidence** 👉 Matters involving scientific or other special knowledge in general

Expert testimony assists the trier-of-fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier-of-fact understand the evidence or determine a fact issue. Rules of Evid., Rule 702.

16 Cases that cite this headnote

**[6]     Evidence ⬦ Matters of common knowledge or observation**

An expert's testimony should be excluded when the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury. Rules of Evid., Rule 702.

15 Cases that cite this headnote

**[7]     Evidence ⬦ Matters of common knowledge or observation**

Expert testimony is inadmissible when it concerns a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance. Rules of Evid., Rule 702.

1 Cases that cite this headnote

**[8]     Evidence ⬦ Construction and Repair of Structures, Machinery, and Appliances**

Proposed testimony by human factors and safety expert that lack of top railing on defendant store's shopping cart corral created unreasonable risk because it served as invitation for people to sit on lower railing, and that it was reasonable for plaintiff invitee to sit on lower railing, would not have assisted jury to understand evidence or to determine fact issue in negligence action arising from injuries invitee allegedly suffered when purportedly struck by carts that store employee pushed into cart corral, and thus, such testimony was properly excluded; jury viewed photographs of cart corral from which it could draw its own conclusions, and its collective common sense could ably assist it in determining whether people would likely sit on lower railing. Rules of Evid., Rule 702.

5 Cases that cite this headnote

**[9]     Evidence ⬦ Cause**

Proposed testimony by human factors and safety expert, that lack of top railing on defendant store's shopping cart corral caused injuries invitee allegedly suffered when she sat on lower railing and was purportedly struck by carts that store employee pushed into cart corral, would not have assisted jury to understand evidence or to determine fact issue in ensuing negligence action, and thus, such testimony was properly excluded; case did not involve causation issue that required scientific or technical explanation, and it was within jury's ability to determine on its own whether lack of railing caused accident. Rules of Evid., Rule 702.

6 Cases that cite this headnote

**[10]     Evidence ⬦ Due care and proper conduct in general**

Proposed testimony by human factors and safety expert that store employee did not receive proper training for pushing shopping carts would not have assisted jury to understand evidence or to determine fact issue in negligence action arising from personal injuries invitee allegedly suffered when struck by shopping carts that employee pushed into cart corral, and thus, such testimony was properly excluded; jurors did not need assistance in determining whether employee knew how to properly push shopping carts. Rules of Evid., Rule 702.

Cases that cite this headnote

**[11]** **Evidence** 👈 Due care and proper conduct in general

Proposed testimony by human factors and safety expert that store employee did not keep proper lookout while pushing shopping carts into store's cart corral would not have assisted jury to understand evidence or to determine fact issue in negligence action arising from personal injuries invitee allegedly suffered when struck by those carts, and thus, such testimony was properly excluded; jury did not need any special interpretation of facts for it to determine whether employee was negligent. Rules of Evid., Rule 702.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*359** Christopher A. Fusselman, Willie Ben Daw, III, Daw & Ray, Houston, for Petitioner.

William R. Edwards, III, John Blaise Gsanger, The Edwards Law Firm, Karen R. Thompson, Allison & Huerta, Steve T. Hastings, Huerta Hastings & Allison, Corpus Christi, for Respondent.

**Opinion**

PER CURIAM.

In this negligence case, we decide whether the trial court abused its discretion by excluding the plaintiffs' human factors and safety expert. The court of appeals held that it did. *Honeycutt v. K-Mart,* 1 S.W.3d 239 (Tex.App.-Corpus Christi 1999). We conclude that the trial court did not abuse its discretion in excluding the expert because none of his opinions would assist the trier-of-fact to understand the evidence or to determine a fact issue. We therefore reverse the court of appeals' judgment and render judgment that the Honeycutts take nothing from K–Mart.

Lisa Honeycutt injured her back while shopping at a K–Mart store in Portland, Texas. She was waiting in line to check out at the register next to the cart corral when the injury occurred. The cart corral, where K–Mart stores empty shopping carts, usually consists of two horizontal rails intersecting a series of vertical posts; however, a part of the upper rail was missing. While in line, Honeycutt sat on the lower rail where the top rail was missing with her back to the shopping carts.

As Honeycutt was sitting on the lower rail, Linda Robledo, a service desk supervisor and twelve-and-a-half-year employee, pushed several shopping carts into the cart corral. Robledo saw Honeycutt quickly stand up. Robledo was unable to see Honeycutt because Honeycutt was hunched over with her elbows on her knees and Robledo's view was totally or partially obscured by the carts already in the corral.

Lisa and Michael Honeycutt sued K–Mart for injuries to Lisa's back allegedly caused from being hit by the shopping carts. The Honeycutts hired Dr. Way Johnston as a human factors and safety expert. During discovery, Johnston entered the K–Mart store without notifying K–Mart. In his report, Johnston offered the following five opinions: (i) the lack of a top rail presented an unreasonable risk of injury to shoppers and employees of K–Mart; (ii) the accident would not have occurred but for the lack of a top rail; (iii) Linda Robledo was not properly trained in pushing shopping carts; (iv) Linda Robledo failed to keep a proper lookout while pushing the shopping carts into the cart corral; and, (v) Lisa Honeycutt was not contributorily negligent.

Before trial, K–Mart moved to exclude Johnston from testifying. K–Mart argued that Johnston did not satisfy the requirements of Texas Rule of Evidence 702 because his opinions were not relevant and reliable and were within the average juror's common knowledge. K–Mart also argued that the trial court should exclude Johnston's testimony because his unauthorized inspection of the store violated former Texas Rule of Civil Procedure 167. The trial court denied the motion. During trial, K–Mart reasserted its motion, which the trial court granted without specifying **\*360** the grounds. The Honeycutts made a bill of exceptions.

The case was submitted to the jury under a general negligence theory against K–Mart and a comparative negligence theory against Lisa Honeycutt. The jury answered that both K–Mart and Honeycutt were negligent and attributed eighty-percent of the fault to Honeycutt. As a result, the trial court rendered a take-nothing judgment against the Honeycutts.

The Honeycutts appealed. The court of appeals initially affirmed the judgment. But on rehearing, it reversed the trial court and remanded the case for a new trial. 1 S.W.3d at 245. The court of appeals held that the trial court abused its discretion in excluding Johnston because he was qualified to testify and his testimony satisfied the relevance and reliability requirements of *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995). 1 S.W.3d at 243–44. The court also held that the trial court abused its discretion in excluding Johnston for violating former Rule 167 because the infraction was harmless. *Id.* at 245.

 **[1]** **[2]** **[3]** We review a trial court's exclusion of expert testimony for abuse of discretion. *See Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 718–19 (Tex.1998). A trial court abuses its discretion when its ruling is arbitrary, unreasonable or without reference to any guiding rules or legal principles. *See Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998). Because the trial court did not specify the ground on which it excluded Dr. Johnston's testimony, we will affirm the trial court's ruling if any ground is meritorious. *See Bradley v. State ex rel. White,* 990 S.W.2d 245, 247 (Tex.1999).

The court of appeals did not consider all of the grounds K–Mart asserted for excluding Johnston under Texas Rule of Evidence 702. Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702; *see also Gammill,* 972 S.W.2d at 718. The court of appeals ruled only that Johnston's testimony was relevant and reliable. It failed to consider whether Johnston's opinions were beyond the average juror's common knowledge.

 **[4]** **[5]** **[6]** **[7]** That a witness has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier-of-fact. *See Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996). Expert testimony assists the trier-of-fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier-of-fact understand the evidence or determine a fact issue. *See $18,800 in U.S. Currency v. State,* 961 S.W.2d 257, 265 (Tex.App.-Houston [1 st Dist.] 1997, no writ); *Glasscock v. Income Property Servs. Inc.,* 888 S.W.2d 176, 180 (Tex.App.-Houston [1 st Dist.] 1994, writ dism'd by agr.). When the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony. *Glasscock,* 888 S.W.2d at 180. Thus, "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance." *Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4 th Cir.1986).

 **[8]** We conclude that none of Johnston's five opinions would have been helpful to the jury in this case. Johnston's first and fifth opinions concern the ultimate issues of K–Mart and Honeycutt's negligence. Johnston asserts that the lack of a top railing created an unreasonable risk because it served as an invitation for people to sit on the lower railing. Johnston's training and experience as a human factors expert informed him that when human **\*361** beings encounter a low railing, they will sit there. This same reasoning compelled his conclusion that Honeycutt's sitting on the lower railing was not unreasonable conduct. The jury did not need Johnston's assistance to determine whether the lack of a top railing was unreasonable. The jury viewed photographs of the cart corral from which it could draw its own conclusions. This case is similar to *Scott,* in which the Fourth Circuit held that it was error to allow a human factors expert to testify that defects in a sidewalk curb created an unreasonably dangerous condition for women wearing high heels. 789 F.2d at 1055. The Fourth Circuit concluded that it would have been of little help to the jury because the jurors were able to observe the accident scene for themselves and reach a conclusion about the dangerousness of the condition. *Id.* In this case, the jury's collective common sense could ably assist it in determining whether people would likely sit on the lower railing. *See id.* (holding it was error to permit human factors expert to testify that women wearing high heels tend to avoid walking on grates); *see also Persinger v. Norfolk & Western Ry.,* 920 F.2d 1185, 1188 (4 th Cir.1990) (excluding

expert testimony about whether the weight the plaintiff had to carry was unreasonable because the testimony "did no more than state the obvious"); *Stepney v. Dildy,* 128 F.R.D. 77, 80 (D.Md.1989) ("Nor is the testimony of a human factors expert required to advise the jury that moisture will freeze at 32 degrees or colder."); Richmond, *Human Factors Experts in Personal Injury Litigation,* 46 ARK. L.REV. 333, 337 (1993) ("[M]any experts misuse human factors expertise in litigation by either testifying about matters clearly within the jury's common knowledge or offering opinions without adequate foundation.").

 **[9]**     **[10]**     **[11]**     Dr. Johnston's other opinions are also not helpful to the jury because they involve matters within the average juror's common knowledge. His second opinion is that the lack of a top railing caused Honeycutt's injuries. This is not a causation issue that requires a scientific or technical explanation. It was within the jury's ability to determine on its own whether the lack of a railing caused the accident. Johnston's third opinion is that Robledo did not receive proper training for pushing shopping carts. The jurors in this case did not need assistance in determining whether Robledo knew how to properly push shopping carts. An expert opinion on how to push a shopping cart would not have aided the jury in deciding the ultimate fact issues in this case. His fourth opinion is that Robledo did not keep a proper lookout while pushing the carts into the corral. The jury did not need any special interpretation of the facts for it to determine whether Robledo was negligent.

Thus, all of Johnston's conclusions would tell the jury how they should view the facts. The jury in this case was competent to determine the ultimate issues without Johnston's testimony. Therefore, the trial court was within its discretion to exclude the testimony. [1]

Pursuant to Texas Rule of Appellate Procedure 59.1, without hearing oral argument, we reverse the court of appeals' judgment and render judgment that the Honeycutts take nothing from K–Mart.

## Parallel Citations

43 Tex. Sup. Ct. J. 1002

Footnotes

1        Because we conclude that the trial court did not abuse its discretion in excluding Johnston's testimony under Rule 702, we do not reach the issue of whether Johnston was properly excluded for violating former Texas Rule of Civil Procedure 167.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

795 S.W.2d 700
Supreme Court of Texas.

MAPCO, INC., et al., Relators,

v.

The Honorable Shirley FORREST, Clerk, and the Ninth Court of Appeals, Respondents.

No. C–9490. | March 7, 1990.

In action for partition, the 75th District Court, Liberty County, Clarence D. Cain, J., ordered partition and in personam owelty award against parent company of cotenant of estate. Cotenant and parent company appealed. The Court of Appeals, 786 S.W.2d 368, reversed in part and remanded. After filing of applications for writ of error, relators sought writ of mandamus to compel clerk of Court of Appeals to forward record and applications for writ of error to Supreme Court. The Supreme Court held that: (1) filing of applications for writ of error deprived Court of Appeals of jurisdiction over rehearing motion, and (2) expiration of court term in which judgment was rendered deprived Court of Appeals of authority to alter or change judgment.

Leave to file granted, mandamus conditionally issued, and Court of Appeals and clerk directed to forward record and applications for writ of error to Supreme Court.

West Headnotes (10)

**[1]**    **Appeal and Error** 👈 Transfer of Jurisdiction in General

Jurisdiction of Supreme Court immediately attaches upon filing of application for writ of error and deprives the Court of Appeals of jurisdiction to change its judgment.

3 Cases that cite this headnote

**[2]**    **Appeal and Error** 👈 New Trial or Rehearing

Court of Appeals is not deprived of jurisdiction to rule on motion for rehearing of another party that is still pending when application for writ of error is filed.

2 Cases that cite this headnote

**[3]**    **Appeal and Error** 👈 Amendment, Modification, or Setting Aside

Except for "ministerial act" consistent with judgment, Court of Appeals lacks authority to correct or alter judgment after expiration of term in which it was rendered.

1 Cases that cite this headnote

**[4]**    **Appeal and Error** 👈 Application

Appellate rules authorize second or subsequent motion for rehearing only if Court of Appeals modifies its judgment or opinion in connection with the overruling of a previous motion. Rules App.Proc., Rule 100(d).

2 Cases that cite this headnote

**[5]**  **Appeal and Error**  Application

Second motion for rehearing not authorized by appellate rules is nullity even if Court of Appeals rules on it.

1 Cases that cite this headnote

**[6]**  **Appeal and Error**  Application

Second motion for rehearing pending when Court of Appeals' term expired did not extend Court of Appeals' plenary jurisdiction over judgment in the case where motion was not authorized because Court of Appeals did not modify its judgment or opinion in connection with overruling original motion.

7 Cases that cite this headnote

**[7]**  **Appeal and Error**  Amendment, Modification, or Setting Aside

Court's action contrary to statute or statutory equivalent means action is erroneous or "voidable," not that ordinary appellate or other direct procedures to correct it may be circumvented.

32 Cases that cite this headnote

**[8]**  **Judgment**  Invalid or Unauthorized Judgments

Only trial court judgment rendered without "jurisdictional power" in sense of lack of subject matter jurisdiction can be set aside by trial court at any time.

84 Cases that cite this headnote

**[9]**  **Appeal and Error**  Amendment, Modification, or Setting Aside

Absent one of those rare circumstances that makes judgment "void," the mere fact that an action by Court of Appeals is contrary to statute, constitutional provision, or rule of civil or appellate procedure makes it "voidable" or erroneous.

59 Cases that cite this headnote

**[10]**  **Appeal and Error**  Amendment of Proceedings
**Appeal and Error**  Application

Court of Appeals lacked jurisdiction to correct or alter judgment where filing of applications of writ of error left court without jurisdiction and second motion for rehearing, pending when Court of Appeals' term expired, was not authorized because Court of Appeals did not modify its judgment or opinion in connection with overruling original motion.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*701**  Roger Townsend, Ben Taylor, Houston, for relators.

Thomas Lee Bartlett, Houston, for respondents.

**ORIGINAL MANDAMUS PROCEEDING**

PER CURIAM.

In this original proceeding, relators seek writ of mandamus to compel the clerk of the court of appeals to forward the application and cross-application for writ of error and case record to this court. The clerk has refused to forward the applications and record on direct orders of the justices of the court of appeals.

Relators Mapco, Inc., Mapco Underground Storage of Texas, Inc., and other aligned parties appealed the trial court judgment against them to the Ninth Court of Appeals. The case was argued June 15, 1989. At that time the three justices who heard the case were Chief Justice Martin Dies and Justices Burgess and Brookshire. On August 31, 1989, Chief Justice Dies retired, and on September 1, 1989, Chief Justice Ronald L. Walker assumed the bench as the appointed successor.

On November 16, 1989, the court of appeals issued its opinions and judgment. Justice Burgess wrote the "majority" opinion, which reversed the trial court judgment and remanded the cause; Justice Brookshire dissented. The written judgment of the court conforms to the "majority" opinion disposition. At the end of the court's opinions this notation appears: "Panel of Dies, C.J., Brookshire, J., Burgess, J. [Next Line:] Walker, C.J., not sitting."

On November 30, 1989, the appellees (the "Carter parties") filed their motion for rehearing. The final point of the motion for rehearing specifically alleged as error the improper court of appeals panel issue. Appellees argued that after his resignation Chief Justice Dies was not authorized to participate in the decision, and that without his concurrence the decision was one-to-one, in violation of sections 22.216(i) and 22.222 of the Texas Government Code. [1] On December 7, 1989, the court of appeals overruled the motion for rehearing. There is no notation concerning which justices participated in the overruling of the motion for rehearing.

On December 21, 1989, the appellees filed with the court of appeals clerk what they styled "Appellees Motion for Reconsideration, or Alternatively, for Opinion." This "motion" re-urged two points that had been in the motion for rehearing, particularly the panel issue. It urged that the opinion and judgment on their face did not show concurrence of a majority of the only "panel" that could have been sitting when the judgment was rendered, that the judgment was "void or voidable" for that reason, and that the court should at least issue a new opinion addressing the panel question.

On January 4, 1990, the court of appeals through its clerk issued a letter stating appellee's motion for reconsideration was granted, directing re-briefing and setting the case for re-argument. On January 8, 1990, appellees filed their application for writ of error with the court of appeals clerk with a cover letter stating it was

> to be filed * * * pursuant to Rule 130(b) of the Texas Rules of Appellate Procedure. This Application is submitted for filing subject to the Order of the Court of Appeals dated January 4, 1990 granting Appellees' Motion for Reconsideration, **\*702** or Alternatively, For Opinion and ordering the subject Appeal to be reargued and rebriefed by the parties.

> It is our position that the decision and judgment rendered by the Court on November 16, 1989 was void or voidable based upon the lack of participation in the Judgment and Opinion rendered by a majority of the panel sitting on the Court at the time of rendition of said Judgment and, therefore, did not commence the running of the time in which Appellees may file their Application for Writ of Error. However, in an abundance of caution, Appellees submit the enclosed Application for Writ of Error in order to present their Points of Error to the Supreme Court on a timely basis in the event said void or voidable Judgment and Opinion did commence the running of the time in which Appellees may file their Application for Writ of Error.

Within ten days the Mapco parties filed their conditional application for writ of error. Thereafter, the Mapco parties wrote the court of appeals clerk requesting that the applications and records be forwarded to the supreme court. The clerk responded with

a letter stating that the court of appeals had "granted in full" the motion for reconsideration and that she declined to forward the applications and record to the supreme court "following direct orders and instructions from the Justices of the Ninth Court of Appeals." The Mapco parties then filed this mandamus proceeding.

 **[1]** **[2]** **[3]** Relators' argument is simply stated. The filing of the applications for writ of error deprived the court of appeals of jurisdiction to change its judgment. *Ammex Warehouse Co. v. Archer,* 381 S.W.2d 478, 482 (Tex.1964). As this court has stated, upon the filing of the application for writ of error "the jurisdiction of the Supreme Court immediately attached," leaving the court of appeals "without authority to make any order in the case." *Johnson v. Sovereign Camp, W.O.W.,* 125 Tex. 329, 336, 83 S.W.2d 605, 608 (1935). [2] Relators also argue that the court of appeals' January 4, 1990 order cannot be justified as an exercise of its plenary power over its judgments, because its period of plenary power over its judgment expired on December 31, 1989, when the term in which the judgment was rendered ended. [3] As this court has written, except for a "ministerial act" consistent with the judgment, a court of appeals "is without authority to correct or alter a judgment after the expiration of the term in which it was rendered." *Cockburn v. Hightower,* 121 Tex. 555, 557, 52 S.W.2d 365, 366 (1932).

In reply the Carter parties urge a number of innovative arguments why the court of appeals could have jurisdiction to render its order. We address two of these, to clarify holdings of this court.

 **[4]** **[5]** **[6]** The Carter parties argue that the court of appeals' plenary jurisdiction to vacate its judgment continued into the next term because the motion for reconsideration was "pending" when the term ended December 31, 1989. The appellate rules authorize a second or subsequent motion for rehearing only if the court of appeals modifies its judgment or opinion in connection with the overruling of a previous motion. Tex.R.App.P. 100(d). A second motion for rehearing not authorized by the rules is a nullity even if the court of appeals rules on it. *Honeycutt v. Doss,* 410 S.W.2d 772 (Tex.1966). Necessarily such a motion did not extend the court of appeals' plenary jurisdiction over the judgment in the case.

The second argument is that the court of appeals' judgment was "void" because it was contrary to section 22.222(c) of the Government Code. In fact a corresponding provision appears in the constitution:

> **\*703** The Court of Appeals may sit in sections as authorized by law. The concurrence of a majority of the judges sitting in a section is necessary to decide a case.

> Tex. Const. art. V, § 6.

It is also true that in *Freeman v. Freeman,* 160 Tex. 148, 156, 327 S.W.2d 428, 433 (1959), this court stated, "Judgments are void for lack of power in courts to render them when they are rendered contrary to constitutional or valid statutory prohibition or outside limiting constitutional or statutory authority." Given only this language from *Freeman,* the Carter parties' argument is reasonably plausible that the court of appeals judgment was "void" as contrary to the "statutory prohibition" that a majority of a panel must concur to render a decision, or beyond the authority of the court because the constitution requires the concurrence of a majority of a "section" of the court of appeals.

 **[7]** **[8]** In fact, the argument does not withstand closer scrutiny. We have spent considerable effort distinguishing and explaining the quoted language from *Freeman* in holdings that a court's action contrary to a statute or statutory equivalent means the action is erroneous or "voidable," not that the ordinary appellate or other direct procedures to correct it may be circumvented. For example, in *El Paso Pipe and Supply Co. v. Mountain States Leasing, Inc.,* 617 S.W.2d 189 (Tex.1981), we expressly distinguished *Freeman* and held that conflict with then rule 329b, Texas Rules of Civil Procedure, although a mandatory rule dealing with the trial court's plenary power, did not make the judgment "void"; the error had to be corrected through the ordinary appellate process or other proper proceedings. Again, in *Middleton v. Murff,* 689 S.W.2d 212, 213 (Tex.1985), we expressly disapproved the quoted statement from *Freeman* to the extent it was construed to mean that "[i]f a judgment rendered by a trial court is void it may be set aside by that court at any time." We further explained it was only a trial court judgment rendered without "jurisdictional power" in the sense of lack of subject matter jurisdiction that could be set aside by the trial court at any time.

**[9]** **[10]** If *Middleton v. Murff* failed to make it clear, we now expressly disapprove the quoted language from *Freeman* to the extent it is construed to apply to a court of appeals' plenary power. <mark>Absent one of those rare circumstances that makes the judgment "void," the mere fact that an action by a court of appeals is contrary to a statute, constitutional provision or rule of civil or appellate procedure makes it "voidable" or erroneous. A judgment is void only when it is apparent that the court rendering the judgment had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment, or no capacity to act as a court.</mark> *Cook v. Cameron,* 733 S.W.2d 137, 140 (Tex.1987); *Browning v. Placke,* 698 S.W.2d 362, 362 (Tex.1985). On facts substantially similar to the present case, this court in an ordinary appeal recently held the court of appeals' judgment was erroneous, and reversed and remanded the cause. *See Hayden v. Liberty Mutual Fire Ins. Co.,* 786 S.W.2d 260 (Tex.1990). Despite its error, here the court of appeals had lost jurisdiction to correct it.

Because the orders and actions of the court of appeals and its clerk conflict with this court's decisions in *Johnson v. Sovereign Camp, W.O.W.* and *Cockburn v. Hightower,* and further with rule 132(a), Tex.R.App.P., we grant leave to file and without oral argument a majority of the court conditionally issues the writ of mandamus. Tex.R.App.P. 122. We direct the Ninth Court of Appeals and its clerk to forward the record and applications for writ of error to this court.

Footnotes

1    Tex.Gov't Code Ann. § 22.216(i) merely provides that the Ninth Court of Appeals consists of a chief justice and two other justices. Tex.Gov't Code Ann. § 22.222 (1988) provides:

      **§ 22.222. Court Sitting in Panels**

      (a) Each court of appeals may sit in panels of not fewer than three justices for the purpose of hearing cases.

      (b) If more than one panel is used, the court of appeals shall establish rules to periodically rotate the justices among the panels. Permanent civil panels and criminal panels without rotation may not be established.

      (c) A majority of a panel constitutes a quorum for the transaction of business, and the concurrence of a majority of a panel is necessary for a decision.

2    This court recently overruled in part *Johnson v. Sovereign Camp,* but *only* to the extent that the court of appeals is not deprived of jurisdiction to rule on the motion for rehearing of another party that is still pending when an application for writ of error is filed. Otherwise, the rule applies with full force that appellate jurisdiction immediately attaches in this court. *See Doctors Hospital Facilities v. Fifth Court of Appeals,* 750 S.W.2d 177, 179 (Tex.1988).

3    Tex.Gov't Code Ann. § 22.218 (1988) provides: "The term of each court of appeals begins and ends with each calendar year."

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

20 S.W.3d 873
Court of Appeals of Texas,
Dallas.

James M. MURPHY and Patricia A. Murphy, Appellants,

v.

Michael F. McDANIEL, Appellee.

No. 05–99–01882–CV.    |    June 21, 2000.

Prospective purchaser of home brought suit against owner for breach of contract, specific performance, declaratory judgment, statutory and common law fraud, and attorney fees, and owner brought action for trespass to try title and action to quiet title, and filed counterclaim alleging breach of contract and seeking unpaid rentals. The 162nd Judicial District Court, Dallas County, Bill Rhea, J., entered temporary injunction preventing owner from selling home or from taking any act attempting to dispossess potential purchasers, entered summary judgment for owner on prospective purchasers claims, and dissolved temporary injunction. Prospective purchasers appealed. The Court of Appeals, Wright, J., held that: (1) summary judgment was interlocutory and not final adjudication of merits of lawsuit, and thus could only be appealed pursuant to limited statutory exception to bar of appeals of interlocutory orders, and (2) interlocutory summary judgment in favor of owner of home was not "change in circumstances," which would authorize dissolution of trial court's temporary injunction.

Reversed and remanded.

West Headnotes (15)

**[1]**    **Appeal and Error** 🔑 On motion for judgment

    **Judgment** 🔑 Construction and operation

    Summary judgment was interlocutory and not final adjudication of merits of lawsuit, and thus could only be appealed pursuant to limited statutory exception to bar of appeals of interlocutory orders, even though trial court granted summary judgment for property owner on all claims brought against him by prospective purchasers of property, where trial court did not rule on claims of owner brought against prospective purchasers, and order did not contain "Mother Hubbard" language that indicated that all relief not expressly granted was denied.

    Cases that cite this headnote

**[2]**    **Appeal and Error** 🔑 On motion for judgment

    **Judgment** 🔑 Construction and operation

    When a summary judgment does not dispose of all parties and issues and does not purport to be final or contain controlling "Mother Hubbard" language, which indicates that all relief not expressly granted is denied, then the order is an interlocutory summary judgment that cannot be appealed except in limited circumstances set out by statute.

    Cases that cite this headnote

**[3]**    **Appeal and Error** 🔑 Injunction

    When interlocutory appeal is from an order granting a motion to dissolve a temporary injunction, and the initial order granting temporary injunctive relief was not appealed, the appellate court does not consider the propriety of the trial

court's decision granting the initial injunctive relief, but rather, the appellate court will presume the injunction was not improvidently granted and the record as a whole supports the trial court's action in granting the temporary injunction.

6 Cases that cite this headnote

**[4]**  **Appeal and Error**  Continuing, vacating, or dissolving

On appeal of dissolution of a temporary injunction, an appellate court will not review the reporter's record from a hearing on the motion to grant initial injunctive relief to ascertain if the evidence supports such grant, but rather the appellate court review of a trial court's dissolution order is limited to the narrow question of whether the trial court's action in dissolving the injunction constituted a clear abuse of discretion.

5 Cases that cite this headnote

**[5]**  **Injunction**  Terminating, Vacating, or Dissolving Injunction

Purpose of a motion to dissolve a temporary injunction is to provide a means to show that changed circumstances, including changes in the law, compel the dissolution of the injunction, and not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant.

4 Cases that cite this headnote

**[6]**  **Injunction**  Grounds or cause in general

When changed circumstances are the basis of a motion to dissolve a temporary injunction, the moving party must show some substantial change has occurred since the proper issuance of the temporary injunction such that the order should be dissolved.

2 Cases that cite this headnote

**[7]**  **Injunction**  Preservation of status quo

Only legitimate purpose of a temporary injunction is to preserve the status quo pending trial, and the most expeditious relief from an unfavorable preliminary order dissolving an injunction is a prompt trial on the merits.

1 Cases that cite this headnote

**[8]**  **Appeal and Error**  Appeal from orders relating to injunctions

Interlocutory appeal of a dissolution of a temporary injunction should not be used to obtain an advance ruling on the issues, and an appellate court may not give full consideration to the merits of the underlying lawsuit.

Cases that cite this headnote

**[9]**  **Appeal and Error**  Appeal from orders relating to injunctions

Narrow scope of review on interlocutory appeal of dissolution of temporary injunction that enjoined owner of home from selling it or from any act attempting to dispossess potential purchasers of home precluded consideration of claims that would require appellate court to determine propriety of summary judgment evidence and whether trial court properly granted summary judgment for owner on potential purchasers' claims without allowing trial court opportunity to render final judgment.

1 Cases that cite this headnote

**[10]**    **Appeal and Error** 🔑 On Separate Appeal from Interlocutory Judgment or Order

Appellate court must strictly limit its review of any interlocutory ruling over which it is granted jurisdiction, where jurisdiction to review interlocutory rulings was extremely narrow in scope.

Cases that cite this headnote

**[11]**    **Injunction** 🔑 Authority and discretion of court

Trial court unquestionably has the authority to dissolve a temporary injunction upon a showing of changed circumstances.

2 Cases that cite this headnote

**[12]**    **Injunction** 🔑 Grounds or cause in general

"Change in circumstances," for the purpose of establishing that temporary injunction may be dissolved, refers to a change in conditions occurring since the granting of the temporary injunction, and changed circumstances may include an agreement of the parties, newly revealed facts, or a change in the law that make the temporary injunction unnecessary or improper.

7 Cases that cite this headnote

**[13]**    **Injunction** 🔑 Particular cases

Interlocutory summary judgment in favor of owner of home in dispute with potential purchasers of home was not "change in circumstances," which would authorize dissolution of trial court's temporary injunction, and thus temporary injunction remained in effect, where trial court could not have dissolved it absent any changed circumstances, when time to review grant of temporary injunction had expired, and appellate court had to presume grant of temporary injunction was proper.

5 Cases that cite this headnote

**[14]**    **Injunction** 🔑 Evidence and affidavits

**Injunction** 🔑 Hearing and determination

Litigant could conceivably rely on the same evidence presented in a separate evidentiary hearing to support a motion to dissolve a temporary injunction, and in that situation, the trial court could, if necessary, make factual determinations, and would not be bound by the procedural restrictions of a summary judgment proceeding.

Cases that cite this headnote

**[15]**    **Injunction** 🔑 Grounds or cause in general

Absent changed circumstances, a determination of the parties' claims should serve as the basis for dissolution of a temporary injunction only upon final adjudication, and at that time, the temporary injunction becomes moot.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*875**  James M. Murphy, Dallas, for Appellant.

Patrick C. Frank, Fieldler, Akin, Frank & Carlton, P.C., Dallas, for Appellee.

Before Justices MORRIS, WRIGHT, and BRIDGES.

## OPINION

CAROLYN WRIGHT, Justice.

James M. Murphy and Patricia A. Murphy bring this interlocutory appeal from the trial court's order dissolving a temporary injunction. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(4) (Vernon Supp.2000) (authorizing interlocutory appeal from an order granting a motion to dissolve a temporary injunction). In five issues, appellants contend generally that the trial court abused its discretion by dissolving the temporary injunction because: (1) the trial court did not conduct an evidentiary hearing; (2) appellee failed to prove a change in circumstances; (3) the trial court refused to consider the evidence adduced at the hearing on the motion to grant the temporary injunction when considering appellee's motion for summary judgment; (4) the trial court erred by striking appellants' summary judgment proof; and (5) the dissolution was based on  **\*876**  an improper summary judgment. We reverse the trial court's order dissolving the temporary injunction and remand for further proceedings.

## Factual and Procedural Background

The underlying lawsuit involves a 1982 lease-purchase agreement between appellants and appellee. Under the terms of the agreement, appellants leased appellee's house for one year and were to purchase the home for $240,000 on or before expiration of the lease. The agreement provided that when appellants purchased the home, seventy-five percent of the rental payments would be applied to reduce the purchase price. Appellants, however, were unable to obtain financing, and at the end of the one-year lease, the parties executed an addendum to the contract. The addendum provided that the closing date for purchase was to be changed from on or before March 31, 1984 to on or before January 15, 1985. The addendum also provided that after March 31, 1984, the rental payments would no longer be applied to either the down payment or taken off of the purchase price. Again, appellants were unable to close on the house, and in January 1985, appellee agreed, by letter, to extend the agreement for another year. The letter provided that except for the closing date, "all other terms and conditions of the original lease-purchase agreement will remain the same." Thereafter, until 1998, appellee agreed each year to extend the closing date. In 1998, appellee refused to extend the closing date, notified appellants that the lease-purchase agreement had expired, and offered to sell the property to appellants for the original purchase price of $240,000.

Appellants acknowledged that the agreement had expired. However, they offered to purchase the home for $65,975.06. According to appellants, the 1984 addendum to the original agreement only applied for that year, and when appellee agreed to extend the agreement in 1985 and thereafter, the original terms of the lease-purchase agreement were in effect. Thus, according to appellants, seventy-five percent of the rental payments from 1985 through 1998 should be applied to reduce the purchase price of the home.

When appellee disagreed, appellants sued him for breach of contract, specific performance, declaratory judgment, statutory and common law fraud, and attorneys' fees. At the same time, appellants requested a temporary injunction allowing them to remain in the house while the suit progressed. Appellee counterclaimed, alleging, among other things, that appellants breached the contract and owed him for unpaid rentals. Appellee also brought suit for trespass to try title and an action to quiet title.

On September 1, 1998, after an evidentiary hearing, the trial court found that appellants made a prima facie showing of a probable right and probable injury if a temporary injunction was not issued during pendency of the suit. The trial court also found appellants would suffer immediate and irreparable harm. Therefore, the trial court granted appellants' application for a temporary injunction enjoining appellee from selling the property or any act attempting to dispossess appellants from the property. The parties did not appeal the order granting the temporary injunction.

**[1]** **[2]** Subsequently, appellee filed a motion for summary judgment arguing that he was entitled to judgment as a matter of law on all of appellants' claims. Although appellee did not file a separate motion to dissolve the temporary injunction, the motion for summary judgment contained a section arguing that "to the extent [the trial court] rules favorably on [appellee]'s motion for summary judgment, [appellee] is entitled to dissolution of the [temporary] injunction." Appellee did not seek summary judgment on his counterclaims. **\*877** [1] After considering the evidence in support of the summary judgment, but without an evidentiary hearing on the motion to dissolve the temporary injunction, the trial court ordered that "[appellants] take nothing as to their claims of [appellee]" and further ordered the temporary injunction dissolved. This interlocutory appeal from the portion of the trial court's order dissolving the temporary injunction followed.

## Discussion

**[3]** **[4]** When, as here, the interlocutory appeal is from an order granting a motion to dissolve, and the initial order granting temporary injunctive relief was not appealed, we do not consider the propriety of the trial court's decision granting the initial injunctive relief. *See Tober v. Turner of Tex., Inc.,* 668 S.W.2d 831, 834 (Tex.App.-Austin 1984, no writ). Rather, we presume the injunction was not improvidently granted and the record as a whole supports the trial court's action in granting the temporary injunction. *Id.* We will not, therefore, review the reporter's record from the hearing on the motion to grant to ascertain if the evidence supports such grant. *Id.* at 835. Our review of the trial court's order of dissolution is limited to the narrow question of whether the trial court's action in dissolving the injunction constituted a clear abuse of discretion. *Desai v. Reliance Mach. Works, Inc.,* 813 S.W.2d 640, 641 (Tex.App.-Houston [14 th Dist.] 1991, no writ).

**[5]** **[6]** The purpose of a motion to dissolve a temporary injunction is to provide a means to show that changed circumstances, including changes in the law, compel the dissolution of the injunction. *See Tober,* 668 S.W.2d at 836. The purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant. *Id.* When, as in this case, changed circumstances are the basis of a motion to dissolve, the moving party must show some substantial change has occurred since the proper issuance of the temporary injunction such that the order should be dissolved. *See Desai,* 813 S.W.2d at 642; *Tober,* 668 S.W.2d at 836.

**[7]** **[8]** **[9]** **[10]** Because of the narrow scope of review in this interlocutory appeal, we begin our analysis by determining which of appellants' issues are properly before us. The only legitimate purpose of a temporary injunction is to preserve the status quo pending trial, and the most expeditious relief from an unfavorable preliminary order dissolving an injunction is a prompt trial on the merits. *See Reeder v. Intercontinental Plastics Mfg. Co.,* 581 S.W.2d 497, 499 (Tex.Civ.App.-Dallas 1979, no writ) (appeal from order granting temporary injunction). An interlocutory appeal should not be used to obtain an advance ruling on the issues, and we may not give full consideration to the merits of the underlying lawsuit. *See State v. Ruiz Wholesale Co.,* 901 S.W.2d 772, 777 (Tex.App.-Austin 1995, no writ) (discussing limited scope of review following denial of a temporary injunction); *Reeder,* 581 S.W.2d at 499. Consideration of appellants' issues three, four, and five would require us to determine the propriety of the summary judgment evidence and whether the trial court properly granted appellee's motion for summary judgment. We decline to do so without allowing the trial court an opportunity to render a final judgment. Because our jurisdiction to review interlocutory rulings is extremely narrow in scope, we must strictly limit our review of any interlocutory ruling over which we are granted jurisdiction. *See* **\*878** *America Online, Inc. v. Williams,* 958 S.W.2d 268, 271 (Tex.App.-Houston [14 th Dist.] 1997, no writ) (The legislature determines, by statute, whether a particular type of pretrial ruling may be appealable before a final judgment is rendered. We strictly construe those statutes authorizing interlocutory appeals.). Thus, we conclude

appellants' third, fourth, and fifth issues are not a proper basis upon which appellants may contend that the trial court abused its discretion by granting appellee's motion to dissolve. We dismiss appellants' third, fourth, and fifth issues.

In appellants' first and second issues, appellants contend the trial court abused its discretion by granting appellee's motion to dissolve because the trial court did not conduct an evidentiary hearing and appellee failed to prove a change in circumstances. [2] In essence, appellants argue that the trial court's interlocutory summary judgment alone is not a proper basis to support the trial court's discretion in dissolving the temporary injunction. The parties agree, and the record supports, that the trial court granted appellee's motion to dissolve the temporary injunction solely on the basis of its ruling on appellee's motion for summary judgment. We must decide, therefore, whether the trial court's interlocutory summary judgment is a change in circumstances that would support the dissolution of the temporary injunction.

 [11]    [12]    [13]    [14]    The trial court unquestionably has the authority to dissolve a temporary injunction upon a showing of changed circumstances. *Tober,* 668 S.W.2d at 834. In our view, a "change in circumstances" refers to a change in conditions occurring since the granting of the temporary injunction. Changed circumstances may include an agreement of the parties, newly revealed facts, or a change in the law that make the temporary injunction unnecessary or improper. *Cf. Desai,* 813 S.W.2d at 641–42 (dissolution of temporary injunction where appellees showed they had been effectively excluded from participation in operation and management of company); *see also City of Tyler v. St. Louis S.W. Ry. Co.,* 405 S.W.2d 330, 333 (Tex.1966) (only trial court has jurisdiction to modify or vacate permanent injunction based on "changed conditions" because trial court can subpoena witnesses, take evidence, and make findings of fact). Here, the "change in circumstances" alleged in appellee's motion was not newly revealed facts or a change in the law; rather, the "change" was merely an interlocutory judicial determination of the merits of appellants' claims against appellee. The trial court's summary judgment did not reach appellee's claims against appellants and the trial court did not order any severance of the parties' claims. We conclude the trial court's interlocutory ruling on the merits of appellants' claims is not, in and of itself, a "change in circumstances" authorizing dissolution of the trial court's otherwise properly granted temporary injunction. [3] Given this conclusion, we still **\*879** must determine whether the trial court, after it properly granted the temporary injunction, could have dissolved it absent any changed circumstances. We conclude it could not.

We recognize that in *Tober,* the Austin court of appeals, relying on *City of Hudson v. Ivie,* 592 S.W.2d 658 (Tex.Civ.App.-Beaumont 1979, no writ), stated that a trial court has the authority to reverse its prior temporary injunction order absent a showing of changed circumstances. *Tober,* 668 S.W.2d at 835. The procedural posture of this case, however, is different from *Ivie.* In *Ivie,* the trial court granted a temporary injunction after an evidentiary hearing. Five days later, after a non-evidentiary hearing, the trial court granted the defendant's motion to dissolve the injunction. On the same day, the trial court dismissed the entire proceeding. The court of appeals determined that the trial court abused its discretion in dismissing the case after holding only a preliminary hearing. However, it affirmed the trial court's order dissolving the injunction because it "read the statement of facts containing the evidence offered at the [temporary injunction] hearing and [could] not conclude that the trial court abused its discretion in dissolving the temporary injunction which had been improvidently granted a few days earlier." *Ivie,* 592 S.W.2d at 659–60.

In *Ivie,* unlike in this case where the time to review the order granting the temporary injunction has expired, the court of appeals had jurisdiction to review the propriety of the trial court's decision to grant the temporary injunction. The court of appeals' determination that the trial court had the authority to dissolve its previously granted temporary injunction was, in reality, a determination that the temporary injunction had been improperly granted. Such is not the case here. We do not have jurisdiction to consider the propriety of the trial court's decision to grant the temporary injunction. Rather, we must presume the trial court's initial decision to grant the temporary injunction was proper. *See Tober,* 668 S.W.2d at 834. Because we must recognize the trial court properly granted the temporary injunction, we conclude that, absent changed circumstances, the temporary injunction should remain in effect until a final disposition of the parties' claims.

 [15]    Our conclusion is directly supported by the very nature of this appeal. The sole basis for granting appellee's motion to dissolve the temporary injunction was the trial court's interlocutory ruling on the merits of appellants' claims. Yet, we are

precluded from reviewing the summary judgment at this time. If we were to conclude that the trial court's interlocutory summary judgment is, in and of itself, an appropriate basis for the trial court's dissolution of its otherwise properly granted temporary injunction, appellants could obtain a meaningful, interlocutory review of the dissolution order only through our review of the merits of the interlocutory summary judgment, which we clearly cannot do. We are of the opinion that, absent changed circumstances, a determination of the parties' claims should serve as the basis for dissolution of a temporary injunction only upon final adjudication. At that time, the temporary injunction becomes moot. *See Isuani v. Manske–Sheffield Radiology Group, P.A.,* 802 S.W.2d 235, 236 (Tex.1991); *Save Our Springs Alliance, Inc. v. Austin Indep. Sch. Dist.,* 973 S.W.2d 378, 384 (Tex.App.-Austin 1998, no writ).

Because the trial court's sole basis for granting appellee's motion to dissolve was its interlocutory judgment, we conclude the trial court abused its discretion by granting appellee's motion to dissolve. The trial court's decision to dissolve was not based on a conclusion that the temporary injunction was improvidently granted or on the guiding principle of a change in circumstances.[4] We sustain appellants' first and second issues.

 **\*880**  We reverse that portion of the trial court's judgment dissolving the temporary injunction and remand for further proceedings consistent with this opinion.

Footnotes

1      Thus, we agree with the parties that the summary judgment is interlocutory and not a final adjudication of the merits of this lawsuit. When a summary judgment does not dispose of all parties and issues and does not purport to be final or contain controlling "Mother Hubbard" language, it is an interlocutory summary judgment that cannot be appealed except in limited circumstances set out by statute. *See Mafrige v. Ross,* 866 S.W.2d 590, 592 (Tex.1993).

2      In their brief, appellants argue issues one and two together. We will address them likewise.

3      In this appeal, the only evidence the trial court could have considered in making its determination to dissolve the temporary injunction was the evidence offered in support of appellee's motion for summary judgment. As we have previously concluded, our limited review of the dissolution of the temporary injunction does not allow us to consider the propriety of the evidence offered in support of the motion for summary judgment. We note, however, that a litigant could conceivably rely on the same evidence presented in a separate evidentiary hearing to support a motion to dissolve. In that situation, the trial court could, if necessary, make factual determinations, and would not be bound by the procedural restrictions of a summary judgment proceeding. *Cf. Liberty Mut. Fire Ins. v. Hayden,* 805 S.W.2d 932, 935 (Tex.App.-Beaumont 1991, no writ) (trial court should conduct separate hearings when faced with "overlapping and intermingling" motions concerning summary judgment and other matters that allow oral testimony). That, however, is not the case here. In this case, the trial court did not conduct a separate hearing on the motion to dissolve.

4      We also note that the trial court's decision was not based on principles of fundamental error or on any statutory authorization.

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

907 S.W.2d 454
Supreme Court of Texas.

Enrique PADILLA, Petitioner,

v.

Ernest J. LaFRANCE, et al., Respondents.

No. 94–0579. | Argued Jan. 3, 1995. | Decided May 25, 1995. | Rehearing Overruled Oct. 5, 1995.

In action arising from automobile accident, defendant driver filed cross-action, seeking enforcement of alleged settlement agreement under contract law. The 127th District Court, Harris County, Sharolyn Wood, J., granted plaintiffs' motion for summary judgment on cross-action, and defendant appealed. The Court of Appeals, Houston (14th Dist.), Sears, J., 875 S.W.2d 730, affirmed. On application for writ of error, the Supreme Court, Phillips, C.J., held that: (1) transcript was timely filed in appeal; (2) series of letters between parties was sufficient to constitute writing that satisfied rule requiring settlement agreements to be in writing and filed with court; and (3) withdrawal of consent to settlement did not render settlement unenforceable.

Reversed and remanded with directions.

Enoch, J., dissented with opinion in which Gammage, J., joined.

West Headnotes (9)

**[1]**    **Appeal and Error**    ☛ Necessity and duty of filing in appellate court

Appeal did not have to be dismissed for failure to file transcript under rule allowing 120 days to file transcript if motion to modify judgment has been filed where appellant's motion for reconsideration was equivalent of motion to modify judgment. Rules App.Proc., Rule 54(a).

13 Cases that cite this headnote

**[2]**    **Frauds, Statute Of**    ☛ Necessity that writing show all the terms

**Frauds, Statute Of**    ☛ Admissibility of evidence to aid memorandum

To satisfy statute of frauds, there must be written memorandum which is complete within itself in every material detail, and which contains all of essential elements of agreement, so that contract can be ascertained from writings without resorting to oral testimony. V.T.C.A., Bus. & C. § 26.01.

35 Cases that cite this headnote

**[3]**    **Frauds, Statute Of**    ☛ Separate Writings

Under statute of frauds, the required written memorandum need not be contained in one document. V.T.C.A., Bus. & C. § 26.01.

7 Cases that cite this headnote

**[4]**    **Contracts**    ☛ Acceptance of Offer and Communication Thereof

Where offer prescribes time and manner of acceptance, those terms must ordinarily be complied with to create contract.

11 Cases that cite this headnote

**[5]    Contracts**    Acceptance of Offer and Communication Thereof

Although, ordinarily, if offer prescribes time and manner of acceptance terms must be complied with to create contract, different method of acceptance may be effectual where original offeror thereafter manifests his assent to other party.

12 Cases that cite this headnote

**[6]    Insurance**    Requisites and Validity of Settlement or Release

Insurance settlement agreement contained in more than one written document was sufficient to satisfy Texas Rule of Civil Procedure 11, which requires settlement agreements to be in writing and filed with papers as part of the record, where insurer's letter that was faxed to victims' attorney agreed to pay policy limits and confirmed "settlement agreement" between parties but noted one uncertainty as to payment of hospital lien, and victims' attorney responded the same day with letter indicating that hospital lien would be paid out of settlement funds and that matter "had been settled." Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

56 Cases that cite this headnote

**[7]    Compromise and Settlement**    Making and Form of Agreement

Texas Rule of Civil Procedure 11, which requires settlement agreements regarding pending suits to be in writing and filed with papers as part of the record, does not require writing to be filed before consent is withdrawn by one of the parties, but merely requires that agreement be filed before it is sought to be enforced. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

141 Cases that cite this headnote

**[8]    Compromise and Settlement**    Enforcement

Although court cannot render valid agreed judgment absent consent at time it is rendered, this does not preclude court, after proper notice and hearing, from enforcing settlement complying with Texas Rule of Civil Procedure 11, which requires settlement agreements to be in writing and filed, even though one party no longer consents to settlement. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

121 Cases that cite this headnote

**[9]    Compromise and Settlement**    Enforcement

Action to enforce settlement agreement must be based on proper pleading and proof if consent to settlement is withdrawn.

58 Cases that cite this headnote

**Attorneys and Law Firms**

**\*455**  James B. Lewis, Ronald P. Schramm, Glover Anderson Chandler & Uzick, Houston, for petitioner.

John Stevenson, Jr., Stevenson Albright & Ammons, Dennis R. Mundy, D. Craig Olivier, Jeffrey W. Hitt, Olivier & Steidley, Houston, for respondents.

**Opinion**

PHILLIPS, Chief Justice, delivered the opinion of the Court, joined by GONZALEZ, HIGHTOWER, HECHT, CORNYN, SPECTOR, and OWEN, Justices.

The primary issue presented is whether a series of letters between the parties' representatives constituted a written settlement agreement enforceable under Texas Rule of Civil Procedure 11, even though plaintiffs withdrew their consent to the settlement before the letters were filed with the court and before judgment was rendered on the agreement. The court of appeals held that any agreement was unenforceable under Rule 11 because plaintiffs revoked consent before the letters were filed with the court. 875 S.W.2d 730. Because we hold that the letters constituted an enforceable Rule 11 agreement, we reverse the judgment of the court of appeals and remand to the trial court with instructions to enforce the parties' settlement agreement.

**I**

One member of the LaFrance family was killed and two others were seriously injured when their vehicle collided with that driven by Enrique Padilla. After the LaFrances sued Padilla, his insurer, State Farm Mutual Automobile Insurance Company, assumed **\*456** defense of the claims. The parties subsequently engaged in settlement negotiations and, as discussed below, vigorously dispute whether an enforceable settlement agreement was consummated.

On April 10, 1991, Jeffrey Steidley, the LaFrances' attorney, mailed a settlement demand to Brian Chandler, Padilla's attorney, providing in pertinent part as follows:

Dear Mr. Chandler:

You are quite familiar with the facts and circumstances surrounding the above referenced matter. At this time we make demand for policy limits of $40,000.00 for full and final settlement of this case against the insured that you represent. *Payment* of this sum should be made on or before Tuesday, April 23, 1991 at 5:00 p.m., by delivery of checks in the appropriate amount to the offices of the undersigned made payable in the following amounts and to the following payees:

One check in the amount of $20,000.00 to Madeleine LaFrance As Next Friend of Michelle LaFrance and Olivier & Steidley.

One check in the amount of $20,000.00 made payable to Ernest J. LaFrance, Marlene Luther, Marilyn Koenig, Madeleine LaFrance and Olivier & Steidley, their attorneys of record.

\* \* \* \* \* \*

Please be advised that although I will be more than happy to discuss this case with you or any of your representatives, no oral discussion that we may have will serve to alter the time limits expressed in the correspondence. I look forward to *receipt* of the checks on or before date specified, failing which this offer to settle will be withdrawn and my clients will proceed to perfect their rights under Texas law, the substance of which I know you are well aware.

Chandler forwarded this letter to Phil Bradshaw, the State Farm adjuster handling the claim, who telephoned Steidley's office on April 15 and spoke with Sherea Carry. [1] Bradshaw informed Carry of an outstanding $1,600 medical lien for treatment to Michelle LaFrance that needed to be cleared up in connection with the settlement. Carry responded that she would have Steidley call Bradshaw to discuss the lien. When Bradshaw did not hear back from Steidley, he called Steidley's office on April 18 and

again on the morning of April 23 to discuss the lien. Each time he was able to speak only with Carry, who informed Bradshaw that the lien had not yet been resolved.

When Bradshaw still had not heard from Steidley by the afternoon of April 23, the settlement deadline, he faxed this handwritten letter to Steidley:

Dear Mr. Steidley,

This will confirm our settlement agreement of 4/18/91, whereby State Farm agreed to meet the policy limit demands set out in your letter of 4/10/91. The only thing holding up resolution of this is the hospital lien re: Michelle. I await word from you regarding the lien so I know to whom to make drafts payable.

It is unclear from the record what Bradshaw was referring to by the "agreement of 4/18/91." Steidley responded before 5:00 p.m. the same day, by fax and regular mail, with this letter:

Dear Mr. Bradshaw:

This letter will confirm that the above referenced matter has been settled for all applicable policy limits, which have been represented to us to be $40,000.00. Please forward settlement checks in the above referenced matter. This office will agreed [sic] to take care of the lien filed by Medical Center Hospital out of the settlement funds forwarded by your office.

Your attention to this matter is greatly appreciated.

Bradshaw did not see Steidley's response until he arrived at his office the next morning, April 24. Approximately one week later, Chandler tendered two settlement checks for $20,000 each to Steidley, along with a formal settlement agreement. Steidley, however, refused to accept the checks or sign the agreement, contending that Padilla had not **\*457** timely accepted the April 10 settlement offer. [2]

Padilla subsequently filed Steidley's April 23 letter with the court, describing it as "an acceptance of a settlement." Padilla then filed a counterclaim in the pending suit, seeking enforcement of the alleged settlement agreement, and both sides moved for summary judgment on the counterclaim. Padilla argued that the letters between the parties' representatives constituted a written settlement agreement. Although acknowledging that the court could not render a consent judgment incorporating the terms of the settlement, as the LaFrances had revoked consent, he nonetheless contended that the court could enforce the settlement by summary judgment. The LaFrances countered that the parties did not have an enforceable agreement under Texas Rule of Civil Procedure 11, which requires agreements regarding pending suits to "be in writing, signed and filed with the papers as part of the record...." The LaFrances further argued that, even if an otherwise valid Rule 11 agreement existed, it could not be enforced since the LaFrances had revoked consent prior to any judgment being rendered on the agreement. The LaFrances also moved to sever the counterclaim.

After a hearing on May 1, 1992, the court orally ruled that an enforceable settlement agreement did not exist, granting the LaFrances' motion for summary judgment and denying Padilla's. The court also granted the motion for severance, noting on the docket that a final judgment would be granted to the LaFrances on the counterclaim. The court, however, did not sign a written judgment or order of severance at that time.

On June 11, 1992, Padilla filed a "Motion for Reconsideration on his Motion for Summary Judgment," raising the same arguments contained in his original motion for summary judgment and adding one additional argument. [3] Although this motion was apparently set for oral hearing on June 22, [4] there is no indication in the record or the briefs that any hearing occurred. On June 19, Padilla filed another motion, styled simply as a "Motion for Summary Judgment," setting forth essentially the same arguments contained in the motion for reconsideration. No oral hearing was held on this subsequent motion for summary judgment, and neither it nor the motion for reconsideration was submitted for a ruling on Harris County's submission docket. *See*

Local Rule 3.3.2 of the Harris County District Courts. On October 19, 1992, the court signed an order granting the LaFrances' motion for summary judgment and denying Padilla's. This order referred only to the cross motions for summary judgment argued on May 1, mentioning neither Padilla's motion for reconsideration nor his later successive motion for summary judgment. [5] On November 20, 1992, the court signed an order severing Padilla's counterclaim and assigning it a new cause number, thus finalizing the earlier summary judgment.

Padilla appealed from this severed cause. The LaFrances moved the court of appeals to dismiss the appeal, contending that the transcript, which Padilla filed 82 days after the judgment became final on November 20, 1992, was untimely. Under Texas Rule of Appellate Procedure 54(a), the transcript must be filed within sixty days after judgment, or within 120 days if a timely motion **\*458** for new trial or motion to modify the judgment has been filed. The court of appeals originally dismissed the appeal, but reinstated it on rehearing. The court concluded that Padilla's motion for rehearing of the trial court's oral summary judgment ruling was the equivalent of a motion for new trial, extending the appellate deadlines under Rule 54(a). 875 S.W.2d at 732.

As to the merits, the court of appeals concluded that the parties did not have an enforceable settlement agreement under Texas Rule of Civil Procedure 11. The court held that, under Rule 11, consent to the settlement agreement must exist at the time it is filed with the court. 875 S.W.2d at 734. Although not expressly deciding whether Steidley's April 23 letter constituted a signed writing sufficient under Rule 11, the court noted that the LaFrances had revoked any consent prior to that letter being filed with the court. *Id.* The court accordingly affirmed the trial court's summary judgment in favor of the LaFrances.

## II

[1]  We initially address the LaFrances' jurisdictional argument. They contend by cross-point that the court of appeals should have dismissed the appeal because Padilla failed to timely file the transcript. [6] We disagree.

An appellant must file the transcript in the court of appeals "within sixty days after the judgment is signed, or, if a timely motion for new trial or to modify the judgment has been filed by any party, ... within one hundred twenty days after the judgment is signed." Tex.R.App.P. 54(a). Padilla filed the transcript 82 days after the judgment became final and appealable through severance. [7] The issue, therefore, is whether Padilla timely filed a motion for new trial or a motion to modify the judgment.

A motion for new trial "shall be filed prior to or within thirty days after the judgment or other order complained of is signed." Tex.R.Civ.P. 329b(a). A motion to modify the judgment must be filed within this same time period. Tex.R.Civ.P. 329b(g). Moreover, Texas Rule of Civil Procedure 306c directs that a motion for new trial filed before judgment "shall be deemed to have been filed on the date of but subsequent to the time of signing of the judgment the motion assails...." We conclude that, under the authority of these rules, Padilla's June 11 motion for reconsideration was the equivalent of a motion to modify the judgment, extending the appellate deadlines. These rules prevent the procedural trap that otherwise could occur if a party prematurely filed a motion that was intended to assail the final judgment. *See, e.g., Syn–Labs, Inc. v. Franz,* 778 S.W.2d 202, 205 (Tex.App.—Houston [1st Dist.] 1989, no writ); *Miller v. Hernandez,* 708 S.W.2d 25, 27 (Tex.App.—Dallas 1986, no writ). *Cf. Fredonia State Bank v. General American Life Ins. Co.,* 881 S.W.2d 279, 280–82 (Tex.1994) (motion for new trial filed after original judgment, but before amended judgment, was sufficient to preserve factual insufficiency points).

At the time Padilla moved for reconsideration, the trial court had orally rendered summary judgment for the LaFrances on the counterclaim and had orally ordered that the counterclaim be severed, indicating to the parties at the May 1 hearing that a final **\*459** judgment would be signed on Padilla's counterclaim. Although Padilla's motion for reconsideration was premature, it clearly assailed the court's final judgment. It thus qualifies as a premature motion to modify the judgment, extending the appellate timetable.

The LaFrances argue that Padilla's motion for reconsideration was of no effect because it was superseded by his subsequent "motion for summary judgment" filed eight days later. The LaFrances rely on *State v. Seventeen Thousand Dollars,* 809 S.W.2d 637 (Tex.App.—Corpus Christi 1991, no writ), where the court, in deciding whether the appellee had preserved a particular summary judgment ground in the trial court, held that "[a] substituted or amended motion for summary judgment supercedes and supplants the previous motion, which may no longer be considered." 809 S.W.2d at 639 (citing Tex.R.Civ.P. 65). Even if this holding is correct, an issue we do not decide, it does not support the LaFrances' position here. To fall within this rule, Padilla's June 19 motion for summary judgment would have to be considered an amended or substituted version of his motion for reconsideration. However, the June 19 summary judgment motion was not styled as an amended motion to reconsider, and it did not directly assail the trial court's earlier ruling, as did the motion for reconsideration. Further, if the later motion for summary judgment *was* actually an amendment to the motion for reconsideration, as the LaFrances seem to argue, it likewise would operate to extend the appellate timetable. Although we do not decide whether the later motion for summary judgment, filed after the trial court's oral rendition of judgment, in and of itself extended the appellate timetable, under the circumstances of this case this filing cannot negate the effect of the earlier motion for reconsideration.

The LaFrances also point out that Padilla's motion for reconsideration was filed under the original, rather than the severed, cause number. They note that the trial court's later written severance order designated certain documents to be included in the record of the severed counterclaim, but did not include the motion for reconsideration, and Padilla never requested that the severance order be supplemented or modified. Because the motion for reconsideration was never actually filed under the severed cause number, the LaFrances contend that it cannot be considered in this appeal from the severed cause.

This argument is without merit. At the time Padilla filed the motion for reconsideration, there was no severed cause number, as the trial court had not yet signed a written order of severance. Further, the trial court's order granting summary judgment, which is the order Padilla's motion for reconsideration assailed, was also filed under the original cause number, as it likewise preceded the order of severance. After the trial court subsequently signed the order of severance, finalizing the summary judgment, Padilla filed a request for transcript under the severed cause number requesting that numerous pleadings, including his motion for reconsideration, be included in the appellate transcript. The transcript before us from the severed cause accordingly includes the motion for reconsideration. Under these circumstances, the motion for reconsideration operated to extend the appellate timetable in the severed cause. *See McRoberts v. Ryals,* 863 S.W.2d 450, 454–55 (Tex.1993); *Mueller v. Saravia,* 826 S.W.2d 608, 609 (Tex.1992).

For the foregoing reasons, we hold that Padilla timely filed the transcript. The court of appeals thus did not err in refusing to dismiss Padilla's appeal.

### III

Texas Rule of Civil Procedure 11 provides as follows:

> Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

This rule has existed since 1840 and has contained the filing requirement since 1877. *See Kennedy v. Hyde,* 682 S.W.2d 525, 526 (Tex.1984) (tracing the history of Rule 11). The rationale for the rule is straightforward:

> **\*460** Agreements of counsel, respecting the disposition of causes, which are merely verbal, are very liable to be misconstrued or forgotten, and to beget misunderstandings and controversies; and hence there is great propriety in the rule which requires that all agreements of counsel respecting their causes shall be in writing, and if not, the court will not enforce them. They will then speak for themselves, and the

court can judge of their import, and proceed to act upon them with safety. The rule is a salutary one, and ought to be adhered to whenever counsel disagree as to what has transpired between them.

*Birdwell v. Cox,* 18 Tex. 535, 537 (1857). A settlement agreement must comply with Rule 11 to be enforceable. *Kennedy,* 682 S.W.2d at 528. [8]

The LaFrances argue that 1) the writings in this case do not evidence a binding agreement, 2) even if there was an agreement, it did not comply with Rule 11 because the LaFrances withdrew their consent before the writings were filed with the court, and 3) any agreement was further unenforceable because the LaFrances withdrew their consent before judgment was rendered on the agreement. We consider each of these arguments in turn.

## A

 **[2]**     **[3]**    Rule 11 requires settlement agreements to "be in writing." Although we have never articulated what is necessary to satisfy this "in writing" requirement, we may analogize to the statute of frauds, which requires certain contracts to be in writing. *See* Tex.Bus. & Com.Code § 26.01. To satisfy the statute of frauds, "there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." *Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex.1978). The written memorandum, however, need not be contained in one document. *See Adams v. Abbott,* 151 Tex. 601, 254 S.W.2d 78, 80 (1952).

 **[4]**     **[5]**     **[6]**    These principles apply equally to Rule 11 agreements. Applying them here, we hold that the series of letters between Steidley, Bradshaw and Chandler are sufficient to constitute an agreement in writing satisfying Rule 11. Steidley's initial letter to Chandler offered to settle the case for the $40,000 policy limits, making clear that the offer could only be accepted by *payment of the money* by a specific deadline. It is undisputed that Padilla did not tender the $40,000 within that deadline. Where an offer prescribes the time and manner of acceptance, those terms must ordinarily be complied with to create a contract. *See Town of Lindsay v. Cooke County Elec. Cooperative Ass'n,* 502 S.W.2d 117, 118 (Tex.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). However, a different method of acceptance may be effectual where the "original offeror thereafter manifests his assent to the other party." *Id.* That was the case here. The later writings reflect that Steidley agreed to a modification of the terms of acceptance set out in the original letter.

Bradshaw's letter—faxed to Steidley on the afternoon of April 23—agreed to pay the $40,000 policy limits, specifically confirming a "settlement agreement" between the parties. That letter, however, noted uncertainty as to one detail, payment of the hospital lien, and requested guidance from Steidley. Steidley responded that same day with a letter indicating that plaintiffs would pay the hospital lien out of the settlement funds, specifically stating that "[t]his letter will confirm that the above referenced matter *has been settled* for all applicable policy limits...." (emphasis added). Steidley used this language, indicating a consummated settlement, notwithstanding that no checks had not yet been forwarded by Padilla. Steidley, therefore, assented to Padilla's alteration of the mode of acceptance set out in Steidley's original offer. Rather than requiring actual payment by a particular deadline, Steidley accepted Padilla's *agreement* to pay the policy limits as acceptance of his earlier offer. Moreover,  **\*461**  the letters reflect all material terms of the agreement; i.e., Padilla agreed to pay $40,000 in settlement of all claims, and the LaFrances agreed to be pay the hospital lien out of those proceeds. We accordingly hold that the parties entered into a binding settlement agreement, evidenced by a writing sufficient to satisfy Rule 11. [9]

## B

 **[7]**    Rule 11 requires settlement agreements to be filed "with the papers as part of the record." Padilla did not file any of the settlement letters until after the LaFrances had refused to accept the settlement checks tendered by Padilla. The court of

appeals accordingly held that the agreement did not comply with Rule 11 because it was not filed until after the LaFrances had revoked their consent.

Although Rule 11 requires the writing to be filed in the court record, it does not say *when* it must be filed. The purpose of the rule—to avoid disputes over the terms of oral settlement agreements—is not furthered by requiring the writing to be filed before consent is withdrawn. As noted by the dissent below, "[t]o require the parties to immediately rush to the courthouse with a signed document in order to quickly comply with the requirements of Rule 11 before the other party reneges on his agreement goes against the grain of the policy in Texas jurisprudence which favors the settlement of lawsuits." 875 S.W.2d at 735. The purpose of the filing requirement, in the language of *Birdwell v. Cox,* is to put the agreement before the court so that "the court can judge of [its] import, and proceed to act upon [it] with safety." 18 Tex. at 537. This purpose is satisfied so long as the agreement is filed before it is sought to be enforced. Padilla met that requirement here by filing each of the settlement letters with his motion for summary judgment on the counterclaim.

**C**

Finally, the LaFrances argue that the settlement is unenforceable because they withdrew consent before judgment was rendered on the agreement. The LaFrances rely on *Kennedy v. Hyde,* where we held that "notwithstanding a valid Rule 11 agreement, consent must exist at the time an agreed judgment is rendered." 682 S.W.2d at 528. *See also Burnaman v. Heaton,* 150 Tex. 333, 240 S.W.2d 288, 291 (1951).

**[8]** The LaFrances, however, confuse the requirements for an agreed judgment with those for an enforceable settlement agreement. Although a court cannot render a valid agreed judgment absent consent at the time it is rendered, this does not preclude the court, after proper notice and hearing, from enforcing a settlement agreement complying with Rule 11 even though one side no longer consents to the settlement. The judgment in the latter case is not an agreed judgment, but rather is a judgment enforcing a binding contract.

In *Burnaman,* for example, the plaintiff wanted to repudiate a settlement that her attorney had agreed to on the record in open court, claiming that she had not authorized such settlement. Although aware of the plaintiff's objection, the court subsequently rendered a consent judgment incorporating the terms of the settlement. We held that the consent judgment was improper since contemporaneous consent was lacking. "It is not sufficient to support the judgment that a party's consent thereto may at one time have been given; consent must exist at the very moment the court undertakes to make the agreement the judgment of the court." **\*462** 240 S.W.2d at 291. In reversing the agreed judgment, however, we noted as follows:

> Since the judgment of the trial court is reversed, we cannot pass on the effect of the agreement made by the attorneys or the notation of that agreement on the docket. We can only say that the announcement of the agreement in open court and its notation on the docket cannot give it the force of a judgment. It follows that the reversal of the judgment should be without prejudice to the right of defendants to plead the agreement in bar of plaintiff's suit and without prejudice also to plaintiff's right to avoid the agreement by pleading that her attorney was without authority to make it. These are issues to be settled by the jury or the court in a trial of the case.

240 S.W.2d at 292. Similarly in *Quintero v. Jim Walter Homes, Inc.,* 654 S.W.2d 442 (Tex.1983), we held that the trial court erred by rendering an agreed judgment of dismissal based on a release signed by plaintiff because plaintiff did not consent to the judgment at the time it was rendered. We noted, however, that "our reversal of the judgment of dismissal is without prejudice to the rights of the Jim Walter Homes in its attempt to plead and prove an enforceable settlement agreement under the release." 654 S.W.2d at 444. *See also S & A Restaurant Corp. v. Leal,* 892 S.W.2d 855, 857 n. 1. (Tex.1995); *Cothron Aviation, Inc. v. Avco Corp.,* 843 S.W.2d 260, 263 (Tex.App.—Fort Worth 1992, writ denied); *Ortega–Carter v. American Int'l Adjustment Co.,* 834 S.W.2d 439, 442 (Tex.App.—Dallas 1992, writ denied); *Browning v. Holloway,* 620 S.W.2d 611, 614–15 (Tex.Civ.App. —Dallas 1981, writ ref'd n.r.e.); *Stewart v. Mathes,* 528 S.W.2d 116, 118 (Tex.Civ.App.—Beaumont 1975, no writ).

 **[9]** An action to enforce a settlement agreement, where consent is withdrawn, must be based on proper pleading and proof. *See Quintero,* 654 S.W.2d at 444; *Browning,* 620 S.W.2d at 615. In this case, for example, Padilla filed a counterclaim seeking enforcement of the parties' agreement, and both sides moved for summary judgment on that claim. As previously discussed, the summary judgment evidence established an enforceable settlement agreement as a matter of law. The trial court therefore should have granted Padilla's motion for summary judgment and enforced the agreement.

For the foregoing reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

ENOCH, Justice, joined by GAMMAGE, Justice, dissenting.

Today the Court holds that a settlement agreement is an enforceable Rule 11 agreement despite the fact that it never complied with all requirements of the rule before the existence and terms of the agreement became disputed. But for this Court's prior opinion in *Kennedy v. Hyde,* 682 S.W.2d 525 (Tex.1984), I would agree that the settlement agreement in this case is enforceable as a binding contract between the parties regardless of whether it is ever filed as a Rule 11 agreement. *Kennedy,* however, engrafted the Rule 11 requirements on the substantive principles of contract law. In my view, *Kennedy,* unless overruled, compels us to conclude that the settlement agreement in this case is unenforceable because, although the agreement is otherwise enforceable as a binding contract, it did not comport with the requirements of Rule 11 at the time Padilla sought to enforce the agreement. I respectfully dissent.

In *Kennedy,* the parties reached an oral settlement agreement. The agreement was reduced to writing and signed by all but one defendant, Kennedy. The plaintiffs amended their pleadings to enforce the oral settlement agreement against Kennedy. *Kennedy,* 682 S.W.2d at 526. This Court reversed the judgment of the courts below enforcing the oral settlement agreement, holding that the oral settlement agreement was unenforceable under Rule 11 because the agreement was not in writing and signed by Kennedy. *Id.* at 530.

I begin by noting that *Kennedy* represents a significant departure from our Rule 11 jurisprudence and substantive contract law. Prior to *Kennedy,* this Court never held that to be enforceable as a contract, a settlement agreement must comply with Rule 11. In **\*463** *Williams v. Hollingsworth,* 568 S.W.2d 130, 131 (Tex.1978) and *Vickrey v. American Youth Camps, Inc.,* 532 S.W.2d 292 (Tex.1976) (per curiam), this Court purportedly "strongly implied" that settlement agreements were subject to Rule 11. *Kennedy,* 682 S.W.2d at 528. The implication, if any, is neither strong nor persuasive. In *Williams,* the Court only held that a valid consent judgment cannot be rendered by a court when consent of one of the parties is lacking. *Williams,* 568 S.W.2d at 131. Because one party was not present or represented by counsel at the time an agreed judgment was rendered, that party had not consented to the agreed judgment. *Id.* at 132.

The reliance on *Vickrey* is even more dubious. In that case, the Court in a per curiam opinion simply recited in its statement of the facts that a settlement was dictated in open court pursuant to Rule 11. *Vickrey,* 532 S.W.2d at 292. One party appealed the judgment that had been rendered based on the dictated settlement on the grounds that it did not conform to the settlement that had been reached between the parties. *Id.* at 292. The Court reversed the judgment holding that a final judgment based on a settlement agreement must be in "strict or literal compliance" with that agreement. *Id.* Like the issue in *Williams,* the issue in *Vickrey* was whether the trial court had the power to render the judgment it did based on the settlement, not whether a settlement agreement is an otherwise enforceable settlement agreement absent compliance with Rule 11.

By reaching out to render settlement agreements subject to Rule 11, the Court engrafted new requirements onto the substantive law of contracts, thus exceeding the Court's rule-making authority. TEX.GOV'T CODE § 22.004. Section 22.004(a) grants this Court the full authority to make rules for practice and procedure in civil actions, "except that its rules may not abridge, enlarge, or modify the substantive rights of a litigant." *Id.* § 22.004(a). Under *Kennedy,* an oral settlement agreement, although otherwise enforceable at common law, becomes unenforceable unless made in open court, and thus made part of the court record. It is

difficult to conceive of a clearer abridgment of the substantive rights of a litigant than to refuse to enforce a valid contract because the parties did not comply with a rule of procedure.

The Court recognized that its holding in *Kennedy* might abridge the substantive law of contracts, but dismissed this concern by concluding that the Legislature had sanctioned its interpretation of Rule 11 by failing to disapprove of the rule. *Kennedy,* 682 S.W.2d at 529. The Legislature's failure to disapprove of Rule 11, according to the Court, may be viewed as signifying its acquiescence in the Court's interpretations of Rule 11's predecessors. While this may be true, it is only true if the Court's interpretations of Rule 11's predecessors have subjected otherwise enforceable settlement agreements to Rule 11 and rendered such contracts unenforceable for failure to comply with the rule. None of the Court's prior interpretations have so held.

Nor is such an interpretation "presaged" by the Court's earlier interpretations in *Birdwell v. Cox,* 18 Tex. 535 (1857) or *Matthews v. Looney,* 132 Tex. 313, 123 S.W.2d 871 (1939). *See Kennedy,* 682 S.W.2d at 529. *Birdwell* simply involved an agreement to postpone trial until some depositions could be taken. *Birdwell,* 18 Tex. at 535–36. In *Matthews,* the parties in a will contest reached a settlement but before judgment, disputes arose concerning the terms of the settlement between the parties. *Matthews,* 123 S.W.2d at 871–72. Although the Court noted that the agreement had not been reduced to writing or rendered of record with the trial court, the Court held that the trial court lacked authority to enter a judgment because the terms were in dispute. *Id.* at 873. In other words, the parties had not consented to the terms of the settlement at the time they sought a judgment. *Matthews* simply stands for the correct proposition that a judgment may not be rendered based on a settlement if a party withdraws its consent prior to the judgment. Neither *Birdwell* nor *Matthews* justify the Court's action in *Kennedy.*

While I believe *Kennedy* is wrongly decided, it is the law and should either be followed or overruled in this case. My criticism of the Court is that it does neither. Assuming the **\*464** Court continues to adhere to the holding in *Kennedy,* Rule 11 requires that three conditions be met before an agreement will be enforceable: (1) a writing, (2) that is signed, (3) and that has been filed with the court. *London Market Cos. v. Schattman,* 811 S.W.2d 550, 552 (Tex.1991) (per curiam). Once the existence or terms of such an agreement becomes disputed, it is unenforceable *unless* it comports with all three of these requirements. *Id.; Kennedy,* 682 S.W.2d at 530. Accordingly, if a purported agreement is in writing and has been signed, but becomes disputed before it has been filed with the court, the agreement is unenforceable under Rule 11. *See Kennedy,* 682 S.W.2d at 530 (oral agreement was unenforceable at the moment its existence was disputed in pleadings).

Recognizing that *Kennedy* hangs like an albatross around its neck, the Court deals with the filing requirement of Rule 11 in such a way as to, in effect, hold that an agreement need only be in writing and signed to be enforceable. According to the Court, the parties need not file an agreement with the court except and until one party disputes the existence or terms of the agreement —filing of the document is a mere technicality. Yet the predecessor to Rule 11, Rule 47, was amended in 1877 to specifically require that agreements be filed with the court to be enforceable. 47 Tex. 597, 625 (1877). In light of this fact, there can be little justification for today's judicial revision. An amendment to a rule must be presumed to have made some change in existing law and the Court must endeavor to give some effect to the amendment. *American Surety Co. v. Axtell Co.,* 120 Tex. 166, 36 S.W.2d 715, 719–20 (1931). To the contrary, the Court effectively eliminates the filing requirement from Rule 11.

Moreover, the Court's construction trivializing the filing requirement arguably defeats the purposes of Rule 11. Rule 11 ensures (1) that agreements of counsel which affect the interest of their clients not be left to the fallibility of human recollection, *Wyss v. Bookman,* 235 S.W. 567, 569 (Tex.Comm'n App.1921, holding approved); and (2) that agreements themselves not become sources of controversy impeding resolution of suits. *Kennedy,* 682 S.W.2d at 530. In addition, Rule 11 also operates to prevent the trial judge from having to place the parties' attorneys on the stand and determine which one is telling the truth. *See Fidelity & Casualty Co. v. McCollum,* 656 S.W.2d 527, 529 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). Stated another way, the significance of Rule 11 is to formalize the procedures for entering into agreements concerning a pending lawsuit so that the court can extricate itself from controversies ancillary to the underlying litigation. The filing element, if it has any purpose at all, surely is designed to make the parties focus on an agreement and recognize that not only have the terms of the agreement been memorialized in writing but also that they have the imprimatur of a court record. The filing requirement thus adds to the

formality of the process and reduces uncertainty and the likelihood that the agreements will become a source of controversy distracting the court and the parties from the case at hand.

I suspect that the Court reduces the filing requirement to a matter of little consequence because it is absurd to hold that a contract would not be enforceable simply because it has not been filed with the court. Yet if we are going to continue to insist that our substantive contract law be modified by Rule 11, we should at least be consistent in our readings. To be enforced, a settlement agreement must be in writing, signed, and filed at the time either its existence or the terms of the agreement become disputed. *Kennedy,* if correct, compels us to conclude that the agreement in this case is unenforceable because it became disputed before it complied with the Rule 11 filing requirement. Because the Court chooses not to address *Kennedy,* it takes the questionable route of trivializing the filing requirement of Rule 11 to the point of nonexistence. If there is value to Rule 11's requirement that an agreement be on file with the Court, then that value should not be destroyed. If there is no value to the mere filing of an agreement, then the Court should amend Rule 11 to delete the requirement. I dissent.

## Parallel Citations

38 Tex. Sup. Ct. J. 663

Footnotes

1    The record does not disclose whether Carry was an attorney, legal assistant, or secretary.

2    Shortly after refusing the settlement funds, Steidley sent another letter to Chandler contending that State Farm had acted in bad faith by not settling the case for the policy limits, demanding $2.75 million from Padilla and State Farm in extra-contractual damages.

3    The new argument was based on section 154.071(a) of the Texas Civil Practice and Remedies Code, which provides:
   > If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract.
   This section is contained in Title 7 of the Civil Practice and Remedies Code, regarding referral of cases to alternative dispute resolution.

4    The transcript contains a "Notice of Oral Hearing," filed by Padilla on June 12, indicating that the motion for reconsideration would be "presented to the court for ruling with an oral hearing" on June 22, 1992.

5    The court's order did, however, address section 154.071(a) of the Texas Civil Practice and Remedies Code, which was raised only in the two later motions.

6    Padilla argues that the LaFrances have waived this argument because they did not raise it in this Court by separate application for writ of error. Padilla relies on the requirement that a party who seeks a different and more favorable judgment in this Court than that rendered by the court of appeals must file his or her own application for writ of error, rather than merely raising the argument by a responsive cross-point. *See Donwerth v. Preston II Chrysler–Dodge, Inc.,* 775 S.W.2d 634, 639 n. 5 (Tex.1989); *Archuleta v. International Ins. Co.,* 667 S.W.2d 120, 123 (Tex.1984). The LaFrances' cross-point, however, does not seek a different *and more favorable* judgment. Although a judgment of dismissal would be different from the actual judgment of the court of appeals affirming the judgment of the trial court, the end results would be equally favorable. In either case, the trial court's summary judgment in favor of the LaFrances remains undisturbed. The LaFrances were thus entitled to raise the dismissal argument by cross-point.

7    Although the trial court signed the order granting summary judgment for the LaFrances on the settlement issue on October 19, 1992, it did not sever this issue until November 20, 1992. The latter date controls the appellate timetable.

8    Because the primary purpose of Rule 11 is to require the parties to reduce their agreements to writing, the Court in *Kennedy* refused to enforce an oral settlement agreement.

9    The LaFrances argue that there is no summary judgment evidence that Bradshaw, who was not an attorney, was authorized to negotiate a settlement or enter a binding Rule 11 agreement on Padilla's behalf. We disagree. The record reflects that Chandler, who was Padilla's attorney, was the one who forwarded the LaFrances settlement offer to Bradshaw, and it was Chandler who procured the settlement checks from Bradshaw and tendered them to Steidley. Moreover, Steidley knew that Bradshaw was negotiating on behalf of Padilla and that he was at least purporting to act as Padilla's agent. Under these circumstances, even if Bradshaw did not have actual authority to settle the lawsuit, Padilla was entitled to ratify Bradshaw's actions, thereby creating a binding agreement. *See* Restatement (Second) of Agency, § 87. Padilla clearly ratified the agreement by tendering the settlement funds and seeking enforcement.

**End of Document**                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

434 S.W.3d 774
Court of Appeals of Texas,
Houston (14th Dist.).

PARHAM FAMILY LIMITED PARTNERSHIP and Van E. Parham, Jr., Appellants

v.

Diane MORGAN f/k/a Diane Parham, Appellee.

Parham Enterprises, Inc. and Rhetta Parham, Appellants

v.

Diane Morgan f/k/a Diane Parham, Appellee.

Nos. 14–12–00753–CV, 14–12–00795–CV. | June 3, 2014.

**Synopsis**

**Background:** Judgment creditor filed petition to set aside warranty deed that allegedly fraudulently transferred property from judgment debtor in order to defeat creditor's monetary claim, and for a temporary injunction against further conveyances of the property. Grantee petitioned to intervene. The Civil Court at Law No. 3, Harris County, Linda Storey, J., struck intervention, granted partial summary judgment for creditor on attempted transfer, declared deed void, and, signed final judgment awarding creditor attorney fees, on jury verdict, and enjoining grantee from pursuing its collateral suit regarding the property. Debtor and grantee appealed.

**Holdings:** The Court of Appeals, McCally, J., held that:

[1] court had subject matter jurisdiction;

[2] creditor had standing to seek anti-suit injunction;

[3] court granted summary judgment on all bases;

[4] deed was void;

[5] debtor exhibited intent to defraud;

[6] court should not have continued the temporary injunction in its final judgment;

[7] court had authority to enter anti-suit injunction; and

[8] award of attorney fees was properly conditioned on creditor's appellate success.

Affirmed as modified.

West Headnotes (20)

**[1]** **Courts** 👉 Amount claimed or value of property

**Courts** 🔑 Jurisdiction

Although value of property alleged to have been fraudulently transferred exceeded county court at law's jurisdictional maximum amount in controversy, court had subject matter jurisdiction, based on subject matter of claim, rather than amount in controversy; court had jurisdiction to "decide the issue of title to real or personal property" and to "hear a suit for the enforcement of a lien on real property." V.T.C.A., Government Code §§ 25.0003, 25.1032.

Cases that cite this headnote

**[2]** **Courts** 🔑 Allegations and prayers in pleadings

The plaintiff's allegations in the petition regarding the amount in controversy control for jurisdictional purposes unless the party challenging jurisdiction pleads and proves that the allegations were made fraudulently to obtain jurisdiction.

Cases that cite this headnote

**[3]** **Courts** 🔑 Allegations and prayers in pleadings

Judgment creditor's petition, alleging damages exceeding $84,000 but "within the jurisdictional limits of this court," controlled for jurisdictional purposes, notwithstanding that value of property interest at issue in court's judgment was $340,000, which exceeded county court at law's $100,000 jurisdictional maximum amount in controversy. V.T.C.A., Government Code § 25.0003(c)(1).

Cases that cite this headnote

**[4]** **Courts** 🔑 Loss or divestiture of jurisdiction

When jurisdiction is lawfully and properly acquired, no later fact or event deprives the court of jurisdiction.

Cases that cite this headnote

**[5]** **Injunction** 🔑 Persons entitled to apply; standing

Judgment creditor had standing to seek an injunction against further conveyance of real property allegedly fraudulently transferred from judgment debtor, even though the transfer took place nine months prior to creditor's claim against debtor resulting in judgment; creditor had a clear justiciable interest in whether her judgment lien attached to a property she alleged was fraudulently transferred to defeat her monetary claim against debtor. V.T.C.A., Bus. & C. § 24.005(a).

Cases that cite this headnote

**[6]** **Judgment** 🔑 Construction and operation

Grant of motion for partial summary judgment was on both claims asserted in motion, and was not grant of motion in part, on one claim. V.T.C.A., Bus. & C. § 24.005.

Cases that cite this headnote

**[7]** **Appeal and Error** 🔑 Reasons for Decision

Where an appellant fails to challenge even one of the grounds for grant of summary judgment, the Court of Appeals may affirm the summary judgment on that ground alone.

Cases that cite this headnote

**[8]** **Appeal and Error** 🔑 In general; asserting new defense or grounds of opposition

On appeal of fraudulent transfer action, Court of Appeals would not consider judgment debtor's argument, raised for first time on appeal, that deed was valid because a grantee existed, but received the deed in assumed name. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[9]** **Deeds** 🔑 Capacity to take

Warranty deed that attempted to convey property to a non-existent entity was void.

Cases that cite this headnote

**[10]** **Appeal and Error** 🔑 Extent of Review Dependent on Nature of Decision Appealed from

In considering grounds for reversal of summary judgment, Court of Appeals is limited to those grounds expressly set forth in the summary-judgment motions, answers, or other responses, and may not rely on the appellate briefs or summary-judgment evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[11]** **Judgment** 🔑 Evidence and Affidavits in Particular Cases

Statement of judgment debtor's president in summary judgment affidavit, that "the sale of the property was done to either hinder, delay or defraud" judgment creditor, supplied conclusive evidence that she, on behalf of her company, transferred the real property with actual intent to hinder, delay, or default creditor as required to constitute a fraudulent transfer. V.T.C.A., Bus. & C. § 24.005(a)(1, 2).

Cases that cite this headnote

**[12]** **Injunction** 🔑 Findings and conclusions

Rule requiring that a temporary injunction order describe in reasonable detail, without reference to complaint or other document, the act or acts to be restrained, is not violated when documents are attached to the injunction and referred to it as part of the injunction because the attachments become part of the injunction itself. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

Cases that cite this headnote

**[13]** **Injunction** 🔑 Review

Even if temporary injunction order was void, contempt order based upon it was not reviewable by direct appeal.

Cases that cite this headnote

**[14]** **Injunction** 🔑 Operation and effect

Temporary injunction, which was effective "until further order of this court," was still in effect until trial court entered judgment on merits. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

Cases that cite this headnote

**[15]   Injunction** 🔑 Particular cases

Continuing temporary injunction in final judgment improperly transformed temporary injunction into permanent injunction without trial.

Cases that cite this headnote

**[16]   Injunction** 🔑 Grounds in general

An anti-suit injunction is appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation.

Cases that cite this headnote

**[17]   Appeal and Error** 🔑 Extent of Review Dependent on Nature of Decision Appealed from

Court of Appeals will uphold an anti-suit injunction issued to protect a court's dominant jurisdiction where, if the enjoined party were allowed to proceed, the dominant court would lose its ability to proceed with the case.

Cases that cite this headnote

**[18]   Injunction** 🔑 Proceedings for recovery of real property

In judgment creditor's action alleging judgment debtor fraudulently transferred real property in an effort to defeat her monetary claim, trial court had authority to permanently enjoin grantee from filing action to quiet title to property in probate court; at time of creditor's request for an anti-suit injunction, trial court had already granted summary judgment for creditor, declaring debtor's deed void, and had determined that grantee's quiet title lawsuit regarding the property was a "mirror lawsuit." V.T.C.A., Bus. & C. §§ 24.005(a)(1), 24.009(a).

Cases that cite this headnote

**[19]   Costs** 🔑 Taxation of costs on appeal or error

Trial court's judgment properly conditioned award of appellate attorney fees on defendant's failure on appeal, which was tantamount to conditioning it on plaintiff's appellate success.

Cases that cite this headnote

**[20]   Costs** 🔑 Form and requisites of application in general

**Costs** 🔑 Objections to taxation or to items

A failure to segregate attorney's fees can result in the recovery of no such fees; but if no one objects to a jury charge in which the jury is not asked to segregate fees, then the objection is waived. Rules App.Proc., Rule 33.1(a).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*776** James Nathan Overstreet, Houston, David Richard Toups, Dallas, for Appellants.

Robert J. Thomas, Houston, Clinard J. Hanby, The Woodlands, for Appellee.

Panel consists of Justices McCALLY, BUSBY, and WISE.

## OPINION

SHARON McCALLY, Justice.

This consolidated appeal arises from a dispute over Lot 9, Block 1 of Farmette **\*777** Meadows Section One, Harris County, Texas (the "subject property"). By the underlying suit, Diane Morgan f/k/a Diane Parham (Diane) sought to avoid a transfer of the subject property as a fraudulent transfer as well as a declaration that the September 22, 2007 deed purporting to accomplish the transfer is void. The trial court granted partial summary judgment on the attempted transfer, declared the deed void, signed a final judgment awarding Diane attorney's fees, and enjoined appellants Parham Family Limited Partnership (Partnership) and Van E. Parham, Jr. (Van Jr.) from pursuing their collateral suit regarding the subject property.

On appeal, Parham Enterprises, Inc. (PEI) and Rhetta Parham (Rhetta), the president of PEI, urge the trial court erred by (a) granting the motion for partial summary judgment, (b) enforcing an "expired" temporary injunction, and (c) awarding Diane attorney's fees despite a failure to segregate. Partnership and Van Jr. challenge the trial court's subject matter jurisdiction over Diane's suit and Diane's standing to seek injunctive relief against them. Partnership and Van Jr. also assert the trial court erred in entering the injunction against them. As explained below, we affirm the trial court's judgment as modified.

## I. BACKGROUND

Diane was married to Shawn Parham in June 2004. On June 22, 2004, Shawn conveyed the subject property to PEI. PEI is a corporation that was owned and controlled by Van Parham, Sr. and Rhetta. Diane worked for PEI until she and Shawn were separated in August 2005; they were divorced in May 2006.

On September 22, 2007, Rhetta, as president of PEI, signed a deed attempting to convey the subject property to Partnership. However, it is undisputed that the warranty deed identified the wrong lot within the Farmette Meadows Section and named a non-existent entity, Parham Family Limited Partnership No. 2, as grantee. The warranty deed, including these errors, was recorded in the real property records of Harris County. In July 2008, Diane obtained a judgment against PEI for around $82,500 in County Court at Law No. 3 related to PEI's unauthorized use of her personal credit cards. The transfer of the subject property occurred during the pendency of the credit card dispute. Diane attempted to execute her judgment against PEI once it became final, but was unsuccessful. She abstracted this judgment in the Harris County deed records on September 22, 2008.

On January 28, 2009, Diane, as a judgment creditor, filed a petition to set aside deed, for declaratory judgment, for fraudulent transfer and for a temporary restraining order (TRO) and temporary injunction. She named PEI and Rhetta as defendants. Diane asserted that the September 22, 2007 deed conveying Lot 1 was a fraudulent conveyance of the subject property to a non-existent entity made to "delay, hinder, or defraud" Diane in her efforts to collect that judgment. Diane sought to set aside "the purported transfer and an order of sale ... for disposition and satisfaction of [her] judgment," a declaratory judgment, a TRO and temporary injunction against further conveyances of the subject property, actual damages that "exceed $84,000 but are within the jurisdictional limits of this court," and attorney's fees. The trial court issued a TRO on February 2 and set the hearing on the temporary injunction for February 13.

On February 13, Diane obtained a temporary injunction against PEI and Rhetta, prohibiting them from "deeding, transferring or conveying" Lot 1. The trial court set the matter for trial on July 15.

**\*778** On February 27, Van Jr. and Partnership filed a petition in intervention (mistakenly styled an "interpleader"), asserting an interest in the subject property. Diane filed an amended petition naming Van Parham Sr., Van Jr., Partnership, and V.E. Parham Jr. Management Corp. as additional defendants. She also added claims for conspiracy and exemplary damages against all the defendants.

During the remainder of 2009, the defendants filed and continued various dispositive motions. The parties agreed to continue numerous trial settings and the parties unsuccessfully mediated. In 2010, the trial court denied all of the defendants' dispositive motions, Van Sr. passed away, and Diane amended her petition to remove Van Sr. and V.E. Parham Jr. Management Corp. as parties and delete her claim for exemplary damages. And, the parties agreed to more continuances, moving the trial into 2011. On September 19, 2011, Diane filed a motion for partial summary judgment against PEI only. In this motion, she sought judgment on her claims for declaratory judgment and for fraudulent transfer. This motion was set for submission on October 7. Diane attached to her motion (1) a copy of the recorded deed on the subject property, bearing the two errors in lot and grantee, (2) a certificate from the Texas Secretary of State certifying that there is no record of any business entity, foreign or domestic, by the name of Parham Family Limited Partnership No. 2, [1] and (3) evidence in support of her fraudulent transfer claim, including an appraisal of the subject property at the time of the purported transfer. Rhetta and PEI responded to Diane's motion for partial summary judgment. Intervenors [2] Partnership and Van Jr. also filed a response to Diane's motion.

Later in September, Diane filed a third amended petition restating her previous claims; and adding a claim for piercing the corporate veil against Rhetta, seeking to hold her individually liable for disregarding the corporate form of PEI. A week later, Diane filed a "notice of disobedience of the temporary injunction," asking the court to hold PEI and Rhetta, individually and as president of PEI, in contempt. In this notice, she asserted:

> The Defendants [PEI] and [Rhetta] were served with the Plaintiff's Motion for Partial Summary Judgment on Thursday, September 15, 2011. In a calculated bad faith attempt to defeat the partial summary judgment motion, the Defendants [PEI] and [Rhetta] violated the Court's Temporary Injunction Order on Friday, September 23, 2011 by filing an amended and alleged corrected Warranty Deed to the subject property Lot 9 with the county clerk.

The trial court heard this motion on October 12. After the hearing, the trial court signed an order holding PEI and Rhetta in contempt. In this order, the trial court declared the deed executed by PEI and Rhetta on September 22, 2011 (filed on September 23) void and fined Rhetta "$500.00 as punishment for contempt" of the temporary injunction. The trial court further ordered PEI and Rhetta to obey the contempt order and the February 13, 2009 temporary injunction. In the order, the trial court stated the temporary injunction "remains in effect for any and all purposes." The trial court also signed **\*779** a trial setting that day, setting the case for trial on January 23, 2012.

Two days before the hearing on Diane's motion for contempt, Diane filed a motion to strike the intervention of Partnership and Van Jr. At a hearing on October 19, 2011, Diane orally dropped her conspiracy claims against all the parties. The trial court signed a partial non-suit with prejudice of these claims that same date. The trial court also signed an order granting Diane's motion to strike the intervention of Partnership and Van Jr. According to the trial court's findings, Partnership and Van Jr. filed a motion for new trial/motion for reconsideration in response to the trial court's order striking their intervention. [3]

Diane filed an amended petition on November 7 naming only PEI and Rhetta as defendants. In this petition, Diane sought to set aside the September 22, 2007 deed, a declaratory judgment that this deed was void, and alternative relief for fraudulent transfer, piercing the corporate veil, and fraud. She further alleged that the February 13, 2009 temporary injunction remained in effect.

On January 17, 2012, Partnership and Van Jr. filed an action to quiet title to the subject property in Harris County Probate Court No. 1, which was overseeing the probate of the estate of Van Sr. This quiet-title action was based on the September 22, 2007 deed. On January 19, PEI and Rhetta filed a motion in the underlying cause here to transfer venue to the probate court. The motion also complained that, due to the amount in controversy, the court did not have jurisdiction, and that the court had

improperly excluded necessary parties by striking Partnership/Van Jr.'s petition in intervention. Although Diane responded to the motion, it appears that the motion was neither set for hearing nor ruled upon.

On January 23, 2012, the trial court signed an order granting Diane's September 19 motion for partial summary judgment against PEI. Specifically, the trial court's order: "GRANTS Plaintiff's motion for partial summary judgment against the Defendant Parham Enterprises, Inc. regarding the issue that the warranty deed executed on September 22, 2007 is void."

The next day, the trial court signed an order denying Partnership and Van Jr.'s motion for new trial/motion for reconsideration. Also on January 24, Diane and PEI proceeded to a jury trial on the issue of attorney's fees only. [4] After a brief jury trial, the jury returned a verdict finding Diane's reasonable and necessary attorney's fees for preparation and trial to be $75,000, for an appeal to the court of appeals to be $25,000, and for an appeal to the Supreme Court of Texas to be $15,000.

Following the trial, Diane filed an amended petition on February 6, 2012, listing Partnership and Van Jr. as "intervenors." In addition to the claims listed above that Diane had raised in her previous pleadings, she sought an anti-suit TRO and temporary injunction against Partnership and Van Jr., enjoining them from pursuing their "mirror lawsuit" to quiet title. The trial court granted the TRO on February 8 and set the temporary injunction for a hearing on February 20. Counsel for Partnership and Van Jr. appeared **\*780** at the February 8 hearing on the TRO as "amici curiae."

Diane's February 15 motion for temporary injunction against Partnership and Van Jr. cited Texas Civil Practice & Remedies Code section 65.011, which provides, "A writ of injunction may be granted if a party performs or is about to perform ... an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual; the applicant is entitled to a writ of injunction under the principles of equity and the statutes of this state relating to injunction." [5] She noted in this motion that "on the eve of trial," she was served with citation and a copy of the intervenors' original petition for declaratory judgment in the probate court regarding the deed/title to the subject property. She alleged that in this "mirror lawsuit," Partnership and Van Jr. were attempting to re-litigate the identical issues regarding the deed/title to the subject property, which was the subject of "this pending litigation." She stated that on January 23, the trial court had signed a partial summary judgment in her favor, in which the court had issued an order that the September 22, 2007 deed issued by PEI was void. She further noted that on January 24, 2012, the trial court signed an order denying Partnership's motion for new trial or motion for reconsideration. She asserted that the trial court had jurisdiction over Partnership and Van Jr. because they consented to the court's jurisdiction regarding their motion for new trial, which was not denied until January 24, 2012. Diane also alleged she was entitled to an anti-suit temporary injunction to address a threat to the court's jurisdiction, to prevent the evasion of important public policy, to prevent a multiplicity of suits, or to protect a party from vexatious or harassing litigation, citing *Bridas Corp. v. Unocal Corp.* and *Golden Rule Insurance v. Harper.* [6]

Partnership and Van Jr. responded to this motion, "without waiving citation, service of process, or making a general appearance." They asserted that the trial court lacked subject matter jurisdiction to hear this case because the property in question was valued at over $300,000, which exceeded the jurisdictional limits of the maximum amount in controversy for statutory county courts in Harris County. They further claimed that, rather than maintaining the status quo, as a temporary injunction was intended to do, granting a temporary injunction in this case would destroy the status quo. They asserted that the probate court had now obtained dominant jurisdiction over their claims, which was evidenced by the need for Diane to seek leave of court to amend her pleadings, post-jury trial and concurrently with the temporary injunction hearing. Citing *United States Fidelity & Guaranty Co. v. Beuhler,* they alleged that a plaintiff may not dismiss claims against defendants, proceed to a jury trial without them, and after a trial on the merits, rejoin them as a party in the same case, particularly as intervenors. [7] Finally, they contended that Diane was judicially estopped from obtaining injunctive relief against them because she had them struck and dismissed from the case.

**\*781** After an evidentiary hearing on February 20, 2012, at which counsel for all parties and putative parties appeared, the trial court granted the temporary injunction, as well as granting Diane leave to amend her petition. Bond was set at $1,000, and the case was set for trial on the permanent injunction on June 4, 2012.

Partnership and Van Jr. filed a plea to the jurisdiction and answer on February 27. In their plea to the jurisdiction, they asserted that the trial court lacked subject matter jurisdiction because the property at issue was valued above the jurisdictional limits of the statutory county court at law. They also filed a verified denial, urging that there was a defect in parties—they were named as intervenors after their petition in intervention had been struck. They asserted that no such intervention existed and that because Diane had proceeded to a jury trial on the merits, she could no longer, post-trial, sue them as intervenors in an adjudicated matter. Subject to several affirmative defenses, they filed a general denial.

Also on February 27, the trial court signed an interlocutory judgment.[8] In this interlocutory judgment, the trial court included the following regarding summary judgment regarding the void deed:

> Plaintiff Diane Morgan timely filed a motion for partial summary judgment against the Defendant Parham Enterprises, Inc. regarding the issue that the warranty deed attempting to transfer the title to [the subject property] was void.
>
>> On January 23, 2012, the Court, after considering the pleadings, the motion, the affidavits, the response of the Defendant, the response of the *Interveners,* the law, and the facts, granted the Plaintiff's motion for partial summary judgment against the Defendant Parham Enterprises, Inc. The Order is attached as Exhibit 'A' and incorporated by reference.
>>
>> The court hereby renders judgment for Plaintiff Diane Morgan that the warranty deed attempting to transfer title to the subject property ... and executed on or about September 22, 2007 is void.

(emphasis added). This interlocutory judgment also iterated the jury verdict on fees against PEI, and the February 13, 2009 temporary injunction against Partnership and the February 20, 2012 temporary injunction against Partnership and Van Jr.

At the June 4, 2012 evidentiary hearing on the permanent injunction, counsel for Partnership and Van Jr. again raised the issue that they had been brought into the case as intervenors even though their petition in intervention had been struck and Diane had non-suited her claims against them:

> This Court on October the 12th [2011] had a hearing. And at that hearing Diane Morgan's counsel nonsuited my clients and nonsuited with prejudice. The Court signed off on an order on October 19th nonsuiting with prejudice any conspiracy claims. Then what transpired is the Court in—well, actually Diane Morgan filed a fourth amended petition. And in that fourth amended petition, she dropped all claims against Parham Family Limited Partnership and Dr. Van E. Parham, Jr.
>
> The Court also struck the intervention that my clients filed back in October as well. Therefore, they ceased being parties at the very latest at the beginning of November. The Court proceeded to go to trial on the merits. It was a jury **\*782** trial. The Court granted a motion for summary judgment at the end of January prior to trial and then went right into a jury trial to which the Parham Family Limited Partnership and Dr. Van E. Parham were not parties, nor were they given notice of the trial.
>
> Your Honor, I'm not sure what—the Court granted a post-trial leave to amend for Diane Morgan in which she has sued my clients as intervenors which the Court struck back in October.
>
> Your Honor, under the Rules of Procedure, once you proceed to trial, anything that's not submitted at that point in time is abandoned and under 165 that's exactly what we have here. Is Ms. Morgan asking the Court for a new trial?

The trial court responded that it had already ruled on Partnership's and Van Jr.'s motion to dismiss by denying it and asked the parties to proceed on the permanent injunction hearing. Both sides presented evidence and argument. On June 11, 2012, the trial court signed an order granting a permanent injunction "restraining the Interveners from prosecuting a mirror lawsuit regarding the deed/title to Lot 9 in Harris County Probate court No. [1] or any other Court."

The trial court signed a final judgment on August 8, 2012. This judgment provides, in pertinent part, as follows:

The Defendants in this litigation are Parham Enterprises, Inc.... and Rhetta Parham. Van Parham Sr. was a defendant in this litigation, but he died during the pendency of this litigation on November 2, 2010 and was non-suited on or about September 20, 2011.

The Interveners in this litigation are Van Parham Jr. and Parham Family Limited Partnership ....

On January 23, 2012, the Court after considering the pleadings, the motion, the affidavits, the response of the Defendants, the response of the Interveners, the law, and the facts granted the Plaintiff's motion for partial summary judgment against the Defendant Parham Enterprises, Inc ....

The court hereby RENDERS judgment for Plaintiff Diane Morgan that the warranty deed attempting to transfer the title to the subject property ... and executed on or about September 22, 2007 is void.

On January 24, 2012, this case was called for trial regarding the fact issue of attorney fees. Plaintiff, Diane Morgan, appeared in person and through her attorney and announced ready for trial. Defendant, Parham Enterprises, Inc., appeared through its representative (President), Ms. Rhetta Parham and through its attorney and announced ready for trial.

After a jury was impaneled and sworn, it heard the evidence and arguments of counsel.... Because it appears to the Court that the verdict of the jury was for the Plaintiff, Diane Morgan, and against the defendant Parham Enterprises, Inc., judgment should be rendered on the verdict in favor of the Plaintiff, Diane Morgan and against the Defendant Parham Enterprises, Inc.

* * *

## INJUNCTIONS

On February 13, 2009, this Court issued a Temporary Injunction against the Defendant Parham Enterprises, Inc. and restrained the Defendant from deeding, transferring or conveying all or any part of the subject property ... from the date of the Order and while this cause is pending or until further order of the Court. This Temporary Injunction remains in effect for any and all purposes **\*783** against the Defendant until further order from this Court.

The final judgment also incorporated the permanent injunction against Partnership and Van Jr., described above. All court costs were taxed against PEI.

From this judgment, PEI, Rhetta, Partnership, and Van Jr. timely appealed.[9]

## II. ANALYSIS

**A. Jurisdictional Issues**

In their first two issues, Partnership and Van Jr. challenge the trial court's subject matter jurisdiction over the case below and Diane's standing to seek injunctive relief against them. Because these issues attack the jurisdiction of the trial court, we address them first.

### 1. Subject Matter Jurisdiction

Partnership and Van Jr. assert that the trial court lacked subject matter jurisdiction over the proceedings below because the amount in controversy exceeded the trial court's statutory authority. Subject matter jurisdiction may not be conferred by consent or waiver, and its absence may be raised at any time. *Carroll v. Carroll,* 304 S.W.3d 366, 367 (Tex.2010) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993)). Whether a trial court has subject matter jurisdiction is a question of law we review de novo. *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002).

 **[1]**    Here, Partnership and Van Jr. contend that Diane alleged the property at issue in this case was worth $340,000, which exceeds the Texas Legislature's grant of jurisdiction to statutory county courts at law over amounts in controversy between $500 and $200,000. *See* Tex. Gov't Code Ann. § 25.0003(c)(1). [10] Section 25.0003 of the Texas Government Code governs the general jurisdiction of statutory county courts and proscribes the monetary jurisdictional limits of them. *See id.* § 25.0003. But section 25.1032 of the Government Code contains additional jurisdictional provisions particular to Harris County civil courts at law. *See id.* § 25.1032. Subsections 25.1032(c)(1) and (3) provide the Harris County civil courts at law jurisdiction to "decide the issue of title to real or personal property" and to "hear a suit for the enforcement of a lien on real property." *Id.* § 25.1032(c)(1), (3).

Diane brought this suit to decide the issue of title to real property. She sought a determination of whether title to Lot 9 remained with PEI or had been conveyed to another. *See id.* § 25.1032(c)(1). Additionally, Diane sought to enforce the judgment lien from her prior suit in County Civil Court at Law No. 3 against Lot 9 if it found the deed void. *See id.* § 25.1032(c)(3). Indeed, Partnership and Van Jr. acknowledge in their briefing that Diane is "trying to establish and determine title to real property," albeit they claim it is "regarding a sale to which she was not a party or has a justiciable interest." The jurisdiction provided by section 25.1032 is based on the subject matter of the claim, not the amount in controversy. *See AIC* **\*784** *Mgmt. v. Crews,* 246 S.W.3d 640, 644 (Tex.2008) ("Section 25.1032(c)(1) thus bases the county civil courts' jurisdiction on the type of claim, not the amount of money in dispute."); *see also Haas v. Ashford Hollow Comty. Improvement Ass'n, Inc.,* 209 S.W.3d 875, 880 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (same). Thus, we conclude that County Court at Law No. 3 properly exercised subject matter jurisdiction over this matter based on the type of claims Diane brought.

 **[2]**    Further, we review de novo whether a pleader has alleged facts that affirmatively demonstrate subject matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). We construe pleadings liberally in favor of the plaintiff and look to the pleader's intent. *See id.* (citing *Tex. Air Control Bd.,* 852 S.W.2d at 446). The plaintiff's allegations in the petition regarding the amount in controversy control for jurisdictional purposes unless the party challenging jurisdiction pleads and proves that the allegations were made fraudulently to obtain jurisdiction. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 449 (Tex.1996); *see also Miranda,* 133 S.W.3d at 224 n. 4; *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000).

 **[3]**    Here, in her original petition, Diane alleged damages exceeding $84,000 but "within the jurisdictional limits of this court." Partnership and Van Jr. neither pleaded nor proved that Diane's allegations of the amount in controversy were made fraudulently for the purpose of obtaining jurisdiction. Thus, the allegations in her petition regarding the amount in controversy control for jurisdictional purposes. *Miranda,* 133 S.W.3d at 224 n. 4; *Cont'l Coffee,* 937 S.W.2d at 449. Section 25.0003(c)(1) of the Texas Government Code provides jurisdiction for statutory county courts over matters in controversy between $500 and $200,000 "*as alleged on the face of the* petition." Tex. Gov't Code Ann. § 25.0003(c)(1) (emphasis added). As noted above, the jurisdictional maximum amount in controversy at the time Diane filed her suit was $100,000. Diane's allegation of damages on the face of her petition falls below this maximum amount; thus, the trial court had jurisdiction over this matter even under the more general provision of jurisdiction provided by section 25.0003. [11]

 **[4]**    Finally, with certain exceptions not relevant here, when jurisdiction is lawfully and properly acquired, no later fact or event deprives the court of jurisdiction. *Cont'l Coffee,* 937 S.W.2d at 449; *Kubovy v. Cypress–Fairbanks Indep. Sch. Dist.,* 972 S.W.2d 130, 133 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Thus, once the trial court properly obtained subject matter **\*785** jurisdiction over this matter, it did not later lose it based on the contents of its judgment, as asserted by Partnership and Van Jr.

For the foregoing reasons, we conclude that County Civil Court at Law No. 3 properly acquired subject matter jurisdiction over Diane's suit. We therefore overrule Partnership's and Van Jr.'s first issue.

### 2. Diane's Standing

Partnership and Van Jr. assert that Diane lacked standing to seek an anti-suit injunction against them because she lacked any interest in the subject property "without a perfected judgment lien." A party must have standing to maintain suit. *See Tex. Ass'n*

*of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex 1993). Under Texas law, a plaintiff has standing to bring suit if she has suffered a distinct injury, and there exists a real controversy between the parties that will be determined by the judicial determination sought. *Brown v. Todd,* 53 S.W.3d 297, 305 (Tex.2011). The requirement that a real controversy exist between the parties that will be determined by the trial court refers to the presentation of a justiciable interest. *Salas v. LNV Corp.,* 409 S.W.3d 209, 216 (Tex.App.-Houston [14th Dist.] 2013, no pet.).

 **[5]**    Partnership and Van Jr. assert that there is no real controversy between the parties that will be determined by any judicial declaration sought because PEI sold the subject property to Partnership *before* Diane's "failed attempts to perfect a judgment lien or interest in the property." In other words, Partnership and Van Jr. argue that Diane cannot have standing because the transfer about which she complains took place nine months prior to Diane's claim against PEI resulting in judgment. [12] But their assertion ignores the provisions of the Texas Uniform Fraudulent Transfer Act that include "creditor's claim[s that] arose before *or within a reasonable time after the transfer was made or the obligation was incurred.*" Tex. Bus. & Com.Code Ann. § 24.005(a) (emphasis added). Thus, Partnership and Van Jr.'s argument begs the entire question of Diane's case: Is the September 22, 2007 deed purporting to transfer the subject property void as a fraudulent conveyance or otherwise?

If the purported conveyance failed to transfer the property to Partnership, then title of the property remained with PEI, and Diane's judgment lien against PEI attached. Thus, Diane had a clear justiciable interest in whether her judgment lien attached to a property she alleges was fraudulently transferred to Partnership to defeat her monetary claim against PEI; the Texas Uniform Fraudulent Transfer Act provides that justiciable interest *because* she was not a party to the transaction. For the foregoing reasons, we overrule Partnership's and Van Jr.'s challenge to Diane's standing to bring this suit. [13]

Having addressed the jurisdictional issues presented by Partnership and Van Jr., we turn to the trial court's summary **\*786** judgment declaring the September 22, 2007 deed void.

### B. Validity of the Deed

In PEI and Rhetta's first issue, they assert that the trial court erred in declaring this deed void by traditional summary judgment because Diane failed to conclusively establish that the deed lacked the legal requisites to qualify as a deed.

We review the trial court's granting of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.,* 295 S.W.3d 642, 644 (Tex.2009) (per curiam). To be entitled to summary judgment under Rule 166a(c), a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). We take as true all evidence favorable to the nonmovant and resolve any doubt in the nonmovant's favor. *20801, Inc. v. Parker,* 249 S.W.3d 392, 399 (Tex.2008). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable fact finders could, and disregarding evidence contrary to the nonmovant unless reasonable fact finders could not. *Mann Frankfort,* 289 S.W.3d at 848.

### 1. The Trial Court Grants Summary Judgment on All Bases

 **[6]**    PEI and Rhetta argue that the trial court's summary judgment should be reversed because their evidence conclusively established the grantee's existence. They do not urge an issue concerning Diane's fraudulent transfer claim. Instead, they state that the trial court granted the motion for summary judgment solely on the basis of the declaratory judgment act claim. We disagree.

Diane sought partial summary judgment. By her motion, Diane asked the trial court to set aside the deed and return the subject property to PEI. Diane argued both that (a) PEI failed in its attempt to transfer the subject property because the deed was defective and (b) PEI violated Texas Uniform Fraudulent Transfer Act section 24.005. *See* Tex. Bus. & Com.Code Ann. § 24.005. The trial court granted the motion for partial summary judgment. The trial court did not grant the motion for partial

summary judgment *in part.* When it incorporated the summary judgment order into the judgment, the trial court stated: "On January 23, 2012, the Court, after considering the pleadings, the motion, the affidavits, the response of the Defendants, the response of the Interveners, the law, and the facts granted Plaintiff's motion for partial summary judgment against the Defendant Parham Enterprises, Inc."

Nevertheless, PEI and Rhetta urge that the motion was granted in part. They appear to rely upon a single sentence in the summary judgment order as a limit on the grounds for granting. Specifically, the trial court's summary judgment order also stated: "The Grantee, Parham Family Limited Partnership No. 2, was not in existence at the time the deed was executed." However, this is merely a statement of an undisputed fact. The order does not purport to resolve *only* the legal effect of the undisputed fact. Instead, the summary judgment order declares the deed void, which is precisely the relief Diane sought on *both* her declaratory judgment claim and her fraudulent transfer claim. Based upon the plain language of the order, we conclude that the trial court granted Diane's motion for partial summary judgment on both her Declaratory Judgment action and her fraudulent transfer claim.

**\*787** Further, to the extent that there was any confusion about whether the trial court granted a fraudulent transfer summary judgment, [14] the trial court clarified it when, at the trial on the permanent injunction, the following colloquy occurred:

> Mr. Toups [Partnership/Van Jr.]: Your Honor, you granted a motion for summary judgment on the declaratory judgment.
>
> The Court: They both said yes, I set it aside. So, I'm not sure why we're all on a different page.
>
> Mr. Thomas [Diane]: You declared it void.
>
> The Court: I declared it void. Okay. Same thing, in my mind. When I declared it void, *I considered it in my mind fraudulent* and set it aside, hence, the declaring it void.

(emphasis added).

**[7]** For PEI and Rhetta to obtain a reversal of the motion for partial summary judgment, they must attack every ground relied on for which summary judgment could have been granted. *See Malooly Bros. Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970). Where an appellant fails to challenge even one of the grounds, the appellate court may affirm the summary judgment on that ground alone. *See Trevino & Assoc. Mech., L.P.,* 400 S.W.3d 139, 144 (Tex.App.-Dallas 2013, no pet.). Although PEI and Rhetta do not include an issue on appeal attacking the trial court's summary judgment on fraudulent conveyance, they argue the merits of the claim in the body of their brief. Therefore, we construe the brief to adequately raise the point.

### 2. Declaratory Judgment

**[8]** **[9]** This court has previously stated that "in Texas, a deed is void if the grantee is not in existence at the time the deed is executed." *Lighthouse Church of Cloverleaf v. Tex. Bank,* 889 S.W.2d 595, 600 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Diane attached evidence to her summary judgment motion that established that Parham Partnership No. 2 was not in existence at the time the deed was executed; she provided a certificate from the Texas Secretary of State stating that there was no record of the existence of this entity. As outlined above, PEI and Rhetta do not dispute this point.

Instead, PEI and Rhetta assert that a deed is not void if the grantee exists but receives the deed in an assumed name, citing *Buist v. Connell,* 233 S.W.2d 458, 462 (Tex.Civ.App.-Eastland 1950, writ. ref'd). They contend that "the fact that Partnership directed that the deed be taken in the name of Parham Family Limited Partnership No. 2[ ] would not void or invalidate the deed under the assumed name statutes of Texas."

**[10]** In considering grounds for reversal, we are limited to those grounds expressly set forth in the summary-judgment motions, answers, or other responses, and may not rely on the appellate briefs or summary-judgment evidence. *D.M. Diamond Corp. v. Dunbar Armored,* Inc., 124 S.W.3d 655, 659–60 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (op. on reh'g) (citing Tex.R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993)). These grounds were not presented

to the trial court by PEI or Rhetta. Instead, PEI and Rhetta maintained **\*788** in the trial court that both the conveyance to "Parham Family Partnership No. 2" and the conveyance of Lot 1, rather than Lot 9, were "clerical errors" that properly could be corrected by a "correction deed" relating back to September 22, 2007. Thus, we may not consider this argument raised for the first time on appeal as a ground for reversing summary judgment.

In sum, Diane presented conclusive evidence that the deed from PEI, dated September 22, 2007, attempted to convey the subject property to a non-existent entity. "[I]n Texas, a deed is void if the grantee is not in existence at the time the deed is executed." *Lighthouse Church of Cloverleaf,* 889 S.W.2d at 600. Accordingly, Diane established as a matter of law that the September 22, 2007 deed was void. The trial court did not err in so declaring.

### 3. Fraudulent Transfer

 **[11]**    PEI and Rhetta argue that Diane was not entitled to summary judgment on her fraudulent transfer claim because there is a genuine issue of material fact as to both PEI's intent to fraudulently transfer the property and the reasonably equivalent value received for the property. PEI and Rhetta correctly argue that PEI's intent is an element running through several of Diane's theories of fraudulent transfer. For example, section 24.005(a)(1) permits Diane to avoid the transfer if the "debtor made the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com.Code Ann. § 24.005(a) (1). Alternatively, section 24.005(a)(2) permits Diane to avoid the transfer without proving PEI's intent if she establishes that PEI made the transfer without receiving a reasonably equivalent value in exchange for the transfer. Diane sought summary judgment on both subsections (1) and (2).

PEI and Rhetta responded with, *inter alia,* the affidavit of Rhetta. She averred that she was an officer and owner of PEI on September 22, 2007, when PEI made the subject transfer. She further stated that it was her intent to transfer the subject property to Partnership. Rhetta describes the conveyance and the amount paid for the subject property. Finally, Rhetta states that "[t]he sale of the property was done to either hinder, delay or defraud Diane Morgan fka Diane Parham." Thus, Rhetta's affidavit supplies conclusive evidence that she, on behalf of PEI, transferred the subject property with actual intent to hinder, delay, or default Diane as creditor in satisfaction of 24.005(a)(1). With such evidence of intent, the parties' dispute over whether the transferor paid reasonably equivalent value for the property under subsection (2) became immaterial. The trial court properly granted the summary judgment on the alternative basis urged.

We overrule PEI's and Rhetta's first issue.

### C. Injunctive Relief

In their second issue, PEI and Rhetta assert that the trial court abused its discretion in granting and enforcing a procedurally flawed temporary injunction and continuing it in its final judgment. Partnership and Van Jr. complain in their third issue that the trial court abused its discretion in issuing a "post-trial anti-suit permanent injunction against dismissed non-parties prohibiting them from prosecuting a quiet-title suit for real property." We address each of these issues in turn.

### 1. The Temporary Injunction Against PEI and Rhetta

We review a trial court's decision to grant a temporary injunction for an abuse of discretion. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). A temporary **\*789** injunction is an extraordinary remedy that does not issue as a matter of right. *Id.* Temporary injunction orders are strictly construed to ensure that they comply with Rule 683 of the Texas Rules of Civil Procedure. *Kaufmann v. Morales,* 93 S.W.3d 650, 653 (Tex.App.-Houston [14th Dist.] 2002, no pet.). An order that does not comply with this rule "is subject to being declared void and dissolved." *Qwest Comm'ns Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000).

 **[12]**    First, PEI and Rhetta assert that the temporary injunction issued against them in February 2009 in this case violates Rule 683 by referring to another document, the September 2007 warranty deed, as grounds for issuance and to describe the acts sought

to be enjoined. A temporary injunction shall be specific in its terms and shall describe in reasonable detail, not by reference to the complaint or other document, the act or acts to be restrained. Tex.R. Civ. P. 683. The order at issue here does not simply refer to another document; rather, it attaches the deed as an exhibit to the temporary injunction. "Rule 683 is not violated when documents are attached to the injunction and referred to it as part of the injunction because the attachments become part of the injunction itself." *Layton v. Ball,* 396 S.W.3d 747, 753 (Tex.App.-Tyler 2013, no pet.) (citing *Tex. Pet Foods, Inc. v. State,* 529 S.W.2d 820, 829 (Tex.Civ.App.-Waco 1975, writ. ref'd n.r.e.)).

 **[13]**   **[14]**   Next, PEI and Rhetta assert that the temporary injunction expired because the order stated it was set for trial on July 15, 2009. As noted above, however, there were numerous trial continuances. Further, at the hearing on Diane's motion for contempt filed against PEI and Rhetta for violation of the temporary injunction, held on October 12, 2011, counsel for PEI and Rhetta never asserted that the temporary injunction was no longer in effect. Instead, counsel asserted that their actions in filing a correction deed did not violate the temporary injunction. In the court's order of contempt against PEI and Rhetta, the trial court stated, "The Temporary Injunction issued by this Court was effective from February 13, 2009 and while this litigation is pending or until further order of this court ...." [15] Thus, PEI and Rhetta have not met their burden, as appellants, to establish that the February 2009 temporary injunction was not still in effect until the trial court entered a judgment on the merits of Diane's claim. *See, e.g., Butnaru,* 84 S.W.3d at 204 (providing that the purpose of a temporary injunction is to preserve the status quo pending a trial on the merits of the litigation's subject matter). [16]

 **[15]**   Finally, PEI and Rhetta assert that the trial court erred by continuing the February 2009 temporary injunction in the final judgment of the trial court. We agree with this portion of their issue. As noted above, the purpose of a temporary injunction is to preserve the litigation's **\*790** subject matter pending a trial on the merits. *Id.* This purpose is not served by continuing a temporary injunction in a final judgment; such a process effectively transforms a temporary injunction into a permanent injunction without a trial. *See EMC Mortgage Corp. v. Jones,* 252 S.W.3d 857, 866 (Tex.App.-Dallas 2008, no pet.) (op. on reh'g); *EOG Resources, Inc. v. Gutierrez,* 75 S.W.3d 50, 53 (Tex.App.-San Antonio 2002, no pet.); *cf. Kaufmann,* 93 S.W.3d at 657 ("There are at least two reasons for requiring a trial date on the [temporary injunction] order. One is to prevent the injunction from becoming permanent."). Thus, the trial court erred by continuing the February 2009 temporary injunction in the final judgment.

Accordingly, we sustain this portion of PEI and Rhetta's second issue and modify the trial court's judgment to remove the following language from it:

> The Court issued a Temporary Injunction against the Defendant Parham Enterprises, Inc. on February 13, 2009 and restrained the Defendant from deeding, transferring or conveying all or part of the subject property 18610 Tomato Street, Spring, Harris County, Texas 77379 from the date of the Order and while this cause was pending or until further order of the Court. This Temporary Injunction continues against the Defendant until 180 days after all appeals are completed or until further order from this Court.

We overrule this issue to the extent that it involves complaints about the temporary injunction prior to entry of the final judgment and the order of contempt based on it.

### 2. The Permanent Anti–Suit Injunction Against Partnership and Van Jr.

Partnership and Van Jr. assert that the trial court abused its discretion in entering a permanent "post-trial" anti-suit injunction against them because (a) they were no longer parties to the suit, (b) they had a legal right to pursue the action to quiet title in another court, and (c) the anti-suit injunction lacks both a cause of action and evidentiary support.

We begin by noting what is not disputed within this issue. First, Partnership and Van Jr. do not appeal the trial court's order striking their intervention. As such, Partnership and Van, Jr. do not have a justiciable interest in Diane's fraudulent transfer/ declaratory judgment action. Second, Partnership and Van Jr. did not file a motion to strike Diane's post-trial, pre-judgment amended petition naming them as intervenors and they do not appeal the trial court's grant of leave to file that petition.

Finally, although Partnership and Van Jr. complain that the court held a trial (against PEI on fees) without their participation, they do not complain that they were without notice or an opportunity to be heard on the anti-suit injunction. To the contrary, Partnership and Van Jr. participated in the hearing on the anti-suit injunction. Thus, we only address the sufficiency of the evidence to enter the anti-suit injunction.

[16] [17] We review an order granting a permanent injunction for an abuse of discretion. *Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.,* 975 S.W.2d 546, 560 (Tex.1998). "An anti-suit injunction is appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation." *Golden Rule Ins. Co. v. Harper,* 925 S.W.2d 649, 651 (Tex.1996). Although there are "no precise guidelines" for reviewing an anti-suit injunction, we **\*791** will uphold an injunction issued to protect a court's dominant jurisdiction where, if the enjoined party were allowed to proceed, the dominant court would lose its ability to proceed with the case. *See, e.g., Owens–Illinois, Inc. v. Webb,* 809 S.W.2d 899, 902 (Tex.App.—Texarkana 1991, no writ).

[18] Diane supported her request for anti-suit injunction with evidence that her suit pertained to title to the subject property, and that she filed the suit prior to Partnership and Van Jr.'s suit to quiet title in the subject property—also a suit pertaining to title. The evidence showed that Diane, a judgment creditor, filed her suit alleging that PEI, a judgment debtor, made a fraudulent conveyance of the subject property. Her pleading sought to set aside "the purported transfer" of the subject property.

At the time of Diane's request for anti-suit injunction, the trial court had already granted an affirmative motion for summary judgment on Diane's claims and declared the September 22, 2007 deed void. The trial court had already held the attempted correction deed of September 22, 2011, void as a violation of the court's injunction. Finally, the trial court determined that Partnership and Van Jr.'s lawsuit regarding the "deed/title to" the subject property is a "mirror lawsuit."

Partnership and Van Jr. offer no argument about how the two suits did not or would not interfere with one another. Partnership and Van Jr. confine their arguments to the impairment of their rights in the subject property. As noted above, however, Partnership and Van Jr. have not appealed the striking of their intervention, and they offer no argument on appeal in support of their rights to the fraudulently transferred property. Given the trial court's unchallenged ruling that Partnership and Van Jr. do not have a justiciable interest in the property, that court had the authority to enjoin them from contending otherwise in the probate court. If Partnership and Van Jr. are implying that Partnership accepted the transfer in good faith and for reasonably equivalent value, as recognized by Texas Uniform Fraudulent Transfer Act section 24.009(a), they neglected to preserve that argument in these proceedings through an appeal of their justiciable interest in the property. [17] *See* Tex. Bus. & Com.Code Ann. § 24.009(a) ("A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.")

We therefore conclude that the trial court did not abuse its discretion in entering an anti-suit injunction to protect its jurisdiction over the subject property.

## D. Segregation of Attorney's Fees

[19] In PEI's third issue, it asserts that Diane failed to segregate her attorney's fees. PEI further asserts that the appellate attorney's fees are not conditioned on Diane's prevailing on appeal.

[20] A failure to segregate attorney's fees can result in the recovery of no such fees. *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 389 (Tex.1997). But if no one objects to a jury charge in which the jury is not asked to segregate fees, then the objection is waived. *Jackson v. LongAgriBusiness, L.L.C.,* No. 14–11–01073–CV, 2013 WL 84921, at \*4 (Tex.App.-Houston [14th Dist.] Jan. 8, 2013, no pet.) (mem. op) (citing Tex.R.App. P. 33.1(a); **\*792** *Solis,* 951 S.W.2d at 389; *Ogden v. Ryals,* No. 14–10–01052–CV, 2012 WL 3016856, at \*4 (Tex.App.-Houston [14th Dist.] July 24, 2012, no pet.) (mem. op)). PEI-the only party

against whom fees were assessed-made no objection to the jury charge on attorney's fees. Thus, we do not address this portion of its issue. *See id.*

As to the remainder of PEI's third issue, the judgment conditions the award of appellate attorney's fees on PEI's *failure* on appeal:

> In the event of an appeal by the Defendant Parham Enterprises, Inc. to the court of appeals, if the appeal is unsuccessful, Plaintiff Diane Morgan will be further entitled to $25,000.00 as a reasonable attorney's fee; in the event of an appeal by the Defendant Parham Enterprises, Inc. to the Supreme Court of Texas, if the appeal is unsuccessful, Plaintiff Diane Morgan will be further entitled to $15,000.00 as a reasonable attorney's fee.

Such an award is tantamount to conditioning it on Diane's appellate success against PEI; for Diane to succeed on appeal, PEI must fail on its issues.

For the foregoing reasons, we overrule PEI's third issue.

## III. CONCLUSION

In sum, we have concluded that the trial court had subject matter jurisdiction over this case and that Diane had standing to bring her claims. We have accordingly overruled Partnership's and Van Jr.'s first and second issues. We have further determined that the trial court properly granted Diane's partial summary judgment on all bases; thus we have overruled PEI's and Rhetta's first issue. Further, we have overruled PEI's and Rhetta's third issue regarding segregation of attorney's fees.

The trial court did not abuse its discretion by enforcing the February 13, 2009 temporary injunction against PEI, and we lack jurisdiction to consider that portion of PEI's and Rhetta's complaint regarding the trial court's contempt order. However, the trial court did improperly include this temporary injunction in the final judgment, and we therefore have sustained in part PEI's second issue. We modify the trial court's judgment to remove the language concerning this temporary injunction from the final judgment. Finally, we have concluded that the trial court did not abuse its discretion in entering a permanent anti-suit injunction against Partnership and Van Jr. We thus overruled the third and final issue of Partnership and Van Jr.

We affirm the trial court's judgment as modified.

### Footnotes

1   This certificate notes that a similarly named entity, Partnership, had been identified through the Secretary of State's record search.
2   The parties variously spell this word as "intervenor" and "intervener." For consistency's sake, we spell it "intervenor" throughout this opinion, except where it has been quoted from the record.
3   Our record does not contain a copy of the motion for new trial/motion for reconsideration filed by Partnership and Van Jr.
4   The reporter's record from the pretrial conference reflects that Diane non-suited her claims against Rhetta for piercing the corporate veil regarding responsibility for attorney's fees. According to the trial transcript, the only issue thus remaining was Diane's attorney's fees against PEI.
5   Tex. Civ. Prac. & Rem.Code Ann. § 65.011.
6   *See Golden Rule Ins. v. Harper,* 925 S.W.2d 649, 651 (Tex.1996); *Bridas Corp. v. Unocal Corp.,* 16 S.W.3d 887, 891 (Tex.App.-Houston [14th Dist.] 2000, pet. dism'd w.o.j.).
7   *U.S. Fid. & Guar. Co. v. Beuhler,* 597 S.W.2d 523, 524 (Tex.Civ.App.-Beaumont 1980, no writ).
8   The word "Final" was struck out by the trial court and the word "Interlocutory" was handwritten above it. Language of finality was also struck from the end of the judgment.
9   The trial court filed findings of fact and conclusions of law on October 4, 2012, after Partnership and Van Jr. filed a notice that such findings and conclusions were past due and they had filed both a first and second request for them.

At the time this suit was filed, the amount in controversy ceiling for statutory county courts was $100,000. However, this amount was raised to $200,000 effective January 1, 2012. *See* Tex. Gov't Code Ann. § 25.0003(c)(1). Because Partnership and Van Jr. assert that Diane's allegations exceed even the current amount, we will refer to the current enactment for ease of reference.

Partnership and Van Jr. cite *Eris v. Giannakopoulos,* a case from our sister court, for the proposition that "[w]hen a suit is for an interest in real property or to foreclose a lien on real property, rather than damages, the value of the property interest at issue determines the amount in controversy." 369 S.W.3d 618, 622 (Tex.App.-Houston [1st Dist.] 2012, no pet.). In *Giannakopoulos,* the plaintiff did not contain a statement of jurisdiction or otherwise identify the amount in controversy. *Id.* at 622. Here, Diane's petition did contain a jurisdictional statement identifying an amount in controversy. Further, the plaintiff in *Giannakopoulos* brought suit to partition three separate but adjacent and contiguous properties, of which he owned a fifty percent interest. *Id.* at 619. The trial court granted a partition of the properties, dividing them into two equal-sized lots and awarding one to the plaintiff. *Id.* at 620. Diane, on the other hand, sued to have a title declared void, for fraudulent transfer, and for damages. Nowhere in her pleadings does she seek to obtain an interest in the property. Thus, the analysis in *Giannakopoulos* is inapplicable to the facts of this case.

See *infra* section B.3 regarding the trial court's summary judgment in favor of Diane on her fraudulent transfer claim.

As discussed above, Diane initially sued PEI and Rhetta, seeking to set aside the deed and for fraudulent transfer. Partnership and Van Jr. then intervened in the lawsuit asserting their interest as the purported grantee of the subject property. Diane added claims against them for conspiracy, but later nonsuited those claims. Their intervention was also struck on Diane's motion; they filed a motion for reconsideration/new trial. A permanent anti-suit injunction was entered against them in the trial court's final judgment, the propriety of which is addressed later in this opinion.

Diane does not appear to have been confused about the order. As PEI and Rhetta point out, Diane did not attempt to try the fraudulent transfer claim to the court or a jury. PEI and Rhetta characterize such failure as waiver. But Diane did not need to submit this claim to the jury; the trial court had already granted her summary judgment on it.

PEI and Rhetta also complain about the order of contempt, signed October 12, 2011, against them based on their violation of the temporary injunction. However, we lack jurisdiction to address complaints about the contempt order. *See Cadle Co. v. Lobingier,* 50 S.W.3d 662, 671 (Tex.App.-Fort Worth 2001, pet. denied) ("Decisions in contempt proceedings cannot be reviewed on appeal because contempt orders are not appealable, even when appealed along with a judgment that is appealable."); *see also In re B.A.C.,* 144 S.W.3d 8, 10–12 (Tex.App.-Waco 2004, no pet.) (listing cases).

We note that even if we were to declare the temporary injunction void, the contempt order based upon it is not reviewable by direct appeal. *See supra* note 15.

We note that Partnership and Van, Jr. have abandoned their claim in the trial court that they were necessary parties to the fraudulent transfer action.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4735602

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
Beaumont.

Chad POOLE and Terry Fendley, Appellants

v.

U.S. MONEY RESERVE, INC. d/b/a United States Rare Coin & Bullion Reserve, Appellee.

No. 09–08–137CV.   |   Submitted on June 26, 2008.   |   Delivered Oct. 30, 2008.

**Synopsis**

**Background:** Coin business filed suit against two of its former employees, alleging that defendants worked together to divert sales of coins from business's customers, and asserting violations of Deceptive Trade Practices Act, breach of employment agreement signed by former employees, and other claims. The 58th District Court, Jefferson County, Bob Wortham, J., issued temporary injunction prohibiting defendants from subsequent employment in gold coin industry for period of three years. Defendants filed interlocutory appeal.

**Holdings:** The Court of Appeals, Charles Kreger, J., held that:

[1] temporary injunction enforcing covenant not to compete executed by former employees, which prohibited them from engaging in any subsequent employment in that business throughout the United States, was overbroad;

[2] evidence supported trial court's implied finding that business would suffer a probable imminent and irreparable injury prior to trial; and

[3] temporary injunction order was void.

Reversed and remanded.

West Headnotes (3)

**[1]    Injunction**  🔑 Non-competition and non-solicitation issues

Temporary injunction enforcing covenant not to compete executed by former employees of coin business, which prohibited former employees from engaging in any subsequent employment in that business throughout the United States, was overbroad; former employees were salesmen, such that extension of prohibition to clients with whom former employees had no dealings during their employment was unreasonable, and, while former employees acknowledged in covenant that limitations as to time, geographic area, and scope of activity to be restrained were reasonable, this language alone was not outcome determinative.

3 Cases that cite this headnote

**[2]**  **Injunction**  ☞ Non-competition and non-solicitation issues

Evidence supported trial court's implied finding that coin business, prior to trial in its suit against former employees asserting breach of covenants not to compete contained in employment agreements signed by business's former employees, would suffer a probable imminent and irreparable injury, as necessary to support issuance of temporary injunction against former employees; former employee stipulated that he sold coins to customers on business's customer list after leaving business, business's chief executive officer (CEO) testified that he did not believe business's damages could be calculated exactly, former employee testified that he did not believe that he or other former employee could pay a substantial judgment, and former employees contractually agreed that business would suffer irreparable injury if restrictive covenants were breached.

1 Cases that cite this headnote

**[3]**  **Injunction**  ☞ Non-competition and non-solicitation issues

**Injunction**  ☞ Determination

Temporary injunction order enforcing covenant not to compete executed by former employees of coin business was void, as it did not set forth any reasons for issuance of temporary injunction or otherwise state any reason why the identified probable injury was an irreparable one for which business has no legal remedy, nor did order include a date setting matter for trial, as required by rule governing form and scope of injunctions, but instead, order attempted to enjoin former employees through a date certain in the future, and order was overly broad. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

2 Cases that cite this headnote

On Appeal from the 58th District Court, Jefferson County, Texas, Trial Cause No. A–180,741, Bob Wortham, J.

**Attorneys and Law Firms**

Todd C. Collins, Glast, Phillips & Murray, P.C., Mark E. Dykes, Houston, TX, for appellants.

Glen W. Morgan, Chris Portner, Reaud, Morgan & Quinn, LLP, Beaumont, TX, for appellee.

Before GAULTNEY, KREGER, and HORTON, JJ.

**MEMORANDUM OPINION**

CHARLES KREGER, Justice.

**\*1**  Appellants, Chad Poole and Terry Fendley, filed this interlocutory appeal after the trial court issued a temporary injunction prohibiting them from subsequent employment in the gold coin industry for a period of three years. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon 2008). We hold that, while the trial court did not abuse its discretion in granting a temporary injunction to preserve the status quo, it did abuse its discretion in crafting the temporary injunction order. We declare the temporary injunction order void and dissolve the order because it is overly broad and fails to comply with Rule 683 of the Texas Rules of Civil Procedure. TEX.R. CIV. P. 683.

## FACTUAL AND PROCEDURAL BACKGROUND

U.S. Money Reserve, Inc. d/b/a United States Rare Coin & Bullion Reserve ("U.S. Money Reserve") filed suit against a group of former employees, including appellants, Chad Poole and Terry Fendley, alleging that appellants orchestrated a conspiracy to defraud U.S. Money Reserve and its customers. U.S. Money Reserve alleged specifically that defendants worked together to divert sales of coins from customers of U.S. Money Reserve and set up a scheme to abscond customer leads and divert sales to other defendant companies. The petition alleged that defendants received cash payments for diverting sales to the other companies. The petition sought among other remedies, a temporary restraining order, temporary injunction, and permanent injunctive relief. The petition asserted that the acts of defendants constituted violations of the Deceptive Trade Practices Act as well as a breach of the employment agreement signed by defendant-employees. U.S. Money Reserve further alleged tortious interference with its business relationships and misappropriation of trade secrets.

The trial court entered a temporary injunction on February 22, 2008, preventing Poole and Fendley [1] from soliciting existing or potential clients of U.S. Money Reserve or otherwise engaging in any similar business in the United States through January 25, 2011. The Temporary Injunction states in part that Poole and Fendley:

> shall not call upon, solicit, divert, take away, and/or attempt to call upon, solicit, divert, or take away any existing or potential clients, customers, suppliers, businesses, and/or accounts of U.S. Money Reserve, Inc. d/b/a United States Rare Coin & Bullion Reserve (hereinafter referred to as "Company") in connection with any business similar or related to the business in the United States, nor will Defendant[s] ... interfere or compete with the Company in connection with such clients, customers, suppliers, businesses, and accounts in the United States before 01/25/2011.
>
> The Order further provides:

> Defendant[s] ... shall not solicit the hiring of any present or future salesman or consultant of the Company before 01/25/2011.

> Defendant[s] ... shall not engage in, or give any advice to any person, firm, partnership, associations, corporation, and/or other entity engaged in a business similar to or related to the business of the Company or any portion thereof in the United States before 01/25/2011.

> **\*2** Defendant[s] ... shall not lend credit, money, or reputation for the purpose of establishing or operating a business similar or related to the business of the Company or any portion thereof in the United States before 01/25/2011.

Fendley and Poole contend in three issues that the trial court abused it discretion 1) in reaching the implied finding that U.S. Money Reserve had a probable right to the relief sought; 2) by entering a temporary injunction that was overbroad; and 3) in reaching the implied finding that U.S. Money Reserve would suffer a probable, imminent, and irreparable injury. Appellants argue in conjunction with their third issue that the trial court's order granting the temporary injunction is void because it fails to comply with Rule 683 of the Texas Rules of Civil Procedure.

## STANDARD OF REVIEW

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002) (citing *Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex.1993)). Its purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Wright v. Sport Supply Group, Inc.,* 137 S.W.3d 289, 292 (Tex.App.-Beaumont 2004, no pet.) (citing *Butnaru,* 84 S.W.3d at 204). "The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *CRC–Evans Pipeline Int'l, Inc. v. Myers,* 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ) (citing *Walling,* 863 S.W.2d at 58).

Likewise, we review only the trial court's exercise of discretion in determining whether U.S. Money Reserve showed a probability of success on the merits at trial and that it would suffer imminent, irreparable injury if the temporary injunction were not granted. *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 882–83 (Tex.App.-Dallas 2003, no pet.). "In making that determination on appeal, we do not substitute our judgment for that of the trial court, but determine only whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion." *Id .* at 883. "[W]e must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor...." *IAC, Ltd. v. Bell Helicopter Textron, Inc.,* 160 S.W.3d 191, 196 (Tex.App.-Fort Worth 2005, no pet.). "When the trial court bases its decision on conflicting evidence, there is no abuse of discretion." *Tom James,* 109 S.W.3d at 883. A trial court

> abuses its discretion when it misapplies the law to established facts or when the evidence does not reasonably support the trial court's determination of the existence of probable injury or probable right of recovery. We review de novo any determinations on questions of law the trial court made in support of its order. However, we only review the trial court's decision on the issues before the court.

 **\*3** *Id.* (citations omitted). We recognize that the trial court's order is "based on the record presented at the temporary injunction hearing." ,*Id.* at 885. "We will not assume that the evidence taken at a preliminary hearing will be the same as the evidence developed at a full trial on the merits." *Id.* Thus, our review of the trial court's order is limited to whether the trial judge abused its discretion in granting the temporary injunction on the record before it. *Id.*


## PROBABLE RIGHT TO RELIEF SOUGHT

"To obtain a temporary injunction, an applicant must plead and prove three specific elements (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury before trial." *Wright,* 137 S.W.3d at 292. The first element is not disputed. Appellants contend that the trial court erred in impliedly finding that a probable right to relief existed and in entering the temporary injunction. Specifically, appellants contend that the covenant not to compete is overbroad in that it contains an industry-wide exclusion preventing appellants from calling upon or soliciting any existing or potential clients within the United States and prevents appellants from engaging in any business similar to or related to the business of U.S. Money Reserve throughout the United States.

 **[1]** An interlocutory appeal from "an order granting or denying a temporary injunction based on a covenant not to compete does not present for appellate review the ultimate question of whether the covenant is enforceable under section 15.50 of the [Texas] business and commerce code." *Tom James,* 109 S.W.3d at 882–83 (citing TEX. BUS. & COM.CODE ANN. § 15.50 (Vernon 2002)). We will only address the enforceability of those provisions insofar as it affects our analysis of whether the elements required for issuance of a temporary injunction have been satisfied. *See id.* at 883–85. The employment agreements which contain the covenants at issue in this lawsuit provide as follows:

> 15. *Unauthorized Competition Prohibited.* The Employee expressly agrees that the Employee shall not, for a period of five (5) years after termination of the Association or employment between Employer and Employee, without prior written consent of the Employer, directly or indirectly through any corporation, organization or entity owned or controlled by the Employee, or as principal, agent, joint venture, employee, employer, consultant, partner, stock holder or holder of any equity or security ..., in any other individual, representative or corporate capacity whatsoever:

> a) Call upon, contact, solicit, divert, take away, or attempt to call upon, contact, solicit, divert or take away any existing or potential clients, customers, suppliers, businesses, or accounts of the Employer in connection with any business similar or related to the business within the above defined geographical area; nor will the Employee interfere with or compete with the Employer in connection with such clients, customers, suppliers, businesses, and accounts in the geographical area. **The term client or customer as referenced in this covenant includes:** (1) any clients or customers for whom Employer provided services at any time during Employee's employment with Employer; and (2) any prospective clients

or customers to whom Employer had submitted a proposal for services as of the effective date of Employee's termination of employment with Employer.

**\*4** b) Solicit for hiring, or hire, any past, present or future employee, agent, representative or consultant of the Employer.

c) **Engage in,** or give any advice to any person, firm, partnership, associations, corporation, or other entity engaged in **a business similar to or related to the business of the Employer or any portion thereof** in the geographical area.

d) Lend credit, money, or reputation for the purpose of establishing or operating a business similar to the business, or any portion thereof, of the Employer in the geographical area.

e) **Accept employment or pay from any person, firm, operation, partnership, association, or any other entity engaged in a business similar to or related to the business of the Employer anywhere within the United States,** United Kingdom and Canada. This provision specifically includes existing competitors of the Employer, and any potential, future competitors of Employer. This provision also specifically prohibits Employee from forming a competitive Employer or organization as an owner, sole proprietor, partner, joint venturer (or in any other ownership capacity) competing against Employer. Similarly, this provision specifically prohibits Employee from getting or giving any advice, knowledge or information from or to any person, firm, partnership, association, corporation, or other entity engaged in a business similar to or related to the business of Employer or any portion thereof, within the United Kingdom, Canada or the United States.

f) It is expressly agreed, stipulated and understood by the Employee that the services of the Employer have been and are currently being marketed and sold in the geographical area described above, and it is the Employer's intent to continue to expand the marketability of its services and products. Accordingly, **these covenants are intended to restrict the Employee from competing in any manner with the Employer in the activities, which have heretofore been carried on, by the Employee or any portion thereof or any activities similar or related** thereto within the geographical area....

(Emphasis added).[2] The geographical area is not specifically defined in the agreements of Poole and Fendley, however, at the hearing Poole and Dean Liepsner, C.E.O of U.S. Money Reserve, testified the geographic area encompassed the entire United States. This is consistent with both the trial court's order and the terms of the restrictive covenants.

Appellants contend that because the covenant contains an industry-wide exclusion it is overbroad and unenforceable and does not give rise to a probable right to the relief sought. Appellants further contend that because the trial court's order implements the industry-wide exclusion set forth in the restrictive covenants, it is likewise overbroad and unenforceable. While we do not undertake to consider the ultimate issue of whether the covenant is enforceable under current law, we hold, based on the facts established by the record, that the trial court abused its discretion in enjoining appellants from engaging in any subsequent employment in that industry throughout the United States.

**\*5** U.S. Money Reserve argues that this case is governed by *Alex Sheshunoff Management Services, L.P. v. Johnson,* 209 S.W.3d 644 (Tex.2006), while appellants contend it is governed by *Peat Marwick Main & Co. v. Haass,* 818 S.W.2d 381 (Tex.1991) and *Wright,* 137 S.W.3d at 289. The parties argued the enforceability of the covenants not to compete at the temporary injunction hearing. "The enforceability of a covenant not to compete ... is a question of law for the court." *Light v. Centel Cellular Co. of Tex.,* 883 S.W.2d 642, 644 (Tex.1994). Our analysis merits a discussion of the cases cited by both parties.

Section 15.50(a) of the Texas Business & Commerce Code provides that

> a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Additionally, section 15.51(b) provides that "[i]f the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, for a term or at will, the promisee has the burden of establishing that the covenant meets the criteria specified by Section 15.50...." *Id.* § 15.51(b) (Vernon 2002).

In *Haass,* the Texas Supreme Court held that "a damages provision affecting the right to render personal services operates as a restraint of trade and must be judged by the reasonableness standards for covenants not to compete [.]" *Haass,* 818 S.W.2d at 382. The underlying dispute in *Haass* began with the merger of two accounting firms, CJ and MH. *Id.* The Court recognized that the relevant reasonableness questions with respect to the contractual provision at issue were whether the restraint imposed by the provision was greater than required to protect MH's legitimate interests and whether MH's need outweighed the hardship to Haass or the damage to the public. *Id.* at 386. The Court in *Haass* found significant that the contract provisions operated prospectively to include clients that became clients after the departing partner had already left the firm. *Id.* In addition, the provision also expressly included any of MH's clients worldwide, not just those with whom Haass had some actual contact. *Id.* The Court stated,

> These aspects of the provision the court of appeals concluded were unreasonable because they were overbroad, oppressive to Haass because he "would have to, in effect, take a prospective client's accounting history," and injurious to the public by limiting the choice of accountants.
>
> The court of appeals' conclusion is supported by decisions from other jurisdictions. The fundamental legitimate business interest that may be protected by such covenants is in preventing employees or departing partners from using the business contacts and rapport established during the relationship of representing the accounting firm to take the firm's customers with him.

**\*6** *Id.* at 386–87 (citations omitted).

The Court concluded that in the context of the accounting firm merger at the center of dispute in *Haass,* the protectible fundamental business interest included preserving the client base that MH acquired by merging with CJ. *Id.* at 387. The Court recognized that in order to meet the reasonableness standard there should be a "connection between the personal involvement of the former firm member with the client." *Id.* The Court stated that "[i]nhibiting departing partners from engaging accounting services for clients who were acquired after the partner left, or with whom the accountant had no contact while associated with the firm, does not further and is not reasonably necessary to protect" the relevant business interest. *Id.* at 388. Therefore, the Court held the provision was "overbroad and unreasonable." *Id.* Notably, *Haass* was not a case involving a review of the trial court's grant of a temporary injunction; however, our decision in *Wright* was such a case. *See Wright,* 137 S.W.3d at 291.

In *Wright,* we considered whether the trial court abused its discretion in entering a temporary injunction to enforce a covenant, which like the restrictive covenant in the present case, contained an industry-wide exclusion, prohibiting the former employee from engaging in any sales activities in any related business across several counties. *See id.* Specifically, the agreement prohibited Wright, a former salesman for Sport Supply Group, Inc. ("SSG") from, "either directly or indirectly, conducting any sales related activities for a business related to the promotion, marketing, distribution, manufacturing, sourcing, importing and/or sale of sports related equipment and/or supplies to institutional customers" in twenty-nine counties. *Wright,* 137 S.W.3d at 291, 298. The agreement further prohibited Wright from doing business with the "customers, suppliers, clients, licensors, licensees, distributors, dealers, or independent salespersons of SSG, or any [of] its affiliates" that conducted business in Wright's sales district. *Id.* at 298.

In *Wright* we stated that "[a] restrictive covenant is unreasonable unless it bears some relation to the activities of the employee." *Id.* (citing *Haass,* 818 S.W.2d at 386–87). Additionally, we recognized that "[a] covenant not to compete that contains an industry-wide exclusion from subsequent employment is unenforceable." *Id.* (citing *John R. Ray & Sons, Inc. v. Stroman,* 923 S.W.2d 80, 85 (Tex.App.-Houston [14th Dist.] 1996, writ denied)). Further, we stated, "a covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable." *Id.* We held the covenants at issue

were unreasonable restraints of trade because they did not limit the prohibitions to customers with whom Wright had dealings while he was employed by SSG. *Id.* Consequently, we held that the trial court abused its discretion by granting the temporary injunction. *Id.*

 **\*7** In *Sheshunoff,* the Texas Supreme Court addressed the enforceability of a restrictive covenant with no geographic restriction that prohibited a former employee, Kenneth Johnson ("Johnson") from providing consulting services to any former customers of his former employer, Alex Sheshunoff Management Services, L.P. ("ASM"), or from soliciting any affiliation member or previously identified prospective client or affiliation member. *Sheshunoff,* 209 S.W.3d at 646–47. ASM provided consulting services to banks and other financial institutions. *Id.* Johnson was the director of the company's "Affiliation Program," a program designed to maintain relationships with clients and prospective clients. *Id.* A few months after being promoted to director of the affiliation program, Johnson signed an employment agreement, which he was told was a condition of his continued employment. *Id.* The agreement provided in pertinent part:

> (a) In consideration of the training and access to Confidential Information provided by Employer ... for a period of one (1) year following the termination of Employee's employment for any reason, Employee will not

> (i) directly or indirectly, as an owner, employee, independent contractor or otherwise, provide consulting services to banks, savings and loans or other financial institutions where the Employee has provided fee based services in excess of 40 hours within the last year of employment, or with which Employee has conducted significant sales activity, including, but not limited to, more than one sales call, preparation of a sales proposal and actual sales, within the last year of employment. This restriction applies regardless of geographic location, it being acknowledged by the parties that Employer's clients are not confined to a particular geographic area;

> (ii) solicit or aid any other party in soliciting any affiliation member or previously identified prospective client or affiliation member; or

> ....

> (b) Employee understands and acknowledges that Employer has made substantial investments to develop its business interests and goodwill, and to provide special training to Employee for the performance of Employee's duties under this Agreement. Employee agrees that the limitations as to time, geographical area, and scope of activity to be restrained contained in this Paragraph 6 are reasonable and are not greater than necessary to protect the goodwill or other business interests of Employer.

*Id.* at 656.

ASM brought an action to enforce the agreement after Johnson left and went to a competitor, Strunk & Associates, L.P. ("Strunk"). *Id.* at 647. Johnson argued that the covenant was overbroad because 1) its restriction on his solicitation of certain ASM's prospective clients and "affiliation members" was unrelated to any training or confidential information he received; 2) ASM's protection of its goodwill was unrelated to any such information; and 3) there was no basis for restricting Johnson from calling on ASM's clients of whom he was aware before signing the agreement. *Id.* at 657. The Court disagreed noting that with Johnson's help, as director of affiliation, ASM continued to develop clients for four years after the agreement was signed. *Id.* In addition, Johnson helped develop ASM's goodwill and could have tried to unfairly capitalize on it after going to Strunk. *Id.*

 **\*8** The Court found significant that Johnson was privy to ASM's development of an overdraft protection product, while Strunk was the market leader for such products. *Id.* at 647, 657. The Court noted that the record established that the covenant would have prevented Johnson from calling on 821 ASM clients for one year. *Id.* at 657. Finally, the Court took into consideration the fact that Johnson had admitted in his agreement that his covenant with ASM was reasonable [3] and had testified that "[w]hen [he] began work with Strunk, he agreed he would not sell an overdraft protection product ... to anyone in the industry ... for two years after leaving Strunk's employment," which Johnson further testified was reasonable. *Id.* The Court concluded the covenant in Johnson's agreement with ASM was reasonable. *Id.*

*Sheshunoff* is distinguishable from the present case in that while ASM's restrictive covenant contained no geographic limitation, it only prevented Johnson from soliciting prior clients with whom he had personal contact or any "previously identified prospective client or affiliation member." *Id.* at 647. Here, in addition to preventing Poole or Fendley from contacting existing and potential clients, the temporary injunction order prevents Poole and Fendley from engaging in any similar or related business, in any capacity. Moreover, Johnson's job duties specifically involved client development and maintaining relationships with prospective clients. Therefore, the restrictions in the covenant were directly related to Johnson's activities as an employee of the company. Like the defendant-employees in *Haass* and *Wright,* Poole and Fendley were salesmen. The law is well settled in Texas that "[i]n the case of covenants applied to a personal services occupation, such as that of a salesman, a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his [or her] employment." *Stroman,* 923 S.W.2d at 85 (citing *Haass,* 818 S.W.2d at 386–88; *Daytona Group of Tex., Inc. v. Smith,* 800 S.W.2d 285, 288 (Tex.App.-Corpus Christi 1990, writ denied)). As the Court stated in *Haass,* there should be a connection between the personal involvement of the former employee and the client. *Haass,* 818 S.W.2d at 387. The Court's subsequent decision in *Sheshunoff* did not change the law in this regard.[4]

U.S. Money Reserve argues that the court's order is reasonable based on the express provisions of the covenant wherein the employees acknowledged "that the limitations as to time, geographic area, and scope of activity to be restrained are reasonable...." The Court in *Sheshunoff* analyzed the reasonableness of a covenant which included virtually identical language. *Sheshunoff,* 209 S.W.3d at 656. Notably, while the Court considered the language in making its determination, the language alone was not outcome determinative. *See id.* at 657. Likewise, this court addressed an agreement in *Wright* which contained a provision that remedies at law for any breach or attempted breach of the agreement would be inadequate and waived as a defense that either party had an adequate remedy at law. *Wright,* 137 S.W.3d at 293–94. We noted that we were unaware of any Texas case holding that such agreements, alone, were controlling on those issues; however, we recognized Texas's strong public policy in favor of preserving freedom of contract. *Id.* at 294. We considered the language of the agreement together with other evidence established by the record, including testimony that SSG's damages would have been difficult to calculate. *Id.* at 293–94. Following this approach, we conclude that the language of the agreement at issue here is but one consideration in our analysis to be viewed in conjunction with the record in its entirety. *See Wright,* 137 S.W.3d at 293–94; *see also Sheshunoff,* 209 S.W.3d at 657.[5]

**\*9** In addition to relying on the contract's express language, U.S. Money Reserve argues that the restraints found in the temporary injunction are reasonable because of the nature of its business. U .S. Money Reserve asserts that the key to its success in the coin business is its marketing. It further argues that because of its tremendous investment and experience in marketing in the coin industry, it has learned which techniques are effective, and its salesman are provided with confidential information about the company's marketing techniques, which would give them an unfair advantage in the national coin market if they were allowed to work for a competitor. Leipsner testified that in addition to the company's customer list, the marketing materials the company puts together are protected confidential information. Leipsner explained that the company discusses the marketing materials with its salesmen before the materials are distributed to the public. This is done so that the company's salesmen will be adequately prepared to answer sales calls from the public following the company's advertising or media campaigns.

Nonetheless, it is undisputed that Poole and Fendley worked in sales. While marketing and advertising materials may have been reviewed or discussed with Poole or Fendley prior to public distribution, neither Poole nor Fendley were shown during the hearing to have been hired to head up or develop the company's marketing efforts. Poole testified that he had "no idea" how the company determined what to include in its advertising. Poole testified that his job responsibilities as a salesman were limited to making sales calls and acting as a team leader for his sales team. Likewise, Poole testified that his job responsibilities did not include determining which cities the ads would run in. While Leipsner testified that his salespeople were privy to "the rationale and the way that we put things together" in terms of marketing and advertising, he admitted that crafting this type of information was not part of Poole's or Fendley's job responsibilities.

Viewing the record in its entirety and in the light most favorable to the trial court's order, we hold that the trial court abused its discretion in entering a temporary injunction order that was overbroad.[6] Therefore, we overrule issue one and sustain issue two.

Courts are generally required to reform overbroad convenants to the extent necessary to protect the business interest at issue. *See* TEX. BUS. & COM.CODE ANN. § 15.51(c); *see also* TEX.R.APP. P. 43.3. An exception to this rule exists where remand is necessary for further proceedings. TEX.R.APP. P. 43.3(a); *see also Wright,* 137 S.W.3d at 299. Our determination of appellants' final issue requires that we dissolve the order granting the temporary injunction.

## IRREPARABLE INJURY

 **[2]**    Appellants argue in issue three that the trial court abused its discretion in reaching the implied finding that U.S. Money Reserve would suffer a probable, imminent, and irreparable injury. Specifically, appellants argue that there is an adequate legal remedy when damages for breach of contract are available thus, precluding injunctive relief. U.S. Money Reserve argues that the trial court did not abuse its discretion in reaching the implied finding that U.S. Money Reserve would suffer a probable, imminent, and irreparable injury because 1) Poole testified that he does not believe that he or Fendley would have the money to pay a substantial judgment; 2) the damages suffered by U.S. Money Reserve are incapable of being measured by any certain pecuniary standard—particularly, the damage to its relationship with its client-base; and 3) appellants contractually agreed that U.S. Money Reserve would suffer an irreparable injury if the restrictive covenants were breached and that damages would be difficult, if not impossible, to calculate.

 **\*10**  "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru,* 84 S.W.3d at 204. Damages are inadequate, so as to support a temporary injunction, if they are difficult to calculate. *Rollins v. Universal Coin & Bullion Ltd.,* No. 09–06–150 CV, 2006 Tex.App. LEXIS 8764, at \*13, 2006 WL 2883122 (Tex.App.-Beaumont Oct.12, 2006, no pet.) (mem.op.). Additionally, "[a]n abuse of discretion does not occur when [a] trial court bases its decision on conflicting evidence." *NMTC Corp. v. Conarroe,* 99 S.W.3d 865, 868 (Tex.App.-Beaumont 2003, no pet.). Here, Poole stipulated that he sold coins to customers on U.S. Money Reserve's customer list after leaving the company. He also admitted that U.S. Money Reserve could no longer "take [him] at [his] word" when he says he will not contact their customers.

In support of their argument that the trial court abused its discretion, appellants point out that Leipsner testified that U.S. Money Reserve suffered a twenty percent decline in revenues since appellants left the company, as well as a five percent increase in gold orders returned to the company since appellants left. Based on this testimony, appellants argue that damages are capable of ready calculation. However, Leipsner also testified that he did not believe that damages could be calculated exactly. While Leipsner admitted placing a $250,000 liquidated damage value on aspects of appellants' conduct, he testified additionally that the long-term effects of appellants conduct also needed to be taken into account. Moreover, while Poole testified that he may be able to take out a loan to satisfy a judgment in the nature of $20,000, he also testified that he did not think he would be able to satisfy a judgment in the neighborhood of $50,000 and certainly not a judgment for $250,000. Poole testified that in his opinion Fendley would also not be able to satisfy such a judgment. [7]

U.S. Money Reserve points to the contract language, arguing that appellants expressly agreed in the employment agreement that U.S. Money Reserve would suffer an irreparable injury if the restrictive covenants contained within the contracts are breached. Further, appellants expressly acknowledge in the contract that it would be difficult, if not impossible, to calculate damages as a result of a breach of the restrictive covenants. Considering the language in the contract in conjunction with the testimony in the record, we cannot say the trial court erred in making the implied finding that U.S. Money Reserve, prior to trial, would suffer a probable imminent and irreparable injury. Issue three is overruled.

## COMPLIANCE WITH RULE 683

 **[3]**    In conjunction with their final issue, Appellants argue that the order granting the temporary injunction is void under Rule 683 of the Texas Rules of Civil Procedure. U.S. Money Reserve argues that appellants have waived any right to raise that issue on appeal. Rule 683 provides in pertinent part:

 **\*11**   Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought.

TEX.R. CIV. P. 683. We recognized in *International Brotherhood of Electrical Workers Local Union 479 v. Becon Construction Co. Inc.,* 104 S.W.3d 239, 244 (Tex.App.-Beaumont 2003, no pet.), that "[t]he reasons given by the trial court for granting a temporary injunction must be specific and legally sufficient, and not mere conclusory statements." We stated,

> [B]ecause probable injury subsumes the elements of irreparable injury and no adequate remedy at law, a valid injunction must articulate the reasons why the identified probable injury is an irreparable one for which [applicants] have no adequate legal remedy. Consequently, the specificity required by Rule 683 is not satisfied by the mere recital of no adequate remedy at law and irreparable harm.

*Id.* (citations and internal quotation marks omitted). We concluded that " '[t]he failure to include in the order a reason why the court deems issuance of the writ proper for preventing injury to the applicant is reversible error.' " *Id.* (quoting *Stoner v. Thompson,* 553 S.W.2d 150, 151 (Tex.Civ.App.-Houston [1st Dist.] 1977, writ ref'd n.r.e.)).

In *Int'l Brotherhood,* we addressed the issue of whether the requirements of Rule 683 could be waived. *Id.* at 243. We recognized that in *InterFirst Bank San Felipe, N.A. v. Paz Construction Co.,* the Texas Supreme Court held that the requirements of Rule 683 are mandatory and must be strictly followed. *Id.* (citing *InterFirst,* 715 S.W.2d 640, 641 (Tex.1986)). "[W]hen an order of temporary injunction fails to adhere to these requirements it is subject to being declared void and dissolved." *Id.* In *Int'l Brotherhood* we rejected the argument that appellants waived any issues concerning failure to comply with Rule 683 and held, in line with the great weight of authority following *InterFirst,* that a defective order granting a temporary injunction could not be validated by means of waiver. *Id.*

Here, U.S. Money Reserve argues that appellants waived the right to raise this issue on appeal not only because they failed to raise it in the trial court, but also because appellants agreed to the court's judgment, wherein the phrase "Agreed as to Form Only" prefaced appellants' counsel's signature. The San Antonio Court of Appeals recently addressed this very issue. *See In re Garza,* 126 S.W.3d 268 (Tex.App.-San Antonio 2003, orig. proceeding [mand. denied] ).

 **\*12**  In *Garza,* appellant argued that because "the temporary injunction failed to (1) set a trial setting pursuant to Texas Rule of Civil Procedure 683 and (2) set bond pursuant to Texas Rule of Civil Procedure 684, the temporary injunction [was] void." *Id.* at 270. In response, appellee argued that Garza "waived her complaint by agreeing to the terms of the temporary injunction." *Id.* Specifically, the temporary injunction stated that the parties agreed to the terms of the order as evidenced by their signatures, which were prefaced by the phrase "Approved as to Form Only." *Id.* Appellee argued that appellant was barred from complaining about the order on appeal relying on case law stating that "a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation." *Id.* (citing *Henke v. Peoples State Bank,* 6 S.W.3d 717, 720 (Tex.App.-Corpus Christi 1999, pet. dism'd w.o.j.)).

The court in *Garza* recognized that "[a] void order has no force or effect and confers no rights; it is a mere nullity." *Id.* at 271 (citing *Slaughter v. Qualls,* 139 Tex. 340, 345, 162 S.W.2d 671, 674 (1942)). Thus, the court concluded, "a party who agrees to a void order has agreed to nothing." *Id.* The court then undertook to determine whether the trial court's order granting the

temporary injunction was "void" or merely "voidable ." *Id.* The court recognized that the Texas Supreme Court spoke to this issue in *Qwest Communications Corp. v. AT & T Corp.,* 24 S.W.3d 334 (Tex.2000) (per curiam).

In *Qwest* appellants argued that the trial court's order was not a temporary injunction because it failed to set the case for trial on the merits or set a bond as required by Rules 683 and 684 of the Texas Rules of Civil Procedure. *Quest,* 24 S.W.3d at 337 (citing TEX.R. CIV. P. 683, 684). The Court disagreed stating,

> These procedural requirements are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved. In *InterFirst Bank,* however, the order failed to set the case for trial on the merits. Yet rather than dismissing the appeal for want of jurisdiction, we declared the temporary injunction void and ordered it dissolved. We have also held that a temporary injunction was void when there was no bond. Here, these procedural requirements may render the trial court's order void but they do not change the order's character and function defining its classification.

*Id.* (citations omitted). Based on this language, the court of appeals in *Garza* concluded that unless a temporary injunction complies with Rules 683 and 684, it is void. *Garza,* 126 S.W.3d at 273; *see also* Int'l Brotherhood, 104 S.W.3d at 244. Based on the Court's holding in *Qwest,* the court in *Garza* held that the temporary injunction, which failed to comply with Rules 683 and 684, was void even though the parties expressly agreed to the temporary injunction order. *Garza,* 126 S.W.3d at 273. The Texas Supreme Court recently clarified its holding in *Interfirst* stating "[o]rders that fail to fulfill [the] requirements [of Rule 683] are void." *In re Office of the Attorney General,* 257 S.W.3d 695, 697 (Tex.2008) (per curiam).

 **\*13**  The trial court's order granting the temporary injunction in favor of U.S. Money Reserve does not set forth any reasons for issuance of the temporary injunction or otherwise state any reason why the identified probable injury is an irreparable one for which U.S. Money Reserve has no legal remedy. Further, the order does not include a date setting the matter for trial as required by Rule 683. TEX.R. CIV. P. 683. Instead, the order attempts to enjoin the parties through a date certain in the future, January 25, 2011. The purpose of a temporary injunction is to preserve the status quo through the date of trial. *See Butnaru,* 84 S.W.3d at 204.

While the trial court did not abuse its discretion in granting a temporary injunction to maintain the status quo, it did abuse its discretion in entering the temporary injunction order as crafted. We hold that the temporary injunction order is void as it is overly broad and fails to comply with the requirements of Rule 683. TEX.R. CIV. P. 683. We dissolve the temporary injunction.

REVERSED AND REMANDED.

**Parallel Citations**

28 IER Cases 629

Footnotes

| | |
|---|---|
| 1 | We note that the court's order appears to have erroneously misspelled Terry Fendley's name as "Terry Finley." |
| 2 | We note that while appellants argue that the trial court's order follows the language of the restrictive covenants in their employment agreements verbatim, this is not the case. The language in Poole's and Fendley's agreements differed from the language in some of the older employment agreements, which appear to have been inadvertently referenced by appellants in their brief. A significant difference in the agreements at issue and the agreement referenced is that the term "clients" is defined in the agreements of Poole and Fendley as set forth above. Likewise, the agreement set forth above is the agreement that Poole authenticated and testified to during the hearing. While existing and potential customers and clients are defined in these employment agreements, the trial court's order granting the temporary injunction made no attempt whatsoever to define "existing or potential clients or customers." |
| 3 | *See Sheshunoff,* 209 S.W.3d at 656. |
| 4 | We note that Texas decisions analyzing the reasonableness of time, geography, and scope of activities restricted in covenants not to compete are fact-specific and those decisions vary depending largely on the particular facts and circumstances of each individual |

case. The nature of the employer's business and the job responsibilities and involvement of the subject employee are usually taken into account. For example, we note that other courts have found nation-wide exclusions reasonable where the covenant accompanied the sale of a business and was enforced against its prior owner. *See Vais Arms, Inc. v. Vais,* 383 F.3d 287, 295–96 n. 20 (5th Cir.2004) (citing *Williams v. Powell Elec. Mfg. Co.,* 508 S.W.2d 665, 668 (Tex.Civ.App.-Houston [14th Dist.] 1974, no writ) (nationwide injunction not an abuse of discretion where business sold was national in character)) (geographic scope of noncompete agreement was reasonable and enforceable against prior business owner where business owner had advertised his product in nationally-distributed trade publications, mail order catalogues, and the internet). In those cases, the individual restricted by the covenant had a more unique and specialized knowledge of the business and the business interests at issue. *See also Curtis v. Ziff Energy Group, Ltd.,* 12 S.W.3d 114, 118–19 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (restrictive covenant upheld against the former Vice President of Pipelines and Energy Marketing, which prevented him from working for any similar company in North America for a period of six months, where former Vice President was hired to "head up and build up the U.S. practice in the areas of consulting regarding pipeline/transportation issues, and energy marketing).

5    We note that this analysis is in line with the analysis employed by courts in other jurisdictions when analyzing covenants containing similar acknowledgments. *See Webster Ins., Inc. v. Levine,* NNHCV074026861S, 2007 Conn.Super. LEXIS 3410, at *11–12, 2007 WL 4733105 (Conn.Super.Ct. Dec. 21, 2007) (unpublished) ("Private parties cannot dictate a conclusion that injunctive relief is required.... The agreement to this effect is probably some evidence ...." (quoting *Custard Ins. Adjusters Inc. v. Nardi,,* CV 980061967S, 2000 Conn.Super. LEXIS 1003, at *158, 2000 WL 562318 (Conn.Super.Ct. Apr. 20, 2000))) (Levin's concession in the agreement is merely evidence the court may weigh in determining whether Webster met his burden of proof with regard to irreparable harm and lack of an adequate remedy at law.); *see also Herring Gas Co. v. Magee,* 813 F.Supp. 1239, 1241, 1245–46 (S.D.Miss.1993) (evaluating the reasonableness of the restrictive covenants without regard to contract language wherein the employees expressly acknowledged that the restrictions were reasonable); *Jackson Hewitt Inc. v. Childress,* No. 06–CV–0909, 2008 U.S. Dist. LEXIS 24460, at *20–23 (D.N.J. Mar. 27, 2008) (unpublished) (considering acknowledgments of reasonableness along with other evidence in the record); *Hagemeyer N. Am. Inc. v. Thompson,* No. 2:05–3425, 2006 U.S. Dist. LEXIS 19468, at *5, 12–16 (D.S.C. Mar. 1, 2006) (unpublished) (employee's acknowledgment of reasonableness of the restrictive covenants was considered in conjunction with other evidence in the record).

6    Notably, U.S. Money Reserve acknowledged at the temporary injunction hearing that the industry-wide exclusions such as the one at issue here have been held unreasonable and that the covenant at issue may need to be reformed. Counsel stated,

> Now, the only area that this thing would possibly need to be reformed on is something we're willing to stipulate for the Court. It does have a nationwide, industrywide exclusion and to start off we're willing to tell the Court that we are willing to reform that to make it no competition if they are located in the state of Texas or any of the surrounding states with the state of Texas.
> Therefore, if they want to sell coins in the state of Kentucky or the state of Georgia or Alaska or on the West Coast, we feel that's fine....

Counsel additionally stated: "What I'm saying is that an industrywide, nationwide exclusion has been held unreasonable; .... [s]o, what I'm suggesting is, ... the trial court merely has to make a decision on the trial court's own as to the scope of the geographic restriction." Appellant-employees, on the other hand, argued that the covenant needed to be reformed to prevent the employees from soliciting clients with whom they had contact while working for U.S. Money Reserve or who were clients of the company. In fact, there is evidence in the record that Poole agreed to enter into an injunction prohibiting him from contacting U .S. Money Reserve clients. The trial court refrained from reforming the covenant prior to hearing testimony and allowed the parties to move forward.

7    While there is evidence in the record that Fendley was subpoenaed, he failed to appear at the injunction hearing.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

24 S.W.3d 334
Supreme Court of Texas.

QWEST COMMUNICATIONS CORPORATION and Qwest Communications International, Inc., Petitioners,

v.

AT & T CORPORATION and AT & T Communications of the Southwest, Inc., Respondents.

No. 99–0306.  |  April 6, 2000.  |  Rehearing Overruled June 8, 2000.

Telecommunications company filed negligence suit against competitor, seeking injunctive and compensatory relief for alleged damage to buried cable. The District Court, Travis County, 261st Judicial District, John K. Dietz, J., entered order, which asserted it was correct rendition of parties' prior agreement. Competitor appealed. The Austin Court of Appeals, 983 S.W.2d 885, dismissed appeal. Competitor filed petition for review. The Supreme Court held that order was temporary injunction, and thus was appealable.

Court of Appeals reversed and remanded.

West Headnotes (8)

**[1]    Appeal and Error** 👉 Power to review in general

Supreme Court has jurisdiction to determine whether a court of appeals correctly decided its jurisdiction over an interlocutory appeal.

8 Cases that cite this headnote

**[2]    Appeal and Error** 👉 Necessity of final determination

Appellate court lacks jurisdiction to review an interlocutory order unless a statute specifically authorizes an exception to the general rule, which is that appeals may only be taken from final judgments.

53 Cases that cite this headnote

**[3]    Injunction** 👉 Nature of remedy in general

**Injunction** 👉 Equitable nature of remedy

Injunction is a remedial writ that depends on the issuing court's equity jurisdiction.

4 Cases that cite this headnote

**[4]    Injunction** 👉 Purpose or function of remedy

One function of injunctive relief is to restrain motion and to enforce inaction.

7 Cases that cite this headnote

**[5]    Appeal and Error** 👉 Injunction

**Injunction** 👉 Operation and effect

Trial court's order, which purported to be correct rendition of parties' agreement in negligence action brought by telecommunications company against competitor seeking compensatory and injunctive relief for damages to cable, which commanded competitor of telecommunications company to undertake certain monitoring and give notice when conducting certain boring operations, was temporary injunction, and thus was appealable, even though it went beyond what was necessary to preserve status quo, and instead, applied to all of competitor's operations in nation, governed competitor's conduct for period of three years, did not set bond or trial date, and did not order issuance of writ of injunction, where trial court's order placed restrictions on competitor, and was made effective immediately, so that it operated during pendency of suit. V.T.C.A., Civil Practice & Remedies Code § 51.014(a)(4).

22 Cases that cite this headnote

**[6]** **Injunction** 🔑 Operation and effect

Whether an injunction is effective for a fixed period of time or is made effective only until further order of the court or final judgment is only one of the factors in determining the character and nature of the order.

5 Cases that cite this headnote

**[7]** **Injunction** 🔑 Form and requisites

**Injunction** 🔑 Necessity and waiver in general

Procedural requirements imposed by the Texas Rules of Civil Procedure, which require that an order granting a temporary injunction set the cause for trial on the merits and fix the amount of security to be given by the applicant, are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved. Vernon's Ann.Texas Rules Civ.Proc., Rules 683, 684.

73 Cases that cite this headnote

**[8]** **Appeal and Error** 🔑 Injunction

**Injunction** 🔑 Form and requisites

**Injunction** 🔑 Amount

Procedural requirements for temporary injunctions, which require that an order granting a temporary injunction set the cause for trial on the merits and fix the amount of security to be given by the applicant, may render the trial court's order void, but they do not change the order's character and function defining its classification for purposes of determining whether order is appealable.

54 Cases that cite this headnote

**Attorneys and Law Firms**

**\*335** Claude E. Ducloux, Austin, P. Michael Jung, Dallas, Delno J. Grosenheider, J. Stephen Ravel, Michael Shaunessy, Diane Barlow-Sparkman, Austin, Bruce A. Featherstone, Nancy C. Shea, Denver, CO, for Petitioner.

Joseph Latting, John K. Schwartz, G. Alan Waldrop, C. W." Rocky" Rhodes, Barbara M. Ellis, Kamela Bridges, Austin, for Respondent.

**Opinion**

PER CURIAM.

The single issue in this petition is whether the trial court's interlocutory order is a temporary injunction and thus appealable under Texas Civil Practice and Remedies Code section 51.014(a)(4). The court of appeals held that the order was not an appealable temporary injunction and dismissed the appeal for want of jurisdiction. 983 S.W.2d 885. Because we hold that the trial court's order grants a temporary injunction, we grant the petition and remand the case to the court of appeals to consider the merits of the appeal.

In 1997, AT & T Corporation and AT & T Communications of the Southwest, Inc. (collectively "AT & T") sued Qwest Communications Corporation, Qwest Communications International, Inc. (collectively "Qwest"), and others for damages to AT & T's fiber optic cables. In addition, AT & T sought a temporary restraining order, a temporary injunction, and a permanent injunction. On the same day that the petition was filed, the trial court issued an *ex parte* temporary restraining order.

At the temporary injunction hearing, the parties informed the trial court that they had resolved the matters set for the temporary injunction hearing, and then read the agreement into the record. Among other restrictions applicable to all activities within the United States, the agreement required Qwest to notify AT & T of any construction operations within thirty feet of an AT & T underground facility, and to electronically monitor the location of the drill borehead used during boring and pullback operations. Further, the agreement dissolved the previous temporary restraining order bond, left open any claims for damages, and expired three years from the date it became effective unless extended or modified in a signed writing by the parties. At the conclusion of this hearing, the judge stated that "[w]ith respect to the plaintiff's application for temporary injunction, judgment is rendered" and told counsel for AT & T to prepare a written order, deliver it to Qwest's counsel for comment, and then submit it to the trial court. Ultimately, the parties could not agree to the terms of the written order to be submitted to the trial court. The trial court, after a "clarification" hearing, signed an order following the terms recited into the record at the temporary injunction hearing.

Qwest appealed. But the court of appeals dismissed the appeal for want of jurisdiction, holding that the order did not grant a temporary injunction. The court concluded that the order did not meet the "traditional requirements" of a temporary injunction because the order did not preserve the status quo, require a bond, set a trial date, require the clerk to issue a writ of injunction, nor was the order's duration limited until final judgment or further order of the court. 983 S.W.2d at 888. Qwest then petitioned this Court for review.

 **[1]**  **[2]**  This Court has jurisdiction to determine whether a court of appeals correctly decided its jurisdiction over an interlocutory **\*336** appeal. *See Lesikar v. Rappeport,* 899 S.W.2d 654, 655 (Tex.1995) (determining whether interlocutory order being appealed was temporary injunction). An appellate court lacks jurisdiction to review an interlocutory order unless a statute specifically authorizes an exception to the general rule, which is that appeals may only be taken from final judgments. *See Stary v. DeBord,* 967 S.W.2d 352, 352–53 (Tex.1998)*; Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992). In this case, Texas Civil Practice and Remedies Code section 51.014(a) states: "[a] person may appeal from an interlocutory order of a district court, county court at law, or county court that: ... (4) grants or refuses a temporary injunction...." TEX. CIV. PRAC. & REM.CODE § 51.014(a)(4).

 **[3]**  **[4]**  **[5]**  An injunction is a remedial writ that depends on the issuing court's equity jurisdiction. *See State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994). One function of injunctive relief is to restrain motion and to enforce inaction. *See Boston v. Garrison,* 152 Tex. 253, 256 S.W.2d 67, 70 (1953). The trial court's order here commands Qwest to undertake certain monitoring and notice provisions when conducting certain boring operations. Thus, the order is an injunction.

AT & T argues, however, that the order cannot be a temporary injunction because it lacks the defining characteristics of a temporary injunction. First, it contends that the order goes beyond what is necessary to preserve the status quo because it applies to all of Qwest's operations in the United States. Second, AT & T asserts that one of the hallmarks of a temporary injunction is

that it is effective for an indefinite period, operating only until dissolved by another interlocutory order or until final hearing. Here, the order governs Qwest's conduct for a period of three years, until December 2000, a period well beyond the original scheduled trial date of July 6, 1998. Finally, AT & T notes that the order did not set a bond or trial date and did not order issuance of a writ of injunction.

The order's features that AT & T identifies do not necessarily control the classification of this order as a temporary injunction. In *Del Valle Independent School District v. Lopez,* we rejected the notion that "matters of form control the nature of the order itself —it is the character and function of an order that determine its classification." 845 S.W.2d 808, 809 (Tex.1992). We reasoned that if errors in the form of the order determined the order's status, then those errors would deny review of the very defects that render the order void. *See Del Valle,* 845 S.W.2d at 809–10; *Brines v. McIlhaney,* 596 S.W.2d 519, 523 (Tex.1980).

Here, AT & T requested and received a court order restricting Qwest's conduct. The order recites that it is effective for a set three-year period from the date it was rendered unless it is extended or modified in writing signed by the parties. AT & T notes that this Court has previously stated that a temporary injunction "operates until dissolved by an interlocutory order or until the final hearing." *Brines,* 596 S.W.2d at 523; *see also J.C. Matlock v. Data Processing Sec., Inc.,* 618 S.W.2d 327, 328 (Tex.1981) (stating the purpose of a temporary injunction is to preserve the status quo pending trial on the merits). Thus, we must decide whether the fixed three-year term precludes the order's classification as a temporary injunction.

Some courts of appeals' opinions have held an order was a temporary injunction even when it granted the maximum duration of relief to which the plaintiff would be entitled at a trial on the merits. *See Glenn Advertising, Inc. v. Black,* 454 S.W.2d 841, 844 (Tex.Civ.App.—Houston [14 th Dist.] 1970, writ ref'd n.r.e.). In *Glenn Advertising,* the court of appeals noted that the order should correctly provide that the temporary injunction should remain in effect only until final hearing or until further order of the court. *Id.* Yet, the court did not dismiss the appeal for **\*337** want of jurisdiction, but instead simply modified the order to remain in full force and effect until final judgment was entered. Other courts of appeals have followed this reasoning and exercised jurisdiction over appeals from orders that were not made effective until final judgment or further action by the trial court. *See Hailey v. Texas–New Mexico Power Co.,* 757 S.W.2d 833, 835 (Tex.App.—Waco 1988, writ dism'd w.o.j.); *Owens v. Texaco Inc.,* 368 S.W.2d 780, 783 (Tex.Civ.App.—Beaumont 1963, no writ).

But other courts of appeals have held that when an injunction is effective for a fixed period of time it is a permanent rather than a temporary injunction. *See Aloe Vera of America, Inc. v. CIC Cosmetics Int'l Corp.,* 517 S.W.2d 433, 436 (Tex.Civ.App.— Dallas 1974, no writ). In *Aloe Vera,* the trial court signed an order styled "Permanent Injunction" and directed the clerk to issue a "Writ of Injunction permanently enjoining until January 1, 1975." The court of appeals held that limiting the restraint to the period ending January 1, 1975, precluded the order from being a temporary injunction. "Whether the restraint continues for six months or six years has no bearing on the question of permanency. No more permanent order could be made with respect to this particular claim for injunctive relief." *Id. at 436.* The court therefore held that the order was an interlocutory permanent injunction rather than a temporary injunction and thus was not appealable. *See id.* Other courts of appeals have adopted the reasoning of *Aloe Vera. See James v. Hubbard,* 985 S.W.2d 516, 518 (Tex.App.—San Antonio 1998, no writ); *Brelsford v. Old Bridge Lake Community Service Corp.,* 784 S.W.2d 700, 702 (Tex.App.—Houston [14 th Dist.] 1989, no writ); *Kelso v. Thorne,* 710 S.W.2d 735, 736 (Tex.App.—Corpus Christi 1986, no writ); *Zoning Bd. of Adjustment v. Graham,* 664 S.W.2d 430, 434 (Tex.App.—Amarillo 1983, no writ); *Gensco, Inc. v. Thomas,* 609 S.W.2d 650, 651 (Tex.Civ.App.—San Antonio 1980, no writ).

 **[6]**    The approach taken by *Aloe Vera* and the line of cases that follow it is problematic in that a burdensome interlocutory order that has the same effect as a temporary injunction could be shielded from appellate review by the very defect that makes it erroneous. *See Del Valle,* 845 S.W.2d at 809–10. Whether an injunction is effective for a fixed period of time or is made effective only until further order of the court or final judgment is only one of the factors in determining the character and nature of the order. Because the trial court's order places restrictions on Qwest and is made effective immediately so that it operates during the pendency of the suit, it functions as a temporary injunction.

 **[7]**   **[8]**   Finally, AT & T argues that the order is not a temporary injunction because it does not set the case for trial on the merits or set a bond. The Texas Rules of Civil Procedure require that an order granting a temporary injunction set the cause for trial on the merits and fix the amount of security to be given by the applicant. *See* TEX.R. CIV. P. 683, 684. These procedural requirements are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved. *See InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (stating that requirements of Rule 683 are mandatory and must be strictly followed). In *InterFirst Bank,* however, the order failed to set the case for trial on the merits. *Id.* at 641. Yet rather than dismissing the appeal for want of jurisdiction, we declared the temporary injunction void and ordered it dissolved. *See id.* We have also held that a temporary injunction was void when there was no bond.  *See Lancaster v. Lancaster,* 155 Tex. 528, 291 S.W.2d 303, 308 (1956) (holding that bond provisions of Rule 684 are mandatory). Here, these procedural requirements may render the trial court's order void but they do not change the order's character and function defining its classification.

 **\*338**   We hold that, in character and function, the trial court's order grants a temporary injunction and is appealable under Texas Civil Practice and Remedies Code section 51.014(a)(4). We do not express any opinion, however, on the merits of the appeal. Accordingly, the Court grants petitioner's petition for review and, without hearing oral argument, reverses the judgment of the court of appeals and remands the case to that court for consideration of the merits of the appeal. TEX.R. APP. P. 59.1

**Parallel Citations**

43 Tex. Sup. Ct. J. 600

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

341 S.W.3d 919
Supreme Court of Texas.

Larry ROCCAFORTE, Petitioner,

v.

Jefferson COUNTY, Respondent.

No. 09–0326.    |    Argued Oct. 14, 2010.    |    Decided April 29, 2011.

**Synopsis**

**Background:** Former chief deputy constable brought § 1983 wrongful termination action against county, county constable, and county employees. After jury returned a verdict in favor of former chief with respect to the claims against constable, the 136th District Court, Jefferson County, Milton G. Shuffield, J., granted county's plea to jurisdiction, and former chief brought interlocutory appeal. While interlocutory appeal was pending, the District Court rendered final judgment against constable. Constable appealed, and former chief cross-appealed. The Beaumont Court of Appeals affirmed in part, reversed in part, and rendered judgment that former chief take nothing. In the interlocutory appeal, the Beaumont Court of Appeals, 281 S.W.3d 230, modified the dismissal order to reflect that the dismissal was without prejudice and affirmed the order as modified. Former chief petitioned for review.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

[1] even if court erred in rendering final judgment after it had issued a stay in proceedings, former chief waived such error;

[2] Court of Appeals would treat interlocutory appeal that was pending when trial court issued a final judgment as an appeal from the final judgment;

[3] provision in statute requiring notice of suit against county via mail was not a jurisdictional requirement; and

[4] provision in statute requiring notice of suit against county via mail was satisfied by hand-delivery of notice.

Reversed and remanded.

Willett, J., concurred in part and filed opinion.

West Headnotes (5)

[1]     **Appeal and Error**  🔑 Judgment

Even if court erred in rendering final judgment after it had issued a stay in proceedings pending an interlocutory appeal by plaintiff, former chief deputy constable waived such error in wrongful termination action brought by former chief deputy constable against county and other constable; trial court's final judgment was voidable, rather than void, and former chief deputy constable failed to object to entry of final judgment.

4 Cases that cite this headnote

**[2]**     **Appeal and Error**   Nature and grounds of right

The right of appeal should not be lost due to procedural technicalities.

1 Cases that cite this headnote

**[3]**     **Appeal and Error**   Interlocutory Proceedings Brought Up in General

Court of Appeals would treat interlocutory appeal that was pending when trial court issued a final judgment as an appeal from the final judgment; claims against defendant that were subject matter of interlocutory appeal were not severed prior to entry of final judgment, defendant remained a party to the underlying proceeding, and final judgment implicitly modified the interlocutory order, which merged with it. Rules App.Proc., Rule 27.3.

15 Cases that cite this headnote

**[4]**     **Counties**   Notice, Demand, or Presentation of Claim

Provision in statute governing local government providing that, upon motion by the defendant, an action against a county or county official must be dismissed if plaintiff failed to provide written notice via mail to the county judge or district attorney, was not a jurisdictional requirement. V.T.C.A., Local Government Code § 89.0041.

4 Cases that cite this headnote

**[5]**     **Counties**   Service or presentation; timeliness

Statute requiring that a plaintiff filing suit against a county or county official must provide notice of suit via mail to county judge or district attorney was satisfied by hand-delivery of notice, rather than delivery by mail, in wrongful termination action brought by former chief deputy constable against county and other constable. V.T.C.A., Local Government Code § 89.0041.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*920** Laurence W. Watts, Watts & Associates, P.C., Missouri City, TX, Brandon David Mosley, Cowan & Lemmon, LLP, Houston, TX, for Larry Roccaforte.

Thomas F. Rugg, District Attorney's Office, First Assistant—Civil Div., Steven L. Wiggins, Jefferson County District Attorney Office, Thomas E. Maness, Criminal District Attorney, Beaumont, TX, for Jefferson County.

Todd K. Sellars, Dallas County Assistant Attorney, Dallas, TX, for Amicus Curiae Dallas County, Texas.

**Opinion**

Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, Justice GUZMAN, and Justice LEHRMANN, and joined by Justice WILLETT as to parts I through III.

The Local Government Code requires a person suing a county to give the county judge and the county or district attorney notice of the claim. TEX. LOC. GOV'T CODEE § 89.0041. The plaintiff provided that notice here, but did so by personal service of process, rather than registered or certified mail as the statute contemplates. We conclude that when the requisite county officials

receive timely notice enabling them to answer and defend the claim, the case should not be dismissed. Because the court of appeals concluded otherwise, we reverse its judgment and remand the case to the trial court for further proceedings.

## I. Background

Former Chief Deputy Constable Larry Roccaforte sued Jefferson County and Constable Jeff Greenway, alleging that his wrongful termination deprived him of rights guaranteed by the Texas Constitution. Roccaforte personally served County Judge Carl Griffith with the suit, and fifteen days later, the County (represented by the district attorney) and Constable Greenway answered, denying liability. The County propounded written discovery requests, deposed Roccaforte, and presented County officials for depositions. The County also filed a plea to the jurisdiction, asserting that Roccaforte did not give requisite notice of the suit. *See* TEX. LOC. GOV'T CODEE § 89.0041. Roccaforte disagreed, arguing that the statute applied only to contract claims. Alternatively, he argued that 42 U.S.C. § 1983 preempted the notice requirements and that he substantially complied with them in any event.

Although the trial court indicated that it would sustain the County's plea and sever those claims from the underlying case, it did not immediately sign an order doing so. In the meantime, Roccaforte tried his claims against Greenway. A jury returned a verdict in Roccaforte's favor. Afterwards, the trial court signed an order granting the County's jurisdictional plea. The order did not sever the claims from the underlying case. Roccaforte then pursued this interlocutory appeal. His notice of appeal stated that "[p]ursuant to Civ. P. Rem.Code § 51.014(b), all proceedings are **\*921** stayed in the trial court pending resolution of the appeal." But the proceedings were not stayed.

In the underlying case, Greenway moved for judgment notwithstanding the verdict, which the trial court granted as to Roccaforte's property interest and First Amendment retaliation claims but denied as to Roccaforte's claimed violation of his liberty interest. Roccaforte moved for entry of judgment. Notwithstanding the statutory stay referenced in Roccaforte's notice of appeal, the trial court rendered judgment for Roccaforte and awarded damages, attorney's fees, and costs. The judgment was titled "FINAL JUDGMENT"; it "denie[d] all relief no [sic] granted in this judgment"; and it stated "[t]his is a FINAL JUDGMENT." The County was included in the case caption. No one objected to the continuation of trial court proceedings despite the statutory stay.

Greenway appealed, and Roccaforte cross-appealed, raising as his only issues complaints regarding the trial court's JNOV on his claims against Greenway. The court of appeals affirmed in part and reversed in part, rendering judgment that Roccaforte take nothing. *Greenway v. Roccaforte*, 2009 WL 3460683, at *6, 2009 Tex.App. LEXIS 8290, at *15 (Tex.App.-Beaumont 2009, pet. denied). [1]

In Roccaforte's separate interlocutory appeal, the court of appeals made the following notation:

> Roccaforte notes that immediately after the dismissal order, the trial of the case proceeded to judgment without the County as a party. No one disputes that all the claims against all other parties have been resolved. The order of dismissal is therefore appealable whether or not the statute at issue is jurisdictional.

281 S.W.3d 230, 231 n. 1. The court ultimately concluded that Roccaforte's failure to notify the County of the suit by registered or certified mail mandated dismissal of his suit against the County, but not because the trial court lacked jurisdiction. *Id.* at 236–37. Accordingly, the court modified the dismissal order to reflect that dismissal was without prejudice and affirmed the order as modified. *Id.*

Roccaforte petitioned this Court for review, which we granted. [2] 53 Tex.Sup.Ct.J. 1061 (Aug. 27, 2010).

## II. Did the trial court's final judgment moot this interlocutory appeal?

Before turning to the merits, we must decide a procedural matter: What happens when a party perfects an appeal of an interlocutory judgment that has not been severed from the underlying action, and that action proceeds to trial and a final judgment? The trial court did not sever Roccaforte's claims against the County [3] and denied "all relief not granted" in its final judgment. Ordinarily, under these circumstances, Roccaforte would have to complain on appeal that the trial court erroneously dismissed those claims. Roccaforte, however, did not complain about the County's dismissal in his appeal from the final judgment. His separate interlocutory appeal, then, rests on a precipice of mootness.

**\*922  A. Roccaforte waived any complaint about the trial court's actions during the statutory stay.**

Although Roccaforte's interlocutory appeal was supposed to stay all proceedings in the trial court pending resolution of the appeal, [4] Roccaforte did not object to the trial court's rendition of judgment while the stay was in effect. To the contrary, he affirmatively moved for entry of judgment. Because a final judgment frequently moots an interlocutory appeal, [5] we must decide whether the trial court's failure to observe the stay made the final judgment void or merely voidable. If the final judgment is void, it would have no impact on this interlocutory appeal. *Lindsay v. Jaffray,* 55 Tex. 626 (Tex.1881) ("A void judgment is in legal effect no judgment.") (quoting FREEMAN ON JUDGMENTS, § 117). [6] If voidable, then we must decide whether it moots this proceeding. *See Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 863 (Tex.2010) (observing that voidable orders must be corrected by direct attack and, unless successfully attacked, become final). We conclude it is voidable.

Two of our courts of appeals have held that the failure to object when a trial court proceeds despite the automatic stay waives any error the trial court may have committed by failing to impose it. *See Escalante v. Rowan,* 251 S.W.3d 720, 724–25 (Tex.App.-Houston [14th Dist.] 2008), *rev'd on other grounds,* 332 S.W.3d 365 (Tex.2011) (per curiam); *Henry v. Flintrock Feeders, Ltd.,* No. 07–04–0224–CV, 2005 WL 1320121, at \*1, 2005 Tex.App. LEXIS 4310, at \*1 (Tex.App.-Amarillo June 1, 2005, no pet.) (mem.op.). In *Escalante,* the court of appeals held that a party's failure to object to a trial court's ruling on summary judgment motions during the statutory stay "failed to preserve error as to any objection that the summary judgment is voidable based on the stay." *Escalante,* 251 S.W.3d at 725. In *Henry,* the court held that a party's failure to object to the trial court's action in violation of the stay waived any error resulting from that action. *Henry,* 2005 WL 1320121, at \*1–2, 2005 Tex.App. LEXIS 4310, at \*4 (holding that trial court's grant of summary judgment mooted interlocutory appeal challenging denial of special appearance). We find particularly instructive a case involving a trial court's rendition of final judgment while an interlocutory appeal of a class certification order was pending:

> [I]f a trial court proceeds to trial during the interlocutory appeal, the class action plaintiff must inform the court of section 51.014(b) and request that the stay be enforced. If a court proceeds to trial over the objection of a class action plaintiff, the class action plaintiff could request a mandamus and this court would grant it. However, if the class action plaintiff fails to inform the trial court of section 51.014(b), and allows the court to proceed to trial, as happened here, the **\*923**  plaintiff waives the right to object or request any relief on appeal. *See* TEX.R.APP. P. 33.1(a). We see this as no different from any other trial court error that is not preserved—it is waived.

*Siebenmorgen v. Hertz Corp.,* No. 14–97–01012–CV, 1999 WL 21299, at \*3, 1999 Tex.App. LEXIS 311, at \*10–11 (Tex.App.-Houston [14th Dist.] Jan. 21, 1999, no pet.) (dismissing as moot interlocutory appeal of order denying class certification).

A third court of appeals has implicitly concluded that parties can waive the right to insist on a section 51.014(b) stay. *See Lincoln Property Co. v. Kondos,* 110 S.W.3d 712, 715 (Tex.App.-Dallas 2003, no pet.). In that case, the court observed that the trial court's grant of summary judgment while an interlocutory appeal was pending violated the statutory stay. Noting that "neither party requested a stay from this Court" and "both parties sought to commence the 'trial' below by filing and/or arguing motions for summary judgment while this appeal was pending," the court of appeals did not conclude that the trial court's summary judgment was void. *Id.* at 715. Instead, the appellate court held that the summary judgment mooted the interlocutory appeal. *Id.* at 715–16 (noting that the interlocutory class certification order merged into the final judgment). The court concluded: "By

rendering a final judgment during this appeal, the trial court also rendered itself powerless to reconsider its class certification ruling were we to conclude here the ruling was entered in error." *Id.* at 715.

We agree with those decisions that have held that a party may waive complaints about a trial court's actions in violation of the stay imposed by section 51.014(b). That stay differs from a situation in which the relevant statute vests "exclusive jurisdiction" in a particular forum. *See, e.g., Kalb v. Feuerstein,* 308 U.S. 433, 439, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (noting that bankruptcy law in effect at the time "vested in the bankruptcy courts exclusive jurisdiction" and "withdr[ew] from all other courts all power under any circumstances"). For that reason, we have held that actions taken in violation of a bankruptcy stay are void, not just voidable. *Cont'l Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988). [7]

[1] But as we have noted, "a court's action contrary to a statute or statutory equivalent means the action is erroneous or 'voidable,' not that the ordinary appellate or other direct procedures to correct it may be circumvented." *Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990); *cf. Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) (noting that failure to comply with a non-jurisdictional statutory requirement may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived). That is the case here. The trial court's rendition of final judgment while the stay was in effect was voidable, not void, and Roccaforte's failure to object to the trial court's actions waived any error related to the stay. We must, therefore, confront the fact that the trial **\*924** court signed a final judgment disposing of all parties and all claims and that Roccaforte did not present in his appeal from that judgment the arguments he advances in this interlocutory appeal.

**B. The trial court's final judgment implicitly modified its interlocutory order, and we treat this appeal as relating to that final judgment.**

[2] We have repeatedly held that the right of appeal should not be lost due to procedural technicalities. [8] Roccaforte timely perfected appeals from both the interlocutory order and the final judgment, and this is not a situation in which further proceedings mooted the issues raised in Roccaforte's interlocutory appeal. [9]

[3] Our procedural rules provide that:

> After an order or judgment in a civil case has been appealed, if the trial court modifies the order or judgment, or if the trial court vacates the order or judgment and replaces it with another appealable order or judgment, the appellate court must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment. The subsequent order or judgment and actions relating to it may be included in the original or supplemental record. Any party may nonetheless appeal from the subsequent order or judgment.

TEX.R.APP. P. 27.3. Here, although the trial court's final judgment did not expressly modify its interlocutory order, it did so implicitly. Because the claims against the County had not been severed, the County remained a party to the underlying proceeding despite the interlocutory appeal. The final judgment necessarily replaced the interlocutory order, which merged into the judgment, [10] even though Roccaforte's interlocutory appeal remained pending. Under our rules, however, we may treat this interlocutory appeal as an **\*925** appeal from the final judgment. That permits us to reach the merits of Roccaforte's claims rather than dismiss the interlocutory appeal as moot.

Although not relying on rule 27.3, the court of appeals took a similar approach, treating Roccaforte's appeal as though it were from the final judgment. 281 S.W.3d at 231 n. 1. Similarly, we treat Roccaforte's appellate complaints about the trial court's grant of the County's jurisdictional plea as though they related to the appeal of the final judgment. We turn now to the merits of his claim.

## III. The post-suit notice requirements are not jurisdictional.

Local Government Code section 89.0041 provides:

> (a) A person filing suit against a county or against a county official in the official's capacity as a county official shall deliver written notice to:
>
> > (1) the county judge; and
> >
> > (2) the county or district attorney having jurisdiction to defend the county in a civil suit.
>
> (b) The written notice must be delivered by certified or registered mail by the 30th business day after suit is filed and contain:
>
> > (1) the style and cause number of the suit;
> >
> > (2) the court in which the suit was filed;
> >
> > (3) the date on which the suit was filed; and
> >
> > (4) the name of the person filing suit.
>
> (c) If a person does not give notice as required by this section, the court in which the suit is pending shall dismiss the suit on a motion for dismissal made by the county or the county official.

TEX. LOC. GOV'T CODEE § 89.0041. In 2005, the Legislature amended the Government Code to provide that "[s]tatutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE § 311.034.

The County contends section 311.034 makes Roccaforte's failure to comply with section 89.0041's notice requirements jurisdictional—an issue we have never decided. Our courts of appeals, however, have concluded that the notice requirements are not jurisdictional, even in light of section 311.034. *See El Paso Cnty. v. Alvarado,* 290 S.W.3d 895, 898–99 (Tex.App.-El Paso 2009, no pet.) (holding that section 89.0041 is not jurisdictional because section 311.034 applies only to prerequisites to file suit, not post-suit notice requirements); *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same); 281 S.W.3d 230, 232–33 (same); *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 754–56 (Tex.App.-Dallas 2008, pet. denied) (same); *Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same); *Cnty. of Bexar v. Bruton,* 256 S.W.3d 345, 348–49 (Tex.App.-San Antonio 2008, no pet.) (same).

 **[4]**    We presume "that the Legislature did not intend to make the [provision] jurisdictional[,] a presumption overcome only by clear legislative intent to the contrary." *City of DeSoto v. White,* 288 S.W.3d 389, 394 (Tex.2009). The statutes' language reflects no such intent here. Section 311.034 applies to *prerequisites* to suit, not notice requirements that can be satisfied only *after* suit is filed. *Compare* TEX. GOV'T CODE § 311.034, *with* TEX. LOC. GOV'T CODEE § 89.0041 (requiring notice of cause number, court in which case is filed, and date of filing). Nor does Local Government Code section 89.0041 show such intent: that section states that a trial court may  **\*926**  dismiss a case for noncompliance only after the governmental entity has moved for dismissal. TEX. LOC. GOV'T CODEE 89.0041(c) ("If a person does not give notice as required by this section, the court in which the suit is pending shall dismiss the suit on a motion for dismissal made by the county or the county official."). The motion requirement means that a case may proceed against those governmental entities that do not seek dismissal—in other words, that a county can waive a party's noncompliance. This confirms that compliance with the notice requirements is not jurisdictional. *See Loutzenhiser,* 140 S.W.3d at 359 ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). We find no basis upon which to conclude that the Legislature intended section 89.0041 to be jurisdictional.

## IV. Where the appropriate county officials receive timely notice of the suit, the case should not be dismissed if notice was provided by some means other than mail.

Roccaforte provided timely notice of every item required by section 89.0041, and the requisite officials received that notice. Did the Legislature intend to bar Roccaforte's claim, merely because that notice was hand-delivered rather than mailed?

Roccaforte argues that the County's actual notice of the suit and his substantial compliance with section 89.0041 should suffice. A number of courts of appeals (though not the court of appeals in this case) agree with him. [11] The County disagrees, arguing that the statute requires strict compliance with its terms, and dismissal is mandated if those terms are not satisfied.

 **[5]** Section 89.0041 ensures that the appropriate county officials are made aware of pending suits, allowing the county to answer and defend the case. *See Howlett,* 301 S.W.3d at 846 ("The apparent purpose of section 89.0041 is to ensure that the person responsible for answering and defending the suit—the county or district attorney-has actual notice of the suit itself."); *Coskey,* 247 S.W.3d at 757 ("Section 89.0041's notice of suit requirement against a county serves the purpose of aiding in the management and control of the City's finances and property...."). That purpose was served here—the county judge and the district attorney had notice within fifteen days of Roccaforte's filing, and they answered and defended the suit. *Cf. Loutzenhiser,* 140 S.W.3d at 360 (observing that "if in a particular case a governmental unit were not prejudiced by lack of notice and chose to waive it, we do not see how the statutory purpose would thereby be impaired"). The statute was not intended to create a procedural trap allowing a county to obtain dismissal even though the appropriate officials have notice of the suit. *See* **\*927** *Southern Surety Co. v. McGuire,* 275 S.W. 845, 847 (Tex.Civ.App.-El Paso 1925, writ ref'd) (holding that failure to present written claim to commissioners' court as required by statute did not bar the claim, because "[t]he purpose of the statute was fully accomplished by [oral presentment]"); *see also Coskey,* 247 S.W.3d at 757 ("The manner of delivery specified by the statute assures that county officials will receive notice of a suit after it has been filed to enable it to respond timely and prepare a defense."). Because those officers had the requisite notice, we conclude that the trial court erred in dismissing Roccaforte's claims.

## V. Conclusion

Roccaforte's claims against the County should not have been dismissed for lack of notice. [12] We reverse the court of appeals' judgment as to those claims and remand the case to the trial court for further proceedings. TEX.R.APP. P. 60.2(d).

Justice WILLETT delivered a concurring opinion.

Justice WILLETT, concurring in part.

I join Parts I–III of the Court's opinion. As for Part IV, I join the result but not the reasoning. There is a better approach, one more allegiant to the Legislature's words. Roccaforte's claim should proceed, but the reason is rooted not in his substantial compliance but rather the County's substantial dalliance.

\* \* \*

Aristotle would have enjoyed this case, which perfectly illustrates the challenge he recognized of reconciling the "absoluteness" of the written law with equity in the particular case. [1] Believing that "the equitable is superior" and that rigid laws must bend, [2] Aristotle urged "a correction of law where it is defective owing to its universality." [3] From Athens, Greece to Athens, Texas (and beyond), judges still debate the bounds of interpretive discretion—whether it is appropriate to temper the "absoluteness" of statutory mandates and ameliorate their seeming harshness. Millennia may have passed since Aristotle's Lyceum, but this great philosophical and jurisprudential debate endures.

## I

As the Court persuasively explains in Part III, the post-suit notice requirements in Section 89.0041 are not jurisdictional, meaning a County can waive a plaintiff's noncompliance.[4] Here, the County objected to Roccaforte's noncompliance, prompting the Court to ask: "Did the Legislature intend to bar Roccaforte's claim, merely because that notice was hand-delivered rather than mailed?"[5] If phrased that way, our recent and unanimous precedent answers the question "yes," since "the surest guide to legislative intent" is the language lawmakers chose.[6] In other words, "Where text is clear, it is determinative of that intent."[7] The Court today agrees that nothing in Section 89.0041 relieves **\*928** Roccaforte from compliance. So, to escape the statute's emphatic "shall dismiss the suit" mandate,[8] the Court pivots on "actual notice" and "substantial compliance" and holds that the statute's purpose was fulfilled via hand-delivery.

Honoring a statute's plain words is indispensable, even if enforcing those words as written works an unpalatable result. To be sure, courts deviate from otherwise-clear textual commands to avert "absurd" results or to vindicate constitutional principles.[9] But as a general matter, if the legal deck is stacked via technical statutory requirements, the Legislature should reshuffle the equities, not us.[10]

As for whether Section 89.0041's use of phrases like "shall deliver,"[11] "must be delivered,"[12] "as required,"[13] and "shall dismiss"[14] mandates strict compliance, I would take the statute at face value. Beyond that, those desiring additional reassurance that lawmakers intended what they enacted can find it in a properly contextual reading of other notice-related statutes.

First, the Legislature, while omitting an actual-notice exception from Section 89.0041, expressly included one in the Tort Claims Act, stating the Act's pre-suit notice requirements "do not apply if the governmental unit has actual notice...."[15] The Legislature understands how to let actual notice excuse technical noncompliance; it easily could have said actual notice suffices, thus obviating the need for service via certified or registered mail. Instead, it opted against actual notice, presumably on purpose. For better or worse, lawmakers enacted strict compliance, not substantial compliance. Our interpretive focus, both textual and contextual, must be on the law as written, and we should refuse to engraft what the Legislature has refused to enact.

Second, reading "actual notice" into Section 89.0041's *post*-suit notice requirement robs it of any real meaning and also makes Section 89.004's *pre*-suit notice requirement redundant. Section 89.004 forbids someone from suing a county or county official "unless the person has presented the claim to the commissioners court and the commissioners court neglects or refuses to pay all or part of the claim...."[16] This presentment requirement assures actual notice of a claim before it is filed and was already on the books when Section 89.0041 was added in 2003. Logically then, Section 89.0041 must require something *in addition to* the preexisting notice and presentment requirements.[17]

**\*929** The requisite officials here received notice, but they did not receive "requisite notice," as the Court states.[18] The Court may deem it *adequate,* but it is irrefutably not *requisite.* As the Court reads Section 89.0041, it is not only nonjurisdictional (I agree on this point), but also nonmandatory. I acknowledge the statute's no-exceptions mandate works a harsh result,[19] but to the degree this seems a trap for the unwary, it is a trap the Legislature left well marked.

## II

Having said all that, I agree with the Court that Roccaforte ultimately wins his notice dispute, but on different grounds. Instead of asking whether the Legislature meant to bar Roccaforte's claim,

I would rephrase the question in a manner less assaultive to the statutory text: Did the County effectively *waive* Roccaforte's noncompliance by not timely asserting it? I believe so. [20]

**\*930** True, the County, after waiting for limitations to expire, filed a motion for dismissal complaining that Roccaforte provided notice via personal service rather than registered or certified mail. I believe that obscures the key point, which on these facts is not *whether* the County sought dismissal, but *when.* A governmental body can raise a jurisdictional bar like immunity from suit whenever it pleases because "the trial court does not have—and never had—power to decide the case," [21] thus making judgments forever vulnerable to delayed attack. Not so with nonjurisdictional requirements like this, which are waived if not timely raised. Under our precedent, dismissal delayed is sometimes dismissal denied: "The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but *that failure must be timely asserted* and compliance can be waived." [22] Moreover, "if a governmental unit is to avoid litigation to which it should not be subjected because of lack of notice, it should raise the issue as soon as possible." [23] On these facts, there was no timely assertion, much less one made "as soon as possible." [24]

We have held that waiver is decided on a case-by-case basis, meaning courts look to the totality of the circumstances. [25] Here, **\*931** the County sought dismissal based on imperfect notice more than two years after suit was filed; more than two years after the County filed its answer; more than two years after the County filed its special exceptions; after the County presented three County officials for deposition and defended those depositions; after the County sent written discovery requests; after the County deposed Roccaforte; and after the County filed a motion for continuance. If two-plus years qualifies as "timely asserted" or "as soon as possible"—at least in the context of a statutory notice requirement commanding action—then these phrases have been drained of all meaning. [26] Indeed, the only thing the County "timely asserted" was limitations. I would disallow the County's belated insistence on dismissal given its decision to defend the case for so long, asserting noncompliance only after seizing tactical advantage via limitations, and thus materially prejudicing Roccaforte. There is no countervailing prejudice in allowing Roccaforte's suit to proceed against the County, which can hardly argue at this late stage that imperfect notice has harmed its legal position (unlike its fiscal position, having underwritten years of legal and judicial expenses). On these facts, two-plus years of litigation activity to run out the limitations clock betrays the County's too-little, too-late request for dismissal and constitutes waiver.

The Court's understandable desire to work an eminently fair result has led it to revise the statute as desired rather than read it as enacted. I favor a different approach to the same outcome. Roccaforte should win not because the Court waived the Legislature's words but because the County did.

**Parallel Citations**

32 IER Cases 346, 54 Tex. Sup. Ct. J. 900

Footnotes

1    Today, we deny that petition for review.

2    Dallas County submitted an amicus curiae brief in support of Jefferson County.

3    "As a rule, the severance of an interlocutory judgment into a separate cause makes it final." *Diversified Fin. Sys., Inc. v. Hill, Heard, O'Neal, Gilstrap & Goetz, P.C.,* 63 S.W.3d 795, 795 (Tex.2001) (per curiam).

4    TEX. CIV. PRAC. & REM.CODE § 51.014(b); *see also* TEX.R.APP. P. 29.5 (providing that "[w]hile an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and *unless prohibited by statute* may make further orders, including one dissolving the order complained of on appeal") (emphasis added).

5    *See, e.g., Hernandez v. Ebrom,* 289 S.W.3d 316, 319 (Tex.2009) ("Appeals of some interlocutory orders become moot because the orders have been rendered moot by subsequent orders.").

6    *See also Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 863 (Tex.2010) (noting that "[a] judgment is void ... when it is apparent that the court rendering judgment had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act") (quoting *Browning v. Prostok,* 165 S.W.3d 336, 346 (Tex.2005)).

7    *But see Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) (holding that, under the 1978 Bankruptcy Act, "the better reasoned rule characterizes acts taken in violation of the automatic stay as voidable rather than void"); *see also Chisholm v. Chisholm,* No. 04–06–00504–CV, 2007 WL 1481574, at *2–3, 2007 Tex.App. LEXIS 3936, at *6–7 (Tex.App.-San Antonio May 23, 2007, no pet.) (noting conflict between *Sikes* and *Continental Casing* ); *In re De La Garza,* 159 S.W.3d 119, 120–21 (Tex.App.-Corpus Christi 2004, no pet.) (same); *Oles v. Curl,* 65 S.W.3d 129, 131 n. 1 (Tex.App.-Amarillo 2001, no pet.)(same); *Chunn v. Chunn,* 929 S.W.2d 490, 493 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (same).

8    *See, e.g., Guest v. Dixon,* 195 S.W.3d 687, 688 (Tex.2006) ( "[W]e have repeatedly stressed that procedural rules should be construed and applied so that the right of appeal is not unnecessarily lost to technicalities."); *Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121–22 (Tex.1991) (per curiam)(stating that procedural rules should be "liberally construed so that the decisions of the courts of appeals turn on substance rather than procedural technicality").

9    *See, e.g., Isuani v. Manske–Sheffield Radiology Grp., P.A.,* 802 S.W.2d 235, 236 (Tex.1991) (holding that final judgment mooted interlocutory appeal of order granting or denying temporary injunction); *Providian Bancorp Servs. v. Hernandez,* No. 08–04–00186–CV, 2005 WL 82197, at *1, 2005 Tex.App. LEXIS 288, at *2 (Tex.App.-El Paso Jan. 13, 2005, no pet.) (mem.op.)(dismissing as moot interlocutory appeal from order denying motion to compel arbitration, because trial court entered an order compelling arbitration); *Mobil Oil Corp. v. First State Bank of Denton,* No. 2–02–119–CV, 2004 WL 1699928, at *1, 2004 Tex.App. LEXIS 6940, at *2 (Tex.App.-Fort Worth July 29, 2004, no pet.) (dismissing as moot interlocutory appeal from class certification order, because trial court subsequently vacated order, decertified class, and dismissed class action); *Lincoln Property Co. v. Kondos,* 110 S.W.3d 712, 715–16 (Tex.App.-Dallas 2003, no pet.) (dismissing as moot interlocutory appeal of order granting class certification, as trial court subsequently granted summary judgment motion); *see also Hernandez,* 289 S.W.3d at 321 (acknowledging that a party may not, after trial and an unfavorable judgment, prevail on a complaint that the party's summary judgment motion should have been granted, nor could a party complain of a failure to dismiss a health care liability claim based on an inadequate expert report, after a full trial and evidence establishing the elements of that claim).

10   *See Webb v. Jorns,* 488 S.W.2d 407, 408–09 (Tex.1972) (holding that interlocutory judgment merged into final judgment, which was then appealable).

11   *Compare Howlett v. Tarrant Cnty.,* 301 S.W.3d 840, 847 (Tex.App.-Fort Worth 2009, pet. denied) (holding that substantial compliance with section 89.0041 was sufficient because the purpose of the statute was to ensure notice, and that purpose was accomplished), *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same), *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 757 (Tex.App.-Dallas 2008, pet. denied) (same), *and Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same), *with* 281 S.W.3d at 237 (holding that "[r]eading a broad actual notice or service exception into the statute—without any attempt by plaintiff to comply—would, in effect, largely eliminate the specified, additional written notice requirement of the statute"). That conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e).

12   Because this issue is dispositive, we do not reach Roccaforte's argument that 42 U.S.C. § 1983 preempts section 89.0041's notice requirements.

1    Aristotle, Nicomachean Ethics bk. V, ch. 10.

2    *Id.*

3    *Id.*

4    341 S.W.3d 919, 926 (explaining that compliance with the notice requirements of Section 89.0041 of the Local Government Code "is not jurisdictional") (citation omitted).

5    341 S.W.3d at 926.

6    *Presidio Indep. Sch. Dist. v. Scott,* 309 S.W.3d 927, 930 (Tex.2010) (citation and quotation marks omitted).

7    *Id.*

8    *See* TEX. LOC. GOV'T CODEE § 89.0041(c).

9    The absurdity doctrine, rightly understood, is a safety valve reserved for truly exceptional cases, not just those where the mandated statutory outcome is thought unwise or inequitable. *See generally* John F. Manning, *The Absurdity Doctrine,* 116 HARV. L.REV.. 2387 (2003). As Chief Justice Marshall famously put it, a court's allegiance to the text ceases when applying the text "would be so monstrous that all mankind would, without hesitation, unite in rejecting the application." *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 203, 4 L.Ed. 529 (1819).

10   The Legislature can, of course, if it wishes, statutorily overturn today's holding that Section 89.0041 is nonjurisdictional and subject to an actual-notice exception.

11   TEX. LOC. GOV'T CODEE § 89.0041(a).

12    *Id.* § 89.0041(b).

13    *Id.* § 89.0041(c).

14    *Id.*

15    TEX. CIV. PRAC. & REM.CODE § 101.101(c).

16    TEX. LOC. GOV'T CODEE § 89.004(a).

17    Another point: As the Court notes, some courts of appeals have concluded that a substantial-compliance exception lies hidden within Section 89.0041, notwithstanding the statute's emphatic "shall dismiss" mandate. 341 S.W.3d at 928 (citing *Howlett v. Tarrant Cnty.,* 301 S.W.3d 840, 847 (Tex.App.-Fort Worth 2009, pet. denied) (holding that substantial compliance with Section 89.0041 was sufficient because the purpose of the statute was to ensure notice, and that purpose was accomplished); *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same); *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 757 (Tex.App.-Dallas 2008, pet. denied) (same); *Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same)). Two of the three courts of appeals even cite as support two of our decisions involving notice in other contexts. *Coskey,* 247 S.W.3d at 757 ("Both *Artco–Bell Corp.* and *Cox Enterprises, Inc.*. support a standard of substantial compliance with notice requirements under certain circumstances, and we conclude that standard applies in these circumstances.") (citations omitted); *Ballesteros,* 286 S.W.3d at 571–72. A third court of appeals opinion in turn relies upon *Coskey. See Autry,* 251 S.W.3d at 158.

Closer analysis reveals *Coskey* and *Ballesteros* offer feeble support, as they misinterpret this Court's holdings in *Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.,* 706 S.W.2d 956 (Tex.1986), and *Artco–Bell Corp. v. City of Temple,* 616 S.W.2d 190 (Tex.1981). The issue in *Cox* involved *how much* particularity was required in notice. 706 S.W.2d at 960 (noting that "less than full disclosure is not substantial compliance" and that "the Open Meetings Act requires a full disclosure of the subject matter of the meetings"). *Artco–Bell* is likewise inapposite. In *Artco–Bell,* the Court simply invalidated the notice requirement in a city's charter and held the plaintiff had provided sufficient notice. 616 S.W.2d at 193–94 ("[W]e hold that the requirement of verification represents an unreasonable limitation on the City's liability and is invalid as it is contrary to the limitation of authority placed upon home rule cities....") (footnote omitted).

*Cox* was about the specificity of notice; *Artco–Bell* resulted in the invalidation of notice. In neither case did the Court craft an *exception* for notice. The lower courts' treatment of these cases was thus strained, and should not be taken as a correct reading of our jurisprudence on statutory notice requirements.

18    341 S.W.3d at 927.

19    Had the County "timely asserted" Roccaforte's noncompliance, dismissal would have been mandatory under the statute's rigid, no-discretion mandate, thus raising the question of whether Section 89.0041's notice regime is preempted by 42 U.S.C. § 1983. *See Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). That question, while interesting legally, is not before us.

20    Waiver may actually be the wrong term; it may be more accurate to call this forfeiture. As the United States Supreme Court explains: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the *timely assertion* of a right, waiver is the intentional relinquishment of a known right." *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (emphasis added) (citations and quotation marks omitted). In any event, under our definition:

"[W]aiver" is the intentional relinquishment of a right actually or constructively known, or intentional conduct inconsistent with claiming that right. The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right.

*Perry Homes v. Cull,* 258 S.W.3d 580, 602–03 (Tex.2008) (citations omitted).

21    *In re United Servs. Auto. Ass'n,* 307 S.W.3d 299, 306 (Tex.2010) (citation omitted).

22    *Loutzenhiser,* 140 S.W.3d at 359 (emphasis added).

23    *Id.* at 360. "Moreover, if in a particular case a governmental unit were not prejudiced by lack of notice and chose to waive it, we do not see how the statutory purpose would thereby be impaired." *Id.*

24    Reading Section 89.0041 in tandem with our settled precedent distinguishing mandatory requirements (waivable) from jurisdictional ones (nonwaivable) is consistent with a textualist approach that integrates established interpretive norms. For example, even the most ardent textualist would read a statute of limitations in light of the common-law rules of equitable tolling. *See Young v. United States,* 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.") (citations and quotation marks omitted); *see also United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). As Justice Scalia noted in *Young,* a limitations period is subject to the principles of equitable tolling, so long as the statutory text does not preclude such tolling. 535 U.S.

at 47, 122 S.Ct. 1036. Same here, where the Legislature drafts notice requirements in light of our decisions differentiating between mandatory and jurisdictional provisions and the consequences that flow from each characterization.

*See Perry Homes,* 258 S.W.3d at 589–91 (explaining that a party waives an arbitration clause by engaging in substantial litigation to the other party's detriment or prejudice).

In *Jernigan v. Langley*, the Court considered whether a defendant physician waived his statutory right to contest the adequacy of the plaintiff's expert reports by waiting too long. 111 S.W.3d 153, 153 (Tex.2003). The Court held that delay does not always result in waiver, but it does when the defendant's silence or inaction for such a long period shows an intent to yield a known right. *Id.* at 157. I would hold that the County's actions are inconsistent with the intent to assert its statutory right to up-front dismissal based on defective notice. Moreover, *Jernigan* predates our 2004 decision in *Loutzenhiser,* which speaks specifically to statutorily mandated notice requirements involving governmental units and says notice-based objections should be asserted "as soon as possible." 140 S.W.3d at 360.

It is true that defendants may assert defenses like limitations in the trial court even following extensive discovery and other pre-trial activity. *See* TEX.R. CIV. P. 94 (affirmative defenses including limitations must be pleaded); TEX.R. CIV. P. 63 (pleadings may be amended without leave of court until seven days before trial). Today's case, though, involves a statutory notice requirement that mandates action within a prescribed time, something *Loutzenhiser* held should be raised "as soon as possible" since the statutory purpose is to avoid litigation altogether. 140 S.W.3d at 360.

Section 89.0041 may not be a prerequisite to bringing suit, but it is a postrequisite to maintaining suit. In my view, Section 89.0041, unlike the Tort Claims Act, does not allow actual notice to forgive defective notice, but that does not mean actual notice may not affect the *waiver* inquiry of whether a defendant "timely asserted" noncompliance. For reasons stated above, I believe a county that quickly asserts statutory noncompliance, even if it has actual notice, is entitled to dismissal under Section 89.0041. But a county with actual notice that untimely asserts noncompliance (here only after limitations had run two-plus years later) has waived its objection and is not entitled to dismissal. *See City of DeSoto v. White,* 288 S.W.3d 389, 400–01 (Tex.2009) (noting that a party that declines to act in light of "full knowledge" of a defect in a nonjurisdictional notice requirement generally waives any complaint). Any other result would incentivize counties to sit on their rights rather than assert them immediately. Here, the County would be rewarded for wasting over two-years' worth of judicial resources and taxpayer dollars in defending a suit it could have easily dismissed from the outset.

\* \* \*

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

959 S.W.2d 171
Supreme Court of Texas.

SCHLUMBERGER TECHNOLOGY CORPORATION and Schlumberger Limited, Petitioners,

v.

John SWANSON, et al., Respondents.

No. 95–0355.　|　Dec. 11, 1997.

Consultants for offshore diamond mining project filed action against drilling company's parent company alleging claims of common law and statutory fraud and breach of fiduciary duty owed concerning release of claims. After jury found in favor of consultants and awarded actual damages, exemplary damages, and attorney fees, the 281st Judicial District Court, Harris County, Louis M. Moore, J., granted judgment notwithstanding the verdict (JNOV) for parent company. Appeal was taken. The Court of Appeals, 895 S.W.2d 719,reversed. Parent company filed application for writ of error. The Supreme Court, Enoch, J., held that: (1) lack of any evidence of agreement to share profits precluded existence of partnership; (2) confidential relationship imposing fiduciary duty on part of parent company concerning negotiations for release did not arise in absence of evidence of prior fiduciary relationship; and (3) consultants' unequivocal disclaimer of reliance on representations by parent company about feasibility and value of offshore diamond mining project, contained in written release, conclusively negated, as matter of law, element of reliance required to support their claims of fraudulent inducement, common law fraud, and statutory fraud.

Judgment of the Court of Appeals reversed, and judgment rendered.

West Headnotes (17)

**[1]　Partnership**　🔑　Creation and Requisites in General

Partnership consists of express or implied agreement containing four required elements: (1) community of interest in venture, (2) agreement to share profits, (3) agreement to share losses, and (4) mutual right of control or management of enterprise.

21 Cases that cite this headnote

**[2]　Mines and Minerals**　🔑　Creation and existence

Evidence that consultants were to receive royalty on any diamonds mined in offshore mining project and were paid consulting fee by drilling company's parent company did not constitute profit sharing required to prove existence of partnership. Vernon's Ann.Texas Civ.St. art. art. 6132b, § 7(3).

3 Cases that cite this headnote

**[3]　Mines and Minerals**　🔑　Creation and existence

Fact that drilling company's parent company paid money to consultants in settlement and to obtain release of their claimed interests in offshore diamond mining project did not constitute evidence of agreement to share profits in project required to prove existence of partnership.

4 Cases that cite this headnote

**[4]**     **Mines and Minerals**  👈 Creation and existence

Lack of any evidence of agreement to share profits precluded existence of partnership between consultants and drilling company's parent company concerning project for offshore mining of diamonds.

2 Cases that cite this headnote


**[5]**     **Fraud**  👈 Fiduciary or confidential relations

Informal relationship may give rise to fiduciary duty where one person trusts in and relies on another, whether relation is moral, social, domestic, or purely personal one, but not every relationship involving high degree of trust and confidence rises to stature of fiduciary relationship.

114 Cases that cite this headnote


**[6]**     **Fraud**  👈 Fiduciary or confidential relations

Although fiduciary or confidential relationship may arise from circumstances of particular case, imposition of such relationship in business transaction requires that relationship must exist prior to, and apart from, agreement that is made basis of suit.

83 Cases that cite this headnote


**[7]**     **Fraud**  👈 Fiduciary or confidential relations

Mere subjective trust does not, as matter of law, transform arm's-length dealing into fiduciary relationship.

53 Cases that cite this headnote


**[8]**     **Release**  👈 Fraud and Misrepresentation

Consultants' testimony that they relied on drilling company's parent company to negotiate fair price for withdrawal of offshore diamond mining project from joint venture, and that lease documents and testimony of parent company executives referred to consultants as partners, did not give rise to confidential relationship imposing fiduciary duty on part of parent company for purposes of consultants' claim that parent company fraudulently induced consultants to sign release of their alleged interests and claims relating to project and thereby allow parent company to sell project to other members in joint venture, absent evidence of prior fiduciary relationship.

5 Cases that cite this headnote


**[9]**     **Release**  👈 Fraud and Misrepresentation

Mere fact that consultants and parent company of drilling company were aligned together in negotiating with other participants in joint venture for withdrawal of their offshore diamond mining project from joint venture did not create confidential relationship giving rise to fiduciary duty on part of parent company for purposes of consultants' claim that parent company fraudulently induced consultants to sign release of their alleged interests and claims related to project, in absence of any prior fiduciary relationship.

13 Cases that cite this headnote


**[10]**     **Release**  👈 Fraud and Misrepresentation

Misrepresentations by drilling company's parent company to consultants about technological feasibility or commercial viability of offshore diamond mining project were actionable as fraudulent inducement of release of consultants' alleged interests in project.

1 Cases that cite this headnote

**[11]** **Release** Mistake

**Release** Fraud and Misrepresentation

Release is contract, and like any other contract, is subject to avoidance on grounds such as fraud or mistake.

5 Cases that cite this headnote

**[12]** **Release** Fraud and Misrepresentation

Consultants' unequivocal disclaimer of reliance on representations by drilling company's parent company about feasibility and value of offshore diamond mining project, contained in written release of consultants' alleged interests and causes of action relating to project, conclusively negated, as matter of law, element of reliance required for claims of fraudulent inducement, in light of circumstances that release was executed when parties were attempting to end their deal and were embroiled in dispute over feasibility and value of project, that parties were represented by competent counsel, and that parties were sophisticated business players dealing at arm's length.

117 Cases that cite this headnote

**[13]** **Release** Fraud and Misrepresentation

Release that clearly expresses parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude claim of fraudulent inducement, but disclaimer of reliance or merger clause will not always bar fraudulent inducement claim.

120 Cases that cite this headnote

**[14]** **Fraud** Reliance on Representations and Inducement to Act

Reliance is element of fraud.

18 Cases that cite this headnote

**[15]** **Fraud** Fraudulent Concealment

Fraud by nondisclosure is simply subcategory of fraud because, where party has duty to disclose, nondisclosure may be as misleading as positive misrepresentation of facts.

62 Cases that cite this headnote

**[16]** **Release** Fraud and Misrepresentation

Consultants' unequivocal disclaimer of reliance on representations by drilling company's parent company about offshore diamond mining project, contained in written release of consultants' alleged interest in project, covered both parent company's affirmative misrepresentations and alleged nondisclosures of geologic, economic, and technical information and thus precluded consultants' claims of common-law fraud based on alleged nondisclosures.

21 Cases that cite this headnote

[17]    Fraud  🗝 Persons who may rely on representations

Even assuming statutory fraud provision applied to parent company's purchase of written release of consultants' alleged interest in offshore diamond mining project, consultants' unequivocal disclaimer of reliance on representations by parent company, expressed in written release, negated any reliance by consultants on misrepresentations of parent company about commercial feasibility and value of project and therefore precluded claims of statutory fraud. V.T.C.A., Bus. & C. § 27.01(a)(1)(B).

59 Cases that cite this headnote

**Attorneys and Law Firms**

**\*172** Linda L. Addison, Roger Townsend, Joy M. Soloway, Hugh E. Tanner, Blake Tartt, **\*173** Houston, Ben Taylor, Dallas, Joe R. Greenhill, Austin, for petitioners.

F. Eric Fryar, Evelyn Jo Wilson, Houston, Franklin Jones, Jr., Marshall, Douglas Laycock, Russell J. Weintraub, Austin, Kendall C. Montgomery, Houston, Stephen D. Susman, Dallas, John M. O'Quinn, Houston, Luther H. Soules, III, San Antonio, William Powers, Jr., Pamela Stanton Baron, Austin, for respondents.

**Opinion**

ENOCH, Justice, delivered the opinion of the court.

This is a commercial dispute. In settling this dispute, the Swansons signed a release that disclaimed reliance on the representations of Schlumberger. The question is whether this disclaimer precludes, as a matter of law, the Swansons from recovering damages against Schlumberger for fraudulently inducing them to settle. The trial court granted a judgment for Schlumberger notwithstanding the jury's verdict for the Swansons. The court of appeals reversed, holding that the disclaimer of reliance did not preclude the Swansons' fraudulent inducement claim. 895 S.W.2d 719. We agree with the trial court. Accordingly, we reverse the court of appeals' judgment and render judgment for Schlumberger.

**I. FACTS**

In the 1970s, John Swanson and his brother George Swanson approached SEDCO, Inc. about a proposal to mine diamonds from the ocean floor in deep waters off the South African coast. SEDCO had expertise in offshore oil and gas drilling and had mined manganese nodules off the ocean floor. The Swansons, whose family had been in the mining industry in South Africa for several decades, had contacts with the South African government. By letter dated October 17, 1978, SEDCO agreed to a three-phase project. In Phase I, SEDCO would study the feasibility of the sea-diamond project. In Phase II, a lease was to be acquired and prospecting was to begin. Phase III was to be commercial mining. The agreement provided that SEDCO had exclusive authority to determine whether to proceed with Phases II and III.

The Swansons were to use their goodwill and contacts to obtain concession rights and any licenses or permits the South African government required. They also were to provide SEDCO with information on diamond mining generally and offshore mining specifically. For their part, the Swansons would be paid a consulting fee through Phases I and II and a royalty, if any, on any diamonds mined during Phases II and III. Should the project ever become commercially productive, the Swansons had the right to purchase five percent of the shares in the company contemplated to be formed to mine the diamonds. SEDCO was to bear the

expense of all phases of the project, with the exception of the Swansons' own out-of-pocket expenses. Any diamond grants or offshore concessions or leases were to be held by SEDCO, by the company to be formed, or by the Swansons, but as trustees.

SEDCO completed Phase I in 1979 and opted to proceed with Phase II. In July 1983, SEDCO and George E. Swanson Enterprises, as co-lessees, obtained a prospecting lease, Lease 3C, from the South African government. At the same time, the South African government issued leases on surrounding tracts to other companies. DeBeers Mining Consolidated Limited (DeBeers) obtained Leases 4C and 5C immediately to the south; African Selection Trust Exploration (Pty.) Limited (Seltrust), a subsidiary of British Petroleum, obtained Lease 2C to the north.

Almost immediately after receiving the leases, SEDCO, DeBeers, and Seltrust began negotiating a joint venture agreement to jointly develop the mining project. In December 1984, before this joint venture agreement was finalized, Schlumberger Technology Corporation acquired SEDCO by merger and formed Sedswan Diamonds (Pty.), Limited, a wholly-owned South African subsidiary, to continue the sea-diamond project. Sedswan then entered into the joint venture with DeBeers and Seltrust in February 1985. Around the same time, the South African government reissued Lease 3C in Sedswan's name only and without reference to George E. Swanson Enterprises. Sedswan, DeBeers, and Seltrust participated in the joint venture through 1986. In early January **\*174** 1987, the Swansons became concerned about rumors that Schlumberger was going to stop funding its share or withdraw from the joint venture. Further, they were disturbed about the lack of information they were receiving on the project's progress. Consequently, the Swansons consulted a lawyer. Their objectives were to ensure that Schlumberger stayed in the joint venture and that their rights under the original letter agreement, which predated the joint venture agreement, were enforced. Of particular concern to the Swansons was the effect of the joint venture agreement on the Swansons' interests, including Schlumberger's ability to dilute Sedswan's joint venture interest after an initial investment, the right of first refusal given to the other joint venture members, and a confidentiality agreement.

Shortly after the Swansons hired their lawyer, Schlumberger gave notice to DeBeers and Seltrust of its intent to withdraw Sedswan from the joint venture. As required by the joint venture agreement, Schlumberger offered to sell Sedswan's interest to the remaining joint venture members. DeBeers and Seltrust rejected this offer, each refusing to buy out Sedswan's interest so long as it was subject to any rights the Swansons may claim.

During the next thirteen months, Schlumberger negotiated its withdrawal from and a price for Sedswan's joint venture interest with DeBeers and Seltrust. Schlumberger initially offered to sell Sedswan's interest for twenty-five million dollars plus a royalty. DeBeers and Seltrust rejected this offer and countered at ten million rand. Schlumberger dropped its demand for a royalty and offered to sell for thirty-five million dollars. Again, DeBeers and Seltrust rejected this offer, holding firm at ten million rand.

Throughout this time, Schlumberger discussed the various proposals with the Swansons, communicating mostly through their lawyer. According to the Swansons, Schlumberger represented to them that the sea-diamond project was neither technologically feasible nor commercially viable, but refused to give them joint venture progress reports and other information and data supporting Schlumberger's views. During these negotiations, Schlumberger also disputed the validity of the Swansons' rights and interests in the joint venture, claiming that the joint venture agreement altered whatever rights the Swansons had. Displeased with Schlumberger's decision to withdraw Sedswan from the joint venture and concerned about Schlumberger's assertions disputing their interests and its unwillingness to turn over joint venture information, the Swansons contemplated suing Schlumberger but did not.

Instead, in February 1988, a little more than a year after Schlumberger gave notice of its withdrawal from the joint venture, the Swansons agreed that Schlumberger would buy their interest for two million South African rand (about $814,000). In exchange, the Swansons relinquished all rights, claims, and interests in the offshore diamond project and Lease 3C and released all causes of action against Schlumberger, known or unknown. In the release, the Swansons specifically agreed that they were not relying on any statement or representation of Schlumberger, SEDCO, or Sedswan, that they were relying on their own judgment, and that they had been represented by counsel who had explained the entire contents and legal consequences of the release.

Schlumberger thereafter sold Sedswan's interest to DeBeers and Seltrust for 10 million rand (about $4,100,000). After recouping its investment in the project of 6.8 million rand (about $2,767,000), buying out the Swansons' interests for two million rand (about $814,000) and paying them an additional $200,000 in consulting fees, Schlumberger netted 778,000 rand (about $319,000) from the offshore diamond project.

Asserting that Schlumberger had misrepresented the project's viability and value, the Swansons then sued Schlumberger and its parent corporation, Schlumberger Limited, Inc., for fraudulently inducing them to sell their interest at an undervalued price. The Swansons also alleged breach of fiduciary duty.

The jury found for the Swansons and against Schlumberger on all issues. The jury awarded the Swansons fifteen million dollars in actual damages, thirty-five million **\*175** dollars in exemplary damages on a statutory fraud claim under section 27.01 of the Texas Business and Commerce Code, ten million dollars in exemplary damages on the common law claims, and attorney's fees. As already mentioned, the trial court rendered a judgment notwithstanding the verdict, but the court of appeals reversed and rendered judgment in accordance with the jury's findings. 895 S.W.2d 719.

Here, Schlumberger contends that the release precludes all of the Swansons' claims as a matter of law; that there is no evidence of common law fraud, statutory fraud under section 27.01 of the Texas Business and Commerce Code, or breach of fiduciary duty; and that the court of appeals erred in awarding prejudgment interest on future damages. We agree that the release precludes all of the Swansons' claims as a matter of law. Accordingly, we reverse the court of appeals' judgment and render judgment for Schlumberger. Because of our disposition, we need not reach the prejudgment interest issue.

## II. RELATIONSHIP OF THE PARTIES

Schlumberger argues that the Swansons' fraud claims are barred as a matter of law because the Swansons were represented by legal counsel throughout the arm's-length negotiations between the parties. Schlumberger contends that when a party is represented by counsel and that party agrees that, in signing a release, it is not relying on any statement or representation of the party to be released, the presence of independent legal advice breaks the chain of both reliance and causation. Schlumberger reasons that if parties can refute their reliance, even though they were represented by counsel when they settled their claims, litigation never ends. This is so, Schlumberger says, because dissatisfied parties could always break their settlement by claiming that the other party, through its misrepresentations, fraudulently induced them to enter into the settlement or release.

Important to Schlumberger's position is its assertion that it was negotiating with the Swansons at arm's length. Schlumberger contends that it openly disputed the validity of the Swansons' interests in the sea-diamond project. Schlumberger further contends that, by virtue of the extended adversarial negotiations through legal counsel over the Swansons' rights and the buyout of their interests, if any, Schlumberger did not owe a fiduciary duty to the Swansons during the negotiations.

The Swansons respond, however, that there was a long-standing fiduciary relationship that arose either because Schlumberger and the Swansons were partners or because they were parties to a confidential relationship. Given that relationship, the Swansons argue, Schlumberger cannot unilaterally eliminate the fiduciary duty by generating a dispute with the Swansons.

As the relationship between the parties informs both parties' arguments on the effect of the disclaimer of reliance, we must first determine the nature of that relationship.

### A. PARTNERSHIP

In *Johnson v. Peckham,* 132 Tex. 148, 120 S.W.2d 786, 788 (1938), we held that a partner selling his interest to another partner has a fiduciary duty requiring full disclosure of all important information about the value of the interest. This is true, we said,

even though the partners had strained relations and one partner had sued for an accounting and dissolution of the partnership. *Johnson,* 120 S.W.2d at 788. "If the existence of strained relations should be suffered to work an exception [to the fiduciary relationship], then a designing fiduciary could easily bring about such relations to set the stage for a sharp bargain." *Id.* We concluded that more mischief would result from relieving the fiduciary of his duty to make full disclosure than from requiring adherence to his fiduciary responsibilities. *Id.* If Schlumberger and the Swansons were partners, *Johnson* counsels that their negotiations terminating their relationship would not be at arm's length, but would be conducted under the higher fiduciary standard requiring full disclosure.

Schlumberger does not challenge *Johnson* on principle, but contends that there is no evidence of a partnership between it and the Swansons. We agree.

**\*176** At the outset, we note that the Legislature revised the Texas Uniform Partnership Act in 1993, effective January 1994. Act of May 31, 1993, 73d Leg. R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887. As the Swansons and SEDCO originally formed their enterprise in 1978, the pre–1993 statute and case law decided under that statute control our determination. *See* TEX.REV.CIV. STAT. ANN.. art. 6132b, § 47.

[1] Under the Texas Uniform Partnership Act, a partnership or joint venture is an association of two or more persons to carry on as co-owners a business for profit. TEX.REV.CIV. STAT. ANN.. art. 6132b, § 6. As the issue was submitted to the jury, a partnership consists of an express or implied agreement containing four required elements: (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *See Coastal Plains Dev. Corp. v. Micrea, Inc.,* 572 S.W.2d 285, 287 (Tex.1978). Accordingly, if there is no evidence of any one element of a partnership, we cannot sustain the jury's affirmative finding.

[2] We conclude that there is no evidence of an agreement to share profits. The undisputed evidence is that the Swansons were to receive a royalty on diamonds mined in Phases II and III and that their royalty was to be paid before expenses. Entitlement to a royalty based on gross receipts is not profit sharing. *See* TEX.REV.CIV. STAT. ANN.. art. 6132b, § 7(3) (sharing gross returns does not itself establish partnership); *see also Patton v. Callaway,* 522 S.W.2d 252, 256 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.). Of course, the payment of consultation fees is not the sharing of profits. Such payments are compensation for services rendered and are unrelated to the venture's profits. *See Grimmett v. Higginbotham,* 907 S.W.2d 1, 2–4 (Tex.App.—Tyler 1994, writ denied) (weekly compensation unrelated to financial requirements of business is no evidence of agreement to share profits or losses); *Gutierrez v. Yancey,* 650 S.W.2d 169, 172 (Tex.App.—San Antonio 1983, no writ) (partners must participate in profits and share them as principals of business and not as compensation).

[3] The Swansons further urge, though, that an agreement to share profits is evidenced by the fact that they received part of the sale proceeds for Sedswan's joint venture interest. But this is evidence only that the Swansons may have had an interest in the sea-diamond project. It is circular to contend that the payment in settlement of the Swansons' disputed interests proves those interests. The two million rand Schlumberger paid the Swansons to settle and release their claimed interests in the sea-diamond project is no evidence of an agreement to share partnership profits.

[4] Because there is no evidence of an agreement to share profits, there is no evidence of a partnership under the question submitted to the jury. This conclusion renders unnecessary any consideration of Schlumberger's other evidentiary contentions on the remaining elements of a partnership. We conclude that the Swansons and Schlumberger were not partners.

## B. CONFIDENTIAL RELATIONSHIP

The Swansons claim that even if the technical requirements of a partnership are not satisfied, they were nonetheless owed a fiduciary duty by Schlumberger arising out of a confidential relationship. Agreeing with the Swansons, the jury found that between January 1987 (when Schlumberger decided to withdraw Sedswan from the joint venture) and October 1988 (when

the release was finally signed and the transaction closed), Schlumberger and the Swansons had a relationship of special trust and confidence and that Schlumberger breached its fiduciary duty arising from that relationship by making representations that fraudulently induced the Swansons to sign the release.

 [5]    [6]    An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962); *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951). But not every relationship involving a high  **\*177**  degree of trust and confidence rises to the stature of a fiduciary relationship. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992). In order to give full force to contracts, we do not create such a relationship lightly. *See Thigpen,* 363 S.W.2d at 253. Accordingly, while a fiduciary or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 280 (Tex.1995). In this case, there is no evidence that a prior fiduciary relationship had arisen between the Swansons and Schlumberger.

 [7]    [8]    We recognize that the Swansons testified that they trusted and relied on Schlumberger to negotiate a fair price with DeBeers and Seltrust for Sedswan's interest in the joint venture. However, mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship. *See Crim Truck,* 823 S.W.2d at 595. In addition, though, the Swansons point out that certain Schlumberger and SEDCO executives testified that the Swansons were their "partners" in the sea-diamond project, and that the original lease application to the South African government and the original lease from the South African government provided that SEDCO and the Swansons were partners. The Swansons maintain that this evidence established, at the very minimum, that both parties believed a confidential relationship existed, providing some evidence to support the jury's finding. Again, the fact that the parties to a transaction trust one another will not, in and of itself, establish a finding of a confidential relationship. *See Thigpen,* 363 S.W.2d at 253. Instead, to impose such a relationship in a business transaction, " 'there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit.' " *Tyra v. Woodson,* 495 S.W.2d 211, 213 (Tex.1973) (quoting *Consolidated Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966)). As we have said, there is no evidence of a prior fiduciary relationship in this case.

 [9]    The Swansons next rely on evidence that Schlumberger thought it had an obligation to get the best deal it could for itself and the Swansons, to "put the Swansons' interest at least equal" to its own, and that it was representing the Swansons' interest in negotiating with DeBeers and Seltrust. This evidence proves only that Schlumberger's interests were aligned with the Swansons' to obtain the best possible price for Sedswan's joint venture interest and, to that end, Schlumberger spoke not only for itself, but also for the Swansons. To permit any further inference would impose a fiduciary relationship in every contract because all contracting parties presumably contract for their mutual benefit. Once again, the fact that Schlumberger and the Swansons were aligned does not create a confidential relationship giving rise to a fiduciary duty in the absence of a prior relationship.

Finally, the Swansons argue that *Manges v. Guerra,* 673 S.W.2d 180 (Tex.1984), imposes a fiduciary duty on Schlumberger. In *Manges,* we recognized that a holder of executive rights to a mineral estate owes a fiduciary duty to the non-executive interest. 673 S.W.2d at 183. That is not the situation here. *Manges* simply is inapposite.

We conclude that there is no evidence of a partnership or confidential relationship between Schlumberger and the Swansons that would give rise to a fiduciary duty on Schlumberger's part.

### III. DISCLAIMER OF RELIANCE

Given that Schlumberger and the Swansons were dealing with each other at arm's length, we now turn to Schlumberger's contention that the disclaimer of reliance clause in the release precludes the Swansons' fraudulent inducement claim. It does.

To support their fraudulent inducement claim, the Swansons alleged that Schlumberger made several affirmative misrepresentations during their negotiations over the withdrawal of Sedswan from the joint venture. The Swansons had seen an April 1986 Schlumberger evaluation that described the project as "economical," but noted that the "commerciality" of the project would not be **\*178** determined until 1988 or 1989. Despite the 1986 evaluation, and without having undertaken any later studies, Schlumberger represented to the Swansons that the project was neither technologically feasible nor commercially viable. In addition, Schlumberger represented that the project had a negative value and that Sedswan would be lucky to get out with its costs.

 [10]    At trial, the evidence was undisputed that there are diamonds on the ocean floor off South Africa. It was further undisputed that, as of the time of trial in 1993, no one had begun mining diamonds. Also, it was undisputed that Seltrust's successor sold its interest to DeBeers in 1992 for only slightly more than its project costs. On the other hand, there was substantial dispute about whether the project was technologically feasible or commercially viable. Schlumberger brings a point of error asserting that there is legally insufficient evidence of fraud, but it does not argue in its briefing in this Court that its representations about the project's technological or commercial infeasibility were immaterial, were merely opinion, or were either not knowingly made or not made without knowledge of the truth. *See Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 163 (Tex.1995). Accordingly, we assume, as we must, that Schlumberger misrepresented the project's technological feasibility and commercial viability and that such misrepresentations are actionable as fraudulent inducement.

In this light, Schlumberger asks us to adopt a *per se* rule that the presence of independent legal counsel always precludes a claim that a party fraudulently induced a release. Texas law does not support such a rule.

 [11]    Texas law favors and encourages voluntary settlements and orderly dispute resolution. However, a release is a contract, and like any other contract, is subject to avoidance on grounds such as fraud or mistake. *See Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990); *Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 236–37 (1957). Yet our early decisions are not entirely consistent. Several of our opinions conclude that a release could be set aside if it was induced by a fraudulent representation or promise—even if the release contained language disclaiming that any such representation had been made. Other cases hold to the contrary.

In *Texas & Pacific Railway Co. v. Presley,* 137 Tex. 232, 152 S.W.2d 1105 (Tex.1941), an injured worker settled his claim against his employer for $50, executing a release providing that he relied upon his own judgment as to the extent and duration of his injuries and that no promise of employment or other agreement not mentioned in the release had been made to him. *Id.* at 1106. The worker later sued to set aside the release, contending that his employer's doctor had misrepresented the extent of his injuries and that the employer had promised him permanent employment for executing the release, with no intention of fulfilling that promise. *See id.* We held that proof of these contentions would be sufficient to set aside the release. *Id.* at 1108. This could be done, we decided, even though the plaintiff may have read and understood the release. *Id.* at 1107.

Similarly, in *Edward Thompson Co. v. Sawyers,* 111 Tex. 374, 234 S.W. 873 (1921), a buyer purchased a set of legal encyclopedias based on the seller's oral promise that it would continue to publish and deliver annual supplements for at least fifteen years. The buyer proved that the seller made this promise with no intention of fulfilling it. We held that this constituted fraud sufficient to set aside the agreement, even though the written contract provided that no representations or guaranties had been made by the seller that were not expressed therein. "Promises made without intention of fulfillment, in order to induce others to make contracts, are as culpable and as harmful as are willful misrepresentations of existing facts. Hence contracts may be avoided alike for such fraudulent promises and for such misrepresentations." *Id.* at 874. We explained that, where a contract is induced by fraud, there is in reality no contract because there is no "real assent" to the agreement. *Id.* Thus, the defrauded party is not bound by any of the contractual provisions, "including those relating to representations or guaranties which induced its execution." *Id.* at 874–75.

 **\*179**  There are other early cases, however, that reach the opposite result. For example, in *Distributors Investment Co. v. Patton,* 130 Tex. 449, 110 S.W.2d 47 (Tex.1937), the seller of a tractor sued the buyer on his promissory note. In defense,

the buyer contended that the seller had fraudulently induced the transaction by orally misrepresenting the tractor's capabilities. The contract provided that the tractor was sold "as is," and further provided that no other representations had been made. *Id. at 48.* We held that, in light of these contract provisions, an action for rescission could not be maintained on account of oral representations. Although recognizing that "fraud vitiates a contract," we concluded that the fraud must be something more than merely oral representations that conflict with the terms of the written contract. *Id.* Instead, to vitiate the contract, the fraud must be such that it "prevents the coming into existence of any valid contract at all." *Id.; see also Avery Co. v. Harrison Co.,* 267 S.W. 254, 256 (Tex. Com. App.1924, judgm't adopted); *J.I. Case Threshing Mach. Co. v. Manes,* 254 S.W. 929, 931 (Tex. Com. App.1923, judgm't adopted); *Wright v. Couch,* 54 S.W.2d 207, 209 (Tex.Civ.App.—Eastland 1932, no writ).

In *Dallas Farm Machinery Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233 (1957), we considered whether parol evidence was admissible, despite a merger clause in a written contract, to establish that a contract was induced by fraud. The seller brought suit against the purchaser of a tractor and loader for the balance due on the purchase contract. The buyer counterclaimed for rescission, claiming that he was fraudulently induced to contract by false representations about the work capacities of the tractor and loader. The seller argued that a merger clause providing that the contract was "the entire contract relating to the sale and warranty" of the equipment and that "no warranty is made or authorized to be made other than herein set forth" precluded the buyer's fraudulent inducement claim. *Id.* at 234. In resolving the parties' dispute, we considered the two lines of cases discussed previously and concluded that they represented conflicting lines of authority that could not be distinguished on any principled ground. *See id.* at 238–39. We resolved the conflict by holding, as a matter of policy, that a merger clause can be avoided based on fraud in the inducement and that the parol evidence rule does not bar proof of such fraud. *See id.* at 239. In doing so, we brought the law on the subject "into harmony with the great weight of authority, with the rule of the Restatement of the Law of Contracts, and with the views of eminent textwriters." *Id.* (citations omitted).

Juxtaposed to this authority, we have a competing concern—the ability of parties to fully and finally resolve disputes between them. Parties should be able to bargain for and execute a release barring all further dispute. This principle necessarily contemplates that parties may disclaim reliance on representations. And such a disclaimer, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim. As an example, a disclaimer of reliance may conclusively negate the element of reliance, which is essential to a fraudulent inducement claim. *See Prudential,* 896 S.W.2d at 161–62 (holding that agreement to buy property "as is," in which buyer included "voluntary, freely negotiated affirmation that he was depending on his own assessment of the building," precluded claim for damages when building was found to contain asbestos); *Estes v. Hartford Accident & Indem. Co.,* 46 S.W.2d 413, 417–18 (Tex.Civ.App.—El Paso 1932, writ ref'd) (affirming directed verdict upholding release where evidence conclusively negated reliance on alleged misrepresentations). The question is under which circumstances such disclaimers are binding.

 [12]    In this case, the Swansons contend that they agreed to Schlumberger's low-price buyout offer only after they were induced by misrepresentations about the value and feasibility of the sea-diamond project. We conclude that our well-established rules of contract interpretation govern whether the Swansons gave the requisite clear and unequivocal expression of intent necessary to disclaim reliance on these specific representations by Schlumberger. The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding. *See Columbia Gas Transmission* **\*180** *Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 591 (Tex.1996); *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *Prudential,* 896 S.W.2d at 162. Because the parties were attempting to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project, we conclude that the disclaimer of reliance the Swansons gave conclusively negates the element of reliance.

In negotiating the release, highly competent and able legal counsel represented both parties and, as we have said above, the parties were dealing at arm's length. Further, both Schlumberger and the Swansons are knowledgeable and sophisticated business players. The Swansons have been involved in traditional diamond mining in South Africa for several decades. They and Schlumberger, a multinational corporation, were engaged in a business venture involving tens of millions of dollars and in negotiations to sell their interests ultimately for several million dollars.

Significantly, throughout the parties' negotiations, the Swansons disagreed with Schlumberger about the feasibility and value of the sea-diamond project. Schlumberger never convinced the Swansons that DeBeers' offer was a good deal; four days before he signed the release, John Swanson wrote to his attorney that the Swansons' lease interest was "worth billions." The Swansons seriously considered suing Schlumberger even *before* the sale to DeBeers and Seltrust. Indeed, the release states that the Swansons claimed that they had an interest in the mining consortium and in Schlumberger's prospecting lease, and that Schlumberger was "liable to the Swansons in connection with the prospecting or exploration of diamonds or other precious stones or minerals in South Africa." In this connection, the release recites that

> there is considerable doubt, disagreement, dispute and controversy with reference to the validity of the Swansons' claim against [Schlumberger] and as to the legal or moral liability of [Schlumberger] for any amount of damages or justification for legal relief, and there is further doubt, disagreement, uncertainty and confusion as to the amount of said liability, if any.

Further, the Swansons released all "causes of action of whatsoever nature, or any other legal theory arising out of the circumstances described above, from any and all liability damages of any kind known or unknown, whether in contract or tort." The sole purpose of the release was to end the dispute about the value of this commercial project between Schlumberger and the Swansons once and for all.

In this context and in clear language, the Swansons unequivocally disclaimed reliance upon representations by Schlumberger about the project's feasibility and value. They said:

> [E]ach of us [the Swansons] expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that **none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment** and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release .... (emphasis added)

Because courts are to assume that the parties intended every contractual provision to have some meaning, *see Columbia Gas,* 940 S.W.2d at 591; *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996), we must presume that the parties contemplated, by the inclusion of this clause, that the Swansons would not rely on any representations of Schlumberger about the commercial feasibility and value of this project, which, after all, was the very dispute that the release was supposed to resolve. Therefore, we conclude that the disclaimer of reliance is binding and, as a matter of law, precludes the Swansons' claim that they were fraudulently induced to sell their interest in the sea-diamond project.

 **\*181** **[13]**  In sum, we hold that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement. We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. *See Prudential,* 896 S.W.2d at 162 (identifying some circumstances in which "as is" clause would not preclude fraudulent inducement claim). We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance on representations about the feasibility and value of the sea-diamond mining project needed to support the Swansons' claim of fraudulent inducement. As there is no evidence of a fiduciary or confidential relationship, the trial court correctly rendered a judgment notwithstanding the verdict against the Swansons on their claims of breach of fiduciary duty and fraudulent inducement.

## IV. COMMON–LAW FRAUD

The Swansons contend that even if the disclaimer of reliance precludes their claim that they were fraudulently induced to sign the release by Schlumberger's affirmative misrepresentations, it does not preclude their claim of fraud by non-disclosure. Under common-law fraud, the Swansons assert, Schlumberger had an affirmative duty to disclose material information about the sea-diamond project because Schlumberger knew that the Swansons did not have an equal opportunity to discover the information, that the Swansons lacked accurate information on the project's value and feasibility, and that the Swansons were relying on this inaccurate information in selling their interests in the project. *See Smith v. National Resort Communities, Inc.,* 585 S.W.2d 655, 658 (Tex.1979). In addition, the Swansons claim that Schlumberger, having made only partial disclosures that were misleading, had a duty to disclose the whole truth about the value and feasibility of the project. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986). The Swansons contend that Schlumberger withheld geologic, economic, and technical information that would have permitted the Swansons to make their own assessment of the sea-diamond project. Again, we assume that Schlumberger had a duty to disclose pertinent information and failed to do so.

[14] [15] The Swansons assert that the jury's verdict must be sustained because reliance is not an element of a claim for fraud by non-disclosure. We disagree. Reliance is an element of fraud. *See Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977). Fraud by non-disclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts. *See Smith,* 585 S.W.2d at 658.

The Swansons rely on *Johnson,* 120 S.W.2d at 787, in which we said that partners owe each other a duty to make full disclosure of all material facts within their knowledge relating to partnership affairs. Because of that duty, we held that the issue of one partner's reliance on the other to discharge that duty to disclose was immaterial. *Id.* at 788. *Johnson* is not pertinent to our discussion because, as we have said, there is no evidence of a partnership or other confidential relationship between Schlumberger and the Swansons.

[16] Even so, the Swansons assert that the disclaimer of reliance is nonetheless immaterial because it does not disclaim reliance on Schlumberger's non-disclosures; it does not say, for example, that "none of us is relying on Schlumberger for accurate reports about the project." Schlumberger responds that the language of the disclaimer of reliance expressly covers claims for both affirmative statements and non-disclosures. In particular, Schlumberger asserts that the alleged non-disclosures are merely the converse of the misrepresentations; the disclaimer of reliance covers any "non-disclosures" that are the equivalent of the representations on which the Swansons disclaimed reliance. We agree with Schlumberger.

In support of their argument, the Swansons reiterate the evidence that in April 1986 Schlumberger had a report that positively **\*182** assessed the technological and economic feasibility of the sea-diamond project, yet in 1987 and 1988, after Schlumberger decided to withdraw Sedswan from the joint venture, Schlumberger made statements and disclosures to the Swansons indicating that the technology was unworkable and the project would not be commercially feasible. Had Schlumberger disclosed the geological, economic, and technical data available to it, the Swansons contend that they would have been able to make their own assessment and determine that there had been no adverse developments since April 1986. In short, had Schlumberger disclosed all the true facts about the project, it would not have affirmatively misrepresented the truth. The Swansons' non-disclosure allegations are simply the converse of Schlumberger's affirmative misrepresentations and are covered by the disclaimer of reliance.

## V. SECTION 27.01 OF THE TEXAS BUSINESS & COMMERCE CODE

In addition to finding breach of fiduciary duty and common-law fraud, the jury found that Schlumberger committed fraud in connection with a real estate transaction in violation of section 27.01 of the Texas Business and Commerce Code. TEX. BUS. & COM.CODE § 27.01. Schlumberger contends that section 27.01 does not apply to the Swansons' interest in the sea-diamond project. Schlumberger argues that the Swansons' interest at most was an interest in a prospecting lease off the South African coast, which under both South African and Texas law is a personal property interest, and not an interest in real estate.

 **[17]**    We need not consider the choice-of-law and applicability issues Schlumberger raises. Nor do we approve or disapprove of the court of appeals' discussion on the application and construction of section 27.01 in this case. For our purposes, we assume, without deciding, that section 27.01 applies to Schlumberger's purchase of the Swansons' interest. Given that assumption, we hold that the disclaimer of reliance precludes the Swansons' statutory fraud claim.

As with the common law, reliance is a necessary element of a statutory fraud claim under section 27.01. TEX. BUS. & COM.CODE § 27.01(a)(1)(B). As is clear from our previous discussion, the disclaimer of reliance in this case conclusively negates the Swansons' allegation that they relied on misrepresentations about commercial feasibility and value by Schlumberger in selling their interest in the sea-diamond project. The trial court's judgment notwithstanding the verdict was in all respects proper.

\* \* \* \* \* \*

We reverse the judgment of the court of appeals and render judgment that the Swansons take nothing.

OWEN, J., not sitting.

**Parallel Citations**

41 Tex. Sup. Ct. J. 165

---

          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

186 S.W.3d 182
Court of Appeals of Texas,
Fort Worth.

Allison SCOTT–RICHTER, Individually, a/k/a Allison Scott, Allison L. Scott, as Trustee of the Thomas
Eugene Scott, Jr. Living Trust, and Allison L. Scott, as Trustee of the Allison L. Scott Trust, Appellants,

v.

Diana TAFFARELLO and Robert L. Soltis, Jr., Appellees.

No. 2–05–122–CV.    |    Feb. 2, 2006.

**Synopsis**
**Background:** Lessee, who was a prospective purchaser of leased property, brought action against lessor seeking declaratory judgment, and asserting claims for breach real estate contract, fraud, and breach of lease agreement. Lessor also asserted a third-party claim. Lessee and third-party filed motion to enforce settlement agreement. Lessor moved to continue the hearing on motion to enforce. The 16th District Court, Denton County, Carmen Rivera-Worley, J., recessed the hearing, ordered parties to return to mediation, and awarded lessee and third-party attorney fees. After mediation failed, lessee and third-party reasserted claims and added claim for breach of the memorandum of settlement. Denying lessor's request for jury trial, the District Court granted motion to enforce settlement agreement. Lessor moved for new trial and District Court denied. Lessor appealed.

**Holdings:** The Court of Appeals, Dixon W. Holman, J., held that:

[1] lessor's failure to timely file notice of appeal of denial of its motion for new trial did not require dismissal of appeal;

[2] lessor's claim of error for denial of jury trial on lessee's breach of contract claim was moot;

[3] lessor was foreclosed from challenge the motion to enforce; and

[4] award of attorney fees was warranted.

Affirmed.

West Headnotes (9)

**[1]**     **Appeal and Error**    🗝    Relief from effect of failure
Lessor's failure to timely file notice of appeal of trial court denial of its motion for new trial on lessee's breach of lease and fraud claims did not require appeal to be dismissed for lack of jurisdiction; letter from appellate court granted lessor twelve days to show reasonable explanation of late filing of the notice of appeal, lessor provided a reasonable explanation for the late filing, and, although the notice of appeal recited that it was being taken to a different appellate court, the lessor timely amended its notice to cure the error. Rules App.Proc., Rules 25.1(d, f), 26.3, 44.3.

1 Cases that cite this headnote

**[2]**    **Appeal and Error**    ⚷    Review of specific questions in general

Lessor's claim that trial court erred by denying request for jury trial on lessee's breach of contract claim was moot; lessee withdrew breach of contract claim during hearing on enforcement of settlement agreement, and order granting the motion to enforce settlement agreement expressly dismissed the breach of contract claim. U.S.C.A. Const.Amend. 7; Vernon's Ann.Texas Const. Art. 5, § 10; Vernon's Ann.Texas Rules Civ.Proc., Rule 216.

Cases that cite this headnote

**[3]**    **Compromise and Settlement**    ⚷    Necessity of writing

The rule requiring agreements between parties to be in writing in order to be enforceable aims to eradicate the misunderstandings and controversies commonly associated with verbal agreements among parties and counsel. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

1 Cases that cite this headnote

**[4]**    **Compromise and Settlement**    ⚷    Necessity of writing

Agreements in writing and filed with the court allow the writings to speak for themselves so that the court can judge of their import, and proceed to act upon them with safety. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

2 Cases that cite this headnote

**[5]**    **Compromise and Settlement**    ⚷    Enforcement

A trial court has a ministerial duty to enforce a valid written settlement agreement between parties. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

3 Cases that cite this headnote

**[6]**    **Compromise and Settlement**    ⚷    Necessity of writing
         **Compromise and Settlement**    ⚷    Enforcement

Attorneys, on behalf of their clients, lessor and lessee, entered into a valid written settlement agreement, and thus, trial court had a ministerial duty to enforce the agreement; clerk's record contained a "Notice of Filing of Rule 11 Agreement" which stated that it was an enforceable agreement under Rule 11, contained signatures of both parties' attorneys, was filed with the trial court as part of the record, and contained statement that lessor agreed not to challenge amended motion to enforce settlement agreement filed by lessee. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

5 Cases that cite this headnote

**[7]**    **Appeal and Error**    ⚷    Agreements and stipulations
         **Compromise and Settlement**    ⚷    Enforcement

Fact that the written settlement agreement filed with clerk regarding dispute between lessor and lessee contained statement that lessor agreed not to challenge lessee's amended motion to enforce the settlement agreement foreclosed lessor's ability to challenge the motion to enforce or to complain on appeal regarding the terms of the motion and subsequent order granting the motion. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

Cases that cite this headnote

**[8]**    **Appeal and Error**   🔑   Scope and Effect of Objection

        **Appeal and Error**   🔑   Form and requisites in general

Lessor failed to preserve for appellate review its claim that trial court abused its discretion by awarding attorney fees to lessee, although lessor's counsel stated at trial court hearing that it opposed lessee's request for attorney fees, where lessor failed to present arguments to trial court and failed to cite any authority for its argument in its appellate brief. Rules App.Proc., Rules 33.1(a)(1)(A), 38.1(h).

1 Cases that cite this headnote

**[9]**    **Compromise and Settlement**   🔑   Enforcement

Trial court decision awarding lessee attorney fees from lessor in its action to enforce settlement agreement was warranted; despite lessor's contention that award was granted at a time that lessor was without legal representation, trial court granted award prior to granting motion to withdraw from lessor's counsel, and the award was not premature, as trial court upheld the award at two subsequent occasions.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*184**   Law Office of James P. Moon, PLLC, James P. Moon, Desoto, for appellants.

Law Office of Bruce K. Thomas, Bruce K. Thomas, David Spoede, Dallas, for appellees.

PANEL A: CAYCE, C.J.; HOLMAN and McCOY, JJ.

### OPINION

DIXON W. HOLMAN, Justice.

### I. INTRODUCTION

Appellants Allison Scott–Richter, Individually, a/k/a Allison Scott, Allison L. Scott, as Trustee of the Thomas Eugene Scott, Jr. Living Trust, and Allison L. Scott, as Trustee of the Allison L. Scott Trust ("Appellants," if jointly) appeal from an order granting an amended motion to enforce a settlement agreement between Appellants and Appellees Diana Taffarello and Robert L. Soltis ("Appellees," if jointly). In five issues, Appellants complain that the trial court erred as a matter of law by granting the amended motion to enforce the settlement agreement, that the trial court abused its discretion by denying their request for a jury trial and by awarding attorneys' fees to Appellees, and that the filing of a notice of settlement constitutes an unlawful taking of property in violation of the United States and Texas Constitutions. We affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Taffarello filed her original plaintiff's petition on January 29, 2004. Taffarello alleged that she had entered into a real property lease with Appellants and that Appellants later agreed to sell her the leased property. According to the petition, however, Appellants subsequently advised Taffarello that they would not sell the property to her. In addition to seeking a declaratory

judgment regarding her right to continued possession of the property, Taffarello asserted claims for breach of the real estate contract, fraud, and breach of a lease agreement. Appellants answered Taffarello's petition and asserted a third-party claim against Soltis.

The parties went to mediation on July 14, 2004 and agreed to a number of terms as evidenced in a written Memorandum of **\*185** Settlement ("Memorandum"). The Memorandum, among other things, indicates that Taffarello's lawsuit is to be dismissed, describes how the net proceeds of the sale are to be divided after the property is sold, provides for the drafting of a "compromise settlement agreement" and "trust agreement," and designates a settlement closing date of August 13, 2004, which the parties later agreed to extend by two weeks. In mid-August, counsel for Appellants allegedly advised Taffarello that they would no longer negotiate regarding the settlement documents. Appellants' counsel also filed a motion to withdraw and a motion to abate the case.

Appellees responded with a letter dated August 24, 2004, which demanded that Appellants engage in good faith negotiations in regard to the remaining settlement documents and that the parties return to mediation. Appellees received no response to the letter, and consequently, the parties were unable to reach an agreement regarding the preparation of the additional documents contemplated by the Memorandum. As such, the parties did not close on the designated date, and Appellees filed a motion to enforce the settlement agreement on September 17, 2004; they amended the motion on October 7.

Appellees' amended motion to enforce the settlement agreement requested that the trial court declare, among other things, that the Memorandum is a binding Rule 11 settlement agreement, [1] that the "Compromise and Settlement Agreement" attached to the motion is the compromise settlement agreement specified in the Memorandum, that the "Cole Richter Irrevocable Trust Agreement" also attached to the motion is the trust instrument specified in the Memorandum, and that the "Notice of Settlement" attached to the motion is "proper and appropriate."

On October 13, 2004, the trial court heard arguments on the pending motions, which included a motion filed by Appellants to continue the hearing on the motion to enforce because of their attorney's pending motion to withdraw. The trial court ultimately granted Appellants' counsel's motion to withdraw, recessed the hearing on the amended motion to enforce the settlement agreement until a later date, ordered the parties to return to mediation, and awarded Appellees $5,000 in attorneys' fees.

The parties returned to mediation but were unable to reach a compromise regarding the terms of the Memorandum calling for further agreement. On November 15, 2004, Appellees filed their first amended petition and third-party defendant counterclaims, which, in addition to re-asserting claims for breach of the real estate contract and lease agreement, asserted a claim for breach of the Memorandum. On November 19, 2004, the parties entered into a second Rule 11 agreement, which partially provided:

> We have agreed that your clients, Allison Scott, a/k/a Allison Scott–Richter, individually, and as Trustee of the Thomas Eugene Scott, Jr., Living Trust, and as Trustee of the Allison L. Scott Trust (collectively, "Scott"), will not challenge the validity or enforceability of the Memorandum of Settlement dated July 14, 2004 (the "Memorandum") by and between Scott and Diana Taffarello ("Taffarello") and Robert Soltis, Jr. ("Soltis"). In particular, but without limiting the generality of the foregoing, Scott agrees not to raise lack of competency, duress, lack of essential term(s), tax effect or consequences, violation of any other trust, or any other matter as a **\*186** bar or defense to the Memorandum. *Scott further agrees that she will not challenge or contest the Amended Motion to Enforce Settlement Agreement filed by Taffarello and Soltis.* [Emphasis added.]

Notwithstanding this language, Appellants filed a request for a jury trial on December 14, 2004. The trial court heard the amended motion to enforce the settlement agreement three days later on December 17, and despite Appellants' arguments that they were entitled to a jury trial on Taffarello's breach of contract claim, the trial court granted the motion to enforce.

Appellants filed a motion for new trial on January 18, 2005, which the trial court subsequently denied. This appeal followed.

### III. JURISDICTION

We begin our analysis by determining whether we have jurisdiction to consider this matter. Appellees assert that this appeal should be dismissed for lack of jurisdiction because Appellants' notice of appeal was not timely filed. We disagree.

 **[1]**    The trial court signed its final judgment on December 17, 2004. Appellants timely filed a motion for new trial; therefore, Appellants' notice of appeal was due on or before March 17, 2005. *See* TEX.R.APP. P. 26.1(a)(1). On March 30, 2005, Appellants filed their notice of appeal with the District Clerk of Denton County, Texas. On April 6, 2005, we notified Appellants of our concern that the notice of appeal was not timely filed. We informed Appellants that if we did not receive a response from them within twelve days showing a reasonable explanation for the late filing of the notice of appeal, the appeal could be dismissed for want of jurisdiction. *See* TEX.R.APP. P. 10.5(b), 26.3(b), 42.3(a); *Jones v. City of Houston,* 976 S.W.2d 676, 677 (Tex.1998); *Verburgt v. Dorner,* 959 S.W.2d 615, 617 (Tex.1997).

Appellants responded by filing a motion for extension of time to file their notice of appeal. Because Appellants' motion was not filed within fifteen days of the date the notice of appeal was due, we were not authorized to grant the motion, and we took no action on the motion. *See* TEX.R.APP. P. 26.3. However, inasmuch as Appellants filed their notice of appeal with the proper trial court clerk within fifteen days of the due date, a motion for extension of time was necessarily implied. *See Verburgt,* 959 S.W.2d at 617 (holding a motion for extension of time is necessarily implied when an appellant acting in good faith files a document attempting to perfect the appeal beyond the time allowed by the appellate rules, but within the fifteen-day period in which the appellant would be entitled to move to extend the filing deadline).

Accordingly, we construed Appellants' motion as a response to our April 6, 2005 letter questioning our jurisdiction. Consequently, the question before us was whether Appellants provided a reasonable explanation for the late filing of their notice of appeal within the fifteen-day period of Rule 26.3. *See* TEX.R.APP. P. 26.3; *Hone v. Hanafin,* 104 S.W.3d 884, 886–87 (Tex.2003); *Jones,* 976 S.W.2d at 677; *Verburgt,* 959 S.W.2d at 617. Appellants explained that their failure to timely file their notice of appeal was not deliberate or intentional, but was the result of inadvertence, mistake, or mischance in the calculation of the deadline and the mis-docketing of such date on the calendar of Appellants' counsel. On April 18, 2005, we issued an order finding that Appellants had provided a reasonable explanation for the late filing of their notice of appeal.

 **\*187**  Appellees filed a motion asking us to reconsider our order. Appellees asserted that the notice of appeal was not timely filed, and they further contended that this appeal must be dismissed because the body of Appellants' notice of appeal recites, "This appeal is taken to the Fifth Court of Appeals of the State of Texas in Dallas, Texas."

On May 9, 2005, we denied Appellees' motion for reconsideration and permitted Appellants ten days to file an amended notice of appeal reciting that they were appealing to the Court of Appeals for the Second District of Texas. *See* TEX.R.APP. P. 25.1(d)(4), (f) (providing that an "amended notice of appeal correcting a defect or omission in an earlier filed notice may be filed in the appellate court"), TEX.R.APP. P. 44.3 ("A court of appeals must not ... dismiss an appeal for formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or irregularities."); *Maxfield v. Terry,* 888 S.W.2d 809, 811 (Tex.1994) (holding that if an appellant makes a bona fide attempt to invoke the jurisdiction of the appellate court, the appellant must be permitted to file an amended notice of appeal); *Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121–22 (Tex.1991) ("[T]he decisions of the courts of appeals [should] turn on substance rather than procedural technicality."). Appellants timely filed an amended notice of appeal that complied with the requisites of Rule 25.1(d). *See* TEX.R.APP. P. 25.1(d).

Accordingly, we hold that Appellants offered a reasonable explanation for the late filing of their notice of appeal,[2] which they timely amended, and we have jurisdiction over this appeal.[3]

## IV. REQUEST FOR JURY TRIAL

 **[2]**    In their first issue, Appellants argue that the trial court abused its discretion by denying their request for a jury trial. They contend that their demand for a jury trial was timely and that their federal constitutional rights under the Seventh Amendment to the United States Constitution, their state constitutional rights under Article 5, Section 10 of the Texas Constitution, and their statutory rights under Texas Rule of Civil Procedure 216 were violated. Appellees respond that Appellants' request for a jury trial pertains only to Appellees' breach of contract claim, which was abandoned by Appellees and dismissed by the order granting the amended motion to enforce the settlement agreement and final judgment. We agree.

Appellants argued repeatedly during the hearing on the amended motion to enforce the settlement agreement that they were entitled to a jury trial on Appellees' breach of contract (Memorandum) claim. Counsel for Appellants argued,

> In that First Amended Petition ... Mr. Spoede asserted a claim for breach of contract of the Settlement Agreement and a claim for declaratory judgment. Both of those claims are claims that under **\*188** Article 5, Section 10 of the Texas Constitution, these defendants are entitled to a trial by jury on those claims.

Counsel continued,

[I]f the Court construes, and we believe the Court cannot reach any other conclusion but that there are still two breaches of Settlement Agreement—two causes of action still outstanding, then this matter needs to go ahead and proceed to trial in February as the Court currently has it set.

....

[I]f they are asserting a claim for breach of contract, they're required to prove the breach of contract.... My clients have the right, based on the current state of the pleadings, to do discovery on this claim of breach of contract and declaratory judgment, to call witnesses, to have documents produced, to take depositions, and most important, to try to have a jury trial in connection with this.

Finally, counsel argued,

> We believe that the Court ought to set this matter for trial, that Ms. Scott and the remaining defendants ought to be allowed the opportunity as they are given the right under the Texas Constitution to defend against the claims of breach of contract and the declaratory judgment claims....

Counsel for Appellees, however, responded that they were withdrawing the breach of contract claim. He said,

> Once he [opposing counsel] signed the Rule 11 Agreement saying that he wouldn't oppose our Amended Motion to Enforce, it made everything moot. Everything settled except for the issue of attorney's fees. So to the extent we do have other—the same claims couched as other causes of action, *we withdraw those causes of action* because [the trial court's] order gives us all the relief we were seeking in the first place. [Emphasis added.]

At the conclusion of the hearing, the trial court, in response to a question by Appellants regarding the effect of the order as it relates to the breach of contract claim, stated it understood that Appellees were "abandoning or waiving many of those claims." Counsel for Appellees responded that the order "speaks for itself." Indeed, the order signed by the trial court provides that "[a]ny claims in this lawsuit that are not specifically addressed in this Order and Judgment, including all claims, counter-claims, cross-claims, and third-party claims, are dismissed with prejudice to the refiling of same."

Our review of the order indicates that it does not address Appellees' breach of contract claim, specifically or as part of its declarations. Thus, because Appellees withdrew their breach of contract claim during the hearing and because the order granting the amended motion to enforce the settlement agreement expressly dismisses the breach of contract claim, Appellants' argument that they are entitled to a jury trial on Appellees' breach of contract claim is moot. *See* TEX.R.APP. P. 47.1; *Williams v. Lara,* 52 S.W.3d 171, 184 (Tex.2000) (reasoning that case is moot if live controversy ceases to exist); *In re Guardianship of Keller,* 171 S.W.3d 498, 500 (Tex.App.-Waco 2005, pet. filed) (reasoning that appellate courts lack jurisdiction to consider issues that have been rendered moot). Moreover, to the extent Appellants' argument can be interpreted as challenging the denial of a jury trial on the declaratory judgment claims as violative of Article 5, Section 10 of the Texas Constitution and the Seventh Amendment to the United States Constitution, the record reflects that Appellants agreed by the November 19, 2004 Rule 11 agreement not to challenge or contest the amended motion to enforce the settlement agreement, **\*189** which the order tracks substantially verbatim. Accordingly, the trial court did not abuse its discretion by denying Appellants' request for a jury trial. We overrule Appellants' first issue.

## V. AMENDED MOTION TO ENFORCE SETTLEMENT AGREEMENT AND CONSTITUTIONAL CHALLENGES

In their second issue, Appellants argue that the trial court erred as a matter of law by granting the amended motion to enforce the settlement agreement because it had the effect of imposing additional material terms to the agreement that the parties had yet to negotiate and agree upon. Appellants contend that there is no evidence or insufficient evidence that they agreed to be bound by the compromise settlement agreement, trust agreement, and notice of settlement and that the issue of whether they agreed to be bound by the terms of these agreements should have been set for a jury trial. In their third issue, Appellants argue —without citing any authority—that the denial of their right to a jury trial on these issues denied them due process under the Texas and federal constitutions and constituted an unlawful taking of property under the Fifth Amendment to the United States Constitution. In their fourth issue, Appellants argue—without citing any authority-that the filing of the "Notice of Settlement" in Denton County results in an unconstitutional taking of property. Appellees respond that the November 19, 2004 Rule 11 agreement resolved any dispute as to the enforceability of the settlement agreement and the documents drafted to effectuate it. We agree.

**[3]** **[4]** **[5]** Pursuant to Rule 11, no agreement between the parties or their attorneys shall be enforceable unless the agreement is either (1) in writing, signed by the parties, and filed with the papers as part of the record or (2) made orally in open court and entered as part of the record. TEX.R. CIV. P. 11. Rule 11 aims to eradicate the misunderstandings and controversies commonly associated with verbal agreements among parties and counsel. *Padilla v. LaFrance,* 907 S.W.2d 454, 460 (Tex.1995). Agreements in writing and filed with the court allow the writings to "speak for themselves" so that "the court can judge of their import, and proceed to act upon them with safety." *Id.* A trial court has a ministerial duty to enforce a valid Rule 11 agreement. *ExxonMobil Corp. v. Valence Operating Co.,* 174 S.W.3d 303, 309 (Tex.App.-Houston [1st Dist.] 2005, pet. filed).

**[6]** Here, the clerk's record contains a "Notice of Filing of Rule 11 Agreement." The document states that it "is an enforceable agreement under Rule 11 of the Texas Rules of Civil Procedure," contains the signatures of both Appellants' and Appellees' attorneys, and was filed with the trial court as part of the record on December 8, 2004. Dated November 19, 2004, the agreement states that Scott [4] "*agrees that she will not challenge or contest the Amended Motion to Enforce Settlement Agreement filed by Taffarello and Soltis.*" [Emphasis added.] We hold that the attorneys, on behalf of their clients, entered into a valid Rule 11 Agreement that the trial court had a ministerial duty to enforce. *See* TEX.R. CIV. P. 11; *ExxonMobil Corp.,* 174 S.W.3d at 309.

**[7]** The amended motion to enforce the settlement agreement that Appellants agreed not to contest sought a declaration by the trial court that the Memorandum entered into by the parties on July 14, 2004 is a binding and enforceable Rule 11 **\*190** settlement agreement; that the "Compromise and Settlement Agreement" attached to the amended motion as exhibit "B" constitutes the compromise settlement agreement specified in paragraph 4 of the Memorandum; that the "Cole Richter Irrevocable Trust Agreement" attached to the amended motion as exhibit "C" is the trust instrument or agreement specified in

paragraphs 4 and 5 of the Memorandum; and that the "Notice of Settlement" attached to the amended motion as exhibit "D" is "proper and appropriate" and may be filed in the real property records of Denton County, Texas. Despite the valid Rule 11 agreement entered into by the parties, Appellants now attempt to challenge the "Compromise and Settlement Agreement," the "Cole Richter Irrevocable Trust Agreement," and the "Notice of Settlement" by arguing that they never agreed to the terms contained therein and by arguing that their rights under the United States and Texas Constitutions have been denied. This they cannot do. Appellants expressly agreed not to challenge the amended motion to enforce the settlement agreement. By so agreeing, they foreclosed their ability to complain on appeal regarding the terms of the motion and subsequent order granting the same. As Appellees state in their brief,

> By executing the Nov. 19 Rule 11 Agreement, counsel resolved the very issues he now attempts to challenge in this appeal: the enforceability of the mediated settlement agreement and the documents drafted to effectuate it.... Moreover, the amended motion to enforce incorporates each of the documents Scott now claims go beyond the settlement agreement. Appellants agreed to each one by agreeing not to contest the amended motion to enforce.

The trial court's order granting Appellees' motion to enforce the settlement agreement and final judgment tracks the language in the motion closely and states,

> 1. The Memorandum of Settlement entered into by the parties and dated July 14, 2004, is declared to be a binding and effective settlement agreement that is enforceable under contract law and under Rule 11*of* the Texas Rules of Civil Procedure....

> 2.... The Compromise and Settlement Agreement is hereby declared to constitute the compromise settlement agreement specified in paragraph 4 of the Memorandum of Settlement, and to be a final and binding agreement of all of the parties as if each party hereto had properly signed and executed it....

> 3.... The Cole Richter Irrevocable Trust Agreement is hereby declared to be that trust instrument or agreement specified or referenced in paragraphs 4 and 5 of the Memorandum of Settlement, and in paragraphs 2 and 3 of the Compromise and Settlement Agreement, and shall be fully enforceable and effective as if properly signed and executed by each of the parties....

> 4. The document attached as Exhibit "B" to the Compromise and Settlement Agreement [entitled Notice of Settlement and Net Sales Proceeds Interest] is hereby declared to be proper and appropriate. Taffarello may sign and file the Memorandum in the real property records of Denton County, Texas.

Appellants never challenged the validity and enforceability of the November 19, 2004 Rule 11 agreement (e.g., by attacking it on the grounds of fraud or mistake or by arguing that an exception applies), and they do not raise such a challenge on appeal. And the Rule 11 agreement is clear and unambiguous. Accordingly, because Appellants agreed not to challenge or contest the amended motion to enforce the settlement agreement pursuant to a **\*191** valid Rule 11 agreement, the trial court did not err by performing its ministerial duty and granting Appellees' amended motion to enforce the settlement agreement. *See*TEX.R. CIV. P. 11; *ExxonMobil Corp.,* 174 S.W.3d at 309;*see also Childers v. King Ranch, Inc.,* No. 13–03–006–CV, 2005 WL 774512, at \*5 (Tex.App.-Corpus Christi April 7, 2005, no pet.) (mem.op.) (holding trial court did not abuse its discretion by granting relief in strict accordance with parties' rule 11 agreements). We overrule Appellants' second, third, and fourth issues.

## VI. ATTORNEYS' FEES

In their fifth issue, Appellants argue that the trial court abused its discretion by awarding Appellees attorneys' fees. Appellants contend that the trial court should not have considered Appellees' request for attorneys' fees because Appellants were without legal representation at the time of the award, the award was premature, and Appellants were entitled to a jury trial on the issue of attorneys' fees.

 **[8]** We initially note that Appellants failed to present any of these arguments during the October 13, 2004 hearing at which the trial court awarded Appellees attorneys' fees; thus, they failed to put the trial court on notice of their objections to the award. *See* TEX.R.APP. P. 33.1(a)(1)(A). After counsel for Appellees requested $5,000 in attorneys' fees, the trial court asked for a response from Appellants' counsel, who stated, "Well, obviously, we oppose that." The trial court indicated thereafter that it was awarding Appellees the attorneys' fees. Appellants also fail to cite one single authority for each of the three arguments raised in their brief. *See* TEX.R.APP. P. 38.1(h). Accordingly, Appellants failed to preserve these arguments for appellate review.

 **[9]** Nonetheless, Appellants' arguments are unpersuasive. Appellants were not without counsel at the time the trial court awarded Appellees attorneys' fees. The record clearly indicates that the trial court awarded Appellees attorneys' fees before granting Appellants' counsel's motion to withdraw. Moreover, as demonstrated above, the trial court afforded Appellants an opportunity to argue against the request for attorneys' fees. Regarding Appellants' prematurity argument, the trial court had two subsequent opportunities to consider the award; Appellants filed their "Motion for Reconsideration or to Set Aside Order Granting Attorney's Fees" on December 16, 2004 and motion for new trial on January 18, 2005. The trial court ultimately upheld the award of attorneys' fees. Appellants lastly argue that they are entitled to a jury trial on the issue of attorneys' fees because "the right to such recovery was necessarily predicated upon Appellees' successful prosecution of their claims that the Memorandum was an enforceable agreement and that the Appellants had breached it." However, as we discussed in Section IV above, Appellees waived their breach of contract claim in open court, and the order granting their amended motion to enforce the settlement agreement expressly dismisses all claims not addressed in the order, which includes Appellees' breach of contract claim. We hold that the trial court did not abuse its discretion by awarding Appellees attorneys' fees. Accordingly, we overrule Appellants' fifth issue.

## VII. CONCLUSION

Having overruled all of Appellants' issues, we affirm the trial court's judgment.

Footnotes

1    TEX.R. CIV. P. 11.

2    On appeal, Appellees do not challenge the reasonableness of Appellants' explanation for the late filing of their notice of appeal. *See Hone,* 104 S.W.3d at 886–87 (discussing what constitutes a reasonable explanation for late filing of a notice of appeal).

3    Appellees' brief states that Appellants filed a motion for extension of time to file their notice of appeal in the Court of Appeals for the Fifth District of Texas, which refused to act. Our record does not contain any such motion, but even if it did, the motion would not have any significance in our decision that Appellants offered a reasonable explanation for the filing of their notice of appeal with the proper trial court clerk within fifteen days of the due date.

4    In the agreement, Scott refers to Appellants, i.e., Scott in all of her capacities.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

901 S.W.2d 772
Court of Appeals of Texas,
Austin.

The STATE of Texas, the Texas Alcoholic Beverage Commission, and
Jeannene Fox, in Her Capacity as Acting Administrator, Appellants,

v.

RUIZ WHOLESALE CO., et al., Appellees.
RUIZ WHOLESALE CO., et al., Appellants,

v.

TEXAS ALCOHOLIC BEVERAGE COMMISSION, Jeannene Fox, Acting
Administrator; State of Texas; and Silver Eagle Distributors, Inc., Appellees.

Nos. 03–93–00618–CV, 03–94–00269–CV.    |    June 21, 1995.

Local beer distributor sought to enjoin Texas Alcoholic Beverage Commission (TABC) from requiring or enforcing manufacturers' territorial agreements in connection with resale of beer. The 53rd Judicial District Court, Travis County, Margaret A. Cooper, J., initially granted temporary injunction and then, on rehearing, dissolved it. After trial court also denied second application for temporary injunction, distributor perfected interlocutory appeal. The Court of Appeals, Jones, J., held that: (1) order granting temporary injunction to distributor was moot after temporary injunction was dissolved on rehearing; (2) second application for temporary injunction provided no valid basis from which trial court could grant relief; and (3) testimony of local distributor would not show probable injury from failure to grant injunction prohibiting enforcement of manufacturers' territorial agreements.

Dismissed in part; affirmed in part.

West Headnotes (12)

**[1]      Injunction**  ☞ Mootness and ripeness;  ineffectual remedy

Issue of whether injunction is valid becomes moot when injunction ceases to have effect.

2 Cases that cite this headnote

**[2]      Appeal and Error**  ☞ Effect of delay or failure to take proceedings

Denial of temporary injunctive relief, from which no timely appeal is taken, is interlocutory order not reviewable by court.

4 Cases that cite this headnote

**[3]      Injunction**  ☞ Successive injunctions or applications therefor

Dissolution of temporary injunction ordinarily bars second application for injunctive relief, unless second request is based on changed circumstances not known at time of first application.

1 Cases that cite this headnote

**[4]    Injunction** 🔑 Successive injunctions or applications therefor

Successive application for injunctive relief on grounds that could have been raised in connection with earlier request for that relief are not allowed if there is insufficient reason why grounds were not urged in earlier application.

1 Cases that cite this headnote


**[5]    Injunction** 🔑 Successive injunctions or applications therefor

**Intoxicating Liquors** 🔑 Judicial review and enforcement

Challenges to procedural and substantive validity of requirements and constitutional due process and equal protection arguments in second request for injunction with regard to Texas Alcoholic Beverage Commission (TABC) enforcing territorial agreements in connection with resale of beer duplicated challenges raised in initial request, and, thus, there was no basis on which trial court could have abused its discretion in denying second request. U.S.C.A. Const.Amends., 5, 14.

Cases that cite this headnote


**[6]    Injunction** 🔑 Successive injunctions or applications therefor

**Intoxicating Liquors** 🔑 Judicial review and enforcement

Brief notice from Texas Alcoholic Beverage Commission (TABC) to beer distributors that previous injunction had been dissolved was not change in circumstances which would warrant second attempt by manufacturers and distributors at injunctive relief where TABC consistently maintained that all beer distributors must have territorial agreements before purchasing beer from another distributor for resale.

1 Cases that cite this headnote


**[7]    Appeal and Error** 🔑 Refusing injunction

Appellate review of order denying temporary injunction is strictly limited to determination of whether there has been clear abuse of discretion.

Cases that cite this headnote


**[8]    Appeal and Error** 🔑 Abuse of discretion

Trial court abuses its discretion only if it acts in unreasonable and arbitrary manner or if it acts without reference to any guiding principles.

Cases that cite this headnote


**[9]    Injunction** 🔑 Entitlement to Relief

**Injunction** 🔑 Likelihood of success on merits

**Injunction** 🔑 Injury, Hardship, Harm, or Effect

To prevail on request for temporary injunction, applicant must show probable right to recover at trial on merits and probable injury in interim.

1 Cases that cite this headnote

**[10]**   **Appeal and Error**  👈 Injunction

In reviewing order denying temporary injunction, court draws all legitimate inferences from evidence in light most favorable to trial court order.

Cases that cite this headnote

**[11]**   **Appeal and Error**  👈 Necessity of finding facts

**Appeal and Error**  👈 Scope and theory of case

If no findings of fact or conclusions of law are filed, trial court's order will be upheld on any legal theories supported by record.

1 Cases that cite this headnote

**[12]**   **Injunction**  👈 Intoxicating liquors

**Intoxicating Liquors**  👈 Judicial review and enforcement

Testimony of local distributor that Texas Alcoholic Beverage Commission (TABC) had not cited distributor or threatened him with action for failure to have territorial agreement did not show that injunction to prohibit TABC from requiring enforcement of agreement was necessary.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*773**  Jennifer S. Riggs, Jennifer S. Riggs, P.C., Austin.

Lowell Lasley, Austin.

Jim L. DeFoyd, Houston.

Dan Morales, Atty. Gen., W. Reed Lockhoof, Asst. Atty. Gen., Austin.

John K. Schwartz, Liddell, Sapp, Zivley, Hill & La Boon, L.L.P., Austin.

Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

**Opinion**

JONES, Justice.

These interlocutory appeals involve two trial-court orders, the first granting a temporary injunction and the second denying one. Tex.Civ.Prac. & Rem.Code Ann. § 51.014(4) (West Supp.1995). Ruiz Wholesale Company and other local beer distributors (collectively "Ruiz") sought to enjoin the Texas Alcoholic Beverage Commission ("TABC") from requiring or enforcing manufacturers' territorial agreements in connection with the resale of beer. [1] The trial court initially granted a temporary injunction, from which the TABC perfected an interlocutory appeal. On rehearing, however, the trial court dissolved that injunction. Ruiz then made a second application for a temporary injunction. Concluding that Ruiz had failed to show sufficient evidence of a probable right to recover or probable injury, the trial court denied this second request, from which Ruiz perfected

an interlocutory appeal. We will affirm the trial court's order denying Ruiz's second application; **\*774** we will dismiss the TABC's appeal as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

The procedural background of this case is complex. Because the procedural posture defines the parameters of the issues before this Court, we will describe the history of this dispute in detail.

At the core of this controversy is the proper construction of section 102.52 of the Alcoholic Beverage Code as amended by the 73rd Legislature in 1993. Before its amendment, the section provided:

> (a) Nothing in Section 102.51 of this code limits or alters the right of a holder of a general, local, or branch distributor's license to sell beer to any other holder of a general, local, or branch distributor's license, *except that a distributor who has purchased beer from another distributor may distribute and sell the beer only within a territory for which the manufacturer of the brand has designated that it may be sold by a distributor.*

Act of March 29, 1979, 66th Leg., R.S., ch. 33, § 9, 1979 Tex.Gen.Laws 53, 55 (Tex.Alco.Bev.Code Ann. § 102.52(a), since amended) (emphasis added).

In 1993, the Legislature amended the last portion of the section to read "except that a distributor who has purchased beer from another distributor may distribute and sell the beer only within a territory for which the manufacturer of the brand has designated that it may be sold by *the general, local, or branch distributor making the purchase.*" Act of May 30, 1993, 73rd Leg., R.S., ch. 934, § 67, 1993 Tex.Gen.Laws 3950, 3975 (Tex.Alco.Bev.Code Ann. § 102.52) (emphasis added). Ruiz and the TABC dispute whether this amendment to section 102.52 now requires local beer distributors to have territorial agreements with beer manufacturers before such distributors can resell beer purchased from another distributor.

On September 28, 1993, Ruiz filed suit for declaratory judgment and injunctive relief against the TABC. Ruiz alleged entitlement to a temporary injunction enjoining the TABC from enforcing section 102.52 on four grounds: (1) procedural invalidity for noncompliance with the Administrative Procedure Act and due-course-of-law provision of the Texas Constitution when the TABC announced its intent to enforce the section, (2) violation of constitutional rights to due process and equal protection, (3) inconsistency with other sections of the Alcoholic Beverage Code, and (4) lack of authority for the TABC to enact an unconstitutional rule.

On October 18, 1993, the trial court conducted an evidentiary hearing on Ruiz's application for temporary injunction. In its first order, dated January 20, 1994, the court found section 102.52 ambiguous and construed it as not requiring local beer distributors to obtain manufacturers' territorial agreements. Concluding there was a probable right to recover on the merits, the court issued a temporary injunction against TABC enforcement of the provision. The TABC timely perfected an appeal from this order in our cause number 3–93–618–CV.

Silver Eagle Distributors, Inc. ("Silver Eagle"), an intervenor below, did not appeal this initial order by the trial court. [2] Rather, Silver Eagle filed a motion for rehearing, which the trial court granted. In a second order, dated January 27, 1994, the court determined that the temporary injunction should not have been issued because the court's preliminary interpretation of amended section 102.52 was incorrect. The court concluded that section 102.52 "requires that when a distributor (the 'purchasing distributor') purchases beer from another distributor, the purchasing distributor may only resell that beer in the territory assigned to the purchasing distributor by the manufacturer of the beer." The court dissolved the temporary injunction it had issued only the week before. Significantly, Ruiz did not appeal this January 27, 1994 order dissolving the temporary injunction and construing section 102.52. Meanwhile, the TABC's appeal from the trial court's first order remained pending in this Court.

**\*775** On January 31, 1994, the TABC issued a letter notifying all holders of general and local distributors' licenses of the trial court's January 27, 1994 order. This notification letter, which included a copy of the trial court's order, simply stated that the order was "self-explanatory" and advised distributors to "make sure that you are in compliance with the law."

On March 28, 1994, Ruiz filed in the trial court a second application for temporary injunctive relief. This second request reiterated all of the grounds asserted in Ruiz's initial application and also included three claims that were essentially new: (1) the requirement of territorial agreements constitutes an unconstitutional delegation of power to beer wholesalers; (2) the requirement is an unconstitutional suspension of law; and (3) territorial agreements operate as an unreasonable restraint violating the Texas Antitrust Act. [3] Following another hearing, the trial court, in an order dated May 10, 1994, denied Ruiz's second application for temporary injunctive relief on the grounds that Ruiz had failed to show probable right to recover and probable injury. Further, the court found that claims of adverse action by the TABC were not ripe for consideration. Finally, the court expressed no opinion "on the alleged absence of standards to guide the discretion of the licensing authority in the implementation or application of Section 102.52." Ruiz perfected an interlocutory appeal from this May 10, 1994 order in our cause number 3–94–269–CV.

## DISCUSSION

In its first point of error, Ruiz asserts that the trial court adopted an erroneous construction of section 102.52 of the Alcoholic Beverage Code. Given the procedural history described above, it is imperative that we identify precisely the issues that are properly before this Court in these interlocutory appeals.

### A. January 20, 1994 Order Granting Temporary Injunction

 [1]    The TABC properly appealed the validity of the initial January 20, 1994 order granting Ruiz a temporary injunction. However, the trial court subsequently granted a rehearing and, in its January 27, 1994 order, dissolved the injunction. The issue of whether an injunction is valid becomes moot when the injunction ceases to have effect. *University Interscholastic League v. Buchanan,* 848 S.W.2d 298, 304 (Tex.App.—Austin 1993, no writ). Because the trial court dissolved the temporary injunction on rehearing, the TABC's appeal of the January 20, 1994 order is moot. We lack jurisdiction when an appeal is moot. *See id.*

### B. January 27, 1994 Order Dissolving Temporary Injunction

 [2]    When the trial court reconsidered its temporary injunction, it renounced its earlier interpretation of section 102.52 and concluded that the statute requires that all purchasing distributors, including local distributors, have manufacturers' territorial agreements. Consequently, the court dissolved the previously granted temporary injunction. This order constituted a denial of temporary injunctive relief, from which Ruiz did not appeal. An interlocutory order that is not timely appealed is not reviewable by this Court. *See Desai v. Reliance Mach. Works, Inc.,* 813 S.W.2d 640, 641 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Cellular Mktg., Inc. v. Houston Cellular Tel. Co.,* 784 S.W.2d 734, 735 (Tex.App.—Houston [14th Dist.] 1990, no writ); *Tober v. Turner of Texas, Inc.,* 668 S.W.2d 831, 833–34 (Tex.App.—Austin 1984, no writ). Although Ruiz argues vigorously that the trial court did not correctly construe section 102.52 in its January 27, 1994 order, Ruiz's failure to perfect an interlocutory appeal from that order precludes this Court from reviewing its validity.

### C. May 10, 1994 Order Denying Second Request for Temporary Injunction

After the time to appeal the dissolution of the previously granted temporary injunction had passed, Ruiz filed a second application for temporary injunctive relief. Following **\*776** another evidentiary hearing, the trial court denied this second request. Ruiz perfected an interlocutory appeal from this May 10, 1994 order.

In points of error two and three, Ruiz asserts that the trial court erred in "refusing to restrain the TABC's enforcement of its interpretation of section 102.52" and in "refusing to enjoin the application of section 102.52." However, in the subparts of these

arguments, Ruiz directly challenges only one aspect of the trial court's May 10, 1994 decision: "ripeness." The remainder of Ruiz's contentions focus on the *merits* of whether the TABC "rules" are: procedurally and substantively invalid, violative of due process and equal protection, an improper delegation of authority, an invalid suspension of law, an invalid special law,[4] and violative of the Texas Antitrust Act. Because of Ruiz's misconception of the scope of a second request for injunctive relief and the appropriate standard of review in this interlocutory appeal, the issues we must address are considerably narrowed.

### 1. Scope of a Second Request for Injunctive Relief

 **[3]**   **[4]**   Ordinarily, the dissolution of a temporary injunction bars a second application for such injunctive relief, unless the second request is based on changed circumstances not known at the time of the first application. *See Ellis v. Lamb–McAshan Co.,* 278 S.W. 858, 862 (Tex.Civ.App.—Fort Worth 1925, writ dism'd); *Birchfield v. Bourland,* 187 S.W. 422, 425 (Tex.Civ.App.—Fort Worth 1916, no writ); *see also* 43A C.J.S. *Injunctions* § 278 (1978). Successive applications for injunctive relief on grounds that could have been raised in connection with an earlier request for such relief are not allowed where there is insufficient reason why the grounds were not urged in the earlier application. *Ellis,* 278 S.W. at 862. This restriction on the scope of successive requests for the extraordinary remedy of a temporary injunction sensibly deters piecemeal litigation, conserves judicial resources, and prohibits litigants from receiving "two bites at the apple." *Cf. Tober,* 668 S.W.2d at 835.

 **[5]**   Ruiz's second application for temporary injunction provides no valid basis on which the trial court could have granted relief. The challenges to the procedural and substantive validity of the requirement and the constitutional due process and equal protection arguments in Ruiz's second request duplicate those in its initial request. Moreover, all of the "new grounds" alleged in the second application—improper delegation of power, invalid suspension of law, and violation of the Texas Antitrust Act —were clearly available to Ruiz when it made its initial request for injunctive relief. Consequently, there is no basis on which the trial court could have abused its discretion in denying Ruiz's second request.

 **[6]**   Additionally, there are no changed circumstances that would allow Ruiz to reurge its request for an injunction or generate new grounds for relief. The only thing that occurred between the dissolution of the injunction and Ruiz's second request was the TABC notification letter.[5] This brief notice merely informed beer distributors that the previous injunction had been dissolved and that distributors should comply with section 102.52. This in no way amounts to a change in circumstances warranting a second attempt at injunctive relief. Throughout the proceedings, the TABC consistently maintained that section 102.52 required all beer distributors to have manufacturers' territorial agreements before purchasing beer from **\*777** another distributor for resale. A letter restating this position is not a changed circumstance, nor was it unknown at the time of the initial application. It does not, therefore, permit a second request for an injunction. Accordingly, the trial court did not abuse its discretion in denying Ruiz's second request.

### 2. Review of a Denial of a Temporary Injunction

 **[7]**   **[8]**   An equally fundamental misconception also pervades Ruiz's appeal. This is an appeal of an *interlocutory* order. Appellate review of an order denying a temporary injunction is strictly limited to a determination of whether there has been a clear abuse of discretion. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). We must confine our review to abuse of discretion and cannot give full consideration to the merits of the underlying lawsuit. *Id.* at 861–62. A trial court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

Ruiz fails to recognize the abuse-of-discretion standard that controls this appeal. Rather, the entire thrust of Ruiz's argument goes to the *merits* of its many challenges to section 102.52 and its enforcement by the TABC. We decline to reach the merits of these claims without allowing the trial court an opportunity to render a final judgment on them. The sole issue on review here is whether the trial court abused its discretion in denying Ruiz's second request for injunctive relief.

**[9]** **[10]** **[11]** Moreover, even if the present appeal were from the trial court's *initial* refusal to grant injunctive relief, Ruiz would still not be entitled to a reversal on this record. To prevail in its request for a temporary injunction, Ruiz had to demonstrate a probable right to recover at trial on the merits and probable injury in the interim. *See Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218 (Tex.1968). In reviewing an order denying a temporary injunction, we must draw all legitimate inferences from the evidence in the light most favorable to the trial court's order. *Hartwell's Office World, Inc. v. Systex Corp.,* 598 S.W.2d 636, 638 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *see W.C. Larock, D.C., P.C. v. Enabnit,* 812 S.W.2d 670, 671 (Tex.App.—El Paso 1991, no writ). When no findings of fact or conclusions of law are filed, the trial court's order must be upheld on any legal theory supported by the record. *Davis,* 571 S.W.2d at 862.

**[12]** In its May 10, 1994 order, the trial court found that the second request for injunctive relief should be denied because, *inter alia,* the evidence presented was insufficient to show probable injury. At the hearing on its second request, Ruiz offered the testimony of only one witness, Reecie Dunn, a local distributor. Dunn testified that the TABC had not cited him or threatened him with any action for failure to have a territorial agreement.

The only other evidence admitted at the hearing consisted of two letters from beer manufacturers to Mary Boggs. [6] The first, from Miller Brewing Company, dated January 28, 1994, responds to a January 26, 1994 inquiry by stating that Miller was aware of the court ruling but was unable to respond to "your request" until the TABC informs the company what manufacturers can and cannot do. Given that it is unclear what the request was and whether the court ruling mentioned was the initial January 20, 1994 order or later January 27, 1994 order, this is not conclusive evidence of probable injury.

The second letter, from Anheuser–Busch, also dated January 28, 1994, merely states that the company already has a contractual agreement granting an exclusive territorial agreement to another distributor. Given this paucity of evidence, the trial court certainly did not abuse its discretion when it refused to find probable injury.

## *778 CONCLUSION

We dismiss the TABC's appeal in cause number 3–93–618–CV as moot, because the trial court has dissolved the injunction from which the appeal was taken. In cause number 3–94–269–CV, we overrule Ruiz's points of error and affirm the trial-court order denying Ruiz's second application for an injunction. The trial court did not abuse its discretion in denying this relief, both because Ruiz was not entitled to seek successive injunctive relief and because Ruiz failed to carry its burden of proof on probable injury.

Footnotes

1       The Ruiz Wholesale Co. litigants also include: Ruiz Wholesale Co. No. 2, Ruiz Wholesale Co. No. 4, Ruiz Cash N Carry Co. No. 1, Ruiz Cash N Carry No. 5, AAA Wholesale Beer Co., Port Houston Wholesale, Bill's Wholesale Beer Co., Simon G. Garza d/b/a G & S Wholesale Beer, and Prevost Wholesale No. 2.

2       Silver Eagle, a general distributor licensed by the TABC, intervened in the lawsuit following the initial temporary injunction hearing, but before the trial court issued its ruling.

3       Ruiz contended at oral argument that its constitutional due process argument was also new. However, the initial request for injunctive relief included this constitutional challenge.

4       This contention was not raised to the trial court in Ruiz's second request for injunctive relief. Consequently, it is not properly before this Court and will not be addressed further.

5       The brief notification letter, signed by acting TABC administrator Jeannene Fox, consists of only four sentences. The entire text is:
        On the reverse side you will find a copy of the order signed by Judge Margaret Cooper of the 53rd District Court of Travis County, Texas on January 27, 1994, dissolving the temporary injunction previously issued in Cause No. 93–11542, Ruiz Wholesale, et al. v. Texas Alcoholic Beverage Commission, et al.

Judge Cooper's order is self-explanatory. Therefore, § 102.52, Texas Alcoholic Beverage Code, as amended by the 73rd Legislature, is in full force and effect as of the date of the dissolution of the injunction. Please make sure that you are in compliance with the law.

6    Mary Boggs did not testify at the hearing. Presumably, she is another local beer distributor, but there is no record evidence to this effect.

---

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

8 S.W.3d 727
Court of Appeals of Texas,
Austin.

TEXAS DEPARTMENT OF TRANSPORTATION, et al., Appellants, [1]

v.

CITY OF SUNSET VALLEY, Appellee.

No. 03–98–00660–CV.    |    Dec. 16, 1999.

City filed inverse condemnation action against Texas Department of Transportation (TxDOT) concerning highway expansion. The District Court, Travis County, 353rd Judicial District, Peter M. Lowry, J., overruled TxDOT's plea to the jurisdiction and rendered partial summary judgment for city. TxDOT filed appeal. The Court of Appeals, Kidd, J., held that: (1) city had standing to bring inverse condemnation suit for appropriation of city street in highway expansion and seeking compensation for alleged increases in circuity of travel and light and noise pollution, and (2) TxDOT did not have sovereign immunity from city's suit.

Affirmed.

West Headnotes (14)

**[1]**    **Pleading**  🔑  Plea to the Jurisdiction

In a proper plea to the jurisdiction, a defendant contends that, even if all the allegations in a plaintiff's pleadings are taken as true, there is an incurable jurisdictional defect apparent from the face of the pleadings.

3 Cases that cite this headnote

**[2]**    **Appeal and Error**  🔑  Extent of Review Dependent on Nature of Decision Appealed from

In reviewing the grant or denial of a plea to the jurisdiction, the reviewing court does not look at the merits of the case.

2 Cases that cite this headnote

**[3]**    **Appeal and Error**  🔑  On Motions Relating to Pleadings

Government unit's plea to the jurisdiction need not be based upon a claim of sovereign immunity in order for it to bring an interlocutory appeal from grant or denial of the plea. V.T.C.A., Civil Practice & Remedies Code § 51.014(a)(8).

4 Cases that cite this headnote

**[4]**    **Appeal and Error**  🔑  On Motions Relating to Pleadings

Because the statute authorizing interlocutory appeals from a grant or denial of a governmental unit's plea to the jurisdiction is a narrow exception to the general rule that only final judgments and orders are appealable, it must be given a strict construction by the reviewing court. V.T.C.A., Civil Practice & Remedies Code § 51.014(a)(8).

21 Cases that cite this headnote

**[5]**    **Eminent Domain** 🔑 Persons Entitled to Sue

City had standing to bring inverse condemnation suit against Texas Department of Transportation (TxDOT) for its appropriation of city street in highway expansion, based on city's justiciable interest in street that was taken and its interest in maintaining streets for its residents, regardless of whether city could ultimately prevail on merits of it suit.

Cases that cite this headnote

**[6]**    **Action** 🔑 Persons Entitled to Sue

In order for a court to have subject matter jurisdiction, the party bringing suit must have standing.

Cases that cite this headnote

**[7]**    **Action** 🔑 Persons Entitled to Sue

To establish standing, a party must show that (1) a real controversy exists between the parties and (2) the controversy will actually be determined by the judicial relief sought.

Cases that cite this headnote

**[8]**    **Eminent Domain** 🔑 Appeal and Error

Whether city could prevail on its action against Texas Department of Transportation (TxDOT) for taking of its streets in highway expansion was issue of merits of case that could not be reviewed on interlocutory appeal from denial of TxDOT's plea to the jurisdiction of the trial court.

5 Cases that cite this headnote

**[9]**    **Pleading** 🔑 Plea to the Jurisdiction

Plea to the jurisdiction of the trial court is not sustainable where the contention is to the effect that the plaintiff has falsely stated a claim which, in fact, is nonexistent, for this is a matter of defense on the merits.

Cases that cite this headnote

**[10]**    **Eminent Domain** 🔑 Persons Entitled to Sue

City's allegation of injury to public it represented was enough to confer standing to bring inverse condemnation suit against Texas Department of Transportation (TxDOT) seeking compensation for alleged increase in circuity of travel and for light and noise pollution resulting from highway expansion.

1 Cases that cite this headnote

**[11]**    **Eminent Domain** 🔑 Appeal and Error

Whether alleged increase in circuity of travel and light and noise pollution resulting from highway expansion were compensable damages in city's inverse condemnation suit against Texas Department of Transportation (TxDOT) was issue of merits of case that could not be reviewed on interlocutory appeal from denial of TxDOT's plea to the jurisdiction of the trial court.

7 Cases that cite this headnote

**[12]** **States**  Declaratory Judgment

 **States**  Eminent Domain

Texas Department of Transportation (TxDOT) did not have sovereign immunity from city's inverse condemnation action which was in nature of takings claim concerning highway expansion and which sought declaratory relief involving nuisance claim for noise and light pollution from highway expansion. Vernon's Ann.Texas Const. Art. 1, § 17.

3 Cases that cite this headnote

**[13]** **Eminent Domain**  Corporations or Persons Liable

 **Municipal Corporations**  Destruction of Property

When a governmental entity takes, damages, or destroys property for public use, the State Constitution waives the governmental entity's immunity from both suit and liability. Vernon's Ann.Texas Const. Art. 1, § 17.

Cases that cite this headnote

**[14]** **Municipal Corporations**  Nuisances

Claim for nuisance is an alternative ground of recovery to an inverse condemnation action under the provision of the State Constitution prohibiting the taking of property without adequate compensation and thus is also an exception to the State's sovereign immunity. Vernon's Ann.Texas Const. Art. 1, § 17.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*728** Kirk Kuykendall, Asst. Atty. Gen., Transp. Div., Austin, for appellant.

Brad Rockwell, Scanlan, Buckle & Young, P.C., Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices KIDD and YEAKEL.

**Opinion**

MACK KIDD, Justice.

The Texas Department of Transportation ("TxDOT") brings this interlocutory appeal from a district court decision overruling its plea to the jurisdiction and rendering a partial summary judgment for the City of Sunset Valley ("Sunset Valley") in a suit for inverse condemnation. In three issues, TxDOT complains that the district court erred in denying its plea to the jurisdiction because (1) Sunset Valley lacks standing to sue for the physical taking of its streets, (2) Sunset Valley lacks standing to sue for any injuries that may result from the increased circuity of travel and noise and light pollution caused by the highway's expansion, and (3) TxDOT is immune from suit by virtue of the doctrine of sovereign immunity. We will affirm the district court's ruling.

## BACKGROUND

Sunset Valley is a small general-law municipality that is bifurcated by U.S. Highway 290 and virtually surrounded by the City of Austin. This dispute arose when **\*729** TxDOT expanded U.S. Highway 290 from a small ground-level highway into a multi-

level, limited-access divided highway. As a result of TxDOT's decision to make Highway 290 a controlled-access highway along the length of Sunset Valley, several streets that had previously crossed or run alongside the old ground-level highway were affected. Jones Road, an important municipal artery, was one of the streets affected, and a substantial portion of it had to be closed. This street had served as a vital transportation link that the residents of Sunset Valley, as well as its police officers and other emergency personnel, had used to commute between the central and southwestern portions of the city. After the closure, travel between the two portions was possible only by traveling along Highway 290's access road to a point outside the city, crossing under, and then doubling back along the opposite side of Highway 290.

Sunset Valley has since found it necessary to construct a substitute street in order to regain the transportation connection it lost as a result of the expansion. The question of who should pay for this substitute street, along with a multitude of other issues involved in the construction and completion of Highway 290, was presented to the district court. Sunset Valley also raised issues of noise and light pollution, charging that TxDOT had failed to perform state and federally mandated noise-abatement procedures and studies. Sunset Valley moved for partial, interlocutory summary judgment, and TxDOT responded by filing a plea to the jurisdiction along with several special exceptions to Sunset Valley's pleadings. The district court denied TxDOT's plea and special exceptions and granted Sunset Valley's motion for partial, interlocutory summary judgment on November 9, 1998. The court found that Sunset Valley proved all the elements of inverse condemnation as a matter of law and that the substitute facilities doctrine was the proper method of determining the amount of damages incurred by Sunset Valley. The trial court also found that Sunset Valley was entitled to declaratory relief with respect to its noise pollution claims, but that it was not entitled to relief in the form of an injunction or mandamus. TxDOT now challenges the district court's denial of its plea to the jurisdiction in this interlocutory appeal, arguing (1) that Sunset Valley lacks standing to sue for inverse condemnation, (2) that Sunset Valley lacks standing to bring its claims for damages resulting from increased circuity of travel and noise and light pollution, and (3) that TxDOT is immune from suit for declaratory relief by virtue of the doctrine of sovereign immunity.

## DISCUSSION

### Interlocutory Appeal

[1] [2] [3] [4] In bringing this appeal, TxDOT must of necessity rely *solely* on section 51.014(a)(8) of the Texas Civil Practice and Remedies Code, which provides that "[a] person may appeal from an interlocutory order of a district court that grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001."[2] Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8) (West Supp.1999). A plea to the jurisdiction contests the trial court's authority to adjudicate the subject matter of the cause of action. *See Dolenz v. Texas State Bd. of Med. Exam.,* 899 S.W.2d 809, 811 (Tex.App.—Austin 1995, no writ); *Schulz v. Schulz,* 726 S.W.2d 256, 257 (Tex.App.—Austin 1987, no writ). In a proper plea to the jurisdiction, a defendant contends that, even if all the allegations in a plaintiff's pleadings are taken as true, there is an incurable jurisdictional defect apparent from the face of the pleadings. *See* **\*730** *Firemen's Ins. Co. v. Board of Regents of Univ. of Tex. Sys.,* 909 S.W.2d 540, 541 (Tex.App.—Austin 1995, writ denied) (citing *Bybee v. Fireman's Fund Ins. Co.,* 160 Tex. 429, 331 S.W.2d 910, 917 (1960)); *Washington v. Fort Bend Indep. Sch. Dist.,* 892 S.W.2d 156, 159 (Tex.App.—Houston [14th Dist.] 1994, writ denied). In reviewing the grant or denial of a plea to the jurisdiction, we do not look at the merits of the case. *See Firemen's Ins. Co.,* 909 S.W.2d at 541. This Court recently held that a governmental unit is free to appeal a trial court's denial of its plea to the jurisdiction under section 51.014(a)(8), regardless of the basis on which it asserts a lack of jurisdiction. *See City of Austin v. L.S. Ranch, Ltd.,* 970 S.W.2d 750, 752 (Tex.App.—Austin 1998, no pet.). Thus, a government unit's plea to the jurisdiction need not be based upon a claim of sovereign immunity in order for it to bring an interlocutory appeal under section 51.014(a)(8). *See id.* Nevertheless, because the statute authorizing interlocutory appeals is a narrow exception to the general rule that only final judgments and orders are appealable, we must give it a strict construction. *See id.* at 753; *America Online, Inc. v. Williams,* 958 S.W.2d 268, 271 (Tex.App.—Houston [14th Dist.] 1997, no pet.); *Tober v. Turner of Texas, Inc.,* 668 S.W.2d 831, 835 (Tex.App.—Austin 1984, no writ). Thus, we will limit our discussion to the narrow issue that is before us, the question of whether the trial court erred in denying TxDOT's plea to the jurisdiction.

*Standing*

 **[5]**   **[6]**   **[7]**   We first address TxDOT's argument that the district court erred in overruling its plea to the jurisdiction because Sunset Valley lacks standing to sue TxDOT for the appropriation of Jones Road. In order for a court to have subject matter jurisdiction, the party bringing suit must have standing. *See Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–46 (Tex.1993). To establish standing, a party must show that (1) a real controversy exists between the parties and (2) the controversy will actually be determined by the judicial relief sought. *See id.* at 446.

 **[8]**   TxDOT argues that because a city's interest in its streets is subordinate to the interests of the State, and since the legislature has provided TxDOT statutory authority to appropriate city streets for the construction of controlled-access highways, Sunset Valley cannot successfully bring an action against the State for TxDOT's appropriation of its streets. *See City of Mission v. Popplewell,* 156 Tex. 269, 294 S.W.2d 712, 715 (1956) (holding that legal title to city streets belongs to State and that cities' authority and control limited to extent delegated by legislature or state constitution); Tex. Transp. Code Ann. § 203.003 (West Supp.1999) (authorizing transportation commission to exercise powers to lay out, construct, maintain, and operate a state highway in a county or municipality without consent of county or municipality). TxDOT contends that because Sunset Valley cannot successfully bring an action for the taking of its streets, it has no claim and ultimately lacks standing to bring suit. We disagree with this analysis.

Although TxDOT characterizes this as an issue of standing, in reality TxDOT is seeking a determination of this case on the merits. TxDOT confuses the jurisdictional question of whether Sunset Valley has standing to bring a cause of action for the State's appropriation of city streets with the substantive issue of whether Sunset Valley should *prevail on the merits* of its case. TxDOT is attempting to meld its appeal of the denial of its plea to the jurisdiction with an appeal of the partial summary judgment rendered against it by the trial court.[3] As we have stated previously, **\*731** this Court is not authorized to review the merits of Sunset Valley's claims in this interlocutory appeal. We decline to permit TxDOT to use this interlocutory appeal as a vehicle to circumvent the bounds set by the statute in order to obtain judicial review of the merits of Sunset Valley's case before the district court has rendered a final judgment.[4]

Certainly, a city has standing to bring suit against the State for appropriation of that city's streets, regardless of whether its action is ultimately unsuccessful. TxDOT cites no case law in support of its contention that municipalities lack standing to sue the State for the physical appropriation of city streets. Likewise, we are unable to find any authority supporting this argument. Here, Sunset Valley has pleaded that it has a justiciable interest in the street that was taken and that as a city, it has an interest in maintaining its streets for its residents. Cities have always had standing to litigate issues involving their entitlement to public property in suits against other state governmental entities.[5]

 **[9]**   In asserting a claim to the streets that run within its boundaries, Sunset Valley has shown that a controversy exists as to the nature and extent of its interest in its streets and the State's responsibility for compensation. The ultimate question of whether Sunset Valley can *prevail* in its suit against TxDOT is a matter for the trial court to decide on the merits. "A plea to the jurisdiction of the trial court is not sustainable where the contention is to the effect that the plaintiff has falsely stated a claim which, in fact, is nonexistent, for this is a matter of defense on the merits." *Bernard Hanyard Enters., Inc. v. McBeath,* 663 S.W.2d 639, 642 (Tex.App.—Austin 1983, writ ref'd n.r.e.). Because TxDOT has not presented this Court with a true jurisdictional issue, we overrule appellant's first issue.

*Circuity of Travel, Noise and Light Pollution*

 **[10]**   Having determined that Sunset Valley has standing to sue for the physical taking of its streets, we now address TxDOT's argument that Sunset Valley has no standing to sue TxDOT for any injuries resulting from increased circuity of travel and the light and noise pollution resulting from the expansion of Highway 290. In **\*732** support of this argument, TxDOT states in its brief that whether there has been a material and substantial impairment of access or whether there exists an issue of increased circuity of travel is a question of law that must be decided by the trial court. *See State v. Wood Oil Distrib. Co.,* 751 S.W.2d 863,

865 (Tex.1988). TxDOT adds that the burden of proving a compensable impairment of access is upon the landowner and that if the reconfiguration has caused only an increased circuity of travel, any injury suffered by Sunset Valley is noncompensable. *See id.; State v. Westgate,* 798 S.W.2d 903, 906–7 (Tex.App.—Austin 1990), *aff'd, Westgate v. State,* 843 S.W.2d 448 (1992).

 **[11]**　Once again, TxDOT is attempting to reach beyond the narrow jurisdictional issue before us in order to argue its case on the merits. If a judicial determination of the issue of increased circuity of travel is necessary and the burden of proof is upon the landowner to prove a compensable impairment of access, surely that same landowner has standing to bring the action necessary to receive this judicial determination. TxDOT cannot successfully argue that because a defense of circuity of travel may exist, Sunset Valley has no standing to bring suit in the first place. TxDOT's circuity-of-travel contentions concern questions of compensable injuries and the measure of damages, which are questions on the merits, not jurisdictional issues. Likewise, TxDOT's argument that Sunset Valley's claims for injuries resulting from the noise and light pollution caused by the highway expansion are not compensable again goes to the merits of the case and not to the jurisdictional issue of standing. The fact that Sunset Valley has alleged injury to the public it represents is enough to confer standing. We overrule TxDOT's second issue.

### *Sovereign Immunity*

 **[12]**　In its third and final issue, TxDOT argues that the district court erred in denying its plea to the jurisdiction because it is immune from suit pursuant to the doctrine of sovereign immunity, specifically with respect to Sunset Valley's request for declaratory judgment on its noise and light pollution claims. TxDOT complains that this declaratory relief compels the State through its officials to perform certain acts without the required legislative consent. *See Griffin v. Hawn,* 161 Tex. 422, 341 S.W.2d 151, 153 (1960) (holding that where purpose of proceeding against state officials is to control action of State, suit is against State and cannot be maintained without legislature's consent).

First, TxDOT mischaracterizes the trial court's judgment. In its partial, interlocutory summary judgment, the trial court granted TxDOT's jurisdictional challenge to Sunset Valley's request for relief by mandamus and denied Sunset Valley's request for an injunction. The only relief that the court granted Sunset Valley was a declaratory judgment with respect to its claim for noise pollution. Contrary to TxDOT's assertions, this relief does not require the State to take any action. The trial court expressly rejected any such relief when it denied Sunset Valley's requests for a mandamus and injunction.

 **[13]**　**[14]**　Furthermore, although the State as sovereign is generally immune from both liability and suit without its consent, actions for inverse condemnation brought pursuant to article I, section 17 of the Texas Constitution [6] comprise a limited exception to the doctrine of sovereign immunity. *See Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997); *State v. Biggar,* 848 S.W.2d 291, 295 (Tex.App.—Austin 1993), *aff'd,* 873 S.W.2d 11 (1994). When a governmental entity takes, damages, or destroys property for public use, the Constitution waives the **\*733** governmental entity's immunity from both suit and liability. *See Steele v. City of Houston,* 603 S.W.2d 786, 791 (Tex.1980)*; Dillard v. Austin Indep. Sch. Dist.,* 806 S.W.2d 589, 596 (Tex.App.—Austin 1991, writ denied). A claim for nuisance is an alternative ground of recovery under article 1, section 17 and is also an exception to sovereign immunity. *See Tarrant County v. English,* 989 S.W.2d 368, 374 (Tex.App.—Fort Worth 1998, pet. denied); *Golden Harvest Co. v. City of Dallas,* 942 S.W.2d 682, 688–90 (Tex.App.—Tyler 1997, writ denied) (holding sovereign immunity does not make city immune from action for nuisance caused by city's non-negligent or intentional acts where suit brought under article I, section 17 of Constitution). Because Sunset Valley's entire claim is in the nature of a takings claim and the declaratory relief of which TxDOT complains involves a nuisance claim for noise and light pollution, TxDOT cannot successfully assert sovereign immunity from suit. Accordingly, we overrule TxDOT's final issue.

### CONCLUSION

Having overruled all three issues TxDOT raised in this interlocutory appeal, we affirm the trial court's denial of TxDOT's plea to the jurisdiction.

Footnotes

1    Appellants include the Texas Department of Transportation; Charles W. Heald, both individually and in his official capacity as Executive Director of the Texas Department of Transportation; Anne S. Wynne, both individually and in her official capacity as Commissioner of the Texas Department of Transportation; Robert L. Nichols, both individually and in his official capacity as Commissioner of the Texas Department of Transportation; and David M. Laney, both individually and in his official capacity as Commissioner of the Texas Department of Transportation.

2    Section 101.001 defines "governmental unit" to include "a political subdivision of this state, including any city." Tex. Civ. Prac. & Rem.Code Ann. § 101.001(3)(B) (West Supp.1999).

3    We note that in its motion filed with the district court, entitled "Defendant's First Amended Pleas to the Jurisdiction and Special Exceptions to Plaintiff's Amended Motion for Partial, Interlocutory Summary Judgment," TxDOT sought to attack Sunset Valley's motion for summary judgment on substantive as well as jurisdictional grounds. Our analysis is, of necessity, confined only to TxDOT's jurisdictional arguments.

4    TxDOT's attempt to appeal the merits of this case is especially troubling because this matter was set for a trial on the merits on the issue of damages in May 1999. Absent this interlocutory appeal, all the issues TxDOT wishes to raise here would properly be before us on a regular appeal.

5    *See, e.g., Texas Antiquities Committee v. Dallas Community College Dist.,* 554 S.W.2d 924, 930 (Tex.1977) (reaffirming its holding in *Milam County v. Bateman,* 54 Tex. 153 (1880), and extending same state constitutional guaranties to local governments that shield individual property owners); *Brazos River Auth. v. City of Graham,* 163 Tex. 167, 354 S.W.2d 99, 108–10 (1961) (extending protection to municipalities under article 1, section 17 of state constitution and affirming award to municipality for state river authority's appropriation of city's sewage disposal plant); *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20, 29 (1931) (holding that rights associated with property acquired by school districts and cities protected by same constitutional guaranties that shield property of individuals); *Fort Worth Improvement Dist. No. 1 v. City of Fort Worth,* 106 Tex. 148, 158 S.W. 164, 168 (1913) (upholding injunction restraining State from erecting levee that would damage city water treatment plant, absent payment of necessary compensation); *State v. City of Denton,* 542 S.W.2d 224 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.) (holding city enjoys exclusive dominion over its streets and denying state university's attempt to exercise eminent domain over city's streets); *State v. Waco I.S.D.,* 364 S.W.2d 263, 265–68 (Tex.Civ.App.—Waco 1963, writ ref'd n.r.e.) (awarding school district damages against TxDOT's predecessor on grounds that appropriation of public school's property in course of constructing highway improvement constituted violation of state constitutional takings clause).

6    This section provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, § 17.

---

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

87 S.W.3d 538
Supreme Court of Texas.

TEXAS STATE BANK, Petitioner,

v.

Rutilo Vargas AMARO, Respondent.

No. 00–1220.    |    Argued Oct. 3, 2001.    |    Decided Sept. 26, 2002.

Trustee sought declaratory relief, seeking determination of trust's status in light of another district court's decree in a separate divorce action that beneficiary was no longer incapacitated. The 206th District Court, Hidalgo County, Joe B. Evins, J., entered order terminating trust, approving trustee's accounting, and releasing trustee from any liability to trust or beneficiary. Beneficiary appealed. The Corpus Christi Court of Appeals, 28 S.W.3d 789, affirmed as modified. Trustee filed petition for review. Upon overruling motions for rehearing, the Supreme Court, Xavier Rodriguez, J., held that: (1) district court had continuing jurisdiction over trust and was not bound by adjudication of beneficiary's capacity in divorce action; but (2) district court exceeded the relief requested by approving trustee's investment philosophy and adjudicating trustee's potential tort liability; (3) district court could approve all distributions, fees, costs, and expenses under its authority to approve the accounting; (4) beneficiary did not waive his appeal from judgment by accepting payment of trust monies under that judgment; and (5) approval of trustee's final accounting did not settle trustee's tort liabilities.

Affirmed as modified.

West Headnotes (8)

**[1]    Mental Health** 🔑 Particular Courts

District court's decree creating trust and trust documents invoked that court's continuing jurisdiction over trust, including jurisdiction to determine whether beneficiary regained capacity thereby terminating trust, and thus, such court was not bound by prior adjudication of beneficiary's capacity in his divorce action, where decree creating trust stated that trust would "remain in full force and effect until further orders of this court," and trust document provided that court retained right before termination "to mend, alter, modify, or revoke this trust." V.T.C.A., Property Code § 142.005(d, f).

Cases that cite this headnote

**[2]    Trusts** 🔑 Judgment or Decree

Approval of trustee's investment philosophy and adjudication of trustee's potential tort liability to the beneficiary were not components of an accounting, and thus, district court exceeded the relief requested by ruling on such matters, where trustee requested only determination of whether trust was terminated, removal as trustee if it was not terminated, and approval of final accounting. V.T.C.A., Property Code § 113.152.

3 Cases that cite this headnote

**[3]    Trusts** 🔑 Form and Requisites of Account

All distributions, fees, costs, and expenses trustee paid from a trust, not merely those related to trust's termination, amounted to "disbursements," and thus, were properly part of trustee's accounting at termination, such that district

court, as court of continuing jurisdiction over trust, could approve such disbursements under its authority to approve the accounting. V.T.C.A., Property Code §§ 113.152(2), 142.005(b)(6).

1 Cases that cite this headnote

**[4]** **Declaratory Judgment** 🔑 Scope and Extent of Review in General

By objecting in the district court to the introduction and consideration of evidence that went beyond trustee's request for declaratory relief, beneficiary preserved for appellate review issue of whether district court's order exceeded the relief requested.

Cases that cite this headnote

**[5]** **Appeal and Error** 🔑 Acceptance of Sum Absolutely Due or Admitted to Be Due

Trust beneficiary's acceptance of the trust corpus was not inconsistent with his position on appeal that district court lacked authority to rule on trustee's potential tort liability, and thus, beneficiary did not waive his appeal from judgment by accepting payment of trust monies under that judgment, where neither party disputed winding up of trust and distribution of corpus.

14 Cases that cite this headnote

**[6]** **Appeal and Error** 🔑 Acceptance of Sum Absolutely Due or Admitted to Be Due

As long as an appellant accepts only that which appellee concedes, or is bound to concede, to be due him under the judgment he is not estopped to prosecute an appeal which involves only his right to a further recovery.

25 Cases that cite this headnote

**[7]** **Trusts** 🔑 Hearing or Reference

**Trusts** 🔑 Operation and Effect of Accounting

District court's approval of trustee's final accounting, including the distributions, costs, and expenses, was not an adjudication of the trustee's tort liabilities, if any, and thus, beneficiary was not entitled to a jury or to 45 days' notice of the hearing that approved the accounting. Vernon's Ann.Texas Rules Civ.Proc., Rule 245; V.T.C.A., Property Code § 113.152.

1 Cases that cite this headnote

**[8]** **Trusts** 🔑 Operation and Effect of Accounting

The Trust Code does not contemplate that an accounting will settle the trustee's tort liability. V.T.C.A., Property Code § 113.152.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*539** Lisa Powell, Gary Gurwitz, Sofia Amabel Ramon, Atlas & Hall, McAllen, for petitioner.

**\*540** [Benjamin L. Hall, III,](#) Elizabeth B. Hawkins, Hall Law Firm, [Russell S. Post](#), Hogan Dubose & Townsend, [Jennifer Bruch Hogan](#), Hogan Dubose & Townsend, L.L.P., [John K. Leach](#), O'Quinn Laminack & Pirtle, Houston, for respondent.

**Opinion**

Justice RODRIGUEZ delivered the opinion of the Court.

We overrule Texas State Bank's and Rutilo Vargas Amaro's motions for rehearing. We withdraw our opinion of June 6, 2002, and substitute the following in its place.

In this appeal from a modification of a district court's order, Texas State Bank (TSB) asks this Court to reinstate those parts of the district court's order the court of appeals reversed. The issues here are whether the district court had continuing jurisdiction over a trust it created under Chapter 142 of the Texas Trust Code, and whether the district court's order went beyond the relief TSB's motion requested. Because the district court did have continuing jurisdiction over the trust but the district court's judgment exceeded the relief TSB's motion requested, we reinstate only a part of the order and affirm the court of appeals' judgment, as modified.

**I.**

Rutilo Vargas Amaro (Vargas) [1] suffered severe injuries in a sugarcane field burn-off. He sued the field's owners, Rio Grande Valley Sugar Growers, Inc. (Sugar Growers), for negligence in the 206th district court and received a substantial settlement. In 1989, the district court adjudged Vargas incapacitated as defined by [section 142.007 of the Texas Property Code](#), and, on Vargas's guardian's motion, the court created a trust for him under [section 142.005](#) of the Code. The trust document provided that the trust would terminate when Vargas regained capacity, and the district court's decree stated that the trust would "take effect immediately to remain in full force and effect until further orders of this Court." TSB served as trustee during the trust's nine-year existence.

In May 1997, Vargas filed a "Motion for Termination of Trust" in the 206th district court, alleging that he had regained capacity. In September 1997, before the 206th district court had ruled on Vargas's motion, the 370th District Court of Hidalgo County issued an order in Vargas's uncontested divorce action decreeing that Vargas was fully capable of acting as sole managing conservator for his minor child and suffered no incapacity. Five days after the 370th district court issued its order, Vargas filed a motion with the 206th district court to withdraw his request to terminate the trust and, the following day, he filed a notice of nonsuit in the 206th district court. Vargas then sent a letter to TSB, demanding that TSB release the trust funds due to the divorce court's adjudication of his regained capacity. In the letter, Vargas threatened TSB with legal action if TSB did not promptly comply with the request.

TSB responded by tendering the trust funds to the 206th district court and filing a "Motion Regarding the Rutilo Vargas Amaro Trust for Declaratory Judgment and for Other Relief" under the caption of the original personal-injury suit between Vargas and Sugar Growers. In this motion, filed September 18, 1997, TSB asked the court: (1) to determine if the trust was terminated because of Vargas's regained **\*541** capacity; (2) to allow TSB to resign as trustee and to appoint a substitute trustee in case the trust was not terminated; (3) to "approve final accountings to be submitted to the Court;" and (4) to order any "other and further relief, at law or in equity, to which TSB may be justly entitled." TSB alleged jurisdiction under Chapter 142 of the Texas Property Code, the Texas Uniform Declaratory Judgments Act, [2] and section 115.001 of the Texas Trust Code. [3]

On October 6, Vargas filed a plea to the jurisdiction arguing that the 206th district court did not have continuing jurisdiction over the trust, and that the 370th district court had jurisdiction to determine Vargas's capacity. At the same time, he filed a "Notice of Determination of Capacity" with the 206th district court, informing the court that the 370th district court had found

capacity. Vargas argued that the trust had terminated by its own terms when the 370th district court ruled that Vargas was not incapacitated.

Vargas then filed a new suit against TSB in the 93rd District Court, also in Hidalgo County. This suit alleged that TSB had committed fraud, breach of fiduciary duty, negligence, breach of the duty of good faith and fair dealing, breach of contract, and DTPA violations in administering the trust. Some of TSB's alleged misconduct, according to Vargas, had to do with improper and imprudent investment decisions, failing to keep Vargas fully informed of trust decisions, and failing to keep proper records regarding the trust. This suit is still pending and discovery is proceeding.

On November 25, 1997, the 206th district court denied Vargas's plea to the jurisdiction and claimed jurisdiction "to any matter pertaining to the assets of Mr. Rutilo Vargas as it relates to matters of his Trust." On February 26, 1998, Vargas filed a "Supplemental Notice of Determination of Capacity and Request for Release of Monies Owed to Rutilo Vargas Amaro" and scheduled a hearing for March 11, 1998. Through a letter to the court coordinator, sent six days before the hearing date, TSB gave notice that it was also scheduling a hearing on its "Motion Regarding the Rutilo Vargas Amaro Trust for Declaratory Judgment and for Other Relief." Vargas objected to TSB's request to have the 206th district court "make final legal determinations," arguing that the notice requirements of Texas Rule of Civil Procedure 245 were not met.

The 206th district court held hearings on both parties' motions and, on March 17, issued an "Order Terminating Trust, Approving Trust Administration, Investment Philosophy, Accounting, Actions and Fees, and Discharging Trustee Relating to the Rutilo Vargas Amaro Trust." In this order, the court terminated the trust due to Vargas's regained capacity and approved all accountings TSB presented, including all distributions TSB made, all fees TSB received, and all fees, costs, and expenses TSB paid. In addition, the court approved TSB's investment philosophy and ordered that "[s]ubject to the payment to Vargas ... as directed above, the Court discharges TSB as trustee and releases TSB as trustee from any liability to the Trust or to Vargas."

Vargas appealed, complaining that the 206th district court erred in absolving TSB **\*542** of liability for its handling of the trust. Vargas argued that the Declaratory Judgments Act could not expand the district court's jurisdiction over the trust to allow it to adjudicate Vargas's tort claims against TSB. The court of appeals agreed, and modified the district court's judgment by reversing those parts of the district court's order: (1) approving all distributions, fees, costs, and expenses TSB paid, except for the fees, costs, and expenses relating to the trust's termination; (2) approving TSB's investment philosophy; and (3) absolving TSB from any liability to Vargas or the Vargas trust. 28 S.W.3d at 796.

TSB filed a petition for review, asking this Court to resolve four issues: 1) Did the 206th district court exercise continuing jurisdiction over the Chapter 142 trust that it created, and thus have jurisdiction to issue its declaratory judgment in connection with the trust, related issues, and parties? 2) Did the 206th district court have jurisdiction to and properly approve the investment philosophy, distributions, and expenses of the trustee of the Vargas trust, to discharge the trustee from liability, and to issue its declaratory relief? 3) Did Vargas waive his argument concerning the proper scope of declaratory relief by failing to make the argument to the district court? and, 4) Did Vargas waive his arguments by accepting payment under the judgment?

Vargas counters by asking this Court to consider cross-points that would preclude reinstatement of those parts of the 206th district court's judgment reversed by the court of appeals. Specifically, Vargas urges that the district court erred in rendering judgment for TSB when Vargas was not given the required forty-five days notice of trial under Rule 245 of the Texas Rules of Civil Procedure, and, alternatively, the district court erred in rendering judgment for TSB even though Vargas was denied his right to a jury trial.

## II.

 **[1]**   We first consider the district court's jurisdiction over a trust created under Texas Property Code section 142.005. By filing a motion under the caption of the original *Sugar Growers* personal-injury suit, TSB invoked the 206th district court's continuing

jurisdiction over the trust created in that suit. TSB's motion specifically requested the 206th district court to determine whether the trust was terminated due to Vargas's regained capacity, to allow TSB to resign if the trust was not terminated, and to approve TSB's final accounting of the trust.

Chapter 142 provides that the trust will continue until terminated or revoked, and allows the court to amend, modify, or revoke the trust at any time before its termination. TEX. PROP.CODE § 142.005(d),(f). The 206th district court's decree creating the trust stated that the trust would "take effect immediately to remain in full force and effect until further orders of this court." And the trust document itself provides that the "Court shall retain the right at any time before the termination of this trust to amend, alter, modify, or revoke this trust." Taken together, these documents invoke the 206th district court's continuing jurisdiction over the trust under Chapter 142. Therefore, the 206th district court had continuing jurisdiction over the Vargas trust until such time that it terminated the trust. Thus, although the 370th district court adjudicated Vargas's capacity in the divorce action, the 206th had jurisdiction to consider whether he regained capacity such that the trust was terminated, and the trust did not terminate until the 206th so decreed.

### *543  III.

[2]    Having determined that the 206th district court had continuing jurisdiction to determine issues related to the trust and its termination, we now consider whether the court properly exercised that jurisdiction by ordering the relief that it did. As noted, the district court has continuing jurisdiction to supervise, modify, revoke, and terminate the trust. Further, section 142.005(b)(4) provides that the trust terminates when the beneficiary regains capacity and section 142.005(e) provides that upon the trust's termination the principal and undistributed income shall be paid to the beneficiary. In this case, neither capacity nor the district court's order terminating the trust are disputed. The question here is whether the remainder of the district court's order—specifically, approval of TSB's accounting, approval of TSB's investment philosophy, and absolving TSB of liability —was properly granted.

To determine the corpus due to the beneficiary, the trustee may provide the terminating court with a final accounting of the trust funds for examination. In its motion to the 206th district court, TSB asked the court to "approve final accountings to be submitted to the Court." Property Code section 113.152 provides what an accounting should contain.

A written statement of accounts shall show:

(1) all trust property that has come to the trustee's knowledge or into the trustee's possession and that has not been previously listed or inventoried as property of the trust;

(2) a complete account of receipts, disbursements, and other transactions regarding the trust property for the period covered by the account, including their source and nature, with receipts of principal and income shown separately;

(3) a listing of all property being administered, with an adequate description of each asset;

(4) the cash balance on hand and the name and location of the depository where the balance is kept; and

(5) all known liabilities owed by the trust.

TEX. PROP.CODE § 113.152. In the context of a terminating trust, the statutory requirements for an accounting form the basis winding up the trust to ascertain the balance due to the beneficiary. Nowhere does section 113.152 mention investment philosophy or potential tort liability to the beneficiary with regard to an accounting. Thus, these determinations are not components of an accounting. Accordingly, although the 206th district court's approving TSB's accounting was appropriate under TSB's motion to the court, the 206th district court's approving TSB's investment philosophy and absolving TSB's tort liability, if any, were not. The 206th district court improperly granted relief that TSB did not request. TSB's motion asked the district court only to determine whether the trust was terminated, to remove TSB as trustee if the trust was not terminated, and

to approve TSB's final accounting. In its motion, TSB did not ask the district court to adjudicate TSB's potential tort liability as trustee, nor to approve TSB's investment philosophy, and therefore the district court should not have ruled on these issues. We conclude that the court of appeals was correct in reversing those parts of the district court's order.

## IV.

**[3]** The court of appeals further modified the district court's order by reversing that part of the order approving all distributions, fees, costs, and expenses TSB paid from the Vargas trust except those relating to the trust's termination. But Chapter 142 of the Property Code gives **\*544** the court of continuing jurisdiction the power to approve the trustee's fees, TEX. PROP.CODE § 142.005(b)(6), and the trust instrument also provided that "[t]he trustee shall receive reasonable compensation ... on application to and approval of the 206th District Court." And because the distributions, costs, and expenses of a trust would be "disbursements" under Property Code section 113.152(2), and therefore properly part of the trustee's accounting, we hold that the court of appeals erred by reversing that part of the district court's order. Accordingly, we reinstate that part.

## V.

**[4]** TSB argues that Vargas waived his objections to the proper scope of the declaratory relief the district court granted by failing to make the argument to the district court. We disagree. The error is that the district court's order exceeded the relief TSB's motion requested. Vargas objected at the March hearing to the introduction and consideration of evidence that went beyond TSB's request for relief. And, Vargas's brief to the court of appeals clearly objected to the fact that the district court went far beyond the scope of TSB's motion in its final order. Vargas properly preserved his objections.

## VI.

**[5]** **[6]** Finally, TSB argues that Vargas waived his objection to the district court's judgment by accepting payment of his trust monies under that judgment. This Court, in *Carle v. Carle,* stated that a "litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot afterward prosecute an appeal therefrom." 149 Tex. 469, 234 S.W.2d 1002, 1004 (1950). There is a narrow exception to this rule that as long as an appellant "accepts only that which appellee concedes, or is bound to concede, to be due him under the judgment he is not estopped to prosecute an appeal which involves only his right to a further recovery." *Id.*

Here, neither side disputes that capacity was regained and that the trust should have been terminated. And neither party argues with winding up the trust and distributing the corpus. Vargas contested only the district court's ability to rule on TSB's potential tort liability to Vargas as trustee. Therefore, Vargas's acceptance of the trust corpus is not inconsistent with his position and falls within the *Carle* exception.

## VII.

Because we reinstate the trial court's judgment approving the accounting, including the approval of distributions, fees, costs, and expenses, we next consider Vargas's alternative grounds for affirming the court of appeals' judgment reversing these rulings. Vargas argues that judgment cannot be rendered on these issues because he was not given the forty-five days notice of trial required under Rule 245 of the Texas Rules of Civil Procedure. Vargas also argues that the 206th district court erred in rendering judgment for TSB because it denied him the right to a jury trial.

 **[7]**     As we stated above, the trustee may provide the court with a final accounting of the trust funds to determine the amount due to the beneficiary, and we held that the court's approval of the accounting was within its jurisdiction and within the scope of relief requested by TSB's motion. To properly assess Vargas's argument that the ruling violates his due process rights, we must determine the nature of the trial court's ruling. TSB contends that "[a]pproval of an 'accounting' involves more than merely approval of **\*545**  the math involved in expenditure and disbursement: approval of an accounting disposes of all claims that might be made in regard to matters relating thereto." For support, TSB cites only one case—*Coble Wall Trust Co., Inc. v. Palmer, 859 S.W.2d 475, 480–81 (Tex.App.-San Antonio 1993, writ denied)*. In that case, the court of appeals held that a probate court's judgment, after a full hearing based on the new administrators' and others' objections, that approved the final accounts and discharged Coble Wall from all liability barred the plaintiff's subsequent suit for negligence and DTPA violations. In that case, full evidentiary hearings were conducted and the court of appeals noted that all of the contentions advanced by the plaintiffs regarding the estate plan and fees were heard by the probate court and thus were placed in issue and adjudicated. Thus, the guardian's liability had been fully litigated in the probate court. *Coble Wall* does not hold that a court's approval of an accounting necessarily includes adjudication of the trustee's tort liability; it merely affirms that, in certain circumstances, it may. [4]

 **[8]**     Contrary to TSB's assertion, the Trust Code does not contemplate that an accounting will settle the trustee's tort liability. As noted, section 113.152 establishes the contents of an accounting and requires the trustee to list trust property, transactions, property, cash, and all known liabilities owed by the trust. It simply does not reach the trustee's tort liability. This conclusion is supported by the Trust Code's structure, which includes Subchapter E "Accounting by Trustee" within Chapter 113, entitled "Administration." In contrast, Chapter 114 concerns "liabilities, rights, and remedies of trustees, beneficiaries, and third persons." Thus, the final accounting "form[s] the basis for a winding up of the trust to ascertain the balance due to the beneficiary." *Supra* at 543. As TSB states in its brief, "TSB's requested relief in essence provided for determination of what amounts should be paid to Vargas by TSB and the closing of the trust and issues relating thereto." Determining TSB's tort liability is not necessary to the closing of the trust or ascertaining the trust balance due the beneficiary, and, as we held above, was not within the scope of TSB's requested relief. Accordingly, because approving the accounting, including the distributions, costs, and expenses, was not an adjudication of TSB's tort liabilities, Vargas was not entitled to a jury or to forty-five days notice of the hearing.

## VIII.

In sum, we conclude that under Property Code section 142.005 and the trust documents, the district court had continuing jurisdiction to rule on the issues requested by TSB's motion; specifically, the 206th district court had jurisdiction in this case to terminate the trust and to approve TSB's final accounting, including all distributions, fees, costs, and expenses of the trust. We hold that the 206th district court's order exceeded, in part, the relief TSB requested and should not have encompassed approving TSB's investment philosophy, nor ruling on TSB's potential tort liability to Vargas. We modify the court of appeal's judgment by reinstating that part of the 206th district court's order approving the distributions, fees, costs, **\*546**  and expenses TSB paid from the Vargas Trust. Accordingly, we affirm the court of appeal's judgment, as modified.

Justice SCHNEIDER did not participate in the decision.

**Parallel Citations**

45 Tex. Sup. Ct. J. 1302

Footnotes

1        The court of appeals referred to Rutilo Vargas Amaro as "Vargas." For the sake of consistency, we do the same.

2        TEX. CIV. PRAC. & REM.CODE § 37.005.

3      TEX. PROP.CODE § 115.001 (providing for the original and exclusive jurisdiction of a district court "over all proceedings concerning trusts, including proceedings to: ... (4) determine the powers, responsibilities, duties, and liability of a trustee").

4      In *Bohlssen v. Bohlssen,* 56 S.W.2d 913, 916 (Tex.Civ.App.-Galveston 1932, no writ), upon which the court in *Coble Wall* relied, the probate court not only approved the final accounting and discharged the guardian, but the ward expressly released the guardian from any further liability to him and acknowledged that he would not thereafter "have [a] claim against his guardian."

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

668 S.W.2d 831
Court of Appeals of Texas,
Austin.

Rick TOBER, Appellant,

v.

TURNER OF TEXAS, INC., Appellee.

No. 13881.　|　March 14, 1984.

Salesman appealed from an order of the 98th Judicial District Court, Travis County, Charles D. Mathews, P.J., overruling his motion to dissolve an injunction which temporarily enjoined him from selling specialty advertising items in competition with his former employer. The Court of Appeals, Phillips, C.J., held that: (1) since salesman made an untimely cash deposit in lieu of an appeal bond, the Court of Appeals was without jurisdiction to consider an appeal of the order granting temporary injunction; (2) salesman's cash deposit was made within 30 days of signing of order overruling his motion to dissolve the injunction; thus, the Court of Appeals had jurisdiction to review trial court's order overruling such motion; (3) by failing to perfect an appeal from the grant of the temporary injunction, salesman waived right to complain of errors allegedly committed by the trial court in originally granting temporary injunction; and (4) trial court had no duty, upon filing of motion to dissolve, to reconsider propriety of grant of the temporary injunction.

Affirmed.

West Headnotes (23)

**[1]**　　**Appeal and Error** 〜 Injunction

While an order granting a temporary injunction is an appealable interlocutory order, appeal of such an order must conform to requirements for accelerated appeals. Vernon's Ann.Texas Rules Civ.Proc., Rule 385.

Cases that cite this headnote

**[2]**　　**Appeal and Error** 〜 Deposit as security

In all accelerated appeals, deposit in lieu of appeal bond must be made within 30 days after order is signed. Vernon's Ann.Texas Rules Civ.Proc., Rule 385(d).

Cases that cite this headnote

**[3]**　　**Appeal and Error** 〜 Deposit as security

Requirement for accelerated appeal that a deposit in lieu of appeal bond must be made within 30 days after order appealed from is signed is a prerequisite to invoking the Court of Appeals' jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 385(d).

1 Cases that cite this headnote

**[4]**　　**Appeal and Error** 〜 Effect of failure to give or defects in security

Salesman who made a cash deposit in lieu of an appeal bond more than 30 days after grant of order which temporarily enjoined him from selling specialty advertising items within a certain area could not appeal such order; the Court of Appeals was without jurisdiction to consider it. Vernon's Ann.Texas Rules Civ.Proc., Rule 385(d).

Cases that cite this headnote

**[5]** **Appeal and Error** 🔑 Injunction

An order overruling a motion to dissolve a temporary injunction is an appealable interlocutory order. Vernon's Ann.Texas Civ.St. art. 4662.

1 Cases that cite this headnote

**[6]** **Appeal and Error** 🔑 Continuing, modifying, vacating, or dissolving

Court of Appeals had jurisdiction to review a trial court order overruling salesman's motion to dissolve an order which temporarily enjoined him from selling specialty advertising items within a certain county and various cities in competition with his employer, where salesman's cash deposit in lieu of an appeal bond was made within 30 days of the overruling of such motion, though he had not timely appealed from original injunction order. Vernon's Ann.Texas Civ.St. art. 4662.; Vernon's Ann.Texas Rules Civ.Proc., Rule 385(d).

1 Cases that cite this headnote

**[7]** **Injunction** 🔑 Authority and discretion of court

Determination of question of whether to dissolve a temporary injunction is a matter lying within discretion of the trial court.

1 Cases that cite this headnote

**[8]** **Appeal and Error** 🔑 Continuing, vacating, or dissolving

Scope of Court of Appeals' review of a trial court order overruling a motion to dissolve a temporary injunction is limited to the narrow question of whether the action of the trial judge, in overruling motion to dissolve, constituted an abuse of discretion.

4 Cases that cite this headnote

**[9]** **Injunction** 🔑 Evidence and affidavits

Salesman who filed motion to dissolve an order which temporarily enjoined him from selling specialty advertising items within a particular county and various cities had burden to show that trial court abused its discretion.

1 Cases that cite this headnote

**[10]** **Appeal and Error** 🔑 Continuing, vacating, or dissolving

Salesman's four points of error, relating to errors allegedly committed by the trial court in originally granting temporary injunction enjoining salesman from selling specialty advertising items within a particular area, were not a proper basis upon which salesman could contend that the trial court abused its discretion in overruling his motion to dissolve such injunction; by failing to perfect an appeal from grant of temporary injunction, salesman waived right to complain of the specified alleged errors, where none of the alleged errors were fundamental in nature, and where the trial court

was made aware of such alleged errors prior to signing temporary injunction. Vernon's Ann.Texas Rules Civ.Proc., Rule 385(d).

4 Cases that cite this headnote

**[11]** **Appeal and Error** ☛ Injunction

Since appeal was from denial of salesman's motion to dissolve an injunction which temporarily enjoined him from selling specialty advertising items within a particular area and was not an appeal of the grant of the temporary injunction, Court of Appeals would presume that record as a whole supported trial court's action in granting the temporary injunction, and would not look to statement of facts from hearing on motion to grant temporary injunction to ascertain if evidence supported such grant.

2 Cases that cite this headnote

**[12]** **Injunction** ☛ Authority and discretion of court

Trial court has no duty, upon filing of a motion to dissolve a temporary injunction, to reconsider propriety of the granting of the temporary injunction, at least where the motion does not allege fundamental error, and also where motion is not based upon evidence of changed conditions, but is rather based upon evidence which was before the court at prior hearing on motion to grant the temporary injunction.

8 Cases that cite this headnote

**[13]** **Judgment** ☛ Discretion of court

A trial court cannot be held to have abused its discretion where it refused to alter its prior decision in the absence of new evidence.

Cases that cite this headnote

**[14]** **Appeal and Error** ☛ Interlocutory appeals

Purpose of rule providing that no motion for new trial should be filed in appeals from interlocutory orders appealable by law is to avoid duplicity of effort and to give some degree of finality to interlocutory orders. Vernon's Ann.Texas Rules Civ.Proc., Rule 385.

Cases that cite this headnote

**[15]** **Appeal and Error** ☛ Injunction

A motion to dissolve a temporary injunction may not be used as a means of evading or expanding rules applicable to appealing interlocutory orders.

Cases that cite this headnote

**[16]** **Appeal and Error** ☛ Interlocutory and Intermediate Decisions

A statute authorizing an appeal from an interlocutory order must be given a strict construction since the statute is in derogation of the general rule that only final judgments and orders are appealable.

10 Cases that cite this headnote

**[17]   Injunction**   Authority and discretion of court

Trial court did not lack authority to reverse its prior temporary injunction order on a showing of changed conditions.

2 Cases that cite this headnote

**[18]   Injunction**   Evidence and affidavits

A trial court will not be deemed to have abused its discretion by refusing to reverse a prior grant of a temporary injunction, absent pleading and proof of changed conditions, or perhaps upon pleading and proof of fundamental error.

9 Cases that cite this headnote

**[19]   Injunction**   Right or necessity

A trial court may not enter a temporary injunction against a party before that party has presented its defenses and has rested its case. Vernon's Ann.Texas Rules Civ.Proc., Rule 681.

Cases that cite this headnote

**[20]   Injunction**   Authority and discretion of court

Under rule precluding a trial court from entering a temporary injunction against a party before that party has presented its defenses and has rested its case, party opposing temporary injunction has an opportunity to fully litigate the issue of whether the temporary injunction should issue prior to the granting of such injunction; thus, there is no longer any reason for requiring a trial court to reexamine the legal and factual basis of a preliminary injunction upon a motion to dissolve. Vernon's Ann.Texas Rules Civ.Proc., Rule 681.

1 Cases that cite this headnote

**[21]   Injunction**   Terminating, Vacating, or Dissolving Injunction

Purpose of motion to dissolve a temporary injunction is to provide a means to show that changed circumstances or changes in the law require modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant.

8 Cases that cite this headnote

**[22]   Injunction**   Evidence and affidavits

Trial court did not abuse its discretion in refusing to hear evidence of employer's alleged breach of employment contract with salesman in hearing on motion to dissolve temporary injunction; such evidence was not within proper scope of motion to dissolve.

Cases that cite this headnote

**[23]   Appeal and Error**   Sufficiency of offer of proof or showing of evidence excluded

Even if the trial court had refused to hear testimony on motion to dissolve temporary injunction, movant showed no error where he did not direct the Court of Appeals to a bill of exceptions which would show what the witnesses would have testified to.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*833** John L. Bates, Bates & Cates, Waco, for appellant.

Jeffrey M. Friedman, Friedman, Weddington, Hansen & Fisher, Austin, for appellee.

Before PHILLIPS, C.J., and POWERS and BRADY, JJ.

**Opinion**

PHILLIPS, Chief Justice.

Rick Tober appeals from the trial court's order overruling a motion to dissolve a temporary injunction.

We affirm that order.

Rick Tober was formerly employed by Turner of Texas, Inc. as a salesman of advertising specialty products. In September of 1982 Turner instituted this action against Tober. Turner contended that Tober had violated an agreement not to compete with Turner; Turner sought damages for prior breaches of the agreement as well as an injunction precluding future breaches. Tober lodged a counterclaim against Turner, seeking damages for Turner's alleged wrongful withholding of commissions earned by Tober.

On October 11, 1982, following an evidentiary hearing at which both Tober and Turner participated, the trial court signed an order which temporarily enjoined Tober from, *inter alia,* selling specialty advertising items within all of Travis County and the city limits of San Antonio, Dallas, Fort Worth, and Houston. On November 9, 1982 Turner filed a motion requesting that the trial court order Tober to appear and show cause as to why Tober should not be held in contempt. On November 16, 1982 Tober filed a motion captioned "Defendant's Response To Plaintiff's Motion To Show Cause; Defendant's Amended Motion To Set Aside the Temporary Restraining Order And/Or Alternatively Motion to Provide Adequate Bond."

On December 1, 1982 the trial court, following a hearing at which Tober and Turner were represented, signed an order overruling Tober's motion (apparently treating it as a motion to dissolve the temporary injunction). The trial court also found Tober in contempt of the temporary injunction; the contempt order is not here challenged. Tober made a cash deposit in lieu of an appeal bond on December 13, 1982.

**[1]** **[2]** **[3]** **[4]** We initially note that although Tober purports to appeal from the order granting temporary injunction as well as the order overruling his subsequently filed motion, he has not perfected an appeal from the initial order. While an order granting a temporary injunction is an appealable interlocutory order, *see* Tex.Rev.Civ.Stat.Ann. art. 4662 (Supp.1982), the appeal of such an order must conform to the requirements for accelerated appeals, Tex.R.Civ.P.Ann. 385 (Supp.1983). In all accelerated **\*834** appeals, the deposit in lieu of appeal bond must be made within thirty days after the order is signed. *Id.* 385(d). Such a requirement is a prerequisite to invoking this Court's jurisdiction; since Tober made an untimely cash deposit, we are without jurisdiction to consider an appeal of the order granting a temporary injunction. *Marshall v. Good Times, Inc.,* 537 S.W.2d 536 (Tex.Civ.App.1976, writ dism'd).

**[5]** **[6]** However, Tober's cash deposit *was* made within thirty days of the signing of the order overruling Tober's subsequent motion. Although that subsequent motion was rather awkwardly titled, to the extent possible we will treat it as a motion to dissolve the temporary injunction. An order overruling a motion to dissolve a temporary injunction is an appealable interlocutory

order. Tex.Rev.Civ.Stat.Ann. art. 4662 (Supp.1982). Therefore, although we lack jurisdiction to entertain an appeal of the order granting the temporary injunction, we have jurisdiction to review the trial court's order overruling the motion to dissolve the injunction. *Marshall v. Good Times, Inc., supra.*

 **[7]**   **[8]**   **[9]**   The determination of the question of whether to dissolve a temporary injunction is a matter lying within the discretion of the trial court; the scope of this Court's review of a trial court order overruling a motion to dissolve a temporary injunction is limited to the narrow question of whether the action of the trial judge, in overruling the motion to dissolve, constituted an abuse of discretion. *Marshall v. Good Times, Inc., supra.* Tober, as movant, has the burden to show that the trial court abused its discretion. *Id.*

As stated above, Tober was represented at the hearing on the application for temporary injunction. At that hearing Tober presented evidence in opposition to the granting of the temporary injunction. Later, at the hearing on the motion to dissolve the temporary injunction, Tober presented no evidence in support of dissolution; his case was based exclusively upon his attorney's legal argument.

Appellant's first four points of error relate to errors allegedly committed by the trial court in *originally granting* the temporary injunction; each of these matters were brought to the trial court's attention prior to the signing of the temporary injunction order, and were obviously rejected by the trial court. These points of error provide that the trial court erred in granting the temporary injunction because: (1) neither the contract of employment nor the restrictive covenant designate the market area of Turner, (2) the restrictive covenant is not reasonable either as to limitation of time or limitation of geographical area, (3) under the evidence presented Turner had breached the contract of employment prior to any breach upon the part of Tober, and (4) an inadequate injunction bond was set by the court.

 **[10]**   We hold that the above four points of error are not a proper basis upon which Tober may contend that the trial court abused its discretion in overruling the motion to dissolve. They *are* a proper basis upon which Tober could have contended, upon direct appeal of the order granting the temporary injunction, that the trial court abused its discretion in granting such. By failing to perfect an appeal from the grant of the temporary injunction, Tober has now, upon appeal of the motion to dissolve, waived the right to complain of the specified alleged errors; this is particularly true where, as here, none of the alleged errors are fundamental (i.e. jurisdictional) in nature, and where, as here, the trial court was made aware of such alleged errors prior to signing the temporary injunction.

 **[11]**   Additionally, to the extent that appellant complains that the restrictive covenant was unreasonable as to geographic scope, we note that the trial court has limited the scope of the temporary injunction in this regard, and has thereby reformed the covenant. Since this is not an appeal of the *grant* of the temporary injunction, we will presume that the record as a whole supports the trial court's action in granting the temporary injunction. *See State v. Friedmann,* 572 S.W.2d 373 (Tex.Civ.App.1978, writ ref'd n.r.e.) We will not   **\*835**   look to the statement of facts from the hearing on the motion to grant the temporary injunction to ascertain if the evidence supports such grant. *Id.*

 **[12]**   **[13]**   Finally, we hold that the trial court has no duty, upon the filing of a motion to dissolve, to *reconsider* the propriety of the granting of a temporary injunction, at least where the motion does not allege fundamental error, and also where the motion is not based upon evidence of changed conditions but is rather based upon evidence which was before the court at the prior hearing on the motion to grant the temporary injunction. We will specify both practical and legal reasons for this holding below; however, assuming it to be sound, the trial court cannot be held to have abused its discretion where, as here, it refused to alter its prior decision in the absence of new evidence.

From a practical standpoint, if a litigant could, by motion to dissolve, force reconsideration of the original grant, without a showing of changed conditions, then there is an incentive for him to do so at least once, or more often, in hope that he will be able to wear down the resistance of the original trial judge, or in hope that he will be able to secure a hearing before a different trial judge who may be more sympathetic. Such actions needlessly add to the judicial caseload, both at the trial and appellate

level. Recognition of the principle that the trial court has no duty to reconsider the validity of the original grant of temporary injunction upon motion to dissolve enables the trial court to dispose of motions to dissolve solely upon the pleadings when the motion to dissolve, on its face, shows that the litigant offers no new evidence.

 **[14]**    There is a legal basis for holding that the trial court has no duty, upon motion to dissolve, to reconsider the original grant of temporary injunction. Tex.R.Civ.P.Ann. 385 (Supp.1983) provides that *no motion for new trial shall be filed* in appeals from interlocutory orders appealable by law. The purpose of this rule is to avoid duplicity of effort and to give some degree of finality to interlocutory orders. If a litigant is permitted, upon motion to dissolve, to again challenge the original temporary injunction grant, without an allegation of changed conditions, then the litigant could accomplish indirectly what he could not directly do (make a motion for new trial). *Cf. State v. Friedmann, supra.* In such a manner, the litigant could thereby render meaningless the appellate timetable applicable to accelerated appeals, *see* Tex.R.Civ.P.Ann. 385(d) (Supp.1983); a litigant, after unsuccessfully opposing a temporary injunction, could wait for an indefinite period to perfect an appeal of the grant of the temporary injunction (by filing a subsequent motion to dissolve, which raises the points of error which could have, and should have, been raised in a direct appeal of the order granting temporary injunction).

 **[15]**    **[16]**    A motion to dissolve may not be used as a means of evading or expanding the rules applicable to appealing interlocutory orders. A statute authorizing an appeal from an interlocutory order must be given a strict construction since the statute is in derogation of the general rule that only final judgments and orders are appealable. 4 Tex.Jur.3d Appellate Review § 70 (1980). We note that Tober did not file his motion to dissolve until after it was too late to perfect an appeal from the order granting a temporary injunction.

 **[17]**    **[18]**    We should not be understood to say that a trial court lacks the authority to reverse its prior temporary injunction order absent a showing of changed conditions; it does have that power. *City of Hudson v. Ivie,* 592 S.W.2d 658 (Tex.Civ.App.1979, no writ). We hold only that the trial court will not be deemed to have abused its discretion by refusing to reverse a prior grant of temporary injunction, absent pleading and proof of changed conditions, *State v. Friedmann, supra; see* 6 L. Lowe Texas Practice—Remedies § 186 (1973), or perhaps upon pleading and proof of fundamental (i.e. jurisdictional) error, *but see Texas Board of Examiners in Optometry v. Carp,* 162 Tex. 1, 343 S.W.2d 242 (1961).

 **\*836**  In *Carp,* the Supreme Court held that a plea of privilege, as to which appeal had not been timely perfected, was not reviewable in conjunction with review of an order granting temporary injunction, as to which appeal had been timely perfected. The Supreme Court also held that the Court of Civil Appeals lacked jurisdiction to review pleas to the jurisdiction which had been rejected by the trial court. The Supreme Court stated the rule that appellate courts lack jurisdiction to review an unappealable interlocutory order in an appeal "from another interlocutory order which is appealable except insofar as the questions raised might affect the validity of the latter order." 343 S.W.2d at 243. We hold that the questions relevant to the grant of the temporary injunction, raised by Tober in this appeal, do not affect the *validity* of the order overruling the motion to dissolve; however, our holding does not here turn solely upon jurisdiction, but is also grounded upon Tober's failure to prove that the trial court abused its discretion in overruling the motion to dissolve.

We should stress that most of what we have said above, especially as it relates to the trial court's duty in considering a motion to dissolve, is applicable to temporary injunctions, which are granted only after notice and an opportunity for an evidentiary hearing; the trial court's duty in considering a motion to dissolve an injunctive order rendered without notice and opportunity for hearing would be broader. *Compare State v. Friedmann, supra* (motion to dissolve filed after full evidentiary hearing on grant of temporary injunction) *with Whitaker v. Wilson,* 349 S.W.2d 753 (Tex.Civ.App.1961, writ ref'd n.r.e.) (temporary injunction granted solely upon intervenor's sworn petition).

Much of the confusion as to the proper scope of a motion to dissolve arises from cases decided at a time when no distinction was made as between injunctive relief granted before and injunctive relief granted after a full evidentiary hearing. Apparently, under prior law it was standard procedure for a trial court to issue a temporary injunction solely upon the applicant's sworn petition; therefore, upon filing a motion to dismiss, the opposite party had a right to a full evidentiary hearing upon the issue

of whether the temporary injunction should have, in the first instance, been granted. *See Plateau Oil Co. v. Choate Oil Corp.,* 235 S.W. 686 (Tex.Civ.App.1921, writ dism'd).

 **[19]**  **[20]**  **[21]**  Under current rules the trial court may not enter a temporary injunction against a party before that party has presented its defenses and has rested its case. Tex.R.Civ.P.Ann. 681 (1967); *Great Lakes Engineering, Inc. v. Andersen,* 627 S.W.2d 436 (Tex.App.1981, no writ); *City of Austin v. Texas Public Emp. Ass'n,* 528 S.W.2d 637 (Tex.Civ.App.1975, no writ). Under this procedure the party opposing the temporary injunction has an opportunity to fully litigate the issue of whether the temporary injunction should be granted *prior to* the granting of such; there is no longer any reason for requiring the trial court to reexamine the legal and factual basis of the preliminary injunction upon motion to dissolve. *See Nu-Tred Tire Co. v. Dunlop Tire & Rubber Corp.,* 118 Ariz. 417, 577 P.2d 268 (App.1978). The purpose of the motion to dissolve is to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant. *Id.; see State v. Friedmann, supra.* Tober's first four points of error are overruled.

In his fifth point of error Tober contends that the trial court erred in granting a temporary injunction which by its terms restrained persons who were not parties to this action. Although this point attacks the original grant of temporary injunction, apparently it could not have been brought to the trial court's attention prior to entry of the judgment. However, it could have been raised in a direct appeal from the order granting temporary injunction. For that reason, it is questionable, under the above analysis, as to whether it can now be raised in the appeal of the order overruling the motion to dissolve. However, we need **\*837** not resolve that question, since it is obvious from reading the temporary injunction order that Tober, and no other person, is thereby enjoined. The fifth point of error is overruled.

Finally, Tober complains that the trial court abused its discretion in refusing to hear evidence of Turner's breach of the employment contract. Tober contends that such evidence was relevant to showing that Turner lacked clean hands and that Turner was therefore not entitled to equitable relief.

 **[22]**  To the extent that Tober complains of the trial court's refusal to hear evidence at the hearing on application for temporary injunction, we hold, for reasons given above, that such is not within the proper scope of a motion to dissolve. The same holds true as to any complaint of the trial court's refusal, at the hearing on the motion to dissolve, to consider evidence not relevant to changed conditions, unless, perhaps, there is an allegation that such evidence is newly discovered.

 **[23]**  Also, we have examined the statement of facts from the hearing on the motion to dissolve. At no point did Tober offer any evidence; the trial court certainly never prevented the introduction of any evidence. Even if the trial court had refused to hear testimony, Tober does not direct us to a bill of exceptions which would show what the witnesses would have testified to; therefore, no error is shown. *Schutz v. Southern Union Gas Co.,* 617 S.W.2d 299 (Tex.App.1981, no writ). The final point of error is overruled.

Having overruled all of appellant's points of error, we affirm the trial court's order.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

690 S.W.2d 884
Supreme Court of Texas.

UVALDE COUNTRY CLUB, Petitioner,

v.

MARTIN LINEN SUPPLY COMPANY, INC., Respondent.

No. C–3920.　|　May 22, 1985.　|　Rehearing Denied June 26, 1985.

Supply company brought suit against country club to collect on contract for services rendered, and country club failed to file an answer or enter an appearance. The 285th District Court, Bexar County, Paul Rivera, J., entered default judgment. Country club appealed. The Court of Appeals, 685 S.W.2d 375, Tijerina, J., affirmed. On petition for review, the Supreme Court held that record did not reflect strict compliance with Rules of Civil Procedure relating to issuance, service, and return of citation, where petition alleged that registered agent was "Henry Bunting, Jr." whereas sheriff's return on citation showed delivery to "Henry Bunting."

Reversed and remanded.

West Headnotes (3)

**[1]　Appeal and Error** 🔑 Judgment by Default

There are no presumptions in favor of valid issuance, service, and return of citation in face of writ of error attack on default judgment.

152 Cases that cite this headnote

**[2]　Process** 🔑 Defects and Irregularities in Writ or Other Process or Notice

**Process** 🔑 Defects and Irregularities in Service or Return or Proof Thereof

Failure to affirmatively show strict compliance with Rules of Civil Procedure 101, 106, and 107, relating to issuance, service, and return of citation, renders attempted service of process invalid and of no effect. Vernon's Ann.Texas Rules Civ.Proc., Rules 101, 106, 107.

165 Cases that cite this headnote

**[3]　Clubs** 🔑 Actions by or Against Clubs

Record in suit against country club did not reflect strict compliance with Rules of Civil Procedure 101, 106, and 107 relating to issuance, service, and return of citation, where petition alleged that registered agent was "Henry Bunting, Jr." whereas sheriff's return on citation showed delivery to "Henry Bunting." Vernon's Ann.Texas Rules Civ.Proc., Rules 101, 106, 107.

142 Cases that cite this headnote

**Attorneys and Law Firms**

**\*884**  Clemens, Spencer, Welmaker & Finck, George H. Spencer, Jr., San Antonio, for petitioner.

Cox & Smith, R. Laurance Macon, San Antonio, for respondent.

**Opinion**

PER CURIAM.

The question here is whether service of citation was proper in the face of a writ of error attack on a default judgment. The plaintiff's original petition alleged that the defendant, Uvalde Country Club, could be served by serving its registered agent, Henry Bunting, Jr., 137 West Nopal Street, in Uvalde, Uvalde County, Texas. The citation was directed to Uvalde Country Club, by serving its registered agent, "Henry Bunting." The sheriff's return on this citation showed delivery to "Henry Bunting." Uvalde Country Club failed to answer, and the trial court rendered a default judgment in favor of Martin Linen Supply Company, Inc. Uvalde Country Club brought writ of error to the court of appeals within six months of the default judgment. In affirming the trial court judgment, the court of appeals held that the lack of "Jr." was immaterial because it did not constitute any part of the name of the registered agent. 685 S.W.2d 375. We reverse the judgment of the court of appeals and remand the cause to the trial court.

 **[1]**   **[2]**   The court of appeals holding conflicts with our holdings in *Hendon v. Pugh,* 46 Tex. 211, 212 (1876) and *Faver v. Robinson,* 46 Tex. 204 (1876). In *Hendon,* we remanded a default judgment because the return reflected that it was served on J.N. Hendon, not the named defendant, J.W. **\*885**  Hendon. In *Faver,* we remanded a default judgment against John R. Faver because the citation was addressed and served on John R. Faver*s*. There are no presumptions in favor of valid issuance, service, and return of citation in the face of a writ of error attack on a default judgment. *McKanna v. Edgar,* 388 S.W.2d 927, 929 (Tex.1965). Moreover, failure to affirmatively show strict compliance with the Rules of Civil Procedure renders the attempted service of process invalid and of no effect. *McKanna,* 388 S.W.2d at 929.

 **[3]**   The record does not show that the person served with citation, "Henry Bunting," was authorized to receive service or that he was connected with the appellant. Rather, the petition alleges that the registered agent is "Henry Bunting, Jr." Thus, the record in this case does not reflect strict compliance with the rules of civil procedure relating to the issuance, service, and return of citation. *See, e.g.,* Tex.R.Civ.P. 101, 106, and 107. In view of our holding we need not discuss the other points of error.

Pursuant to Tex.R.Civ.P. 483, without hearing oral argument, we reverse the judgment of the court of appeals and remand the cause to the trial court.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

439 S.W.3d 585
Court of Appeals of Texas,
Houston (14th Dist.).

Alice M. WOOD and Daniel L. Wood, Appellants

v.

HSBC BANK USA, N.A. and Ocwen Loan Servicing, L.L.C., Appellees.

No. 14–13–00389–CV.   |   July 31, 2014.

**Synopsis**
**Background:** Borrowers, who obtained home-equity loan that encumbered their homestead with a lien, sued current lienholder, loan servicer, and other defendants seeking declaratory judgment and relief for breach of security instrument. Current lienholder counterclaimed, seeking declaration that it was equitably subrogated to rights of prior lienholders. The 268th District Court, Fort Bend County, Brady G. Elliott, J., granted summary judgment in favor of current lienholder and loan servicer and denied borrowers' motion for summary judgment.

**Holdings:** Court of Appeals, Marc W. Brown, J., held that:

[1] four-year residual statute of limitations applied to borrowers' constitutional claims;

[2] constitutional claims accrued on date home equity transaction closed; and

[3] breach of contract claim accrued on date hone equity transaction closed.

Affirmed.

West Headnotes (15)

**[1]     Judgment** 🔑 Particular defenses

A defendant moving for summary judgment on the affirmative defense of limitations must: (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury; if the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[2]     Judgment** 🔑 Weight and sufficiency

A matter is conclusively established, for purposes of summary judgment, if reasonable people could not differ as to the conclusion to be drawn from the evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

---

**[3]**    **Homestead**  &#9758;  Exceptions from exemptions in general

Homestead liens that do not comply with constitutional requirements are voidable, rather than void, in light of existence of cure provision in constitution. Vernon's Ann.Texas Const. Art. 16, § 50(a, c).

1 Cases that cite this headnote

---

**[4]**    **Declaratory Judgment**  &#9758;  Limitations and laches

Borrowers' declaratory judgment action to cancel home equity lien that secured their home equity loan, on the ground that lien was defective under State constitution in that the fees exceeded 3% of the loan amount, was not an action to recover real property, and thus four-year residual statute of limitations applied to constitutional claims, as claims would not support a trespass to try title action and required equitable powers of court to cancel lien. Vernon's Ann.Texas Const. Art. 16, § 50(a, c); V.T.C.A., Civil Practice & Remedies Code § 16.051.

2 Cases that cite this headnote

---

**[5]**    **Limitation of Actions**  &#9758;  Recovery of Real Property

An action for the recovery of real property, to which the four-year residual statute of limitations would not apply, is one that would support a trespass to try title suit without first invoking the equitable powers of the court to cancel a deed. V.T.C.A., Civil Practice & Remedies Code § 16.051; V.T.C.A., Property Code § 22.001(a).

1 Cases that cite this headnote

---

**[6]**    **Trespass to Try Title**  &#9758;  Nature and scope of remedy

A trespass to try title suit is generally used to clear problems in chains of title or to recover possession of land unlawfully withheld from a rightful owner. V.T.C.A., Property Code § 22.001(a).

Cases that cite this headnote

---

**[7]**    **Declaratory Judgment**  &#9758;  Validity and construction of deeds

A declaratory judgment action provides an efficient procedural method for seeking a declaration of rights regarding the construction or validity of deeds by those whose rights are affected by such instruments.

Cases that cite this headnote

---

**[8]**    **Limitation of Actions**  &#9758;  Penalties and Forfeitures

Borrowers' cause of action challenging the validity of home equity lien on ground that it was defective under State constitution, in that fees exceeded 3% of the loan amount, accrued, and four-year limitations period began to run, on the date that the home equity transaction closed, rather than after the 60–day period to cure deficiencies expired, in borrowers' declaratory judgment action against current lienholder and loan servicer to cancel lien; legal injury occurred when the transaction closed, the facts that would have alerted borrowers to potential constitutional violations existed when the transaction closed, as did their right to seek a judicial remedy, and nothing in constitution prevented borrowers from initiating declaratory judgment action as soon as the transaction closed. Vernon's Ann.Texas Const. Art. 16, § 50(a, c); V.T.C.A., Civil Practice & Remedies Code § 16.051.

---

Cases that cite this headnote

**[9]   Limitation of Actions**  ⟶ Causes of action in general

Generally, a cause of action accrues, for statute of limitations purposes, when a wrongful act causes a legal injury.

1 Cases that cite this headnote

**[10]   Limitation of Actions**  ⟶ Penalties and Forfeitures

In cases involving a challenge to the validity of a home-equity lien on constitutional grounds, the legal injury occurs, and the cause of action accrues for statute of limitations purposes, on the date the transaction closes. Vernon's Ann.Texas Const. Art. 16, § 50(a, c); V.T.C.A., Civil Practice & Remedies Code § 16.051.

1 Cases that cite this headnote

**[11]   Declaratory Judgment**  ⟶ Appeal and Error

Borrowers, in declaratory judgment action seeking to cancel home equity lien on ground that it was constitutionally defective, failed to adequately brief their arguments that statute of limitations was tolled due to current lienholder's alleged continuing and ongoing constitutional violations, and thus borrowers waived those arguments on appeal, where borrowers did not explain or cite any legal authority in support of their contention. Rules App.Proc., Rule 38.1(i); V.T.C.A., Civil Practice & Remedies Code § 16.051.

Cases that cite this headnote

**[12]   Limitation of Actions**  ⟶ Effect of security

Borrowers' breach of contract claim, alleging that current lienholder and loan servicer breached security agreement that created borrower's home equity lien by charging fees exceeding 3% of loan amount in violation of State constitution, accrued, and the four-year residual statute of limitations began to run, on the date that the excessive fees were charged, namely the date that the transaction closed, rather than the date on which borrowers sent current lienholder notice of the alleged constitutional violations; absent mitigating circumstances, which borrowers did not allege, borrowers had four years in which to demand a cure and file breach of contract action. Vernon's Ann.Texas Const. Art. 16, § 50(a)(6)(E); V.T.C.A., Civil Practice & Remedies Code § 16.051.

Cases that cite this headnote

**[13]   Limitation of Actions**  ⟶ Breach of contract in general

A claim for breach of contract accrues, for statute of limitations purposes, when the contract is breached.

Cases that cite this headnote

**[14]   Limitation of Actions**  ⟶ Demand for performance of contract

Generally, when demand is a condition precedent to the right to sue, the statute of limitations does not begin to run until demand is made, unless the demand is waived or unreasonably delayed.

Cases that cite this headnote

**[15]    Limitation of Actions** 🗝 Demand for performance of contract

> Where demand is a prerequisite to a right of action, the injured party must make the demand within a reasonable time after it may lawfully be made; the reasonableness of the delay is normally a fact question, but in the absence of mitigating circumstances, the law will ordinarily consider a reasonable time as being coincident with the running of the statute of limitations, and an action will be barred if a demand is not made within that period.

> Cases that cite this headnote

**Attorneys and Law Firms**

**\*587** Russell S. Post, Anh Dinh, Constance H. Pfeiffer, Robert Petersen, Robert C. Lane, Houston, for Appellants.

Valerie Anne Henderson, Houston, for Appellees.

Panel consists of Justices BOYCE, CHRISTOPHER, and BROWN.

**\*588  OPINION**

MARC W. BROWN, Justice.

This case arises out of a home-equity loan obtained by appellants Alice M. Wood and Daniel L. Wood in 2004 that encumbered their homestead with a lien. The Woods appeal the summary judgment granted in favor of appellees HSBC Bank USA, N.A. and Ocwen Loan Servicing, L.L.C. The Woods presented a single issue on appeal, which we address in two separate sub-issues:

(1) Whether the Texas Civil Practice and Remedies Code section 16.051 four-year statute of limitations bars the Woods' claims for monetary and declaratory relief based on HSBC's and Ocwen's alleged violations of the home-equity lending protections found in article XVI, section 50(a)(6), of the Texas Constitution.

(2) Whether the section 16.051 statute of limitations bars the Woods' claim for monetary relief based on HSBC's and Ocwen's alleged breach of the security instrument creating the home-equity lien.

Because we conclude that the Woods' claims are barred by limitations, we affirm.

### I. FACTS AND PROCEDURAL BACKGROUND

On July 2, 2004, the Woods obtained a home-equity loan of $76,000 from Fremont Investment & Loan, secured by a first lien on their homestead located in Fresno, Fort Bend County, Texas. On March 16, 2012, the Woods sent HSBC, the current holder of the lien, a "Notice of Request to Cure." The Notice alleged that the home-equity lien violated seven provisions of article XVI, section 50(a)(6), of the Texas Constitution and demanded that HSBC cure the alleged violations. HSBC did not respond to the Woods' letter.

On July 9, 2012, the Woods sued HSBC, Ocwen, Ameriapraise, Inc., and Joel Brock seeking forfeiture of principal and interest for the constitutional violations, damages for breach of contract, damages for fraud, and a declaratory judgment that (1) the loan and accompanying home-equity lien were void, (2) HSBC failed to cure the constitutional defects, and (3) HSBC must forfeit all principal and interest paid on the loan. HSBC and Ocwen answered on August 10, 2012. HSBC filed a counterclaim on February 28, 2013, seeking a declaration that it was equitably subrogated to the rights of the prior lienholders.

On January 3, 2013, the Woods filed a motion for summary judgment on their claim that the fees exceeded three percent of the loan amount. On February 7, 2013, HSBC and Ocwen filed a hybrid traditional and no-evidence motion for summary judgment. In their motion, HSBC and Ocwen asserted that all of the Woods' claims were barred by limitations, that no tolling rule delayed the accrual of the Woods' claims, that the constitutional claims failed as a matter of law, that the Woods' breach of contract claim failed as a matter of law, and that no evidence supported the Woods' fraud claim. [1] On April 4, 2013, the trial court granted HSBC's traditional and no- **\*589** evidence motions and denied the Woods' motion for summary judgment. The Woods then nonsuited defendants Ameriapraise, Inc. and Joel Brock, and HSBC nonsuited its counterclaim for equitable subrogation against the Woods. The Woods timely appealed.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

 **[1]** **[2]** We review the trial court's granting of summary judgment de novo. *Mid–Century Ins. Co. of Tex. v. Ademaj,* 243 S.W.3d 618, 621 (Tex.2007). To prevail on a traditional motion for summary judgment, the movant must carry the burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). When reviewing a traditional summary judgment granted in favor of the defendant, we determine whether the defendant conclusively disproved at least one element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997).

> A defendant moving for summary judgment on the affirmative defense of limitations ... must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury. If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations.

*KPMG Peat Marwick,* 988 S.W.2d at 748 (footnotes omitted). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *Farmers Ins. Exch. v. Rodriguez,* 366 S.W.3d 216, 221 (Tex.App.-Houston [14th Dist.] 2012, pet. denied). In deciding whether a disputed material fact issue exists precluding summary judgment, we must take evidence favorable to the non-movant as true, and we must indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994). We will affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex.2003).

## III. DISCUSSION

**A. The Woods' claims for monetary and declaratory relief under Texas Constitution article XVI, section 50(a)(6), are barred by the section 16.051 four-year statute of limitations.**

The Woods alleged in their petition that the home-equity lien on their residence violated article XVI, sections 50(a)(6)(B), 50(a)(6)(E), 50(a)(6)(Q)(v), and 50(a)(6)(Q)(viii), of the Texas Constitution. The Woods contend that their home-equity lien is void because of section 50(c), which states, "No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section ...." Tex. Const. art. XVI, § 50(c). The Woods assert that section 50(c) renders "void but curable" any home-equity lien that does not strictly comply with a provision of section 50(a)(6). Consequently, because an action to remove a cloud on **\*590** title is not subject to the four-year residual statute of limitations if a lien is void, *see Ford*

*v. Exxon Mobil Chem. Co.,* 235 S.W.3d 615, 618 (Tex.2007), the Woods argue that the trial court erred in granting summary judgment in favor of HSBC.

HSBC and Ocwen respond that the Woods' constitutional claims are barred by the four-year residual statute of limitations. Relying on the Dallas Court of Appeals' decision in *Williams v. Wachovia Mortg. Corp.,* 407 S.W.3d 391 (Tex.App.-Dallas 2013, pet. denied), and the Fifth Circuit Court of Appeals' decision in *Priester v. JP Morgan Chase Bank, N.A.,* 708 F.3d 667 (5th Cir.2013), *cert. denied,* ––– U.S. ––––, 134 S.Ct. 196, 187 L.Ed.2d 256 (2013), they contend a lien that violates section 50(a)(6) is voidable. They further assert that section 50(a)(6)(Q)(x) allows a lender to cure a lien that would otherwise be invalid. HSBC argues that the trial court properly granted summary judgment on limitations grounds because a voidable lien is subject to limitations and the Woods did not file suit until eight years after closing the transaction.

### 1. Home-equity liens that do not comply with section 50(a)(6) are voidable.

The fundamental question we face today is whether a home-equity lien that violates section 50(a)(6) of the Texas Constitution is void or voidable. Two courts have recently concluded that constitutionally noncompliant homestead liens are voidable. First, like the Woods, the plaintiffs in *Priester* obtained a home-equity loan that did not comply with the constitutional requirements. 708 F.3d at 671. Five years after the transaction closed, the plaintiffs sent a letter to the defendant, which had acquired the loan from the original lender, requesting cure under section 50(a)(6)(Q)(x). *Id.* The defendant took no action to cure the perceived infirmities. *Id.* The plaintiffs then sued the defendants for a declaratory judgment that the loan and lien on their home were void ab initio, that the defendants had failed to cure, and that the defendants were required to forfeit all principal and interest. *Id.* In deciding whether a statute of limitations applied to the plaintiffs' claims, the *Priester* court reasoned:

> The decision in *Doody v. Ameriquest Mortgage Co.,* 49 S.W.3d 342 (Tex.2001), offers indirect support for the applicability of limitations. The court responded to a question certified by this court on the issue of cure, explaining that a lien cured under Section 50(a)(6)(Q) became valid even if it was "invalid" before the cure. *Id.* at 347. Discussing forfeiture, the court stated that "if a lien that secures such a loan is voided," the lender loses all rights to recovery. *Id.* at 346. That language suggests that the Texas Supreme Court considers liens created in violation of Section 50(a)(6) to be voidable rather than void—a "void" lien could not be "voided" by future action.

708 F.3d at 674. The *Priester* court further noted that "[b]ecause a cure provision exists in Section 50(a)(6)(Q), liens that are contrary to the requirements of § 50(a) are voidable rather than void from the start." *Id.* at 674 n. 4. [2]

**\*591** Second, after the *Priester* decision was issued, the Dallas Court of Appeals faced a similar question in *Williams*. In that case, the plaintiff's husband took out a loan on the couple's residence and represented himself to be an unmarried man. *Williams,* 407 S.W.3d at 392. Six years after she discovered the home-equity loan and lien, the plaintiff sought declaratory judgment that the home-equity lien was void. *Id.* at 392–93, 398. The trial court granted the defendants' motion for summary judgment, which was based in part on the applicability of the four-year residual statute of limitations found in section 16.051 of the Texas Civil Practice and Remedies Code. *Id.* at 393. The plaintiff argued on appeal that the home-equity lien on her homestead was void because she did not sign the agreement granting the lien or consent to it. *Id.* at 395; *see* Tex. Const. art. XVI, § 50(a)(6)(A). Finding the *Priester* court's analysis persuasive, the *Williams* court held that the noncompliant home-equity lien was voidable. *Id.* at 397.

We too find the *Priester* court's analysis persuasive not only because of its sound reasoning, but also because its conclusion comports with Texas Supreme Court precedent on ==the key distinction between a void act and a voidable act, which is a party's ability—either through its own action or through the judicial process—to disaffirm, ratify, or confirm a voidable act.== *See Brazzel v. Murray,* 481 S.W.2d 801, 803 (Tex.1972) ("A void act is one entirely null within itself, not binding on either party, and which is not susceptible of ratification or confirmation.... A voidable act ... is binding until disaffirmed, and ... may be made finally valid by failure within proper time to have it annulled, or by subsequent ratification or confirmation."); *Slaughter v. Qualls,* 139 Tex. 340, 162 S.W.2d 671, 674 (1942); *Murchison v. White,* 54 Tex. 78, 81 (1880); *Cummings v. Powell,* 8 Tex. 80, 85 (1852); *see also Oles v. Curl,* 65 S.W.3d 129, 131 n. 1 (Tex.App.-Amarillo 2001, no pet.) ("Simply put, if a supposedly void act can be

validated then the act cannot actually be void."); *In re Moreno,* 4 S.W.3d 278, 280–81 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Bayoud v. Bayoud,* 797 S.W.2d 304, 309 (Tex.App.-Dallas 1990, writ denied).

Keeping this distinction in mind, if we were to decide that a noncompliant home-equity lien is void from the start, then the lien would not be susceptible to correction, ratification, confirmation, disaffirmation, or even cure. While this may have been the case prior to the 1997 constitutional amendment that added the section 50(a)(6)(Q)(x) cure provisions, it is not the case now. The 1997 home-equity loan amendment affords lenders the means to correct mistakes in order to validate a noncompliant home-equity lien. *Doody,* 49 S.W.3d at 346 (discussing *Collier v. Valley Bldg. & Loan Ass'n,* 62 S.W.3d 82, 84 (Tex.Com.App.1933, holding approved)). The section 50(a)(6)(Q)(x) cure provisions place noncompliant home-equity liens on the voidable side of the void-voidable scale. [3]

**\*592** Despite the Woods' argument that a plain reading of section 50(c) necessitates finding a constitutionally noncompliant lien void, our conclusion is consistent with the rules governing interpretation of the Texas Constitution:

> When interpreting our state constitution, we rely heavily on its literal text and must give effect to its plain language. We strive to give constitutional provisions the effect their makers and adopters intended. We construe constitutional provisions and amendments that relate to the same subject matter together and consider those amendments and provisions in light of each other. And we strive to avoid a construction that renders any provision meaningless or inoperative.

*Doody,* 49 S.W.3d at 344 (citations omitted). In adhering to these core principles, the Doody court stated:

> [T]he cure provision in section 50(a)(6)(Q)(x) applies to all the lender's obligations under the 'extension of credit' including section 50(c)'s requirements that to be valid a homestead must secure a debt described by this section.

*Id.* at 345. Accepting the Woods' position would require us to read section 50(c) in isolation and in contravention of Texas Supreme Court precedent, which we decline to do.

 **[3]** Accordingly, we hold that because a cure provision exists in the Texas Constitution, homestead liens that do not comply with the constitutional requirements are voidable. *Priester,* 708 F.3d at 674; *Williams,* 407 S.W.3d at 396–97.

### 2. The four-year statute of limitations of *Texas Civil Practice and Remedies Code section 16.051* applies to the Woods' constitutional claims.

 **[4]** Having determined that noncompliant home-equity liens are voidable, and because such liens are subject to limitations, we must decide which statute of limitations applies to the Woods' constitutional claims. "Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues." Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (West 2008). Section 50(a)(6) does not contain an express limitations period. *Williams,* 407 S.W.3d at 394. Therefore, the Woods' causes of action based on HSBC and Ocwen's alleged violations of section 50(a)(6) are subject to the section 16.051 four-year residual statute of limitations.

 **[5]** **[6]** **[7]** Anticipating the possibility that section 16.051 would apply to their constitutional claims, the Woods assert that section 16.051 does not apply to their declaratory judgment action to cancel HSBC's lien because it constitutes an action for the recovery of real property. An action for the recovery of real property is one that would support a trespass to try title suit without first invoking the equitable powers **\*593** of the court to cancel a deed. *Miles v. Martin,* 159 Tex. 336, 321 S.W.2d 62, 69 (1959); *Carr v. Weiss,* 984 S.W.2d 753, 762 (Tex.App.-Amarillo 1999, pet. denied); *see also Neill v. Pure Oil Co.,* 101 S.W.2d 402, 404 (Tex.Civ.App.-Dallas 1937, writ ref'd); *Landram v. Robertson,* 195 S.W.2d 170, 175 (Tex.Civ.App.-San Antonio 1946, writ ref'd n.r.e.). A trespass to try title suit is "the method of determining title to lands, tenements, or other real property." Tex. Prop.Code Ann. § 22.001(a) (West 2000). It is generally used to clear problems in chains of title or to

recover possession of land unlawfully withheld from a rightful owner. *Martin v. Amerman,* 133 S.W.3d 262, 265 (Tex.2004). A declaratory judgment action, on the other hand, provides an efficient procedural method for seeking a declaration of rights regarding the construction or validity of deeds by those whose rights are affected by such instruments. *Jordan v. Bustamante,* 158 S.W.3d 29, 35 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

Initially, we note that the Woods' claim for forfeiture of principal and interest is an action to recover money damages. As such, it is not an action for the recovery of real property. Nor is the Woods' declaratory judgment action to void the home-equity lien —which does not implicate any of the issues resolved by a trespass to try title suit—an action for the recovery of real property. *Cf. Mortg. Elec. Registration Sys., Inc. v. Groves,* No. 14–10–00090–CV, 2011 WL 1364070, at *4 (Tex.App.-Houston [14th Dist.] Apr. 12, 2011, pet. denied) (mem. op.) (where defendant did not dispute plaintiff's title to property and plaintiff did not dispute defendant's ownership of deed of trust, plaintiff's claim that deed of trust was invalid did not implicate any issues resolved by trespass to try title suit).

Citing the general principle that the legal and equitable estates in real property are severed when a mortgagor executes a deed of trust, *see Flag–Redfern Oil Co. v. Humble Expl. Co., Inc.,* 744 S.W.2d 6, 8 (Tex.1987), the Woods further contend that their suit to invalidate the home-equity lien is an action to recover "equitable title." Therefore, it is an action to recover real property. The Woods then cite two cases, *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334 (1944), and *In re Lemons,* 281 S.W.3d 643 (Tex.App.-Tyler 2009, no pet.), for the proposition that "the Supreme Court has long held that suits for equitable title are not subject to the 4–year residual statute of limitations."

We reject the Woods' argument. In *MacDonald,* the plaintiff brought an action in trespass to try title seeking to impose a constructive trust on the legal title to real property acquired by the defendant through an alleged breach of fiduciary duty. 180 S.W.2d at 335–36. The Texas Supreme Court held that if the plaintiff could successfully establish a relationship of trust and confidence with the defendant, then the four-year statute of limitations would not apply to the plaintiff's suit because it would be an action to recover real property. *Id.* at 338. In *Lemons,* the plaintiff sued to impose a constructive trust on the legal title to real property purchased by the defendant with funds that were removed from the plaintiff's bank account without authority. 281 S.W.3d at 645. The defendant moved to transfer venue under section 15.011 of the Texas Civil Practice and Remedies Code. *Id.* at 646. Section 15.011 is a mandatory venue provision stating that "[a]ctions for recovery of real property ... shall be brought in the county in which all or a part of the property is located." Tex. Civ. Prac. & Rem.Code Ann. § 15.011 (West 2002); *Lemons,* 281 S.W.3d at 646. The Tyler Court of Appeals held that **\*594** section 15.011 applied to the plaintiff's claim because "a suit to impose a constructive trust on real property is a suit for the recovery of real property." *Lemons,* 281 S.W.3d at 647.

Based on the context provided by the facts of *MacDonald* and *Lemons,* the more accurate proposition is that suits for equitable title *by reason of a constructive trust* are not subject to the four-year residual statute of limitations because a beneficiary's interest under a constructive trust will support an action in trespass to try title. *See Binford v. Snyder,* 144 Tex. 134, 189 S.W.2d 471, 476 (1945); *Grunwald v. Grunwald,* 487 S.W.2d 240, 245 (Tex.Civ.App.-Houston [1st Dist.] 1972, writ ref'd n.r.e.); *Gates v. Coquat,* 210 S.W.2d 614, 615 (Tex.Civ.App.-San Antonio 1948, no writ).

Here, the Woods are not attempting to impose a constructive trust on the home-equity lien and do not allege that HSBC has acquired legal title through wrongdoing. To the contrary, the Woods have merely asserted a cause of action to cancel their home-equity lien, which will not support an action in trespass to try title and which requires the equitable powers of the court to determine. *Cf. Neill,* 101 S.W.2d at 403 ("[P]laintiffs' action [to cancel the voidable deeds] rests upon equitable title, assertion of which requires the aid of a court of equity to determine, thus the action is not one to recover real estate but one to remove the impediment to such title, and is barred by the [article 5529, now section 16.051] statute of limitation...."); *Johnson v. Wood,* 138 Tex. 106, 157 S.W.2d 146, 148 (Tex.Com.App.1941) (a cause of action to cancel a conveyance will not support an action in trespass to try title); *see also Groves,* 2011 WL 1364070, at *4 (declaratory judgment action to cancel deed of trust did not implicate issues resolved by trespass to try title suit).

Because the Woods' declaratory judgment action to cancel their home-equity lien would not support a trespass to try title action and requires the equitable powers of the court to cancel their lien, their declaratory judgment action to cancel the home-equity lien is not an action to recover real property.

We conclude that the section 16.051 four-year statute of limitations applies to the Woods' constitutional claims.

### 3. The Woods' constitutional claims accrued on July 2, 2004, the date the home-equity transaction closed.

 **[8]** **[9]** **[10]** We now address whether HSBC and Ocwen conclusively proved when the Woods' cause of action accrued. Generally, a cause of action accrues when a wrongful act causes a legal injury. *Etan Indus., Inc. v. Lehmann,* 359 S.W.3d 620, 623 (Tex.2011); *Williams,* 407 S.W.3d at 398. In cases involving a challenge to the validity of a home-equity lien on constitutional grounds, the legal injury occurs on the date the transaction closes. *Priester,* 708 F.3d at 676; *Williams,* 407 S.W.3d at 398; *Rivera v. Countrywide Home Loans, Inc.,* 262 S.W.3d 834, 840 (Tex.App.-Dallas 2008, no pet.); *Schanzle v. JPMC Specialty Mortg. LLC,* No. 03–09–00639–CV, 2011 WL 832170, at *4 (Tex.App.-Austin Mar. 11, 2011, no pet.) (mem. op.). Here, the Woods are challenging the validity of the home-equity lien on constitutional grounds. Therefore, the Woods' constitutional claims accrued on July 2, 2004, the date the Woods' home-equity loan closed.

In reaching this conclusion, we reject the Woods' alternative arguments for a later accrual date. The Woods initially rely on *Dessommes v. Dessommes,* 543 S.W.2d 165 (Tex.Civ.App.-Texarkana 1976, writ ref'd n.r.e.), in support of their position **\*595** that no controversy arose with respect to their declaratory judgment action until HSBC failed to cure. Essentially, the Woods argue that, for purposes of determining the accrual date, their legal injury did not occur until the sixty-day period for cure expired. *See* Tex. Const. art. XVI, § 50(a)(6)(Q)(x). However, *Dessommes* simply restates the general principle that a statute of limitations begins to run when facts come into existence authorizing a party to seek a judicial remedy, i.e., when the legal injury occurs. 543 S.W.2d at 169 (citing *Williams v. Pure Oil Co.,* 124 Tex. 341, 78 S.W.2d 929, 931 (1935)); *see also Knott,* 128 S.W.3d at 221.

We have already held that the legal injury in this case occurred when the transaction closed on July 2, 2004. The facts that would have alerted the Woods to potential constitutional violations—e.g., fees exceeding three percent of the loan amount—existed when the transaction closed, as did their right to seek a judicial remedy for those violations. Furthermore, nothing in the Texas Constitution prevented the Woods from initiating their declaratory judgment action as soon as the transaction closed. *See Priester,* 708 F.3d at 675 n. 6 ("[T]here is nothing in the Texas Constitution that suggests that the borrower must seek cure before filing suit.").

 **[11]** The Woods next argue that the statute of limitations was tolled because of HSBC's "continuing and ongoing violations" of the Texas Constitution. The Woods did not explain or cite any legal authority in support of their contention. This issue is therefore inadequately briefed. *See* Tex.R.App. P. 38.1(i); *In re S.A.H.,* 420 S.W.3d 911, 929 (Tex.App.-Houston [14th Dist.] 2014, no pet.). Because we conclude that the Woods have waived error on this particular argument, we decline to address it. [4]

In sum, because a cure provision exists in the Texas Constitution, homestead liens that do not comply with the constitutional requirements are voidable. The section 16.051 four-year residual statute of limitations applies to the Woods' constitutional claims, and their constitutional claims are not actions for the recovery of real property. The Woods' constitutional claims accrued when the home-equity transaction closed on July 2, 2004. The Woods had until July 2, 2008, to file their petition. The Woods did not file their original petition until July 9, 2012.

With regard to the Woods' constitutional claims, we conclude that the trial court did not err in granting HSBC's motion for summary judgment on limitations grounds. The Woods' first sub-issue is overruled. [5]

 **\*596 B. The Woods' breach-of-contract claim was barred by the section 16.051 four-year statute of limitations.**

**[12]**  The Woods alleged in their second amended petition that HSBC and Ocwen breached paragraph 13 of the security agreement that created the home-equity lien by charging fees exceeding three percent of the loan amount, in violation of section 50(a)(6)(E) of the Texas Constitution. [6] The Woods contend on appeal that because notice is a prerequisite to filing suit under the security instrument, [7] their cause of action for breach of contract did not accrue until March 16, 2012, the date they sent HSBC notice of the alleged constitutional violations. HSBC and Ocwen respond that the Woods' breach-of-contract claim is barred by limitations because the Woods filed suit more than four years after their claim accrued on July 2, 2004, when the transaction closed.

**[13]**  **[14]**  **[15]**  The limitations period for a breach-of-contract cause of action is four years. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.051; *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002). A claim for breach of contract accrues when the contract is breached. *Barker v. Eckman,* 213 S.W.3d 306, 311 (Tex.2006); *Stine,* 80 S.W.3d at 592. Generally, when demand is a condition precedent to the right to sue, the statute of limitations does not begin to run until demand is made, unless the demand is waived or unreasonably delayed. *Gabriel v. Alhabbal,* 618 S.W.2d 894, 896 (Tex.Civ.App.-Houston [1st Dist.] 1981, writ ref'd n.r.e.).

> Where demand is a prerequisite to a right of action, the injured party must make the demand within a reasonable time after it may lawfully be made.... The reasonableness of the delay is normally a fact question, but in the absence of mitigating circumstances, the law will ordinarily consider a reasonable time as being coincident with the running of the statute, and an action will be barred if a demand is not made within that period.

*Barnes v. LPP Mortg., Ltd.,* 358 S.W.3d 301, 306 (Tex.App.-Dallas 2011, pet. denied) (quoting *Stevens v. State Farm Fire & Cas. Co.,* 929 S.W.2d 665, 671 (Tex.App.-Texarkana 1996, writ denied)).

**\*597**  Assuming, for the sake of argument, that HSBC did in fact breach the security agreement by charging fees in excess of three percent of the loan amount, the breach occurred on the date the excessive fees were charged. The Woods referred to certain itemized charges in the HUD–1 settlement statement as evidence that HSBC assessed excessive fees. [8] The HUD–1 identified the settlement date as July 2, 2004, which coincides with the closing date of the transaction. Therefore, the alleged excessive fees were charged, and the Woods' breach-of-contract claim accrued, on July 2, 2004. Absent mitigating circumstances, the Woods had until July 2, 2008, to demand cure and file their breach-of-contract cause of action. The Woods did not demand cure until March 16, 2012, and they did not file their original petition until July 9, 2012. The Woods did not allege in their live petition any mitigating circumstances to justify waiting nearly eight years to demand cure.

Therefore, with regard to the Woods' breach-of-contract claim, we conclude that the trial court did not err in granting HSBC and Ocwen's motion for summary judgment on limitations grounds. The Woods' second sub-issue is overruled.

## IV. CONCLUSION

The trial court did not err by granting summary judgment in favor of HSBC and Ocwen on limitations grounds. We overrule both of the Woods' sub-issues on appeal and affirm the trial court's judgment.

Footnotes

1   The Woods have abandoned their challenge to the no-evidence summary judgment in favor of HSBC and Ocwen on the fraud claim because the Woods have not raised the fraud issue on appeal. *See* Tex.R.App. P. 38.1(f), 47.1; *Shafaii Children's Trust & Party & Reception Ctr., Inc. v. W. Am. Ins. Co.,* 417 S.W.3d 614, 622 n. 6 (Tex.App.-Houston [14th Dist.] 2013, pet. denied); *Martinez v. El Paso Cnty.,* 218 S.W.3d 841, 844 (Tex.App.-El Paso 2007, pet. struck) ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not raised in the appellant's brief, even if the ends of justice so require."); *see also Clonts v. Johnson,* 116 Tex. 489, 294 S.W. 844, 846 (Tex.Com.App.1927).

*Priester* effectively overruled prior federal district court cases that reached the opposite conclusion. *See Ausmus v. Deutsche Bank Trust Co. Nat'l Ass'n,* No. 3:13–CV–148, 2013 WL 3938515, at \*2–\*3 (S.D.Tex. Jul. 29, 2013); *see also Moran v. Ocwen Loan Servicing, L.L.C.,* 560 Fed.Appx. 277, 277 (5th Cir.) (*Priester* is controlling precedent in Fifth Circuit); *Smith v. JPMorgan Chase Bank Nat'l Ass'n,* 825 F.Supp.2d 859, 868 (S.D.Tex.2011) (holding that noncompliant home-equity liens are void ab initio), *adhered to on reconsideration sub nom.*; *Santos v. CitiMortgage, Inc.,* No. 3:11–CV–2592–M–BK, 2012 WL 1058159, at \*3 (N.D.Tex. Feb. 7, 2012) (same), *rejected in part,* 2012 WL 1065464 (N.D.Tex. Mar. 29, 2012).

The Woods cite *Collier,* in support of the proposition that the *Doody* court created a new "void but curable" status for section 50(a)(6) home-equity liens. *Collier* stands for the proposition that an invalid lien cannot be ratified unless the authority to ratify it exists under our Constitution or statutes. *Collier v. Valley Bldg. & Loan Ass'n,* 62 S.W.2d 82, 84 (Tex.Com.App.1933, holding approved). Referring to *Collier,* the *Doody* court made clear that the 1997 home-equity loan amendment affords lenders the authority to ratify an invalid lien. *Doody,* 49 S.W.3d at 346. The *Doody* court's statement supports our conclusion that constitutionally noncompliant liens are voidable.

The Woods' further reliance on *York v. State,* 373 S.W.3d 32 (Tex.2012), in support of their "void but curable" argument is also misplaced. The *York* court held that a judgment that violates a bankruptcy automatic stay is void unless a federal bankruptcy court modifies the stay. *Id.* at 40. The Woods' situation is distinguishable because the lender in a home-equity transaction has the ability under our Constitution to cure the noncompliant lien without the involvement of the federal judiciary or any other third party. Furthermore, the Texas Supreme Court has noted that the rationale for classifying judgments in violation of an automatic stay as void was that bankruptcy law vests "exclusive jurisdiction" in the bankruptcy courts. *See Roccaforte v. Jefferson Cnty.,* 341 S.W.3d 919, 923 (Tex.2011) (citing *Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940)). That rationale does not apply to the present case.

The Woods pleaded two alternative tolling theories in their second amended petition—the discovery rule and equitable tolling. Both theories were addressed in HSBC and Ocwen's motion for summary judgment and in the Woods' response to HSBC and Ocwen's motion for summary judgment. The Woods did not raise these theories on appeal and have therefore abandoned them. *See* Tex.R.App. P. 38.1(f), 47.1; *Shafaii Children's Trust,* 417 S.W.3d at 622 n. 6; *Martinez,* 218 S.W.3d at 844 ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not raised in the appellant's brief, even if the ends of justice so require."); *see also Clonts,* 294 S.W. at 846.

In an additional argument against the applicability of a statute of limitations to their constitutional claims, the Woods characterize their declaratory judgment action as a defense to foreclosure. According to the Woods, because defenses are not governed by the statutes of limitations, their declaratory judgment action is not barred by limitations. We have indicated in the foreclosure context that a lender's failure to comply with the constitutional requirements is in the nature of an affirmative defense. *Wilson v. Aames Capital Corp.,* No. 14–06–00524–CV, 2007 WL 3072054, at \*1 (Tex.App.-Houston [14th Dist.] Oct. 23, 2007, no pet.) (mem. op.). However, potential defendants like the Woods cannot "use a declaratory judgment to prematurely adjudicate defenses to liability that may not yet exist." *Transcon. Realty Investors, Inc. v. Orix Capital Mkts., LLC,* 353 S.W.3d 241, 245 (Tex.App.-Dallas 2011, pet. denied) (citing *Calderon v. Ashmus,* 523 U.S. 740, 748, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998), for the proposition that under the federal constitution, a party cannot use a declaratory judgment to obtain an advance ruling on an affirmative defense). Nothing in the record before us indicates that the Woods were actually faced with foreclosure; thus, their liability may not yet exist, and because we are prohibited from issuing advisory opinions, *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993), we decline to treat the Woods' declaratory judgment action as a defense to foreclosure.

Paragraph 13 of the security agreement reads, in pertinent part: "Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law." The term "Applicable Law" is defined as "all controlling applicable ... state and local statutes ...."

Paragraph 19 of the security agreement states, in pertinent part:

Neither Borrower nor Lender may commence ... any judicial action ... that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party ... of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

For purposes of the HUD–1, "settlement means the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan. This process may also be called 'closing' or 'escrow' in different jurisdictions." 24 C.F.R. § 3500.2(b) (2014).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Appellate Procedure
    Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
      Rule 24. Suspension of Enforcement of Judgment Pending Appeal in Civil Cases (Refs & Annos)

TX Rules App.Proc., Rule 24.1

24.1. Suspension of Enforcement

Currentness

(a) *Methods.* Unless the law or these rules provide otherwise, a judgment debtor may supersede the judgment by:

(1) filing with the trial court clerk a written agreement with the judgment creditor for suspending enforcement of the judgment;

(2) filing with the trial court clerk a good and sufficient bond;

(3) making a deposit with the trial court clerk in lieu of a bond; or

(4) providing alternate security ordered by the court.

(b) *Bonds.*

(1) A bond must be:

(A) in the amount required by 24.2;

(B) payable to the judgment creditor;

(C) signed by the judgment debtor or the debtor's agent;

(D) signed by a sufficient surety or sureties as obligors; and

(E) conditioned as required by (d).

(2) To be effective a bond must be approved by the trial court clerk. On motion of any party, the trial court will review the bond.

(c) *Deposit in Lieu of Bond.*

---

(1) Types of Deposits. Instead of filing a surety bond, a party may deposit with the trial court clerk:

(A) cash;

(B) a cashier's check payable to the clerk, drawn on any federally insured and federally or state-chartered bank or savings-and-loan association; or

(C) with leave of court, a negotiable obligation of the federal government or of any federally insured and federally or state-chartered bank or savings-and-loan association.

(2) Amount of Deposit. The deposit must be in the amount required by 24.2.

(3) Clerk's Duties; Interest. The clerk must promptly deposit any cash or a cashier's check in accordance with law. The clerk must hold the deposit until the conditions of liability in (d) are extinguished. The clerk must then release any remaining funds in the deposit to the judgment debtor.

(d) *Conditions of Liability.* The surety or sureties on a bond, any deposit in lieu of a bond, or any alternate security ordered by the court is subject to liability for all damages and costs that may be awarded against the debtor--up to the amount of the bond, deposit, or security--if:

(1) the debtor does not perfect an appeal or the debtor's appeal is dismissed, and the debtor does not perform the trial court's judgment;

(2) the debtor does not perform an adverse judgment final on appeal; or

(3) the judgment is for the recovery of an interest in real or personal property, and the debtor does not pay the creditor the value of the property interest's rent or revenue during the pendency of the appeal.

(e) *Orders of Trial Court.* The trial court may make any order necessary to adequately protect the judgment creditor against loss or damage that the appeal might cause.

(f) *Effect of Supersedeas.* Enforcement of a judgment must be suspended if the judgment is superseded. Enforcement begun before the judgment is superseded must cease when the judgment is superseded. If execution has been issued, the clerk will promptly issue a writ of supersedeas.

**Credits**
Eff. Sept. 1, 1997.

Notes of Decisions (82)

Rules App. Proc., Rule 24.1, TX R APP Rule 24.1
Current with amendments received through 3/15/2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part I. General Rules (Refs & Annos)

TX Rules of Civil Procedure, Rule 11

Rule 11. Agreements To Be in Writing

Currentness

Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by order of July 15, 1987, eff. Jan. 1, 1988.

**Editors' Notes**

**COMMENT--1988**

The amendment makes it clear that Rule 11 is subject to modification by any other rule of Civil Procedure.

Notes of Decisions (567)

Vernon's Ann. Texas Rules Civ. Proc., Rule 11, TX R RCP Rule 11
Current with amendments received through 3/15/2015

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.